1  Patrick R. Kitchin, Esq. (SBN 162965)
**THE LAW OFFICE OF PATRICK R. KITCHIN**
2  565 Commercial Street, 4th Floor
San Francisco, CA 94111
3  Telephone:   (415) 677-9058
Facsimile:   (415) 627-9076
4  Counsel to Janis Keefe, Corinne Phipps,
Justin Kiser and Renee Davis
5

6  Daniel Feder (State Bar No. 130867)
**THE LAW OFFICES OF DANIEL FEDER**
7   807 Montgomery Street
San Francisco, CA 94133
8  (415) 391-9476
Counsel to Ann Otsuka
9

UNITED STATES DISTRICT COURT

10

NORTHERN DISTRICT OF CALIFORNIA

11

SAN FRANCISCO DIVISION

12

| | |
|---|---|
| ANN OTSUKA, an individual; JANIS KEEFE, an individual; CORINNE PHIPPS, an individual; JUSTIN KISER, an individual; and RENEE DAVIS, an individual, and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>      vs.<br><br>POLO RALPH LAUREN CORPORATION; a Delaware Corporation; POLO RETAIL, LLC., a Delaware Corporation; POLO RALPH LAUREN CORPORATION, a Delaware Corporation, doing business in California as POLO RETAIL CORP; and FASHIONS OUTLET OF AMERICA, INC., a Delaware Corporation<br><br>        Defendants. | Case No.:  C-07-02780-SI<br><br>**[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>• **FRAUD**<br>• **FALSE IMPRISONMENT**<br>• **VIOLATIONS OF LABOR CODE §§ 510 AND 204 (FAILURE TO PAY WAGES EARNED)**<br>• **VIOLATIONS OF LABOR CODE § 221**<br>• **BREACH OF CONTRACT**<br>• **WILLFUL VIOLATIONS OF LABOR CODE §§ 201, 202 AND 203**<br>• **FAILURE TO PROVIDE REST PERIODS (LABOR CODE § 226.7)**<br>• **VIOLATIONS OF LABOR CODE § 226**<br>• **VIOLATIONS OF LABOR CODE § 232**<br>• **VIOLATIONS OF BUSINESS AND PROFESSIONS CODE §§ 17200, ET SEQ.**<br>• **DECLARATORY RELIEF**<br>• **RECOVERY UNDER THE PRIVATE ATTORNEYS GENERAL ACT**<br><br>**JURY TRIAL DEMANDED**<br><br>**Complaint Filed:  May 30, 2006** |

1

Plaintiffs, individually and on behalf of all others similarly situated, for their complaint against defendants Polo Ralph Lauren Corporation, Polo Retail, LLC, Polo Retail Corp., and Fashions Outlet of America, Inc., inclusive, allege upon information and belief, except as to the allegations that pertain to Plaintiffs and their counsel, as follows:

## JURISDICTION AND VENUE

1.      Plaintiff Ann Otsuka is an individual who resides, and at all times relevant has resided, in Santa Clara County, California, who is a citizen of the State of California, and who was employed by Polo Retail Corp., and/or Polo Ralph Lauren Corporation and/or Polo Retail, LLC, in Santa Clara County, California, between approximately May 2004 and approximately November 2004.

2.      Plaintiff Corinne Phipps is an individual who at all times relevant resided in San Francisco County, California, who is a citizen of the State of California, and who was employed by Polo Retail Corp., and/or Polo Retail, LLC, and/or Polo Ralph Lauren Corporation, in San Francisco County, California, between approximately May 2004 and approximately December 2004.

3.      Plaintiff Justin Kiser is an individual who at all times relevant resided in Contra Costa County, California, who is a citizen of the State of California, and who was employed by Fashion Outlets of America, Inc., and/or Polo Retail Corp., and/or Polo Ralph Lauren Corporation and/or Polo Retail, LLC, in San Francisco County, California, between approximately July 2004 and approximately August 2005.

4.      Plaintiff Janis Keefe is an individual who at all times relevant resided in San Francisco County, California, who is a citizen of the State of California, and who was employed by Polo Retail Corp., Polo Retail, LLC, and/or Polo Ralph Lauren Corporation, in San Francisco, California, between approximately May 2004 and December 2004.

5.      Plaintiff Renee Davis is an individual who at all times relevant resided in Riverside County, California, who is a citizen of the State of California, and who was employed by Polo Retail Corp., Polo Retail, LLC, Polo Ralph Lauren Corporation and/or Fashions Outlet of

2

1    America, Inc., in Defendants' factory outlet store in Cabazon, California, between

2    approximately October 2002 and February 2004.

3    6.    Defendant Ralph Lauren Corporation, Inc., is a company organized and existing under

4    the laws of the State of Delaware, and doing business in cities throughout California,

5    including San Francisco.

6    7.    Defendant Polo Retail, LLC, is a company organized and existing under the laws of

7    the State of Delaware, and doing business in cities throughout California, including in San

8    Francisco.

9    8.    Polo Retail Corp. is a business of unknown origin and business form, doing business

10    in California, including in San Francisco, as a fictitious business name of Polo Ralph Lauren

11    Corporation.

12    9.    Fashions Outlet of America, Inc., is a corporation organized and existing under the

13    laws of the State of Delaware, and doing business in cities throughout California, including in

14    San Francisco.

15    10.    This matter was originally filed May 30, 2006, in the Superior Court of California for

16    the City and County of San Francisco.  On May 29, 2007, Defendants removed this matter to

17    the United States District Court for the Northern District of California.

18                        **NATURE OF THE ACTION—SUMMARY**

19    11.    This action is brought by Plaintiffs and all other current and former employees of Polo

20    Ralph Lauren Corporation, Polo Retail, LLC, Polo Retail Corp., and Fashions Outlet of

21    America, Inc., in the State of California who have been injured by the conduct of Defendants

22    as alleged herein below.  These employees were and/or are employed in Polo's full-price

23    retail stores ("**retail stores**") and Polo's factory outlet stores ("**outlet stores**") in California.

24    12.    Defendants have engaged in a long-standing practice of violating the employment

25    rights of their employees.  Those violations are summarized in this paragraph and are further

26    detailed below.

27        a)    Defendants have engaged and continue to engage in fraud toward their employees,

3

i)   Defendants represent to their employees in their **retail stores** that they will be paid a base wage, representing an hourly wage multiplied by all hours worked, plus commissions on sales exceeding sales targets set by Defendants.  Defendants' employees, including Plaintiffs Ann Otsuka, Janis Keefe, Corinne Phipps and Justin Kiser, relied on these representations, which, in fact, were false.  In violation of their promises, Defendants instituted two programs in their **retail stores** that permitted Defendants to take back wages previously paid and/or to offset future wages owed to sales associates.  These two programs involve, first, an **arrears program** under which Defendants take back wages paid to employees who fail to meet Defendants' unreasonably high sales targets, and, second, a **product return program** that permits Defendants to take back wages paid to employees when products they have sold are returned to the company for any reason and at any time.

ii)  Defendants' also falsely promise employees in their **retail stores** that they would perform an end-of-the-year wage reconciliation to determine which employees are eligible to receive premium overtime compensation for worked performed during the entire course of the previous year.  (As described herein, the reconciliation constitutes a separate violation of California law relating to the timely payment of wages.)  This promise is made to all of Defendants' employees through Defendants' Sales Associate Handbook at page 7.  Defendants have failed to fulfill that promise, all to the detriment of their employees.

iii) Defendants represent to all of their employees, in both their **retail** and **outlet** stores that they will be permitted to take two 15-minute rest breaks during an eight-hour shift.  This representation is made in Defendants' Retail Employee Handbook on page 18, which is provided to all

4

employees, and it is also made during the hiring process.  Defendants'
employees, including Plaintiffs named herein, relied on this representation,
when, in fact, it is false.  Defendants do not provide employees with all
mandatory rest breaks and Plaintiffs and the Class have been injured as a
result of Defendants' misrepresentations.

iv) Defendants routinely fraudulently manipulate Plaintiffs' and the Class's
time records to keep Defendants' employees from receiving wages for all
hours they worked.

b)  Defendants routinely require all of their employees to perform work "off the
clock" for which they are not paid.

i)  Defendants force employees in both their **retail** and **outlet** stores to clock
out of the Defendants' timekeeping system, and/or Defendants shut down
the timekeeping system, and then require employees to perform work
without compensation.

ii)  Defendants require employees in both their **retail** and **outlet** stores to stand
in line and/or remain in their locked and/or door-alarmed stores, for up to
one half hour to undergo a loss prevention search by managers after the
employees have clocked out at the end of their shifts.  They are warned that
if they attempt to leave the store through the designated exit before a
manager authorizes them to leave, an alarm will sound, and/or that they
will be unable to leave the stores until a manager unlocks the doors for
them.  They are warned that they can be disciplined or terminated if they
attempt to leave the store through any exit until a manager has conducted
his or her loss prevention search at the end of their shift.  In short,
Defendants' employees are subjected to false imprisonment on a daily
basis:  they are confined by their supervisors to the interior of their stores
for an appreciable period of time each day without compensation under the

5

express and unequivocal threat that they will be fired or reprimanded if they leave the store before a manger inspects them, and/or they are locked inside their stores until a manager releases them. Plaintiffs and the Class are also warned in Defendants' Retail Employee Handbook, at page 26, that all packages and bags are subject to inspection before the employee may exit the store, and that this requirement is "a condition of employment." Defendants thus intend to confine, and do confine, their employees through the unlawful assertion that Defendants have the legal right to detain employees within the stores' premises after the employees' work shifts are over.

iii) Defendants also require their employees to appear for work at a certain hour, or to return to work after a meal break at a certain time, and then make their employees wait for up to 20 minutes or more outside the store before opening the employee entrance door to permit them to begin or continue working. Employees are not compensated for this waiting time. Defendants' failure to pay their employees for all hours worked results in further violations of California's premium overtime compensation laws.

c) Defendants routinely fail to provide their employees with mandatory rest breaks, sometimes warning employees that they will not sell enough products to meet their sales goals if they waste time off the selling floor. At other times, Defendants insufficiently staff their stores so that employees are required to forego rest breaks to properly serve Defendants' customers. Defendants were and are required to pay each employee who missed a rest period one additional hour of pay, and yet they have failed to do so.

d) Defendants routinely fail to pay wages to employees when those wages are earned, and in their **retail stores** maintain an unconscionable and illegal arrears program under which Defendants collect back from employees' wages they have earned by

6

debiting their later earned commissions.  If an employee fails to meet his or her sales goals, Defendants take from subsequent wages the difference between the hourly rate promised to employees and a percentage of the total value of products sold by the employees, in the case of Plaintiffs Otsuka, Keefe, Phipps and Kiser, 8% of sales.  Because Defendants have misclassified their employees as bona fide commissioned employees, Defendants' application of a commission-based wage arrears system is illegal, inequitable and unconscionable.

e) Defendants maintain an illegal and unconscionable product returns policy in their **retail stores** that permits Defendants to collect from their employees' wages previously paid by debiting their later earned commissions. Because Defendants have misclassified their employees as bona fide commissioned employees, Defendants' application of a commission-based product return system is illegal, inequitable and unconscionable.

f) Defendants have established a wage system they call "Base Rate Against Commission" in their **retail stores**, which they characterize as a *bone fide* commission based system, when it fact it is not.  Defendants' wage system is an illegal scheme designed to avoid the wage rules and overtime regulations set forth in Industrial Welfare Commission Order 7-2001 and in the California Labor Code.

