1  Patrick R. Kitchin, Esq. (SBN. 162965)
2  **THE LAW OFFICE OF PATRICK R. KITCHIN**
   565 Commercial Street, 4th Floor
3  San Francisco, CA 94111
   415-677-9058
4  415-627-9076 (fax)

5
   Attorneys for Plaintiffs Janis Keefe, Corinne Phipps and Renee Davis
6

7

8      **UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA**

9

10  ANN OTSUKA, an individual; JANIS KEEFE, ) Case No.: C-07-02780-SI
    an individual;  CORINNE PHIPPS, an       )
11  individual; and  KISER, an individual;   ) **PLAINTIFFS PHIPPS, DAVIS AND**
    individually and on behalf of all others similarly ) **KEEFE'S MOTION FOR CLASS**
12  situated,                                 ) **CERTIFICATION**
                                              )
13                                            )
                   Plaintiffs,                ) **Date:  July 11, 2008**
14         vs.                                ) **Time:  9:00 a.m.**
                                              ) **Courtroom:  10 (19th Floor)**
15  POLO RALPH LAUREN CORPORATION; a          ) **Judge:  Hon. Susan Illston**
16  Delaware Corporation; POLO RETAIL, LLC., a)
    Delaware Corporation; POLO RALPH          )
17  LAUREN CORPORATION, a Delaware            ) <u>**Accompanying Papers:**</u>
    Corporation, doing business in California as ) **(1) Declaration of Patrick R. Kitchin**
18  POLO RETAIL CORP; FASHIONS OUTLET         ) **    With Exhibits**
19  OF AMERICA, INC., a Delaware Corporation  ) **(2) Declaration of Nancy E. Hudgins**
    and DOES 1-500, inclusive,                )
20                                            )
                                              )
21                 Defendants.                )
                                              )
22  _____ )

23

24

25

26

27

28

# TABLE OF CONTENTS

**PAGE**

Notice of Motion …………………………………………………...…….……1

Memorandum of Points & Authorities ……………………………………….2

   I. Introduction …………………………………………………………….....2

   II. Facts ……………………………………………………………………...2

      A.   The Defendants …………………………………………………2

      B.   Polo Handbooks And Consistency Of Application Of Policies ……………..3

      C.   Polo Does Not Compensate Employees For "Loss Prevention Inspection" -Related Waiting Time …………………………………………3

      D.   Employees Miss Rest Breaks, Yet Polo Does Not Compensate Them ………..6

      E.   Misclassified Full Price Store Sales Associates (The First SubClass) ………..7

           1. Full Price Compensation System and Misclassification ……………7

           2. Polo Falsely Promises All Sales Associates It Will Perform Wage "Reconciliations" ……………………………..……………….9

      G.   Polo's "Arrears" Compensation Deduction Scheme …………………………10

   IV. Federal Rule of Civil Procedure 23 Analysis Confirms Certification's Propriety …………………………………………………………………10

      A. Governing Standards …………………………………………………..10

      B. "Numerosity" Is Satisfied ……………………………………….......11

           i. General Standards Of Numerosity ……………………………..11

           ii. The Class & Subclasses Satisfy Numerosity …………………….12

      C. Commonality Is Satisified ……………………………………………..12

           i. General Standards Of Commonality ………………………………12

           ii. The Class Satisfies Commonality …………………...…………….13

           iii. The Misclassification Subclass Satisfies Commonality …………..14

           iv. The Arrears Subclass Satisfies Commonality ………………….....14

D. Typicality Is Satisfied .................................................................15

    i. General Standards Of Typicality ...........................................15

    ii. Typicality Exists As To The Class ........................................15

    iii. Typicality Exists As To The Misclassification Subclass .............16

    iv. Typicality Exists As To The Arrears Subclass .........................16

E. Adequacy Of Representation Is Satisfied .............................................16

    i. General Standards Of Adequacy ...........................................16

F. Predominance is Satisfied .............................................................17

    i. General Standards .........................................................17

    ii. Predominance Exists As To The Class ....................................18

    iii. Predominance Exists As To The Misclassification Subclass ..........19

    iv. Predominance Exists As To The Arrears Subclass ......................20

G. Superiority is Satisfied ......... .....................................................20

    i. General Standards .........................................................20

    ii. Class Treatment Would Further The Interests Of Judicial Economy
        And Facilitate Meaningful Access To A Means Of Redress ...........21

    iii. Analysis Of The Other Factors Considered in the Rule 23(b)(3)
        Calculus Also Confirms Superiority Is Satisfied .....................22

        (a)    No Individual Interests In Controlling Prosecution ......22

        (b)    No Existing Related Litigation ...............................23

        (c)    The Desirability of Concentrating Litigation Here ........23

        (d)    Any Class Action-Related Complexities
            Are Manageable .............................................23

V. Conclusion .............................................................................25

**TABLE OF AUTHORITIES**

**CASES**                                                                                           **PAGE**

*Alba v. Papa John's USA, Inc.* 2007 U.S. Dist. LEXIS 28079 ………………….…..19

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, (1997) …………………………....22

*Armstrong v. Davis,* 275 F.3d 849 (9th Cir. 2001) …………………………….…..15,16

*Arnold v. United Artists Theatre Circuit, Inc.,* 158 F.R.D. 439, (N.D. Cal. 1994) …….11

*Barlow v. Marion County Hosp. Dist., 88 F.R.D. 619 (M.D.Fla.1980)* ……...........12

*Blackie v. Barrack* 524 F2d 891 (9th Cir. 1975) ………………………………….....11,18,20

*City of Inglewood v City of Los Angeles,* 451 F.2d 948,(9th Cir. 1971) ………………..23

*Consolidated Rail Corp. v. Town of Hyde Park,* 47 F.3d 473 (2d Cir. 1995) ….……...11

*Dukes v. Wal-Mart* 509 F.3d 1168 (9th Cir. 2007) ………………………………….…..16

*Eisen v. Carlisle & Jacquelin,* 417 US 156 (1974) …………………………………..10

*General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147(1982) ……………....11

*German v. Federal Home Loan Mortg. Corp.,* 885 F.Supp. 537(S.D.N.Y 1995) ……....11

*Hanlon v. Chrysler Corp., 150 F. 3d 1011 (9th Cir. 1998)* ……………….…….....passim

*In re Citric Acid Antitrust Litig.,* 1996 WL 655791 (N.D. Cal. 1996) ……………...…..11

*In Re Wells Fargo,* 2007 U.S. Dist. LEXIS 77525 (N.D. Cal. 2007*)* ……….…………19,24

*Jordan v. Los Angeles County,* 669 F.2d 1311 (9th Cir. 1982) …………………….....11,12

*Klay v. Humana Health Plan,* 382 F.2d 1241(11th Cir. 2004) ……….……………..23

*Lerwill v. In-flight Motion Pictures, Inc.,* 582 F.2d 507 (9th Cir. 1978) …….…..……17,22

*Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands,*

*Inc.,* 244 F.3d 1152 (9th Cir. 2001) …………………………………………………...17

*Mullen v. Treasure Chest Casino, LLC,* 186 F3d 620 (5th Cir. 1999) …………….…..17

*Piel v. National Semiconductor Corp.* (E.D. Pa. 1980) 86 F.R.D. 357, 365 ….….…..12

*Sav-On Drug Stores, Inc. v. Superior Court,* 34 Cal. 4th 319 (2004) ……………….…19,24

*Schwartz v. Upper Deck Co.,*183 F.R.D. 672 (S.D. Cal. 1999) …………….……...…..12

*Staton v. Boeing Co.* 327 F.3d 938 (9th Cir. 2003) ………………………………..10

*Tierno v. Rite Aid Corp* 2006 WL 2535056 (N.D. Cal. August 31, 2006) ……….…..….*passim*

