EXHIBIT 19.

Golden Gate Reporting

1              IN THE UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4

5   ANN OTSUKA, an individual;      )
    JANIS KEEFE, an individual,     )
6   CORINNE PHIPPS, an              )
    individual; and RENEE DAVIS,    )
7   an individual; individually     )
    and on behalf of all others     )
8   similarly situated,             )
             Plaintiffs,            )
9                                   )

10     -vs-                         )   No. C-07-02780-SI

11                                  )

12  POLO RALPH LAUREN CORPORATION;)
    a Delaware Corporation; POLO    )
13  RETAIL, LLC., a Delaware        )
    Corporation, POLO RALPH LAUREN)
14  CORPORATION, a Delaware         )
    Corporation, doing business in)
15  California as POLO RETAIL       )
    CORP; FASHIONS OUTLET OF        )
16  AMERICA, INC., a Delaware       )
    Corporation,                    )
17           Defendants.            )

18  _____  )

19

20          The deposition of HARVEY RESNICK, called
    by the Plaintiffs for examination, pursuant to
21  subpoena and pursuant to the Federal Rules of
    Civil Procedure for the United States District
22  Courts pertaining to the taking of depositions,
    taken before Cynthia J. Conforti, Certified
23  Shorthand Reporter, at Suite 2500, 77 West Wacker
    Drive, Chicago, Illinois, commencing at the hour
24  of 10:09 a.m. on the 23rd day of April, A.D.,
25  2008.

                                          Page 1

**Golden Gate Reporting**

| | |
|---|---|
| 1 in the store. | 1 lower level and went out into the Galleria Mall. |
| 2   Q.  Do you have any kind of an estimate as to | 2   Q.  And on occasion did you perform those |
| 3 how long it took a manager to go through that | 3 inspections? |
| 4 process of transmitting sales data? | 4   A.  Yes. |
| 5   A.  It was probably 15 to 20 minutes, maybe | 5   Q.  And I want to focus just on the inspection |
| 6 less if you're really efficient. | 6 part itself.  What would typically -- what would |
| 7   Q.  And where did they typically perform that | 7 you typically do to performing that inspection? |
| 8 function? | 8   A.  Basically you'd look into any packages or |
| 9   A.  There was a specific computer that was | 9 bags or anything of that nature where some |
| 10 used for that.  I think it was maybe even Theresa | 10 merchandise could be concealed.  Basically that's |
| 11 Cruz's actually.  I'm not sure. | 11 what you were looking for, something of that |
| 12   Q.  What other duties did managers perform at | 12 nature.  If somebody made a purchase, check the |
| 13 closing time other than transmitting this data as | 13 receipt or something of that type. |
| 14 we just talked about and recovering their | 14   Q.  Could you describe the process that a |
| 15 department? | 15 sales associate typically went through at the end |
| 16   A.  Well the only other thing that really you | 16 of the day when you or someone else indicated that |
| 17 needed to do or needed to be done by a manager is | 17 their department was clean and ready and they were |
| 18 to inspect the employee's belongings, purses, | 18 permitted to leave? |
| 19 bags, whatever, gym bag, anything of that nature | 19   A.  Well, from my area they would go |
| 20 an allow them to leave through the employee | 20 downstairs to the employee lockers where they keep |
| 21 entrance. | 21 their belongings, gathered their things, and, |
| 22   Q.  Were there occasions after the close of | 22 actually, they should have clocked out prior to |
| 23 the store but before sales associates went home | 23 that point, then go get their things and wait for |
| 24 when you had duties that required you to be on the | 24 a manager to release them, follow the inspection, |
| 25 telephone to talk with customers or other managers | 25 the loss prevention inspection. |
| Page 38 | Page 40 |

| | |
|---|---|
| 1 or people from Polo? | 1   Q.  And how would sales associates typically |
| 2   A.  Not a requirement.  Nothing was done on a | 2 notify a manager that they were ready to have a |
| 3 regular basis.  It could happen.  It wasn't | 3 loss prevention inspection performed? |
| 4 necessarily something you had to do on a regular | 4   A.  Well, sometimes they would call.  There |
| 5 basis. | 5 was a phone right there near that or very near to |
| 6   Q.  What did Tin Hong Hua typically do during | 6 that door. |
| 7 the shutdown process? | 7       My understanding was that was a location |
| 8   A.  You know, I don't know what exactly he was | 8 where there was at one time a loss prevention |
| 9 doing.  I was upstairs, and he most of the time | 9 person, but then that was a position that no |
| 10 would be in his office which is in the lower | 10 longer existed when I started working there, but, |
| 11 level.  When he was there at closing, he would | 11 at any rate, there was a telephone call there, and |
| 12 often do that shutdown transmittal, you know, that | 12 they would call and say "We're waiting." |
| 13 sort of thing.  He'd shut down the store. | 13   Q.  Would they call different departments? |
| 14   Q.  I want to talk about the loss prevention | 14   A.  Yeah, trying to track down a manager. |
| 15 inspections. | 15   Q.  Would they sometimes page a manager over |
| 16       You indicated that managers would check | 16 the PA system? |
| 17 bags and belongings of individuals before they | 17   A.  Same system, yeah. |
| 18 left the store. | 18   Q.  And when you heard a page, what typically |
| 19   A.  (Nodding head.) | 19 would people say over the PA system? |
| 20   Q.  Yes?  Is that a yes? | 20   A.  Basically just to let you know that they |
| 21   A.  That is correct, yes. | 21 were waiting to be allowed to leave. |
| 22   Q.  And was there a specific entrance/exit | 22   Q.  And were there occasions when you heard |
| 23 that employees were required to use at the end of | 23 more than one page asking for a manager at the |
| 24 the business day? | 24 close of the business day? |
| 25   A.  Yes.  The employee entrance was in the | 25   A.  Yes. |
| Page 39 | Page 41 |

11 (Pages 38 to 41)

**Golden Gate Reporting**

1    Q. How often would that happen?
2    A. It's hard to day. It depended on I think
3  really the time of the year. I think at holiday
4  time it was more frequent than others probably
5  just because the volume of traffic through the
6  store during the day required much more in the way
7  of cleanup and preparation for the next day, and
8  so some people would be finished, others were not,
9  and those who were ready to go wanted to leave,
10  and they would page or call looking for a manager.
11    Managers such as myself, I was upstairs in
12  my area, and the other manager if it women's or
13  home furnishings, they were located downstairs
14  closer to that exit, so it was always my hope that
15  somebody from downstairs would let them out so I
16  didn't have to go downstairs and back upstairs.
17    Q. So on occasion you would hear a page or
18  get a call saying "We're ready to go."
19    A. Yeah.
20    Q. And let's deal with when you heard a page.
21    On occasion did you hear a page that sales
22  associates were waiting at the employee exit in
23  which you didn't respond to it hoping that a
24  manager from downstairs would walk over and do the
25  inspection?

Page 42

1    A. Yes.
2    Q. Did you ever hear that any of the managers
3  were particularly nonresponsive to pages or
4  requests to have loss prevention inspections
5  performed?
6    A. Not specifically. Just in general
7  sometimes it seemed that to the sales associates
8  that they were waiting a long time, and they would
9  become impatient.
10    Q. Did any sales associates ever tell you
11  that they believed they had waited a long time for
12  the loss prevention inspection to occur?
13    A. Yes.
14    Q. Was that on a single occasion or a number
15  of occasions?
16    A. More than once.
17    Q. Do you remember any specific individuals
18  who told you that they had been waiting for what
19  they thought was an unreasonable amount of time at
20  the back door?
21    A. Not specifically, no.
22    Q. Do you recall in general or specifically
23  how long a sales associate told you that they had
24  been waiting to have a loss prevention inspection
25  performed?

Page 43

1    A. Oh, I think sometimes they would say
2  they'd been waiting 10, 15 minutes.
3    Q. Did you ever go down to do a loss
4  prevention inspection to find anyone sitting on
5  the floor in the hallway?
6    A. Yes.
7    Q. How often did that occur?
8    A. It was not unusual that there were groups
9  of people waiting to leave. They'd be sitting on
10  the floor there.
11    Q. At the close of business was it the case
12  that individuals from different departments, maybe
13  even your department, left at different times and
14  so required inspections to be performed?
15    A. Yes, that's right.
16    So as they would -- as each one would be
17  ready to leave, they would want somebody to come
18  to the door to do the inspection so that they
19  could leave, which, since there was nobody
20  assigned to that position, there was nobody -- not
21  one manager was assigned to watch, you know, stay
22  at the door and release everybody as they come
23  through, then that's why it would occur that, you
24  know, three or four, five people might be sitting
25  there waiting to leave, waiting for a manager to

Page 44

1  come, and for a manager it was a bit of a strain
2  to go back and forth to your department to let one
3  person out, go back, let another one out, go. It
4  wasn't unusual for managers not to respond to the
5  first call for someone to let them out.
6    Q. Were there occasions where at the close of
7  business you went down to the employee exit more
8  than one time to let people out?
9    A. Yes.
10    Q. Do you have any recollection of kind of
11  the length of time that you're aware of between
12  the first person or group of people leaving at the
13  close of business and the last people to finish up
14  to be released and waiting for their loss
15  prevention inspection?
16    A. Well, sometimes the very first people to
17  be finished would be from one of the departments
18  in the lower level of the store. They might be
19  done within 10 minutes of the store closing and be
20  out and able to leave. A lot of times, very
21  often, people in the men's area were still working
22  another 30 minutes. Wouldn't be that unusual,
23  especially again to have this little repetition
24  for the holiday time.
25    You know, a big portion of my six months

Page 45

12 (Pages 42 to 45)

**Page 53**

1  A.     That you have to be physically checked out by a
2  manager.
3  Q.     And were you told the reason for the necessity to
4  be checked out physically by a manager?
5  A.     No.
6  Q.     Did you have some intuition as to what the reason
7  was?
8  A.     Yes, absolutely.
9  Q.     And so every day that you worked -- let me back up.
10 On a daily basis, were you actually checked in?  Was there
11 some process to formally check you in to the store?
12 A.     Well, no one was -- I mean, if you're referring to
13 looking through someone's bags while you came in?
14 Q.     Thank you for the clarification.
15 A.     Then no.
16 Q.     Okay.  So we'll get into the check-in procedures a
17 little later.  I'm now focusing on the checkout procedures.
18 A.     Okay.
19 Q.     And if I refer to them as loss prevention searches,
20 would you understand what I'm talking about?
21 A.     Yes.
22 Q.     And you understood the purpose was to make sure
23 that -- even though you were an employee, they wanted to
24 make sure you weren't taking goods or materials out of the
25 store --

**Page 54**

1  A.     Yeah.
2  Q.     -- that hadn't been paid for?
3  A.     Sorry.  Twice now.  It's not bad.
4  Q.     Let's break these loss prevention searches up into
5  two pieces if we could.  I want to talk about the end of
6  your shift or the end of the day.
7  A.     Okay.
8  Q.     Did you have a normal schedule that you worked
9  during your tenure at the company?
10 A.     I would -- you mean like a --
11 Q.     Date, what days of the week.
12 A.     You know what, I was a full-time employee, so I
13 worked any of the given days because they were open seven
14 days a week.
15 Q.     Did you ever work more than five days a week?
16 A.     I don't -- I don't recall.  I would say no though.
17 They were pretty good about that.
18 Q.     So ignoring some aberrant event, your normal
19 schedule was to work five days a week?
20 A.     Or 40 hours.
21 Q.     Or 40 hours?
22 A.     Yes.  Five days or 40 hours.
23 Q.     So you could work 40 hours in less than five days
24 on occasion?
25 A.     I don't actually remember any occasion, but it

**Page 55**

1  is -- it could be possible, yes.
2  Q.     So if I were to -- your schedule was to work 40
3  hours a week?
4  A.     Correct.
5  Q.     Normally spread over five days but it could have
6  been spread over four days?
7  A.     Yeah.
8  Q.     And do you recall what hours your normal shift was?
9  A.     No.  It would -- it would vary.  You could be on
10 the opening shift, the mid shift -- actually, I'm sure --
11 I'm not sure if they had a mid shift, but you could be an
12 opening shift or a closing shift.
13 Q.     Do you recall -- do you have a recollection of what
14 the opening shift hours represented and the closing shift
15 hours represented?
16 A.     I don't understand the question.
17 Q.     Opening shift starting at time A, ending at time B
18 as opposed to closing shifts starting at a later time and
19 ending at a later time?
20 A.     I actually have no recollection of when I was
21 supposed to be there or when I was to leave.
22 Q.     Regardless of the time, explain to me how the
23 process worked when you were ready to leave at the end of
24 your shift?
25 A.     At the end of my shift?

**Page 56**

1  Q.     Yes, ma'am.
2  A.     The process.  It would go something as follows:  A
3  manager would come to make sure that your area that you were
4  supposed to clean up was all in order so you would get an
5  okay that you could leave for the evening; you would then go
6  to one of the registers to clock out the time that you were
7  physically leaving the floor.  Sometimes -- I would say
8  probably about 50 percent of the time that particular
9  computer or register in your area had already been closed
10 down and counted, and you would have to go into the
11 operations manager's, which was Theresa Cruz.  I think she
12 was an operations manager at the time.  I don't really
13 remember hundred percent.  And you would clock out on her
14 register.  So you would get a time stamp.
15         You would gather your things because you couldn't
16 clock out before you gathered your things which is
17 understandable.  No big deal.  Gather your things and then
18 wait by the back door for a manager or someone who wasn't a
19 regular like kind of floor employee.  Someone who had the
20 authority basically.  Excuse me.  Someone who had the key,
21 that's what it was, key holder.  Someone who had a key to
22 let you out, because if you went out on your own, alarm
23 would sound, and that's how it worked.  Now -- okay.
24 Q.     All right.  So going through this checkout
25 process --

Phillips Legal Services
San Francisco, CA  (415) 601-4601

1  A.    Sure.
2  Q.    The first step was that a person who had
3  responsibility for your general floor area had to tell you
4  that your area was suitable for you to depart; is that a
5  fair statement?
6  A.    Yes.
7  Q.    And did that have to be a manager from your
8  department, or could it be any manager in the store?
9  A.    It could be any manager in the store.
10  Q.    And would that process be the same if you were
11  leaving before the store was closing?  As an example, let's
12  say you were departing at 3:00 and the store was staying
13  open till 6:00, would that same first step in the process be
14  applicable?
15  A.    I don't really recall.  I believe that sometimes it
16  would and sometimes it wouldn't.  I don't remember a hundred
17  percent.
18  Q.    And if I understand correctly, basically someone
19  was checking to see that the stock was folded and the things
20  were put away where they belonged, fair statement?
21  A.    No.  Not stock but merchandise on the floor.
22  Q.    So part of your responsibility at the end of the
23  day was to make sure that the merchandise that was on the
24  floor was put in its proper place and suitably dressed on
25  the table and the like?

Page 57

1  where people would take rest breaks during the course of the
2  day?
3  A.    I don't know if other people would, but I did, so
4  yes.
5  Q.    And then you -- prior to going to the back door,
6  would you notify someone that you were ready to go so that
7  they could be prepared to check you out?  How would you
8  then, when you got to the back door, let someone know that,
9  hey, I'm ready to go home?
10  A.    Well, first of all they would know you're leaving
11  the floor because they're excusing you.
12  Q.    Okay.
13  A.    So that's one way.  And on occasion, not very
14  often, but on occasion there would be a manager back there.
15  But more oftentimes than not you would have to call for a
16  manager to come to the back door to let you out.
17        MR. FEDER:  Bill, there may have been an ambiguity
18  on the record.  When you were asking her about the
19  procedures she used to check out the register.  I think
20  there were two registers, and I'm not -- she would use her
21  register, and then occasionally I guess she would clock out
22  on Theresa Cruz's register?
23        MR. GOINES:  Right.
24        MR. FEDER:  I'm not sure the procedures are the
25  same, but I think you might have lumped those in together.

Page 59

1  A.    I would say that would be fair, yeah.
2  Q.    And then the next step would be to go to a register
3  to clock out?
4  A.    Correct.
5  Q.    And you said about half the time the register where
6  I normally clock out would be closed, and I would need to go
7  to Theresa Cruz's -- would it be her office or work area to
8  clock out?
9  A.    Yes.
10  Q.    Okay.  And explain to me processwise what would you
11  do?  Would you enter your employee code number, or how would
12  you do that?
13  A.    Yes.  I would enter in my employee code number,
14  which is another thing I had a problem with, and then press
15  enter or return or whatever it was so --
16  Q.    And that would clock you out?
17  A.    Uh-huh.
18        MR. FEDER:  Yes?
19  Q.    BY MR. GOINES:  Is that a yes?
20  A.    Yes, yes.  I'm sorry, yes.
21  Q.    And you would gather your things.  Did you have an
22  employee coffee room or lunch area or locker area where you
23  normally kept your personal effects for the day?
24  A.    Yes.
25  Q.    Was that also -- was there a break room in there

Page 58

1  I just want to make sure there's a clear record.
2        THE WITNESS:  Oh, you're right actually.  Sorry.
3  Q.    BY MR. GOINES:  So what was it -- what were the
4  differences between the register --
5  A.    Okay.
6  Q.    I take it that about half the time you would clock
7  out on the register where you would ring up sales?
8  A.    Correct.
9  Q.    And you explained to me you would enter an employee
10  code and some process that would say I'm leaving for the
11  day?
12  A.    Correct.
13  Q.    Okay.  In Ms. Cruz's office, how did that work on
14  her computer?
15  A.    Okay.  So going back to the same 50 percent of the
16  time it was on the register that I would ring up sales on or
17  not, and then the other half of the time it would be on
18  Theresa Cruz's computer.
19  Q.    Okay.
20  A.    Generally, when the store was still open, it would
21  be on the computer that you were ringing up sales on.
22  Q.    Right.
23  A.    After the store had closed -- actually, I think I
24  said a little about this, but after the store had closed if
25  you were on a closing shift, they would lock out the

Page 60

15 (Pages 57 to 60)

**Page 61**

1  register that you would be clocking out on, so you could
2  only clock out on one register computer -- computer and
3  register. It's the same. They're synonymous.
4  Q.    I'm using those as synonyms as well.
5  A.    Okay. Great. So then I would go back to her
6  computer and clock out. That would generally be -- well,
7  we're talking about clocking out. Yeah. So that would
8  generally be when the store had already been closed and the
9  doors were locked, and there were no more customers in the
10  store.
11  Q.    And then you would go to the back. Was there only
12  one exit where employees such as yourself could depart at
13  the end of your shift?
14  A.    Yeah, yes.
15  Q.    And that was at the rear of the store?
16  A.    I don't know if it was at the rear. It's not at
17  the rear of the store. It's more like in the basement of
18  the store.
19  Q.    And if someone was there, they would go take a look
20  at your bag and good evening, see you tomorrow?
21  A.    Relatively, yeah. They would look in your bag,
22  make sure you didn't have anything that was not -- you know,
23  they would make sure that there were no Polo property in
24  your purse that didn't have a receipt for it. They would
25  put a key in the door or in the wall. I think it was in the

**Page 62**

1  wall. Maybe it was in the door. I don't remember. And
2  then they would let you out so the alarm wouldn't go off.
3  Q.    And then you indicated there were -- I don't want
4  to put words in your mouth, nor do I want to mischaracterize
5  what you said, but there were occasions where you had to
6  call for a manager to allow you to be -- to allow the loss
7  prevention search to take place and then depart?
8  A.    Correct.
9  Q.    Okay. And I think you indicated kind of putting
10  two and two together on occasion, I don't want -- I
11  want you to quantify it if you can.
12  A.    Okay.
13  Q.    I had to -- it took a long time to get a manager to
14  come, and I missed appointments, missed trains, and the
15  like, correct?
16  A.    That is correct.
17  Q.    Okay. So you worked at the company from the latter
18  part of June to the latter part of October. Are you able to
19  tell me did you keep any record of the days where it was
20  longer than a moment or two for you to check out of the
21  store, a moment or two meaning a manager was there within
22  close proximity as opposed to when you specifically had to
23  call for a manager to come to the door to allow you to be
24  exited?
25  A.    So you're asking if I have any written record of

**Page 63**

1  this?
2  Q.    Right.
3  A.    No. It's all mental.
4  Q.    Okay. So bearing on your recollection of how --
5  what I'm trying to find is a quantification of the number of
6  days where you had to wait longer than a moment or two and
7  then -- well, let me stop there.
8  A.    Sure.
9  Q.    Okay. How many -- can you quantify the number of
10  occasions where you had to wait for a manager to be
11  contacted to arrive at the exit door and be checked out?
12  A.    Now we're only talking about checking out at night;
13  is that correct?
14  Q.    Yes, ma'am, yes.
15  A.    That's it?
16  Q.    Yeah.
17  A.    I would probably say to my best recollection
18  probably three times a week out of five.
19  Q.    Okay.
20  A.    That I would have to wait any -- in an upwards of a
21  half an hour.
22  Q.    And when you say three times a week wait upwards to
23  a half an hour, was it always a half hour? Was it sometimes
24  five minutes? I'm trying to get some recollection of how
25  long this would take.

