EXHIBIT 40.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ANN OTSUKA, an individual,
et al.,

                    Plaintiffs,

        vs.                    No. C-07-02780-SI

POLO RALPH LAUREN CORPORATION,
et al.,

                    Defendants.

_____/

CERTIFIED COPY

Videotaped Deposition of

**JANIS KEEFE**

Monday, March 17, 2008

Reported by:
IRIS MEINKE-SMITH, RMR/CRR
CSR No. 3798
Job No. 18235LR



PHILLIPS LEGAL SERVICES
SAN FRANCISCO DEPOSITION REPORTERS
795 FOLSOM STREET, FIRST FLOOR
SAN FRANCISCO, CA 94107
1-888-333-8270
WWW.PHILLIPSDEPO.COM

1    A.        No.   We had our own lockers with -- you

2    know, you couldn't go to your locker during the

3    course of employment, so they didn't question

4    anything.

01:38:38 5    Q.        So let's talk about the loss prevention

6    search at Polo Ralph Lauren.   The totality of your

7    employment was at the San Francisco store.   You did

8    not work in any other stores, right?

9    A.        Yes.   Correct.

01:38:53 10   Q.        And is it consistent with your recollection

11   that the San Francisco store only had one exit that

12   employees were permitted to leave the store either

13   for their lunch or at the conclusion of their shift?

14   A.        Yes.

01:39:11 15   Q.        And that was at the rear of the building --

16   the rear of the property; is that correct?

17   A.        Yes.

18   Q.        And it was on the ground floor?

19   A.        Yes.

01:39:23 20   Q.        And it was -- at least the selling area that

21   was closest to it would have been the men's

22   department?

23   A.        Men's clothing.

24   Q.        And so can you explain to me, as best you

01:39:33 25   recall from the days you worked there, the process

102

1    that you took to clock out, loss prevention search,

2    what -- the steps you took in that process?

3    A.        Okay.  Clock out the end of your shift.  And

4    then you would go and -- well, a manager -- you would

01:39:54 5    tell a manager that, you know, it's the end of your

6    shift.  You would clock out.  And then you would have

7    to go get your things from your locker and page a

8    manager or sometimes wait for a manager to relieve

9    you for your shift, for your -- for the day.

01:40:20 10    Q.        And in terms of clocking out, as a general

11    rule, what work station or what computer would you

12    use to clock out?

13    A.        The one closest to the door.

14    Q.        And that was located where?

01:40:39 15    A.        The Men's Clothing register.

16    Q.        Okay.  And would you -- had you ever clocked

17    out using the computer terminal either in Theresa

18    Cruz's or Kristi Mogel's office?

19    A.        On a few occasions, yeah.

01:41:01 20    Q.        And those occasions, the reason that you

21    would use those other terminals would generally be

22    what?

23    A.        Someone was using the register for -- to

24    help a client.

01:41:11 25    Q.        So you would not clock out at a register

                                                              103

1    where someone was continuing to sell merchandise to a

2    customer?

3    A.        Right.  Right.  You -- then you would have

4    to get paid for that time while you're waiting, and

01:41:23 5    you're just waiting there.

6    Q.        So normally --

7    A.        Or you wanted to go home and it was time to

8    go and there was somebody at the register for, like,

9    way too long, and so you'd have to clock out where it

01:41:34 10    was available.

11    Q.        And the alternate available would other --

12    might be upstairs, but your path was either --

13    A.        Right.

14    Q.        -- to use the one in --

01:41:41 15    A.        Well, if I didn't use --

16        MR. KITCHIN:  Let him finish his question.

17        THE WITNESS:  Okay.  Go ahead.  Sorry.

18    Q.        BY MR. GOINES:  If I understand correctly,

19    normally you would try and use the one in the Men's

01:41:51 20    Clothing Department, correct?

21    A.        The one in my department, I would try to use

22    that one.

23    Q.        So you'd try and use it in the Men's Sport?

24    A.        Uh-huh.  Yes.

01:41:59 25    Q.        And that -- and which floor was that on?

                                                      104

1    A.        I don't know how it's considered, if it's

2    the first floor or the second floor.

3    Q.        Would that be the floor that I --

4    A.        The entrance.

01:42:10  5    Q.        Off of Post Street?

6    A.        Right.

7    Q.        Okay.

8    A.        That's the main entrance.

9    Q.        So normally you would try and use the

01:42:16 10    register in that department?

11    A.        Right.

12    Q.        And if that register were not available,

13    then your alternate would have been what?

14    A.        Men's Clothing.

01:42:28 15    Q.        And what were the types or what set of

16    circumstances would arise where you were not able to

17    clock out in the register in the department in which

18    you worked, Men's Sport?

19    A.        Someone using the register, both registers.

01:42:45 20    There was two registers.

21    Q.        And so the alternate path would be to use

22    the one that would be downstairs, correct?

23    A.        Right.

24    Q.        And then if that one weren't available, then

01:42:55 25    you would try and use the one either in Theresa's or

105

1    Kristi's office?

2    A.        Well, sometimes I was told to clock out

3    there because I would tell them that there was no

4    register to clock out in.

01:43:11 5    Q.        And then would your normal practice be to

6    call -- well, strike that.

7              Would your normal practice be to call a

8    manager before you clocked out or after you clocked

9    out to be allowed to exit through the employee exit

01:43:32 10    at the rear of the property?

11    A.        After we clocked out.

12    Q.        And what process or procedure did you use to

13    contact someone who was authorized to perform the

14    loss prevention search?

01:43:48 15    A.        If there was a manager there to relieve you

16    for your shift, then they were usually aware that

17    there was people at the door waiting.  If there was

18    no one at the door, or a manager that wasn't there

19    when your shift was over, then you would have to page

01:44:07 20    a manager using the phone, the intercom.

21    Q.        So on occasion -- I'm going to ask for some

22    quantification, but let's ignore the quantification

23    for a moment.

24              On occasions a manager would be at the door

01:44:29 25    doing loss prevention searches for others such as

                                                    106

1    yourself departing the store at the end of the day?

2    A.        On some occasions.

3    Q.        So I take it what you say is on the majority

4    of occasions you needed to page a manager to conduct

01:44:46 5    this search before you departed?

6    A.        Yes.

7    Q.        And let me -- I want to come back to this in

8    a minute, but I want to go to departing the store for

9    lunch breaks.

01:45:25 10    Would you use the same procedure to depart

11    the store for lunch breaks as you used to exit at the

12    end of the day?

13    You would clock out, go to the employee

14    exit, and either a manager there or call a manager,

01:45:40 15    and then he or she would do the search and let you

16    out?

17    A.        Yes.

18    Q.        Okay.  In response to a question a minute

19    ago you indicated that -- I think the phrase you

01:46:08 20    used, on some occasions a manager was there to

21    perform the loss prevention search after I clocked

22    out, walked to the door and he or she performed a

23    loss prevention search on exit, but you said on most

24    occasions I had to page someone.  Is that -- am I

01:46:24 25    getting that right?

107

1    A.        Yes.

2    Q.        Okay.  And are you able to give me your best

3    estimate of the amount of times that you exited the

4    store at the end of your shift where someone was not

01:46:42 5    -- a manager or a person authorized to perform this

6    inspection was not at the door to facilitate a quick

7    and easy exit from the store?

8    A.        You mean like a number?

9    Q.        Here is what I'm trying to get at.  You

01:46:59 10    indicated that some of the times a manager or person

11    authorized to do the search was at the door, close by

12    the door and I'd clock out, do the search and I'd

13    leave with little or no wait time.  Fair statement?

14    A.        Yes.

01:47:14 15    Q.        Okay.  What percentage of the time that you

16    worked there was it -- was there literally little or

17    no wait time from clock-out to the conducting the

18    loss prevention search?

19    A.        Percentagewise?

01:47:27 20    Q.        If you can give me your best estimate.

21    A.        I have to think about that for a second.

22    I'm sorry.

23            About -- from a hundred percent, you mean,

24    like how many --

01:47:52 25    Q.        Right.

108

1       A.      I would say about 15 percent of the time

2   there was a manager readily available.

3       Q.      And --

4       A.      Throughout my course of employment.

01:48:01 5   Q.      Okay.  And that would mean you would clock

6   out, someone was readily available, do loss

7   prevention search, go on to your business?

8       A.      Right.

9       Q.      Now, that means about 85 percent of the time

01:48:14 10  there was a lag between your clocking out and your --

11  someone being available to conduct a loss prevention

12  search, right?

13      A.      Yes.

14      Q.      Okay.  And on those occasions when you had

01:48:34 15  to conduct -- so on those other occasions when a

16  manager wasn't readily available, I take it you had

17  to page someone to come down or come over to perform

18  the search and allow you to exit the store?

19      A.      Yes.

01:48:49 20  Q.      Okay.  And was there -- again, I'm trying to

21  generalize a little bit.  I try to be weary of that.

22          But was there a person who you normally

23  looked to to page to conduct the loss prevention

24  search when you were departing at the end of the day?

01:49:08 25  A.      Not a particular manager.  It was just

                                                    109

1    "Manager to the back door."

2    Q.        Okay.

3    A.        Basically.

4    Q.        So you would get on the phone system and

01:49:17 5    say, "Manager to the back door.  We want to leave."

6    A.        Yes.

7    Q.        Okay.

8    A.        Or just "Manager to the back door."  Not "We

9    want to leave."

01:49:24 10   Q.        They would understand.

11   A.        Yeah, you weren't allowed to say that much.

12   Q.        And in -- was there an average time on those

13   85 percent of the time occasions that you had to wait

14   for a manager or someone authorized to perform the

01:49:48 15   loss prevention search to come down to the back door,

16   conduct a search and allow you to depart for the day?

17   A.        I would say an average of about 15 to

18   20 minutes.

19   Q.        So as to those 85 percent of the time best

01:50:10 20   estimate, you would wait an average of 15 to

21   20 minutes for a manager to respond and conduct the

22   bag and loss prevention search?

23   A.        Yes.

24   Q.        And did you keep any records or materials or

01:50:34 25   information that would support the statement that on

                                                            110

1                    REPORTER'S CERTIFICATE

2           I certify that the foregoing proceedings in

3    the within-entitled cause were reported at the time

4    and place therein named; that said proceedings were

5    reported by me, a duly Certified Shorthand Reporter

6    of the State of California authorized to administer

7    oaths and affirmations, and were thereafter

8    transcribed into typewriting.

9           I further certify that I am not of counsel

10   or attorney for either or any of the parties to said

11   cause of action, nor in any way interested in the

12   outcome of the cause named in said cause of action.

13          IN WITNESS WHEREOF, I have hereunto set my

14   hand this 1st day of April, 2008.

15

16          _____

17          IRIS MEINKE-SMITH, CA CSR No.3798
            Registered Merit Reporter
18          Certified Realtime Reporter

19

20

21

22

23

24

25

                                                          150

EXHIBIT 41.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ANN OTSUKA, an individual,

et al.,

**CERTIFIED COPY**

Plaintiffs,

vs.                              No. C-07-02780-SI

POLO RALPH LAUREN CORPORATION,

et al.,

Defendants.

_____/

Videotaped Deposition of

**RENEE DAVIS**

Wednesday, March 19, 2008

Reported by:
IRIS MEINKE-SMITH, RMR/CRR
CSR No. 3798
Job No. 18236LR



**PHILLIPS LEGAL SERVICES**

SAN FRANCISCO DEPOSITION REPORTERS

795 FOLSOM STREET, FIRST FLOOR
SAN FRANCISCO, CA 94107
(888) 333.8270
(800) 455-8030 fax
WWW.PHILLIPSDEPO.COM

1    The occasions when you waited to be let out

2    of the store were when you worked the closing shift;

3    is that correct?

4    A.    Not necessarily.  Just any time you leave

11:58:26 5    the store, if I perhaps got off at 5 o'clock, you

6    know, sometimes -- because they have shuttle buses

7    that come.  And if it's busy, I might have clocked

8    out and gotten somebody's attention to leave.  But,

9    you know, a customer may have needed assistance with

11:58:41 10    something else, then I had to wait until somebody

11    could get to me to do the loss prevention search.

12    Q.    Let's talk about the procedure and the

13    process and then talk about how it impacted you.

14    When you concluded your shift, tell me what

11:59:01 15    practice or policy -- what practice you followed in

16    terms of clocking out.

17    A.    When it was time for me to leave, I would

18    bring it to somebody's attention that I was due to

19    get off.

11:59:12 20    Q.    Okay.

21    A.    I was told to go clock out, which I did.

22    I'd gather my possessions or purchases, whatever I

23    had that particular day, and we'd head for the front

24    door.  You know, say, "Hey, I'm ready."

11:59:26 25    And if somebody was available, you know,

73

1    they would come and, you know, do the little search

2    and check your coat and what have you.  And then if

3    not, then I basically just had to stand there and

4    wait until somebody became available.

11:59:44 5    Q.        And so if I understand correctly -- let's

6    just make an assumption for purposes of my question

7    that your shift ended at 5:00.

8    A.        Okay.

9    Q.        You wouldn't clock out until you notified

11:59:54 10    someone, "Hey, I'm going off duty," or "It's the end

11    of my shift," so you might clock out at 5:05 or 5:10,

12    based on that type of circumstance; is that correct?

13    A.        Yes, I would usually say, "It's 5 o'clock.

14    Do you need me to stay any longer?"  If they would

12:00:10 15    say, "No," "Okay, I'm clocking out."  Then I would

16    say, "Okay," go to my locker and get my things, wave

17    at somebody again, "I'm ready," go to the door, look

18    to see if there's anybody following me.  Sometimes

19    there were, you know, sometimes there wasn't.

12:00:23 20    Q.        Following you, meaning a manager or a person

21    who could check you out?

22    A.        Yes.  Because they escort you to the door

23    and, you know, do their little search and that was

24    it.

12:00:37 25    Q.        And so you indicated -- and what I'm trying

74

# REPORTER'S CERTIFICATE

1

2       I certify that the foregoing proceedings in

3  the within-entitled cause were reported at the time

4  and place therein named; that said proceedings were

5  reported by me, a duly Certified Shorthand Reporter

6  of the State of California authorized to administer

7  oaths and affirmations, and were thereafter

8  transcribed into typewriting.

9       I further certify that I am not of counsel

10  or attorney for either or any of the parties to said

11  cause of action, nor in any way interested in the

12  outcome of the cause named in said cause of action.

13       IN WITNESS WHEREOF, I have hereunto set my

14  hand this 4th day of April, 2008.

15

16  _____ *Iris Meinke-Smith* _____

17  IRIS MEINKE-SMITH, CA CSR No.3798
    Registered Merit Reporter

18  Certified Realtime Reporter

19

20

21

22

23

24

25                                          122

EXHIBIT 42.

**Golden Gate Reporting**

```
 1              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
 2               SAN FRANCISCO DIVISION
        ------------------------------X
 3   ANN OTSUKA, an Individual; JANIS
     KEEFE, an individual, CORINNE PHIPPS,
 4   an individual, and JUSTIN KISER,
     an individual, individually and
 5   on behalf of all others similarly
     situated,
 6
                 Plaintiffs.
 7
     v.                               No. C-07-02780-SI
 8
     POLO RALPH LAUREN CORPORATION,
 9   a Delaware Corporation, POLO
     RETAIL, LLC, a Delaware Corporation,
10   POLO RALPH LAUREN CORPORATION, a
     Delaware Corporation doing business
11   in California as POLO RETAIL CORP.,
     FASHIONS OUTLET OF AMERICA, INC., a
12   Delaware Corporation, and DOES -500,
     inclusive,
13
                 Defendants.
14      ------------------------------X

15
                      January 18, 2008
16                    New York, New York
                      Time:  9:51 a.m.
17                    Volume 1, Pages 84

18

19         Deposition of BETH FLYNN, taken on behalf

20   of the Plaintiffs, at Greenberg Traurig, Met Life

21   Building, 200 Park Avenue, New York, New York, commencing

22   at 9:51 a.m., January 18, 2008, before Anthony

23   Armstrong, a Notary Public and Certified Shorthand

24   Reporter of the State of New York.

25
                                              Page 1
```

**Golden Gate Reporting**

Page 22

1  Polo?
2  A.  Yes. It's an application. It's a
3  software application that's used by Polo.
4  Q.  Does the data that come through that
5  system identify specific sales made by specific
6  sales associates?
7  A.  Yes.
8  Q.  And that's a biweekly download from
9  California?
10  A.  It's a biweekly download from the
11  central system.
12  Q.  How often are those sales reported to
13  the Pacific --
14  A.  Island Pacific.
15  Q.  -- Island Pacific system?
16  A.  It's a nightly process.
17  Q.  And do managers within the full price
18  stores in California transmit that data at the
19  end of the business day?
20  A.  It's a system. It processes. The
21  manager doesn't have to push it.
22  Q.  Does that come through the point of
23  sale system?
24  A.  Yes.
25  Q.  And do the point of sale system, the

Page 24

1  sent from a California store to that system at
2  the end of the business day?
3  A.  I'm not sure.
4  Q.  You understand what I'm asking --
5  A.  Yes.
6  Q.  -- is whether we could track how --
7  at what time that data was sent to the system in
8  New York or New Jersey?
9  A.  I'm not sure of the historical
10  tracking for that.
11  Q.  Are you familiar with the timekeeping
12  systems used in the full price retail stores in
13  California?
14  A.  Yes.
15  Q.  What is that system called?
16  A.  They time keep inside the point of
17  sale system, which is DataVantage. The POS is
18  called Trade Wind.
19  Q.  Is the Trade Wind system also used
20  today in factory outlet stores in California?
21  A.  Yes.
22  Q.  Are those systems capable of
23  downloading data to some department here on the
24  East Coast?
25  A.  Can you clarify?