  i) A great number of Defendants' employees do not earn sufficient commission to be classified as exempt employees under California law and yet are denied premium overtime wages due to them.

  ii) Defendants set the target sales goals at such a high level that many, if not most, employees consistently earn commissions that are at or below the value of the Defendants' draw (the promised hourly wage times hours worked).  They are therefore entitled to premium overtime compensation for hours worked in excess of eight per day and/or 40 per week.

  iii) Consequently, Defendants "Base Rate Against Commission" system is

7

not bona fide.  It is knowingly designed to misclassify Defendants' employees to avoid paying them premium overtime wages and to avoid other wages rules applicable to Defendants' employees.  In the alternative, Defendants routinely fail to pay premium overtime wages to their purported commission-based employees who work in excess of eight hours per day or more than 40 hours per week, who do not earn more than 50% of their wages through commissions, and who do not earn 1.5 times the applicable minimum wage.

g) In conjunction with their "Base Rate Against Commission" system, Defendants have promised to conduct an annual review of their **retail store** employees' right to receive premium overtime wages under Federal law, purporting to evaluate their employees' right to premium overtime compensation at the end of Defendants' fiscal year.  Defendants use this promise of a reconciliation each year as a means to avoid paying wages to their employees in a timely manner in accordance with California law.  Furthermore, Defendants fail to perform, and/or fail to consistently perform, this end of the year evaluation and fail to pay wages due to their employees.  Defendants' illegal wage system results in the additional failure to pay former employees all of their wages due upon termination.

h) Defendants fail to maintain proper records memorializing the hours worked by their employees in both their **retail** and **outlet** stores, the compensation paid to them, and the debits made to the wages of **retail** store employees, and fail to make accurate payroll records available upon request to any of their employees.

i) In both their **retail** and **outlet** stores, Defendants expressly prohibit their employees from disclosing their wages to fellow employees in violation of California labor laws.  Defendants' violation of California's labor laws governing an employee's right to discuss his or her wages with others is designed and/or operates to keep their employees from learning that Defendants are routinely and

8

consistently violating the wage and hour laws detailed herein

j) In both their **retail** and **outlet** stores, Defendants have violated Labor Code § 203 by consistently failing to timely pay employees all wages due upon resignation and/or termination.

k) In both their **retail** and **outlet** stores, Defendants have violated Labor Code § 204 by consistently failing to pay employees in a timely way.

l) In both their **retail** and **outlet** stores, Defendants have violated Labor Code § 206.5 by consistently requiring employees to sign documents releasing them from the obligation to pay wages owed to employees; e.g., the employment handbooks used in both types of stores in California.

m) In their **retail** and **outlet** stores, Defendants have violated Labor Code § 208 by consistently failing to pay all wages due terminated employees at the place of discharge.

n) In their **retail** stores, Defendants have violated Labor Code § 221 by consistently engaging in a practice of taking back wages previously paid to employees.

o) In their **retail** stores, Defendants have violated Labor Code § 223 by consistently agreeing to pay employees certain wages and then though the use of deception and fraudulent payroll practices has secretly paid employees lower wages than promised.

p) In both their **retail** and **outlet** stores, Defendants have violated Labor Code § 226(a) by consistently failing to provide the accurate itemized statement of wages on employees' pay stubs as required under California law.

q) In both their **retail** and **outlet** stores, Defendants have violated Labor Code § 226.7 by consistently failing to provide employees with rest breaks during their working shifts.

r) In their **retail** stores, Defendants have violated Labor Code § 227 by promising employees that they will provide medical and dental insurance to them after they

9

have worked for the company for 90 calendar days and then have consistently breached that promise by failing to make payments into a health insurance fund covering those benefits within 90 days.

s)  In both their **retail** and **outlet** stores, Defendants have violated Labor Code § 232(c) by prohibiting employees from disclosing or discussing their wages, and, based on information and belief, have formally disciplined or otherwise discriminated against employees who disclose the amount of their wages.

t)  In both their **retail** and **outlet** stores, Defendants have violated Labor Code § 432.5 by consistently requiring employees to sign documents, including the company's employee manuals that demand employees agree in writing to illegal policies and practices.

u)  In both their **retail** and **outlet** stores, Defendants have violated Labor Code § 510 by consistently failing to pay premium overtime wages to its employees.

v)  Defendants have violated Labor Code § 976 by consistently publishing misleading statements about the commissions it promises to employees in their **retail stores**.

w)  In their **retail** stores, Defendants have violated Labor Code § 1194 by consistently requiring employees to agree to waive their statutory right to premium overtime wages by acknowledging in writing that they understand they are not entitled to the timely payment of premium overtime wages.

x)  In both their **retail** and **outlet** stores, Defendants have violated Labor Code § 1199 by consistently violating provisions of Labor Code §§ 1171, et seq.

13.  In summary, Defendants have used fraud, deception and credible threats to maintain a work force denied of the basic employment rights guaranteed under California law.

## ANN OTSUKA

14.  Ann Otsuka worked for Polo Retail Corp., and/or Polo Ralph Lauren Corporation, and/or Polo Retail, LLC, between approximately May 2004 and approximately November

10

1   2004 in Defendants' Palo Alto retail store, as a sales associate in Defendants' Home

2   Collection Department.

3   15.      When she began working for Defendants, Tin Hua, General Manager, told her she

4   would be compensated as a draw versus commission employee at the initial rate of $12.00 per

5   hour, with no commission.  Defendants subsequently lowered Otsuka's hourly rate to $10.15,

6   plus 8% commission on sales.  She was told she would receive greater compensation for sales

7   made in excess of her target sales goals, based on a commission rate of 8% of sales.  She was

8   also told and understood that her base rate, based on her hourly wage multiplied by the total

9   hours she worked, would serve as a guaranteed wage payment. Defendants made this

10  representation to Otsuka in Defendants' Sales Associate Handbook and during the job

11  interview process.  She was also told that her wages would increase as she increased her sales.

12  She was told that if she failed to sell a sufficient quantity of merchandise, she would be

13  reprimanded.  She was also instructed through Polo's Sales Associate Handbook that she

14  could be terminated if she failed to meet her sales goals. She was not told and never

15  understood the wage system to mean that she could be forced to pay back some of her earned

16  wages if she failed to meet her sales goals.  Nevertheless, Defendants established an arrearage

17  program after Otsuka was hired that permitted Defendants' to obtain previously paid wages

18  from Ann Otsuka through payroll deductions, which were insufficiently memorialized and

19  communicated to Otsuka.  Otsuka never agreed to this arrearages program and was never

20  legally bound by its terms.  When she sought guidance from Phoebe Morales (Store Manager)

21  and Ha'aheo Zablan (Home Collection/Men's Manager) about the new program, they told her

22  that they didn't really understand how it worked.  These managers informed Otsuka that this

23  arrearage program should have been discussed with Otsuka before she was hired and

24  acknowledged to her that her pay records did not contain sufficient information to permit

25  them to understand and explain how the arrearages had been calculated.  Otsuka's paycheck

26  stub had insufficient information describing the wages withheld, leading Otsuka to conclude

27  that payroll had simply made an error in calculating her wages.  When she asked for a

11

complete accounting of her wages and how the arrearage deductions had been calculated, she

was denied sufficient accounting information to determine how her reduced wages had been

calculated.  Otsuka relied to her detriment on the representations by Defendants regarding the

nature of her wages and was injured by Defendants' misrepresentations when she was in fact

paid less than promised.  Furthermore, when she was hired by Defendants, she was required

to sign her acknowledgement that she had received and understood the policies she alleges

herein were and are illegal, and that purported to relieve Defendants of liability for their

illegal conduct, including those set out in the Defendants' Retail Employee Handbook.  By

way of example, Defendants' Retail Employee Handbook (2002) provides that it is

unacceptable for an employee to divulge "personal salary arrangements to other Polo Retail

Corporation associates."  Divulging such information, the Handbook continues, "may lead to

disciplinary action or termination. .."

16.     In addition, when Otsuka was hired, she was promised healthcare insurance after she

worked for 90 days.  Polo did not fulfill that promise.  As set forth below, Otsuka seeks

penalties only for this violation of the provisions set forth in the California Private Attorneys

General Act.

17.     Defendants also debited Otsuka's wages whenever a customer returned an item she

sold, regardless of whether the return was made within a day or within several months, and

regardless whether the item was deemed to be defective.  By the time Defendants applied the

charge back debit to Otsuka, she had earned a commission and/or the wage on the items

returned or the wage earned, and was entitled to retain those earnings.  Defendants also

routinely failed to provide her with an accounting of how and why her wages were being

debited, despite her requests.

18.     During the course of Ann Otsuka's employment with Defendants, she did not always

sell a sufficient quantity of Polo merchandise to meet her sales target set by Defendants.

Based on information and belief, on several occasions, she sold less than 50% of the sales

target set by Defendants.  Consequently, less than one half of her compensation represented

12

1    commissions.  Therefore, she was entitled to receive premium overtime compensation for

2    hours worked in excess of eight hours per day or 40 hours per week, during those periods in

3    which she was not an exempt employee.  (IWC Order 7-2001.)  Ann Otsuka worked hours in

4    excess of eight per day and/or 40 hours per week on a regular basis, both recorded and

5    unrecorded, during periods when she was entitled to premium overtime compensation.  In

6    addition, Otsuka's compensation was such that her commission earnings were generally at or

7    below her hourly-based draw.  Defendants failed to provide all of those premium wages to

8    Plaintiff Ann Otsuka as required under California law.

9    19.    Defendants' Sales Associate Handbook specifically provides:

10          "Sales Associates and Senior Sales Associates are not eligible to receive a

11          premium overtime compensation rate.  However, a sales commission

12          reconciliation will be performed at the close of each fiscal year to ensure each

13          associate is compliant with Federal Labor guidelines stipulating that the

14          majority of their pay must be in the form of commission.  If an associate is

15          found to be overtime eligible at that time, then the appropriate amount of

16          overtime compensation will be paid to that associate."

17    20.    This payroll policy is illegal under California law and was applied to Ann Otsuka

18    during the course of her employment.  By unlawfully delaying the "reconciliation" for up to a

19    year, Defendants failed to pay Ann Otsuka in a timely fashion.  In fact, while Ann Otsuka

20    terminated her employment with Defendants in November 2004, Defendants have never paid

21    her all the premium overtime compensation she was and is owed.  Defendants' representation

22    that they would perform an end-of-the-year reconciliation, upon which Otsuka reasonably

23    relied, was not fulfilled.  Otsuka was entitled to premium compensation that was not paid to

24    her and that remains unpaid.

25    21.    On many days that Ann Otsuka worked, she was required to perform work without

26    compensation, working off the clock at the direction of, or with the knowledge and

27    acquiescence of, Defendants.  Often, Defendants would instruct her not to clock out at the end

13

1  of a long shift, because her managers would adjust her stop work time later.  Based on

2  information and belief, Defendants actually shut down the timekeeping system on occasions

3  when Otsuka was still working.  Defendants failed to keep accurate records of the hours Ann

4  Otsuka worked and failed to report the time worked to her.  In fact, Ann Otsuka was not paid

5  for all of the hours she worked.