*Valentino v. Carter-Wallace,* 97 F.3d 1227 (9th Cir. 1996) …………………………........*passim*

*Wang v. Chinese Daily News, Inc.,* 231 F.R.D. 602 (C.D. Cal. 2005) …………….….…*passim*

*Whiteway v. FedEx Kinko's Office & Print Servs.,* 2006 U.S. Dist. LEXIS 69193 …….13,22,24

*Wiegele v. FedEx Ground Package System, Inc.* (S.D. Cal. 2008) ……………………..16,21,24

*Zinser v. Accufix Research Institute, Inc.,* 253 1180, 1189 (9th Cir. 2001) …………..20,23

*Otsuka, et al. v. Polo, et al.*

*iv*

Case No. C-07-02780-SI

## NOTICE OF MOTION & MOTION

To Defendants Polo Ralph Lauren Corporation, Polo Retail, LLC, and Fashions Outlet of America, Inc., their attorneys of record, and all other interested parties:

Please take notice that Plaintiffs Janis Keefe, Corinne Phipps and Renee Davis hereby move for an order: (1) certifying this lawsuit as a class action, (2) appointing them class representatives and (3) appointing their attorneys class counsel. The motion hearing will begin on July 11, 2008, at 9:00 a.m., or as soon thereafter as Plaintiffs' attorneys may be heard, in Courtroom 10 at 450 Golden Gate Avenue, 19th Floor, San Francisco, California.

This motion is brought on the ground that certification is proper pursuant to Federal Rule of Civil Procedure 23. It is based on this Notice of Motion & Motion, the Memorandum of Points & Authorities that follows, the accompanying declarations and exhibits, the Third Amended Complaint, and on such further evidence and argument as the Court may permit.

Dated: June 6, 2008                    THE LAW OFFICE OF PATRICK R. KITCHIN

By: Patrick R. Kitchin,
Attorneys for Plaintiffs Janis Keefe,
Corinne Phipps and Renee Davis

*Otsuka, et al. v. Polo, et al.*
Pl.s' Mot. For Class Cert.                    1                    Case No. C-07-02780-SI
otsuka/p/MoClassCert08f05

# MEMORANDUM OF POINTS & AUTHORITIES

## I. Introduction

Since at least 2002, Defendant Polo Ralph Lauren Corporation and two of its subsidiaries (collectively "Polo") have systematically undercompensated employees through unlawful policies and procedures uniformly applied in Polo stores throughout California. Representative Plaintiffs Keefe, Phipps Davis seek to remedy the resulting harm. To that end, they request certification of a class with two subclasses:

1. a class of former Polo sales associates and cashiers who worked in a Polo store in California at any time from May 20, 2002 through the conclusion of this action (hereafter "the Class");

2. a subclass of former sales associates who were misclassified as exempt inside commissioned salespeople ("the Misclassification Subclass"); and

3. a subclass of former sales associates from whom Polo took back earned wages through its "Arrears" compensation deduction scheme ("the Arrears Subclass").

The Class and Subclasses should be certified because the requirements of Federal Rule of Civil Procedure 23(a) and (b)(3) are satisfied.

## II. Facts

### A.   The Defendants

Polo Ralph Lauren Corporation (PLRC) is "a leader in the design, marketing and distribution of premium lifestyle products," including apparel, home accessories and fragrances, with gross profits in excess of $2.3 billion in Fiscal Year 2007. (Exhs. 1-2.) In addition to a Website, PLRC sells its products directly to consumers through full-price retail stores ("Full-Price Stores") and factory outlet stores ("Outlet Stores") around the world.

Together with its Fashions Outlets of America, Inc., and Polo Retail, LLC, subsidiaries, PRLC has directly sold its products through as many as 12 Full-Price Stores and 15 Outlet Stores in California since 2002. (Exh. 3.) Collectively, these entities have implemented certain standardized policies and procedures in these California stores that cause cashiers and sales associates to receive legally inadequate compensation. (*See generally* 3rd Am. Complaint, ¶11.)

**B.      *Polo Handbooks And Consistency Of Application Of Policies***

Polo gives all Full-Price and Outlet Store employees copies of *Polo Ralph Lauren's Retail Employee Handbook*, and requires them to agree in writing to be bound by all of the handbook's terms. (Exh. 4 at 113:25-114:3, 119:1-9; Exh. 5 at 45:8-13, 83:16-85:15; Exh. 6 at 61:2-7, 99:13-23, 100:14-20; Exh. 7 at 30:20-31:6; Exh. 8 at 39:4-10; Exh. 9 at 116:11-19; Exh. 10 at 67:17-68:13, 21:11-17; Exh. 11 at 107:11-20.)  Since May 2002, Polo has used only two versions of this handbook.  Polo released the newest version in Spring 2007 in apparent response to the claims asserted in this case.[1]  (Exhs. 12-13.)

Polo's management consistently applied the policies set forth in these handbooks throughout California.  (Exh. 14 at 74:3-21; Exh. 15 at 95:24-96:2; Exh. 16 at 76:9-77:7; Exh. 17 at 90:8-22.)

**C.      *Polo Does Not Compensate Employees For Waiting     Time     Associated     With     Loss Prevention Inspections Or "Bag Checks"***

Polo requires all its employees to undergo "loss prevention inspections" (or "bag checks") every time they exit a store.  (Exh. 18 at 39:14-45:5, 71:17-72:10; Exh. 19 at 55:22-63; Exh. 20 at 113:19-21; Exh. 21 at 125:19-23; Exh. 22 at 66:25-68:9, Exh. 23 at 23:19-24:5; Exh. 24 at 61:17-62:12, 71:24-72:5; Exh. 25 at 151:2-13.)

This mandatory policy is set out in the employee handbook and is explained to all employees when they are hired. (Exhs. 12-13; Exh. 26 at 48:20-23, 50:16-24; Exh. 27 at 28:5-12; Exh. 25 at 51:2-13; Exh. 28 at 58:16-59:6; Exh. 29 at 42:6-23.)

The policy is imposed consistently in every Polo store in California.  (Exh. 23 at 23:19-24:5; Exh. 24 at 61:17-62:12, 77:24-78:16; Exh. 30 at 140:1-14; Exh. 25 at 151:2-13; Exh. 31 at 90:23-91:4; 125:19-23; Exh. 22 at 66:25-68:9.)

///

///

---

[1] For example, Polo's 2007 handbook omits Polo's long-standing prohibition against employees disclosing their wages, a prohibition that, as noted in the Representative Plaintiff's original Complaint, violated California Labor Code §432.5.

Only managers, a few "key holder" associates (and security guards in the Beverly Hills store only) are permitted to conduct inspections. (Exh.32 at 152:20-154:22; Exh. 33 at 29:11-15; Exh. 34 at 42:22-43:5; Exh. 35 at 62:13-63:23, 68:14-69:1; Exh. 36 at 49:3-11, 49:16-18, Exh. 37 at 41:20-42:9.)

The process works as follows in every store. When a manager is satisfied that a sales associate or cashier has completed her or his end-of-shift cleaning and straightening, that employee is released to clock out. Managers release employees from different departments at different times as they complete their work. (Exh. 38 at 26:22-27:4, 27:22-25; Exh. 39 at 79:7-11.) Employees clock out, gather their personal belongings, and then try to find a manager who has time and is willing to go to the employee exit, perform a bag check and unlock the door. (Exh. 19 at 55:22-63; Exh. 40 at 102:24-110:23; Exh. 41 at 73:12-74:24.)