**Page 64**

1  A.    It would take anywhere -- my best guess -- and this
2  is just wait time, not when a manager is standing right
3  there; is that correct?
4  Q.    Right.
5  A.    Anywhere probably from ten minutes to a half an
6  hour.
7  Q.    And this would happen -- ten minutes to a half hour
8  would happen three times a week checking out?
9  A.    Very regularly, yes. That's my definition of
10  happening regularly, at least three times a week checking
11  out.
12  Q.    You seem to want to make sure we're talking about
13  checking out. Were there other occasions where you had to
14  wait to either check in or check out?
15  A.    Oh, yeah.
16  Q.    Okay. Explain those to me, please, so I can
17  inquire about those.
18  A.    Okay. So when you had to check in at a certain --
19  let's just say when you're starting your shift in the
20  morning, this is -- actually, whenever you're starting your
21  shift, now that I -- whenever you would start your shift,
22  you would have to ring the doorbell to be let in. And if
23  there was not a manager down in the area waiting or
24  listening to a bell or on their lunch break or what have
25  you, you would be waiting outside to come in to check in to

16 (Pages 61 to 64)

# Golden Gate Reporting

1 basis?
2    A.   Not to my knowledge.
3    Q.   The next page has the title Sales Reports.
4 It indicates:
5         In order to ensure that your net sales
6 amount is accurate all commission eligible
7 employees will be provided with a weekly summary
8 report.
9         Were sales associates provided with some
10 type of a weekly summary report setting out their
11 net sales?
12    A.   I believe so.  I believe there was
13 something that was available every week.
14    Q.   Was it posted?
15    A.   That's what I have a recollection of it
16 being posted as opposed to being handed to them
17 individually or something.
18    Q.   I'll take that back from you.  Thank you.
19         I'm going to show you a document that we
20 previously marked as Exhibit 5.
21         It's some selected pages from a document
22 entitled Polo Ralph Lauren Retail Employee
23 Handbook 2002-Volume 2.
24         These are selected pages from a larger
25 handbook, and my first question is whether you

Page 70

1 recall seeing this handbook or a similar handbook
2 during the course of your employment at Polo?
3    A.   I believe I saw something like this, yes.
4    Q.   This document, this handbook had an
5 acknowledgment signature page that went with it.
6         Do you recall whether sales associates in
7 your department had signed the document indicating
8 that they understood and would abide by these
9 policies?
10    A.   I don't recall.
11    Q.   On page 25 it's Bates number 531.  There's
12 a right-hand column General Security.  Do you see
13 that?
14    A.   Um-hmm.
15    Q.   The third bullet point refers to bag
16 checks.
17         Were all sales associates required to have
18 bag checks or loss prevention inspections
19 performed every time they left the building?
20    A.   Every time they left the building.
21         If they had a bag.  If they had anything
22 that they were carrying.
23    Q.   And if they didn't have anything to carry,
24 were they still required to be let out by a
25 manager after some type of an inspection?

Page 71

1    A.   There were variations.
2         Sometimes people would be allowed to leave
3 for a brief period empty handed through the main
4 entry for a break to go get a soft drink or
5 something, bring it back to the store, whatever.
6    Q.   And were sales associates at the end of
7 the day when the store was closed, were they
8 entitled or permitted to leave without being
9 checked out by a manager?
10    A.   I don't believe so.
11    Q.   Take that back as well.
12         Let me show you a document that we
13 previously marked as Exhibit 10.  It's a two-page
14 document Bates number 430 and 431.  It's entitled
15 Special FY05 Addendum.  Take a moment and look at
16 this, and I'd like to ask if you've seen it before
17 today.
18    A.   I don't recall seeing this particular
19 document.
20    Q.   Are you aware of any document that was
21 provided to sales associates while you worked at
22 Polo that laid out in written form how the arrears
23 program operated?
24    A.   Not to my recollection.  I don't remember
25 ever seeing anything as clearly stating the

Page 72

1 arrears program as this.
2    Q.   Thank you.
3    A.   Doesn't mean it didn't exist.  I just may
4 not have seen it.
5    Q.   Let me show you a document that we
6 previously marked as Exhibit 23.
7         It's an untitled document Bates numbered
8 303, and this document may have been prepared just
9 for this litigation.  I'm not sure that you would
10 have seen it before.  If you have seen it before,
11 let me know.  If you haven't seen it before, my
12 question is whether you were provided with a form
13 that had similar categories showing the amount of
14 arrears that a person was in.
15    A.   I don't remember seeing anything in this
16 format.
17    Q.   The information that you indicated that
18 you recall receiving about employees in arrears,
19 was that a report that covered all stores in
20 California or was it specific to your store in San
21 Francisco?
22    A.   If you're referring to the one that you
23 could see on the Internet or whatever that was
24 called, that was I believe all stores.
25    Q.   Throughout the United States?

Page 73

19 (Pages 70 to 73)

certcert

1        I further certify that the signature to the

2   foregoing deposition was not waived by counsel for

3   the respective parties.

4        I further certify that the taking of this

5   deposition was pursuant to subpoena, and that

6   there were present at the deposition the attorneys

7   hereinbefore mentioned.

8        I further certify that I am not counsel for

9   nor in any way related to the parties to this

10  suit, nor am I in any way interested in the

11  outcome thereof.

12       IN TESTIMONY WHEREOF:   I have hereunto set my

13  hand and affixed my notarial seal this 7th day of

14  May, 2008.

15

16

17

18

19       Cynthia J. Conforti, CSR, CRR

20       Notary Public, Cook County, Illinois

21

22   CSR License No. 084-003064

23

24

25

EXHIBIT 20.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ANN OTSUKA, an individual,

et al.,

**CERTIFIED COPY**

Plaintiffs,

vs.                          No. C-07-02780-SI

POLO RALPH LAUREN CORPORATION,

et al.,

Defendants.

_____/

Videotaped Deposition of

**JANIS KEEFE**

Monday, March 17, 2008

Reported by:
IRIS MEINKE-SMITH, RMR/CRR
CSR No. 3798
Job No. 18235LR



**PHILLIPS LEGAL SERVICES**
SAN FRANCISCO DEPOSITION REPORTERS
795 FOLSOM STREET, FIRST FLOOR
SAN FRANCISCO, CA 94107
1-888-333-8270
WWW.PHILLIPSDEPO.COM

1    A.         No.  I mostly voiced my frustrations to Tin

2    and to Theresa.

3              MR. GOINES:  I would like to take a

4    three-minute break and go off record for a minute,

01:53:38 5    please.

6              THE VIDEOGRAPHER:  This marks the end of

7    tape number two in the deposition of Janis Keefe.

8    Going off the record.  The time is 1:53 p.m.

9              (Recess taken.)

01:59:02 10              THE VIDEOGRAPHER:  Back on the record.

11              Here marks the beginning of tape number

12    three in the deposition of Janis Keefe.  The time is

13    1:59 p.m.

14    Q.         BY MR. GOINES:  Janis, with regard to the

01:59:14 15    loss prevention searches, was it your understanding

16    that unless you participated in the loss prevention

17    search, your employment could be terminated?

18    A.         No, I don't remember that.  But...

19    Q.         Did you feel that it was part of your job to

01:59:35 20    participate in a loss prevention search?

21    A.         Yes.

22    Q.         Were you instructed that you could -- strike

23    that.

24              Was it your understanding that the only exit

01:59:46 25    that you could utilize as a Polo Ralph Lauren

113

REPORTER'S CERTIFICATE

1

2    I certify that the foregoing proceedings in

3    the within-entitled cause were reported at the time

4    and place therein named; that said proceedings were

5    reported by me, a duly Certified Shorthand Reporter

6    of the State of California authorized to administer

7    oaths and affirmations, and were thereafter

8    transcribed into typewriting.

9    I further certify that I am not of counsel

10    or attorney for either or any of the parties to said

11    cause of action, nor in any way interested in the

12    outcome of the cause named in said cause of action.

13    IN WITNESS WHEREOF, I have hereunto set my

14    hand this 1st day of April, 2008.

15

16    _____ *Iris Meinke-Smith* _____

17    IRIS MEINKE-SMITH, CA CSR No.3798
      Registered Merit Reporter
18    Certified Realtime Reporter

19

20

21

22

23

24

25
                                          150

EXHIBIT 21.

**Golden Gate Reporting**

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4

 5   ANN OTSUKA, an individual; JANIS      No. C-07-02780-SI
     KEEFE, an individual; CORINNE
 6   PHIPPS, an individual; and
     JUSTIN KISER, an individual;
 7   individually and on behalf of
     all others similarly situated,
 8
                  Plaintiffs,
 9      vs.

10   POLO RALPH LAUREN CORPORATION;
     a Delaware Corporation; POLO
11   RETAIL, LLC, a Delaware Corporation;
     POLO RALPH LAUREN CORPORATION, a
12   Delaware Corporation, doing business
     in California as POLO RETAIL CORP;
13   FASHIONS OUTLET OF AMERICA, INC., a
     Delaware Corporation and DOES 1-500,
14   inclusive,

15                Defendants.
                                      /
16

17

           DEPOSITION OF VALERIE ANN HARRISON
18

19

        DATE:          August 10, 2007
20
        TIME:          10:08 a.m.
21
        LOCATION:      120 Kearny Street
22                     Suite 3200
                       San Francisco, California
23
        REPORTED BY:   Mary E. Garland
24                     Certified Shorthand Reporter
                       License Number 4721
25
```

Page 1

## Golden Gate Reporting

1  that. I mean, now that I read that, I obviously know,
2  so.
3      Q. So just have to look at -- I don't have my
4  calendar here, which would tell us if that's 2006. I
5  believe it is. So that would have been about a year
6  ago. Does that time frame make sense as to when you
7  had the meeting with the other managers and Tin when he
8  indicated that the arrears program was being
9  discontinued?
10     A. Again, I don't know time. I can't recall
11  timelines, as far as that goes.
12     Q. Does it seem to you like it was as long as
13  almost two and a half years ago, or does it seem more
14  recent than that?
15     A. As far as discontinuing it?
16     Q. Yes. When you were informed that it was going
17  to be discontinued.
18     A. Again, I don't recall when we were exactly
19  informed and the lag time in between that was actually
20  discontinued. I mean, I can estimate -- I would
21  estimate from the beginning of a year or two ago is when
22  I would have guessed the whole arrears thing ended.
23     Q. And after the arrears program was terminated,
24  did you ever have a discussion with anyone from Polo
25  about the arrears program, after it was terminated?

Page 122

1      A. Not that I can recall.
2      Q. The second page of Exhibit 13 -- it's Polo 435,
3  "Fiscal 2007 Compensation Update" -- there's a reference
4  to "base plus commission," and it refers to several
5  stores, and the only one in California is Burlingame.
6  You see that? "Coinciding with the start of fiscal
7  2007, we would like to offer a 'base plus' commission
8  option for several of our stores. These stores are
9  Dallas NorthPark," Texas "West Village, San Antonio,
10  Burlingame, Chicago-Northbrook and Minneapolis."
11         Do you remember any discussion or was there
12  any discussion that you heard at Polo San Francisco
13  regarding a base plus commission system?
14     A. I don't recall that that was ever discussed for
15  San Francisco.
16     Q. Do you recall any discussions in the 2006,
17  2007 time frame at Polo regarding whether Polo sales
18  associates were entitled to premium overtime
19  compensation under any circumstances?
20     A. I don't know.
21     Q. You didn't hear any conversations relating to
22  that issue?
23     A. No.
24     Q. We're now in a fairly recent time period, 2006,
25  2007. Do you know whether any of the sales associates

Page 123

1  that were working under your direction in the Home
2  Collection department were ever paid premium overtime
3  compensation?
4      A. I wouldn't know, because I didn't deal with
5  payroll on that level, unless somebody would have come
6  to me with a check saying -- asking me a question about
7  and showing me and telling me, which did not happen.
8      Q. Throughout the time that you worked for Polo,
9  you don't recall an associate ever coming to you and
10  asking you, raising an issue relating to the payment or
11  nonpayment of premium overtime compensation?
12     A. Are we talking in 2006, 2007 again?
13     Q. I'm talking anytime when you worked there,
14  whether any sales associate ever talked to you about
15  whether they were entitled to premium overtime
16  compensation.
17     A. Yes. Corinne did ask once about it. And I
18  referred her to either Kristi or Theresa, Kristi Mogel
19  or Theresa.
20     Q. Did you provide Corinne any information on that
21  issue?
22     A. No. I referred her to those two people,
23  because they would know best.
24     Q. Did you tell Corinne that she should be careful
25  with her paycheck because sometimes mistakes are made in

Page 124

1  a paycheck?
2      A. Be careful with her paycheck?
3      Q. Well, to carefully review her paycheck, because
4  there are mistakes that are made on the paychecks at
5  Polo?
6      A. I don't remember specifically saying that, but
7  I may have told her that she should definitely always
8  take a look at her paychecks.
9      Q. Other than Corinne Phipps, or Mullen at the
10  time, there were no other sales associates who ever
11  spoke with you about the payment of premium overtime
12  compensation?
13     A. Recently or in the past. The past, I couldn't
14  recall. I know for certain recently, no.
15     Q. We've talked a lot about the loss prevention
16  inspections that were taking place back in 2001, 2002.
17  Now I want to focus on the rest of the time period that
18  you were serving as manager of Home Collections.
19         As far as you know, during the period from
20  2002, forward, until you quit, were all sales associates
21  and managers required to undergo loss prevention
22  inspections before they left the store?
23     A. Yes.
24     Q. And at some point in time, I take it the time
25  card system that was back by Theresa Cruz's office was

Page 125

32 (Pages 122 to 125)

CERTIFICATION OF DEPOSITION OFFICER

     I, MARY E. GARLAND, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was thereafter transcribed by means of computer-aided transcription under my direction; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

     I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

     Executed August 15, 2007, at San Francisco, California.

MARY E. GARLAND, CSR 4721

EXHIBIT 22.

**Golden Gate Reporting**

```
 1                 UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN FRANCISCO DIVISION

 4
      ANN OTSUKA, an individual;   )
 5    et al.,                      )
                                   )
 6                 Plaintiffs,     )
                                   )
 7         vs.                     ) No.  C-07-02780-SI.
                                   )
 8    POLO RALPH LAUREN            )
      CORPORATION, a Delaware      )
 9    Corporation; et al.,         )
                                   )
10                 Defendants.     )
      _____)

11

12              DEPOSITION OF:  TIN HUA

13         TAKEN ON:  Friday, March 21, 2008

14

15

16

17

18

19

20    REPORTED BY:

21

22

23

24    PATRICIA L. HUBBARD

25    CSR #3400, CRP #10, RPR #7847
```

Page 1

**Golden Gate Reporting**

1    Q.    And how does that work?  What's the
2   process?
3    A.    Okay.  You're going to have to be a lot
4   more specific.
5    Q.    Sure.  If somebody brings back a sweater
6   that I sold, how is it debited from the amount of
7   money that I have during the period you were at the
8   Palo Alto store?
9    A.    When you sell an item, the receipt is
10  generated with your name and employee's number on
11  there.  When it's returned accompanied by a receipt,
12  it's returned towards the name that's on the receipt
13  and the sale's associate's number on there.
14    Q.    So for my next paycheck that's going to
15  be deducted, assuming that I have enough commission
16  income to deduct from; is that correct?
17    A.    Yes, I'm familiar with that, yes.
18    Q.    Is that the same sort of thing that
19  would apply at both Palo Alto and San Francisco
20  during your tenure?
21    A.    That's correct.
22    Q.    And then if I've quit, then there's
23  nothing you can do to get it back from me, right?
24    A.    I'm not sure.
25    Q.    All right.  Let's go on to the next

Page 66

1   portion, where it says "General Security" and the
2   third bulleted item.  It says,
3        "Bag checks must be performed
4        anytime an employee leaves the
5        store."
6    And that's the policy I think, as you've
7   said before, that was in effect during all of your
8   time with Polo Ralph Lauren, correct?
9    A.    Yes.
10    Q.    And any employee, that's managers, as
11  well, right?
12    A.    That's including managers.
13    Q.    And it says,
14        "It is each individual's
15        responsibility to notify a
16        manager when leaving the store
17        with a bag, box or other item
18        used to carry merchandise."
19    And again that's a policy that's been in
20  effect during your entire tenure with Polo Ralph
21  Lauren Corporation, correct?
22    A.    Yes.
23    Q.    And then on page 26 under "Bag
24  Inspection," it sort of reiterates that, doesn't it?
25  And at the bottom of that it says,

Page 67

1        "Such inspections are a condition
2        of employment."
3    In other words, bag inspections at the
4   time an employee exits is a condition of employment?
5    Is that your understanding of the policy
6   in effect during the time -- during your tenure?
7    A.    I understand that is the policy in place
8   concerning the employee must have their bags checked
9   prior to leaving the premises.
10    Q.    What happens if they decline?  What
11  would have happened?  Do you know?
12    MR. GOINES:  Objection.  Calls for
13  speculation.
14    THE WITNESS:  I don't know.  That hadn't
15  happened.
16  BY MR. GRIGG:
17    Q.    What would you have done if I were your
18  sales associate and I said, "You know, I just don't
19  have time to wait.  I'm going to walk out.  See you
20  later"?
21    A.    We probably would allow it to happen and
22  invite them to have a conversation the next time they
23  come back to work.
24    Q.    Were employees told what would happen
25  ever to your knowledge if they didn't comply with the

Page 68

1   loss inspection prevention searches?
2    A.    I'm aware that they were told that they
3   are in violation of the policy, yes.
4    Q.    Were they ever told anything else, to
5   your knowledge, about what would happen if they
6   didn't comply with the loss inspection prevention
7   searches?
8    A.    No, not to my knowledge.
9    Q.    All right.  And then turning to
10  Exhibit 24, do you recognize that?
11    A.    Which one?  This one (indicating)?
12    Q.    Yes.  I'm sorry.
13    A.    I don't.
14    Q.    Refresh my recollection, when did you
15  leave Polo?
16    A.    I believe it was the beginning of March
17  or the end of February.
18    Q.    Well, just glancing at page 23 of that
19  document, it says, "Meal Periods and Breaks."
20    A.    What page?
21    Q.    23.
22    A.    23.
23    Q.    It's Bates number in the lower
24  right-hand corner 001524.
25    A.    Okay.

Page 69

18 (Pages 66 to 69)

Golden Gate Reporting

```
1                    REPORTER'S CERTIFICATE

2

3              I, PATRICIA L. HUBBARD, do hereby

4    certify:

5

6              That I am a duly qualified Certified

7    Shorthand Reporter in and for the State of

8    California, holder of Certificate Number 3400, which

9    is in full force and effect, and that I am authorized

10   to administer oaths and affirmations;

11

12             That the foregoing deposition testimony

13   of the herein named witness, to wit, TIN HUA, was

14   taken before me at the time and place herein set

15   forth;

16

17             That prior to being examined, TIN HUA

18   was duly sworn or affirmed by me to testify the

19   truth, the whole truth, and nothing but the truth;