Page 23

1  cash registers, need to be closed down in order
2  to transmit that data?
3  A.  Yes.
4  Q.  Do all of the cash registers within
5  the store need to be shut down at the end of the
6  business day to transmit that data?
7  A.  Yes.
8  Q.  Have you been in a California full
9  price retail store when that process is going on?
10  A.  No.
11  Q.  How long does that process take from
12  the time the cash registers are shut down until
13  the process of providing the data to New York is
14  completed?
15  A.  It depends upon the size of the
16  store.
17  Q.  To your knowledge, is there a record
18  maintained through any systems at Polo that
19  memorize the time that data was sent from
20  specific stores within California to the Island
21  Pacific system?
22  A.  Can you repeat that question?
23  Q.  Yes. I'm wondering if the Island
24  Pacific system or any other system can be
25  analyzed to show the specific time that data was

Page 25

1  Q.  I'm wondering if the timekeeping
2  records are similarly sent electronically to New
3  York?
4  A.  Yes, they are.
5  Q.  And how often are those data sent to
6  New York?
7  A.  It's nightly. And at the end of the
8  week, there is a weekly close process.
9  Q.  Is the nightly process part of the
10  process we were talking about earlier with the
11  Island Pacific system?
12  A.  Not the same, but similar.
13  Q.  Can you describe the process that a
14  manager in California would go through to send
15  sales and timekeeping data to New York at the end
16  of the business day?
17  A.  As the close -- the manager wouldn't
18  send the data, but as part of the system at close
19  process, they close each of their registers,
20  which is counting down the tills for it to
21  balance out the reconciliation for each cash
22  register. When all the people are ready to
23  go they -- as people are leaving, they'll clock
24  out and then they get ready to close out the
25  store and they close. And the last piece of

**Golden Gate Reporting**

Page 26

1  closing is to clock out anyone who's in the store
2  who hasn't clocked out yet.
3      Q.   To your knowledge, are there times
4  when the point of sale timekeeping systems have
5  all been shut down while sales associates are
6  still working within the store after the close of
7  business?
8      A.   Yes.
9      Q.   And are sales associates capable of
10 using the Trade Wind system to clock out when the
11 cash registers are shut down?
12     A.   No.
13     Q.   Do you know how their working hours
14 and the end of their working day is memorized by
15 Polo?
16     A.   From my understanding, there is a
17 form that gets completed that the manager writes
18 down with the associate, the time of their
19 leaving, and then that gets entered.  When they
20 open the POS, they do an adjustment to key in the
21 clock out time.
22     Q.   You are familiar with a form that is
23 used in California for making adjustments to
24 time --
25     A.   My assumption is that is the form.  I

Page 28

1      A.   Store ops.  Evan Cohen.
2      Q.   Okay.  So Evan Cohen has indicated to
3  you at some point that stores in California are
4  using a form to help them memorize working hours
5  of employees?
6      A.   Yes.
7      Q.   When did he tell you that?
8      A.   I have no idea on dates.  I don't
9  even have a guess, to be honest.
10     Q.   Can you tell me whether it was within
11 the last year?
12     A.   It would have been a lot longer than
13 that.
14     Q.   Have you ever been part of a
15 discussion or communication in which the process
16 of shutting the timekeeping systems and point of
17 sale systems down should be modified in some way
18 so that employees have an opportunity to clock
19 out themselves at the end of their working day?
20     A.   Yes.
21     Q.   Describe in general your
22 conversations or communications you have had
23 relating to that issue.
24     A.   It was conversations on a way to
25 modify the POS to allow for clock-outs during

Page 27

1  haven't seen the form myself.
2      Q.   I'm going to show you what we have
3  previously marked as Exhibit 20.  I just ask if
4  you have ever seen this form being used in the
5  California retail stores?
6          (Whereupon, Exhibit 20 was
7          previously marked for identification.)
8          **************
9      A.   No, I have not.
10 BY MR. KITCHIN:
11     Q.   You haven't seen any kind of a form
12 used by managers in California to memorize
13 working hours, but you assume that a form is in
14 place?
15     A.   Yes.
16     Q.   And what do you base that assumption
17 on?
18     A.   Process conversations.  Business
19 process conversations.
20     Q.   You have had conversations with
21 managers who've told you that they use a specific
22 form?
23     A.   No.  Not with managers, no.
24     Q.   With whom have you had conversations
25 indicating --

Page 29

1  close process.  The system currently does not
2  allow it.
3      Q.   With whom did you have a conversation
4  on that issue?
5      A.   It would have been with our store ops
6  folks like an Evan Cohen and our IT partners for
7  POS.
8      Q.   How long -- was it a single
9  conversation or communication, or multiple
10 communications?
11     A.   I can't say it was a single.  Might
12 have been more than, you know, one or two
13 conversations.  But that's been quite a while
14 ago.
15     Q.   Can you give me any kind of a
16 ballpark estimate?  Was it more than a year ago,
17 two years ago?
18     A.   It was definitely more than a year
19 ago, and it may have been more than two, but I'm
20 not sure on that point.
21     Q.   Do you understand the impetus for
22 discussions relating to some kind of a
23 modification of the timekeeping system as you
24 discussed?
25          That's bad.

8 (Pages 26 to 29)

Golden Gate Reporting

```
1                    C E R T I F I C A T E
2           I, Anthony Armstrong, a Certified
3    Shorthand Reporter and Notary Public within
4    and for the State of New York, do hereby
5    certify:
6           That BETH FLYNN, the witness whose
7    testimony is hereinbefore set forth, was
8    duly sworn by me and that such testimony is
9    a true record of the testimony given by such
10   witness.
11          I further certify that I am not
12   related to any of the parties by blood or
13   marriage, and that I am in no way interested
14   in the outcome of this matter.
15
16
17                  Anthony Armstrong
18
19
20
21
22
23
24
25
```

Page 83

EXHIBIT 43.

**Golden Gate Reporting**

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4
 5   ANN OTSUKA, an individual;      )
     JANIS KEEFE, an individual,     )
 6   CORINNE PHIPPS, an              )
     individual; and RENEE DAVIS,    )
 7   an individual; individually     )
     and on behalf of all others     )
 8   similarly situated,             )
               Plaintiffs,           )
 9                                   )
10      -vs-                         )   No. C-07-02780-SI
11                                   )
12   POLO RALPH LAUREN CORPORATION;  )
     a Delaware Corporation; POLO    )
13   RETAIL, LLC., a Delaware        )
     Corporation, POLO RALPH LAUREN  )
14   CORPORATION, a Delaware         )
     Corporation, doing business in  )
15   California as POLO RETAIL       )
     CORP; FASHIONS OUTLET OF        )
16   AMERICA, INC., a Delaware       )
     Corporation,                    )
17            Defendants.            )
18   _____)
19
20           The deposition of HARVEY RESNICK, called
     by the Plaintiffs for examination, pursuant to
21   subpoena and pursuant to the Federal Rules of
     Civil Procedure for the United States District
22   Courts pertaining to the taking of depositions,
     taken before Cynthia J. Conforti, Certified
23   Shorthand Reporter, at Suite 2500, 77 West Wacker
     Drive, Chicago, Illinois, commencing at the hour
24   of 10:09 a.m. on the 23rd day of April, A.D.,
25   2008.
```

Page 1

## Golden Gate Reporting

**Page 26**

1  Q.  Were you involved in scheduling sales
2  associates in your department?
3  A.  Yes.
4  Q.  And did your sales associates in your
5  department typically work a 40-hour or
6  40-hour-plus work week?
7  MR. GOINES:  Objection, compound.
8  THE WITNESS:  I think we scheduled them
9  for 40 hours.  Somewhere between 35 and 40 hours
10  is a pretty normal retail schedule.
11  BY MR. KITCHIN:
12  Q.  Did sales associates working at the San
13  Francisco Polo stores for the closing shift have a
14  set time where all sales associates were to finish
15  their day?
16  A.  The day would end when the store closed,
17  and then the next -- it depended on.
18  Could be 15 minutes to an hour could be
19  spent recovering, folding merchandise, stacking
20  it, making the store ready actually for opening
21  the next day.
22  Q.  Did you typically release your sales
23  associates at the end of the day at the same time
24  or were there instances where an individual needed
25  to stay to do something else while others in your

**Page 27**

1  department left?
2  A.  Well, sort of by area.  When an area was
3  finished, when the recovery was finished and the
4  person was --
5  MR. GOINES:  I apologize.  Did you say
6  recovery?
7  THE WITNESS:  Yes, yes.
8  A retail term I guess.
9  BY MR. KITCHIN:
10  Q.  Cleaning up the department.
11  A.  Cleaning up.
12  MR. GOINES:  Got you.
13  THE WITNESS:  Making it ready for -- so if
14  there were three areas and three employees, they
15  each had to do their own area theoretically.
16  Depending at holiday times.
17  The men's, that first floor was always the
18  most difficult to clean up at the end of the day,
19  so we tried to make sure there were a lot of
20  people available.
21  BY MR. KITCHIN:
22  Q.  So would it be accurate to say that some
23  people on certain days were released before other
24  people in your department were released?
25  A.  Yes.  Yes.

**Page 28**

1  Q.  Do you know if that process, that is,
2  releasing certain employees who have completed
3  their section and retaining others who were still
4  working on their section also happened in other
5  departments at the Polo store?
6  A.  You know, I don't really know how other
7  managers did it.
8  I think just, trying to recall, often the
9  other areas were more quickly put back together,
10  and whoever was there was allowed to leave.
11  Usually the other areas would finish before the
12  men's areas.
13  Q.  Was there any kind of policy in effect at
14  Polo when you worked there that required sales
15  associates at the end of the day to clock out at a
16  certain time?
17  MR. GOINES:  Objection, vague, lack of
18  foundation.
19  THE WITNESS:  Clocking out was a function
20  of when you were finished working you'd clock out,
21  leave the building.
22  BY MR. KITCHIN:
23  Q.  Did you ever need to clock an employee in
24  or out for any reason?
25  A.  I think on occasion if somebody forgot to

**Page 29**

1  clock themselves in, it was something that could
2  be done, you know, so that they got paid
3  appropriately.  Clocking them out was not
4  something I normally did.
5  Q.  Would you describe in detail the process
6  you personally went through at the end of the
7  store day, that is, from the point that the
8  customer entrances are locked to the time that you
9  left the building what would you do?
10  A.  Well, mainly was just to prepare the
11  selling area for the next day's business.  That
12  really took up most of my time.
13  There was a store shutting-down process
14  that managers were supposed to participate in that
15  I rarely did because the demands of the floor were
16  so great and it just seemed to require so much of
17  the focus, so if there was another manager who, as
18  you area was finished earlier, I would typically,
19  you know, allow them or I shouldn't say don't.
20  I preferred that they took care of the
21  store shutdown so that they were available to do
22  it so that I could stay with my staff and finish
23  preparing our area for the next day.
24  Q.  On occasion did you participate in what's
25  described as the closing?

**8 (Pages 26 to 29)**

certcert

1     I further certify that the signature to the
2  foregoing deposition was not waived by counsel for
3  the respective parties.
4     I further certify that the taking of this
5  deposition was pursuant to subpoena, and that
6  there were present at the deposition the attorneys
7  hereinbefore mentioned.
8     I further certify that I am not counsel for
9  nor in any way related to the parties to this
10  suit, nor am I in any way interested in the
11  outcome thereof.
12     IN TESTIMONY WHEREOF:   I have hereunto set my
13  hand and affixed my notarial seal this 7th day of
14  May, 2008.

19     Cynthia J. Conforti, CSR, CRR
20     Notary Public, Cook County, Illinois

22  CSR License No. 084-003064

EXHIBIT 44.

**Golden Gate Reporting**

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4

5    ANN OTSUKA, an individual; JANIS          No. C-07-02780-SI
     KEEFE, an individual; CORINNE
6    PHIPPS, an individual; and
     JUSTIN KISER, an individual;
7    individually and on behalf of
     all others similarly situated,
8
                 Plaintiffs,
9       vs.

10   POLO RALPH LAUREN CORPORATION;
     a Delaware Corporation; POLO
11   RETAIL, LLC, a Delaware Corporation;
     POLO RALPH LAUREN CORPORATION, a
12   Delaware Corporation, doing business
     in California as POLO RETAIL CORP;
13   FASHIONS OUTLET OF AMERICA, INC., a
     Delaware Corporation and DOES 1-500,
14   inclusive,

15               Defendants.
                                              /
16

17

              DEPOSITION OF PHOEBE MIRELES
18

19

         DATE:          November 15, 2007
20

         TIME:          10:15 a.m.
21

         LOCATION:      One Montgomery Street
22                      Suite 3220
                        San Francisco, California
23

         REPORTED BY:   Mary E. Garland
24                      Certified Shorthand Reporter
                        License Number 4721
25

                                             Page 1

## Golden Gate Reporting

1  the five cash registers ever closed out before the sales
2  associates in the store had completed their duties at
3  the end of the shift?
4      A. When I personally closed --
5      Q. No.
6      A. -- or are you asking in general?
7      Q. In general.
8      A. I can't speak for any other manager, but I know
9  I would never do that. I never did it.
10     Q. So both when you were working as a Women's
11 manager and a general manager, you would leave one or
12 more of the point-of-sale cash registers available for
13 sales associates to use to clock out?
14     A. That's correct.
15     Q. Are you aware of any instance during the course
16 of your employment where any managers, for any reason,
17 closed all of the cash registers down before the sales
18 associates working that shift had clocked out?
19     A. Yeah, there was a possibility. And it wasn't
20 ever done on purpose. I remember very few times where
21 they thought that a sales associates clocked out, and
22 then began to close the store -- or close the register
23 system down. Yeah, I'm sure. And so --
24     Q. At the end of the shift, after it went to the
25 point-of-sale timekeeping system, was it ever one of

Page 50

1  described upstairs?
2      A. Yes.
3      Q. And what duties did you have that required you
4  to work in that office?
5      A. That would be doing the deposit and entering in
6  sales numbers onto a sales report that was on a desktop
7  on one of the computers.
8      Q. And that was all work that you'd perform on a
9  computer in that office?
10     A. Yes.
11     Q. And at the end of the shift, when you were
12 working as one of the managers or the only manager
13 closing the store, did you generally leave the store at
14 the same time as the sales associates who were working
15 the later shift?
16     A. No. They would leave before me.
17     Q. And what time would you typically leave in the
18 evening when you were closing the store?
19     A. It would depend. As long as everything was
20 completed, then I would -- in the end, when I last left,
21 the clocking in and out system was on the POS. And
22 whomever closed with me, we closed out together, we
23 entered our numbers, did the alarm, and walked out.
24     Q. When you were closing the store, whether you
25 were doing it on your own or with another manager, can

Page 52

1  your jobs to report sales to the corporate office on the
2  East Coast?
3      A. Well, when you close a register down, it
4  automatically pulls and they get the information, they
5  get their data that they need.
6      Q. Was there, at any point in time during your
7  employment at Stanford, a time set by corporate policy
8  when all cash registers had to be closed down to report
9  to New York?
10     A. No, not that I'm aware of, as long as it was
11 closed. Otherwise, we wouldn't pull, and we would have
12 to redo everything in the morning and the numbers would
13 get in late.
14     Q. So as long as you closed down the cash
15 registers and they reported to New York by the time the
16 manager or managers left the store that evening, that
17 was permissible?
18     A. Yes.
19     MR. KITCHIN: Why don't we go off the record
20 and take a break.
21     (Brief recess taken.)
22     MR. KITCHIN: We'll go back on the record.
23     Q. At anytime when you were one of the managers
24 closing the store at the end of the day, did you have
25 duties that required you to work out of the office area

Page 51

1  you, please, describe the sequence of tasks that you
2  generally performed from kind of starting the closing
3  process to walking out the door.
4      A. Sure. Well, we -- like I said, we started
5  closing the registers about 8:30. So that was part of
6  the closing procedure. We'd start two registers, third,
7  fourth, and left one open, two, if needed, you know, if
8  we needed to. It just depends on how many clients were
9  in the store at the time. And then so the last register
10 was open. I did my deposits upstairs, entered in sales
11 numbers, resumed helping the sales associates fold.
12 Because from eight o'clock, on, really, we're starting
13 to fold-down and fix the store.
14     And then when all the departments were folded
15 and clean, that was the time to check out. And I would
16 -- either myself, another manager, or that closing
17 person, senior seller, we would all meet at the back
18 door, which was to the parking lot, and check them out
19 for the day.
20     Q. How long would it typically take you, if you
21 were the only person closing the registers, to close all
22 of the registers, except for the one or two that you
23 kept open?
24     A. It could be as fast as 20, 25 minutes.
25     Q. And you said you would begin that approximately

Page 53

## Golden Gate Reporting

1  how long before the store would close?
2      A. About a half an hour, sometimes later. It
3  would just depend on, again, the clients, the amount of
4  clients in the store.
5      Q. And after you completed that task, would you
6  then typically go upstairs to the office?
7      A. Yes. I would finalize the deposits -- I would
8  always want to do that first -- enter in the sales
9  numbers; and then continue helping them fold-down, the
10  sales associates.
11      Q. And what do you mean by "finalize" or do the
12  deposits?
13      A. Well, we had to -- I don't remember the process
14  exactly, but everything needed to be done that night.
15  If there was live money, check, it needed to be dropped
16  into the safe. Things of that nature, just following
17  that sort of policy and procedure.
18      And then I would have to enter in sales
19  numbers, so that, say, if I was off the next day,
20  everything was clear and concise for the opening manager
21  to follow through with.
22      Q. Now, in terms of the deposits, I thought you
23  had said that you didn't take the money out of the cash
24  registers?
25      A. No. Again, this is only if there was live

Page 54

1  money or checks that needed to be deposited.
2      Q. What is live money?
3      A. Like, say, we had cash for the day, then that
4  would be taken out. The only thing that remained in the
5  till was the opening dollar amount, which I can't
6  remember that exact amount at the moment.
7      Q. So when you went through to close down the
8  registers and count the money, if there was more money
9  in the till than was required for the opening bank --
10      A. Yes.
11      Q. -- you would take that money, collect that
12  money and then take it upstairs?
13      A. Yes. It would be dropped in the safe. Then I
14  would go back and actually do the process, the final
15  process of writing in everything. I just didn't want
16  that money on me or leaving it in the register.
17      Q. So then would you enter in the sales numbers?
18      A. Mm-hm.
19      Q. And that was a manual process?
20      A. Yes.
21      Q. And the combined process, after you got
22  upstairs to do the deposits and put in the sales
23  numbers, how long did that process, in total, take?
24      A. Maybe 15, 20 minutes, at the most.
25      Q. Was it typical that you had other duties to

Page 55

1  perform up in the office at the end of your shift when
2  you were working as a manager, closing the store?
3      A. Not that I can recall.
4      Q. Did you use that time to call clients of Polo?
5      A. No.
6      Q. Did you talk with any other managers at Polo,
7  like Kim Babka, over the phone?
8      A. Yes.
9      Q. During that time?
10      A. Yes, sometimes. Not all the times.
11      Q. And during those conversations, those were to
12  update people about what had happened during the day, I
13  take it?
14      A. Yes.
15      Q. So if you're doing the closing yourself, it's
16  20 to 25 minutes to close the tills?
17      A. Mm-hm.
18      Q. Yes?
19      A. Starting from 8:30, on, yes.
20      Q. And then you'd go upstairs and spend another
21  15 to 20 minutes doing the data entry and the tasks that
22  you had up in the office?
23      A. Yes, that's correct.
24      Q. During that combined time period, were sales
25  associates doing the fold-down of the store?

Page 56

1      A. Yes, that's correct.
2      Q. When you were closing as a manager, throughout
3  the course of your employment in the Stanford Polo
4  store, were there times when sales associates contacted
5  you in some way from downstairs to tell you that they
6  were ready to leave?
7      A. Yes.
8      Q. And would they page you or --
9      A. Yes.
10      Q. They would page you --
11      A. Either a page, or sometimes they would come up.
12      Q. Would some sales associates finish their tasks
13  and be ready to leave before other sales associates had
14  finished their tasks and were leaving, or did all the
15  sales associates typically leave at the same time --
16      A. They would typically --
17      Q. -- at the end of the shift?
18      A. Sorry. They would typically leave at the same
19  time. If one wanted to prepare for the next day and do
20  a little more work, that was up to them.
21      Q. Sales associates, at the end of the day, after
22  they have performed what they believed to be all of
23  their duties for that day, would then go to one of the
24  cash registers that was still open and clock out; is
25  that correct?

Page 57

15 (Pages 54 to 57)

**Golden Gate Reporting**

1    A. Yes.
2    Q. And did they have a break room in the store?
3    A. Yes.
4    Q. And did they have lockers in the store?
5    A. Yes.
6    Q. So would employees typically clock out and then
7  go to their lockers and get purses and personal
8  belongings?
9    A. No. They would actually get their things and
10  then clock out.
11    Q. How do you know that?
12    A. I remember them doing so.
13    Q. So employees would --
14    A. I don't know for sure if they did it all the
15  time, but I remember that.
16    Q. So you saw sales associates who were going to
17  the lockers to get their bags and personal items, taking
18  those items back to the cash register, and then clocking
19  out?
20    A. Yes. Say, they were leaving for the day, they
21  put their scarfs on, their jackets, grab their bags, go
22  downstairs, do their thing, and then meet someone at the
23  door.
24    Q. Were there ever times when you were paged to do
25  the loss prevention or bag checks for sales associates

Page 58

1    a possibility?
2    A. I think it was brought to my attention that a
3  manager said that the associates complained about
4  waiting and they claimed it was like a few minutes, when
5  I don't know how long it was for the sales associates.
6    Q. Who claimed that it was a few minutes?
7    A. Any manager at the time. It could have been
8  Haaheo, it could have been -- who else was the manager
9  at the time? -- Sabrina. There was an assistant key
10  holder, Jennifer. I don't know for sure. It could have
11  been any one of them.
12    Q. Now, let me make sure we have this clear.
13    So a manager told you that sales associates had
14  complained about the wait time to get --
15    A. Yes.
16    Q. -- out of the store, and the manager told you
17  that the sales associates had only waited a few minutes?
18    A. Right.
19    Q. Based on your memory of this --
20    A. Right.
21    Q. -- did the sales associates tell the manager,
22  who told you, that they had only waited a few minutes,
23  or do you know?
24    A. I don't know.
25    Q. Was it your impression that the sales

Page 60

1  when you couldn't respond to them within a few minutes?
2    A. Sometimes. But typically, we would partner
3  with the other person. So if I was the one doing all
4  the deposits and the numbers, the other person, whether
5  it was a manager or senior seller, would have the keys
6  and be ready for them to leave.
7    Q. So more often than not, there were at least two
8  people in the store with keys who were permitted to let
9  people out of the store at the end of the shift?
10    A. If there are two managers, we had two sets of
11  keys. If there was one manager and, say, a senior
12  seller, we had one set of keys. Say, I was doing things
13  upstairs -- or vice versa, that person could do that
14  upstairs -- I would be downstairs with the keys or they
15  would be downstairs with the keys.
16    Q. Throughout the course of your employment at the
17  Stanford Shopping Center, did you ever hear of any sales
18  associates complaining that they had been required to
19  wait for what they thought was an unreasonable period of
20  time to be let out of the store to go home?
21    A. No, not to my knowledge.
22    Q. So you had never even heard from another
23  manager of such a complaint?
24    A. There's a possibility, yes.
25    Q. On what do you base the statement that there's

Page 59

1  associates were complaining that they had to wait for
2  more than a few minutes?
3    A. No. Because I never got a complaint, a
4  personal complaint. This is all word of mouth, through
5  managers, or a manager -- I don't remember -- and it
6  wasn't something that happened very often. And if it
7  did, they would say it and it was in passing, and they
8  had apologized for maybe they were busy, in the
9  restroom. I don't know.
10    But I would always ask, "Well, why were they
11  waiting for that amount of time?" or however long it
12  was. But it was never more than a few minutes.
13    Q. On how many separate occasions do you recall
14  hearing from any source that sales associates were
15  complaining about having to wait too long to leave the
16  store?
17    A. Very few. And if it was, it was during a very
18  short period of time where we were maybe short on
19  managers. Just trying to think here. There's myself --
20  I would say just a few times. There wasn't a whole lot
21  of complaints that I can remember. And, again, it
22  wasn't to me; possibly to other managers.
23    Q. Were there any occasions where you learned from
24  any source that sales associates were complaining that
25  it took what they believed to be an unreasonable period

Page 61

16 (Pages 58 to 61)

CERTIFICATION OF DEPOSITION OFFICER

I, MARY E. GARLAND, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was thereafter transcribed by means of computer-aided transcription under my direction; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed November 26, 2007, at San Francisco, California.

MARY E. GARLAND, CSR 4721

EXHIBIT 45.

**Golden Gate Reporting**