6  22.    In addition, on a daily basis, Defendants required Ann Otsuka to clock out and then

7  wait for a manager to check her purse and bags to make sure she and the other employees

8  leaving the store were not attempting to steal and smuggle merchandise out.  Ann Otsuka

9  routinely had to wait with other sales associates each day that she worked for the mandatory

10  management inspection.  She regularly was required to wait for 10 to 20 minutes for the

11  inspection and was never compensated for that time.  The management team and Kristi

12  Mogel, Human Relations Manager instructed her that she was not to use the customer exit

13  closest to the interior of the mall in which the store is located.  When the store was closed at

14  the end of the day, that door was locked by a manager and could not be opened without a key.

15  Otsuka and the other sales associates did not have a key to that customer door.  The other exit,

16  also a customer door, was deemed to be the only door Otsuka and other employees were

17  permitted to use, when entering or exiting the store. When the store was closed at the end of

18  the day, that door was also locked by a manager and could not be opened without a key.

19  Otsuka and the other sales associates did not have a key to that customer door either.  Otsuka

20  was warned by her managers she would be reprimanded or terminated if she left the store

21  premises before a manager had inspected her.  Defendants' Sales Associate Handbook was

22  provided to Otsuka, and it stated that this inspection procedure was a condition of

23  employment.  She was, in fact, at the end of her work shift physically confined to the interior

24  of the store and could not leave the store until she was inspected and a manager had unlocked

25  the employee exit.  This daily experience was frustrating.  She was led to believe and did

26  believe that Defendants' had the legal right to detain her in the store after her shift was over.

27

1    She missed appointments she had scheduled after working hours because she was forced to

2    wait within the confines of the store for upwards of 20 minutes.

3    23.    Ann Otsuka was not permitted to take rest breaks during the days that she worked.

4    Her managers harassed her and her co-employees when she and they attempted to take rest

5    breaks, telling them that they did not need to take the required breaks and that they would fall

6    behind on sales if they took the breaks. Otsuka felt harassed and intimidated by the comments

7    of her managers and did not take her mandatory breaks because she feared she would lose her

8    job, or be harassed, if she did.

9                              **CORINNE PHIPPS**

10   24.    Corinne Phipps, previously known as Corinne Mullen, was employed by Polo Retail

11   Corp, and/or Polo Ralph Lauren Corporation and/or Polo Retail, LLC, in Polo Ralph Lauren's

12   retail store in San Francisco, California, between May 2004 and December 2004.  She worked

13   in Defendants' Home Collections Department, where she sold products for the home.

14   25.    When she began working for Defendants, she was told by her store's General

15   Manager, Tin Hua, she would be compensated as a "draw versus commission" employee at

16   $12.75 per hour.  She was told that her wages would increase as she increased her sales,

17   through the payment of commissions.  She was also told that her hourly rate would constitute

18   a base guaranteed wage and that she would receive a commission on all sales in excess of her

19   company-set sales target.  Defendants made these representation to Phipps in Defendants'

20   Sales Associate Handbook and during the job interview process.  She was told that if she

21   failed to sell a sufficient quantity of merchandise, she could be terminated.  She was not told

22   and never understood the wage system to mean that she could be forced to pay back some of

23   her earned commission wages if she failed to meet her sales goals.  Nevertheless, Defendants

24   established an arrears program that authorized Defendants' to obtain previously paid

25   commission wages from Phipps through payroll deductions that were insufficiently

26   memorialized and communicated to Phipps.  She never agreed to this arrears program and was

27   not legally bound by its terms.  Phipps relied to her detriment on the representations by

15

1    Defendants regarding the nature of her wages and was injured by Defendants'

2    misrepresentations when she was forced to resign out of protest to this inequitable and illegal

3    wage debit program.

4    26.    Furthermore, when she was hired by Defendants, she was required to sign her

5    acknowledgement that she had received and understood the policies she alleges herein were

6    and are illegal, and that purported to relieve Defendants of liability for their illegal conduct,

7    including those set out in Defendants' Retail Employee Handbook.  By way of example,

8    Defendants' Retail Employee Handbook (2002) provides that it is unacceptable for an

9    employee to divulge "personal salary arrangements to other Polo Retail Corporation

10   associates."  Divulging such information, the Handbook continues, "may lead to disciplinary

11   action or termination. .."

12   27.    In addition, when Phipps was hired, she was promised healthcare insurance after she

13   worked for 90 days.  Polo did not fulfill that promise.  As set forth below, Phipps seeks

14   penalties only for this violation of the provisions set forth in the California Private Attorneys

15   General Act.

16   28.    Defendants also debited Phipps's wages whenever a customer returned an item she

17   sold, regardless of whether the return was made within a day or within several months, and

18   regardless whether the item was deemed to be defective.  Defendants' also routinely failed to

19   provide her with an accounting of how and why her wages were being debited.

20   29.    During the course of Phipps's employment with Defendants, she did not always sell a

21   sufficient quantity of Polo merchandise to meet her sales target set by Defendants.  On several

22   occasions, she sold less than 50% of the sales target set by Defendants.  Consequently, less

23   than one half of her compensation represented commissions.  Therefore, she was entitled to

24   receive premium overtime compensation for hours worked in excess of eight hours per day or

25   40 hours per week, during those periods in which she was not an exempt employee.  (IWC

26   Order 7-2001.)  Phipps worked hours in excess of eight per day and/or 40 hours per week on a

27   regular basis, both recorded and unrecorded, during periods when she was entitled to premium

16

1    overtime compensation.  In addition, Phipps's compensation was such that her commission

2    earnings were generally at or below her hourly-based draw, based on Defendants' practice of

3    setting sales goals impossibly high.  Defendants failed to provide all premium wages to

4    Plaintiff Corinne Phipps as required under California law.

5    30.    Defendants' Sales Associate Handbook specifically provides:

6            "Sales Associates and Senior Sales Associates are not eligible to receive a

7            premium overtime compensation rate.  However, a sales commission

8            reconciliation will be performed at the close of each fiscal year to ensure each

9            associate is compliant with Federal Labor guidelines stipulating that the

10           majority of their pay must be in the form of commission.  If an associate is

11           found to be overtime eligible at that time, then the appropriate amount of

12           overtime compensation will be paid to that associate."

13   31.    This payroll policy is illegal under California law and was applied to Corinne Phipps

14   during the course of her employment.  By unlawfully delaying the "reconciliation" for up to a

15   year, Defendants failed to pay Corinne Phipps in a timely fashion.  In fact, while Corinne

16   Phipps terminated her employment with Defendants in December 2004, Defendants have not

17   paid her all of the premium overtime compensation she was and is owed.  Defendants'

18   representation that they would perform this end-of-the-year reconciliation, upon which Phipps

19   reasonably relied, was not fulfilled.

20   32.    On many days that Corinne Phipps worked, she was required to perform work without

21   compensation, working off the clock at the direction of and/or with the knowledge and

22   acquiescence of Defendants.  Sometimes, managers in her store, including Theresa Cruz

23   (Operations Manager) and Valerie Harrison (Department Manager) clocked her out while she

24   was still performing work.  On other occasions, Defendants, through Operations Manager

25   Theresa Cruz, would write down the hours she worked by fraudulently manipulating her time

26   records so they would reflect less time worked.  On still other occasions, Defendants'

27                                                                                            17

1    managers shut down the timekeeping system while Phipps was still working and, thus, failed

2    to accurately record her hours of work.  She was not paid for any of this off-the-clock work.

3    33.    On a daily basis, Defendants required Corinne Phipps to clock out and then wait at the

4    employee exit for a manager to check her purse and bags to make sure she and the other

5    employees were not attempting to steal and smuggle merchandise out of the store.  Corinne

6    Phipps routinely had to wait with other sales associates each day that she worked near the

7    employee exit for the mandatory management inspection.  She regularly was required to wait

8    for 10 to 15 minutes for the inspection and was never compensated for that time. She was

9    instructed by manages Theresa Cruz, and Valerie Harrison that she was not to use any

10   customer exit to leave the store and that if she tried to leave the store through the employee

11   exit before she had been inspected an alarm would sound and she would or could be

12   terminated.  Defendants' Sales Associate Handbook was provided and/or shown to Phipps,

13   and it stated that this inspection procedure was a condition of employment.  She felt herself to

14   be physically confided to the interior of the store and feared leaving the store except as

15   directed by her supervisors.  She was led to believe her employer had the legal right to retain

16   her within the store.  The experience was often frustrating and humiliating.  She missed

17   appointments she had scheduled after working hours because she was forced to wait by the

18   employee exit for upwards of 30 minutes.  Based on her observations and discussions with

19   other employees who were likewise forced to wait for up to 30 minutes, they shared her sense

20   of frustration and humiliation.

21   34.    At other times, Corinne Phipps was required to report to work at a certain hour and

22   then required to wait outside the store for up to 20 minutes for a manager to open the

23   employee entrance for her to begin work.  On those occasions, her pay was docked and she

24   was deemed late to work.  At other times, she was required to wait up to 20 minutes to be

25   granted access to the store after she took a meal break.  Defendants' failure to permit her to

26   begin work at the time she was required to begin, at the beginning and middle of her work

27

18

1  shift caused her to lose wages she was entitled to earn.  Corinne Phipps was not paid wages

2  for this waiting time that she suffered on behalf of Defendants.

3  **JUSTIN KISER**

4  35.    Justin Kiser was employed by Fashions Outlet of America, Inc., and/or Polo Ralph

5  Lauren Corporation and/or Polo Retail, LLC, between July 2004 and August 2005 in

6  Defendants' San Francisco retail store, working as a sales associate in Polo's Men's

7  Department and Men's Sport Department.

8  36.    When he began working for Defendants, he was told by Tin Hua, Polo's General

9  Manager, he would be compensated as a draw versus commissioned employee at the initial

10  rate of $12.75 per hour. He was told that his wages would increase as he increased his sales

11  through the payment of commissions.  He was also told that his hour rate would constitute a

12  base guaranteed wage and that he would receive commissions on sales in excess of this

13  company-set sales target.  Defendants made these representations to Kiser in Defendants'

14  Sales Associate Handbook and during the job interview process.  He was told that if he failed

15  to sell a sufficient quantity of merchandise, he could be terminated.  He was not told and

16  never understood the wage system to mean that he could be forced to pay back some of his

17  earned commission wages if he failed to meet his sales goals.  Nevertheless, Defendants

18  established an arrears program that authorized Defendants' to obtain previously paid wages

19  from Kiser through payroll deductions, which were insufficiently memorialized and

20  communicated to Kiser. He never agreed to this arrears program and was not legally bound by

21  its terms.  Kiser relied to his detriment on the representations by Defendants regarding the

22  nature of his wages and was injured by Defendants' misrepresentations when he was in fact

23  paid less than promised.

24  37.    Furthermore, when he was hired by Defendants, he was required to sign his

25  acknowledgement that he had received and understood the policies he alleges herein were and

26  are illegal, and that purported to relieve Defendants of liability for their illegal conduct

27  including those set out in the Defendants' Retail Employee Handbook.  By way of example, 19

1    Defendants' Retail Employee Handbook (2002) provides that it is unacceptable for an

2    employee to divulge "personal salary arrangements to other Polo Retail Corporation

3    associates."  Divulging such information, the Handbook continues, "may lead to disciplinary

4    action or termination. .."