The loss prevention process is particularly prolonged at the end of the day. Managers are transmitting sales and timekeeping data to Polo's corporate offices, counting tills, completing paperwork, and monitoring the clean-up process. (Exh. 42 at 25:13-26:2; Exh. 43 at 29:5-23; Exh. 44 at 51:23-59:15.) It takes them about 15 minutes to transmit daily sales data to Polo's corporate offices. (Exh. 45 at 37:14-38:11.) It takes up to 25 minutes for a manager to close down the registers and count the money in the tills. (Exh. 46 at 54:3-14.) Consequently, managers generally are too busy performing their own closing duties to respond to employees' requests to be inspected and released. (*See, e.g.*, Exh. 47 at 251:9-21.)

Everyone is anxious to leave, including the managers, whose departure is delayed each time they are called to conduct inspections and to unlock doors for employees. Employees page managers, sometimes more than once. (Exh. 18 at 41:1-25; Exh. 48 at 106:12-20, 107:3-6, Exh. 49 at 254:2-13; Exh. 47 at 251:9-21.) Managers, however, sometimes ignore pages, hoping another manager might be closer to the employee exit or less occupied.[2] Employees also make calls to various departments, "trying to track down a manager." (Exh. 18 at 41:1-25; Exh. 50 at 75:3-76:5.) However, some managers consider it too burdensome to respond to all the calls for

---

[2] *See, e.g.*, Exh. 18 at 41:1-12: "[I]t was always my [i.e., Manager Resnick's] hope that someone from downstairs would let them out so I didn't have to go downstairs and back upstairs."); *id.*, 42:21-43:1; Exh. 54 at 78:6-79:21.

*Otsuka, et al. v. Polo, et al.*
Pls' Mot. For Class Cert.                    4                    Case No. C-07-02780-SI
                                                                 otsuka/p/MoClassCert08f05

inspections, so they ignore them, respond only sluggishly, or tell employees to find another manager who is less busy. (Exh. 51 at 127:17-130:12; Exh. 52 at 255:24-256:6; Exh. 53 at 125:4-25.)

As a result, employees often just congregate at an employee exit and wait. (Resnick, 40:5-41, 44:11-45:5.) When managers finally complete, or take a break from, closing duties, they go to employee exits where they find groups of employees sitting on floor, waiting to be inspected and released. (Exh. 18 at 40:5-41,44:11-45:5; *see also* Exh. 55 at ¶8: "[M]any employees were often waiting at the…door with me.") Sometimes missing appointments and public transportation, sales associates and cashiers commonly must wait 10-20 minutes a day after clocking out.[3]

Unhappy about the prolonged unpaid waiting time, employees have complained. (Exh. 56 at 46:10-47:1, 129:6-16 ("The employees were unhappy about it, so we heard about it."); Exh. 57 at ¶8; Exh. 58 at 141:17-20: "[W]e all heard the complaints pretty often.") Managers have discussed the problem "in huge detail" on numerous occasions. (Exh. 58 at 25:10-15, 26:6-27:2, 117:19-119:1, 120:3-15; 141:10-142:13 ("We talked about it quite a bit, actually, because there were so many complaints….") Some managers believed more should have been done, but the problem nonetheless has persisted. (Exh. 58 at 121:4-6, 123:1-11; Exh. 59 at 124:25-125:11.)

In its 2007 *Employee Handbook*, Polo sets out a modified loss prevention inspection procedure pursuant to which employees are supposed to find a manager ready to perform a loss prevention inspection *before* clocking out at the end of the day. (Exh. 13.) However, the modified

---

[3] *See* Exh. 62 at 51:17-52:8, 63:9-18; Exh. 63 at Kiser, 261:24-264:12; Exh. 64 at 43:2-44:2, 98:3-99:5; Exh. 65 at ¶5 ("[A]fter almost every shift…I clocked out and then would wait about 15-20 minutes before I was searched…."); Exh. 66 at 124:3-125:3 ("So, if they had to wait, it would have had to have been maybe 15 minutes—15 to 20 minutes."); Exh. 67 at 63:20-64:6; Exh. 68 at 109:1-13, 110:12-23; Exh. 69 at 75:3-78:1; Exh. 70 at 258:18-259:18, 253:18-22; Exh. 55 at ¶7 ("On average, I waited from 10-15 minutes after I had clocked out…during 90% of my shifts."); Exh. 71 at ¶4 ("I estimate that on a couple of days each week I had to wait for about 15 to 20 minutes after the end of my shift to have my bags checked by a manager before I could leave the store."); Exh. 72 at ¶5 ("In general, I had to wait from 10 to 15 minutes after I had clocked out before I was checked and allowed to leave."); Exh. 73 at ¶9 (average daily waits of 10-20 minutes); Exh. 74 at ¶6 ("[A]bout 3 times each week I…had to wait at least ten minutes after my shift, and sometimes waited 15 minutes or so…."); Exh. 75 at ¶4 ("At least 50% of the days I worked, I waited 15-20 minutes after I had clocked out before I was permitted to leave the building.")

---

*Otsuka, et al. v. Polo, et al.*
Pls.' Mot. For Class Cert.                    5                    Case No. C-07-02780-SI
                                                                 otsuka/p/MoClassCert08f05

procedure has been ignored. (*See, e.g.,* Exh. 60 at 122:20-123:24; Exh. 61 at 221:25-222:8; Exh. 76 at 157:2-10; Exh. 77 at 170:8-171:8.)   When asked if anyone is following the new loss prevention procedure, Polo's Director of Human Resources conceded, "[L]ogistically, it would be difficult to do, because many of the computers, where you can clock out are not near the exit." (Exh. 76 at 76:2-10.)   The new policy has been ignored so completely that Manager Valerie Harrison was unaware of it. (Exh. 77 at 170:8-171:8 – "So, that would mean they would have come and found me, and then they would have gone and clocked out?  ... Not that I noticed.") Polo thus still adheres to the same standardized loss prevention procedure that continues to cause prolonged, unpaid wait times. (*See, e.g.,* Exh. 76 at 157:2-10.)

### D.     *Employees Miss Rest Breaks, Yet Polo Does Not Compensate Them*

Polo has not provided to sales associates or cashiers all the rest breaks to which California law entitles them.  (*See generally,* TAC, ¶88.[4])   This is because staffing levels often are insufficient for employees to be able to take care of customers' needs without skipping breaks, and because managers pressure employees not to take breaks, in both the Outlet[5] and Full-Price Stores.[6]

Managers have known employees were missing out on rest breaks, yet have done nothing to ensure conditions were such that rest breaks could be taken as required by law. (Exh. 78 at 143:3-21; Exh. 79 at 63:5-64:13; Exh. 80 at 257:20-24, 258:2-8; Exh. 81 at 166:20-167:18.)

---

[4] California requires that employers provide employees with rest breaks if the employees work over 3½ hours day.  These mandatory rest breaks must be in the middle of each work period and must be an uninterrupted 10 minutes for every four hours worked.  For each day an employer fails to provide a rest break, it must pay the affected employee an extra hour's wage.  Labor Code §226.7; Industrial Wage Commission ("IWC") Order 7-2001.

[5] *See* Exh. 74 at ¶3:  "I was frequently not able to take my rest breaks during my work shifts because I was too busy tending to customers and my other duties."); Exh. 82 at ¶4: "I seldom got breaks during my shifts...because I was too busy helping customers or because the managers never released me for a break."); Exh. 71 at ¶3:  "I missed nearly all my rest breaks on a daily basis [because] my department was too busy for me to take breaks or I was discouraged by managers from taking breaks.); Exh. 83 at ¶3.

[6] *See* Exh. 75 at ¶3:  "It was part of the culture that [taking rest breaks] was discouraged [and] staffing levels were sometimes insufficient to allow for breaks, due to the need to assist customers."); Exh. 84 at 281:2-282:23, 285:16-286:15; Exh. 85 at 84:2-85:24; Exh. 55 at ¶4 ("I almost never took rest breaks...because there was not sufficient staff....")