20

21             That the testimony of the witness and

22   all objections made at the time of examination were

23   recorded stenographically by me and were thereafter

24   transcribed by me or under my direction and

25   supervision;
```

Page 180

1            That the foregoing pages contain a full,

2     true and accurate record of the proceedings and

3     testimony to the best of my skill and ability;

4

5            I further certify that I am not a

6     relative or employee or attorney or counsel of any of

7     the parties, nor am I a relative or employee of such

8     attorney or counsel, nor am I financially interested

9     in the outcome of this action.

10

11           IN WITNESS WHEREOF, I have subscribed my

12    name this 25th day of March, 2000.

13

14

15    _____
      PATRICIA L. HUBBARD, CSR #3400

16

17

18

19

20

21

22

23

24

25

EXHIBIT 23.

**Golden Gate Reporting**

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4

5    ANN OTSUKA, an individual; JANIS        No. C-07-02780-SI
     KEEFE, an individual; CORINNE
6    PHIPPS, an individual; and
     JUSTIN KISER, an individual;
7    individually and on behalf of
     all others similarly situated,

8
                    Plaintiffs,
9        vs.

10   POLO RALPH LAUREN CORPORATION;
     a Delaware Corporation; POLO
11   RETAIL, LLC, a Delaware Corporation;
     POLO RALPH LAUREN CORPORATION, a
12   Delaware Corporation, doing business
     in California as POLO RETAIL CORP;
13   FASHIONS OUTLET OF AMERICA, INC., a
     Delaware Corporation and DOES 1-500,
14   inclusive,

15                  Defendants.
                                            /
16

17

                 DEPOSITION OF PHOEBE MIRELES
18

19
         DATE:            November 15, 2007
20
         TIME:            10:15 a.m.
21
         LOCATION:        One Montgomery Street
22                        Suite 3220
                          San Francisco, California
23
         REPORTED BY:     Mary E. Garland
24                        Certified Shorthand Reporter
                          License Number 4721
25

                                              Page 1

## Golden Gate Reporting

1    A. No, I don't recall that, either.
2    Q. When you underwent the orientation or training
3  at Stanford, were you provided with any employee
4  handbooks?
5    A. Yes. Yes, I was.
6    Q. And do you recall whether you received copies
7  of more than one employee handbook at that time?
8    A. No.
9    Q. You don't recall?
10    A. No, we didn't receive more than one.
11    Q. At that time, was there two separate handbooks,
12  one entitled "Polo Employee Handbook" and the other
13  referencing employee retail commission?
14    A. No, not that I can recall.
15    Q. I'll show you some documents in a little while,
16  maybe that --
17    A. All right.
18    Q. The employee manual that you received at that
19  time, in April of 2002, was that the same manual that
20  was being used in Hawaii?
21    A. I don't recall.
22    Q. At that time -- again, in around April of 2002
23  -- were you provided any kind of manager manual that
24  dealt specifically with duties as a manager at Polo in
25  California?

Page 22

1  basically. So that's for lunches, breaks, and the time
2  you leave.
3    Q. Could any manager at the store perform a loss
4  prevention inspection for exiting employees?
5    A. Yes.
6    Q. Do you recall at that time how many managers
7  were working within the Stanford store?
8    A. At which time?
9    Q. This, again, is in April of 2002 time frame.
10    A. There was myself, an operations manager. So I
11  was the Women's manager, an operations manager. The
12  general manager. There was a Men's manager. I can't
13  recall if there was a Home Collection manager at the
14  time. So, basically, there was -- one, two, three, four
15  -- four managers.
16    Q. Was there a shipping manager?
17    A. No.
18    Q. At that time, April of 2002, that time period,
19  did the Stanford Polo store have a full-time loss
20  prevention or security guard?
21    A. No.
22    Q. At anytime during your employment at the
23  Stanford Polo store, was there a full-time loss
24  prevention specialist or person in the store?
25    A. There was a regional, but she wasn't there all

Page 24

1    A. There wasn't a manager manual, but it was a job
2  description.
3    Q. Was that a multiple-page document, or do you
4  recall?
5    A. Possibly. Maybe two or three pages.
6    Q. Did any of the items referenced in that
7  document refer to the compensation system applied in
8  California at that time?
9    A. Not that I can recall.
10    Q. In April of 2002, when you began at Stanford
11  and were going through this brief orientation or
12  training period, did you receive any information from
13  anyone at the Polo store regarding loss prevention
14  inspections or bag check procedures that were in place
15  at the Stanford store?
16    A. Not that I can recall. Nothing was on paper.
17  There was no literature. It was more of a verbal
18  policy, that I can recall, when I first started.
19    Q. And do you recall the specifics of that policy
20  that was expressed verbally to you?
21    A. Yes. It's anytime you leave the store, you
22  are to ask a manager to check you out. They can't
23  physically put their hands through your bag or your
24  personal belongings, but you have to show them
25  everything that you have or -- and are walking out with,

Page 23

1  the time. It was very rare that she was there.
2    Q. What were her name?
3    A. Her name was Alison Gunder.
4    Q. At anytime during your employment at the
5  Stanford Polo, did you meet with Alison Gunder to
6  discuss loss prevention searches of employees as they
7  exited the building?
8    A. No. We never did training on loss prevention
9  searches at all.
10    Q. How many exit doors are there in the Stanford
11  Polo store?
12    A. There are two.
13    Q. And can you describe their location?
14    A. Sure. We have an atrium, and there's an
15  entrance/exit to the parking lot or an entrance/exit
16  into the mall area.
17    Q. So there's -- I'm not sure how the atrium fits
18  into this. Where is the door related to the atrium?
19    A. So the store is situated, it's such there's
20  departments on either side of the atrium, and the doors
21  connect directly through the atrium. So there's two
22  exits.
23    Q. One of them goes to the parking lot and one of
24  them goes --
25    A. Into the mall area.

Page 25

7 (Pages 22 to 25)

CERTIFICATION OF DEPOSITION OFFICER

I, MARY E. GARLAND, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was thereafter transcribed by means of computer-aided transcription under my direction; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed November 26, 2007, at San Francisco, California.

_____

MARY E. GARLAND, CSR 4721

EXHIBIT 24.

## Golden Gate Reporting

```
 1              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
 2               SAN FRANCISCO DIVISION
    ------------------------------X
 3  ANN OTSUKA, an Individual; JANIS
    KEEFE, an individual, CORINNE PHIPPS,
 4  an individual, and JUSTIN KISER,
    an individual, individually and
 5  on behalf of all others similarly
    situated,
 6
                  Plaintiffs.
 7
    v.                             No. C-07-02780-SI
 8
    POLO RALPH LAUREN CORPORATION,
 9  a Delaware Corporation, POLO
    RETAIL, LLC, a Delaware Corporation,
10  POLO RALPH LAUREN CORPORATION, a
    Delaware Corporation doing business
11  in California as POLO RETAIL CORP.,
    FASHIONS OUTLET OF AMERICA, INC., a
12  Delaware Corporation, and DOES -500,
    inclusive,
13
                  Defendants.
14  ------------------------------X

15
                    December 6, 2007
16                  New York, New York
                    Time:  10:26 a.m.
17                  Volume 1, Pages 130

18

19        Deposition of SHARONDA WEATHERSPOON, taken on behalf

20  of the Plaintiffs, at Greenberg Traurig, Met Life Building,

21  200 Park Avenue, New York, New York, commencing at 10:26

22  a.m., December 6, 2007, before Anthony Armstrong, a Notary

23  Public and Certified Shorthand Reporter of the State of New

24  York.

25
                                              Page 1
```

Page 58

1  normally to transmit. But in terms of -- for the
2  associate -- I mean for the managers, their process is
3  very simple.
4      Q.  Can you give me any kind of rough estimate for
5  the time it takes to transmit that data from the
6  briefest time to the busiest and highest-volume store
7  time?
8      A.  I'm not sure what the estimate would be
9  because it really does vary and normally it happens
10  during the overnight process when that information is
11  transmitted.
12      Q.  Does one of the managers on duty do the
13  transmittal process?
14      A.  Yes.
15      MR. KITCHIN:  Why don't we take a break?
16      (There was a recess.)
17      *********
18  BY MR. KITCHIN:
19      Q.  We're back on the record. You understand you
20  are still under oath?
21      A.  Yes.
22      Q.  If a sales associate forgets to clock out at
23  the end of his or her shift, can an adjustment be made
24  to the time records to show that they actually left at
25  5:00 in the afternoon and -- so that corresponds to

Page 59

1  when they are actually working?
2      A.  Yes.
3      Q.  Who has the authority to make changes to the
4  records?
5      A.  All managers.
6      Q.  Can a sales associate make any changes to his
7  or her time records?
8      A.  No.
9      Q.  The adjustments to time records, under a
10  situation where a person forgets to clock out at the
11  end of their shift, are those adjustments compiled and
12  kept in some form, electric or paper form?
13      A.  The adjustments on the store end, you can
14  actually -- you do actually see the adjustment, but I'm
15  not sure specifically where they are kept.
16      Q.  So at the store level you could print out
17  information showing -- under the example I gave you,
18  that that person had clocked in in the morning, clocked
19  out for lunch, clocked back in after lunch, and failed
20  to clock in -- the next day, comes in and the manager
21  was told that, I forgot to clock out last night, the
22  manager could go in and clock the person out from the
23  previous day showing they had left at 5 o'clock, for
24  example; is that correct?
25      A.  No. Because in order to close out the system,

Page 60

1  there needs to be a matching set of punches. You can
2  go in and modify it the next day, but you will not be
3  able to close the system down unless all punches are
4  accounted for.
5      Q.  So in one scenario, if a manager is closing
6  down the system for the night and sees -- is notified
7  somehow or alerted that one sales associate didn't
8  punch out at the end of the day, that manager would
9  enter in the time that they believe the person left so
10  that they could close the system down?
11      A.  Yes.
12      Q.  And then if that manager approached the
13  associate the next day and said, You forgot to clock
14  out, so I clocked you out at 5 o'clock, and the
15  individual said, I actually left at 4:30, the manager
16  could then go in and make that adjustment back to 4:30?
17      A.  Yes.
18      Q.  Or make an adjustment if they stayed later
19  than that to 6 o'clock?
20      A.  Yes.
21      Q.  And that modification, you believe, would be
22  memorialized in some kind of a record that would show
23  that a manager had made a modification at some point in
24  time?
25      A.  Well, I'm not sure how it would actually be

Page 61

1  recorded. I know on the store end it's actually
2  denoted on the time card by an asterisk that shows that
3  the time card has been modified.
4      Q.  And this applies to the new system that --
5  relatively new system that uses the point of sale cash
6  registers to clock in and out?
7      A.  Yes.
8      Q.  At this point in time, are managers required
9  to fill out any kind of a form in order to make a
10  modification to a time record?
11      A.  No.
12      Q.  Do you know if managers have ever been
13  required to fill out any kind of separate form prior to
14  making -- prior or subsequent to making an adjustment
15  to an employee's time record?
16      A.  I am not aware.
17      Q.  Are you aware of what managers typically tell
18  new sales associates about loss prevention inspections
19  or bag checks?
20      A.  I would say that we have guidelines. Do I
21  know specifically that that is absolutely the
22  information that's being communicated in every single
23  store? I can't say that for certainty.
24      Q.  When you say guidelines, what are you
25  referring to?

16 (Pages 58 to 61)

1   A.   As far as bag check inspections.
2   Q.   And what are those guidelines?
3   A.   That the bag checks should normally be
4   conducted at the front door, and that anyone exiting
5   the building needs to ensure that they do -- any
6   associate or employee needs to have their bag -- their
7   bags or belongings checked. And managers are not able
8   to put their hands inside of anyone's bag if they are
9   not able to -- they are not able to see to the bottom.
10  They do have to ask the employee to remove some of the
11  items or just move them around so that way they can see
12  to the bottom.
13  Q.   Who is permitted to conduct bag checks?
14  A.   Managers and supervisors. Are you talking
15  about currently right now?
16  Q.   Right now.
17  A.   Managers and supervisors.
18  Q.   Is there a category of employee called
19  supervisors?
20  A.   Yes.
21  Q.   And tell me what that category is.
22  A.   What do you mean by category?
23  Q.   Well, you have managers, you have assistant
24  managers. And then is there another category of people
25  called supervisors?

Page 62

1   A.   Yes.
2   Q.   What do supervisors do?
3   A.   Supervisors are responsible for helping and
4   assisting to manage the sales floor and the stock
5   process.
6   Q.   The stock process?
7   A.   Yes, the process by which we process shipment.
8   Q.   Are supervisors salaried employees?
9   A.   No.
10  Q.   Are they sales associates who have been given
11  extra duties?
12  A.   They are hourly employees.
13  Q.   Are they hired as a supervisor?
14  A.   Yes.
15  Q.   And what -- how many supervisors -- do all
16  factory outlet stores in California have employees who
17  are hired as supervisors?
18  A.   No.
19  Q.   Do you know how many stores in California have
20  supervisors within their employment?
21  A.   The only stores that would not have
22  supervisors are any of our children's outlet stores or
23  our luxury outlet stores, do not have supervisors.
24  Q.   Is a supervisor always -- is one or more
25  supervisors always on duty during the time that the

Page 63

1   store is open?
2   A.   No.
3   Q.   Do they have more limited coverage than other
4   employees? Are they part-time, full-time?
5       MR. CAPOBIANCO:   Objection to form.
6       MR. KITCHIN:   Let me re-ask the question.
7   BY MR. KITCHIN:
8   Q.   So it sounds like most of your stores in
9   California have employees that are called supervisors;
10  is that correct?
11  A.   Yes.
12  Q.   And you have described what their duties are.
13  And they have the authority to conduct bag checks?
14  A.   Yes.
15  Q.   Does the number of managers, including general
16  managers and assistant managers, working at any one
17  time within a store vary store to store?
18  A.   Yes.
19  Q.   So there is -- how many assistant managers do
20  you have in your largest or most busy store?
21  A.   Four.
22  Q.   And which store is that?
23  A.   Cabazon.
24  Q.   The Cabazon factory outlet with four managers,
25  are all four of those managers on-duty every single

Page 64

1   day?
2   A.   No.
3   Q.   Is there staffing at the Cabazon store where
4   there is a specific number of managers, including the
5   general manager, who need to be on duty during a
6   specific day?
7   A.   There are always at least two managers
8   scheduled on any particular day.
9   Q.   That's true at the Cabazon store?
10  A.   Yes.
11  Q.   Is it true at all the other stores?
12  A.   Yes.
13  Q.   So in any day, because it's -- the stores are
14  typically open more than eight hours; is that correct?
15  A.   Yes.
16  Q.   So any particular day there, generally, at
17  least two managers would have worked during that day?
18  A.   Yes.
19  Q.   Managers' schedules sometimes overlap?
20  A.   Yes.
21  Q.   Are they -- is generally one of the managers,
22  kind of, an opening manager and one a closing manager?
23  A.   Generally.
24  Q.   So generally at the end of the store's day, is
25  there generally one manager on duty at that time?

Page 65

17 (Pages 62 to 65)

Golden Gate Reporting

1  to grab a sandwich, are they permitted to go out
2  through the emergency door?
3      A.  No.
4      Q.  If they want to go home at the end of the
5  night, are they permitted to go through that emergency
6  door?
7      A.  No.
8      Q.  Can sales associates -- ask a foundational
9  question.
10      Do some of the California factory outlet stores
11  have more than one customer entrance and exit?
12      A.  To my knowledge, yes.
13      Q.  So can sales associates come in after lunch
14  through any of the customer entrances?
15      A.  Can you repeat that?
16      Q.  Yeah.  If a sales associate goes on their
17  lunch break and goes outside to get something to eat,
18  can they come back in through any door except for the
19  emergency door?
20      A.  Are you speaking about specifically when the
21  store is open to customers?
22      Q.  Yes.
23      A.  Yes.
24      Q.  Is there any -- of the factory outlet stores,
25  does that have specifically designated employee exit or

Page 70

1  jeans or whatever they're wearing, do they still have
2  to go through what we have called a bag inspection?
3      A.  At that point they wouldn't have a bag.  What
4  they would need to have is the manager walk them to the
5  door.
6      Q.  We know from testimony from this morning that
7  some sales associates will leave at the end of their
8  shift before the store is closed to the public,
9  correct?
10      A.  Yes.
11      Q.  I want you to, if you know, describe to me at
12  this point in time the process they would go through
13  typically to -- from the time they realize it's time
14  for me to go home to the time that they are out of the
15  store.
16      A.  I would say that the process probably varies
17  from store to store.  But typically, normally, what
18  happens is that the associate would let the manager
19  know that they are about to clock out and the manager
20  would actually walk them -- once they have actually
21  clocked out, walk them to the store to conduct the bag
22  inspection.
23      Q.  How do you know that?
24      A.  From -- based on my experience and based on my
25  observation, I can say that typically that's what

Page 72

1  entrance?
2      A.  Normally, if there is more than one entrance
3  into the store, they will designate one to be used as
4  an employee -- as an employee entrance.  But that
5  normally only applies to if people are taking their
6  breaks during the time that the store is not open to
7  the public.
8      Q.  Okay.  So if an associate wants to go outside
9  for any reason after the store is closed to the public
10  and the customers are all gone, some of the stores may
11  designate one of two or more doors to be the one that
12  they need to exit out of?
13      A.  During the time that the store is open to the
14  public?
15      Q.  No, when it's closed to public.  I thought you
16  said when the store is closed to public, some of the
17  stores will specify a specific employee exit?
18      A.  Yes.
19      Q.  So if an employee wants to leave when a store
20  is closed, or is outside wants to come back in after
21  the store is closed, in those situations, there maybe
22  one door that's designated for them to go to?
23      A.  Yes.
24      Q.  If an employee doesn't have any kind of bag,
25  summertime, just wearing the Polo shirt perhaps and

Page 71

1  happens in every situation.  I can't say that's what
2  happens 100 percent but I can say that's normally what
3  the process looks like.
4      Q.  You have observed that?
5      A.  I have observed that not in the California
6  store but I have observed that in other stores that I
7  have actually worked in or that I visited.
8      Q.  But you don't know from your observations
9  whether that process has happened a single time in
10  California, is that correct, based on your
11  observations?
12      A.  Well, I have only visited one of the stores in
13  California.  So based on -- and I can't recall
14  specifically if I actually observed the bag checks
15  specifically in California during that time.
16          MR. KITCHIN:  Could I have the question
17  read back to the witness, please?
18          (The record was read.)
19          MR. KITCHIN:  That's the question that I'm
20  asking.
21          THE WITNESS:  Can you repeat it one more
22  time?
23          (The record was read.)
24      A.  No, I don't know.
25  BY MR. KITCHIN:

Page 73

19 (Pages 70 to 73)

1    Q.   Has anyone, other than perhaps Polo's counsel,
2 ever described that process happening in a factory
3 outlet store in California?
4    A.   I'm not sure I understand that question.
5    Q.   Has anyone -- I don't want you to disclose any
6 information you have received from Polo's attorneys
7 regarding the process that you described, the clocking
8 out, the managers, all of that. So my question is, has
9 anyone ever described that that is the way the process
10 works in any store in California?
11    A.   No, no one has ever described that that's the
12 way that the process works.
13    Q.   Do you know how the process has ever worked
14 for bag inspections in California based on your
15 observations or information you have received from
16 anyone other than Polo's counsel?
17    A.   Not specific to California.
18    Q.   Have you had any discussions with anyone,
19 other than perhaps Polo's counsel, regarding the time
20 period between when a sales associate has clocked out
21 and the time that they have undergone a loss prevention
22 inspection in California factory outlet stores?
23    A.   No.
24    Q.   Have you heard anyone in management at Polo
25 ever express any concerns about the time it takes from

Page 74

1 in the Polo employee handbook between or among the
2 factory outlet stores in California?
3    A.   Can you repeat that?
4      MR. KITCHIN:   Would you read that back,
5 please?
6      (The record was read.)
7    A.   I'm not sure I understand the question.
8 BY MR. KITCHIN:
9    Q.   I'll break it down. The Polo employee
10 handbook provides or describes some rules and
11 procedures and policies of Polo Ralph Lauren
12 Corporation that are to be applied to workers in
13 California; is that correct?
14    A.   Yes.
15    Q.   And those policies include matters such as
16 loss prevention inspections or bag checks; is that
17 true?
18    A.   Yes.
19    Q.   They include other things such as rest breaks
20 and meal breaks and guidelines for providing those to
21 employees, correct?
22    A.   Yes.
23    Q.   Includes a lot of other things including
24 benefits, descriptions of benefits provided.
25      Are you aware of any variations based on your

Page 76

1 the point when a sales associate clocks out to the time
2 a bag inspection is done?
3    A.   No.
4    Q.   Are you aware of any complaints, other than
5 the complaints in this case, by any sales associate in
6 California about the time it takes to have a bag
7 inspection performed?
8    A.   I am not aware of any.
9    Q.   Are you personally aware of any lawsuits,
10 other than this lawsuit, filed against Polo or factory
11 outlets of America by any associate -- sales associate
12 from a factory outlet store over missed, rest, or meal
13 breaks?
14    A.   Can you repeat that?
15    Q.   Other than this lawsuit, are you aware of any
16 other lawsuits against Polo brought by factory outlet
17 employees for missing meal or rest breaks?
18    A.   No.
19    Q.   Other than this lawsuit, are you aware of any
20 civil complaints or labor commission complaints against
21 Polo for unpaid wages relating to lost prevention
22 inspections?
23    A.   No.
24    Q.   Are you personally aware of any variation in
25 the application of the procedures and policies set out

Page 75

1 personal knowledge in the application of any of those
2 policies or procedures in California's factory outlet
3 stores?
4    A.   No. Anywhere that there is a variation in the
5 handbook, and it is specific to California such as with
6 the -- no rest breaks. It is normally denoted in the
7 handbook from my -- best of my knowledge.
8    Q.   I'm going to show you what was previously
9 marked as Exhibit 11. It's Polo Ralph Lauren
10 simulation handbook, 2005.
11      I'm not certain, but I believe this may be just
12 a portion of the handbook.
13      Have you seen this before today?
14    A.   No. This currently isn't used in our outlet.
15    Q.   Okay. I'll take that back.
16    A.   In the outlet division.
17    Q.   Was it used at sometime, to your knowledge?
18    A.   Not to my knowledge.
19    Q.   I'm going to show you what was previously
20 marked 11 in this case.
21      MR. CAPOBIANCO:   You mean 14.
22      MR. KITCHIN:   Oh, 14.
23 BY MR. KITCHIN:
24    Q.   Are you familiar with this Polo Ralph Lauren
25 employee/new hire loss prevention overview?

Page 77

20 (Pages 74 to 77)

**Golden Gate Reporting**