```
1              IN THE UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4

5   ANN OTSUKA, an individual;      )
    JANIS KEEFE, an individual,     )
6   CORINNE PHIPPS, an              )
    individual; and RENEE DAVIS,    )
7   an individual; individually     )
    and on behalf of all others     )
8   similarly situated,             )
              Plaintiffs,            )
9                                   )
10     -vs-                          )   No. C-07-02780-SI
11                                   )
12  POLO RALPH LAUREN CORPORATION;)
    a Delaware Corporation; POLO  )
13  RETAIL, LLC., a Delaware
    Corporation, POLO RALPH LAUREN)
14  CORPORATION, a Delaware        )
    Corporation, doing business in)
15  California as POLO RETAIL       )
    CORP; FASHIONS OUTLET OF        )
16  AMERICA, INC., a Delaware       )
    Corporation,                    )
17            Defendants.           )
18  _____ )
19
20          The deposition of HARVEY RESNICK, called
    by the Plaintiffs for examination, pursuant to
21  subpoena and pursuant to the Federal Rules of
    Civil Procedure for the United States District
22  Courts pertaining to the taking of depositions,
    taken before Cynthia J. Conforti, Certified
23  Shorthand Reporter, at Suite 2500, 77 West Wacker
    Drive, Chicago, Illinois, commencing at the hour
24  of 10:09 a.m. on the 23rd day of April, A.D.,
25  2008.
```

Page 1

**Golden Gate Reporting**

1  commissioned sales.
2      Q.  Does the phrase "base rate against
3  commission" ring a bell?
4      A.  Well, that's basically what I'm referring
5  to, yeah, yes, rings a bell.
6      Q.  And individuals in your department, were
7  they provided by Polo a sales goal or target that
8  equaled their hourly rate times the hours worked?
9      A.  Yes.
10     Q.  And was that kind of the minimum sales
11 that individuals were expected to make?
12     A.  Yes.  That was the expectation.
13     Q.  Were other sales goals that were higher
14 than that also set for sales associates?
15     A.  Target sales, no.  I mean everybody who
16 was -- ideally we wanted everybody to sell more
17 than their base rate and to earn more money.  At
18 least that was my position.  Didn't happen very
19 often.
20     Q.  Okay.  How often would your department
21 sales associates did they meet or exceed the base
22 rate versus commission goal that was determined to
23 cover their wages?
24     A.  I only have a recollection of a couple of
25 times that Justin, Justin Kaiser had actually

Page 34

1      A.  The one-on-ones.
2      Q.  And what were the one-on-ones?
3      A.  Just review.  Review exactly what you're
4  talking about, the sales performance relative to
5  their targets and talk about ways to get there and
6  just things of that nature.  Basically it was to
7  keep them abreast of where they were
8  performance-wise.
9      Q.  Do you recall if you ever had occasion to
10 review sales records of any of your sales
11 associates in the men's department where the sales
12 associate had not even sold one half of their
13 target goal?
14     A.  Yes, I'm sure that happened, yes.
15     Q.  When you had the one-on-ones with your
16 sales associates, was that typically a meeting
17 just between the two of you or were there other
18 managers that participated as well?
19     A.  I had both.  There were times when it was
20 done in conjunction with the general manager and
21 others when it was just me and the sales
22 associate.
23     Q.  You indicated earlier that the closing
24 procedure that managers participated in including
25 transmitting sales data to the corporate office I

Page 36

1  exceeded his sales and achieved his goals.
2      Q.  Do you have any recollection of any other
3  sales associates in your department who at least
4  on occasion made their numbers or exceeded their
5  numbers?
6      A.  You know, I'm sure it must have happened,
7  but I don't recall specifically.
8      Q.  During the time you were employed by Polo
9  were any sales associates in any department
10 terminated because of their failure to meet or
11 cover their wages through sales?
12     A.  Yes, there was at least one person.
13     Q.  Anyone in your department?
14     A.  Yes.
15     Q.  Who was that?
16     A.  Don't remember.  It was a female employee
17 in sports, and she failed to meet her goals the
18 designated number of pay periods in a row.
19        Consequently, by virtue of the way rules
20 are written, had to be dismissed.  I don't
21 remember.
22     Q.  Did you have regular meetings with sales
23 associates in your department during which you
24 discussed their performance and goals that had
25 been set for their performance?

Page 35

1  take it; is that correct?
2      A.  Some central location, yeah.
3      Q.  Can you describe to the best of your
4  recollection how that process worked?
5      A.  It was a case of just entering the number
6  of -- making a number of entries on the computer
7  to go through the process, and I don't recall the
8  details of it.  I didn't do it that often.
9        It was not something I got -- I typically
10 enjoyed doing, so, as I said, I was often involved
11 in the cleanup and recovery of my floor and then
12 -- but allow or ask one of other managers if they
13 would do it.
14     Q.  Was that process of transmitting sales
15 data something that was typically done around
16 closing time --
17     A.  Shortly after the doors were locked and
18 the store was pretty much ready to at that point,
19 at that point, yeah, everybody should have been
20 ready or ready exiting the building except for the
21 managers.
22     Q.  So that process typically took place after
23 sales associates had left for the day?
24     A.  It could have, but there were times when
25 it was done while the sales associates were still

Page 37

10 (Pages 34 to 37)

## Golden Gate Reporting

1  in the store.
2    Q.  Do you have any kind of an estimate as to
3  how long it took a manager to go through that
4  process of transmitting sales data?
5    A.  It was probably 15 to 20 minutes, maybe
6  less if you're really efficient.
7    Q.  And where did they typically perform that
8  function?
9    A.  There was a specific computer that was
10  used for that.  I think it was maybe even Theresa
11  Cruz's actually.  I'm not sure.
12    Q.  What other duties did managers perform at
13  closing time other than transmitting this data as
14  we just talked about and recovering their
15  department?
16    A.  Well the only other thing that really you
17  needed to do or needed to be done by a manager is
18  to inspect the employee's belongings, purses,
19  bags, whatever, gym bag, anything of that nature
20  an allow them to leave through the employee
21  entrance.
22    Q.  Were there occasions after the close of
23  the store but before sales associates went home
24  when you had duties that required you to be on the
25  telephone to talk with customers or other managers

Page 38

1  lower level and went out into the Galleria Mall.
2    Q.  And on occasion did you perform those
3  inspections?
4    A.  Yes.
5    Q.  And I want to focus just on the inspection
6  part itself.  What would typically -- what would
7  you typically do to performing that inspection?
8    A.  Basically you'd look into any packages or
9  bags or anything of that nature where some
10  merchandise could be concealed.  Basically that's
11  what you were looking for, something of that
12  nature.  If somebody made a purchase, check the
13  receipt or something of that type.
14    Q.  Could you describe the process that a
15  sales associate typically went through at the end
16  of the day when you or someone else indicated that
17  their department was clean and ready and they were
18  permitted to leave?
19    A.  Well, from my area they would go
20  downstairs to the employee lockers where they keep
21  their belongings, gathered their things, and,
22  actually, they should have clocked out prior to
23  that point, then go get their things and wait for
24  a manager to release them, follow the inspection,
25  the loss prevention inspection.

Page 40

1  or people from Polo?
2    A.  Not a requirement.  Nothing was done on a
3  regular basis.  It could happen.  It wasn't
4  necessarily something you had to do on a regular
5  basis.
6    Q.  What did Tin Hong Hua typically do during
7  the shutdown process?
8    A.  You know, I don't know what exactly he was
9  doing.  I was upstairs, and he most of the time
10  would be in his office which is in the lower
11  level.  When he was there at closing, he would
12  often do that shutdown transmittal, you know, that
13  sort of thing.  He'd shut down the store.
14    Q.  I want to talk about the loss prevention
15  inspections.
16        You indicated that managers would check
17  bags and belongings of individuals before they
18  left the store.
19    A.  (Nodding head.)
20    Q.  Yes?  Is that a yes?
21    A.  That is correct, yes.
22    Q.  And was there a specific entrance/exit
23  that employees were required to use at the end of
24  the business day?
25    A.  Yes.  The employee entrance was in the

Page 39

1    Q.  And how would sales associates typically
2  notify a manager that they were ready to have a
3  loss prevention inspection performed?
4    A.  Well, sometimes they would call.  There
5  was a phone right there near that or very near to
6  that door.
7        My understanding was that was a location
8  where there was at one time a loss prevention
9  person, but then that was a position that no
10  longer existed when I started working there, but,
11  at any rate, there was a telephone call there, and
12  they would call and say "We're waiting."
13    Q.  Would they call different departments?
14    A.  Yeah, trying to track down a manager.
15    Q.  Would they sometimes page a manager over
16  the PA system?
17    A.  Same system, yeah.
18    Q.  And when you heard a page, what typically
19  would people say over the PA system?
20    A.  Basically just to let you know that they
21  were waiting to be allowed to leave.
22    Q.  And were there occasions when you heard
23  more than one page asking for a manager at the
24  close of the business day?
25    A.  Yes.

Page 41

11 (Pages 38 to 41)

certcert

1      I further certify that the signature to the

2    foregoing deposition was not waived by counsel for

3    the respective parties.

4      I further certify that the taking of this

5    deposition was pursuant to subpoena, and that

6    there were present at the deposition the attorneys

7    hereinbefore mentioned.

8      I further certify that I am not counsel for

9    nor in any way related to the parties to this

10    suit, nor am I in any way interested in the

11    outcome thereof.

12    IN TESTIMONY WHEREOF:   I have hereunto set my

13    hand and affixed my notarial seal this 7th day of

14    May, 2008.

15

16

17

18

19      Cynthia J. Conforti, CSR, CRR

20      Notary Public, Cook County, Illinois

21

22   CSR License No. 084-003064

23

24

25

EXHIBIT 46.

**Golden Gate Reporting**

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN FRANCISCO DIVISION

 4

 5    ANN OTSUKA, an individual; JANIS      No. C-07-02780-SI
      KEEFE, an individual; CORINNE
 6    PHIPPS, an individual; and
      JUSTIN KISER, an individual;
 7    individually and on behalf of
      all others similarly situated,
 8
                      Plaintiffs,
 9        vs.

10    POLO RALPH LAUREN CORPORATION;
      a Delaware Corporation; POLO
11    RETAIL, LLC, a Delaware Corporation;
      POLO RALPH LAUREN CORPORATION, a
12    Delaware Corporation, doing business
      in California as POLO RETAIL CORP;
13    FASHIONS OUTLET OF AMERICA, INC., a
      Delaware Corporation and DOES 1-500,
14    inclusive,

15                    Defendants.
                                          /
16

17

                DEPOSITION OF ROSALINDA WALLWORK
18

19

20        DATE:            November 13, 2007

          TIME:            10:02 a.m.
21
          LOCATION:        1900 University Avenue
22                         Fifth Floor
                           East Palo Alto, California
23
          REPORTED BY:     Mary E. Garland
24                         Certified Shorthand Reporter
                           License Number 4721
25
```

Page 1

**Golden Gate Reporting**

1 reporting of the day is done in the back. I mean,
2 there's no way to do it anywhere else.
3    Q. During that time period when you were a key
4 holder, was one of your duties to close down the
5 registers within the store?
6    A. Yes. Yes.
7    Q. And how many registers would you close down
8 when you were doing that function?
9    A. About six. But most of the time, it was two,
10 because that's how many were in my department.
11    Q. And how long would it take you to close down
12 the two registers?
13    A. Ten, 15 minutes.
14    Q. Ten or 15 minutes?
15    A. Mm-hm.
16    Q. When you were closing the registers in your
17 department, was that during a time when the other sales
18 associates were performing other assignments, or were
19 they gone by that time?
20    A. No. They would stay and fold. It depends on
21 which department, because I worked in two. In one, the
22 closing was pretty quickly. So if we closed at six,
23 most of the time, they'd be gone before I even finished
24 closing the register, so.
25    Q. At some point, you left the Women's, Ladies'

Page 54

1 department.
2    Q. I forgot to ask one question back when you were
3 a key holder in the Women's or Ladies' department. How
4 long was your typical day during that time period?
5    A. Long. About maybe six, six or seven -- no.
6 Wait. We would start at eight and we'd leave there at
7 six, six or seven. So typically, 11, 11 hours or ten.
8    Q. As a key holder, were you paid an hourly wage?
9    A. Yes.
10    Q. Did you receive premium overtime compensation
11 for working more than eight hours in a specific day?
12    A. Yes.
13    Q. So premium being you would get time and a half,
14 1.5 times your hourly rate?
15    A. I don't remember the specifics of it or how it
16 was paid, but I did receive overtime if I worked.
17    Q. Do you recall, the overtime, if you worked more
18 eight hours in a day, was that overtime more than your
19 regular hourly rate or the same as your regular hourly
20 rate?
21    A. I don't remember how that was paid out. I know
22 it sounds really strange, but I don't remember even
23 looking at my paychecks. I get direct deposit, so I
24 never really saw them.
25    Q. When you began working in the Men's Sports

Page 56

1 department to work in the Men's Sports department; is
2 that correct?
3    A. Yes.
4    Q. How long were you in the Ladies' department,
5 approximately?
6    A. I was there twice, so.
7    Q. Why don't you give me kind of a chronology --
8    A. Okay.
9    Q. -- of your movement within the Polo store in
10 San Francisco.
11    A. I worked in the Women's department for roughly
12 about maybe four months, four or five months, moved up
13 to Polo Sport, different department; and then eventually
14 came back down and worked in Women's again.
15    So it's hard to say the time that I was --
16    Q. When you went to Men's Sports, were you
17 promoted to assistant manager of the department?
18    A. Yes.
19    Q. And as assistant manager, did you take on
20 additional responsibilities?
21    A. Yes.
22    Q. And what other responsibilities did you take on
23 as assistant manager of Men's Sports?
24    A. Well, I managed the people that worked in that
25 department, reporting, sales; pretty much running the

Page 55

1 department as an assistant manager, were you still being
2 paid on an hourly basis?
3    A. I was on salary.
4    Q. And typically, how long were your days when you
5 were on salary as an assistant manager?
6    A. Pretty much the same. I'd start at eight, till
7 about six.
8    Q. Did Tin Hua ever ask you to wait after your
9 duties were completed for that day, so that you could do
10 a loss prevention inspection of him when he left the
11 store later?
12    A. Yes.
13    Q. Did that happen quite often?
14    A. Yes.
15    Q. And sometimes did that take more than an hour,
16 when you were waiting for him to be ready to leave?
17    A. Not -- I mean, it had happened a couple times,
18 but it wasn't -- I mean, it wasn't normal practice that
19 we would wait there.
20    Q. During the time that you were a key holder,
21 you were still required to undergo loss prevention
22 inspections when you left the building; correct?
23    A. Yes.
24    Q. And also when you were an assistant manager,
25 you were required to undergo loss prevention

Page 57

15 (Pages 54 to 57)

CERTIFICATION OF DEPOSITION OFFICER

I, MARY E. GARLAND, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was thereafter transcribed by means of computer-aided transcription under my direction; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed November 26, 2007, at San Francisco, California.