5    38.    Based on information and belief, during the course of Justin Kiser's employment with

6    Defendants, he did not always sell a sufficient quantity of Polo merchandise to meet the sales

7    target set by Defendants every pay period.  Based on information and belief, on at least one

8    occasion, he earned less than 50% of the sales target set by Defendants.  Consequently, less

9    than one half of his compensation represented commissions.  Therefore, he was entitled to

10   receive premium overtime compensation for hours worked in excess of eight hours per day or

11   40 hours per week during those pay periods in which he was not properly classified as an

12   exempt employee.  Justin Kiser worked hours in excess of eight hours per day and/or 40 hours

13   per week on a regular basis, including during periods of time he failed to earn one half of his

14   wages as commissions.  In addition, based on information and belief, Kiser's compensation

15   was such that his commission earnings were generally at or below his hourly-based draw,

16   based on Defendants' practice of setting sales goals impossibly high.  Defendants failed to

17   provide those premium wages to Plaintiff Justin Kiser as required under California law.

18   39.    Defendants' Sales Associate Handbook specifically provides:

19          "Sales Associates and Senior Sales Associates are not eligible to receive a

20          premium overtime compensation rate.  However, a sales commission

21          reconciliation will be performed at the close of each fiscal year to ensure each

22          associate is compliant with Federal Labor guidelines stipulating that the

23          majority of their pay must be in the form of commission.  If an associate is

24          found to be overtime eligible at that time, then the appropriate amount of

25          overtime compensation will be paid to that associate."

26   40.    This payroll policy is illegal under California law and was applied to Justin Kiser

27   during the course of his employment.  By unlawfully delaying the "reconciliation" for up to a

20

1   year, Defendants failed to pay Justin Kiser in a timely fashion.  In fact, while Justin Kiser

2   terminated his employment with Defendants in about August 2005, Defendants have not paid

3   him all of the premium overtime compensation he earned.  Defendants' representation that

4   they would perform this reconciliation was not fulfilled.

5   41.     On many days that Justin Kiser worked, he was required to perform work without

6   compensation, working off the clock at the direction and/or with the knowledge and

7   acquiescence of Defendants.  On a regular basis, managers in his store would shut down the

8   timekeeping computer and therefore clock him out while he was still performing work.  On

9   other occasions, Defendants, through Operations Manager Theresa Cruz, would write down

10  the hours he worked by fraudulently manipulating his time records so they would reflect less

11  time worked.

12  42.     On a daily basis, Defendants required Justin Kiser to clock out and then wait at the

13  employee exit for a manager to check his bags to make sure he and the other employees were

14  not attempting to steal and smuggle merchandise out of the store.  Justin Kiser routinely had

15  to wait with other sales associates each day that he worked near the employee exit for the

16  mandatory management inspection.  He regularly was required to wait for 10 to 15 minutes

17  for the inspection, and as long as 30 minutes, and was never compensated for that time.

18  General Manager Tin Hua instructed him that he was not to use the customer exit to leave the

19  store and that if he tried to leave the store through the employee exit before he had been

20  inspected the alarm would sound and he would be terminated.  Defendants' Sales Associate

21  Handbook was provided to Kiser, and it stated that this inspection procedure was a condition

22  of employment.  He felt himself to be physically confided to the interior of the store and

23  feared leaving the store except as directed by his supervisors.  The experience was often

24  frustrating and humiliating.  He was led to believe that his employers had the legal right to

25  detain him in the store after his shift was over.  He missed appointments he had scheduled

26  after working hours because he was forced to wait by the employee exit for upwards of 30

27  minutes.  Based on his observations and discussions with other employees who were likewise

21

1   forced to wait for up to 30 minutes, they shared his sense of frustration and humiliation.

2   43.    At other times, Justin Kiser was required to report to work at a certain hour and then

3   required to wait outside the store for up to 20 minutes for a manager to open the employee

4   entrance for him to begin work.  At other times, Justin Kiser was required to wait up to 20

5   minutes to be granted access to the store after he took a meal break.  Defendants' failure to

6   permit him to begin work at the time he was required to begin at the beginning and middle of

7   his work shift caused him to lose wages he was entitled to earn.  Justin Kiser was not paid

8   wages for this waiting time that he suffered on behalf of Defendants.

9   44.    Justin Kiser was not permitted to take all of his mandatory rest breaks during the days

10  that he worked.   Managers, including Rosalinda Walwork and Theresa Cruz, harassed him

11  and his co-employees when he and they attempted to take rest breaks, telling them that they

12  did not need to take the required breaks and that they would fall behind on sales if they took

13  the breaks. Justin Kiser felt extremely harassed and intimidated by the comments of his

14  managers and did not take his mandatory breaks because he feared he would lose his job if he

15  did.

16  45.    Defendant also debited Kiser's wages whenever an item he sold was returned by a

17  customer, regardless of whether the return was made within a day or within several months,

18  and regardless whether the item was deemed to be defective.  By the time Defendants' applied

19  the charge back debit to Kiser, he had earned the commission or wages on the items returned

20  or the work performed, and he was entitled to retain those earnings.   Defendants' routinely

21  failed to provide him with an accounting of how and why his wages were being debited.

22                                      **JANIS KEEFE**

23  46.    Janis Keefe, previously known as Janis Howay, worked for Polo Retail Corp., and/or

24  Polo Ralph Lauren Corporation and/or Polo Retail, LLC, between approximately May 2004

25  and approximately January 2005 in Defendants' San Francisco retail store, as a sales associate

26  in Polo's Men's Department and Men's Sport Department.

27                                                                                    22

47.     When she began working for Defendants, Keefe was told by her store's General manager, Tin Hua, she would be compensated as a "draw versus commission" employee at $12.75 per hour.  She was told that her wages would increase as she increased her sales through the payment of commissions.  She was also told that her hourly rate would constitute a base guaranteed wage and that she would receive commissions on sales in excess of the company-set sales targets.  Defendants made these representations to Keefe in Defendants' Sales Associate Handbook and during the job interview process. She was told that if she failed to sell a sufficient quantity of merchandise, she could be terminated.  She was not told and never understood the wage system to mean that she could be forced to pay back some of her earned wages if she failed to meet her sales goals.  Nevertheless, Defendants established an arrears program after Keefe was hired that authorized Defendants' to obtain previously paid commission wages from Keefe through payroll deductions, which were insufficiently memorialized and communicated to Keefe.  She never agreed to this arrears program and was not legally bound by its terms.

48.     Furthermore, when she was hired by Defendants, she was required to sign her acknowledgement that she had received and understood the policies she alleges herein were and are illegal, and that purported to relieve Defendants of liability for their illegal conduct including those set out in the Defendants' Retail Employee Handbook.  By way of example, Defendants' Retail Employee Handbook (2002) provides that it is unacceptable for an employee to divulge "personal salary arrangements to other Polo Retail Corporation associates."  Divulging such information, the Handbook continues, "may lead to disciplinary action or termination. .."

49.     In addition, when Keefe was hired, she was promised healthcare insurance after she worked for 90 days.  Polo did not fulfill that promise.  As set forth below, Keefe seeks penalties only for this violation of the provisions set forth in the California Private Attorneys General Act.

23

50.     During the course of Janis Keefe's employment with Defendants, she did not always sell a sufficient quantity of Polo merchandise to meet her sales target set by Defendants.  On several occasions, she sold less than 50% of the sales target set by Defendants.  Consequently, less than one half of her compensation represented commissions.  Therefore, she was entitled to receive premium overtime compensation for hours worked in excess of eight hours per day or 40 hours per week.  Janis Keefe worked hours in excess of eight per day and/or 40 hours per week on a regular basis.  In addition, Keefe's compensation was such that her commission earnings were generally at or below her hourly-based draw, based on Defendants' practice of setting sales goals impossibly high.  Defendants failed to provide all premium wages to Plaintiff Janis Keefe as required under California law.

51.     Defendants' Sales Associate Handbook specifically provides:

"Sales Associates and Senior Sales Associates are not eligible to receive a premium overtime compensation rate.  However, a sales commission reconciliation will be performed at the close of each fiscal year to ensure each associate is compliant with Federal Labor guidelines stipulating that the majority of their pay must be in the form of commission.  If an associate is found to be overtime eligible at that time, then the appropriate amount of overtime compensation will be paid to that associate."

52.     This payroll policy is illegal under California law and was applied to Janis Keefe.  By unlawfully delaying the "reconciliation" for up to a year, Defendants failed to pay Janis Keefe in a timely fashion.  In fact, while Janis Keefe terminated her employment with Defendants in or about January 2005, Defendants have never paid her all premium overtime compensation she was and is owed.  Defendants' representation that they would perform this reconciliation was not fulfilled.

53.     On many days that Janis Keefe worked, she was required to perform work without compensation, working off the clock at the direction and/or with the knowledge and acquiescence of Defendants.  Sometimes, managers in her store, including Theresa Cruz,

24

1   clocked her out while she was still performing work.  On other occasions, Defendants, though

2   Theresa Cruz, would write down the hours she worked by fraudulently manipulating her time

3   records so they would reflect less time worked.  On other occasions, based on information and

4   belief, Defendants' managers shut down the timekeeping system when Keefe was still

5   working.  Defendants failed to keep accurate records of the hours Keefe worked and failed to

6   report the time to her.  She was not paid for all the hours she worked.

7   54.       On a daily basis, Defendants required Janis Keefe to clock out and then wait at the

8   employee exit for a manager to check her purse and bags to make sure she and the other

9   employees were not attempting to steal and smuggle merchandise out of the store.  Janis

10  Keefe routinely had to wait with other sales associates each day that she worked near the

11  employee exit for the mandatory management inspection.  She regularly was required to wait

12  for 10 to 15 minutes for the inspection and was never compensated for that time. She was

13  instructed by Theresa Cruz, and Tin Hua that she was not to use a customer exit to leave the

14  store and that if she tried to leave the store through the employee exit before she had been

15  inspected, she could be terminated.  Defendants' Sales Associate Handbook was provided

16  and/or shown to Keefe, and it stated that this inspection procedure was a condition of

17  employment.  She felt herself to be physically confined to the interior of the store and feared

18  leaving the store except as directed by her supervisors.  The experience was often frustrating

19  and demeaning.  She was led to believe that her employers had the legal right to detain her

20  within her store after her work shift was over.  She missed appointments she had scheduled

21  after working hours because she was forced to wait by the employee exit for upwards of 30

22  minutes.  Based on her observations and discussions with other employees who were likewise

23  forced to wait for up to 30 minutes, they shared her sense of frustration as well.

24  55.       At other times, Janis Keefe was required to report to work at a certain hour and then

25  required to wait outside the store for up to 20 minutes for a manager to open the employee

26  entrance for her to begin work.  At other times, Janis Keefe was required to wait up to 20

27  minutes to be granted access to the store after she took a meal break.  Defendants' failure to

25

1    permit her to begin work at the time she was required to begin work at the beginning and

2    middle of her work shift caused her to lose wages she was entitled to earn.  Janis Keefe was

3    not paid wages for this waiting time that she suffered on behalf of Defendants.

4    56.    Janis Keefe was not permitted to take rest breaks during the days that she worked.

5    Her managers harassed her and her co-employees when she and they attempted to take rest

6    breaks, telling them that they did not need to take the required breaks and that they would fall

7    behind on sales if they took the breaks. Keefe felt harassed and intimidated by the comments

8    of her managers and did not take her mandatory breaks because she feared she would lose her

9    job, or be harassed, if she did.