*Otsuka, et al. v. Polo, et al.*
Pls' Mot. For Class Cert.                          6                          Case No. C-07-02780-SI
                                                                             otsuka/p/MoClassCert08f05

Even though employees missed out on rest breaks, Polo does not pay them the extra hour's wage to which Labor Code §226.7 entitles them. (Exh. 77 at 64:19-23.) By way of example, Phobe Mireles, the General Manager of the Palo Alto store, testified that, although her employees missed rest breaks, none ever received the one hour's wage penalty. (*Id.*) Polo's Senior Director of Human Resource Administration and Payroll (Joan Conovas), its Outlet Store Director of Human Resources (Sharonda Weatherspoon), and its Director of Retail Business Services (Elizabeth Flynn) similarly are unaware of any occasion on which Polo has paid a California employee an hour's wage penalty due to a missed rest break. (Exh. 86 at 53:15-25; Exh. 87 at 74:3-17; Exh. 88 at 49:12-21.)

**E.      *Misclassified Full-Price Store Sales Associates (The First Subclass)***

  1.      Full-Price Store Sales Associate Compensation Scheme And Misclassification

Polo provides another handbook dealing exclusively with employee compensation to all California Full-Price Store employees. (Exh. 89[7]; Exh. 90 at 77:2-10, 79:3-80:24; Exh. 91 at 61:2-7, 158:8-15; Exh. 92 at 76:21-77:18, 135:15-136:1; Exh. 93 at 99:20-24; Exh. 94 at 112:4-14; Exh. 95 at 67:21-69:2.)

The compensation handbook describes various aspects of Polo's compensation system, including what Polo's describes as a "draw versus commission system" (applicable in all Full-Price Stores in California, except the Burlingame store and one or two employees in the children's department of Polo's Beverly Hills store). (Exh. 89; Exh. 96 at 49:20-51-25.)

Under the draw versus commission system, sales associates are paid either a guaranteed hourly wage (1.5 times minimum wage) or a commission on their sales. (Exh. 97.) An associate earns a commission wage if her sales exceed the sales goal set by the company for each pay period. (*Id.*) When that occurs, the associate earns a percentage (e.g., 7 or 8%) of her net sales. (*Id.*) If the associate fails to sell enough merchandise to reach the sales goal, she is paid an hourly wage. (*Id.*) Under this system, each sales associate is expected to cover her hourly wages through sales of a certain value of merchandise. (*Id.*) The system is based on the assumption that sales associates will regularly meet and exceed the hourly pay-commission threshold. (*Id.*)

---

[7] Polo has issued several compensation handbooks in the last several years. The language and policies relevant to this case are identical.

Polo classifies all its Full-Price Store sales associates as exempt from premium overtime compensation. Polo continues to treat all sales associates as exempt throughout the course of their employment, regardless of whether they regularly exceed the threshold and regardless of whether they frequently earn less than one half of their wages through sales. (Exh. 98 at 56:4-10; Exh. 99 at 11:3: "Plaintiffs were exempt commission employees....")

Plaintiff Phipps, for example, worked for Polo in San Francisco during July-October 2004. During at least five pay periods, Ms. Phipps earned less than half her wages as "commission" when calculated at 8% of sales. (*See* Exh. 100, p. 1.) During her four months of employment, Ms. Phipps never once reached the sales *threshold*. (*Id.*) Despite this sales history, Polo misclassified her as a *bona fide* exempt inside commission salesperson throughout her employment and failed to pay her premium overtime wages. (*Id.; see also* TAC, ¶24.)

Plaintiff Janis Keefe similarly worked for Polo in San Francisco between May 2004 and January 2005. During at least two pay periods, Ms. Keefe's earnings fell below 50% of the threshold. Further, during the 18 pay periods she worked for Polo, Ms. Keefe exceeded the *threshold* only once. (Exh. 100, p. 1.[8]) Neither Ms. Phipps nor Ms. Keefe regularly met or exceeded their hourly draw.

Polo has long recognized that its Full-Price Store sales staff has difficulty reaching the hourly pay-commission threshold. For instance, in April 2002 Polo expressed concerns about the low productivity of its sales associates when compared with its labor costs. (Exh. 97.) At that time, Polo was compensating sales associates under an "hourly plus commission system," whereby associates were paid a low guaranteed hourly wage and a low commission on net sales, a system still in effect in Polo's Burlingame store. (*Id.*) Under the hourly plus commission system, Polo classified all sales associates as non-exempt, meaning Polo was required to pay premium wages for overtime work. (*Id.*) Before switching to the draw versus commission system, which is used today throughout California, Polo kept wage costs low by enforcing a zero overtime rule and

---

[8] Of the 69 misclassified sales associates Plaintiffs have identified to date, 27 of them never sold enough merchandise to cover their base hourly rate. (Exh. 100.)

*Otsuka, et al. v. Polo, et al.*
Pls' Mot. For Class Cert.                    8                    Case No. C-07-02780-SI
otsuka/p/MoClassCert08f05

scheduling sales associates for 37 hours per week to make certain no premium pay obligations would be incurred. (*Id.*)

That changed in 2002 when Polo switched to its draw versus commission system, and re-classified its sales associates as exempt commissioned employees.  (*Id.*)  Polo's draw versus commission system assumes all associates will regularly and consistently exceed the hourly pay-commission threshold.  Hence, the system does not differentiate one sales associate from another for the purpose of determining premium wage eligibility.  Thus, the draw versus commission system treats the sales associate who always exceeds the hourly pay-commission threshold exactly the same as the sales associate who has never exceeded the threshold and whose sales regularly are at or below one-half of the threshold.  While Polo has classified the *position* of sales associate as exempt from premium overtime obligations, it has ignored its obligation to monitor and evaluate the performance of the *individual employees* for the purpose of determining premium overtime eligibility.

This is significant because many sales associates are unable to cover their hourly wages through sales.  Consequently, while many associates do not regularly meet and exceed the threshold, and often fail to reach one half their sales requirements, Polo treats them all as *bona fide* exempt commissioned salespeople.  Polo has tracked the disappointing results on a weekly or bi-weekly basis, but has failed to remedy its misclassification as required by law.

    2.   <u>Polo Falsely Promises All Sales Associates It Will Perform Wage "Reconciliations"</u>

Polo understood that the classification of employees as "exempt" required analysis of each individual employee's sales performance.  It knew it was obligated under the Fair Labor Standards Act (29 U.S.C. §§201, *et seq.*) to analyze its employees' sales records to determine whether the employees had been properly classified as exempt.  In its compensation handbooks, which were provided to each of its associates in the Full-Price Stores, Polo promised to perform a "reconciliation" at the close of each fiscal year to determine whether any associate was entitled to the payment of premium wages. (Exh. 89 at p. 7.)

///

///

*Otsuka, et al. v. Polo, et al.*
Pl.s' Mot. For Class Cert.       9       Case No. C-07-02780-SI
otsuka/p/MoClassCert08f05

Despite these promises, Polo conducted no reconciliation until the summer of 2007, and then only in obvious response to this lawsuit. (Exh. 102 at 14:2-19, 76:5-77:16.) Even then, the reconciliation was performed in a manner that failed to follow state and federal law.[9] This faulty reconciliation procedure thus resulted in miniscule payments to only a small handful of employees. (Exh. 102 at 147:23-148:17.)