```
 1    A.   Yes.
 2    Q.   Is this loss prevention overview booklet used
 3  in the factory outlet stores?
 4    A.   Yes.
 5    Q.   Is it currently used in the factory outlet
 6  stores?
 7    A.   To my knowledge, yes.
 8    Q.   Is this the document you had referred to
 9  earlier as something that is provided to sales
10  associates when they are hired?
11    A.   Yes.
12    Q.   And based on your knowledge, including
13  discussions with other Polo employees, are you aware of
14  any systematic variation in the application of the
15  procedures and policies set out in this manual?
16    A.   I'm not aware of any variations.
17    Q.   Okay.  I'm going to show you an exhibit that
18  was previously marked as No. 18.
19    Q.   This exhibit is produced in this litigation --
20  I know it's hard to read.  It's very small text.
21         And it refers to just several individuals who
22  are named plaintiffs in this case.  We have been told
23  that it documents clock in/clock out time for employees
24  in these specific instances.
25         Have you ever seen a form similar to this that
```

Page 78

```
 1  shows clock in/clock out time for employees of the
 2  factory outlet stores?
 3    A.   Not similar to this one.
 4    Q.   Okay.  Have you seen a form that shows clock
 5  in/clock out times for sales associates in the factory
 6  outlet stores?
 7    A.   Yes.
 8    Q.   And was that one of the documents that you
 9  reviewed in preparation for your testimony today?
10    A.   No.
11    Q.   No.  So to your knowledge, there is some type
12  of form that or data that can be accessed for the
13  factory outlet stores that show clock in/clock out time
14  for specific sales associates; is that correct?
15    A.   Yes.
16    Q.   Would you know how long that data is
17  maintained?
18    A.   I don't.
19    Q.   You have seen actual printouts of clock
20  in/clock out time for factory outlet sales associates;
21  is that true?
22    A.   What time period would you be talking about?
23    Q.   Just ever.
24    A.   I have never seen a document like this.  The
25  document that I have actually seen is the one that the
```

Page 79

```
 1  stores can actually access in the store, which does not
 2  give you -- it does not give you every one.  It just
 3  gives you an individual person.
 4    Q.   So is that -- to your knowledge, to access
 5  that type of data, you would need to access that data
 6  at the store location?
 7    A.   Yes.
 8    Q.   You know that to be the case or are you
 9  guessing that that is the case?
10    A.   Well, what I have actually experienced is that
11  you -- I have had to personally access that in my
12  experience with the company at the store.  I have
13  not -- I have not personally accessed any of this type
14  of data in this format in my current role.
15    Q.   So you don't know whether the data could be
16  accessed in one location or if it needs to be accessed
17  at each store location.  Would that be a true
18  statement?
19    A.   Yes, I don't know.
20    Q.   I'm going to show you what was previously
21  marked as Exhibit 19.  This payroll manual adjustments
22  report concerns some of the named plaintiffs who worked
23  at the full price stores in California.
24         I doubt whether you have seen this specific
25  adjustments report.  I'm using it as an example.  My
```

Page 80

```
 1  question is -- my question is specifically this:  Have
 2  you ever, at any time, seen a document that showed
 3  adjustments to time records for factory outlet store
 4  employees?
 5    A.   Yes.
 6    Q.   Is it in similar format as this, if you know?
 7    A.   Based on the document that I had seen a while
 8  ago, I think the format was similar.
 9    Q.   Did you review any role manual adjustments
10  report in preparation for your deposition today?
11    A.   No.
12    Q.   When did you review a report that was similar
13  to this Exhibit 19?
14    A.   It was during the time that I was a general
15  manager in Flemington, New Jersey.
16    Q.   Have you ever seen any kind of similar report
17  for factory outlet employees in California?
18    A.   No.
19    Q.   Do you know whether there are such reports
20  available for factory outlet employees in California?
21    A.   I'm not certain.
22    Q.   That begs the question, do you believe, based
23  on something that you have heard or know about, that
24  there are similar reports for California employees?
25    A.   I'm not certain.  I have never seen one
```

Page 81

21 (Pages 78 to 81)

**Golden Gate Reporting**

```
1                    C E R T I F I C A T E

2           I, Anthony Armstrong, a Certified

3      Shorthand Reporter and Notary Public within

4      and for the State of New York, do hereby

5      certify:

6           That SHARONDA WEATHERSPOON, the witness

7      whose testimony is hereinbefore set forth, was

8      duly sworn by me and that such testimony is a

9      true record of the testimony given by such

10     witness.

11          I further certify that I am not related

12     to any of the parties by blood or marriage,

13     and that I am in no way interested in the

14     outcome of this matter.

15

16

17                        Anthony Armstrong

18

19

20

21

22

23

24

25
```

Page 130

EXHIBIT 25.

**Golden Gate Reporting**

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4

5   ANN OTSUKA, an individual; JANIS          No. C-07-02780-SI
    KEEFE, an individual; CORINNE
6   PHIPPS, an individual; and
    JUSTIN KISER, an individual;
7   individually and on behalf of
    all others similarly situated,

8
                   Plaintiffs,
9       vs.

10  POLO RALPH LAUREN CORPORATION;
    a Delaware Corporation; POLO
11  RETAIL, LLC, a Delaware Corporation;
    POLO RALPH LAUREN CORPORATION, a
12  Delaware Corporation, doing business
    in California as POLO RETAIL CORP;
13  FASHIONS OUTLET OF AMERICA, INC., a
    Delaware Corporation and DOES 1-500,
14  inclusive,

15                 Defendants.
                                        /
16

17
             DEPOSITION OF KRISTI MOGEL
18

19
          DATE:        February 4, 2008
20
          TIME:        10:06 a.m.
21
          LOCATION:    Greenberg Traurig
22                     1900 University Avenue
                       Fifth Floor
23                     East Palo Alto, California

24        REPORTED BY:  Mary E. Garland
                        Certified Shorthand Reporter
25                      License Number 4721

                                            Page 1

# Golden Gate Reporting

1 Kenneth Cole Productions, and that is the law of
2 California.
3     MR. GOINES: The law of California requires the
4 employer to make the breaks available.
5     Q. BY MR. KITCHIN: Have you ever heard from any
6 source, other than counsel, what California law's
7 requirement is as to the compensation of employees who
8 have missed rest breaks?
9     A. No.
10    Q. Let me take back that document.
11    A. The older one?
12    Q. Yes. This is Exhibit 8, we were looking at.
13        Are you aware of a retail employee handbook
14 dated 2004?
15    A. In general? There maybe a couple versions out
16 there, so.
17    Q. Okay.
18    A. It seems as if there are.
19    Q. So do you have a specific recollection as to
20 whether any employee handbook, other than the 2007
21 handbook, states that it is the manager's responsibility
22 to ensure that appropriate breaks are taken?
23    A. Again, I wouldn't be able to speak to where
24 it's written. I just will tell you it's certainly part
25 of our culture. So I don't know. I don't think -- I've

Page 150

1     A. Yes.
2     Q. Have you performed any loss prevention searches
3 in the La Jolla store?
4     A. Yes.
5     Q. Have you performed loss prevention inspections
6 in the South Coast Plaza store?
7     A. No.
8     Q. Have you performed loss prevention inspections
9 in the Beverly Hills store?
10    A. Yes.
11    Q. Have you performed loss prevention inspections
12 in any of the Malibu stores?
13    A. No.
14    Q. Have you performed loss prevention inspections
15 in the Palm Desert store?
16    A. No.
17    Q. Have you performed any loss prevention
18 inspections in either of the Rugby stores?
19    A. No.
20    Q. Do any of the stores that I've just mentioned
21 have security personnel who are currently assigned to
22 perform loss prevention inspections?
23    A. Assigned to the store?
24    Q. Yes.
25        MR. GOINES: Are you talking about independent

Page 152

1 never been presented with any questions around that.
2     Q. Since you began working for Polo in 2003, has
3 it been the policy of Polo Ralph Lauren to conduct loss
4 prevention searches of every employee before they leave
5 the store?
6     A. Yes.
7     Q. And has it been the policy to conduct those
8 searches both when an employee is leaving at the end of
9 their shift and anytime that they're leaving during the
10 course of their shift?
11    A. Yes.
12    Q. That includes management-level personnel?
13    A. Yes.
14    Q. Have you ever performed a loss prevention or
15 bag check inspection?
16    A. On many, many occasions?
17    Q. On many, many occasions?
18    A. Anytime I'm available and I can help out.
19    Q. And have you performed loss prevention
20 inspections in the San Francisco store?
21    A. Yes.
22    Q. And have you performed any loss prevention
23 inspections in the Burlingame store?
24    A. Yes.
25    Q. The Palo Alto store?

Page 151

1 of -- that's their sole function?
2     Q. BY MR. KITCHIN: Well, they can have many
3 functions, but one of their functions being the
4 performance of loss prevention inspections.
5     A. There is an asset protection staff in the
6 Beverly Hills store.
7     Q. And is that the only store in which loss
8 prevention or asset protection personnel works?
9     A. Where they're designated to that store? Yes.
10    Q. And is that person, as part of his or her
11 responsibility -- or those persons -- permitted to
12 perform loss prevention inspections on employees leaving
13 the Beverly Hills store?
14    A. Yes.
15    Q. Do managers in Beverly Hills, on occasion, also
16 perform loss prevention searches?
17    A. Yes.
18    Q. Is the asset protection personnel assigned to
19 the Beverly Hills store there throughout the time that
20 sales associates are working within the store?
21    A. As in "there," do you mean are they scheduled?
22    Q. Yes.
23    A. Yes.
24    Q. So how many days a week is the Beverly Hills
25 store open?

Page 153

39 (Pages 150 to 153)

CERTIFICATION OF DEPOSITION OFFICER

    I, MARY E. GARLAND, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was thereafter transcribed by means of computer-aided transcription under my direction; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

    I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

    Executed February 12, 2008, at San Francisco, California.

MARY E. GARLAND, CSR 4721

EXHIBIT 26.

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                     SAN FRANCISCO DIVISION

4

5    ANN OTSUKA, an individual;
     JANIS KEEFE, an individual;
6    CORINNE PHIPPS, an individual;
     and JUSTIN KISER, an individual;
7    individually and on behalf of
     all others similarly situated,

8
                     Plaintiffs,
9                                          Case No. c-07-02780-SI
     and
10
     POLO RALPH LAUREN CORPORATION,
11   a Delaware corporation; POLO
     RETAIL, LLC, a Delaware corporation;
12   POLO RALPH LAUREN CORPORATION, a
     ~~Delaware corporation, doing~~
13   business in California as POLO
     RETAIL CORP; FASHIONS OUTLET OF
14   AMERICA, INC., a Delaware
     corporation; and DOES 1-500,
15   inclusive,

16             Defendants.
     _____/
17

18              DEPOSITION OF THERESA CRUZ

19   DATE:        August 20, 2007

20   TIME:        10:00 a.m.

21   LOCATION:    LAW OFFICE OF PATRICK R. KITCHIN
                  565 Commercial Street
22                Fourth Floor
                  San Francisco, California 94111

23

24   REPORTED BY: Katy Leonard
                  Certified Shorthand Reporter
25                License Number 11599

                                              Page 1

**Golden Gate Reporting**

1 involvement, if you have an involvement in the process,
2 of hiring a new sales associate at Polo San Francisco.
3        Are you involved in the interviewing process
4 for sales associates?
5    A. No.
6    Q. Are you involved in the decision-making as
7 to which sales associates to hire?
8    A. No.
9    Q. Are you involved in helping to set up a
10 hired sales associate into the payroll system?
11    A. Yes.
12    Q. And do you have any assistants that work for
13 you?
14    A. No.
15    Q. So, you do all this on your own?
16    A. Yes.
17    Q. And, so, do you work with the corporate
18 office to set up someone in the payroll system?
19    A. No. I can got to the workstation and do
20 that.
21    Q. Okay.
22    A. It's called the "Lawson."
23    Q. L-a-w-s-o-n?
24    A. That's correct.
25    Q. And, so, you enter in specific information

Page 46

1 about the employee to set them up as a user of the
2 Lawson system?
3    A. Yes.
4    Q. And how does the Lawson system differ from
5 the Tradewind system?
6    A. The Lawson is for new-hire employees. After
7 you have put in all the information, it will give you
8 the employee number -- it will assign an employee
9 number.
10    Q. What involvement do you have, in addition to
11 having a new sales associate set up through the Lawson
12 system, to assist a new sales associate to get into the
13 system and start working at Polo?
14    A. I prepare the new hire -- the new-hire
15 paperwork for them.
16    Q. What is included in the new-hire paperwork?
17    A. The PAF.
18    Q. What is a PAF?
19    A. Personal Authorization Form.
20    Q. And what does that Personal Authorization
21 Form relate to?
22    A. Um, you fill in the Social Security number,
23 the information of the employee, if she will be hired
24 full-time, part-time, or temporary, and how many hours.
25 And it also pertained -- we use that form for someone

Page 47

1 who will go on a leave of absence. We use that form for
2 termination, also. And other changes. Let's say if we
3 terminate the person, if there's any changes on their --
4 where to mail the final paycheck.
5    Q. Okay. What other tasks are you involved
6 with in bringing in a new sales associate into the Polo
7 San Francisco store?
8    A. Um, just training with the Tradewind. I do
9 the walk-through with the new hire.
10    Q. And the walk-through involves what?
11    A. Walk-through in the store only.
12    Q. So, you show them around?
13    A. Yes.
14    Q. Do you have any involvement in providing
15 them training related to loss prevention?
16    A. Um, no.
17    Q. When you're doing your walk-through, do you
18 show them where the employee exit is?
19    A. Yes.
20    Q. And do you describe to them the process that
21 they're required to go through in order to leave the
22 store?
23    A. Yes.
24    Q. And what specifically do you tell them about
25 leaving the store?

Page 48

1    A. Leaving the store? They need to call a
2 department manager to check them out.
3    Q. And is it -- are you authorized to let
4 people out the exit?
5    A. Yes.
6    Q. Is Tin -- or, was he authorized to let
7 people out the exit?
8    A. Yes.
9    Q. All department managers had the ability to
10 let people out of the exit?
11    A. Yes.
12    Q. Anyone else, other than the general manager,
13 you, and the department managers, who had the ability to
14 let people out the employee exit?
15    A. Um, all the department managers.
16    Q. Do all department managers have keys to turn
17 off the alarm at the back exit?
18    A. Yes.
19    Q. And the key that they have also gives them
20 access from the outside; is that correct?
21    A. Yes.
22    Q. And the door coming into the store through
23 the -- the employee exit, that's locked from the
24 outside?
25    A. Yes.

Page 49

13 (Pages 46 to 49)

# Golden Gate Reporting

1  Q. But it's not locked from the inside; is that
2  correct?
3      A. No.
4      Q. Is it always alarmed?
5      A. Yes.
6      Q. So, if you -- so, an employee could open the
7  employee exit and leave physically to do that; is that
8  correct?
9      A. By not letting -- check her out?
10     Q. Yeah. Let me rephrase the question.
11         An employee -- a sales associate could leave
12 through the back exit at any time they wanted to, except
13 that an alarm would sound if they did that without the
14 key being turned?
15     A. Turned, yes.
16     Q. Okay. Do you give sales associates, during
17 the walk-through, any information as to the consequences
18 of leaving the store without being checked out?
19     A. Yes.
20     Q. What do you tell the sales associates?
21     A. It is a policy of the company, working in
22 retail, that anybody who leaves at the back door will
23 have to be checked out. And if they have their bags
24 with them, we have to check their bags also.
25     Q. Okay. So, if an employee doesn't have bags,

Page 50

1  lunch been in effect?
2      A. Um, at that time, it was for a while.
3      Q. More than a year?
4      A. More than -- more than two years.
5      Q. Was that policy in effect when Justin Kiser
6  was working at Polo?
7      A. That's correct.
8      Q. Was that policy in place to use the home
9  collections door to return from lunch in effect when
10 Janis Keefe worked for Polo?
11     A. Yes.
12     Q. And the same question with Corinne Phipps?
13     A. Yes.
14     Q. So, they left, I believe, in 2004.
15         Do you believe that this policy has been in
16 effect since at least 2004?
17     A. Oh, yes.
18     Q. And did you do -- strike that.
19         On your walk-through with associates, you
20 tell them that in order to leave the store, they need to
21 have a manager do a loss-prevention inspection; correct?
22     A. Yes.
23     Q. And are they required to do that at any time
24 during the day they wish to leave the building?
25     A. Yes.

Page 52

1  they still need to go through the loss-prevention
2  inspection at the back door; is that correct?
3      A. Just to be checked out by a manager. Just
4  to make sure that the key is not turned the other way so
5  that the alarm will not go off.
6      Q. Are employees permitted -- strike that.
7         Are sales associates permitted to use any
8  other doors within the facility on a regular basis?
9      A. Yes.
10     Q. And what other doors can they use?
11     A. Home collection entrance door.
12     Q. And all sales associates can use the home
13 collections door?
14     A. That is correct.
15     Q. At any time?
16     A. No.
17     Q. At what time?
18     A. Only if they're coming back from their
19 lunch.
20     Q. And does that apply to all sales associates
21 who are currently working at the Polo store in
22 San Francisco?
23     A. Yes.
24     Q. And how long has that specific policy about
25 coming back in through the home collections door after

Page 51

1      Q. Do you explain to them whether there are any
2  consequences for failing to go through a loss-prevention
3  inspection as required under Polo's policy?
4      A. No.
5      Q. Is there any policy in place in Polo
6  regarding what consequences would happen if a sales
7  associate exited the building without undergoing a
8  loss-prevention inspection?
9      A. That will be a -- yes.
10     Q. What is the policy?
11     A. The policy is -- that will be -- I will have
12 to tell my GM that the person had exited the other
13 entrances than what is permitted to us.
14     Q. Have you ever had to inform your general
15 manager that someone had left the store without going
16 through a loss-prevention inspection?
17     A. Um, no.
18     Q. Have you ever heard of any employee who has
19 left the building without going through a
20 loss-prevention inspection?
21     A. No.
22     Q. Are managers required to go through
23 loss-prevention inspections as well?
24     A. Absolutely.
25     Q. And are managers required to -- except for

Page 53

14 (Pages 50 to 53)

**Golden Gate Reporting**

```
 1            CERTIFICATION OF DEPOSITION OFFICER

 2

 3            I, KATY LEONARD, duly authorized to

 4    administer oaths pursuant to Section 2093(b) of the

 5    California Code of Civil Procedure, hereby certify that

 6    the witness in the foregoing deposition was by me sworn

 7    to testify to the truth, the whole truth and nothing but

 8    the truth in the within-entitled cause; that said

 9    deposition was taken at the time and place therein

10    stated; that the testimony of the said witness was

11    thereafter transcribed by means of computer-aided

12    transcription; that the foregoing is a full, complete

13    and true record of said testimony; and that the witness

14    was given an opportunity to read and correct said

15    deposition and to subscribe the same.

16            I further certify that I am not of counsel

17    or attorney for either or any of the parties in the

18    foregoing deposition and caption named, or in any way

19    interested in the outcome of this cause named in said

20    caption.