_____
MARY E. GARLAND, CSR 4721

EXHIBIT 47.



1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION
------------------------------------------x
ANN OTSUKA, an individual; JANIS KEEFE, an
individual; CORINNE PHIPPS, an individual;
JUSTIN KISER, an individual; individually and
on behalf of all others similarly situated, and
RENEE DAVIS, an individual; individually and on
behalf of all others similarly situated,

                    Plaintiffs,

    -against-

POLO RALPH LAUREN CORPORATION; a Delaware
Corporation; POLO RETAIL, LLC., a Delaware
Corporation; POLO RALPH LAUREN CORPORATION, a
Delaware Corporation, doing business in
California as POLO RETAIL CORP; FASHIONS OUTLET
OF AMERICA, INC., a Delaware Corporation,

                    Defendants,
Case No.:  C-07-02780-SI
------------------------------------------x

                    200 Park Avenue
                    New York, New York

                    December 4, 2007
                    10:18 a.m.


        Videotaped Deposition of JUSTIN KISER,

pursuant to notice, before Sophie Nolan, a

Notary Public of the State of New York.




        ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
              New York, New York  10022
                    212-750-6434
                    Ref: 86114

251

1                        KISER

2        A.      Yeah.  I mean not at the exact same

3    time, but, yeah.  We wanted to get out of

4    there, so pretty much yes.

5        Q.      Okay.  And then was the bag check

6    performed at that time?

7        A.      No, not right when we got down

8    there.

9        Q.      Okay.  So, you've been in the

10   store, you said for up to two hours past your

11   scheduled time of 7 o'clock.  It's 9 o'clock

12   now.  You get down to the door and what do you

13   do there?

14       A.      We have to page a manager to come

15   and let us out.

16       Q.      But hasn't the manager just told

17   you that the department is okay and you can go?

18       A.      Yeah, but he's up looking at other

19   floors or he's looking at the numbers, or she

20   is.  They're doing numerous things.  They've

21   never followed us down once.

22       Q.      But are there other managers in the

23   store?

24       A.      There are, but that's why -- a

25   manager couldn't leave alone so there would

324

C E R T I F I C A T E

STATE OF NEW YORK    )
                     )ss.:
COUNTY OF NEW YORK   )


          I, SOPHIE NOLAN, a Notary Public

    within and for the State of New York, do

    hereby certify:

          That JUSTIN KISER, the witness

    whose deposition is herein before set forth,

    was duly sworn by me and that such deposition

    is a true record of the testimony given by

    such witness.

          I further certify that I am

    not related to any of the parties to this

    action by blood or marriage; and that I am in

    no way interested in the outcome of this

    matter.

          IN WITNESS WHEREOF, I have

    hereunto set my hand this 17th day of December,

    2007.


                         *Sophie Nolan*

                         SOPHIE NOLAN

EXHIBIT 48.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ANN OTSUKA, an individual,

et al.,

**CERTIFIED COPY**

Plaintiffs,

vs.                              No. C-07-02780-SI

POLO RALPH LAUREN CORPORATION,

et al.,

Defendants.

_____/

Videotaped Deposition of

**JANIS KEEFE**

Monday, March 17, 2008

Reported by:
IRIS MEINKE-SMITH, RMR/CRR
CSR No. 3798
Job No. 18235LR



**PHILLIPS LEGAL SERVICES**
SAN FRANCISCO DEPOSITION REPORTERS
795 FOLSOM STREET, FIRST FLOOR
SAN FRANCISCO, CA 94107
1-888-333-8270
WWW.PHILLIPSDEPO.COM

1    Kristi's office?

2    A.        Well, sometimes I was told to clock out

3    there because I would tell them that there was no

4    register to clock out in.

01:43:11 5    Q.        And then would your normal practice be to

6    call -- well, strike that.

7              Would your normal practice be to call a

8    manager before you clocked out or after you clocked

9    out to be allowed to exit through the employee exit

01:43:32 10    at the rear of the property?

11    A.        After we clocked out.

12    Q.        And what process or procedure did you use to

13    contact someone who was authorized to perform the

14    loss prevention search?

01:43:48 15    A.        If there was a manager there to relieve you

16    for your shift, then they were usually aware that

17    there was people at the door waiting.  If there was

18    no one at the door, or a manager that wasn't there

19    when your shift was over, then you would have to page

01:44:07 20    a manager using the phone, the intercom.

21    Q.        So on occasion -- I'm going to ask for some

22    quantification, but let's ignore the quantification

23    for a moment.

24              On occasions a manager would be at the door

01:44:29 25    doing loss prevention searches for others such as

106

1    yourself departing the store at the end of the day?

2    A.      On some occasions.

3    Q.      So I take it what you say is on the majority

4    of occasions you needed to page a manager to conduct

01:44:46 5   this search before you departed?

6    A.      Yes.

7    Q.      And let me -- I want to come back to this in

8    a minute, but I want to go to departing the store for

9    lunch breaks.

01:45:25 10         Would you use the same procedure to depart

11   the store for lunch breaks as you used to exit at the

12   end of the day?

13         You would clock out, go to the employee

14   exit, and either a manager there or call a manager,

01:45:40 15  and then he or she would do the search and let you

16   out?

17   A.      Yes.

18   Q.      Okay.   In response to a question a minute

19   ago you indicated that -- I think the phrase you

01:46:08 20  used, on some occasions a manager was there to

21   perform the loss prevention search after I clocked

22   out, walked to the door and he or she performed a

23   loss prevention search on exit, but you said on most

24   occasions I had to page someone.   Is that -- am I

01:46:24 25  getting that right?

107

REPORTER'S CERTIFICATE

1

2          I certify that the foregoing proceedings in

3   the within-entitled cause were reported at the time

4   and place therein named; that said proceedings were

5   reported by me, a duly Certified Shorthand Reporter

6   of the State of California authorized to administer

7   oaths and affirmations, and were thereafter

8   transcribed into typewriting.

9          I further certify that I am not of counsel

10  or attorney for either or any of the parties to said

11  cause of action, nor in any way interested in the

12  outcome of the cause named in said cause of action.

13         IN WITNESS WHEREOF, I have hereunto set my

14  hand this 1st day of April, 2008.

15

16  _____

17  IRIS MEINKE-SMITH, CA CSR No.3798
    Registered Merit Reporter
18  Certified Realtime Reporter

19

20

21

22

23

24

25
                                          150

.

EXHIBIT 49.

```
 1                  UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN FRANCISCO DIVISION

 4

 5   ANN OTSUKA, an individual;
     JANIS KEEFE, an individual;
 6   CORINNE PHIPPS, an individual;
     and JUSTIN KISER, an individual;
 7   individually and on behalf of
     all others similarly situated,

 8
                  Plaintiffs,
 9                                      Case No. c-07-02780-SI
     and
10
     POLO RALPH LAUREN CORPORATION,
11   a Delaware corporation; POLO
     RETAIL, LLC, a Delaware corporation;
12   POLO RALPH LAUREN CORPORATION, a
     Delaware corporation, doing
13   business in California as POLO
     RETAIL CORP; FASHIONS OUTLET OF
14   AMERICA, INC., a Delaware
     corporation; and DOES 1-500,
15   inclusive,

16                Defendants.
     _____/
17

18              DEPOSITION OF THERESA CRUZ

19   DATE:         August 20, 2007

20   TIME:         10:00 a.m.

21   LOCATION:     LAW OFFICE OF PATRICK R. KITCHIN
                   565 Commercial Street
22                 Fourth Floor
                   San Francisco, California 94111
23

24   REPORTED BY:  Katy Leonard
                   Certified Shorthand Reporter
25                 License Number 11599
```

Page 1

**Golden Gate Reporting**

1  five seconds. How fast a person can walk.
2      Q. And earlier, you talked about paging.
3      A. Yes.
4      Q. Now, what did you mean exactly by that --
5  paging?
6      A. They're paging the manager.
7      Q. How many --
8      A. We have an intercom. And then they call the
9  manager to the back door, or "Manager, please call 200."
10 The 200 is the telephone extension at the back door.
11     Q. Do they ask for a specific manager?
12     A. No. They just say, in general, "manager,"
13 so whoever responds right away.
14     Q. How would you know whether you would go or
15 whether someone else would go?
16     A. I will call that extension and someone will
17 pick up from that extension and say, Oh, someone is
18 coming to check us out already, or, So-and-so department
19 manager already called us.
20     Q. And has the checkout procedure you just
21 described -- has it been the same since you've been
22 working there?
23     A. Yes.
24     Q. And you began working there in 1994; is that
25 correct?

Page 254

1      A. Yes, there is. With the Polo Sport
2  department. The Polo Sport department.
3      Q. I don't understand.
4      A. In the Polo Sport department, they do
5  communicate with their coworkers who goes first.
6  Like, between twelve o'clock, one o'clock, two o'clock,
7  and three o'clock.
8      Q. So, there was a schedule that reflected --
9  there was a schedule for all the employees; is that
10 correct?
11     A. It's not a formal document, but they just
12 write it on a piece of paper, who goes first and who
13 goes second. Who's next.
14     Q. So, there was a set time for each employee
15 to take a certain meal period; is that correct?
16     A. Yes.
17     Q. And was it your responsibility to make sure
18 that they took their meal periods?
19     A. No.
20     Q. Whose responsibility was it?
21     A. Um, it's the responsibility of the sales
22 associate.
23     Q. And to the -- well, let me move on to rest
24 periods for a second.
25       Was there a time set for rest periods?

Page 256

1      A. Yes.
2      THE WITNESS: Is there construction in the
3  building, or outside?
4      MR. KITCHIN: There's a building next door.
5  BY MR. KIM:
6      Q. And how long did the inspections take,
7  typically?
8      MR. GOINES: Are you talking about how long the
9  physical inspection of the bag took?
10     MR. KIM: Physical inspection of the bag.
11     THE WITNESS: The bag check?
12     MR. KIM: Yes.
13     THE WITNESS: It will take two seconds, unless
14 you have other shopping bags with you that you went
15 shopping, of course it will take about another two
16 seconds to check that.
17 BY MR. KIM:
18     Q. Okay. Let me ask you some questions about
19 meal and rest periods.
20       Was there a time set for the meal period?
21     A. No.
22       For meal period? You mean --
23     Q. Yeah.
24     A. Oh, the lunch break?
25     Q. For lunch break. Yeah.

Page 255

1      A. For the 15-minute break?
2      Q. Yes.
3      A. No.
4      Q. Now, whose responsibility was it to make
5  sure that the employees took their rest periods?
6      A. It's the responsibility of the sales
7  associate.
8      Q. Okay. Do you know if they took their rest
9  periods?
10     A. I would know if I see them, which is -- the
11 break room is right across from my office.
12     Q. So, let's be specific about the time period.
13     A. Yes.
14     Q. 2002 until now, do you know if your
15 employees took rest periods?
16     A. Not all of them.
17     Q. Not all of them took rest periods?
18     A. No.
19     Q. Do you know why?
20     A. It all depends with the sales associate.
21 I'm only there to remind them once or twice. I will
22 remind them, but I will not obligated -- I will not
23 obligate them to take their meals, especially if they're
24 working with their clients.
25     Q. Okay. How do you know that they didn't take

Page 257

65 (Pages 254 to 257)

**Golden Gate Reporting**

1              CERTIFICATION OF DEPOSITION OFFICER

2

3              I, KATY LEONARD, duly authorized to

4    administer oaths pursuant to Section 2093(b) of the

5    California Code of Civil Procedure, hereby certify that

6    the witness in the foregoing deposition was by me sworn

7    to testify to the truth, the whole truth and nothing but

8    the truth in the within-entitled cause; that said

9    deposition was taken at the time and place therein

10   stated; that the testimony of the said witness was

11   thereafter transcribed by means of computer-aided

12   transcription; that the foregoing is a full, complete

13   and true record of said testimony; and that the witness

14   was given an opportunity to read and correct said

15   deposition and to subscribe the same.

16              I further certify that I am not of counsel

17   or attorney for either or any of the parties in the

18   foregoing deposition and caption named, or in any way

19   interested in the outcome of this cause named in said

20   caption.

21

22

23

24

25              KATY LEONARD, CSR 11599

Page 261

EXHIBIT 50.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


ANN OTSUKA, an individual,

et al.,                                  **CERTIFIED COPY**

                 Plaintiffs,

       vs.                           No. C-07-02780-SI

POLO RALPH LAUREN CORPORATION,

et al.,

                 Defendants.

_____/


Videotaped Deposition of

**RENEE DAVIS**

Wednesday, March 19, 2008


Reported by:
IRIS MEINKE-SMITH, RMR/CRR
CSR No. 3798
Job No. 18236LR




**PHILLIPS LEGAL SERVICES**
SAN FRANCISCO DEPOSITION REPORTERS
795 FOLSOM STREET, FIRST FLOOR
SAN FRANCISCO, CA 94107
(888) 333.8270
(800) 455-8030 fax
WWW.PHILLIPSDEPO.COM

1    to understand is -- let me read something to you.

2    A.        Okay.

3    Q.        This is from the third amended complaint.

4    And it says, "When Ms. Davis worked the closing shift

12:00:57 5    defendants, managers locked the store's exit door and

6    then required Ms. Davis to clock out and wait at the

7    store exit for a manager to check her person and

8    personal effects to ensure she and the other

9    employees were not attempting to steal merchandise.

12:01:13 10    She was regularly required to wait ten to 15 minutes

11    for the inspections after she had clocked out and was

12    never compensated for that time."

13          That's what has been filed with the court.

14    And what I want to understand is, was it every day

12:01:34 15    you waited ten to 15 minutes or -- I'm trying to

16    understand with what level, what the normal checkout

17    procedure was.  Was there -- I'm just trying to

18    understand the bases for what I've just read to you.

19    A.        It didn't happen every day, but usually at

12:01:55 20    closing time you're down to usually one manager, and

21    that manager is in the back counting the tills.  And

22    he's the one who has to search you and -- before you

23    can leave.

24          So at 10 o'clock when we're closing, you

12:02:10 25    know, they've pulled the tills and they're in the

75

1   back counting the tills. And after maybe 15 minutes,

2   you know, if not myself, somebody else would call and

3   say, "Hey, you know, can somebody just let us out?"

4          "Well, I'm busy. I can't leave the till,"

12:02:24 5   that type of thing. Or "I'm on the phone." And...

6   Q.      So I'm -- I'm really -- I'm not trying to

7   put words in your mouth, but what I'm trying to

8   understand is, was the issue of waiting more than a

9   couple of minutes --

12:02:36 10  A.      Yes.

11  Q.      -- I'll get to that in a minute, normally,

12  usually at the closing shift?

13  A.      Yes.

14  Q.      At the nonclosing shift, so when you didn't

12:02:45 15  work a closing shift, because we had these staggered

16  shifts, was there a normal amount of time that you

17  would wait between clock-out, go get your coat, your

18  bags, your goods and have someone check you out?

19  A.      Maybe five or ten minutes.

12:02:59 20  Q.      So every -- in my understanding, at the end

21  of every shift, on a daily basis, regardless of the

22  end of the shift, you waited five to ten minutes to

23  be --

24  A.      Yes.

12:03:11 25  Q.      -- to have a loss prevention search?

76

REPORTER'S CERTIFICATE

1

2       I certify that the foregoing proceedings in

3  the within-entitled cause were reported at the time

4  and place therein named; that said proceedings were

5  reported by me, a duly Certified Shorthand Reporter

6  of the State of California authorized to administer

7  oaths and affirmations, and were thereafter

8  transcribed into typewriting.

9       I further certify that I am not of counsel

10  or attorney for either or any of the parties to said

11  cause of action, nor in any way interested in the

12  outcome of the cause named in said cause of action.

13       IN WITNESS WHEREOF, I have hereunto set my

14  hand this 4th day of April, 2008.

15

16       _____ _Iris Meinke-Smith_ _____

17       IRIS MEINKE-SMITH, CA CSR No.3798
         Registered Merit Reporter
18       Certified Realtime Reporter

19

20

21

22

23

24

25                                                    122

EXHIBIT 51.