10                              **RENEE DAVIS**

11    57.    Renee Davis was employed as a sales associate in Defendants' Cabazon factory outlet

12    store between approximately October 2002 and February 2004 by Fashions Outlet of

13    America, and/or Polo Retail Corp., and/or Polo Ralph Lauren Corporation and/or Polo Retail,

14    LLC.

15    58.    When Renee Davis began working for Defendants she was told she would be

16    compensated on an hourly basis, at $8.00 per hour, as a seasonal employee.  Her store's

17    general manager and Human Resources Department Manager, April Hicks, informed Ms.

18    Davis she was not permitted to discuss these wages with other employees and if she did so it

19    could cause unnecessary personnel problems.

20    59.    Renee Davis was provided Polo Ralph Lauren employee handbooks, the same

21    handbooks used in the full-price retail stores, and was instructed those written policies

22    governed her duties and rights as an employee.  Based on information and belief, Renee Davis

23    was required to sign her acknowledgement that she would abide by her employee's written

24    policies.

25    60.    Renee Davis was later re-classified by Defendants as a permanent sales associate.  She

26    worked various shifts, sometimes opening the store in the morning and sometimes closing it at

27    the end of the business day.  On several occasions, Ms. Davis worked more than eight hours

26

in one day.  While she was on occasion paid premium overtime wages for working more than 8 hours in one day, Defendants' time records failed to record all compensable time she spent in the store and on duty.  Thus, while Defendants paid Ms. Davis normal hourly compensation and even premium overtime compensation on occasion, Defendants failed to pay her for waiting for and undergoing loss prevention inspections and for attending morning meetings held before she was permitted to clock into the timekeeping system.  On many days that Renee Davis worked, therefore, she was required to perform work without compensation, working off the clock at the direction and/or with the knowledge and acquiescence of Defendants.  On occasion, she was entitled to, but not paid, premium overtime compensation for time she was on duty in the store but was not being paid.

61.     When she worked the closing shift, Defendants' managers locked the store's exit door and then required Renee Davis to clock out and then wait at the store exit for a manager to check her purse and bags to make sure she and the other employees were not attempting to steal and smuggle merchandise out of the store.  She regularly was required to wait for 10 to 15 minutes for the inspection, after she had clocked out, and was never compensated for that time.  She was instructed by her store management that she could not leave the building  until she had been inspected.  Defendants' Sales Associate Handbook was provided and/or shown to Renee Davis, and it stated that this inspection procedure was a condition of employment.  She was physically confined to the interior of the store and feared leaving the store through an alarmed back door, except as directed by her supervisors.  The experience was often frustrating and demeaning.  She was led to believe that her employers had the legal right to detain her within her store after her work shift was over.  Based on her observations and discussions with other employees who were likewise forced to wait for up to 20 minutes, they shared her sense of frustration as well.

62.     When Renee Davis worked the opening shift, she routinely arrived at the store 10 to 15 minutes early.  On many occasions, one or more of the stores managers would gather all of the sales associates together for a daily morning meeting before the employees had clocked in,

1    The managers would review sales goals, staffing, meal breaks, schedules, loss prevention

2    procedures and other topics with the sales associates for about 10 minutes each morning.

3    Then, at 10:00 a.m., one of the managers would unlock the customer door and the sales

4    associates, including Ms. Davis, would clock into the timekeeping system. She and the other

5    sales associates were not compensated for attending these daily morning meetings.

6    63.    Renee Davis was not always permitted to take rest breaks during the days that she

7    worked, especially during sales and holidays.   She estimates she missed her rest breaks

8    approximately 25% of the days she worked, often because there were not enough sales

9    associates on duty to assist customers if anyone took their rest breaks. The store managers

10   were aware that Ms. Davis and her co-workers were not always able to take their rest breaks.

11   Yet, she and they did not receive compensation for these missed breaks as is required under

12   California law.

13   64.    Defendants did not properly memorialize the time Renee Davis was working and,

14   consequently, their payroll records were inaccurate and in violation of California law.

15                       **CLASS ACTION ALLEGATIONS**

16   65.    Plaintiffs brought this action in the Superior Court of California as a class action under

17   Code of Civil Procedure § 382. Defendants removed the case to this District Court and, thus

18   Plaintiffs now bring this class action pursuant to Federal Rules of Civil Procedure 23 on

19   behalf of a Class consisting of all current and former hourly-based employees of Defendants

20   in the State of California who were subjected to the unlawful employment practices described

21   herein during all applicable statutes of limitations (the "Class Period"). Plaintiffs initially

22   delineate the subclasses of the Class as follows. This subclass delineation is for the purpose

23   of pleading and may be substantially revised through Plaintiffs' motion for class certification:

24              a.    **Fraud Subclass**: All of Defendants' employees in the State of California

25                    during all applicable statutes of limitations against whom Defendants

26                    committed the fraudulent acts described herein.

27              b.    **False Imprisonment Subclass**: All of Defendants' employees in the State

28

of California during all applicable statutes of limitations who were falsely imprisoned, as described herein.

c. **Failure to Pay Wages Subclass**:  All of Defendants' employees in the State of California during all applicable statutes of limitations to whom Defendants failed to pay wages due, as described herein.

d. **Arrears Subclass**:  All of Defendants' employees in the State of California during all applicable statutes of limitations whose earned wages were taken back by Defendants or otherwise injured by Defendants' illegal arrears program, as described herein.

e. **Product Returns Subclass**:  All of Defendants' employees in the State of California during all applicable statutes of limitations whose earned wages were taken back by Defendants through Defendants' illegal products return policies and practices, as described herein.

f. **Breach of Contract Subclass**:  All of Defendants' employees in the State of California during all applicable statutes of limitations whose employment contracts or covenants were breached by Defendants, as described herein.

g. **Terminated/Resigned Subclass**:  All of Defendants' employees in the State of California during all applicable statutes of limitations who were terminated or who resigned, and to whom Defendants failed to timely pay all wages due, as described herein.

h. **Rest Break Subclass**:  All of Defendants' employees in the State of California during all applicable statutes of limitations who were denied rest breaks, as described herein.

i. **Records Subclass**:  All of Defendants' employees in the State of California during all applicable statutes of limitations whose accurate payroll records were not provided to and/or whose requests for those

29

accurate payroll records were denied.

j. **Wage Disclosure Subclass**: All of Defendants' employees in the State of California during all applicable statutes of limitations who were prohibited from disclosing or discussing their wages, as described herein.

k. **Unfair Business Practice Subclass**: All of Defendants' employees in the State of California during all applicable statutes of limitations who were subjected to the unfair business practices described herein.

l. **Private Attorneys General Subclass:** All of Defendants' employees in the State of California during all applicable statutes of limitations whose claims for penalties are covered by the Private Attorneys General Act.

m. **Declaratory Relief Subclass**: All of Defendants employees in the State of California during all applicable statutes of limitations who will be affected by the declarations of rights sought herein.

66.     The Class definition will be further defined in Plaintiffs' motion for class certification, in which Plaintiffs may establish the need for additional or fewer subclasses based on information obtained through discovery.

67.     The wrongful acts or omissions were and are a uniform practice that affected all putative class members in substantially similar ways.  Defendants, by their practices and policies, have violated the rights of their employees under the California Labor Code, Industrial Wage Orders the common law of California, and the Unfair Competition Law.  The questions raised are therefore of common or general interest to the class members, and they have a well-defined community of interest in the questions of law and fact raised in this action.  The only recognizable difference between class members will be the amounts owed to each individual member.

68.     Based on information and belief, Defendants have employed thousands of individuals in the State of California (a number known particularly to Defendants) since the beginning of the Class Period.  These individuals have been subject to Defendants' unlawful and wrongful

30

1    practices, and their numerosity makes it impractical to bring them all before this forum, and

2    disposition of their claims in a class action is a benefit to the parties and to the court.

3    69.    A class action is superior to other available means for the fair and efficient

4    adjudication of this controversy.  Individual joinder of all class members is not practicable,

5    and questions of law and fact common to the class predominate over any questions affecting

6    only individual members of the class.  Each member of the class has been damaged and is

7    entitled to recover.  Class action treatment will allow those similarly situated persons to

8    litigate their claims in the manner that is most efficient and economical for the parties and the

9    judicial system.

10    70.    A class action is appropriate because Plaintiffs' and class members' damages,

11    although by no means inconsequential, do not rise to the level to make prosecution of

12    individual claims economically feasible for Plaintiffs and the large number of class members.

13    The burden and expense of individual litigation makes it economically unfeasible, for both the

14    parties and the Court, for the members of the class to seek redress other than through a class

15    action.  Consequently, there would be a failure of justice but for the maintenance of the

16    present class action.

17    71.    The prosecution of thousands of individual cases by members of the class would tend

18    to establish inconsistent standards of conduct for the Defendants and would result in the

19    impairment of class members' rights and the disposition of their interests through actions to

20    which they were not parties.

21    72.    Plaintiffs know of no difficulty that will be encountered in the management of this

22    litigation that would preclude its maintenance as a class action.

23    73.    Plaintiffs have incurred and, during the pendency of this action, will incur attorneys'

24    fees and expenses.  Such attorneys' fees and expenses are necessary for the prosecution of this

25    action and will result in a benefit to the class.

26    74.    Upon information and belief, Defendants were aware of the facts herein alleged at the

27    time they failed to perform the duties alleged herein.

31

75.     The names and addresses of the persons who are members of the class are available from Defendants' records and are therefore known to Defendants.  Notice can be provided to the member of the class by mail, or by using techniques and a form of notice similar to those customarily used in class actions under California law, with the costs of any notice to be borne by Defendants.

76.     The Defendants' unlawful acts and unfair trade practices have affected all members of the Class in a similar manner.  Among the questions of law and fact common to the Class are:

(a)     Whether Defendants have committed actionable fraud (through misrepresentations, false promises and tortuous concealment of material facts) with respect to the Class?

(b)     Whether Defendants have falsely imprisoned Class members after their work shifts were over by forcing them to remain within Defendants' stores to wait for loss prevention inspections?

(c)     Whether Defendants have unlawfully denied employees regular and overtime wages?

(d)     Whether Defendants have misclassified employees as bona fide commissioned employees?

(e)     Whether Defendants have unlawfully collected wages previously paid and earned by employees based on unlawful arrears and product return programs?

(f)     Whether Defendants have unlawfully coerced or compelled or otherwise required the Class to forego rest periods?

(g)     Whether Defendants have failed to timely pay all employees?

(h)     Whether Defendants have failed to timely pay employees who have quit or have been terminated?

(i)     Whether Defendants have breached employment contracts or

32

1    covenants made with Class members?

2    (j)    Whether Defendants have maintained an illegal policy that

3    prohibits employees from discussing their wages and terms of

4    employment with others?

5    (k)    Whether Defendants have violated California law, including

6    California's Unfair Competition laws (Business & Professions

7    Code §§ 17200, et seq.) based on their violations of California

8    law?

9    (l)    Whether Defendants have unlawfully failed to maintain

10    employees' pay records, and/or failed to make those records

11    available for employee inspection upon request?

12    (m)    Whether Defendants' labor policies and practices, as described

13    herein, constitute intentional or reckless violations of California

14    law, entitling Plaintiffs and the Class to punitive or exemplary

15    damages?

16    77.    Plaintiffs' claims are typical of those of the Class they seek to represent because

17    Plaintiffs and all members of the Class were injured and/or continue to be injured in the same

18    manner by Defendants' illegal acts and practices, and other wrongful conduct complained of

19    herein.

20    78.    Plaintiffs will fully and adequately protect the interests of all members of the Class.