**F.    Polo's "Arrears" Compensation Deduction Scheme (The Second Subclass)**

Polo instituted its Arrears Scheme in 2004. It applied to all sales associates hired after April 18, 2004. (Exhs. 103-104; Exh. 102: 153:6-10.) Until the Arrears Scheme was instituted, a sales associate was not required to "pay back" money to Polo when he or she did not cover his or her hourly wages through sales. Under the Arrears Scheme, however, a negative sales balance was deemed to be money "owed to the company." (Exh. 102, 69:13-71:19, Exh. 105 at 59:7-21, 109:13-110:6.) Sales associates were required to pay off this putative debt through future commissions, if and when they were earned. Polo enforced its Arrears Program consistently in all its Full-Price stores in California, except for its Burlingame store, which remained on an hourly plus commission system. (Exh. 102 at 153:6-10.)

Polo's upper management intentionally removed information regarding the Arrears Scheme from Polo's revised compensation handbook before it was released to associates in 2004 such that sales associates never received any written description of it. (Exhibit 104; Exh. 106 at 89:24-90:5.)

**III. Federal Rule of Civil Procedure 23 Analysis Confirms Certification's Propriety**

**A.    Governing Standards**

To determine class certification's propriety, "the Court must only determine if the plaintiffs have proffered enough evidence to meet the requirements of FRCP 23, not weigh competing evidence." *Wang v. Chinese Daily News, Inc.*, 231 F.R.D. 602, 605 (C.D. Cal. 2005); *see also Staton v. Boeing Co.* 327 F.3d 938, 954 (9th Cir. 2003). "[T]he question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits…." *Eisen v Carlisle & Jacquelin*, 417 US 156, 178 (1974).

---

[9]  Plaintiffs further contend waiting an entire year to determine whether an employee qualifies as exempt through a "reconciliation" is unlawful because it allows for prolonged misclassification and undercompensation.

A proponent of class certification first must satisfy Rule 23(a)'s requirements of "numerosity," "commonality," "typicality" and "adequacy of representation." The proponent then must satisfy one of the three Rule 23(b) categories. The subdivision of Rule 23 supporting certification here is (b)(3), the requirements of which are "predominance" and "superiority." Each of these six requirements is discussed in context further below.

To determine whether Rule 23's requirements are satisfied, a court should conduct a "rigorous analysis." *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 158-161 (1982). In so doing, "the court may properly consider both the allegations of the class action complaint and the supplemental evidentiary submissions of the parties." *In re Citric Acid Antitrust Litig.*, 1996 WL 655791 *2 (N.D. Cal. 1996) (Smith, J.) However, "the Court 'is bound to take the substantive allegations of the complaint as true.'" *Wang*, 231 F.R.D. at 605, quoting *Blackie v. Barrack* 524 F2d 891, 901, n.17 (9th Cir. 1975).

Ultimately, "all that is required is that the Court form a 'reasonable judgment' on each class certification requirement." *In re Citric Acid Antitrust Litig.*, 1996 WL at *2; *see also Blackie*, 524 F2d at 901 & n.17.

**B.  *"Numerosity" Is Satisfied***

1.  <u>General Standards Of Numerosity</u>

Numerosity requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Impracticability means difficulty or inconvenience of joinder; the rule does not require impossibility of joinder." *German v. Federal Home Loan Mortg. Corp.*, 885 F.Supp. 537, 552 (S.D.N.Y 1995); *see also Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 448 (N.D. Cal. 1994).

Impracticability generally is presumed to exist "at a level of 40 members." *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 482 (2d Cir. 1995); *see also Jordan v. Los Angeles County*, 669 F.2d 1311, 1319 (9th Cir. 1982), *vacated on other grounds by* 459 U.S. 810 (1982) ("[W]e would be inclined to find the numerosity requirement in the present case satisfied solely on the basis of the [39] ascertained class members....")

///

*Otsuka, et al. v. Polo, et al.*
Pl.s' Mot. For Class Cert.                    11                    Case No. C-07-02780-SI
otsuka/p/MoClassCert08f05

Rough estimates are sufficient to establish numerosity, especially where the defendants' records will reveal the correct number. *See Piel v. National Semiconductor Corp.* (E.D. Pa. 1980) 86 F.R.D. 357, 365 n.5; *see also 1 Newberg on Class Actions* ("*Newberg*"), §3.05 at 3-25 (3d ed. 1995); *Barlow v. Marion County Hosp. Dist.,* 88 F.R.D. 619, 625 (M.D. Fla. 1980); *Schwartz v. Upper Deck Co.,*183 F.R.D. 672, 681 (S.D. Cal. 1999). As stated in *Newberg* §7.20 at 7-69:

> In cases where class numerosity is not precisely known, general knowledge or common sense will often support judicial notice or an assumption that there is sufficient numerosity to make joinder impracticable. Similarly, where class numerosity information is in the possession of the party opposing the class ... or where it depends on a fuller development of the case on the merits, ... the courts will generally not determine this issue adversely at an early stage.

2.      The Class & Subclasses Satisfy Numerosity

The Class of former cashiers and sales associates currently consists of an estimated 5,300 members.[10] The Misclassification Subclass has approximately 69 members. (Exh. 100; *see also* Kitchin Decl., ¶¶17-18.) The Arrears Subclasses has 49 members. (*See* Exh. 107; see also Kitchin Decl., ¶22.[11]) Like the Class, the Subclasses' size will continue to increase as more cashiers and sales associates discontinue their employment with Polo.

The numbers of Class and Subclass members alone are sufficient to establish numerosity. (*See Jordan,* 669 F.2d at 1319.) That the members are geographically scattered throughout California further evinces the impracticability of attempting to join them all in one action.

*C.*      ***Commonality Is Satisfied***

1.      General Standards Of Commonality

Commonality exists if there are questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). It does not require that all questions of law or fact be common to every member of the class; rather, at least one issue must be common to members. *Hanlon v. Chrysler Corp.*, 150 F. 3d

---

[10]  Kitchin Decl., ¶23. The class's size will increase as more cashiers and sales associates' employment with Polo ends. Polo also has not yet produced documents that may identify other cashiers, despite Plaintiffs' request. (*Id.*)

[11]  The names of Class and Subclass members are contained in Polo's records, which Polo has produced to Plaintiffs. (Kitchin Decl., ¶22.)

1011, 1019 (9th Cir. 1998). "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.*

In the Ninth Circuit, commonality "has been construed permissively," and its requirements deemed "minimal." *Hanlon*, 150 F.3d at 1020; *see also Whiteway v. FedEx Kinko's Office & Print Servs.*, 2006 U.S. Dist. LEXIS 69193, *13 (N.D. Cal. 2006).

    2.    <u>The Class Satisfies Commonality</u>

Polo's standardized policies and procedures result in numerous common factual and legal questions, including:

- Does Polo's standard policy of not compensating sales associates or cashiers for time spent waiting for completion of the loss prevention inspection process violate Labor Code §§200, *et seq.* and/or constitute an unfair business practice within the meaning of Business & Professions Code §17200, *et seq.*?

- Does Polo's policy of never paying one hour's wage when it failed to provide employees with a rest break violate IWC Order 7-2001 and Labor Code §226.7, and/or constitute an unfair business practice?

- Does Polo fail to furnish or maintain accurate pay records in violation of Labor Code §226 by not recording time employees spent waiting for loss prevention inspections?

- Is Polo's failure to maintain accurate pay records "knowing and intentional," thereby warranting Labor Code §226(f)-based penalties?

- By not compensating employees for loss prevention-related waiting time or missed rest breaks, did Polo fail to pay: (*i*) all wages owed when due in violation of Labor Code §§204 and 504; (*ii*) all wages due upon termination or resignation in violation of Labor Code §§201, *et seq.*; and/or (*iii*) all wages due upon termination at the place of discharge in violation of Labor Code §208?

- Is Polo's failure to pay employees waiting time-related wages or rest break penalties upon termination or resignation "willful" such that Labor Code §203 penalties apply?

Any one of these significant common issues alone would be sufficient to satisfy commonality. *See Hanlon*, 150 F3d at 1020.