21

22

23

24

25            KATY LEONARD, CSR 11599

                                    Page 261
```

EXHIBIT 27.

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4

5  ANN OTSUKA, an individual; JANIS          No. C-07-02780-SI
   KEEFE, an individual; CORINNE
6  PHIPPS, an individual; and
   JUSTIN KISER, an individual;
7  individually and on behalf of
   all others similarly situated,

8               Plaintiffs,

9      vs.

10 POLO RALPH LAUREN CORPORATION;
   a Delaware Corporation; POLO
11 RETAIL, LLC, a Delaware Corporation;
   POLO RALPH LAUREN CORPORATION, a
12 Delaware Corporation, doing business
   in California as POLO RETAIL CORP;
13 FASHIONS OUTLET OF AMERICA, INC., a
   Delaware Corporation and DOES 1-500,
14 inclusive,

15               Defendants.
                                        /
16

17

            DEPOSITION OF VALERIE ANN HARRISON
18

19
        DATE:          August 10, 2007
20
        TIME:          10:08 a.m.
21
        LOCATION:      120 Kearny Street
22                     Suite 3200
                       San Francisco, California
23
        REPORTED BY:   Mary E. Garland
24                     Certified Shorthand Reporter
                       License Number 4721
25

                                              Page 1

Golden Gate Reporting

1 topics you were being trained in?
2    A. There were videos and there was the handbook.
3    Q. And do you recall specifically which videos you
4 were shown?
5    A. It's so long, I don't recall. I'm sorry. I
6 know that there's a series.
7    Q. During this initial part of your employment at
8 Polo, did Cynthia or Todd alert you to any kind of hot
9 button issues for you to be specifically careful about
10 while working at Polo?
11    A. Not that I recall.
12    Q. As part of that training, did you receive any
13 information about loss prevention inspections of
14 employees?
15    A. That we were supposed to, obviously, do them
16 before we left, each person left, managers were supposed
17 to do that; and that we were supposed to check bags and
18 purchases.
19    Q. Were you instructed that employees were
20 required to use any specific exit in the building?
21    A. Yes. We were supposed to use the back exit
22 that goes down the back hallway.
23    Q. And were you told that employees were
24 prohibited from using either -- well, take it one at a
25 time -- using the Home Collections door?

Page 26

1    Q. And so anyone who was in management level at
2 the Polo store could inspect your bags when you exited
3 the building?
4    A. That's correct.
5    Q. With respect to sales associates, were you
6 instructed as to who would be permitted to conduct bag
7 inspections of them before leaving the building?
8    A. It was the same, management.
9    Q. Were you instructed that sales associates were
10 required to have bag inspections done at anytime they
11 left the building?
12    A. Yes.
13    Q. The back exit, did you refer to that as the
14 employee exit? Is there --
15    A. I can't recall specifically.
16    Q. I'm trying get the terms down.
17       So if I refer to it as the back exit, you'll
18 know what I'm talking about?
19    A. The back door.
20    Q. The back door? Okay.
21       Was the back door physically locked during
22 store hours?
23    A. From the outside.
24    Q. From the outside. So you could open the door
25 from the inside?

Page 28

1    A. Yes.
2    Q. And were you instructed that employees were not
3 permitted to enter or exit through the main doors to the
4 store?
5    A. Yes.
6    Q. And were you instructed that there were any
7 consequences that would be imposed on employees who
8 violated the prohibition in using those two exits?
9    A. I believe that the person would be written up,
10 was the policy.
11    Q. Were you instructed that you were required to
12 undergo loss prevention inspections prior to exiting the
13 building?
14    A. Yes.
15    Q. And did those loss prevention inspections take
16 place whether it was leaving for lunch or leaving at the
17 end of the day?
18    A. Yes.
19    Q. If you wanted to go out and get a coffee
20 outside of the building, were you required personally to
21 undergo a loss prevention inspection?
22    A. Yes.
23    Q. And who was permitted to conduct those
24 inspections of you personally?
25    A. A member of management.

Page 27

1    A. There's an alarm, and you had to have a key in
2 order to turn off the alarm. You could push the door,
3 it was open, but it would set the alarm off.
4    Q. And who had keys to -- strike that.
5       The keys that you had, was that to disarm the
6 alarm?
7    A. Yes. And to get inside the back door.
8    Q. So you could enter the back door with your key
9 without setting off the alarm?
10    A. That's correct.
11    Q. Who had keys to the back door, if you know?
12    A. All members of management.
13    Q. Did any sales associates, that you're aware of,
14 have keys to the back door lock?
15    A. No.
16    Q. You referred to an employee manual that you
17 received when you first began at Polo. Was it a single
18 employment manual or was there more than one employment
19 manual that you were provided?
20    A. I believe it was only one.
21    Q. Do you remember if there was an employee manual
22 that dealt with compensation that was a smaller manual
23 than the Polo Ralph Lauren employee handbook?
24    A. I don't recall that.
25    Q. During your initial training at Polo, were you

Page 29

8 (Pages 26 to 29)

CERTIFICATION OF DEPOSITION OFFICER

I, MARY E. GARLAND, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was thereafter transcribed by means of computer-aided transcription under my direction; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed August 15, 2007, at San Francisco, California.

_____
MARY E. GARLAND, CSR 4721

EXHIBIT 28.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ANN OTSUKA, an individual,

**CERTIFIED COPY**

et al.,

Plaintiffs,

vs.                          No. C-07-02780-SI

POLO RALPH LAUREN CORPORATION,

et al.,

Defendants.

_____/

Videotaped Deposition of

**JANIS KEEFE**

Monday, March 17, 2008

Reported by:
IRIS MEINKE-SMITH, RMR/CRR
CSR No. 3798
Job No. 18235LR



**PHILLIPS LEGAL SERVICES**

SAN FRANCISCO DEPOSITION REPORTERS

795 FOLSOM STREET, FIRST FLOOR
SAN FRANCISCO, CA 94107
1-888-333-8270
WWW.PHILLIPSDEPO.COM

1    Theresa went through it briefly and basically kind of

2    said the same thing Tin did.  Everyone pretty much

3    said the same thing, you know.

4    Q.      Do you recall Kristi or Theresa discussing

11:29:02 5   with you in this process the arrears concept or the

6    arrears program?

7    A.      No.  That's one thing that I really -- I'm

8    pretty sure that no one really went in detail with

9    it.

11:29:16 10  Q.      But if I understand correctly, Tin

11    mentioned --

12    A.      Mentioned it, yes.

13    Q.      But you don't recall whether Theresa or

14    Kristi mentioned it?

11:29:24 15  A.      No.

16    Q.      Prior to your actually starting work, do you

17    recall discussing with either Theresa, Tin or Kristi

18    Polo's practice of requiring its sales associates,

19    and actually all its employees, of having a loss

11:29:43 20  prevention search before they departed the store for

21    lunch or at the end of their day?

22    A.      Right.  That was part of the policies and

23    procedures part.

24    Q.      Was this something that you read as opposed

11:29:55 25  to something you were told?

58

1    A.        I think it was something that I found out

2    that day, you know, that I actually started.    It

3    wasn't really discussed in that much detail.    There

4    was just, you know, loss -- there's loss prevention

11:30:11 5    thing.    But it wasn't really like this is what we're

6    going to do type of thing.

7    Q.        Do you recall who at Polo explained to you

8    how you would clock in and clock out to both begin

9    and end your shifts?

11:30:23 10    A.        Theresa Cruz.

11    Q.        And do you recall her explaining the

12    clock-in and clock-out procedure actually on your

13    first day of work or at some time prior to your

14    actually starting work?

11:30:35 15    A.        First day of work.

16    Q.        Can you tell me what you recall her telling

17    you?

18    A.        That you come in to work and you put your

19    things away and then you -- when you're ready to get

11:30:46 20    on the sales floor, you clock in.    And then when

21    you're ready to leave, you clock out, basically.

22    Q.        Did you understand that you had to clock out

23    when you departed the store for your lunch break?

24    A.        Yes.

11:31:00 25    Q.        And then you would clock back in when you

59

## REPORTER'S CERTIFICATE

1

2          I certify that the foregoing proceedings in

3    the within-entitled cause were reported at the time

4    and place therein named; that said proceedings were

5    reported by me, a duly Certified Shorthand Reporter

6    of the State of California authorized to administer

7    oaths and affirmations, and were thereafter

8    transcribed into typewriting.

9          I further certify that I am not of counsel

10   or attorney for either or any of the parties to said

11   cause of action, nor in any way interested in the

12   outcome of the cause named in said cause of action.

13          IN WITNESS WHEREOF, I have hereunto set my

14   hand this 1st day of April, 2008.

15

16   _____ *Iris Meinke-Smith* _____

17   IRIS MEINKE-SMITH, CA CSR No.3798
     Registered Merit Reporter
18   Certified Realtime Reporter

19

20

21

22

23

24

25
                                                      150

EXHIBIT 29.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ANN OTSUKA, an individual,
et al.,

**CERTIFIED COPY**

          Plaintiffs,

    vs.             No. C-07-02780-SI

POLO RALPH LAUREN CORPORATION,

et al.,

          Defendants.

_____/

Videotaped Deposition of

**RENEE DAVIS**

Wednesday, March 19, 2008

Reported by:
IRIS MEINKE-SMITH, RMR/CRR
CSR No. 3798
Job No. 18236LR



**PHILLIPS LEGAL SERVICES**
SAN FRANCISCO DEPOSITION REPORTERS
795 FOLSOM STREET, FIRST FLOOR
SAN FRANCISCO, CA 94107
(888) 333.8270
(800) 455-8030 fax
WWW.PHILLIPSDEPO.COM

1    And I believe they had some even later than that,

2    but...

3    Q.        Would your shift have been one of the 10:00

4    to 7:00, 12:00 to 9:00, 1:00 to 10:00?

10:47:08 5    A.        Yes.

6    Q.        Okay.  Did Fred explain to you that one of

7    the requirements to work in the Cabazon store was

8    that you would need to engage in a loss prevention

9    search when you departed the store, either for a meal

10:47:34 10    break or for -- at the conclusion of your shift?

11    A.        Yes.

12    Q.        And do you recall what he told you about

13    that?

14    A.        Any time you -- any time you leave the

10:47:45 15    store, you have to get a manager or a lead person and

16    be searched before you left.

17    Q.        And did you understand the search to be

18    someone physically just look inside a bag or bags

19    that you were carrying?

10:47:58 20    A.        Well, actually, they told us that you can't

21    wear your coat to the door because they have to check

22    your coat, as well as any purchases that you made,

23    and a female, obviously a purse.

24    Q.        I understand that it's not a -- like a

10:48:14 25    pat-down search, that someone just looked in your

42

# REPORTER'S CERTIFICATE

1

2        I certify that the foregoing proceedings in

3   the within-entitled cause were reported at the time

4   and place therein named; that said proceedings were

5   reported by me, a duly Certified Shorthand Reporter

6   of the State of California authorized to administer

7   oaths and affirmations, and were  thereafter

8   transcribed into typewriting.

9        I further certify that I am not of counsel

10  or attorney for either or any of the parties to said

11  cause of action, nor in any way interested in the

12  outcome of the cause named in said cause of action.

13        IN WITNESS WHEREOF, I have hereunto set my

14  hand this 4th day of April, 2008.

15

16  _____ *Iris Meinke-Smith* _____

17  IRIS MEINKE-SMITH, CA CSR No.3798
    Registered Merit Reporter
18  Certified Realtime Reporter

19

20

21

22

23

24

25                                              122

EXHIBIT 30.

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4

5    ANN OTSUKA, an individual;
     JANIS KEEFE, an individual;
6    CORINNE PHIPPS, an individual;
     and JUSTIN KISER, an individual;
7    individually and on behalf of
     all others similarly situated,

8
              Plaintiffs,
9                                      Case No. c-07-02780-SI
     and
10
     POLO RALPH LAUREN CORPORATION,
11   a Delaware corporation; POLO
     RETAIL, LLC, a Delaware corporation;
12   POLO RALPH LAUREN CORPORATION, a
     Delaware corporation, doing
13   business in California as POLO
     RETAIL CORP; FASHIONS OUTLET OF
14   AMERICA, INC., a Delaware
     corporation; and DOES 1-500,
15   inclusive,

16            Defendants.
     _____/

17

18            DEPOSITION OF THERESA CRUZ

19   DATE:        August 20, 2007

20   TIME:        10:00 a.m.

21   LOCATION:    LAW OFFICE OF PATRICK R. KITCHIN
                  565 Commercial Street
22                Fourth Floor
                  San Francisco, California 94111

23

24   REPORTED BY: Katy Leonard
                  Certified Shorthand Reporter
25                License Number 11599

                                              Page 1

**Golden Gate Reporting**

| | |
|---|---|
| 1       Certain types of unacceptable behavior | 1       Q. Okay. I'd like you to turn on this exhibit |
| 2   warrant specific mention. | 2   to the -- No. 4 to page 777. And I want to have you |
| 3       And then on this page, 773, there are 13 | 3   take a look at the third bullet point under "General |
| 4   items, and on the next page it goes to 27 items. | 4   Security" on the right-hand column. It says, quote: |
| 5   Do you remember seeing this specific list of | 5       Bag checks must be performed any time an |
| 6   unacceptable behavior? | 6       employee leaves the store. It is each |
| 7       A. Um, no. | 7       individual's responsibility to notify a |
| 8       Q. No. | 8       manager when leaving the store with a |
| 9       Take a look at page 774, if you would. Item | 9       bag, box, or any other item used to |
| 10   No. 23 reads, quote: | 10       carry merchandise. |
| 11       Divulging personal salary arrangements | 11       Was that a policy that's been in place |
| 12       to other Polo Retail Corporation | 12   throughout the time you've worked as operations manager |
| 13       associates, closed quote. | 13   at the store? |
| 14       Was it Polo's policy in San Francisco to | 14       A. Yes. |
| 15   prohibit sales associates from telling one another how | 15       Q. And isn't it true that it's not only the |
| 16   much money they were earning? | 16   responsibility to notify a manager when leaving the |
| 17       A. No. | 17   store with a bag, box, or other item used to carry |
| 18       Q. And -- | 18   merchandise, but bag checks or loss-prevention checks |
| 19       A. I don't think it's -- because every single | 19   must be performed any time an employee leaves the store? |
| 20   sales associate gets 8 percent commission. | 20       A. Yes. |
| 21       Q. Did you ever hear -- do you recall seeing | 21       Q. I want you to take a look the page 784. |
| 22   this specific reference that says, "Divulging personal | 22   It's the last page of Exhibit 4. "When You Are Paid." |
| 23   salary arrangements to other Polo Retail Corporation | 23   It says, quote: |
| 24   associates"? | 24       Employees regularly receive their pay |
| 25       A. No. | 25       biweekly on Fridays. |
| Page 138 | Page 140 |

| | |
|---|---|
| 1       Q. Did you ever tell any sales associate that | 1       Is that when employees within the |
| 2   it was improper for them to talk with other sales | 2   San Francisco store were generally paid? |
| 3   associates about how much money they had earned? | 3       A. Yes. |
| 4       A. Well, as my own opinion -- | 4       Q. It goes on to state, quote: |
| 5       Q. Well, let me just focus you here. | 5       Payment will include base salary, as |
| 6       Did you ever tell a sales associate that | 6       well as overtime payment earned during |
| 7   they were not permitted to tell other sales associates | 7       the prior two-week period, closed quote. |
| 8   how much money they had earned? | 8       I may have asked this question before. |
| 9       A. No. | 9       I think I did, but just to make sure, You're |
| 10       Q. Did you ever hear any other manager at Polo | 10   unaware of any premium overtime payment made to sales |
| 11   Ralph Lauren in San Francisco tell any sales associates | 11   associates since you've been operations manager; is that |
| 12   that they were not permitted to share their salary | 12   true? |
| 13   information with any other associate? | 13       A. There are no premium overtime for sales |
| 14       A. No. | 14   associates. |
| 15       Q. You have a personal opinion about this you | 15       Q. Okay. I'm going to show you what we've |
| 16   had -- about this specific item? | 16   marked as Exhibit 5 to the Valerie Harrison deposition, |
| 17       A. Well, I don't discuss my salary to anybody. | 17   and represent to you that these are certain pages from a |
| 18       Q. Okay. And have you ever been instructed | 18   document what was provided to us through the discovery |
| 19   that you're not entitled to do that? | 19   process by Mr. Goines' office. It's entitled, "Polo |
| 20       A. Well, when I read my employee handbook, when | 20   Ralph Lauren Retail Handbook, 2002, Volume 2." |
| 21   I started with the company, I do recall not to tell | 21       Do you recall a retail employee handbook |
| 22   anybody about -- not to indulge [sic] your salary with | 22   being issued in about 2002 that was referred to as |
| 23   other staff. | 23   "Volume 2"? |
| 24       Q. And you haven't done that? | 24       A. Yes. |
| 25       A. No. | 25       Q. And was this document rolled out to sales |
| Page 139 | Page 141 |

36 (Pages 138 to 141)

**Golden Gate Reporting**

1              CERTIFICATION OF DEPOSITION OFFICER

2

3              I, KATY LEONARD, duly authorized to

4    administer oaths pursuant to Section 2093(b) of the

5    California Code of Civil Procedure, hereby certify that

6    the witness in the foregoing deposition was by me sworn

7    to testify to the truth, the whole truth and nothing but

8    the truth in the within-entitled cause; that said

9    deposition was taken at the time and place therein

10   stated; that the testimony of the said witness was

11   thereafter transcribed by means of computer-aided

12   transcription; that the foregoing is a full, complete

13   and true record of said testimony; and that the witness

14   was given an opportunity to read and correct said

15   deposition and to subscribe the same.

16              I further certify that I am not of counsel

17   or attorney for either or any of the parties in the

18   foregoing deposition and caption named, or in any way

19   interested in the outcome of this cause named in said

20   caption.

21

22

23

24

25                    KATY LEONARD, CSR 11599

                                              Page 261

EXHIBIT 31.

Golden Gate Reporting

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN FRANCISCO DIVISION

 4

 5   ANN OTSUKA, an individual; JANIS       No. C-07-02780-SI
     KEEFE, an individual; CORINNE
 6   PHIPPS, an individual; and
     JUSTIN KISER, an individual;
 7   individually and on behalf of
     all others similarly situated,
 8
                    Plaintiffs,
 9      vs.

10   POLO RALPH LAUREN CORPORATION;
     a Delaware Corporation; POLO
11   RETAIL, LLC, a Delaware Corporation;
     POLO RALPH LAUREN CORPORATION, a
12   Delaware Corporation, doing business
     in California as POLO RETAIL CORP;
13   FASHIONS OUTLET OF AMERICA, INC., a
     Delaware Corporation and DOES 1-500,
14   inclusive,

15                  Defendants.
                                          /
16

17            DEPOSITION OF VALERIE ANN HARRISON

18

19
        DATE:         August 10, 2007
20
        TIME:         10:08 a.m.
21
        LOCATION:     120 Kearny Street
22                    Suite 3200
                      San Francisco, California
23
        REPORTED BY:  Mary E. Garland
24                    Certified Shorthand Reporter
                      License Number 4721
25
                                              Page 1
```

1  your department?
2      MR. GOINES: Objection. Overbroad.
3      Q. BY MR. KITCHIN: You can answer.
4      MR. GOINES: What policies?
5      THE WITNESS: Yeah, I guess we're going to have
6  to talk specifics. I mean, I felt that, yes, we were
7  consistent in the Home department.
8      Q. BY MR. KITCHIN: Were there any policies that
9  you were aware of that Polo had instituted on a
10 companywide basis that you, for one reason or the other,
11 decided to apply inconsistently to your sales
12 associates?
13     A. Like? Anything specifically?
14     Q. Anything that you --
15     A. No.
16     Q. -- understood to be a Polo policy that you
17 decided, for some reason or the other, to apply to your
18 sales associates inconsistently?
19     A. No.
20     Q. And was that important, to be consistent, for
21 purposes of fairness?
22     A. I think so.
23     Q. Have you take a look at page 777, Exhibit 4.
24 There's a category, "General Security." Do you see
25 that? The third bullet point says, "Bag checks must be

Page 90

1  performed anytime an employee leaves the store."
2      Was that policy applied consistently when you --
3  were department manager of Home Collections?
4      A. Yes.
5      Q. Did you see that policy being applied
6  inconsistently or not applied to any other sales
7  associates in the store?
8      A. Not that I can recall ever.
9      Q. Did you ever see any of the sales associates
10 who worked for Polo leaving during the day out of any
11 other door except for the employee exit?
12     A. Not that I can recall.
13     Q. How about managers? Did you see them exiting
14 out of any other door during the time that you worked at
15 Polo?
16     A. Not that I can recall.
17     Q. Didn't Kim Babka use the front door on
18 occasion?
19     A. I wouldn't know.
20     Q. If you'd take a look at page 778, the next
21 page. Right-hand column says "Bag Inspection."
22     A. Mm-hm.
23     Q. Again, it says that, "All packages are subject
24 to inspection by store management."
25     That policy, you were aware of, and you

Page 91

1  indicated was applied consistently; is that correct?
2      A. Yes.
3      (Exhibit 5 marked for identification.)
4      Q. BY MR. KITCHIN: Exhibit 5 is a "Retail
5  Employee Handbook 2002 - Volume 2." Do you recall there
6  being a number of revisions or volumes of the retail
7  employee handbook that came out in the 2002 time frame?
8      A. I don't recall.
9      MR. GOINES: And just for the record, this is
10 just a portion of what was produced as part of the
11 retail employee handbook. It appears that the Bates
12 are -- there are pages that you've elected not to
13 include in this exhibit?
14     MR. KITCHIN: Yes. You'll see, Bill, that most
15 of the manuals, I've just included some of the pages
16 that I'd like to ask questions about.
17     MR. GOINES: I just wanted to make sure that I
18 understood the exhibit.
19     MR. KITCHIN: Right.
20     Q. Do you recall any modifications of the policies
21 on commission payments that were made in the 2002 time
22 frame, other than the restructure of the payroll system?
23     A. Not that I can recall.
24     Q. Were there any modifications that you recall
25 during that time frame that were made to the returns

Page 92

1  policies?
2      A. Not that I can recall that, either.
3      Q. Are there any modifications that you recall
4  that were made by Polo Ralph Lauren during the entire
5  course of your employment regarding product returns and
6  how those product returns might impact employee wages?
7      A. Not that I've ever heard.
8      Q. A product can be returned by a Polo customer at
9  anytime; is that correct?
10     A. I think it varied over like -- the policy did
11 vary, although I can't speak to that, I don't recall all
12 that. And in general, we try to discourage, like if
13 they had gone past whatever the policy was, as far as
14 returning and the number of days. But, yes, if the
15 customer pushed hard enough, we would return it.
16     Q. And you in the Home Collections department were
17 selling some pretty large ticket items; correct?
18     A. That's correct.
19     Q. You sold couches; is that correct?
20     A. Yes.
21     Q. And chairs?
22     A. Yes.
23     Q. And on occasion, those were delivered and then
24 returned; is that correct?
25     A. Very rarely.