**Golden Gate Reporting**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN FRANCISCO DIVISION

 4

 5   ANN OTSUKA, an individual;      )
     JANIS KEEFE, an individual,     )
 6   CORINNE PHIPPS, an              )
     individual; and RENEE DAVIS,    )
 7   an individual; individually     )
     and on behalf of all others     )
 8   similarly situated,             )
              Plaintiffs,            )
 9                                   )
10      -vs-                         )   No. C-07-02780-SI
                                     )
11                                   )
                                     )
12   POLO RALPH LAUREN CORPORATION;  )
     a Delaware Corporation; POLO    )
13   RETAIL, LLC., a Delaware        )
     Corporation, POLO RALPH LAUREN  )
14   CORPORATION, a Delaware         )
     Corporation, doing business in  )
15   California as POLO RETAIL       )
     CORP; FASHIONS OUTLET OF        )
16   AMERICA, INC., a Delaware       )
     Corporation,                    )
17            Defendants.            )
                                     )
18   _____)

19

20            The deposition of HARVEY RESNICK, called
     by the Plaintiffs for examination, pursuant to
21   subpoena and pursuant to the Federal Rules of
     Civil Procedure for the United States District
22   Courts pertaining to the taking of depositions,
     taken before Cynthia J. Conforti, Certified
23   Shorthand Reporter, at Suite 2500, 77 West Wacker
     Drive, Chicago, Illinois, commencing at the hour
24   of 10:09 a.m. on the 23rd day of April, A.D.,
25   2008.
```

Page 1

# Golden Gate Reporting

**Page 126**

```
 1  five-minute break.
 2       (Whereupon a recess was had from
 3       2:04 p.m. to 2:10 p.m.)
 4           REDIRECT EXAMINATION
 5  BY MR. KITCHIN:
 6   Q.  Just a couple clarification questions
 7  follow-up.
 8       Did you ever respond to a call or a page
 9  for the employee exit that you responded to to
10  conduct the inspection to find that Tin Hua was in
11  his office on the telephone or otherwise engaged?
12   A.  It's highly possible, but I can't say for
13  certain. I don't remember a specific incident.
14   Q.  Did you ever respond to a call or page to
15  find Theresa Cruz in her office engaged in
16  something other than --
17   A.  Not to my knowledge. It was not uncommon
18  at the end of the workday when we were going
19  through that process for Tin to be talking to a
20  manager from one of the other stores as I recall.
21       So if that -- I mean if that's what you're
22  referencing where he did do some business phone
23  call at that time of the day after hours, in fact
24  there was a time when he was responsible for the
25  Hawaii stores or something like that that he may
```

**Page 127**

```
 1  have been on the phone and not been able to come
 2  to the door.
 3   Q.  Did you ever hear any complaints by anyone
 4  at Polo about Tin Hua's responsiveness or lack of
 5  responsiveness to pages for loss prevention
 6  inspections?
 7   A.  No.
 8   Q.  Did you ever hear anyone complain about
 9  Theresa Cruz' lack of responsiveness to pages or
10  calls for loss prevention inspections?
11   A.  In that sort of general conversation way,
12  that, you know, as I said earlier, a lot of things
13  were said by people on the sales floor in retail
14  stores, and it wasn't uncommon for the staff to be
15  a little more critical of Theresa than they were
16  of Tin.
17   Q.  You have a general recollection of one or
18  more people complaining about Theresa Cruz'
19  failure to promptly respond to requests to perform
20  loss prevention inspections?
21   A.  I don't have a specific recollection.
22   Q.  Do you have a general recollection of
23  that --
24   A.  Yeah.
25   Q.  -- that type of discussion?
```

**Page 128**

```
 1       Same question with respect to Valerie
 2  Harris. Ever hear any complaint that she was not
 3  very responsive to calls?
 4   A.  Yes.
 5   Q.  Do you remember who you heard that from?
 6   A.  No.
 7   Q.  Now, Mr. Goines asked you some questions
 8  about how long it took you at times to get from
 9  your department to the back door.
10       On those occasions when you heard a page
11  but you didn't respond to it knowing that there
12  was another manager closer, did you ever learn on
13  any of those occasions how long the individuals
14  had been waiting at the back door before they were
15  inspected and released?
16   A.  If I follow what you're saying is that I
17  didn't respond to a page and ultimately later did?
18   Q.  No --
19   A.  -- and somebody else did not and they
20  waited a long time?
21   Q.  No. Let me ask it this way:
22       There were occasions when you heard a page
23  for a manager to the back door --
24   A.  Yes.
25   Q.  -- when you didn't respond to that page.
```

**Page 129**

```
 1   A.  That's correct, yes.
 2   Q.  And sometimes you heard more than one page
 3  for a manager to the back door on a single
 4  evening, correct?
 5   A.  Yes.
 6   Q.  And on those occasions when you didn't go
 7  down to do the loss prevention inspection but
 8  apparently someone else did, did you ever learn
 9  how long those individuals claimed that they had
10  waited for a loss prevention inspection?
11   A.  Again, this would be a generalization.
12       There was always remarks being made, "Oh,
13  we waited 10 minutes, we waited five," that sort
14  thing, but did anybody specifically say, "I waited
15  20 minutes tonight for Theresa to come to the
16  door," no, I don't think so.
17   Q.  Individuals. Okay.
18       Was there a general kind of perspective
19  that managers developed at the San Francisco Polo
20  store with respect to loss prevention inspections
21  that it was too burdensome to be running back to
22  the back door to let a single individual out, now
23  two people out, now five people out, now one
24  person out?
25   A.  Sure. It was a feeling that people had,
```

33 (Pages 126 to 129)

**Golden Gate Reporting**

1 but I don't think that they purposely acted on it
2 to make people wait intentionally. I think the
3 waiting was often just a product of what was going
4 on.
5 You were busy, you're doing things.
6 Sometimes I would go down to let people
7 out, and no sooner would I be at the top of the
8 stairs when another page would come.
9 I really don't think the managers
10 calculated among them as a group, "We are going to
11 make them wait." I don't think that was ever a
12 plan.
13 Q. Well, that's not what I'm suggesting or
14 asking.
15 I'm just wondering if there was kind of a
16 custom and practice that developed such that if
17 managers heard one person requesting a loss
18 prevention inspection and knew that there were
19 others that were going to be coming right behind
20 them that they would wait until the other people
21 had collected their things before going from one
22 part of the store to the employee exit.
23 A. It's possible.
24 Q. Did you kind of develop that kind of
25 custom and practice, that if you're letting one

Page 130

1 A. Yes.
2 Q. So other than your observations and what
3 you heard from sales associates, do you have any
4 idea as to how long other sales associates within
5 the store were required to wait?
6 A. Do I have any idea how long? Just that,
7 you know, that same thing that I've been saying.
8 Conversation might be the next day or two days
9 later, "Do you know how long we waited to get out
10 of here the other night? 10 minutes, 15 minutes."
11 Just that type of a conversation, not, you know, a
12 specific, "Harvey, I need to talk to you. Here's
13 what happened last night." Nobody ever did that.
14 MR. KITCHIN: Okay. Those are all the
15 questions I think I have.
16 MR. GOINES: I'm done. Thank you.
17 MR. KITCHIN: Off the record.
18 (Whereupon a discussion was had
19 off the record.)
20 (Whereupon signature was
21 reserved.)
22 (The deposition was concluded at
23 2:18 p.m.)
24 (Exhibit 73 retained by the
25 court reporter.)

Page 132

1 person go from your department as you described to
2 Mr. Goines and knew that you were letting other
3 people go within a matter of 10 or 15 minutes that
4 you would wait until you let the other people
5 leave before you went down to perform the loss
6 prevention inspection?
7 A. Personally I would not have done that.
8 Q. Had you heard that other managers were
9 doing something like that?
10 A. No. It's hard to, you know, to account
11 for what was happening at one end of the store on
12 a floor below you in terms of the proximity of a
13 manager to the door when the page comes through,
14 and it's not possible for me to know if somebody
15 chose not to respond.
16 Q. Now, your knowledge of how long people
17 were waiting at the back door for a loss
18 prevention inspection is based on two different
19 things.
20 One, your experience doing the loss
21 prevention inspection and having people tell you
22 at that time how long they had been waiting, and,
23 two, hearing sales associates in other contexts
24 tell you that they had waited for a certain amount
25 of time for loss prevention inspection?

Page 131

1        IN THE UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
2             SAN FRANCISCO DIVISION
3 ANN OTSUKA, an individual;  )
  et al.,                     )
4       Plaintiffs,           )
5                             )
  -vs-                        ) No. C-07-02780-SI
6                             )
7 POLO RALPH LAUREN CORPORATION;)
  et al.,                     )
8       Defendants.           )
9 _____)
10
11
12 I, HARVEY RESNICK, being first duly
   sworn, on oath, say that I am the deponent in the
13 aforesaid deposition, that I have read the
   foregoing transcript of my deposition taken April
14 23, 2008, consisting of Pages 1 through 136
   inclusive, taken at the aforesaid time and place
15 and that the foregoing is a true and correct
   transcript of my testimony so given.
16
17 _____ Corrections have been submitted
        No corrections have been
18 submitted
19
20 _____
21 HARVEY RESNICK, Deponent
22
23 SUBSCRIBED AND SWORN TO
   before me this _____ day
24 of _____ A.D., 2008.
25 Notary Public

Page 133

34 (Pages 130 to 133)

certcert

1    I further certify that the signature to the

2    foregoing deposition was not waived by counsel for

3    the respective parties.

4    I further certify that the taking of this

5    deposition was pursuant to subpoena, and that

6    there were present at the deposition the attorneys

7    hereinbefore mentioned.

8    I further certify that I am not counsel for

9    nor in any way related to the parties to this

10    suit, nor am I in any way interested in the

11    outcome thereof.

12    IN TESTIMONY WHEREOF:    I have hereunto set my

13    hand and affixed my notarial seal this 7th day of

14    May, 2008.

15

16

17

18

19    Cynthia J. Conforti, CSR, CRR

20    Notary Public, Cook County, Illinois

21

22    CSR License No. 084-003064

23

24

25

EXHIBIT 52.



1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION
----------------------------------------x
ANN OTSUKA, an individual; JANIS KEEFE, an
individual; CORINNE PHIPPS, an individual;
JUSTIN KISER, an individual; individually and
on behalf of all others similarly situated, and
RENEE DAVIS, an individual; individually and on
behalf of all others similarly situated,

Plaintiffs,

-against-

POLO RALPH LAUREN CORPORATION; a Delaware
Corporation; POLO RETAIL, LLC., a Delaware
Corporation; POLO RALPH LAUREN CORPORATION, a
Delaware Corporation, doing business in
California as POLO RETAIL CORP; FASHIONS OUTLET
OF AMERICA, INC., a Delaware Corporation,

Defendants,

Case No.:   C-07-02780-SI
----------------------------------------x


                    200 Park Avenue
                    New York, New York

                    December 4, 2007
                    10:18 a.m.


        Videotaped Deposition of JUSTIN KISER,

pursuant to notice, before Sophie Nolan, a

Notary Public of the State of New York.




        ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
              New York, New York  10022
                    212-750-6434
                    Ref: 86114

255

1                          KISER

2    the other nights of the week?

3          A.    It may have been Valerie, it may

4    have been Tin and it may have been Theresa.

5          Q.    Okay.  Were they equally the other

6    managers or was -- did you have more among

7    them?

8          A.    That was mainly them.  Harvey would

9    also.

10         Q.    Okay.

11         A.    And so would David when he came

12   aboard.

13         Q.    So you didn't have one manager more

14   likely to perform the bag check than any other

15   manager?

16         A.    No, no.

17         Q.    What about the time it took you to

18   get your -- get checked out for these other

19   managers?

20         A.    Valerie was probably the longest.

21         Q.    How long was that on average?

22         A.    I don't know, 20 -- 15, 20 minutes,

23   up to half an hour maybe.

24         Q.    Okay, what about Tin?

25         A.    Tin would sometimes say, "Can't you

256

                              KISER

1     call another manager on duty because I'm in a

2     meeting" or "I'm busy right now" or he would

3     come and check, but it was maybe probably on

4     average 15 minutes later.  I mean, it wasn't

5     like they ran over to do it.

6         Q.    What about Theresa?

7         A.    Theresa was usually on the earliest

8     of trying to get out of there, but she would

9     sometimes do it late when Tin was there

10    checking us out.  So it would take her a while

11    because she was doing some closing procedures

12    on the first floor so she was probably on

13    average 15 to 20 minutes.

14        Q.    What about Harvey?

15        A.    He was -- he took a while too.

16        Q.    Well, wasn't he in the department

17    with you?

18        A.    He was, but Tin would go and point

19    little things out to him after we were already

20    down there, Tin was up there with him going,

21    well, this really doesn't look right, this,

22    this, this and this and, so, they were like

23    having their own little walk through while we

24    were waiting to be checked out.

324

1                    C E R T I F I C A T E

2

3    STATE OF NEW YORK    )

4                              )ss.:

5    COUNTY OF NEW YORK    )

6

7              I, SOPHIE NOLAN, a Notary Public

8    within and for the State of New York, do

9    hereby certify:

10              That JUSTIN KISER, the witness

11    whose deposition is herein before set forth,

12    was duly sworn by me and that such deposition

13    is a true record of the testimony given by

14    such witness.

15              I further certify that I am

16    not related to any of the parties to this

17    action by blood or marriage; and that I am in

18    no way interested in the outcome of this

19    matter.

20              IN WITNESS WHEREOF, I have

21    hereunto set my hand this 17th day of December,

22    2007.

23

24                    _Sophie Nolan_

25                    SOPHIE NOLAN

EXHIBIT 53.

**Golden Gate Reporting**

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

5   ANN OTSUKA, an individual; JANIS      No. C-07-02780-SI
    KEEFE, an individual; CORINNE
6   PHIPPS, an individual; and
    JUSTIN KISER, an individual;
7   individually and on behalf of
    all others similarly situated,

8                Plaintiffs,

9      vs.

10  POLO RALPH LAUREN CORPORATION;
    a Delaware Corporation; POLO
11  RETAIL, LLC, a Delaware Corporation;
    POLO RALPH LAUREN CORPORATION, a
12  Delaware Corporation, doing business
    in California as POLO RETAIL CORP;

13  FASHIONS OUTLET OF AMERICA, INC., a
    Delaware Corporation and DOES 1-500,
14  inclusive,

15                Defendants.
                                        /

16

17

            DEPOSITION OF ROSALINDA WALLWORK
18

19
        DATE:         November 13, 2007
20
        TIME:         10:02 a.m.
21
        LOCATION:     1900 University Avenue
22                    Fifth Floor
                      East Palo Alto, California
23
        REPORTED BY:  Mary E. Garland
24                    Certified Shorthand Reporter
                      License Number 4721
25

                                              Page 1

## Golden Gate Reporting

1    Q. Did you come to believe that the response time
2  of managers, other than yourself, was too slow to
3  requests to have bag checks performed?
4        MR. GOINES: Objection. Vague.
5        THE WITNESS: To get bag checks? I believe
6  that people got checked pretty -- I mean, in a pretty
7  reasonable time.
8    Q. BY MR. KITCHIN: The meetings in which the bag
9  check procedure was discussed, I think you said in
10  detail, did anyone suggest any different procedure to
11  follow to expedite the exit by sales associates?
12    A. I think we changed -- we changed the policy a
13  bit, where our stock supervisor would have access -- or
14  could check them out. Again, it was a complaint that
15  kept coming up. So that was one of the actions we took,
16  we gave Chris the authority to check people in and out.
17    Q. How late did Chris work on most days?
18    A. Till five.
19    Q. What time did sales associates generally leave
20  the building?
21    A. Six, 6:15, 6:30.
22    Q. So he wasn't there to check them out at the end
23  of their shift, but was there to check them out during
24  lunch breaks?
25    A. Yeah.

Page 122

1    A. Not sitting on the floor, but waiting by the
2  door.
3    Q. And any of those times you came and there was
4  more than one person waiting by the door, did any of
5  the sales associates tell you how long they had been
6  waiting?
7    A. Sometimes they would say they've been waiting
8  there forever, or they've been back there, I mean, not
9  specific times, but. When I was downstairs, it would
10  literally take 15, 20 minutes to close out the
11  department. So if anybody was working in any other
12  department and, say, they left at six, and I'm closing
13  out drawers or I'm doing management functions or money
14  functions, it would take about 15 minutes for me to go
15  from the back -- or from the department to the back.
16        So if they ever waited, it would have had to
17  have been maybe 15 minutes -- 15 to 20 minutes, if, in
18  fact, they were waiting that long. Because they would
19  have to get their coat, clock out, get their bag.
20        So many a time, it just seemed exaggerated, the
21  times that they said that they were waiting back there.
22  I mean, it became so that it just -- it was just not --
23  it didn't seem right that they had been waiting there
24  the time that they said. And it was always the same
25  people over, and over, and over again.

Page 124

1    Q. Was there any suggestion of any change in
2  procedure that dealt specifically with expediting the
3  exit of the building at the end of a sales associate's
4  work shift?
5    A. We tried so many different things. I mean, we
6  opened up the Home department for people to come back
7  in, if they were coming back from their lunches, so they
8  wouldn't have to wait. On Sundays, we let people go
9  through Polo Sport, which is -- because the rest of the
10  mall is closed. So, I mean, there were many ways to
11  enter and leave the building.
12    Q. But were there any proposed changes to the
13  practices or policies that related specifically to
14  exiting at the end of a work shift at six, 6:15, or
15  6:30?
16    A. No. Because we would have the managers back
17  there. I mean, all three managers, at any different
18  day, would be back there at the end of the night.
19    Q. At the end of a shift, did you ever go back to
20  the back door and find more than one person waiting to
21  get out of the store?
22    A. At the end of a shift? Sometimes.
23    Q. And sometimes did you go back there and there
24  were people in the back of the hallway, sitting on the
25  floor, waiting for a manager to come in?

Page 123

1        So, I mean, after awhile, it was just -- I
2  didn't believe that they had been waiting back there for
3  so long, or as long as they thought they were.
4    Q. Did anyone ever compliment you by comparing
5  your quick response time to get to the back door to
6  other managers' response time?
7    A. Yes.
8    Q. And who did they compare you to?
9    A. It depends on who it was.
10    Q. Did any sales associates tell you that certain
11  managers took a long time to let them out at the end of
12  their shift?
13    A. Yes.
14    Q. And which managers were referenced?
15    A. Valerie, sometimes.
16    Q. Any other managers that complaints were made
17  about relating to letting associates out at the end of
18  their shifts?
19    A. Sometimes Theresa. But I'm sure there were
20  complaints about me when I didn't get their quick
21  enough, so.
22    Q. Do you remember anyone specifically who said
23  something to the effect of, "You always come quick.
24  Everyone else is slow"?
25    A. Yeah. Or, yes.

Page 125

32 (Pages 122 to 125)

CERTIFICATION OF DEPOSITION OFFICER

I, MARY E. GARLAND, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was thereafter transcribed by means of computer-aided transcription under my direction; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed November 26, 2007, at San Francisco, California.

_____
MARY E. GARLAND, CSR 4721

EXHIBIT 54.

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4

5   ANN OTSUKA, an individual;
    JANIS KEEFE, an individual;
6   CORINNE PHIPPS, an individual;
    and JUSTIN KISER, an individual;
7   individually and on behalf of
    all others similarly situated,

8
              Plaintiffs,
9                                    Case No. c-07-02780-SI

    and
10
    POLO RALPH LAUREN CORPORATION,
11  a Delaware corporation; POLO
    RETAIL, LLC, a Delaware corporation;
12  POLO RALPH LAUREN CORPORATION, a
    Delaware corporation, doing
13  business in California as POLO
    RETAIL CORP; FASHIONS OUTLET OF
14  AMERICA, INC., a Delaware
    corporation; and DOES 1-500,
15  inclusive,

16            Defendants.
    _____/

17

18            DEPOSITION OF THERESA CRUZ

19  DATE:          August 20, 2007

20  TIME:          10:00 a.m.

21  LOCATION:      LAW OFFICE OF PATRICK R. KITCHIN
                   565 Commercial Street
22                 Fourth Floor
                   San Francisco, California 94111

23

24  REPORTED BY:   Katy Leonard
                   Certified Shorthand Reporter
25                 License Number 11599

                                              Page 1

# Golden Gate Reporting

1          And on Thursday from?
2     A. Ten to seven.
3     Q. Ten to seven.
4          Are sales associates, to your knowledge,
5  ever -- strike that.
6          Have sales associates, to your knowledge,
7  ever been told that they are not permitted to page a
8  manager through the PA system to have the manager come
9  down to let them out of the employee exit at the end of
10  the day?
11     A. No.
12     Q. So, there's no policy that says you're not
13  supposed to page your manager to let you out of the
14  door?
15     A. No. There's no policy.
16          Once they're ready at the back door, they
17  page the manager, and especially if they page me, I'll
18  be there in about ten seconds.
19     Q. Looking at -- just looking at today, the
20  last couple of weeks, how many times a week are you the
21  manager that lets people out the back door at the end of
22  their shift?
23     A. At the end of their shift? Um, it's the
24  other department managers who's doing that, because I'm
25  the one who's closing the store.

Page 78

1     Q. So --
2     A. And closing the registers.
3     Q. Okay. So, you'll be in your office and
4  you'll hear a page for a manager to the employee exit?
5          Is that what you'll hear over the PA?
6     A. Yes.
7     Q. And if you're closing the store, doing your
8  functions on the sales floor, you expect that another
9  manager who's not doing those kind of functions would go
10  to the back door and let them out?
11     A. Yes.
12     Q. And if you've made it back to your office
13  and are running the numbers for the day --
14     A. Mm-hm.
15     Q. -- and you hear a page for the back door, is
16  it your expectation that another manager who is not
17  doing those kind of end-of-the-day tasks will let the
18  people out the back door?
19     A. No. Whoever is near to the back door needs
20  to open the back door for the sales associates or the
21  employees.
22     Q. And from the doorway to your office, can you
23  see the back door?
24     A. Um, right now, yes, because there's a
25  camera. From my office? No, I can't see. I have to go

Page 79

1  ten steps.
2     Q. To the corner?
3     A. Yeah.
4     Q. And look down?
5     A. Yes.
6     Q. Now there's a camera at the back door?
7     A. Yes.
8     Q. How long has the camera been there?
9     A. I would say about April. March or April.
10     Q. Of this year?
11     A. Yes.
12     Q. And why was the camera put back there by the
13  employee exit?
14     A. Um, because the San Francisco store has a
15  high shortage when it comes to our inventory, and having
16  loss prevention before, and then we eliminate the loss
17  preventions, so the department managers and sales
18  associates would keep an eye for some of the thieves in
19  the store -- shoplifters, and because the number keeps
20  going up and down, so we were one of the
21  stores, luckily, after how many years we were able to
22  get the camera.
23     Q. Is the camera in place to make sure that
24  sales associates aren't part of the problem of loss
25  prevention?

Page 80

1     A. No. Hm-mm.
2     Q. And the camera --
3     A. Sorry. Ask me the question again.
4     Q. Yeah. I'm wondering if the -- well, let me
5  lay some foundation for this.
6          Where is the camera located?
7     A. Next to my office in the back of the --
8     Q. All right. So, now you have moved -- your
9  office has actually moved around the corner toward the
10  employee exit; is that correct?
11     A. Yes.
12     Q. Okay. So, you're in the same section of the
13  hallway that the exit door is located in?
14     A. Um, if this is the exit hallway
15  (Indicating), you go ten steps. My office is just right
16  there.
17     Q. Okay. So, you're around the corner?
18     A. Yes.
19     Q. You have to walk down the hall from the
20  employee entrance --
21     A. Yes.
22     Q. -- take a right-hand turn --
23     A. Yes.
24     Q. -- and then that takes you past your office
25  and the --

Page 81

21 (Pages 78 to 81)

**Golden Gate Reporting**