21    Plaintiffs have retained counsels who are experienced in employment class action litigation.

22    Plaintiffs have no interests that are adverse to or in conflict with other members of the Class

23    with respect to any of the claims asserted herein.

24    ///

25    ///

26    ///

27    ///

33

**First Cause of Action**

(On Behalf of Plaintiffs and the Fraud Subclass)

**Against All Defendants**

**FRAUD**

79.     Plaintiffs repeat and reallege the preceding and subsequent paragraphs as though set forth herein.

80.     Defendants have made and, based on information and belief continue to make, false promises to employees regarding the wages they will receive while employed in Defendants' stores.

a.   As alleged more fully above, Defendants misrepresented to Plaintiffs during the course of their employment, and continue to misrepresent to Class members who are still employed, the nature of the wages they will be paid while working at Defendants' stores and that they would be paid for all work they performed.  Defendants promise their employees in their full-price retail stores that their base rate of pay, computed as the employees' hourly pay rate times the hours actually worked, would serve as a guaranteed minimum wage payment, and that they will be paid additional wages by commission when they exceed the sales targets set by Defendants.  However, Defendants have imposed an arrears program in their full-price retail stores that results in substantial debits to their employees' commission wages.  By debiting their employees commissions when the employees fail to sell sufficient product to cover their base rate of pay during prior pay periods, Defendants have caused Plaintiffs Ann Otsuka, Janis Keefe, Corinne Phipps and Justin Kiser and the Class specific detriment, that is, the loss of wages promised and earned.  In addition, Defendants have used an unconscionable product returns policy to further reduce their employees' earnings by debiting employees' wages

and/or commissions for items returned by customers at any time and for any reason.

b.  Defendants misrepresented to Plaintiffs Ann Otsuka, Janis Keefe, Corinne Phipps and Justin Kiser and the Class during the course of their employment that they will perform an end-of-the-year wage reconciliation and pay premium overtime wages, and that Defendants will properly record their employees' time and pay all wages due in a timely manner.  In fact, Defendants do not perform this reconciliation and/or fail to pay premium wages as required by California law.

c.  Defendants misrepresented to Plaintiffs during the course of their employment and continue to misrepresent to Class members who are still employed that they will be provided rest breaks in compliance with California law.  In fact, Defendants do not provide rest breaks and use coercion against their employees to make certain they will not take rest breaks.

d.  Defendants manipulated and continue to manipulate the time records of Plaintiffs and the Class to conceal the fact that Defendants have failed to pay them all wages they are due for the time they have worked.

81.    At the time these representations were made by Defendants, Plaintiffs and Class members were ignorant of the falsity of Defendants' representations and believed them to be true.  In reliance on these representations and/or without knowledge of the fraudulent concealments, Plaintiffs and Class members were induced to, and did, work for Defendants at lower rates of pay than they had been promised and under terms and conditions that constituted violations of California law.  Had Plaintiffs and Class members known the actual facts, they would not have taken such action, that is, they would not have accepted employment with Defendants and/or would have demanded and received complete payment of their wages.

35

82.     Plaintiffs' and Class members' reliance on Defendants' representation was justified because Defendants employed Plaintiffs and Class members, and Plaintiffs and Class members perceived Defendants as having the legal and corporate authority to make the promises they made.

83.     As a proximate result of the fraudulent conduct of Defendants, Plaintiffs and Class members have been damaged in an amount to be proven at trial.

84.     The aforementioned acts were intentional misrepresentations, deceit, and concealment of material facts known to Defendants, with the intention on the part of Defendants of depriving Plaintiffs and Class members of their rights under California law.  Defendants' conduct was despicable in that it subjected Plaintiffs and Class members to cruel and unjust hardship, and Defendants acted in conscious disregard of rights of Plaintiffs and Class members, so as to justify an award of exemplary and punitive damages.  Wherefore, Plaintiffs pray judgment as set forth herein below.

**Second Cause of Action**

**(On Behalf of Plaintiff Justin Kiser and the False Imprisonment Subclass)**

**Against All Defendants**

**FALSE IMPRISONMENT**

85.     Plaintiffs repeat and reallege the preceding and subsequent paragraphs as though set forth herein.

86.     On a daily basis, Defendants required Plaintiff and Class members to clock out and then wait at the employee exits for a manager to check their bags to make sure they were not attempting to steal and smuggle merchandise out of the store.  Plaintiff and the Class members routinely had to wait with other sales associates each day that they worked near the employee exit for the mandatory management inspection.  They were regularly required to wait for 10 to 15 minutes for the inspection, and at times up to a half an hour, and were never compensated for that time. They were instructed to use specific exits to leave the store and warned that if they tried to leave the store before they had been inspected, they could or

36

1   would be terminated.  In Defendants' stores, employees were often physically unable to leave

2   because the doors to the stores were locked and they did not have keys to open the doors.

3   Plaintiff and the Class members were, thus, often physically confined to the interior of the

4   store.  The experience was often frustrating, demeaning and humiliating.

5   87.    By forcing Plaintiff and Class members to remain in their stores after they had stopped

6   working and were no longer receiving compensation, Defendants intentionally confined

7   Plaintiff and Class members in a non-consensual manner without a lawful privilege for an

8   appreciable length of time, and their confinement caused harm to the Plaintiff and the Class.

9   As a direct, proximate and foreseeable result of Defendants' acts and failures to act as alleged

10  herein, Plaintiff and Class members have suffered and continue to suffer emotional distress,

11  including but not limited to humiliation, shock, embarrassment, fear, anxiety and discomfort,

12  all to their damage in an amount to be determined according to proof at trial.  In addition,

13  Plaintiff and the Class have suffered the loss of wages for the time Defendants' forced them to

14  remain in the stores to be inspected by managers.

15          Wherefore, Plaintiff prays judgment as set forth herein below.

16                              **Third Cause of Action**

17  (On Behalf of All Plaintiffs and the Failure to Pay Wages Subclass, Arrears Subclass, Product

18      Returns Subclass, Breach of Contract Subclass and Terminated/Resigned Subclass)

19                          **Against All Defendants**

20      **FOR VIOLATIONS OF CALIFORNIA LABOR CODE §§ 510 AND 204 –**

21  **FAILURE TO PAY ALL WAGES, INCLUDING PREMIUM OVERTIME WAGES**

22                      **UNDER CALIFORNIA LAW**

23  88.    Plaintiffs repeat and reallege the preceding and subsequent paragraphs as though set

24  forth herein.

25          On January 1, 2000, Labor Code § 510(a) was enacted and provides:

26          Eight hours of labor constitutes a day's work.  Any work in excess of

27          eight hours in one workday and any work in excess of 40 hours in any

37

1    one workweek and the first eight hours worked on the seventh day of

2    work in any one workweek shall be compensated at the rate of no less

3    than one and one-half times the regular rate of pay for an employee.

4    Any work in excess of 12 hours in one day shall be compensated at the

5    rate of no less than twice the regular rate of pay for an employee.  In

6    addition, any work in excess of eight hours on any seventh day of a

7    workweek shall be compensated at the rate of no less than twice the

8    regular rate of pay of an employee.

9    Labor Code § 1194(a) states:

10   Notwithstanding any agreement to work for a lesser wage, any

11   employee receiving less than the legal minimum wage or the legal

12   overtime compensation applicable to the employee is entitled to recover

13   in a civil action the unpaid balance of the full amount of this minimum

14   wage or overtime compensation, including interest thereon, reasonable

15   attorney's fees, and costs of suit.

16   Labor Code § 204 states, in pertinent part:

17   All wages, other than those mentioned in Section 201, 202, 204.1, or

18   204.2, earned by any person in any employment are due and payable

19   twice during each calendar month, on days designated in advance by

20   the employer as the regular paydays.

21   89.    Under California law, Defendants are required to pay wages for each hour worked,

22   and premium overtime wages when non-exempt employees work over 8 hours in a day or 40

23   hours in a week by calculating the hourly rate and then computing the overtime premium

24   amount owed.  Plaintiffs and putative class members have worked for Defendants without

25   being paid for all hours worked, regular and overtime, as described above, including being

26   forced to work off the clock.

27   90.    Plaintiffs Ann Otsuka, Janis Keefe, Corinne Phipps and Justin Kiser and members of

38

the Class did not regularly earn more commission than their base wages and were thus misclassified as exempt employees under IWC 7-2001. In fact, Defendants wage system was not and is not a bona fide commission system that permitted Defendants to avoid California's premium overtime compensation laws.

91.    In addition, because Defendants do not employee bona fide commissioned employees in their full-price retail stores, the application of Defendants' arrears and product return programs to hourly, non-exempt employees violates California law as described herein.

92.    Plaintiffs and members of the Class who were deemed commissioned employees by Defendants, who were not paid 1.5 times the applicable minimum wage for working overtime, who did not earn more than 50% of their wages from commissions during a specific pay period, who did not regularly earn more commission than their basis rate of pay, and who worked overtime as defined by California law, are also entitled to premium overtime wages. Defendants' once-a-year reconciliation scheme, pursuant to which Defendants purport to determine if their employees are entitled to premium overtime compensation, amounts to a willful failure to pay wages timely.

93.    As a result of Defendants' violation of statutory duties to comply with statutory wage requirements, as more fully set forth above, Plaintiffs and Class members were damaged in an amount above the jurisdictional limits of this Court.

94.    Plaintiffs and Class members seek as damages all wages owed to individuals employed by Defendants, plus all penalties permitted by law.

95.    Plaintiffs and Class members are entitled to, and therefore request, an award of pre-judgment interest on the unpaid wages set forth herein.

96.    Plaintiffs have incurred, and will continue to incur attorneys' fees and costs in the prosecution of this action. Plaintiffs seek attorneys' fees under all applicable provisions of law. Wherefore, Plaintiffs pray judgment as set forth herein below.

39

**Fourth Cause of Action**

(On Behalf of Plaintiffs Ann Otsuka, Janis Keefe, Corinne Phipps and Justin Kiser, the

Arrears Subclass and the Product Returns Subclass)

**Against All Defendants**

**VIOLATIONS OF LABOR CODE 221**

97.     Plaintiffs repeat and reallege the preceding and subsequent paragraphs as though set

forth herein.

98.     California Labor Code § 221 provides:  "It shall be unlawful for any employer to

collect or receive from an employee any part of wages theretofore paid by said employer to

said employee."

99.     In violation of this Labor Code provision, Defendants have established a commission

arrears program that permitted them to obtain wages back from employees who have earned

those wages.  Furthermore, Defendants initiated and applied the commission arrears program

without their employees' knowledge.  In addition, Defendants' commission arrears program

has been applied to Defendants' employees in a manner that is inconsistent with express

promises made to Defendants' employees at the commencement of their employment and

during the course of their employment.  Also, as alleged herein, Defendants applied the

commission arrears program without providing their employees with adequate records of its

operation. Finally, because Defendants do not employee bona fide commissioned employees,

the application of Defendants' arrears and product returns programs to hourly, non-exempt

employees violates California law as described herein.

100.     Defendants have also perpetuated an illegal and unconscionable product returns policy

that further results in the debiting of employees wages and that operates in violation of Labor

Code § 221.  Again, Defendants failed to provide their employees with adequate records of its

operation.

40

1    101.    Plaintiffs and the Class have been injured as a result of Defendants violations of Labor

2    Code § 221, and Plaintiffs and Class members seek as damages all wages owed to individuals

3    employed by Defendants, plus all penalties permitted by law.