///

///

3.   The Misclassification Subclass Satisfies Commonality

Key questions of law and fact common to the Misclassification Subclass include:

- Was it an unfair business practice for Polo to uniformly treat all sales associates in Full-Price Stores as exempt commissioned salespeople?

- Did Polo's misclassification of sales associates result in:  (a) inaccurate pay records, (b) failures to pay all wages owed when due, including premium overtime wages, and/or (c) failures to pay all wages owed at the location or the time of termination of employment?

- Did Polo willfully misclassify employees, warranting imposition of penalties for failures to pay wages owed upon cessation of employment and/or to maintain accurate pay records?

- Did Polo commit fraud by falsely promising all sales associates in writing that it would perform wage "reconciliations" to assess whether they were entitled to premium overtime?

- Does Polo's fraud warrant the imposition of punitive damages?

- If so, how should punitive damages be apportioned among the defrauded employees?

Again, any one of these common issues satisfies commonality.  *See Hanlon*, 150 F.3d, at 1020; *see also* Fed. R. Civ. P. Rule 23(b)(3) Advisory Committee's Notes ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action....")  This is further evident from similar misclassification cases finding commonality satisfied.  *See, e.g., Tierno v. Rite Aid Corp.,* 2006 U.S. Dist. LEXIS 71794 (N.D. Cal. Aug. 31, 2006):

> "Indeed, taking the allegations of the complaint as true, it is apparent that common questions of law and fact are present, including, but not limited to, whether Rite Aid improperly classified all Store Managers as exempt employees, and if so, whether such classification was done knowingly; [and] whether Rite Aid violated various provisions of the California Labor Code....")

4.   The Arrears Subclass Satisfies Commonality

Questions common to the Arrears Subclass include:

- Did Polo's use of its Arrears Scheme to deduct from commission income earned by sales associates violate Labor Code §221 and/or constitute an unfair business practice?

*Otsuka, et al. v. Polo, et al.*
Pls' Mot. For Class Cert.                          14                          Case No. C-07-02780-SI
                                                                              otsuka/p/MoClassCert08f05

- Was Polo's implementation of its Arrears Scheme a breach of its employment agreement with sales associates as set forth in its handbooks?

- Did Polo's use of its Arrears Scheme violate Labor Code requirements for:   (a) maintaining inaccurate pay records, (b) failing to pay all wages owed when due, and/or (c) failing to pay all wages owed at the location or the time of termination of employment?

The existence of common issues such as these easily satisfies the "minimal" hurdle posed by commonality. *See Hanlon*, 150 F.3d at 1020; *see also Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (Commonality exists when "a lawsuit challenges a system-wide practice or policy that affects all of the putative class members.")

**D.    *Typicality Is Satisfied***

1.    General Standards Of Typicality

Typicality is satisfied when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  Representative parties' claims are "typical" when "the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries result from the same, injurious course of conduct" (*Armstrong*, 275 F.3d at 868) or from the "same event" or "practice" (*Jordan,* 669 F.2d at 1319).

Similar to its interpretation of Rule 23(a)(2) commonality, the Ninth Circuit interprets Rule 23(a)(3) typicality permissively.  *Hanlon*, 150 F.3d at 1020.  Under this "permissive" interpretation, representative claims are "typical" if "they are reasonably co-extensive with those of absent class members; they need not be substantially identical."  *Id.*

2.    Typicality Exists As To The Class

The Representative Plaintiffs' claims are typical of the rest of the Class because they involve the same variety of injury caused by the same standardized policies and procedures. *See Armstrong*, 275 F.3d. at 275.  Specifically, like other Class members, the Representative Plaintiffs received legally insufficient compensation due to Polo's standardized practices and policies of:  (a) not paying employees for loss prevention inspection-related waiting time, (b) not paying an hour's wage for missed rest breaks.  (*See generally* TAC, pp. 1, *et seq.*)  As a result, Plaintiffs assert the same legal theories as the rest of the class, including those based on the failure to pay wages in a

*Otsuka, et al. v. Polo, et al.*
Pl.s' Mot. For Class Cert.                                    15                    Case No. C-07-02780-SI
                                                                                otsuka/p/MoClassCert08f05

timely manner, failure to maintain accurate records and failure to provide all wages due at the time and place of termination of employment. (*Id.*; *cf. Wang*, 231 F.R.D. at 608: "Since the named Plaintiffs raise the same Labor Code violations as other putative class members, their claims are typical of the class.")

3.   Typicality Exists As To The Misclassification Subclass

Plaintiffs Phipps and Keefe's claims are typical of the rest of the Misclassification Subclass because they all were undperpaid pursuant to a standardized scheme of classifying all sales associates in full-price stores as exempt. (*See* TAC, pp. 1, *et seq.*) Polo also falsely represented in writing to Plaintiffs Keefe and Phipps and the rest of the Misclassification Subclass that it would conduct an annual "reconciliation" to ensure they were properly paid. (*Id.*)

Because the same course of conduct resulted in the same variety of injury to the entire subclass, including Plaintiffs Phipps and Keefe, typicality is satisfied. *See Armstrong*, 275 F.3d. at 275; *Wang*, 231 F.R.D. at 608.

4.   Typicality Exists As To The Arrears Subclass

Typicality exists as to the Arrears Subclass because, like other members of the proposed subclass, Plaintiffs Phipps and Keefe were undercompensated pursuant to Polo's uniformly applied Arrears-related policies and practices.   When they were unable to meet Polo-established sales targets, Polo took back later commission-based wages they earned, just as it did with all other members of the subclass.   Plaintiffs Phipps and Keefe's claims thus are typical of the rest of the subclass.   (*See* TAC, pp. 1, *et seq.*; *cf. Dukes v. Wal-Mart*, 509 F.3d 1168 (9th Cir. 2007) (Typicality exists when "the class representatives have been subjected to the same policies and practices that have adversely affected members of the class that they seek to represent."); *see also Wang*, 231 F.R.D. at 608; *Wiegele v. FedEx Ground Package Sys.*, 2008 U.S. Dist. LEXIS 10246 (S.D. Cal. 2008).

**E.   *Adequacy Of Representation Is Satisfied***

1.   General Standards Of Adequacy

"Adequacy of representation" requires that class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Establishing adequacy requires that the

*Otsuka, et al. v. Polo, et al.*
Pl.s' Mot. For Class Cert.                                    16                          Case No. C-07-02780-SI
                                                                                          otsuka/p/MoClassCert08f05

named plaintiffs and their counsel:  (1) are willing and able to vigorously prosecute the action on behalf of the entire putative class, and (2) have no conflicts of interest.  *Lerwill v. In-flight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978); *Hanlon*, 150 F.3d 1020.

Plaintiffs satisfy these requirements because they share the interests of the remainder of the Class and Subclasses in redressing Polo's standardized policies and practices of undercompensating them all.  *See, e.g., Wang*, 231 F.R.D. 609-10.  Further, they have no conflicts with other Class or Subclass members, have assisted their attorneys with the prosecution of this case, have participated in discovery, and have retained competent and seasoned counsel to represent their interests. (*See* Kitchin Decl., ¶7; Hudgins Decl., ¶¶1-13.)

**F.    *Predominance Is Satisfied***

1.    General Standards

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  The analysis thus pivots on "the relationship between the common and individual issues." *Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001).  A significant underlying aim of predominance is to ensure common issues form a portion of the case that is sufficiently significant to promote judicial economy. *Hanlon*, 150 F.3d at 1022; 2 Newberg [4th Ed.] §4.25 at pp. 169-174; *Valentino v. Carter-Wallace*, 97 F.3d 1227, 1234 (9th Cir. 1996).  It "was not meant to require that the common issues will be dispositive of the controversy or even be determinative of the liability issues involved." 2 Newberg (4th Ed.) §4.25 at pp. 169-174.