Page 93

24 (Pages 90 to 93)

# Golden Gate Reporting

1  that. I mean, now that I read that, I obviously know,
2  so.
3      Q.  So just have to look at -- I don't have my
4  calendar here, which would tell us if that's 2006. I
5  believe it is. So that would have been about a year
6  ago. Does that time frame make sense as to when you
7  had the meeting with the other managers and Tin when he
8  indicated that the arrears program was being
9  discontinued?
10     A.  Again, I don't know time. I can't recall
11  timelines, as far as that goes.
12     Q.  Does it seem to you like it was as long as
13  almost two and a half years ago, or does it seem more
14  recent than that?
15     A.  As far as discontinuing it?
16     Q.  Yes. When you were informed that it was going
17  to be discontinued.
18     A.  Again, I don't recall when we were exactly
19  informed and the lag time in between that was actually
20  discontinued. I mean, I can estimate -- I would
21  estimate from the beginning of a year or two ago is when
22  I would have guessed the whole arrears thing ended.
23     Q.  And after the arrears program was terminated,
24  did you ever have a discussion with anyone from Polo
25  about the arrears program, after it was terminated?

Page 122

1      A.  Not that I can recall.
2      Q.  The second page of Exhibit 13 -- it's Polo 435,
3  "Fiscal 2007 Compensation Update" -- there's a reference
4  to "base plus commission," and it refers to several
5  stores, and the only one in California is Burlingame.
6  You see that? "Coinciding with the start of fiscal
7  2007, we would like to offer a 'base plus' commission
8  option for several of our stores. These stores are
9  Dallas NorthPark," Texas "West Village, San Antonio,
10  Burlingame, Chicago-Northbrook and Minneapolis."
11         Do you remember any discussion or was there
12  any discussion that you heard at Polo San Francisco
13  regarding a base plus commission system?
14     A.  I don't recall that that was ever discussed for
15  San Francisco.
16     Q.  Do you recall any discussions in the 2006,
17  2007 time frame at Polo regarding whether Polo sales
18  associates were entitled to premium overtime
19  compensation under any circumstances?
20     A.  I don't know.
21     Q.  You didn't hear any conversations relating to
22  that issue?
23     A.  No.
24     Q.  We're now in a fairly recent time period, 2006,
25  2007. Do you know whether any of the sales associates

Page 123

1  that were working under your direction in the Home
2  Collection department were ever paid premium overtime
3  compensation?
4      A.  I wouldn't know, because I didn't deal with
5  payroll on that level, unless somebody would have come
6  to me with a check saying -- asking me a question about
7  and showing me and telling me, which did not happen.
8      Q.  Throughout the time that you worked for Polo,
9  you don't recall an associate ever coming to you and
10  asking you, raising an issue relating to the payment or
11  nonpayment of premium overtime compensation?
12     A.  Are we talking in 2006, 2007 again?
13     Q.  I'm talking anytime when you worked there,
14  whether any sales associate ever talked to you about
15  whether they were entitled to premium overtime
16  compensation.
17     A.  Yes. Corinne did ask once about it. And I
18  referred her to either Kristi or Theresa, Kristi Mogel
19  or Theresa.
20     Q.  Did you provide Corinne any information on that
21  issue?
22     A.  No. I referred her to those two people,
23  because they would know best.
24     Q.  Did you tell Corinne that she should be careful
25  with her paycheck because sometimes mistakes are made in

Page 124

1  a paycheck?
2      A.  Be careful with her paycheck?
3      Q.  Well, to carefully review her paycheck, because
4  there are mistakes that are made on the paychecks at
5  Polo?
6      A.  I don't remember specifically saying that, but
7  I may have told her that she should definitely always
8  take a look at her paychecks.
9      Q.  Other than Corinne Phipps, or Mullen at the
10  time, there were no other sales associates who ever
11  spoke with you about the payment of premium overtime
12  compensation?
13     A.  Recently or in the past. The past, I couldn't
14  recall. I know for certain recently, no.
15     Q.  We've talked a lot about the loss prevention
16  inspections that were taking place back in 2001, 2002.
17  Now I want to focus on the rest of the time period that
18  you were serving as manager of Home Collections.
19         As far as you know, during the period from
20  2002, forward, until you quit, were all sales associates
21  and managers required to undergo loss prevention
22  inspections before they left the store?
23     A.  Yes.
24     Q.  And at some point in time, I take it the time
25  card system that was back by Theresa Cruz's office was

Page 125

32 (Pages 122 to 125)

1                    CERTIFICATION OF DEPOSITION OFFICER

2

3          I, MARY E. GARLAND, duly authorized to administer

4     oaths pursuant to Section 2093(b) of the California Code

5     of Civil Procedure, do hereby certify that the witness

6     in the foregoing deposition was duly sworn by me to

7     testify to the truth, the whole truth and nothing but

8     the truth in the within-entitled cause; that said

9     deposition was taken at the time and place therein

10    stated; that the testimony of said witness was

11    thereafter transcribed by means of computer-aided

12    transcription under my direction; that the foregoing is

13    a full, complete and true record of said testimony; and

14    that the witness was given an opportunity to read and

15    correct said deposition and to subscribe to the same.

16         I further certify that I am not of counsel or

17    attorney for either or any of the parties in the

18    foregoing deposition and caption named, nor in any way

19    interested in the outcome of the cause named in said

20    caption.

21         Executed August 15, 2007, at San Francisco,

22    California.

23

24                    MARY E. GARLAND, CSR 4721

25

EXHIBIT 32.

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4

5  ANN OTSUKA, an individual; JANIS        No. C-07-02780-SI
   KEEFE, an individual; CORINNE
6  PHIPPS, an individual; and
   JUSTIN KISER, an individual;
7  individually and on behalf of
   all others similarly situated,
8
                   Plaintiffs,
9      vs.

10 POLO RALPH LAUREN CORPORATION;
   a Delaware Corporation; POLO
11 RETAIL, LLC, a Delaware Corporation;
   POLO RALPH LAUREN CORPORATION, a
12 Delaware Corporation, doing business
   in California as POLO RETAIL CORP;
13 FASHIONS OUTLET OF AMERICA, INC., a
   Delaware Corporation and DOES 1-500,
14 inclusive,

15               Defendants.
                                    /
16

17

              DEPOSITION OF KRISTI MOGEL
18

19

        DATE:          February 4, 2008
20
        TIME:          10:06 a.m.
21
        LOCATION:      Greenberg Traurig
22                     1900 University Avenue
                       Fifth Floor
23                     East Palo Alto, California

24      REPORTED BY:   Mary E. Garland
                       Certified Shorthand Reporter
25                     License Number 4721

                                            Page 1

**Golden Gate Reporting**

1 Kenneth Cole Productions, and that is the law of
2 California.
3     MR. GOINES: The law of California requires the
4 employer to make the breaks available.
5     Q. BY MR. KITCHIN: Have you ever heard from any
6 source, other than counsel, what California law's
7 requirement is as to the compensation of employees who
8 have missed rest breaks?
9     A. No.
10    Q. Let me take back that document.
11    A. The older one?
12    Q. Yes. This is Exhibit 8, we were looking at.
13        Are you aware of a retail employee handbook
14 dated 2004?
15    A. In general? There maybe a couple versions out
16 there, so.
17    Q. Okay.
18    A. It seems as if there are.
19    Q. So do you have a specific recollection as to
20 whether any employee handbook, other than the 2007
21 handbook, states that it is the manager's responsibility
22 to ensure that appropriate breaks are taken?
23    A. Again, I wouldn't be able to speak to where
24 it's written. I just will tell you it's certainly part
25 of our culture. So I don't know. I don't think -- I've

Page 150

1     A. Yes.
2     Q. Have you performed any loss prevention searches
3 in the La Jolla store?
4     A. Yes.
5     Q. Have you performed loss prevention inspections
6 in the South Coast Plaza store?
7     A. No.
8     Q. Have you performed loss prevention inspections
9 in the Beverly Hills store?
10    A. Yes.
11    Q. Have you performed loss prevention inspections
12 in any of the Malibu stores?
13    A. No.
14    Q. Have you performed loss prevention inspections
15 in the Palm Desert store?
16    A. No.
17    Q. Have you performed any loss prevention
18 inspections in either of the Rugby stores?
19    A. No.
20    Q. Do any of the stores that I've just mentioned
21 have security personnel who are currently assigned to
22 perform loss prevention inspections?
23    A. Assigned to the store?
24    Q. Yes.
25        MR. GOINES: Are you talking about independent

Page 152

1 never been presented with any questions around that.
2     Q. Since you began working for Polo in 2003, has
3 it been the policy of Polo Ralph Lauren to conduct loss
4 prevention searches of every employee before they leave
5 the store?
6     A. Yes.
7     Q. And has it been the policy to conduct those
8 searches both when an employee is leaving at the end of
9 their shift and anytime that they're leaving during the
10 course of their shift?
11    A. Yes.
12    Q. That includes management-level personnel?
13    A. Yes.
14    Q. Have you ever performed a loss prevention or
15 bag check inspection?
16    Q. On many, many occasions?
17    A. Anytime I'm available and I can help out.
18    Q. And have you performed loss prevention
19 inspections in the San Francisco store?
20    A. Yes.
21    Q. And have you performed any loss prevention
22 inspections in the Burlingame store?
23    A. Yes.
24    Q. The Palo Alto store?

Page 151

1 of -- that's their sole function?
2     Q. BY MR. KITCHIN: Well, they can have many
3 functions, but one of their functions being the
4 performance of loss prevention inspections.
5     A. There is an asset protection staff in the
6 Beverly Hills store.
7     Q. And is that the only store in which loss
8 prevention or asset protection personnel works?
9     A. Where they're designated to that store? Yes.
10    Q. And is that person, as part of his or her
11 responsibility -- or those persons -- permitted to
12 perform loss prevention inspections on employees leaving
13 the Beverly Hills store?
14    A. Yes.
15    Q. Do managers in Beverly Hills, on occasion, also
16 perform loss prevention searches?
17    A. Yes.
18    Q. Is the asset protection personnel assigned to
19 the Beverly Hills store there throughout the time that
20 sales associates are working within the store?
21    A. As in "there," do you mean are they scheduled?
22    Q. Yes.
23    A. Yes.
24    Q. So how many days a week is the Beverly Hills
25 store open?

Page 153

39 (Pages 150 to 153)

**Golden Gate Reporting**

1    A. Seven.
2    Q. And is there a loss prevention person there on
3  each of those days?
4    A. We just added a second position there; but for
5  some time, it was only with one person. So, no. There
6  were several days there was no one present.
7    Q. And during the days when that person wasn't
8  present, then managers would perform the loss prevention
9  inspections?
10    A. Yes. And during the days when they were
11  present, managers would perform the loss -- the security
12  inspection.
13    Q. At the conclusion of the latest shift that
14  works in the Beverly Hills store, to your knowledge, is
15  a loss prevention or asset protection person generally
16  on duty at that time?
17    A. If they're scheduled. Again, it depends on
18  their schedule and their shifts.
19    Q. Does that mean that sometimes the asset
20  protection person is there at the end of the final shift
21  at the store and sometimes they're not?
22    A. Correct.
23    Q. Have you ever observed asset protection
24  personnel performing loss prevention inspections in the
25  Beverly Hills store?

Page 154

1    A. Yes.
2    Q. And where are those inspections performed?
3    A. There are two public entrances and exits. It's
4  in the back side of the building, facing the alley. We
5  call that the valet entrance. That's where those are
6  performed.
7    Q. And in the Beverly Hills store, is that the
8  only door, under normal circumstances, that an employee
9  may enter or exit?
10    A. Yes. Unless the alarm is set and the store's
11  literally at closing mode; then everyone needs to leave
12  out of the alarmed door.
13    Q. And is that one of the other -- that's not the
14  door that leads out to valet?
15    A. Correct. It's a nonpublic door, and it's
16  through the employee locker room.
17    Q. So at the end of a business day, for those
18  sales associates who are working that later shift and
19  are closing the store, do they then exit out of this
20  other door, not the valet door?
21    A. No. The associates would primarily leave out
22  of the valet door. It's the managers who stay well
23  after the store closes to do any more remaining store-
24  closing functions. So it's predominantly the management
25  team that would leave out of the alarmed door.

Page 155

1    Q. Are there any other stores that, since you
2  began working for Polo, had on-site asset protection
3  personnel?
4    A. No. We have a regional asset protection
5  manager who will rotate between stores at times, but
6  that would not be his primary role.
7    Q. Would you take a look at Exhibit 24, on page
8  37, or Bates stamped 1538. The right-hand column is
9  "General Security."
10    A. Yes.
11    Q. The third bullet point reads:
12    "Bag checks must be performed anytime an
13    employee leaves the store. Each employee must
14    inform a manager that he or she is about to
15    leave the store with a bag, box, or any other
16    item used to carry merchandise. When the
17    manager arrives, the employee should then punch
18    out (for lunch or end of shift) and proceed to
19    have all bags inspected by the manager before
20    exiting the store."
21    To your knowledge, is this procedure -- that
22  is, an employee finding a manager before they clock out
23  -- being followed in all of the stores over which you
24  have some duties and responsibilities at this time?
25    A. To my knowledge, I wasn't aware of this

Page 156

1  terminology.
2    Q. Prior to April 2007, to your knowledge, was it
3  the policy or practice of any store over which you had
4  some duties and responsibilities to have employees find
5  a manager to perform a loss prevention inspection before
6  they clocked out?
7    A. Logistically, it would be difficult to do,
8  because many times the computers where you can clock out
9  are not near the exit. So, again, this is something
10  that is new discussion for me right here today.
11    Q. Has it been generally the practice in all of
12  the California retail stores over which you have some
13  duties and responsibilities for the sales associates to
14  clock out prior to the time that they find a manager who
15  is available to perform a loss prevention search?
16    A. Yes. They would clock out, typically, collect
17  their belongings, and leave the store.
18    Q. Have you ever learned from any source, other
19  than perhaps counsel in this action, that employees of
20  Polo Ralph Lauren in California had complained that they
21  were being required to wait what they believed was an
22  unreasonable amount of time to have loss prevention or
23  bag check inspections performed at the end of their
24  shifts?
25    A. No, I don't recall any formal complaints around

Page 157

40 (Pages 154 to 157)

CERTIFICATION OF DEPOSITION OFFICER

I, MARY E. GARLAND, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was thereafter transcribed by means of computer-aided transcription under my direction; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed February 12, 2008, at San Francisco, California.

_____
MARY E. GARLAND, CSR 4721

EXHIBIT 33.

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

5   ANN OTSUKA, an individual; JANIS          No. C-07-02780-SI
    KEEFE, an individual; CORINNE
6   PHIPPS, an individual; and
    JUSTIN KISER, an individual;
7   individually and on behalf of
    all others similarly situated,

8
              Plaintiffs,
9     vs.

10  POLO RALPH LAUREN CORPORATION;
    a Delaware Corporation; POLO
11  RETAIL, LLC, a Delaware Corporation;
    POLO RALPH LAUREN CORPORATION, a
12  Delaware Corporation, doing business
    in California as POLO RETAIL CORP;
13  FASHIONS OUTLET OF AMERICA, INC., a
    Delaware Corporation and DOES 1-500,
14  inclusive,

15            Defendants.
                                          /
16

17

          DEPOSITION OF VALERIE ANN HARRISON
18

19

        DATE:        August 10, 2007
20
        TIME:        10:08 a.m.
21
        LOCATION:    120 Kearny Street
22                   Suite 3200
                     San Francisco, California
23
        REPORTED BY: Mary E. Garland
24                   Certified Shorthand Reporter
                     License Number 4721
25

                                              Page 1

Golden Gate Reporting

1 topics you were being trained in?
2     A. There were videos and there was the handbook.
3     Q. And do you recall specifically which videos you
4 were shown?
5     A. It's so long, I don't recall. I'm sorry. I
6 know that there's a series.
7     Q. During this initial part of your employment at
8 Polo, did Cynthia or Todd alert you to any kind of hot
9 button issues for you to be specifically careful about
10 while working at Polo?
11     A. Not that I recall.
12     Q. As part of that training, did you receive any
13 information about loss prevention inspections of
14 employees?
15     A. That we were supposed to, obviously, do them
16 before we left, each person left, managers were supposed
17 to do that; and that we were supposed to check bags and
18 purchases.
19     Q. Were you instructed that employees were
20 required to use any specific exit in the building?
21     A. Yes. We were supposed to use the back exit
22 that goes down the back hallway.
23     Q. And were you told that employees were
24 prohibited from using either -- well, take it one at a
25 time -- using the Home Collections door?

Page 26

1     A. Yes.
2     Q. And were you instructed that employees were not
3 permitted to enter or exit through the main doors to the
4 store?
5     A. Yes.
6     Q. And were you instructed that there were any
7 consequences that would be imposed on employees who
8 violated the prohibition in using those two exits?
9     A. I believe that the person would be written up,
10 was the policy.
11     Q. Were you instructed that you were required to
12 undergo loss prevention inspections prior to exiting the
13 building?
14     A. Yes.
15     Q. And did those loss prevention inspections take
16 place whether it was leaving for lunch or leaving at the
17 end of the day?
18     A. Yes.
19     Q. If you wanted to go out and get a coffee
20 outside of the building, were you required personally to
21 undergo a loss prevention inspection?
22     A. Yes.
23     Q. And who was permitted to conduct those
24 inspections of you personally?
25     A. A member of management.

Page 27

1     Q. And so anyone who was in management level at
2 the Polo store could inspect your bags when you exited
3 the building?
4     A. That's correct.
5     Q. With respect to sales associates, were you
6 instructed as to who would be permitted to conduct bag
7 inspections of them before leaving the building?
8     A. It was the same, management.
9     Q. Were you instructed that sales associates were
10 required to have bag inspections done at anytime they
11 left the building?
12     A. Yes.
13     Q. The back exit, did you refer to that as the
14 employee exit? Is there --
15     A. I can't recall specifically.
16     Q. I'm trying get the terms down.
17        So if I refer to it as the back exit, you'll
18 know what I'm talking about?
19     A. The back door.
20     Q. The back door? Okay.
21        Was the back door physically locked during
22 store hours?
23     A. From the outside.
24     Q. From the outside. So you could open the door
25 from the inside?

Page 28

1     A. There's an alarm, and you had to have a key in
2 order to turn off the alarm. You could push the door,
3 it was open, but it would set the alarm off.
4     Q. And who had keys to -- strike that.
5        The keys that you had, was that to disarm the
6 alarm?
7     A. Yes. And to get inside the back door.
8     Q. So you could enter the back door with your key
9 without setting off the alarm?
10     A. That's correct.
11     Q. Who had keys to the back door, if you know?
12     A. All members of management.
13     Q. Did any sales associates, that you're aware of,
14 have keys to the back door lock?
15     A. No.
16     Q. You referred to an employee manual that you
17 received when you first began at Polo. Was it a single
18 employment manual or was there more than one employment
19 manual that you were provided?
20     A. I believe it was only one.
21     Q. Do you remember if there was an employee manual
22 that dealt with compensation that was a smaller manual
23 than the Polo Ralph Lauren employee handbook?
24     A. I don't recall that.
25     Q. During your initial training at Polo, were you

Page 29

8 (Pages 26 to 29)

# CERTIFICATION OF DEPOSITION OFFICER

I, MARY E. GARLAND, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was thereafter transcribed by means of computer-aided transcription under my direction; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed August 15, 2007, at San Francisco, California.