```
1              CERTIFICATION OF DEPOSITION OFFICER

2

3              I, KATY LEONARD, duly authorized to

4    administer oaths pursuant to Section 2093(b) of the

5    California Code of Civil Procedure, hereby certify that

6    the witness in the foregoing deposition was by me sworn

7    to testify to the truth, the whole truth and nothing but

8    the truth in the within-entitled cause; that said

9    deposition was taken at the time and place therein

10   stated; that the testimony of the said witness was

11   thereafter transcribed by means of computer-aided

12   transcription; that the foregoing is a full, complete

13   and true record of said testimony; and that the witness

14   was given an opportunity to read and correct said

15   deposition and to subscribe the same.

16             I further certify that I am not of counsel

17   or attorney for either or any of the parties in the

18   foregoing deposition and caption named, or in any way

19   interested in the outcome of this cause named in said

20   caption.

21

22

23

24   _____

25            KATY LEONARD, CSR 11599

                                          Page 261
```

EXHIBIT 55.

Patrick R. Kitchin, Esq. (SBN. 162965)
**THE LAW OFFICE OF PATRICK R. KITCHIN**
565 Commercial Street, 4th Floor
San Francisco, CA 94111
415-677-9058
415-627-9076 (fax)

Attorneys for Plaintiffs
Janis Keefe, Corinne Phipps, and
Renee Davis

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ANN OTSUKA, an individual; JANIS KEEFE, an individual; CORINNE PHIPPS, an individual; and RENEE DAVIS, an individual; individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> POLO RALPH LAUREN CORPORATION; a Delaware Corporation; POLO RETAIL, LLC., a Delaware Corporation; POLO RALPH LAUREN CORPORATION, a Delaware Corporation, doing business in California as POLO RETAIL CORP; and FASHIONS OUTLET OF AMERICA, INC., <br><br> Defendants. | Case No.: C-07-02780-SI <br><br> DECLARATION OF JUDY LIU IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION <br><br> Date: July 11, 2006 <br> Time: 9:00 a.m. <br><br> LOCATION: Courtroom 10, 19th Floor <br> 450 Golden Gate Avenue <br> San Francisco, California 94102 <br><br> JUDGE: Hon. Susan Illston |

I, Judy Liu, declare:

1)      I am a resident of Los Angeles County, California, and make this declaration based on my personal knowledge.

---

*Otsuka, et al. v. Polo, et al.*                                        Case No. C-07-02780-SI <sup>1</sup>

DECLARATION OF JUDY LIU IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

2)    I was hired to work as a Cashier in the Polo Ralph Lauren Beverly Hills Store in November 2001. I was promoted to be the Assistant to a Sales Associate, a top seller for the company, and eventually became a Sales Associate myself, until resigning in or around May 2005. When I worked as a Sales Associate, I was told I was a full-time commissioned salesperson and that I was expected to sell enough merchandise to cover my base hourly wage multiplied by a certain commission rate.

3)    When I was hired at the Beverly Hills Polo store, I was told I was not permitted to tell any other employee how much I was earning.

4)    As a Sales Associate, I worked in the Children's Department. I almost never took rest breaks during my shifts in this Department, because there was not sufficient staff other than myself to assist customers and maintain the inventory. Also, rest breaks were nearly impossible due to the demands of customer needs, especially as that related to making sales goals. I don't remember anyone telling or encouraging me to take rest breaks.

5)    I received a copy of the Polo employee handbook. From the handbook, I understood that I could not leave the Polo store at any time until a manager performed a bag check on me at the employee exit. My managers communicated the same thing to me. I understood that I could be fired if I did not undergo a bag check before I left the store.

6)    I hated the fact that when I clocked out at lunch or at the end of the day, I had to find a manager to check my belongings before I could leave the store. Any time we left the store, we had to leave through the back exit and have a manager check us. To get to this location, we had to pass through several doorways. While we were doing this, we had already checked out. I usually had to call or grab a manager; they were rarely waiting and available at the back of the store when I needed to check out.

7)    At the end of the day, if I was still on the clock, manager's would tell me, "Go clock out," before they would perform the bag check. Almost always after this, I would still be waiting for a manager to actually to the check. Then, I would have to go back through the doorways, into the body of the store. The managers were usually involved in closing down the

---

1  store and would not have portable phones with them. I had to physically find a manager who

2  would take time from their closing duties to check me out so that I could leave the store. You just

3  could not leave until someone said, "Yes."

4         8)       Even after I had located a manager who could do the bag check at the employee

5  exit, I usually waited longer for the manager to actually arrive and perform the search. There were

6  about 60 employees on each shift, and about 2-5 managers also on the shift. Given these staffing

7  numbers, many other employees were often waiting at the rear or "valet" door with me.

8  Sometimes, we exited through the locker room door, where we still were usually required to wait

9  for a manager to meet us and check us out. As a whole, I waited during 90% of my shifts to be

10  checked out. About 50% of the time I waited to be checked out after clocking out at the end of a

11  shift. On average, I waited from 10 to 15 minutes after I had clocked out to be checked and

12  approved to leave. On occasion, I did wait longer than this. I was not paid for any of this waiting

13  time.

15  Signed under penalty of perjury under the laws of the State of California. Executed at Los

16  Angeles, California, on May _____, 2008.

18                                                  Judy Liu

would take ~~time from their closing duties to check~~ me ~~files that I could leave the store~~

8) Even after I had located a manager who could do the bag check at the employee exit, I usually waited longer for the manager to actually arrive and perform the search. There were about 60 employees on each shift, and about 2-5 managers also on the shift. Given these staffing numbers, many other employees were often waiting at the rear or "valet" door with me. Sometimes, we exited through the locker room door, where we still were usually required to wait for a manager to meet us and check us out. As a whole, I waited during 90% of my shifts to be checked out. About 50% of the time I waited to be checked out after clocking out at the end of a shift. On average, I waited from 10 to 15 minutes after I had clocked out to be checked and approved to leave. On occasion, I did wait longer than this. I was not paid for any of this waiting time.

Signed under penalty of perjury under the laws of the State of California. Executed at Los Angeles, California, on May 27, 2008.

_Judy Liu_ (signature)

Judy Liu

EXHIBIT 56.

**Golden Gate Reporting**

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                 SAN FRANCISCO DIVISION

 4

 5   ANN OTSUKA, an individual;      )
     JANIS KEEFE, an individual,     )
 6   CORINNE PHIPPS, an              )
     individual; and RENEE DAVIS,    )
 7   an individual; individually     )
     and on behalf of all others     )
 8   similarly situated,             )
               Plaintiffs,           )
 9                                   )
10      -vs-                         )   No. C-07-02780-SI
11                                   )
12   POLO RALPH LAUREN CORPORATION; )
     a Delaware Corporation; POLO    )
13   RETAIL, LLC., a Delaware        )
     Corporation, POLO RALPH LAUREN  )
14   CORPORATION, a Delaware         )
     Corporation, doing business in  )
15   California as POLO RETAIL       )
     CORP; FASHIONS OUTLET OF        )
16   AMERICA, INC., a Delaware       )
     Corporation,                    )
17             Defendants.           )
18   _____ )
19
20          The deposition of HARVEY RESNICK, called
     by the Plaintiffs for examination, pursuant to
21   subpoena and pursuant to the Federal Rules of
     Civil Procedure for the United States District
22   Courts pertaining to the taking of depositions,
     taken before Cynthia J. Conforti, Certified
23   Shorthand Reporter, at Suite 2500, 77 West Wacker
     Drive, Chicago, Illinois, commencing at the hour
24   of 10:09 a.m. on the 23rd day of April, A.D.,
25   2008.
```

Page 1

**Golden Gate Reporting**

1   spent there was the holiday time, so that's -- it
2   seems like that was a lot of the workday.
3       Q.   Did you ever have any discussions with any
4   of the other managers at the Polo store about the
5   loss prevention inspection wait time?
6       A.   I don't recall actually having any formal
7   discussions about it. I'm sure that just in
8   general conversation in passing it was probably
9   mentioned.
10      Q.   Do you recall anyone ever discussing an
11  employee's complaints about the amount of time
12  that they were required to wait before a loss
13  prevention inspection occurred?
14      A.   Specific conversation? No.
15      Q.   Do you have a general recollection of
16  talking with other managers within the store about
17  that process?
18      A.   There was I think some conversation. It's
19  hard for me to say. It's been a while obviously,
20  but, you know, it certainly was something that was
21  brought up from time to time in conversation
22  because the employees were unhappy about it, so we
23  heard about it.
24          We might have been told or asked to make
25  sure that we're responsive to their calls which

Page 46

1       Q.   And typically would that manager then walk
2   you to the door?
3       A.   Yes, yeah.
4       Q.   Were there ever times that you were
5   waiting at the book door for a loss prevention
6   inspection?
7       A.   I'm sure I had to wait from time to time
8   but, you know, just to me as manager it wasn't a
9   big issue.
10          You know, I was required to be there until
11  the store was closed pretty much anyways. Seldom
12  left before other managers left, so it was often
13  myself and whoever else was closing the store, we
14  left the store at the same time.
15      Q.   Were there occasions that you recall when
16  the timekeeping system at the Polo store in San
17  Francisco was closed down before sales associates
18  had clocked out at the end of the day?
19      A.   I can remember on a few occasions when
20  Theresa Cruz would effectively clock people out at
21  a certain time. I think the reason it was done
22  was you couldn't go through the shutdown process
23  until everybody had clocked out.
24      Q.   On those occasions when Theresa Cruz
25  clocked people out, in that situation, do you know

Page 48

1   isn't always the easiest thing to do.
2       Q.   Do you have a specific recollection of any
3   discussion with Tin Hua where he indicated that it
4   was important for you or other managers to be
5   responsive to calls for loss prevention
6   inspections?
7       A.   No specific recollection.
8       Q.   Were you required to undergo a loss
9   prevention when you left the building?
10      A.   Yes.
11      Q.   Who would perform that?
12      A.   Another manager.
13      Q.   And typically did that happen when you or
14  at least one other manager were leaving together?
15      A.   It could. I mean, you know, if you're the
16  last two people out of the building you basically
17  checked each other and assumed to have been
18  responsible, yes.
19      Q.   And if you weren't the last two people in
20  the building, how would you arrange for a loss
21  prevention inspection?
22      A.   I'd ask for somebody to check me out.
23      Q.   Would you typically do that in person with
24  another manager?
25      A.   Yeah.

Page 47

1   how she determined when specific individuals in
2   different departments quit working for that day?
3       A.   You know, if there were people who were
4   still actually physically working in the store,
5   they were clocked out at whatever that moment was.
6          If it was 8:15 or 8:45 or whatever it
7   might have been, and it was -- if you wanted to do
8   the shutdown process, then she would have to clock
9   them out, so everybody would be clocked out at
10  that time. It was not possible to, I don't think,
11  to push it ahead to if it was 8:45 to say that
12  they clocked out at 9 o'clock. I don't think you
13  could do that. I'm not positive but I think that
14  was the case.
15      Q.   Did you ever hear of any manager including
16  Theresa Cruz do an adjustment to the time records
17  in that situation on the following day?
18      A.   Well, there was a way to do that, and it
19  may have been done from time to time. I don't
20  know of specific instances, but I know it could
21  have been done. It's possible that if somebody
22  said, you know, "I was here way past 8:45," then
23  they might have adjusted it.
24      Q.   Did any sales associate ever come to you
25  and say," I received my paycheck, and it doesn't

Page 49

13 (Pages 46 to 49)

# Golden Gate Reporting

1  five-minute break.
2      (Whereupon a recess was had from
3      2:04 p.m. to 2:10 p.m.)
4      REDIRECT EXAMINATION
5  BY MR. KITCHIN:
6  Q.  Just a couple clarification questions
7  follow-up.
8      Did you ever respond to a call or a page
9  for the employee exit that you responded to to
10  conduct the inspection to find that Tin Hua was in
11  his office on the telephone or otherwise engaged?
12  A.  It's highly possible, but I can't say for
13  certain. I don't remember a specific incident.
14  Q.  Did you ever respond to a call or page to
15  find Theresa Cruz in her office engaged in
16  something other than --
17  A.  Not to my knowledge. It was not uncommon
18  at the end of the workday when we were going
19  through that process for Tin to be talking to a
20  manager from one of the other stores as I recall.
21      So if that -- I mean if that's what you're
22  referencing where he did do some business phone
23  call at that time of the day after hours, in fact
24  there was a time when he was responsible for the
25  Hawaii stores or something like that that he may

Page 126

1  have been on the phone and not been able to come
2  to the door.
3  Q.  Did you ever hear any complaints by anyone
4  at Polo about Tin Hua's responsiveness or lack of
5  responsiveness to pages for loss prevention
6  inspections?
7  A.  No.
8  Q.  Did you ever hear anyone complain about
9  Theresa Cruz' lack of responsiveness to pages or
10  calls for loss prevention inspections?
11  A.  In that sort of general conversation way,
12  that, you know, as I said earlier, a lot of things
13  were said by people on the sales floor in retail
14  stores, and it wasn't uncommon for the staff to be
15  a little more critical of Theresa than they were
16  of Tin.
17  Q.  You have a general recollection of one or
18  more people complaining about Theresa Cruz'
19  failure to promptly respond to requests to perform
20  loss prevention inspections?
21  A.  I don't have a specific recollection.
22  Q.  Do you have a general recollection of
23  that --
24  A.  Yeah.
25  Q.  -- that type of discussion?

Page 127

1      Same question with respect to Valerie
2  Harris. Ever hear any complaint that she was not
3  very responsive to calls?
4  A.  Yes.
5  Q.  Do you remember who you heard that from?
6  A.  No.
7  Q.  Now, Mr. Goines asked you some questions
8  about how long it took you at times to get from
9  your department to the back door.
10      On those occasions when you heard a page
11  but you didn't respond to it knowing that there
12  was another manager closer, did you ever learn on
13  any of those occasions how long the individuals
14  had been waiting at the back door before they were
15  inspected and released?
16  A.  If I follow what you're saying is that I
17  didn't respond to a page and ultimately later did?
18  Q.  No --
19  A.  -- and somebody else did not and they
20  waited a long time?
21  Q.  No. Let me ask it this way:
22      There were occasions when you heard a page
23  for a manager to the back door --
24  A.  Yes.
25  Q.  -- when you didn't respond to that page.

Page 128

1  A.  That's correct, yes.
2  Q.  And sometimes you heard more than one page
3  for a manager to the back door on a single
4  evening, correct?
5  A.  Yes.
6  Q.  And on those occasions when you didn't go
7  down to do the loss prevention inspection but
8  apparently someone else did, did you ever learn
9  how long those individuals claimed that they had
10  waited for a loss prevention inspection?
11  A.  Again, this would be a generalization.
12      There were always remarks being made, "Oh,
13  we waited 10 minutes, we waited five," that sort
14  of thing, but did anybody specifically say, "I waited
15  20 minutes tonight for Theresa to come to the
16  door," no, I don't think so.
17  Q.  Individuals. Okay.
18      Was there a general kind of perspective
19  that managers developed at the San Francisco Polo
20  store with respect to loss prevention inspections
21  that it was too burdensome to be running back to
22  the back door to let a single individual out, now
23  two people out, now five people out, now one
24  person out?
25  A.  Sure. It was a feeling that people had,

Page 129

33 (Pages 126 to 129)

certcert

1    I further certify that the signature to the
2  foregoing deposition was not waived by counsel for
3  the respective parties.
4    I further certify that the taking of this
5  deposition was pursuant to subpoena, and that
6  there were present at the deposition the attorneys
7  hereinbefore mentioned.
8    I further certify that I am not counsel for
9  nor in any way related to the parties to this
10 suit, nor am I in any way interested in the
11 outcome thereof.
12   IN TESTIMONY WHEREOF:   I have hereunto set my
13 hand and affixed my notarial seal this 7th day of
14 May, 2008.
15
16
17
18
19    Cynthia J. Conforti, CSR, CRR
20    Notary Public, Cook County, Illinois
21
22  CSR License No. 084-003064
23
24
25

EXHIBIT 57.