4    102.    Plaintiffs and Class members are entitled to, and therefore request, an award of pre-

5    judgment interest on the unpaid wages set forth herein.

6    103.    Plaintiffs have incurred, and will continue to incur attorneys' fees and costs in the

7    prosecution of this action.  Plaintiffs seek attorneys' fees under all applicable provisions of

8    law.  Wherefore, Plaintiffs pray judgment as set forth herein below.

9                                **Fifth Cause of Action**

10                   (On Behalf of Plaintiffs and the Breach of Contract Subclass)

11                                **Against All Defendants**

12                                **BREACH OF CONTRACT**

13    104.    Plaintiffs repeat and reallege the preceding and subsequent paragraphs as though set

14    forth herein.

15    105.    Plaintiffs and the Class entered into employment contracts with Defendants

16    memorialized by employee manuals described herein.  These contracts were common to all of

17    Defendants' similarly-situated employees in the State of California and imposed duties on

18    Defendants, including the duty to pay wages as promised, the duty to provide rest breaks as

19    required under California law, the duty to pay for all time worked, the duty to refrain from

20    receiving back wages previously paid, and the duty to permit employees to leave Defendants'

21    premises after they had completed their shifts.

22    106.    Defendants breached each and every one of these contractual duties.  Plaintiffs and the

23    Class fulfilled any and all duties required of them to receive the benefit of the contracts they

24    formed with Defendants.

25    107.    Plaintiffs and the Class sustained damages as a direct and proximate result of

26    Defendants' contractual breaches, including the loss of wages.  Plaintiffs seek, on their own

27    behalf and on behalf of the entire Class, the value of all damages caused by Defendants'

41

1  breaches of contract described herein.

2  108.    Wherefore, Plaintiffs pray judgment as set forth herein below.

3  ### Sixth Cause of Action

4  (On Behalf of Plaintiffs and the Terminated/Resigned Subclass)

5  ### Against All Defendants

6  **FOR WILLFUL VIOLATIONS OF CALIFORNIA LABOR CODE §§ 201, 202, AND**

7  **203 –**

8  **FAILURE TO PAY WAGES UPON DISCHARGE OR QUITTING;**

9  ### WAITING TIME PENALTIES

10  109.    Plaintiffs repeat and reallege the preceding and subsequent paragraphs as though set

11  forth herein.

12  110.    California Labor Code §§ 201 and 202 require Defendants to pay their employees all

13  wages due immediately upon discharge or 72 hours after an employee quits.  California Labor

14  Code § 203 provides that if an employer willfully fails to timely pay such wages the employer

15  must, as a penalty, continue to pay the subject employees' wages until the back wages are

16  paid in full or an action is commenced.  The penalty cannot exceed 30 days of wages per

17  violation.  A worker need not prove malice or intentional conduct in establishing their claim

18  for waiting time penalties, but merely establish the employer did not do something it was

19  obligated to do.  (See Mamika v. Barca (1998) 68 Cal. App. 4th 487; Barnhill v. Robert

20  Saunders & Co. (1981) 125 Cal.App.3d 1.)

21  111.    Plaintiffs and Class members are entitled to unpaid compensation, but to date have not

22  received such compensation.  As a consequence of Defendants' willful conduct in not paying

23  compensation for all hours worked, including premium overtime hours, Plaintiffs and Class

24  members who were terminated and who resigned are entitled to 30 days wages as penalty

25  under Labor Code § 203, together with interest thereon and attorneys' fees and costs for each

26  violation described above.  Wherefore, Plaintiffs pray judgment as set forth herein below.

27

42

**<u>Seventh Cause of Action</u>**

(On Behalf of all Plaintiff Ann Otsuka, Janis Keefe, Justin Kiser and Renee Davis and the

Class and the Rest Breaks Subclass)

**<u>Against All Defendants</u>**

**FOR VIOLATIONS OF CALIFORNIA LABOR CODE § 226.7 –**

**FAILURE TO AFFORD MANDATORY REST BREAKS AS REQUIRED BY**

**<u>IWC ORDERS AND LABOR CODE</u>**

112.    Plaintiffs repeat and reallege the preceding and subsequent paragraphs as though set forth herein.

113.    At all times relevant, Plaintiffs and the Class members were covered by the provisions of Industrial Wage Commission ("IWC") Orders, including IWC Orders 7-2001.

114.    The IWC Orders provide, in applicable part:

12. (A)  Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3 ½) hours. Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages.

12. (B)  If an employer fails to provide an employee a rest period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the rest period is not provided.

California Labor Code § 226.7 states:

43

1    (a) No employer shall require any employee to work during any meal

2    or rest period mandated by an applicable order of the Industrial Welfare

3    Commission.

4    (b) If an employer fails to provide an employee a meal period or rest

5    period in accordance with an applicable order of the Industrial Welfare

6    Commission, the employer shall pay the employee one additional hour

7    of pay at the employee's regular rate of compensation for each work

8    day that the meal or rest period is not provided.

9 115.  Defendants routinely failed to provide Plaintiffs and the Class members with a 10-

10 minute paid rest period for each four (4) hour period of work, or major portion thereof, in

11 compliance with IWC Orders and Labor Code § 226.7.  As a result of Defendants' failure,

12 Plaintiffs and the Class members are entitled to recover an amount to be proved at trial, of not

13 less than one additional hour of pay at the regular rate of compensation for each workday that

14 any one rest period was not provided, and any and all penalties provided by law.

15 116.  Defendants' policy and practice of denying Plaintiffs and the Class rest periods

16 constitutes a willful violation of California Labor Code § 226.7.  Plaintiffs and the entire

17 Class have sustained damages as a direct and proximate consequence of the Defendants'

18 willful and illegal conduct, to wit, they have been forced to work continuously throughout the

19 day, every day, without being allowed to take rest periods.

20 117.  Plaintiffs have incurred, and will continue to incur attorneys' fees and costs in the

21 prosecution of this action.  Plaintiffs seek attorneys' fees under all applicable provisions of

22 law.  Wherefore, Plaintiffs pray judgment as set forth herein below.

23 ///

24 ///

25 ///

26 ///

27 ///

44

1

**Eighth Cause of Action**

2

(On Behalf of Plaintiff Justin Kiser and the Records Subclass)

3

Against All Defendants

4

**FOR VIOLATIONS OF LABOR CODE § 226 –**

5

**FAILURE TO MAINTAIN PAY RECORDS; FAILURE TO MAKE**

6

**PAY RECORDS AVAILABLE UPON REQUEST**

7

118.    Plaintiffs repeat and reallege the preceding and subsequent paragraphs as though set

8

forth herein.

9

119.    Defendants knowingly and intentionally failed to maintain accurate pay records, and

10

failed to allow current and former employees to inspect pay records upon request, in violation

11

of California Labor Code § 226, as more fully alleged hereinabove.

12

120.    As a direct result of Defendants' failure, Plaintiff and Class members were injured and

13

are entitled to recover an amount to be proved at trial, of not less than the penalties provided

14

by the Labor Code.  In addition, Class members who are currently employed by Defendants

15

are entitled to equitable relief against Defendants to force Defendants to comply with

16

California law.

17

121.    Plaintiff and Class members are entitled to penalties and attorneys' fees pursuant to

18

Labor Code § 226 and California Code of Civil Procedure § 1021.5.  Wherefore, Plaintiffs

19

pray judgment as set forth herein below.

20

**Ninth Cause of Action**

21

(On Behalf of Plaintiffs and the Wage Disclosure Subclass)

22

Against All Defendants

23

**VIOLATION OF LABOR CODE § 232**

24

122.    Plaintiffs repeat and reallege the preceding and subsequent paragraphs as though set

25

forth herein.

26

123.    Labor Code § 232, provides:

27

No employer may do any of the following:

45

1      (a)  Require, as a condition of employment, that an employee refrain from

2           disclosing the amount of his or her wages.

3      (b)  Require an employee to sign a waiver or other document that purports to

4           deny the employee the right to disclose the amount of his or her wages.

5      (c)  Discharge, formally discipline, or otherwise discriminate against an

6           employee who discloses the amount of his or her wages.

7

8 124.    In violation of this prohibition, Defendants' specifically instruct their employees that

9 they are not permitted to disclose their compensation to other employees.

10 125.    Plaintiffs seek an order prohibiting Defendants from continuing to engage in this

11 illegal conduct, and seek all penalties available under California law, and seek the award of

12 attorneys' fees and costs associated with obtaining the relief requested.

13 126.    Wherefore, Plaintiffs pray judgment as set forth herein below.

**Tenth Cause of Action**

(On Behalf of Plaintiffs and the Unfair Business Practice Subclass)

Against All Defendants

**FOR VIOLATIONS OF CALIFORNIA BUSINESS AND PROFESSIONS CODE**

**SECTIONS 17200, ET SEQ.**

**BASED UPON DEFENDANTS' UNFAIR BUSINESS ACTS AND PRACTICES**

20 127.    Plaintiffs repeat and reallege the preceding and subsequent paragraphs as though set

21 forth herein.

22 128.    Plaintiffs further bring this action pursuant to the Business and Professions Code

23 Sections 17200, et seq., seeking restitution for monies owed for regular and overtime wages,

24 and injunctive relief to enjoin Defendants' illegal practices.

25 129.    Plaintiffs further bring this action pursuant to the Business and Professions Code

26 Sections 17200, et seq., seeking disgorgement of one hour of pay for every rest break missed

27 by the class during the past four years.  Unless Defendants are ordered to disgorge these

46

1    monies, they will be unjustly enriched by their illegal conduct.

2    130.    The Unfair Competition Law prohibits all unfair competition, which is defined as "any

3    unlawful, unfair or fraudulent business act or practice."  Plaintiffs and the class have standing

4    to bring this claim because they are direct victims of Defendants' illegal and unfair business

5    practices, which Defendants engaged in for their sole financial benefit.

6    131.    Defendants, and each of them, are "persons" as defined under Business and

7    Professions Code § 17201.  Each of the directors, officers, and/or agents of Defendants, and

8    each of them, are equally responsible for the acts of the other directors, officers, employees

9    and/or agents as set forth in the Business and Professions Code § 17095.

10    132.    Plaintiffs and the Class members bring this action in the interest of themselves, as

11    representatives, and in the interest of other employees of Defendants, and each of them, and in

12    the interest of the public pursuant to § 17203 of the California Business and Professions Code.

13    Plaintiffs and Class members bring this cause of action seeking restitution for Defendants'

14    failure to pay employees regular and overtime wages, as well as disgorgement of wage

15    penalties for every rest break Defendants failed to provide, as well as an injunction

16    prohibiting Defendants from denying employees regular and overtime wages and rest periods,

17    now and in the future.

18    133.    Plaintiffs and the Class members bring this action to pursue claims during a 4-year

19    statute of limitations under § 17208 of the California Business and Professions Code.

20    134.    The following practices of Defendants, and each of them, are unlawful and unfair

21    business practices under California Business and Professions Code §§ 17200 et seq.:

22              (a)    Failure to pay all regular and overtime wages, in violation of the

23                     California Labor Code and all other applicable laws;

24              (b)    Failure to abide by promises regarding wages to be paid to

25                     employees.

26              (c)    The use of fraud in the conduct of business.

27              (d)    The false imprisonment of employees after their work shifts were

47

1    over.

2    (e)    Imposition of an illegal and unconscionable arrearage program

3           designed to obtain back from Plaintiffs and the Class wages that

4           they had been previously paid, in violation of Labor Code § 221.