Rather than require a simple counting of common issues, the predominance inquiry entails a weighing of their comparative significance. *Mullen v Treasure Chest Casino, LLC*, 186 F3d 620 (5th Cir. 1999); *see also* 2 Newberg (4th Ed.) §4.25 at pp. 169-174 ("A single common issue may be the overriding one in the litigation, despite the fact that the suit also entails numerous remaining individual questions."[12])

---

[12] "Even if the common questions do not predominate over the individual questions...Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues." *Valentino*, 97 F.3d 1227;

*Otsuka, et al. v. Polo, et al.*
Pl.s' Mot. For Class Cert.                    17                    Case No. C-07-02780-SI
                                                                   otsuka/p/MoClassCert08f05

2.    Predominance Exists As To The Class

Because all Class members' claims arise from Polo's standardized policies and procedures, common issues will be predominant in the collective resolution of those claims.  Some of these common issues are detailed above in conjunction with the discussion of commonality (*infra*, 13:7-26) and generally include *inter alia*:  (1) whether Polo's policies of not compensating sales associates or cashiers for loss prevention inspection-related waiting time or missed rest breaks are lawful; (2) whether these policies resulted in inaccurate pay records, legally inadequate compensation, and/or a failure to pay wages timely; and (3) whether Polo knowingly undercompensated employees and/or maintained inaccurate pay records.  *See generally* TAC, pp. 1, *et seq.*

Because these issues are "overriding," predominance would exist even if "numerous remaining individual questions" existed.  2 Newberg (4th Ed.) §4.25 at pp. 169-174.  Regardless, they do not.  *See generally* TAC, pp. 1, *et seq.*  Instead, individual issues would relate largely to damages, which is "invariably an individual question" that "does not defeat class action treatment."  *Blackie*, 524 F2d at 905; *see also Wang*, 231 F.R.D. at 13 ("Most difference among putative class members, such as…the number of breaks that have been missed, affect damages, not Defendant's liability."); *Local Joint Exec. Bd. Of Culinary/Bartender Trust Fund*, 244 F.3d at 1163 ("[S]ome variation among the individual employees as well as some proof – including as to damages – do not defeat predominance.")

"When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis."  *Hanlon*, 150 F.3d at 1022 (emphasis added).  Because common questions present a significant aspect of the Class's case against Polo, "clear justification" for class treatment thus exists here.  *Id.*

///

///

---

*see also Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 976 (5th Cir. 2000) (reciting the advantages of claim-by-claim certification and remanding case for determination of whether certification of a modified class with respect to some of the claims would be proper).

3.   Predominance Exists As To The Misclassification Subclass

Predominance exists as to the Misclassification Subclass because collective resolution of its members' claims likewise would entail addressing predominant common issues. (*See infra*, 14:1-14.)

Indeed, "[i]n the context of overtime pay litigation, courts have often found that common issues predominate where an employer treats the putative class members uniformly with respect to compensation, even where the party opposing class certification presents evidence of individualized variations." *In Re Wells Fargo*, 2007 U.S. Dist. LEXIS 77525, *17-19 (N.D. Cal. 2007). That Polo has uniformly classified all sales associates in Full-Price Stores as exempt thus alone itself constitutes an overriding issue satisfying predominance. *See In Re Wells Fargo*, 2007 U.S. Dist. LEXIS 77525, *17-19 (N.D. Cal. 2007); *Sav-On Drug Stores, Inc. v. Superior Court*, 34 Cal. 4th 319, 329 (2004) ("[I]t is sufficient, for class treatment, that Plaintiff show either the likelihood of a standardized or uniform policy of *deliberate* misclassification *or* simply that the defendant's uniform practices likely led to wide spread *de facto* misclassification.); *Alba v. Papa John's USA, Inc.*, 2007 U.S. Dist. LEXIS 28079, at *39-41 ("[T]he question of whether store managers are 'exempt' is a common defense [that] supports class adjudication.")

That courts have deemed predominance satisfied in closely analogous circumstances further illustrates that predominance is satisfied here. Specifically, in *Wang v. Chinese Daily News*, the court stated:

> "[C]ommon questions of law and fact predominate in this case. These questions include: whether Defendant has a uniform policy of unlawfully treating certain classifications of employees as "exempt;" whether Defendant conducted an appropriate investigation to support a good faith defense of this policy; whether Defendant failed to pay overtime compensation to non-exempt employees; whether Defendant deprived employees of meal and rest breaks and failed to pay appropriate penalties for missed breaks; whether Defendant failed to keep accurate records of hours worked; whether Defendant failed to provide accurate itemized wage statements to employees; whether Defendant failed to pay all wages due to employees at the time that their employment was terminated."

*Otsuka, et al. v. Polo, et al.*
Pls' Mot. For Class Cert.                    19                    Case No. C-07-02780-SI
                                                                    otsuka/p/MoClassCert08f05

*Wang*, 231 F.R.D. at 612.   In such circumstances, "common questions of law and fact predominate." *Id.*  Because the Misclassification Subclass's claims involve strikingly congruent issues, common questions of law and fact predominate here as well. *See id.*

4.  Predominance Exists As To The Arrears Subclass

Collectively litigating the Arrears Subclass's claims also predominately would entail consideration of common issues, including:  (1) whether taking wages through the Arrears Scheme violated Labor Code §221 or constituted and unfair business practice; (2) whether it was a breach of its employment agreement set forth in Polo's handbooks; (3) whether it violated Labor Code prohibitions against maintaining inaccurate pay records, failing to pay all wages owed at the location or the time of cessation of employment; or failing to pay all wages owed when due and/or (4) whether such violations were knowing or willful, warranting imposition of penalties. (*See* TAC, pp. 1, *et seq.*; *infra*, 14:25, *et seq.*)  By contrast, the individualized issues would relate primarily, if not exclusively, to application of a straightforward mathematical calculation of damages (*see* Kitchin Decl., ¶24), which does not detract from the predominance of common issues. *See, e.g., Blackie,* 524 F2d at 905.

Because "common questions present a significant aspect of the [Subclass's] case and they can be resolved for all members of the [Sub]class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022.

**G.    *Superiority Is Satisfied***

1.  General Standards

The final determination relevant to certification is whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. Proc. 23(b)(3).  That a class action promotes judicial economy or facilitates meaningful access to a means of redress militates in favor of a finding of superiority.  *See, e.g., Valentino*, 97 F.3d at 1234; *Hanlon*, 150 F.3d at 1022-23 (9th Cir. 1998); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d. 1180, 1189 (9th Cir. 2001).  Other matters that should be balanced in determining superiority include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed R. Civ. Proc. 23(b)(3)(A)-(D). A balancing of these factors confirms a class action is superior to other methods for "fairly and efficiently adjudicating the controversy." Fed R. Civ. Proc. 23(b)(3).

> 2. Class Treatment Would Further The Interests Of Judicial Economy And Facilitate Meaningful Access To Redress

Certification of the Class and the Subclasses would further the interest of judicial economy because, if each member of the Class or the Subclasses were required to litigate separately, that would needlessly clog the courts with repetitious lawsuits requiring multiple judges and juries to address the numerous common legal and factual issues mentioned above.

Further, a tremendous waste of resources would result because each individual cashier and sales associate would be required to expend significant resources to re-litigate essentially the same case in its entirety. "For these reasons, Courts often certify class actions when employer wage and hour practices similarly impact a large number of workers." *Wiegele*, 2008 U.S. Dist. LEXIS 10246; *see also Krzesniak v. Cendant Corp.*, 2007 U.S. Dist. LEXIS 47518, at *50.[13]

---

[13] As the *Sav-On* court observed:

> Absent class treatment, each individual plaintiff would present in separate, duplicative proceedings the same or essentially the same arguments and evidence, including expert testimony. The result would be a multiplicity of trials conducted at enormous expense to both the judicial system and the litigants. It would be neither efficient nor fair to anyone, including defendants, to force multiple trials to hear the same evidence and decide the same issues.