MARY E. GARLAND, CSR 4721

EXHIBIT 34.

1  UNITED STATES DISTRICT COURT

2  NORTHERN DISTRICT OF CALIFORNIA

3  SAN FRANCISCO DIVISION

4

5  ANN OTSUKA, an individual; JANIS      No. C-07-02780-SI
   KEEFE, an individual; CORINNE
6  PHIPPS, an individual; and
   JUSTIN KISER, an individual;
7  individually and on behalf of
   all others similarly situated,

8          Plaintiffs,

9    vs.

10 POLO RALPH LAUREN CORPORATION;
   a Delaware Corporation; POLO
11 RETAIL, LLC, a Delaware Corporation;
   POLO RALPH LAUREN CORPORATION, a
12 Delaware Corporation, doing business
   in California as POLO RETAIL CORP;
13 FASHIONS OUTLET OF AMERICA, INC., a
   Delaware Corporation and DOES 1-500,
14 inclusive,

15          Defendants.
                                    /
16

17

           DEPOSITION OF ROSALINDA WALLWORK
18

19
      DATE:          November 13, 2007
20
      TIME:          10:02 a.m.
21
      LOCATION:      1900 University Avenue
22                   Fifth Floor
                     East Palo Alto, California
23
      REPORTED BY:   Mary E. Garland
24                   Certified Shorthand Reporter
                     License Number 4721
25

                                          Page 1

**Golden Gate Reporting**

Page 42

1    A. About six years.
2    Q. And what led you to move from Sony to Polo in
3  about 2004?
4    A. I worked in the technology industry, and I
5  thought working in clothing would be a good career move.
6    Q. Prior to working at Sony, where did you work?
7    A. I work at Gap, which is where I'm employed now.
8    Q. And what did you do for Gap back then?
9    A. I worked as a sales associate and managed their
10  Los Gatos store; and then just moved up the ranks into
11  management, moved to San Francisco.
12    Q. When were you last employed as a sales
13  associate for Gap, approximately?
14    A. Oh, you know what? No. I started in
15  management for Gap. I'm sorry. I was a sales associate
16  for Miller's; and then my manager there, we both moved
17  over to Gap. Pardon.
18    Q. And Miller's was what?
19    A. Very similar to Gap. Casual clothing.
20    Q. And you were a sales associate there?
21    A. Yes.
22    Q. What was the position that you took when you
23  first joined Polo?
24    A. A key carrier.
25    Q. And for which department?

Page 43

1    A. I'm sorry. Hold on. I started as a sales
2  associate, and then became a key carrier in a very short
3  period of time.
4    Q. And sales associate for which department?
5    A. Ladies'.
6    Q. And who was your manager when you started?
7    A. Tin Hua.
8    Q. He was the general manager?
9    A. Yes.
10    Q. Who was your department manager in Women's?
11    A. We did not have one.
12    Q. Then you became a key holder?
13    A. Mm-hm.
14    Q. Yes?
15    A. Yes.
16    Q. And what is a key holder at Polo?
17    A. A key holder is -- how I would describe it is
18  somebody who starts in sales and wants a management
19  position, so you kind of juggle both.
20    Q. So you had some manager duties, some sales
21  associate's duties?
22    A. Yes. Mm-hm.
23    Q. As a key holder, did you have the authority to
24  conduct loss prevention inspections of sales associates?
25    A. Yes.

Page 44

1    Q. And did you do that?
2    A. Yes.
3    Q. Did you do that for lunch breaks?
4    A. Yes.
5    Q. And did you do it at the end of the shift, the
6  end of the day?
7    A. Yes.
8    Q. And at the time you were a key holder, were you
9  still in the Ladies' department?
10    A. Yes.
11    Q. When you were a sales associate, prior to
12  becoming a key holder, were you required to go through
13  loss prevention inspections every time you left the
14  building?
15    A. No.
16    Q. You were not -- even before you became a key
17  holder --
18    A. I was not allowed to do bag checks prior to
19  that.
20    Q. So when you were just a sales associate, did
21  you have to undergo --
22    A. Oh.
23    Q. -- loss prevention inspections to leave the
24  building?
25    A. Yes.

Page 45

1    Q. And how would you arrange to have a loss
2  prevention inspection performed?
3    A. Just --
4    MR. GOINES: You're talking about when she was
5  a sales associate?
6    MR. KITCHIN: Yes. I'm focussing --
7    THE WITNESS: Just by saying that I'm going to
8  lunch or that I'm leaving the building, and they would
9  check my bag.
10    Q. BY MR. KITCHIN: And so at lunchtime, if you
11  could describe the process of leaving the building to
12  me, that would be helpful.
13    A. Okay. You tell someone that you're going on
14  your break, you walk to the back, they check your bag,
15  and you walk out.
16    Q. And when in that process do you check out -- or
17  clock out?
18    A. Before you leave the sales floor.
19    Q. So at that time, in 2004, the timekeeping
20  system was coupled with the point-of-sale system; is
21  that correct?
22    A. Yes.
23    Q. So within the Ladies' department, how many
24  sales associates would be typically working with you?
25    A. Total or in a given day?

12 (Pages 42 to 45)

CERTIFICATION OF DEPOSITION OFFICER

I, MARY E. GARLAND, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was thereafter transcribed by means of computer-aided transcription under my direction; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed November 26, 2007, at San Francisco, California.

MARY E. GARLAND, CSR 4721

EXHIBIT 35.

# Golden Gate Reporting

1　　　　　　　　UNITED STATES DISTRICT COURT
2　　　　　　　　NORTHERN DISTRICT OF CALIFORNIA
　　　　　　　　　　SAN FRANCISCO DIVISION
　　------------------------------X
3　ANN OTSUKA, an Individual; JANIS
　KEEFE, an individual, CORINNE PHIPPS,
4　an individual, and JUSTIN KISER,
　an individual, individually and
5　on behalf of all others similarly
　situated,
6
7　　　　　　　　Plaintiffs.
8　v.　　　　　　　　　　　　　　No. C-07-02780-SI
9　POLO RALPH LAUREN CORPORATION,
　a Delaware Corporation, POLO
10　RETAIL, LLC, a Delaware Corporation,
　POLO RALPH LAUREN CORPORATION, a
11　Delaware Corporation doing business
　in California as POLO RETAIL CORP.,
12　FASHIONS OUTLET OF AMERICA, INC., a
　Delaware Corporation, and DOES 500,
　inclusive,
13
14　　　　　　　　Defendants.
　　------------------------------X
15
16　　　　　　　　　December 6, 2007
　　　　　　　　　　New York, New York
17　　　　　　　　　Time:　10:26 a.m.
　　　　　　　　　　Volume 1, Pages 130
18
19　　　　Deposition of SHARONDA WEATHERSPOON, taken on behalf
20　of the Plaintiffs, at Greenberg Traurig, Met Life Building,
21　200 Park Avenue, New York, New York, commencing at 10:26
22　a.m., December 6, 2007, before Anthony Armstrong, a Notary
23　Public and Certified Shorthand Reporter of the State of New
24　York.
25

Page 1

**Golden Gate Reporting**

Page 62

1    A.    As far as bag check inspections.
2    Q.    And what are those guidelines?
3    A.    That the bag checks should normally be
4    conducted at the front door, and that anyone exiting
5    the building needs to ensure that they do -- any
6    associate or employee needs to have their bag -- their
7    bags or belongings checked. And managers are not able
8    to put their hands inside of anyone's bag if they are
9    not able to -- they are not able to see to the bottom.
10   They do have to ask the employee to remove some of the
11   items or just move them around so that way they can see
12   to the bottom.
13   Q.    Who is permitted to conduct bag checks?
14   A.    Managers and supervisors. Are you talking
15   about currently right now?
16   Q.    Right now.
17   A.    Managers and supervisors.
18   Q.    Is there a category of employee called
19   supervisors?
20   A.    Yes.
21   Q.    And tell me what that category is.
22   A.    What do you mean by category?
23   Q.    Well, you have managers, you have assistant
24   managers. And then is there another category of people
25   called supervisors?

Page 63

1    A.    Yes.
2    Q.    What do supervisors do?
3    A.    Supervisors are responsible for helping and
4    assisting to manage the sales floor and the stock
5    process.
6    Q.    The stock process?
7    A.    Yes, the process by which we process shipment.
8    Q.    Are supervisors salaried employees?
9    A.    No.
10   Q.    Are they sales associates who have been given
11   extra duties?
12   A.    They are hourly employees.
13   Q.    Are they hired as a supervisor?
14   A.    Yes.
15   Q.    And what -- how many supervisors -- do all
16   factory outlet stores in California have employees who
17   are hired as supervisors?
18   A.    No.
19   Q.    Do you know how many stores in California have
20   supervisors within their employment?
21   A.    The only stores that would not have
22   supervisors are any of our children's outlet stores or
23   our luxury outlet stores, do not have supervisors.
24   Q.    Is a supervisor always -- is one or more
25   supervisors always on duty during the time that the

Page 64

1    store is open?
2    A.    No.
3    Q.    Do they have more limited coverage than other
4    employees? Are they part-time, full-time?
5         MR. CAPOBIANCO:   Objection to form.
6         MR. KITCHIN:   Let me re-ask the question.
7    BY MR. KITCHIN:
8    Q.    So it sounds like most of your stores in
9    California have employees that are called supervisors;
10   is that correct?
11   A.    Yes.
12   Q.    And you have described what their duties are.
13   And they have the authority to conduct bag checks?
14   A.    Yes.
15   Q.    Does the number of managers, including general
16   managers and assistant managers, working at any one
17   time within a store vary store to store?
18   A.    Yes.
19   Q.    So there is -- how many assistant managers do
20   you have in your largest or most busy store?
21   A.    Four.
22   Q.    And which store is that?
23   A.    Cabazon.
24   Q.    The Cabazon factory outlet with four managers,
25   are all four of those managers on-duty every single

Page 65

1    day?
2    A.    No.
3    Q.    Is there staffing at the Cabazon store where
4    there is a specific number of managers, including the
5    general manager, who need to be on duty during a
6    specific day?
7    A.    There are always at least two managers
8    scheduled on any particular day.
9    Q.    That's true at the Cabazon store?
10   A.    Yes.
11   Q.    Is it true at all the other stores?
12   A.    Yes.
13   Q.    So in any day, because it's -- the stores are
14   typically open more than eight hours; is that correct?
15   A.    Yes.
16   Q.    So any particular day there, generally, at
17   least two managers would have worked during that day?
18   A.    Yes.
19   Q.    Managers' schedules sometimes overlap?
20   A.    Yes.
21   Q.    Are they -- is generally one of the managers,
22   kind of, an opening manager and one a closing manager?
23   A.    Generally.
24   Q.    So generally at the end of the store's day, is
25   there generally one manager on duty at that time?

17 (Pages 62 to 65)

1    A.   Yes, generally.
2    Q.   Sometimes, I take it in busy holiday seasons
3   or inventory time, there may be more than one manager
4   in the store at the time that the store closes?
5    A.   Yes.
6    Q.   But typically, absent those special needs,
7   there would be one manager on duty at the end of the
8   day?
9    A.   Yes. When you say at the end of day, do you
10   mean end of the day -- do you mean -- what do you mean
11   by end of the day?
12    Q.   Good question. Let's ask it.
13        For the end of the day, under one scenario,
14   when the store closes to the public?
15    A.   Yes.
16    Q.   Would there typically be one manager on duty
17   at that time?
18    A.   Yes.
19    Q.   And at the end of the day when everyone in the
20   store or the last person in the store is ready to go
21   home, taking that as the definition of the end of the
22   day, would there typically be one manager on duty at
23   that time?
24    A.   That would vary.
25    Q.   So, typically, when the store is being closed

Page 66

1    Q.   Except for the holiday season or busy times,
2   is it typical that there is either -- that there is one
3   manager, assistant manager, or supervisor on duty when
4   the store is being closed to the public, one of those
5   three categories, general manager, assistant manager or
6   supervisor?
7    A.   Yes.
8    Q.   And typically, excluding busy times of the
9   year when special needs are present, when the store is
10   being buttoned up at the end of the day and everyone is
11   going home, is there typically either a general
12   manager, a manager, or a supervisor in the store?
13    A.   Yes.
14    Q.   In all of the factory outlet stores at the end
15   of the business day, the customer day, when no more
16   customers are permitted to come into the store, are --
17   is the door or are the doors locked?
18    A.   At the end of the business day, yes, but
19   normally once the last customer in the store actually
20   leaves the store.
21    Q.   So when all the customers are gone and the
22   store is closed to the public, all of the doors are
23   locked?
24    A.   Yes.
25    Q.   And who has keys to those doors?

Page 68

1   at the end of the customer day, when it's being locked
2   or closed with no more customers to come in, generally
3   there is one manager on duty?
4    A.   Yes.
5    Q.   Okay. And then there are things that the
6   sales associates and manager do after the door is
7   closed to the public, correct?
8    A.   Yes.
9    Q.   And at that time, those individuals are
10   performing those duties in finishing up, cleaning up,
11   and folding, and doing the data tasks. Typically, is
12   there a single manager who is on duty at that time?
13    A.   That varies.
14    Q.   How does that vary?
15    A.   Because there could either be a manager on
16   duty or a supervisor on duty at that time.
17    Q.   Okay. Thank you. So, typically, is there a
18   manager and a supervisor on duty and working at the
19   time that the store is being closed to the public?
20    A.   It varies.
21    Q.   How does it vary?
22    A.   There could be a manager and a supervisor, a
23   manager and two managers or it could be a supervisor.
24    Q.   Just a supervisor?
25    A.   Yes.

Page 67

1    A.   Managers, general managers, and supervisors.
2    Q.   And in any of the factory outlet stores, are
3   there -- is there any way for a sales associate to
4   leave the building or leave the store without unlocking
5   a door or having a door unlocked?
6    A.   Yes.
7    Q.   Is that in some specific stores that you can
8   think of or in all the stores?
9    A.   Well, in order for them to leave the store,
10   they would need to leave out of the back door, which
11   actually has a panic alarm and does not require someone
12   to unlock it because you can open it and the panic
13   alarm would sound.
14    Q.   Is that all the case for all the stores in
15   California?
16    A.   Yes.
17    Q.   So if there is a fire or something and the
18   manager is incapacitated and you can't find the key,
19   you can still get out of the building?
20    A.   Yes.
21    Q.   Are employees permitted under normal
22   circumstances to go through that emergency -- call it
23   an emergency door?
24    A.   What do you mean by "normal circumstances"?
25    Q.   Well, if a sales associate wants to go outside

Page 69

18 (Pages 66 to 69)

**Golden Gate Reporting**

```
1                    C E R T I F I C A T E
2             I, Anthony Armstrong, a Certified
3     Shorthand Reporter and Notary Public within
4     and for the State of New York, do hereby
5     certify:
6             That SHARONDA WEATHERSPOON, the witness
7     whose testimony is hereinbefore set forth, was
8     duly sworn by me and that such testimony is a
9     true record of the testimony given by such
10    witness.
11            I further certify that I am not related
12    to any of the parties by blood or marriage,
13    and that I am in no way interested in the
14    outcome of this matter.
15
16
                    Anthony Armstrong
17
18
19
20
21
22
23
24
25
                                        Page 130
```

EXHIBIT 36.

1               UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4

5    ANN OTSUKA, an individual;
     JANIS KEEFE, an individual;
6    CORINNE PHIPPS, an individual;
     and JUSTIN KISER, an individual;
7    individually and on behalf of
     all others similarly situated,

8
                  Plaintiffs,
9                                       Case No. c-07-02780-SI
     and
10
     POLO RALPH LAUREN CORPORATION,
11   a Delaware corporation; POLO
     RETAIL, LLC, a Delaware corporation;
12   POLO RALPH LAUREN CORPORATION, a
     Delaware corporation, doing
13   business in California as POLO
     RETAIL CORP; FASHIONS OUTLET OF
14   AMERICA, INC., a Delaware
     corporation; and DOES 1-500,
15   inclusive,

16                Defendants.
     _____/

17

18              DEPOSITION OF THERESA CRUZ

19   DATE:        August 20, 2007

20   TIME:        10:00 a.m.

21   LOCATION:    LAW OFFICE OF PATRICK R. KITCHIN
                  565 Commercial Street
22                Fourth Floor
                  San Francisco, California 94111

23

24   REPORTED BY: Katy Leonard
                  Certified Shorthand Reporter
25                License Number 11599

                                              Page 1

# Golden Gate Reporting

1 involvement, if you have an involvement in the process,
2 of hiring a new sales associate at Polo San Francisco.
3     Are you involved in the interviewing process
4 for sales associates?
5     A. No.
6     Q. Are you involved in the decision-making as
7 to which sales associates to hire?
8     A. No.
9     Q. Are you involved in helping to set up a
10 hired sales associate into the payroll system?
11     A. Yes.
12     Q. And do you have any assistants that work for
13 you?
14     A. No.
15     Q. So, you do all this on your own?
16     A. Yes.
17     Q. And, so, do you work with the corporate
18 office to set up someone in the payroll system?
19     A. No. I can got to the workstation and do
20 that.
21     Q. Okay.
22     A. It's called the "Lawson."
23     Q. L-a-w-s-o-n?
24     A. That's correct.
25     Q. And, so, you enter in specific information

Page 46

1 who will go on a leave of absence. We use that form for
2 termination, also. And other changes. Let's say if we
3 terminate the person, if there's any changes on their --
4 where to mail the final paycheck.
5     Q. Okay. What other tasks are you involved
6 with in bringing in a new sales associate into the Polo
7 San Francisco store?
8     A. Um, just training with the Tradewind. I do
9 the walk-through with the new hire.
10     Q. And the walk-through involves what?
11     A. Walk-through in the store only.
12     Q. So, you show them around?
13     A. Yes.
14     Q. Do you have any involvement in providing
15 them training related to loss prevention?
16     A. Um, no.
17     Q. When you're doing your walk-through, do you
18 show them where the employee exit is?
19     A. Yes.
20     Q. And do you describe to them the process that
21 they're required to go through in order to leave the
22 store?
23     A. Yes.
24     Q. And what specifically do you tell them about
25 leaving the store?

Page 48

1 about the employee to set them up as a user of the
2 Lawson system?
3     A. Yes.
4     Q. And how does the Lawson system differ from
5 the Tradewind system?
6     A. The Lawson is for new-hire employees. After
7 you have put in all the information, it will give you
8 the employee number -- it will assign an employee
9 number.
10     Q. What involvement do you have, in addition to
11 having a new sales associate set up through the Lawson
12 system, to assist a new sales associate to get into the
13 system and start working at Polo?
14     A. I prepare the new hire -- the new-hire
15 paperwork for them.
16     Q. What is included in the new-hire paperwork?
17     A. The PAF.
18     Q. What is a PAF?
19     A. Personal Authorization Form.
20     Q. And what does that Personal Authorization
21 Form relate to?
22     A. Um, you fill in the Social Security number,
23 the information of the employee, if she will be hired
24 full-time, part-time, or temporary, and how many hours.
25 And it also pertained -- we use that form for someone

Page 47

1     A. Leaving the store? They need to call a
2 department manager to check them out.
3     Q. And is it -- are you authorized to let
4 people out the exit?
5     A. Yes.
6     Q. Is Tin -- or, was he authorized to let
7 people out the exit?
8     A. Yes.
9     Q. All department managers had the ability to
10 let people out of the exit?
11     A. Yes.
12     Q. Anyone else, other than the general manager,
13 you, and the department managers, who had the ability to
14 let people out the employee exit?
15     A. Um, all the department managers.
16     Q. Do all department managers have keys to turn
17 off the alarm at the back exit?
18     A. Yes.
19     Q. And the key that they have also gives them
20 access from the outside; is that correct?
21     A. Yes.
22     Q. And the door coming into the store through
23 the -- the employee exit, that's locked from the
24 outside?
25     A. Yes.

Page 49

13 (Pages 46 to 49)

Golden Gate Reporting

1                CERTIFICATION OF DEPOSITION OFFICER

2

3          I, KATY LEONARD, duly authorized to

4    administer oaths pursuant to Section 2093(b) of the

5    California Code of Civil Procedure, hereby certify that

6    the witness in the foregoing deposition was by me sworn

7    to testify to the truth, the whole truth and nothing but

8    the truth in the within-entitled cause; that said

9    deposition was taken at the time and place therein

10   stated; that the testimony of the said witness was

11   thereafter transcribed by means of computer-aided

12   transcription; that the foregoing is a full, complete

13   and true record of said testimony; and that the witness

14   was given an opportunity to read and correct said

15   deposition and to subscribe the same.