Patrick R. Kitchin, Esq. (SBN. 162965)
**THE LAW OFFICE OF PATRICK R. KITCHIN**
565 Commercial Street, 4th Floor
San Francisco, CA 94111
415-677-9058
415-627-9076 (fax)

Attorneys for Plaintiffs
Janis Keefe, Corinne Phipps, and
Renee Davis

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ANN OTSUKA, an individual; JANIS KEEFE, an individual; CORINNE PHIPPS, an individual; and RENEE DAVIS, an individual; individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> POLO RALPH LAUREN CORPORATION; a Delaware Corporation; POLO RETAIL, LLC., a Delaware Corporation; POLO RALPH LAUREN CORPORATION, a Delaware Corporation, doing business in California as POLO RETAIL CORP; and FASHIONS OUTLET OF AMERICA, INC., <br><br> Defendants. | Case No.: C-07-02780-SI <br><br> DECLARATION OF ASYA SOLOIAN IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION <br><br> Date: July 11, 2006 <br> Time: 9:00 a.m. <br><br> LOCATION: Courtroom 10, 19th Floor <br> 450 Golden Gate Avenue <br> San Francisco, California 94102 <br><br> JUDGE: Hon. Susan Illston |

I, Asya Soloian, declare:

    1)    I am a resident of San Francisco County, California, and make this declaration based on my personal knowledge.

1

2)      Between approximately 2000 and 2003, I worked as a Sales Associate in the Women's Department of the San Francisco Polo Ralph Lauren store located at 90 Post Street, San Francisco, California. Based on my best recollection, I was hired as a full-time employee. I was told I was a commissioned salesperson and that I was expected to sell enough merchandise to cover my base hourly wage multiplied by a certain commission rate.

3)      When I was hired at the San Francisco Polo store, I was told I was not permitted to tell any other employee how much I was earning.

4)      Based on my best recollection, I was unable to sell enough merchandise to cover my base hourly wage about 40% of the time. On several occasions, I did not sell ½ of my sales target during my employment with Polo.

5)      On many occasions I worked more than 8 hours in one day or more than 40 hours in one week, especially if you consider all the time I was required to remain inside the store after I had clocked out for the day. I was not paid premium overtime for these hours.

6)      On many occasions I was not able to take one or more of my rest breaks during my work shifts. I estimate that I missed two or more rest breaks per week on average because my department was too busy for me to take breaks and because I was discouraged by managers from taking rest breaks.

7)      I was instructed by my managers and in the Polo employee handbook that I could not leave the Polo store at any time unless a manager performed a bag check on me at the employee exit. I understood I could be fired if I did not undergo a bag check before I left the store.

8)      I was instructed to clock out, when leaving for lunch or at the end of the day, and then required to find a manager who could do the bag check at the employee exit. On average, I estimate that I had to wait 10 minutes after I had clocked out before I was permitted to leave the building. I often had to stand at the employee exist with several other sales associates waiting for a manager to perform the mandatory bag checks. I was frustrated and upset about having to wait inside the Polo store after my shift was over, and, on occasion, expressed my frustrations to managers. I was not paid for any of this waiting time.

2

*Otsuka, et al. v. Polo, et al.*                                    Case No. C-07-02780-SI

DECLARATION OF ASYA SOLOIAN IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

Signed under penalty of perjury under the laws of the State of California. Executed at San Francisco, California, on May 16 , 2008.

Asya Soloian

*Otsuka, et al. v. Polo, et al.*            Case No. C-07-02780-SI

DECLARATION OF ASYA SOLOIAN IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

EXHIBIT 58.

**Golden Gate Reporting**

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4

5   ANN OTSUKA, an individual; JANIS      No. C-07-02780-SI
    KEEFE, an individual; CORINNE
6   PHIPPS, an individual; and
    JUSTIN KISER, an individual;
7   individually and on behalf of
    all others similarly situated,

8
                   Plaintiffs,
9      vs.

10  POLO RALPH LAUREN CORPORATION;
    a Delaware Corporation; POLO
11  RETAIL, LLC, a Delaware Corporation;
    POLO RALPH LAUREN CORPORATION, a
12  Delaware Corporation, doing business
    in California as POLO RETAIL CORP;
13  FASHIONS OUTLET OF AMERICA, INC., a
    Delaware Corporation and DOES 1-500,
14  inclusive,

15                 Defendants.
                                      /
16

17
              DEPOSITION OF ROSALINDA WALLWORK
18

19
         DATE:          November 13, 2007
20
         TIME:          10:02 a.m.
21
         LOCATION:      1900 University Avenue
22                      Fifth Floor
                        East Palo Alto, California
23
         REPORTED BY:   Mary E. Garland
24                      Certified Shorthand Reporter
                        License Number 4721
25

                                              Page 1

**Golden Gate Reporting**

1 day.
2    Q. Have you seen the Web site that my office
3 established for this case?
4    A. No.
5    Q. At around that time when you were having
6 discussions with Mr. Hua and Valerie Harrison, had you
7 seen a copy of the complaint in the lawsuit?
8    A. No.
9    Q. Have you ever seen a copy of the complaint?
10    A. No.
11    Q. At the time when you had the first discussion
12 where you talked about the individuals who had brought
13 the lawsuit --
14    A. Yes.
15    Q. -- did you have a discussion relating to what
16 kinds of claims were being made in the lawsuit?
17    A. Yes.
18    Q. And if you can ferret this out, at that time,
19 what was your understanding of the claims that were
20 being made in the lawsuit?
21    A. I didn't understand a lot of what it meant. To
22 me, the discussions were surrounding the fact that I
23 probably should have mentioned that I had heard that
24 Justin had been manipulating the clock.
25      But I just didn't think, again, that it was

Page 22

1 important, because I had never witnessed it. So I never
2 brought it to light. And those discussions were mainly
3 about some of the things that I probably should have
4 mentioned, you know, early on.
5    Q. Well, I want to talk about those, but the
6 question I have right now is: Did you have any
7 discussions during that first meeting about what kinds
8 of claims were being made?
9    A. Specifically, I don't remember. I mean, that's
10 what I remember discussing with them when it was first
11 brought to light.
12    Q. Do you remember having discussions during any
13 of the meetings that you had with Mr. Hua and/or Valerie
14 Harrison about the plaintiffs' claims that they had been
15 falsely imprisoned within the store?
16    A. Yes.
17    Q. And what do you recall about the discussions
18 where the claim of false imprisonment was mentioned or
19 discussed?
20    A. For me personally, that didn't really mean a
21 lot. Because our department left together in the
22 evenings, so I never felt like anybody in that
23 department had to wait for the back door.
24      Or when they would go to lunch, it's normal --
25 it would normally be around this time that I would go to

Page 23

1 lunch, so I don't remember in my department in
2 particular having to wait for the door.
3    Q. So you would typically leave at the same time
4 as your crew?
5    A. They would all leave together, and I would be
6 there to get the door.
7    Q. And you would stay then?
8    A. We would fold together, so we'd exit pretty
9 much together. I wouldn't exit, but we would come down,
10 and they would grab their stuff, and I would thank them,
11 and they would leave.
12    Q. And then you would stay, generally?
13    A. Yes.
14    Q. So would you generally stay beyond the time
15 that your department sales associates had left?
16    A. Yes.
17    Q. Did either Mr. Hua or Valerie Harrison make any
18 specific comments about what they believed to be the
19 merits of the claim relating to the loss prevention
20 inspections?
21    A. If they said anything, I don't remember
22 specifically what they would -- if they said anything,
23 I mean.
24    Q. Did either of them, during any of these
25 meetings or conversations about the lawsuit, say that

Page 24

1 the wait time to exit the store was excessive or took
2 too long on some occasions?
3    A. Seriously, that was not a topic that we would
4 really discuss.
5    Q. Was there any -- go ahead.
6    A. Maybe, at the maximum, five, ten minutes, you
7 would wait by the door when you're coming back from
8 lunch, if there were no managers in the back. But, I
9 mean, we really didn't discuss it.
10    Q. Did Mr. Hua, after learning of the lawsuit,
11 make any comments to you about the need to improve or
12 change the loss prevention search protocol or process?
13    A. We had a meeting surrounding that, yes. That
14 we had to have a manager in the back room to get the
15 door at all times.
16    Q. And who was at that meeting, if you can recall?
17    A. We all were; Theresa Cruz, Tin, Valerie,
18 myself. I think, at the time, we had somebody -- we had
19 another manager, but I don't remember exactly.
20    Q. Did that meeting take place after the lawsuit
21 had been filed?
22    A. Maybe not right away, but sometime thereafter.
23    Q. And how long did that meeting last, or at least
24 the portion of that meeting where one of the topics of
25 conversation was the loss prevention inspection

Page 25

7 (Pages 22 to 25)

Page 26

1  procedure?
2      A. It was brief. I mean, it -- we didn't surround
3  the whole meeting around it. It was just something that
4  was mentioned, we put a system in place, and we moved on
5  to the next topic.
6      Q. Could you describe the new system that you
7  referred to?
8      A. We gave the stock manager keys. And,
9  basically, he was in the back most of the time, so he
10  was allowed keys to open and close the door.
11      And even prior to that, we received shipments
12  between one or 12 and four, so that door was constantly
13  open, anyway, so. But now he had keys and it would --
14  he could open the door, close the door.
15      Q. And was he, prior to that change in policy --
16      MR. GOINES: Objection -- oh.
17      Q. BY MR. KITCHIN: -- was he permitted to --
18      This is the? I'm sorry. Loading? What --
19      A. The shipping department.
20      Q. Shipping department manager? Prior to -- let
21  me start a new question, clean it up.
22      A. Okay.
23      Q. Prior to the meeting in which loss prevention
24  inspection procedures were discussed, did the shipping
25  department manager have the authority to conduct loss

Page 27

1  prevention inspections of employees leaving the store?
2      A. No.
3      Q. Did the shipping manager have keys to the back
4  door to turn the alarm off?
5      A. Yes.
6      Q. Earlier, I believe you testified that, after
7  the meeting, he was given keys.
8      A. Okay. He had keys, he was just not allowed to
9  check people in and out.
10      Q. I see. Was the shipping manager present at
11  this meeting where loss prevention inspections were
12  discussed?
13      A. No.
14      Q. What was the shipping manager's name?
15      A. Oh. Chris. I don't remember his last name.
16      Q. Do you know if he's still employed by Polo?
17      A. Hmm. No, he is not.
18      Q. And where does he work now?
19      A. I have no idea.
20      Q. During the meeting that you referred to where
21  loss prevention inspections were discussed, did anyone
22  make any comments at the meeting that, prior to that
23  meeting, people were having to wait to exit the
24  building?
25      A. Yes.

Page 28

1      Q. And who made comments about the waiting time to
2  leave the building?
3      A. Well, there were no comments made about it, but
4  there were some people that have said, "I've had to
5  wait," you know, "for more than five minutes." So, I
6  mean, it wasn't really discussed in great detail, that I
7  remember.
8      Q. Were there other topics discussed during the
9  meeting where the loss prevention inspection issue was
10  discussed relating to the claims in the lawsuit?
11      A. No. We discussed putting a system in place so
12  that people can come in and out, you know, perhaps
13  quicker than, you know, we were getting the door.
14      Like I said, it wasn't a meeting surrounding
15  that. It was something we talked about, put the system
16  in place, and moved on to the next topic. We didn't
17  have a managers' meeting surrounding the lawsuit.
18      Q. Prior to the meeting that we're discussing
19  where loss prevention inspections was discussed, had you
20  had any other meetings relating to any concerns about
21  wait time to exit the building?
22      A. No.
23      Q. So that topic, based on your best recollection,
24  was never discussed at any manager meeting prior to the
25  meeting that we've been discussing?

Page 29

1      A. No.
2      Q. I'm going to get back to the loss prevention
3  inspection --
4      A. Sure.
5      Q. -- but I want to move back now to the other
6  discussions that you described or identified between
7  you, and Mr. Hua, and Valerie Harrison.
8      A. Mm-hm.
9      Q. I can't remember the number you said, but it
10  was more than one meeting where the lawsuit was
11  discussed; correct?
12      A. It was not a meeting. It was comments being
13  made as we're closing down shop or making our final
14  notes. And for me personally, mainly, was the
15  discussion surrounding the time clock situation that I
16  never brought to light. So that is really the most that
17  I remember discussing this lawsuit. In fact, all of
18  this is just shocking to me, so.
19      That was the only serious conversation I had
20  with the management team about the whole thing that I'd
21  read in the paper, was that I probably should have
22  mentioned that Justin was doing something weird with the
23  time clock, but I didn't really know what it was. And
24  after I was rest assured -- I was told that if he was
25  doing something strange, that we would probably know,

8 (Pages 26 to 29)

Page 114

1    A. I don't think with Justin, it was a specific
2  time, but he would claim that he waited back there for
3  some time.
4    Q. And did you believe that he was lying when he
5  told you that?
6    A. I didn't believe that he was lying. But at
7  that time, I worked in the same department that he did,
8  so it was very hard for me to get the door probably as
9  quickly as I would have got it for Corinne or whoever
10 was there. So I never really knew exactly how long he
11 waited back there. I didn't assume that he was lying.
12 I got to the door as quickly as I could when I was
13 upstairs.
14   Q. Did Janis Keefe ever complain to you that it
15 took too long for her to have a bag check performed so
16 she could get out of the store at the end of her shift?
17   A. No.
18   Q. Did she ever complain to you that she waited
19 too long to get out the back door when she was going to
20 lunch?
21   A. No.
22   Q. And did she ever complain to you that she
23 waited too long to come back into the store at the end
24 of a lunch break?
25   A. Yes.

Page 116

1  that would happen.
2    Q. Did any other sales associates ever tell you
3  that they had been waiting for what they thought was an
4  unreasonable period of time to leave the building?
5    A. Yes, there were times.
6    Q. And how many individuals, approximately, other
7  than the three plaintiffs we've talked about, complained
8  to you that they had been waiting what they believed to
9  be an unreasonable time to leave the store?
10   MR. GOINES: Objection. Mischaracterizes her
11 testimony. She never said one of them complained about
12 waiting to leave the store; she only said about getting
13 back in from lunch or breaks. You can ask her again,
14 but that's what I recall the testimony.
15   Q. BY MR. KITCHIN: Did any of the three
16 plaintiffs that you talked about complain to you that it
17 took too long for them to get out of the store?
18   A. No. Because I happened to work with most of
19 them, so we would leave together or at the same time.
20 So getting out of the store --
21   Q. So Corinne Phipps didn't complain to you on a
22 number of occasions that it took too long for her to get
23 out of the store?
24   A. I mean, it's possible. Most of the encounters
25 I had with them was trying to get back in.

Page 115

1    Q. And how many times did she complain to you
2  about that?
3    A. I'm not going to say many with her, because I
4  didn't work with her very long. So maybe a few times, a
5  couple times.
6    Q. And did she tell you how long she had been
7  waiting outside to come into the store?
8    A. Yeah.
9    Q. How long did she tell you she'd been waiting?
10   A. I think more than 20 minutes was the magic
11 number that I heard a lot. More than 20 minutes.
12   Q. On the couple or few occasions --
13   A. Yeah.
14   Q. -- she said 20 minutes?
15     And did you think that she was lying to you?
16   A. I can't say that she was lying. Again, I can't
17 -- I can't imagine a 20-minute wait at that door,
18 regardless. Because we have shipments that were
19 processed back there. I mean, the door, there was so
20 much movement back there, that 20 minutes would seem
21 unlikely. Because people were coming and going on their
22 breaks. So 20 minutes with that door not being opened,
23 or some sort of shipment being delivered, or FedEx
24 coming through, it just -- to me, it just -- I didn't
25 think she was lying, but it just seemed unlikely that

Page 117

1    Q. You testified earlier that Corinne Phipps would
2  either compliment you or chastise you, depending on
3  whether she had something going on.
4    A. Right.
5    Q. Now, was that going out or in?
6    A. It could be -- it could be both; it could be
7  coming in or out.
8    Q. Did she complain to you that it took too long
9  to get out of the store on any occasion?
10   A. Yes.
11   Q. And were those the occasions you talked about
12 before, when she complained that she had been waiting
13 too long to get out of the store?
14   A. It's possible.
15   MR. GOINES: Don't guess or speculate.
16   THE WITNESS: Okay.
17   MR. GOINES: Tell him what you recall.
18   THE WITNESS: Yes.
19   Q. BY MR. KITCHIN: So did any sales associates,
20 other than the named plaintiffs in this case, complain
21 about the wait time to get out of the store?
22   A. Yes.
23   Q. And how many individuals complained about
24 having to wait too long to get out of the store?
25   A. Maybe just two more.