5    (f)    Imposition of an unconscionable charge back policy that permits

6           Defendants to debit their employees wages for commission on

7           merchandize returned by customers, regardless of the reason for

8           the return and regardless of how long after the sale had been

9           completed.

10   (g)    Breaches of employment contracts and covenants made to

11          employees.

12   (h)    Failure to provide rest breaks pursuant to the California Labor

13          Code and IWC wage orders;

14   (i)    Failure to maintain accurate pay records, and make those records

15          available for inspection upon request by employees;

16   (j)    Unjust enrichment due to the failure to pay wages, including

17          overtime wages.

18   (k)    Imposing an illegal prohibition that employees may not disclose

19          or discuss their wages with others.

20   135.   At all times material to this action, Defendants' conduct described above is an unfair,

21   unlawful, and/or fraudulent business practice in violation of California Business &

22   Professions Code §§ 17200 et seq.

23   136.   As alleged hereinabove, Defendants have inequitably and unlawfully conspired,

24   agreed, arranged and combined to violate California labor laws, as alleged herein.

25   137.   As set forth below, Plaintiffs and Class members are informed and believe and

26   thereupon allege, that by failing to pay wages to all employees at Defendants' business,

27   Defendants have engaged in business within the State of California in a manner that injured   48

1  competitors, lead to misrepresentations to the public about the manner in which Defendants

2  engaged in business, and/or destroyed competition in violation of Business and Professions

3  Code § 17043.  Upon information and belief, Plaintiffs and Class members allege that

4  Defendants engaged in the acts and omissions heretofore alleged for the purpose of profiting

5  from lower labor costs, and obtaining an unlawful or unfair advantage, all in a scheme to

6  engage in unfair competition, at the expense of their employees and to the detriment of public

7  policy for the lawful employment of employees.

8  138.    Pursuant to Business and Professions Code §§ 17071 and 17075, the failure of

9  Defendants, and each of them, to pay all wages, including overtime wages, is admissible as

10  evidence of Defendants' intent to violate the California Unfair Competition Law.

11  139.    As a direct and proximate result of the unfair, unlawful, and/or fraudulent business

12  practices alleged herein, Plaintiffs and the entire Class have been denied due wages, both

13  regular and overtime, as well as rest periods, all to their detriment and all to Defendants'

14  illegal economic advantage.

15  140.    Plaintiffs and the Class members are informed and believe and thereon allege that the

16  Defendants, and each of them, by committing the above-described acts, have deceived the

17  public by illegally depriving their employees regular and overtime wages, rest periods, and

18  engaging in the other wrongful conduct described herein.

19  141.    Business and Professions Code provides that the Court may restore to an aggrieed

20  party any money or property acquired by means of unlawful and unfair business practices, and

21  to disgorgement of penalty wages for failing to provide rest periods to employees.  Plaintiffs

22  and Class members seek restitution of all unpaid wages owing to them and members of the

23  general public, and to disgorgement, according to proof, that the Defendants have enjoyed as

24  a result of the unfair business practices.

25  142.    Business and Professions Code § 17202 states: "Notwithstanding Section 3369 of the

26  Civil Code, specific or preventive relief may be granted to enforce a penalty, forfeiture, or

27  penal law in a case of unfair competition."

49

143.    In addition to restoration of all wages owed, Plaintiffs and Class members seek to enforce penalties in the interest of themselves, in the interest of other employees of Defendants, and each of them, and in the interest of the general public pursuant to § 17202:

      (a)    Waiting time penalties (Labor Code § 203);

      (b)    Extra hour of pay for not authorizing or permitting rest breaks (Labor Code § 226.7);

      (c)    Failure to maintain and make available for inspection accurate pay records (Labor Code § 226);

      (d)    Illegally prohibiting employees from disclosing or discussing their wages (Labor Code § 232).

144.    There is a financial burden incurred in pursuing this action that would be unjust to place on Plaintiffs and the Class members, because the burden of enforcing workforce-wide rights is disproportionate to that of enforcing only individual claims.  It would be against the interests of justice to force payment of attorneys' fees from Plaintiff and Class members' recovery in this action.  Therefore, attorneys' fees are appropriate and sought pursuant to all applicable laws, including but not limited to California Code of Civil Procedure § 1021.5.

145.    Unless equitable relief is granted, members of the Class will continue to be subjected to Defendants' illegal conduct. Pursuant to Business and Professions Code §§ 17203, Plaintiffs and the Class seek a permanent injunction enjoining Defendants' continuing violations of California's Unfair Competition Law on the grounds that such acts described herein violate § 17200 of the Business and Professions Code and California's public policy. Wherefore, Plaintiffs pray judgment as set forth herein below.

**Eleventh Cause of Action**

**Against All Defendants**

**(On Behalf of Plaintiffs and the Declaratory Relief Subclass)**

**FOR DECLARATORY RELIEF**

146.    Plaintiffs repeat and reallege the preceding and subsequent paragraphs as though set

50

1  forth herein.

2  147.    Plaintiffs and the Class seek a Declaration by this Court that Defendants' concerted

3  violations alleged herein constitute unfair business practices, in violation of the Unfair

4  Competition Law.

5  148.    Plaintiffs and the Class also seek a Declaration by this Court that Defendants' policy

6  and practice of denying regular and overtime wages and rest periods constitute a violation of

7  California law, as alleged herein.

8  149.    In addition, Plaintiffs and Class members seek a Declaration by this Court that

9  Defendants' policy and practice of failing to maintain accurate pay records, and failing to

10  provide employees with those records for inspection upon request constitutes a violation of

11  California law, as alleged herein.

12  **<u>Twelfth Cause of Action</u>**

13  **<u>(On Behalf of Plaintiff Justin Kiser, the Private Attorneys General Subclass and the</u>**

14  **<u>State of California</u>**

15  **Against All Defendants**

16  **VIOLATION OF THE PRIVATE ATTORNEYS GENERAL ACT**

17  **(Labor Code §§2699, et seq.)**

18  150.    Plaintiffs repeat and reallege the preceding and subsequent paragraphs as though set

19  forth herein.

20  151.    Defendants have violated Labor Code § 203 by consistently failing to timely pay

21  employees all wages due upon resignation and/or termination.

22  152.    Defendants have violated Labor Code § 204 by consistently failing to pay employees

23  in a timely way.

24  153.    Defendants have violated Labor Code § 206.5 by consistently requiring employees to

25  sign documents releasing them from the obligation to pay wages owed to employees.

26  154.    Defendants have violated Labor Code § 208 by consistently failing to pay all wages

27  due terminated employees at the place of discharge.

51

155.    Defendants have violated Labor Code § 221 by consistently engaging in a practice of taking back wages previously paid to employees.

156.    Defendants have violated Labor Code § 223 by consistently agreeing to pay employees certain wages and then though the use of deception and fraudulent payroll practices has secretly paid employees lower wages than promised.

157.    Defendants have violated Labor Code § 226(a) by consistently failing to provide the accurate itemized statement of wages on employees' pay stubs as required under California law.

158.    Defendants have violated Labor Code § 226.7 by consistently failing to provide employees with rest breaks during their working shifts.

159.    Defendants have violated Labor Code § 227 by promising employees that they will provide medical and dental insurance to them after they have worked for the company for 90 calendar days and then has consistently breached that promise by failing to make payments into a health insurance fund covering those benefits within 90 days.

160.    Defendants have violated Labor Code § 232(c) by prohibiting employees from disclosing or discussing their wages, and, based on information and belief, has formally disciplined or otherwise discriminated against employees who disclose the amount of their wages.

161.    Defendants have violated Labor Code § 432.5 by consistently requiring employees to sign documents, including the company's employee manuals that demand employees agree in writing to illegal policies and practices.

162.    Defendants have violated Labor Code § 510 by consistently failing to pay premium overtime wages to its employees.

163.    Defendants have violated Labor Code § 976 by consistently publishing misleading statements about the commissions it promises to employees.

164.    Defendants have violated Labor Code § 1194 by consistently requiring employees to agree to waive their statutory right to premium overtime wages, and then fails to pay them

52

1  premium overtime.

2  165.   Defendants have violated Labor Code § 1199 by consistently violating provisions of

3  Labor Code §§ 1171, et seq.

4  166.   Plaintiffs herein seek to serve as private attorneys general under the California Private

5  Attorneys General Act, Labor Code §§ 2699, et seq., and have provided proper notice to

6  defendants and the state of California.

7  167.   On or about June 23, 2006, the California Labor and Workforce Development Agency

8  provided notice to defendants and plaintiffs that it did not intend to investigate the allegations

9  contained in plaintiffs' properly and timely served notice letter.  (A copy of the California

10  Labor and Workforce Development Agency's June 23, 2006, letter is attached as Exhibit 1.)

11  168.   Plaintiffs are now entitled as a matter of law to amend this compliant to include their

12  requests for relief under the California Private Attorneys General Act, and hereby do so, and

13  to seek and collect statutory penalties available under the Private Attorneys General Act on

14  behalf of the State of California, themselves and the class they seek to represent.

15  **PRAYER FOR RELIEF**

16       WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of

17  them, as follows:

18       (a)    Certifying this action to proceed as a class action pursuant to Federal Rules of

19  Civil Procedure 23 and designating Plaintiffs as the representatives of the Class and their legal

20  counsels as counsels for the Class;

21       (b)    For damages for unpaid wages, including regular and overtime wages, and

22  such general and special damages as may be appropriate, according to proof at trial;

23       (c)    For 30 days waiting time penalties under Labor Code § 203;

24       (d)    For penalties under Labor Code § 210 and 558(a)(3);

25       (e)    For penalties under Labor Code § 226(f);

26       (f)    For damages calculated at one extra hour for each day no rest period was

27  provided (Labor Code § 226.7);

53

1          (g)      For all civil penalties available pursuant to Labor Code §§ 2699, et seq., as

2   alleged herein above.

3          (h)      For severe emotional distress caused by Defendants' concerted conduct,

4   including the false imprisonment of their employees;

5          (i)      Declaring that the concerted violations alleged herein constitute unfair

6   competition in violation of California's Unfair Competition Law, and violations of

7   California's Labor Code;

8          (j)      Permanently enjoining Defendants from continuing to engage in the unlawful

9   concerted conduct described herein;

10          (k)      Equitable remedies, including but not limited to, an equitable accounting, as

11   the court deems just and proper under the circumstances;

12          (l)      Awarding Plaintiffs and the Class punitive or exemplary damages based on

13   Defendants' oppressive and despicable conduct;

14          (m)      Granting Plaintiffs and the Class the costs of prosecuting this action, together

15   with interest and reasonable attorneys' and experts' fees; and

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

54

1     (n)     Granting such other relief as this Court may deem just and proper under the

2     circumstances.

3                              **<u>JURY DEMAND</u>**

4          To the full extent available, Plaintiffs demand a trial by jury.

5

6

7     DATED:  September __, 2007            THE LAW OFFICE OF PATRICK R. KITCHIN

8

9                                          By:_____
                                              Patrick R. Kitchin, Esq.

10
                                           Attorneys for Plaintiffs Janis Keefe, Corinne
11                                         Phipps, Justin Kiser and Renee Davis

12

13    DATED:  September __, 2007            LAW OFFICES OF DANIEL FEDER

14

15                                         By:_____
                                              Daniel L. Feder, Esq.

16                                            Attorneys for Plaintiff Ann Otsuka

17

18

19

20

21

22

23

24

25

26

27