*Sav-On*, 34 Cal.4th at 340 (internal quotations and citations omitted).

*Otsuka, et al. v. Polo, et al.*
Pl.s' Mot. For Class Cert.                    21                    Case No. C-07-02780-SI
                                                                     otsuka/p/MoClassCert08f05

Not only would "numerous individual actions...be expensive and time-consuming," they also "would create the danger of conflicting decisions as to persons similarly situated." *Lerwill*, 582 F.2d at 512. The preclusive effect of a class action would eliminate such concerns.

Class treatment also would facilitate meaningful access to redress because without it the damage claims of some may be so small that their potential recovery would be less than they would have to expend to obtain it. It also would facilitate meaningful access to justice for others who might fear challenging a massive corporation in a legal proceeding, or who mistakenly assume Polo lawfully compensated them. Such circumstances are routinely deemed to satisfy superiority. *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997); *Lerwill*, 582 F.2d at 512; *Wang*, 231 F.R.D. at 612; *Whiteway*, 2006 U.S. Dist. LEXIS 69193, at *29-30; *Krzesniak*, 2007 U.S. Dist. LEXIS 47518 *54-55 (N.D. Cal. 6/20/07); *Tierno*, 2006 U.S. Dist. LEXIS 71794 ("If a class was not certified in this case, the alternative would be either numerous individual suits or the abandonment of individual claims. The former would undoubtedly result in a great duplication of effort given the predominance of common questions of law and fat, while the latter would result in lost access to the courts.")

3.   Analysis Of The Other Factors Considered in the Rule 23(b)(3) Calculus Also Confirms Superiority Is Satisfied

(a)   *No Individual Interests In Controlling Prosecution*

Because the class members are asserting essentially identical claims, no single member has a significant interest in individually controlling the prosecution. Indeed, it could allow the plaintiffs, as a group, to keep more of the damages they are awarded by obviating the need for numerous contingency fee lawyers. Further, collective litigation could lead to a more advantageous settlement because, through a single settlement, Polo could be assured no further related litigation would occur.

///

///

///

*Otsuka, et al. v. Polo, et al.*
Pls' Mot. For Class Cert.                                    22                         Case No. C-07-02780-SI
                                                                                        otsuka/p/MoClassCert08f05

In short, as was the case in *Hanlon*:

> From either a judicial or litigant viewpoint, there is no advantage in individual members controlling the prosecution of separate actions. There would be less litigation or settlement leverage, significantly reduced resources and no greater prospect for recovery.

*Hanlon, supra*, at 1023.

### (b)   *No Existing Related Litigation Of Consequence*

Plaintiffs are aware of only one other case against Polo involving similar issues, which Justin Kiser filed following his voluntary dismissal from this action. It thus would seem no genuine concerns exist about judicial economy being undermined by substantial amounts of pre-existing related litigation. *Cf. City of Inglewood v City of Los Angeles*, 451 F.2d 948, 952, n. 4 (9th Cir. 1971) (that over 2,000 class members already had sued pertinent to Rule 23(b)(3) certification); *Hanlon*, 150 F.3d 1011 (no bar to certification where only a few pending lawsuits may be difficult to merge into class action). In sum, "The lack of other litigation militates in favor of...a finding of superiority." *Krzesniak*, 2007 U.S. Dist. LEXIS 47518, *54-55; *see also Zinser*, 253 F.3d at 1189 (9th Cir. 2001).

### (c)   *The Desirability of Concentrating Litigation Here*

Because the proposed class members worked in stores scattered throughout California, this forum is as good as, or better than, any other for pursuing their claims. *Cf. Hanlon*, 150 F.3d at 10-11 (finding superiority when, *inter alia*, "no particular forum [stood] out as a logical venue for concentration of claims"). Further, because the attorneys for both the Representative Plaintiffs and Polo have offices in the Bay Area, litigating in San Francisco would seem superior to any other forum.

### (d)   *Any Class Action-Related Complexities Are Manageable*

Whether the class action procedure would create manageability problems is relevant only to the extent it would "create relatively more management problems than any of the alternatives." *Klay v. Humana Health Plan*, 382 F.2d 1241, 1273-74 (11th Cir. 2004). However, manageability itself rarely by itself defeats class certification. *See id.* This is particularly true when, as here, the predominance is satisfied. *See, e.g., id* at 1274.

*Otsuka, et al. v. Polo, et al.*
Pl.s' Mot. For Class Cert.                                          23                                 Case No. C-07-02780-SI
                                                                                                        otsuka/p/MoClassCert08f05

In any event, collectively litigating the proposed class members' claims here would not make class litigation unmanageable, as illustrated by similar cases in which superiority was deemed satisfied. *See, e.g., Wang*, 231 F.R.D. at 612; *Krzesniak*, 2007 U.S. Dist. LEXIS 47518, at *50; *Tierno*, 2006 U.S. Dist. LEXIS 71794 at *33-37. Indeed, resolution of class members' claims here would be comparatively straightforward.  To the extent individual issues exist, they "do not render class certification inappropriate so long as such issues may effectively be managed." *Sav-On*, 34 Cal. 4th at 334 quoted with approval in *Tierno*, 2006 U.S. Dist. LEXIS 71794 at *35-37. As evident from multiple similar cases, any individual issues in this case could be effectively managed.  *See Tierno*, 2006 U.S. Dist. LEXIS 71794 at *35-37 ("[W]here, as here, there is sufficient similarity among Store Manager positions to render class treatment appropriate, any remaining individual issues regarding eligibility for relief or damages can be addressed through other measures."); *Sav-On*, 34 Cal. 4th at 334; *Wiegele*, 2008 U.S. Dist. LEXIS 10246 (S.D. Cal. 2008). As the *Tierno* court explained:

> [C]ourts in overtime cases such as this may properly couple uniform findings on common issues regarding the proper classification of the position at issue with innovative procedural tools that can efficiently resolve individual questions regarding eligibility and damages. Such tools include administrative mini-proceedings, special master hearings, and specially fashioned formulas or surveys.

*Tierno*, 2006 U.S. Dist. LEXIS 71794 at *35-37; *see also Whiteway*, 2006 U.S. Dist. LEXIS 69193, at *29-30.  Because wage and hour suits like this one thus are not unmanageable, courts routinely consider superiority satisfied, and grant certification. *See, e.g., Wang*, 231 F.R.D. at 612; *In Re Wells Fargo*, 2007 U.S. Dist. LEXIS 77525; *Tierno*, 2006 U.S. Dist. LEXIS 71794; *Whiteway*, 2006 U.S. Dist. LEXIS 69193, *29-30; *Krzesniak*, 2007 U.S. Dist. LEXIS 47518, *54-55; *Wiegele*, 2008 U.S. Dist. LEXIS 10246 (S.D. Cal. 2008).

///

///

///

### IV. Conclusion

Common issues predominate.  No superior mechanism for resolving all Class members' claims exists.  Rule 23(a)'s requirements all are satisfied.  Consequently, the Representative Plaintiffs respectfully submit certification should be granted.

Dated: June 6, 2008                                THE LAW OFFICE OF PATRICK R. KITCHIN


By:  Patrick R. Kitchin,
Attorneys for Janis Keefe, Corinne Phipps and Renee Davis

*Otsuka, et al. v. Polo, et al.*
Pl.s' Mot. For Class Cert.                          25                          Case No. C-07-02780-SI
                                                                                otsuka/p/MoClassCert08f05