16          I further certify that I am not of counsel

17   or attorney for either or any of the parties in the

18   foregoing deposition and caption named, or in any way

19   interested in the outcome of this cause named in said

20   caption.

21

22

23

24   _____

25          KATY LEONARD, CSR 11599

                                        Page 261

EXHIBIT 37.

**Golden Gate Reporting**

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4

 5   ANN OTSUKA, an individual; JANIS      No. C-07-02780-SI
     KEEFE, an individual; CORINNE
 6   PHIPPS, an individual; and
     JUSTIN KISER, an individual;
 7   individually and on behalf of
     all others similarly situated,
 8
                    Plaintiffs,
 9       vs.

10   POLO RALPH LAUREN CORPORATION;
     a Delaware Corporation; POLO
11   RETAIL, LLC, a Delaware Corporation;
     POLO RALPH LAUREN CORPORATION, a
12   Delaware Corporation, doing business
     in California as POLO RETAIL CORP;
13   FASHIONS OUTLET OF AMERICA, INC., a
     Delaware Corporation and DOES 1-500,
14   inclusive,

15                  Defendants.
                                          /
16

17
                  DEPOSITION OF PHOEBE MIRELES
18

19
         DATE:          November 15, 2007
20
         TIME:          10:15 a.m.
21
         LOCATION:      One Montgomery Street
22                      Suite 3220
                        San Francisco, California
23
         REPORTED BY:   Mary E. Garland
24                      Certified Shorthand Reporter
                        License Number 4721
25
                                                   Page 1
```

1  day?
2      A. No.
3      Q. That same time period, were any senior sellers
4  scheduled to work more than eight hours in one day?
5      A. No.
6      Q. Same time period, when you were Women's
7  department manager, were any sales associates regularly
8  scheduled to work more than 40 hours in one week?
9      A. No.
10     Q. And senior sellers, during that time period,
11  were they regularly scheduled to work more than 40 hours
12  in one week?
13     A. No.
14     Q. Earlier you estimated that there were
15  approximately 12 to 14 total sales associates working at
16  the Stanford Polo store during any one period; is that
17  correct?
18     A. Possibly, yes.
19     Q. On a typical day, excluding the holiday season,
20  how many sales associates would be working in the store
21  on any given day?
22     A. I would say anywhere from eight to 11;
23  typically, ten.
24     Q. And during the holiday season, typically, how
25  many sales associates, including senior sellers, would

Page 38

1  are heading home?
2      A. One -- two. There would be two.
3      Q. Was that the same schedule, non-holiday season
4  -- sorry, not schedule. Let me start over.
5          Throughout the course of your employment at the
6  Stanford Polo store, was it typical during non-holiday
7  seasons that two managers would be at the store at
8  closing?
9      A. Yes. But not all the time.
10     Q. Sometimes there would be fewer?
11     A. Sometimes there would be one, and we would
12  close with a senior sales associate.
13     Q. Were any of your senior sales associates what
14  I've heard referred to as key holders?
15     A. No. None of them were key holders when I was
16  there.
17     Q. Could any senior seller do a bag inspection or
18  a loss prevention inspection for any other sales
19  associate?
20     A. Yes.
21     Q. And could senior sellers do the bag inspection
22  for other sales associates at anytime throughout the
23  year?
24     A. No. It was mainly when it was their shift to
25  close with the manager.

Page 40

1  be working in the store on any one given day?
2      A. Maybe just a few people more, three or four, if
3  that.
4      Q. So you could have up to 13 people during one
5  specific day during the holiday seasons?
6      A. Yes.
7      Q. Now, typically, excluding the holiday season,
8  how many managers would be in the store during the
9  workweek?
10     A. If we had all positions filled at the time --
11  myself, one, two, three, four -- up to six, possibly.
12     Q. And would those six work on the same day
13  together? Their shifts would be -- strike that.
14         How many of them would be working in the store
15  at one given time during the non-holiday season?
16     A. Well, anywhere from four to six. I mean,
17  everyone gets two days off. So seven days a week, I
18  mean, we could just do the math. It just depends.
19     Q. Did you have additional managers working during
20  the holiday seasons?
21     A. No.
22     Q. At the end of the shift in a non-holiday
23  season, focusing on the time when you were Women's
24  manager, how many managers would be in the store at the
25  end of the day, when sales associates in the final shift

Page 39

1      Q. So when a senior seller was scheduled to close
2  with a single manager in the store, that senior seller
3  had the authority to conduct bag checks of other sales
4  associates leaving the store?
5      A. Yes, that is correct.
6      Q. And the senior seller would do a bag check of
7  the manager, as well?
8      A. Yes. We would check each other.
9      Q. How many senior sellers did the store have at
10  any one time, or did it vary too much to give me a
11  response?
12     A. It varied.
13     Q. What was the maximum number of senior sellers
14  you recall working at Stanford Polo while you were
15  employed there?
16     A. Possibly three or four.
17     Q. Possibly three or four working at one specific
18  period of time?
19     A. Yes.
20     Q. At the end of the day, when the store was
21  closed to the public, were the two doors locked?
22     A. Yes.
23     Q. And were the doors locked with a key or with
24  like a dead-bolt kind of lock?
25     A. It was locked with a key.

Page 41

11 (Pages 38 to 41)

**Page 42**

1    Q. Who within the store had keys to those doors?
2    A. Just the managers.
3    Q. Did any of the senior sellers have keys to the
4    doors?
5    A. No.
6    Q. So when the store is closing and the customers
7    have all left, the doors are locked by one of the
8    managers; correct?
9    A. Yes.
10    Q. Then after the doors are locked, do the sales
11    associates generally have other duties to perform before
12    their shift ends?
13    A. Yes.
14    Q. What kind of duties do they have to perform?
15    A. There's a fold-down, whatever department needs
16    to be folded down, fixed to our standards; which is,
17    basically, ready to open the next morning, beautiful,
18    and perfect, clean. Then they can clock out to go home.
19    Q. And I'm sure it varied, but can you give me an
20    estimate of the amount of time sales associates
21    continued to work after the store doors were closed at
22    the end of the day?
23    A. I'm sorry. Can you repeat that?
24    Q. Yes. At the end of the day, when the store's
25    closed --

**Page 44**

1    exactly. But they were given cards where they -- no, it
2    wasn't cards. I apologize. It was all done manually at
3    the register. Yes.
4    Q. They would enter their employee number --
5    A. They would enter their -- yes.
6    Q. Prior to '04, was there kind of a timecard
7    swipe system?
8    A. I don't recall. I know it was different. It
9    wasn't that process.
10    Q. Prior to 2004, when timekeeping, punching
11    in/punching out, was done at the point-of-sale, do you
12    recall where sales associates would clock out or in?
13    A. Yes. Prior to that, there was -- in the
14    office, there was a little machine that was located by a
15    printer, the main printer in the management office.
16    Q. Was there a rack, with some type of card
17    identified by sales associate?
18    A. Yes, that is correct.
19    Q. So they would swipe that card?
20    A. Yes.
21    Q. Throughout the time of your employment at
22    Stanford, were employees required to clock in when they
23    arrived at work?
24    A. Yes.
25    Q. And were they required to clock out for any

**Page 43**

1    A. Yes.
2    Q. -- the sales associates do a fold-down and
3    cleaning, how long did that process typically take?
4    A. About a half an hour. If it was the holiday
5    season, possibly up to an hour.
6    Q. During the period of time from store closure to
7    the public to the time that sales associates have
8    finished their post-closure duties, what did the manager
9    or the managers do? That's a terrible question. Let
10    me rephrase that.
11    What kind of duties, as a Women's manager, did
12    you have at around closing time?
13    A. Oh. Well, I was helping them fold. I was
14    closing registers, if necessary; doing the deposit. We
15    have an office upstairs, so. Anything operational was
16    done, and then we would go and help the other associates
17    fold and get out of there.
18    Q. How many cash registers were there in the
19    Stanford store?
20    A. Five.
21    Q. And throughout the time that you worked at Polo
22    at Stanford, were sales associates able to clock in and
23    clock out through the point-of-sale system?
24    A. There was a period where we did that, yes. And
25    I believe it was from '04, on, I think. I don't recall

**Page 45**

1    rest breaks?
2    A. "Rest breaks" meaning their 15-minute breaks?
3    Q. Correct.
4    A. No.
5    Q. Were they required to clock out for their lunch
6    break?
7    A. Yes.
8    Q. Was that scheduled for an hour per employee?
9    A. Yes.
10    Q. And when they came back from lunch, were they
11    required to clock back in?
12    A. Yes.
13    Q. And then at the conclusion of their shift,
14    they'd clock out, I take it?
15    A. Yes.
16    Q. And that happened regardless of whether it was
17    the swipe system or the point-of-sale system?
18    A. Yes.
19    Q. Now, at the close of the shift, when you were
20    working as Women's manager, you, I take it, worked some
21    shifts where you were a closer?
22    A. Yes.
23    Q. Was one of your duties on closing the store to
24    count the cash in the registers?
25    A. Yes.

12 (Pages 42 to 45)

CERTIFICATION OF DEPOSITION OFFICER

I, MARY E. GARLAND, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was thereafter transcribed by means of computer-aided transcription under my direction; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed November 26, 2007, at San Francisco, California.

_____

MARY E. GARLAND, CSR 4721

EXHIBIT 38.

**Golden Gate Reporting**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                 SAN FRANCISCO DIVISION

 4

 5   ANN OTSUKA, an individual;    )
     JANIS KEEFE, an individual,   )
 6   CORINNE PHIPPS, an            )
     individual; and RENEE DAVIS,  )
 7   an individual; individually   )
     and on behalf of all others   )
 8   similarly situated,           )
              Plaintiffs,          )
 9                                 )
10      -vs-                       )   No. C-07-02780-SI
11                                 )
12   POLO RALPH LAUREN CORPORATION;)
     a Delaware Corporation; POLO  )
13   RETAIL, LLC., a Delaware      )
     Corporation, POLO RALPH LAUREN)
14   CORPORATION, a Delaware       )
     Corporation, doing business in)
15   California as POLO RETAIL     )
     CORP; FASHIONS OUTLET OF      )
16   AMERICA, INC., a Delaware     )
     Corporation,                  )
17            Defendants.          )
18   _____)
19
20          The deposition of HARVEY RESNICK, called
     by the Plaintiffs for examination, pursuant to
21   subpoena and pursuant to the Federal Rules of
     Civil Procedure for the United States District
22   Courts pertaining to the taking of depositions,
     taken before Cynthia J. Conforti, Certified
23   Shorthand Reporter, at Suite 2500, 77 West Wacker
     Drive, Chicago, Illinois, commencing at the hour
24   of 10:09 a.m. on the 23rd day of April, A.D.,
25   2008.
```

Page 1

# Golden Gate Reporting

1    Q.  Were you involved in scheduling sales
2  associates in your department?
3    A.  Yes.
4    Q.  And did your sales associates in your
5  department typically work a 40-hour or
6  40-hour-plus work week?
7      MR. GOINES: Objection, compound.
8      THE WITNESS: I think we scheduled them
9  for 40 hours.  Somewhere between 35 and 40 hours
10  is a pretty normal retail schedule.
11  BY MR. KITCHIN:
12    Q.  Did sales associates working at the San
13  Francisco Polo stores for the closing shift have a
14  set time where all sales associates were to finish
15  their day?
16    A.  The day would end when the store closed,
17  and then the next -- it depended on.
18      Could be 15 minutes to an hour could be
19  spent recovering, folding merchandise, stacking
20  it, making the store ready actually for opening
21  the next day.
22    Q.  Did you typically release your sales
23  associates at the end of the day at the same time
24  or were there instances where an individual needed
25  to stay to do something else while others in your

Page 26

1    Q.  Do you know if that process, that is,
2  releasing certain employees who have completed
3  their section and retaining others who were still
4  working on their section also happened in other
5  departments at the Polo store?
6    A.  You know, I don't really know how other
7  managers did it.
8      I think just, trying to recall, often the
9  other areas were more quickly put back together,
10  and whoever was there was allowed to leave.
11  Usually the other areas would finish before the
12  men's areas.
13    Q.  Was there any kind of policy in effect at
14  Polo when you worked there that required sales
15  associates at the end of the day to clock out at a
16  certain time?
17      MR. GOINES: Objection, vague, lack of
18  foundation.
19      THE WITNESS: Clocking out was a function
20  of when you were finished working you'd clock out,
21  leave the building.
22  BY MR. KITCHIN:
23    Q.  Did you ever need to clock an employee in
24  or out for any reason?
25    A.  I think on occasion if somebody forgot to

Page 28

1  department left?
2    A.  Well, sort of by area.  When an area was
3  finished, when the recovery was finished and the
4  person was --
5      MR. GOINES: I apologize.  Did you say
6  recovery?
7      THE WITNESS: Yes, yes.
8      A retail term I guess.
9  BY MR. KITCHIN:
10    Q.  Cleaning up the department.
11    A.  Cleaning up.
12      MR. GOINES: Got you.
13      THE WITNESS: Making it ready for -- so if
14  there were three areas and three employees, they
15  each had to do their own area theoretically.
16  Depending at holiday times.
17      The men's, that first floor was always the
18  most difficult to clean up at the end of the day,
19  so we tried to make sure there were a lot of
20  people available.
21  BY MR. KITCHIN:
22    Q.  So would it be accurate to say that some
23  people on certain days were released before other
24  people in your department were released?
25    A.  Yes.  Yes.

Page 27

1  clock themselves in, it was something that could
2  be done, you know, so that they got paid
3  appropriately.  Clocking them out was not
4  something I normally did.
5    Q.  Would you describe in detail the process
6  you personally went through at the end of the
7  store day, that is, from the point that the
8  customer entrances are locked to the time that you
9  left the building what would you do?
10    A.  Well, mainly was just to prepare the
11  selling area for the next day's business.  That
12  really took up most of my time.
13      There was a store shutting-down process
14  that managers were supposed to participate in that
15  I rarely did because the demands of the floor were
16  so great and it just seemed to require so much of
17  the focus, so if there was another manager who, as
18  you area was finished earlier, I would typically,
19  you know, allow them or I shouldn't say allow.
20      I preferred that they took care of the
21  store shutdown so that they were available to do
22  it so that I could stay with my staff and finish
23  preparing our area for the next day.
24    Q.  On occasion did you participate in what's
25  described as the closing?

Page 29

8 (Pages 26 to 29)

certcert

1    I further certify that the signature to the

2    foregoing deposition was not waived by counsel for

3    the respective parties.

4    I further certify that the taking of this

5    deposition was pursuant to subpoena, and that

6    there were present at the deposition the attorneys

7    hereinbefore mentioned.

8    I further certify that I am not counsel for

9    nor in any way related to the parties to this

10   suit, nor am I in any way interested in the

11   outcome thereof.

12   IN TESTIMONY WHEREOF:    I have hereunto set my

13   hand and affixed my notarial seal this 7th day of

14   May, 2008.

15

16

17

18

19        Cynthia J. Conforti, CSR, CRR

20        Notary Public, Cook County, Illinois

21

22   CSR License No. 084-003064

23

24

25

EXHIBIT 39.

Golden Gate Reporting

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4

5   ANN OTSUKA, an individual; JANIS        No. C-07-02780-SI
    KEEFE, an individual; CORINNE
6   PHIPPS, an individual; and
    JUSTIN KISER, an individual;
7   individually and on behalf of
    all others similarly situated,

8                    Plaintiffs,

9       vs.

10  POLO RALPH LAUREN CORPORATION;
    a Delaware Corporation; POLO
11  RETAIL, LLC, a Delaware Corporation;
    POLO RALPH LAUREN CORPORATION, a
12  Delaware Corporation, doing business
    in California as POLO RETAIL CORP;
13  FASHIONS OUTLET OF AMERICA, INC., a
    Delaware Corporation and DOES 1-500,
14  inclusive,

15                   Defendants.
                                        /

16

17

               DEPOSITION OF PHOEBE MIRELES
18

19

        DATE:        November 15, 2007
20

        TIME:        10:15 a.m.
21

        LOCATION:    One Montgomery Street
22                   Suite 3220
                     San Francisco, California
23

        REPORTED BY: Mary E. Garland
24                   Certified Shorthand Reporter
                     License Number 4721
25

                                              Page 1

# Golden Gate Reporting

1 made was earlier than they actually quit working?
2     A. I don't recall.
3     Q. During the course of your employment at the
4 Stanford Shopping Center, were sales associates
5 provided, in any form, a written description or a
6 memorialization of their clock-in and clock-out times?
7     A. I can't recall.
8     Q. I'm going to show you what we've marked as
9 Exhibit 20, and just ask you if you've seen this form
10 entitled "Time Clock Correction Form."
11     A. It doesn't look familiar.
12     Q. Do you recall any other type of form that you
13 used during the course of your employment at the
14 Stanford Shopping Center to memorialize or make a record
15 of any time clock adjustment?
16     A. No, I don't remember there being any other
17 form, or ever seeing that one.
18     Q. Did you ever hear from any source that the time
19 clock records of sales associates at the Stanford
20 Shopping Center Polo store were being adjusted back down
21 to the time that they had been scheduled to work from
22 the time that they had actually worked?
23     A. No, I don't think --
24     Q. Do you understand the question?
25     A. Yeah. I can't recall that.

Page 78

1 it would depend if they had a late client, they would
2 stay later. If they were a closing shift and they
3 started at 12:30, a lot of times, we'd be out before
4 9:30. So I can't -- I don't remember exactly, I mean.
5     Q. So I take it that sales associates, on a
6 regular basis, clocked in at one time, beginning of the
7 shift, and clocked out more than eight hours later?
8     A. On occasion. I wouldn't say absolutely no to
9 that.
10     Q. The closing shift, during a regular workweek,
11 they were supposed to finish and go home at what time?
12     A. I would say they started at 12:30; and 9:30, at
13 the latest. And, really, we'd only stay the full hour
14 after closing possibly during the holidays, because
15 that's when it gets a little chaotic and messy.
16     Q. So 12:30 to 9:30 is a total of nine hours.
17     A. Yes.
18     Q. And employees would take an hour lunch break;
19 correct?
20     A. That's correct.
21     Q. And they were not compensated for that one-hour
22 lunch break?
23     A. That's correct.
24     Q. Can you tell me whether it was more common for
25 an employee to clock out, during nonholiday periods,

Page 80

1     Q. A sales associate working a full shift --
2     A. Right.
3     Q. -- as a full-time employee at the Stanford Polo
4 store, during the course of your employment there, was
5 scheduled to work eight-hour shifts; is that correct?
6     A. Yes, that is correct.
7     Q. And so at the conclusion of the eight hours,
8 did all sales associates clock out at the exact time
9 that they were scheduled to clock out?
10     A. No. They would clock out when they were
11 finished.
12     Q. So, on occasion, were sales associates on the
13 clock for more than eight hours in one day?
14     A. There's a possibility.
15     Q. Do you recall that specifically, that anyone
16 clocked out after their shift was supposed to end?
17     A. I can't recall.
18     Q. Was it a regular occurrence that sales
19 associates would clock out before their eight-hour shift
20 was complete?
21     A. I don't recall that.
22     Q. So, generally, did sales associates work at
23 least eight hours if they were working full-time as a
24 sales associates at the Stanford Polo store?
25     A. That's correct. Or less, because if -- well,

Page 79

1 before 9:30 p.m. or sometime after 9:30 p.m.?
2     A. I can't recall.
3     Q. If any sales associate clocked out at anytime
4 after 9:30 p.m., was their time record adjusted back to
5 9:30, under any circumstance, to your knowledge?
6     A. No, I can't recall that.
7     Q. So if a person worked a full shift, their time
8 records should show the precise time that they clocked
9 out; is that correct?
10     A. From what I remember, yeah.
11     Q. How often, if you could provide me an estimate,
12 did sales associates in the Palo Alto store work more
13 than eight hours on a given day?
14         MR. GOINES: Objection. Overbroad.
15     Q. BY MR. KITCHIN: Is it possible for you to
16 provide such an estimate?
17     A. No. I -- it just -- it varies.
18     Q. Throughout the course of your employment at the
19 Palo Alto Polo store, did you ever become aware that
20 employees, sales associates, were working more than
21 eight hours in any one day?
22     A. Yeah. It's possible.
23     Q. And did you ever become aware of sales
24 associates working more than 40 hours in one week?
25     A. I'm -- it was possible, but it was very rare.

Page 81

21 (Pages 78 to 81)

CERTIFICATION OF DEPOSITION OFFICER

I, MARY E. GARLAND, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was thereafter transcribed by means of computer-aided transcription under my direction; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed November 26, 2007, at San Francisco, California.

MARY E. GARLAND, CSR 4721