30 (Pages 114 to 117)

**Golden Gate Reporting**

| | |
|---|---|
| 1    Q. And who were those two others? | 1    A. Not unreasonable, but I believe that they had |
| 2    A. Catherine Lang was one, and -- maybe just the | 2    been waiting. |
| 3    one. That's the only other person I remember. | 3    Q. Did you ever report to Tin Hua that you had |
| 4    Q. And what did Catherine Lang tell you about | 4    received these complaints from employees about the time |
| 5    waiting at the employee exit? | 5    that they were waiting to go out of or come back into |
| 6    A. That she needed to be checked out quickly | 6    the store? |
| 7    because she had dinner plans or -- | 7    A. Yes. |
| 8    Q. And did she complain that she had been waiting | 8    Q. And how many times did you complain to Tin Hua |
| 9    for some period of time that she thought was | 9    about that? |
| 10    unreasonable? | 10    A. Hmm, a few times. |
| 11    A. Not specifically. | 11    Q. And were you, essentially, making a complaint |
| 12    Q. Did she complain that she had been waiting too | 12    on behalf of these employees, or were you just reporting |
| 13    long? | 13    what you had been told by these employees? |
| 14    A. Yes. | 14    A. Reporting back, to make sure that the other |
| 15    Q. She didn't tell you how long? | 15    managers were coming to the door, as well. |
| 16    A. No. | 16    Q. You were one of the best in the store at |
| 17    Q. Did you believe that she had been waiting what | 17    responding to the back door; isn't that true? |
| 18    she thought was an unreasonable amount of time? | 18    A. I believe so. |
| 19    A. No. | 19    Q. You would go there when other managers were in |
| 20    Q. Did any sales associates, other than the three | 20    the store but didn't go to the back door; is that |
| 21    named plaintiffs we've talked about, complain to you | 21    correct? |
| 22    that they had been waiting for a period of time that | 22    A. Yes. |
| 23    they thought was unreasonable to get back into the store | 23    Q. Were there specific managers that you came to |
| 24    after a break? | 24    believe were just really ignoring the back door, despite |
| 25    A. I mean, at times, but not on a regular basis, | 25    requests from employees? |
| Page 118 | Page 120 |

| | |
|---|---|
| 1    like the few people that are on this sheet. | 1    A. I just always thought that we can make the |
| 2    Q. And can you give me estimate of the number of | 2    effort that I was making to get the back door. I don't |
| 3    people who complained directly to you that they felt | 3    think they were being neglectful or -- |
| 4    that they had been required to wait outside for some | 4    Q. You felt they should respond more timely to |
| 5    period that they felt was unreasonable? | 5    requests to do the bag checks? |
| 6    A. Maybe just a couple. | 6    A. At times, yeah. |
| 7    Q. And do you remember who those people were? | 7    Q. When you reported the complaints on these few |
| 8    A. Just Catherine Lang was one of them. I can't | 8    occasions to Tin Hua about the entrance and exit issues |
| 9    -- I don't remember her name. There was another person | 9    raised by these sales associates, did he respond in any |
| 10    that worked there that I heard that a lot from. | 10    way? |
| 11    Q. And did anyone ever complain directly to you, | 11    A. He did. |
| 12    that you haven't talked about yet, that they felt that | 12    Q. And what did he respond? |
| 13    they were having to wait too long to leave the building | 13    A. He would ask Valerie Harrison and Theresa Cruz |
| 14    for their lunch break? | 14    to get more involved in the process that goes on with |
| 15    A. At times, yes. | 15    the back door. |
| 16    Q. And how many people do you think complained | 16    Q. Did he tell you that he would speak to Valerie |
| 17    about that? | 17    Harrison and Theresa Cruz about responding to the back |
| 18    A. It just -- the same two. | 18    door? |
| 19    Q. That would be Catherine -- | 19    A. No. We would discuss it in meetings. |
| 20    A. Catherine. There was another woman there, I | 20    Q. In how many meetings, where there were other |
| 21    don't remember her name. | 21    managers in the meeting, was the issue of entering and |
| 22    Q. And did you believe them when they told you | 22    exiting the store discussed? |
| 23    that they had been waiting for what they believed was an | 23    A. In the time that I was there, it was discussed |
| 24    unreasonable amount of time to get out of the store at | 24    in huge detail probably more than three times in a |
| 25    their lunch break? | 25    meeting. |
| Page 119 | Page 121 |

31 (Pages 118 to 121)

**Golden Gate Reporting**

1    Q. And who were those two others?
2    A. Catherine Lang was one, and -- maybe just the
3  one. That's the only other person I remember.
4    Q. And what did Catherine Lang tell you about
5  waiting at the employee exit?
6    A. That she needed to be checked out quickly
7  because she had dinner plans or --
8    Q. And did she complain that she had been waiting
9  for some period of time that she thought was
10  unreasonable?
11    A. Not specifically.
12    Q. Did she complain that she had been waiting too
13  long?
14    A. Yes.
15    Q. She didn't tell you how long?
16    A. No.
17    Q. Did you believe that she had been waiting what
18  she thought was an unreasonable amount of time?
19    A. No.
20    Q. Did any sales associates, other than the three
21  named plaintiffs we've talked about, complain to you
22  that they had been waiting for a period of time that
23  they thought was unreasonable to get back into the store
24  after a break?
25    A. I mean, at times, but not on a regular basis,

Page 118

1    A. Not unreasonable, but I believe that they had
2  been waiting.
3    Q. Did you ever report to Tin Hua that you had
4  received these complaints from employees about the time
5  that they were waiting to go out of or come back into
6  the store?
7    A. Yes.
8    Q. And how many times did you complain to Tin Hua
9  about that?
10    A. Hmm, a few times.
11    Q. And were you, essentially, making a complaint
12  on behalf of these employees, or were you just reporting
13  what you had been told by these employees?
14    A. Reporting back, to make sure that the other
15  managers were coming to the door, as well.
16    Q. You were one of the best in the store at
17  responding to the back door; isn't that true?
18    A. I believe so.
19    Q. You would go there when other managers were in
20  the store but didn't go to the back door; is that
21  correct?
22    A. Yes.
23    Q. Were there specific managers that you came to
24  believe were just really ignoring the back door, despite
25  requests from employees?

Page 120

1  like the few people that are on this sheet.
2    Q. And can you give me estimate of the number of
3  people who complained directly to you that they felt
4  that they had been required to wait outside for some
5  period that they felt was unreasonable?
6    A. Maybe just a couple.
7    Q. And do you remember who those people were?
8    A. Just Catherine Lang was one of them. I can't
9  -- I don't remember her name. There was another person
10  that worked there that I heard that a lot from.
11    Q. And did anyone ever complain directly to you,
12  that you haven't talked about yet, that they felt that
13  they were having to wait too long to leave the building
14  for their lunch break?
15    A. At times, yes.
16    Q. And how many people do you think complained
17  about that?
18    A. It just -- the same two.
19    Q. That would be Catherine --
20    A. Catherine. There was another woman there, I
21  don't remember her name.
22    Q. And did you believe them when they told you
23  that they had been waiting for what they believed was an
24  unreasonable amount of time to get out of the store at
25  their lunch break?

Page 119

1    A. I just always thought that we can make the
2  effort that I was making to get the back door. I don't
3  think they were being neglectful or --
4    Q. You felt they should respond more timely to
5  requests to do the bag checks?
6    A. At times, yeah.
7    Q. When you reported the complaints on these few
8  occasions to Tin Hua about the entrance and exit issues
9  raised by these sales associates, did he respond in any
10  way?
11    A. He did.
12    Q. And what did he respond?
13    A. He would ask Valerie Harrison and Theresa Cruz
14  to get more involved in the process that goes on with
15  the back door.
16    Q. Did he tell you that he would speak to Valerie
17  Harrison and Theresa Cruz about responding to the back
18  door?
19    A. No. We would discuss it in meetings.
20    Q. In how many meetings, where there were other
21  managers in the meeting, was the issue of entering and
22  exiting the store discussed?
23    A. In the time that I was there, it was discussed
24  in huge detail probably more than three times in a
25  meeting.

Page 121

31 (Pages 118 to 121)

## Golden Gate Reporting

1  Q. Did you come to believe that the response time
2  of managers, other than yourself, was too slow to
3  requests to have bag checks performed?
4    MR. GOINES: Objection. Vague.
5    THE WITNESS: To get bag checks? I believe
6  that people got checked pretty -- I mean, in a pretty
7  reasonable time.
8  Q. BY MR. KITCHIN: The meetings in which the bag
9  check procedure was discussed, I think you said in
10  detail, did anyone suggest any different procedure to
11  follow to expedite the exit by sales associates?
12  A. I think we changed -- we changed the policy a
13  bit, where our stock supervisor would have access -- or
14  could check them out. Again, it was a complaint that
15  kept coming up. So that was one of the actions we took,
16  we gave Chris the authority to check people in and out.
17  Q. How late did Chris work on most days?
18  A. Till five.
19  Q. What time did sales associates generally leave
20  the building?
21  A. Six, 6:15, 6:30.
22  Q. So he wasn't there to check them out at the end
23  of their shift, but was there to check them out during
24  lunch breaks?
25  A. Yeah.

Page 122

1  A. Not sitting on the floor, but waiting by the
2  door.
3  Q. And any of those times you came and there was
4  more than one person waiting by the door, did any of
5  the sales associates tell you how long they had been
6  waiting?
7  A. Sometimes they would say they've been waiting
8  there forever, or they've been back there, I mean, not
9  specific times, but. When I was downstairs, it would
10  literally take 15, 20 minutes to close out the
11  department. So if anybody was working in any other
12  department and, say, they left at six, and I'm closing
13  out drawers or I'm doing management functions or money
14  functions, it would take about 15 minutes for me to go
15  from the back -- or from the department to the back.
16  So if they ever waited, it would have had to
17  have been maybe 15 minutes -- 15 to 20 minutes, if, in
18  fact, they were waiting that long. Because they would
19  have to get their coat, clock out, get their bag.
20  So many a time, it just seemed exaggerated, the
21  times that they said that they were waiting back there.
22  I mean, it became so that it just -- it was just not --
23  it didn't seem right that they had been waiting there
24  the time that they said. And it was always the same
25  people over, and over, and over again.

Page 124

1  Q. Was there any suggestion of any change in
2  procedure that dealt specifically with expediting the
3  exit of the building at the end of a sales associate's
4  work shift?
5  A. We tried so many different things. I mean, we
6  opened up the Home department for people to come back
7  in, if they were coming back from their lunches, so they
8  wouldn't have to wait. On Sundays, we let people go
9  through Polo Sport, which is -- because the rest of the
10  mall is closed. So, I mean, there were many ways to
11  enter and leave the building.
12  Q. But were there any proposed changes to the
13  practices or policies that related specifically to
14  exiting at the end of a work shift at six, 6:15, or
15  6:30?
16  A. No. Because we would have the managers back
17  there. I mean, all three managers, at any different
18  day, would be back there at the end of the night.
19  Q. At the end of a shift, did you ever go back to
20  the back door and find more than one person waiting to
21  get out of the store?
22  A. At the end of a shift? Sometimes.
23  Q. And sometimes did you go back there and there
24  were people in the back of the hallway, sitting on the
25  floor, waiting for a manager to come in?

Page 123

1  So, I mean, after awhile, it was just -- I
2  didn't believe that they had been waiting back there for
3  so long, or as long as they thought they were.
4  Q. Did anyone ever compliment you by comparing
5  your quick response time to get to the back door to
6  other managers' response time?
7  A. Yes.
8  Q. And who did they compare you to?
9  A. It depends on who it was.
10  Q. Did any sales associates tell you that certain
11  managers took a long time to let them out at the end of
12  their shift?
13  A. Yes.
14  Q. And which managers were referenced?
15  A. Valerie, sometimes.
16  Q. Any other managers that complaints were made
17  about relating to letting associates out at the end of
18  their shifts?
19  A. Sometimes Theresa. But I'm sure there were
20  complaints about me when I didn't get their quick
21  enough, so.
22  Q. Do you remember anyone specifically who said
23  something to the effect of, "You always come quick.
24  Everyone else is slow"?
25  A. Yeah. Or, yes.

Page 125

32 (Pages 122 to 125)

## Golden Gate Reporting

| | |
|---|---|
| 1 particular would think that they were not required to | 1 finishing my questions. |
| 2 clock in and out. | 2    A. Right. |
| 3    Q. And how do you -- | 3    Q. Like in a conversation, we can guess what a |
| 4    A. Because of their status, or because how much | 4 person is going to say -- |
| 5 they sold, or because they were in a salary bracket, or | 5    A. Okay. |
| 6 whatever it is that they might have been thinking. | 6    Q. -- but for the record, we need to do that. |
| 7    Q. Did you specifically talk to some sales | 7    A. Yes. |
| 8 associates in any of your departments about not clocking | 8    Q. So this form or a form like it was in existence |
| 9 in? | 9 when you first started at Polo? |
| 10    A. We've had conversations surrounding that | 10    A. Yes. |
| 11 absolutely everybody should clock in, including the | 11    Q. And was this form being used when you first |
| 12 senior sellers, including the managers, I mean, | 12 started at Polo? |
| 13 including everyone. | 13    A. No, not -- no. |
| 14    Q. To your knowledge, were any sales associates | 14    Q. How do you know that this form was in existence |
| 15 ever reprimanded or spoken to about not clocking in? | 15 when you first started at Polo? |
| 16    A. Yes. | 16    A. Because every time I made an adjustment on |
| 17    Q. And who do you recall was reprimanded or spoken | 17 something, we would keep a record of it, whether it was |
| 18 to about not clocking in? | 18 initialing what we had done -- I don't know if it was |
| 19    A. Pretty much everyone I've worked with in that | 19 that elaborate, but maybe I'm just assuming that we had |
| 20 store, pretty much, at least once, for forgetting to | 20 something in place because it just seems sensible to |
| 21 clock back from their break or forgetting to clock out | 21 have that. I know that we got a little bit more strict |
| 22 when they leave, so. | 22 about the punches right before I was leaving. |
| 23    Q. Did you ever learn that any sales associate was | 23    Q. I'm going to show you what we've previously |
| 24 reprimanded or addressed because they were not clocking | 24 marked as Exhibit 23 -- |
| 25 in, in order to manipulate the records to show that they | 25    A. Okay. |
| Page 138 | Page 140 |

| | |
|---|---|
| 1 were selling more per time period than they really were? | 1    Q. -- and ask you whether you've seen a form in |
| 2    A. No. | 2 this format prior to just seeing it now. |
| 3    Q. Did you ever hear that that was happening? | 3    A. I mean, I have seen something like this. I'm |
| 4    A. No. I mean, yes. | 4 trying to figure out if it's the commission report that |
| 5    Q. And did you ever hear the name of a specific | 5 we would get. Yes. |
| 6 individual that someone believed was doing that? | 6    MR. KITCHIN: Could we go off the record for a |
| 7    A. Yes. | 7 moment? |
| 8    Q. And who was that? | 8    MR. GOINES: Sure. |
| 9    A. Justin. | 9    (Brief recess taken.) |
| 10    Q. Anyone else? | 10    Q. BY MR. KITCHIN: Were you ever present during |
| 11    A. No. I personally never believed that that was | 11 which issues relating to exiting and/or entering the |
| 12 happening. Like I said, I never witnessed it, I never | 12 building were discussed when Theresa Cruz was there? |
| 13 -- I just assumed that people were maybe unhappy with | 13    A. Yes. |
| 14 him because he was such a great seller. I never thought | 14    Q. And on how many occasions were the issues |
| 15 anything twice about it. | 15 relating to exiting and entering the building discussed |
| 16    Q. Was this time clock correction form that's | 16 when Theresa Cruz was present? |
| 17 Exhibit 20 rolled out after this lawsuit was filed, if | 17    A. When you say "discussed," I mean, people would |
| 18 you know? | 18 say, "I've waited back here for a long time," and it |
| 19    A. It was always in place. I don't believe that | 19 could be any manager. I mean, we all heard the |
| 20 we used it as much as we should have, but. | 20 complaints pretty often. |
| 21    Q. So from the time you started this -- | 21    Q. Well, I'm specifically asking whether you |
| 22    A. That form was existing, yes. | 22 recall, you know, any discussion, whether it was a |
| 23    Q. So this form was -- | 23 complaint by an employee, or in a manager meeting, any |
| 24    A. I don't know if it's the same one, but -- | 24 kind of discussion at all, relating to entering and |
| 25    Q. I'm sorry. We have to make sure that I'm | 25 exiting the building in which Theresa Cruz was present. |
| Page 139 | Page 141 |

36 (Pages 138 to 141)

**Golden Gate Reporting**

1    A. Yes.
2    Q. And was that on more than one occasion?
3    A. I mean, I don't remember. We -- that was a
4  huge topic. We talked about it quite bit, actually,
5  because there were so many complaints that would come
6  about, so.
7    Q. Same question with respect to Valerie Harrison.
8  Were there times where you actually observed a
9  discussion or a comment being made about exiting and
10  entering the building when Valerie Harrison was present?
11    A. Yes.
12    Q. On more than one occasion?
13    A. Possibly.
14    Q. While you were working at Polo, were sales
15  associates entitled, under Polo's policy, to receive two
16  15-minute breaks each day that they worked a full-time
17  shift?
18    A. Yes.
19    Q. So they were entitled to a morning 15-minute --
20    A. Mm-hm. A lunch break.
21    Q. -- an hour lunch, and then an afternoon
22  15-minute break?
23    A. Yes.
24    Q. Did all of the sales associates that you worked
25  with in your departments, to your knowledge, take all of

Page 142

1  their rest breaks?
2    A. Yes.
3    Q. Were there any sales associates that you worked
4  specifically with that you were aware were not taking
5  either their morning or afternoon break, so that they
6  could sell more?
7    A. The only time that someone might not take their
8  break is if they had an appointment.
9    Q. An appointment with a customer?
10    A. Yes.
11    Q. Were you aware of times where a person wasn't
12  able to take one of their 15-minute breaks because of an
13  appointment with a customer?
14    A. Yes.
15    Q. Do you remember specific instances of that or
16  do you just have a general recollection of that?
17    A. I can think of maybe one instance where someone
18  maybe didn't take their breaks. I mean, in the
19  departments I worked in, breaks were taken. I mean, I
20  can't think of one person that did not take their
21  breaks.
22    Q. Did you, as assistant manager key holder, or
23  manager, keep any kind of written notes as to when a
24  person within your department would be taking their rest
25  breaks?

Page 143

1    A. We had a daily break sheet, where we broke down
2  when people took their meal breaks.
3    Q. Was it just the meal breaks on the daily sheet?
4    A. The meal breaks. And when I worked in Men's,
5  which is a larger department, people would sign up for
6  15s, as well. Because they'd like to go like at a
7  certain time, like at 11, or they'd like to go at four
8  in the afternoon, so they would sign up for breaks.
9    Q. Was that a form that was kept on a computer
10  or --
11    A. Yes.
12    Q. Do you remember if it was an Excel file or --
13    A. It was a Word document, very simple.
14    Q. Did it have a table with columns and rows?
15    A. The first one did, and the second one didn't.
16  Because we liked to update the sheet, because it also
17  had other information on there. It had like daily goals
18  or customers that were coming in.
19    Q. So when you were in the Men's department, you
20  used --
21    A. I think that was Excel, because -- and when we
22  were in Ladies', it was a Word document, because it was
23  more -- just more information on it.
24    Q. And both in the Ladies' department and in the
25  Men's department, break times were pencilled in?

Page 144

1    A. Not so much the breaks, but the lunch breaks.
2    Q. But in the Men's department, people would sign
3  up for specific allotments of 15-minute breaks?
4    A. At times. It wasn't practiced all the time;
5  but at times when people had something to do, they would
6  say, "I need to run out and," you know, "do something on
7  my break," so we would write it down. But it wasn't --
8  sometimes you had appointments, so it was very hard to
9  gauge when you could go on your 15.
10    Q. Was it Polo's policy, during the whole time
11  that you worked there, that employees were not permitted
12  to leave the building during their 15-minute breaks?
13    A. No. You can leave the building whenever.
14    Q. Did you ever hear any complaints that were
15  being made by any sales associates, in any department at
16  Polo San Francisco, that they weren't taking their
17  15-minute rest breaks?
18    A. No.
19    Q. In any management meetings that you
20  participated in, was rest breaks, as a problem area,
21  ever discussed?
22    A. No. Just the time clock situation, where
23  people would forget to come in and out. We would just
24  assume that there could be an issue, but --
25    Q. With respect to rest breaks, employees didn't

Page 145

37 (Pages 142 to 145)

CERTIFICATION OF DEPOSITION OFFICER

I, MARY E. GARLAND, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was thereafter transcribed by means of computer-aided transcription under my direction; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed November 26, 2007, at San Francisco, California.

_____
MARY E. GARLAND, CSR 4721