EXHIBIT 59.

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4

5   ANN OTSUKA, an individual; JANIS        No. C-07-02780-SI
    KEEFE, an individual; CORINNE
6   PHIPPS, an individual; and
    JUSTIN KISER, an individual;
7   individually and on behalf of
    all others similarly situated,

8
                     Plaintiffs,
9      vs.

10  POLO RALPH LAUREN CORPORATION;
    a Delaware Corporation; POLO
11  RETAIL, LLC, a Delaware Corporation;
    POLO RALPH LAUREN CORPORATION, a
12  Delaware Corporation, doing business
    in California as POLO RETAIL CORP;
13  FASHIONS OUTLET OF AMERICA, INC., a
    Delaware Corporation and DOES 1-500,
14  inclusive,

15                   Defendants.
                                          /
16

17

               DEPOSITION OF KIM LEE BABKA
18

19
        DATE:          March 7, 2008
20
        TIME:          10:03 a.m.
21
        LOCATION:      Greenberg Traurig
22                     1900 University Avenue
                       Fifth Floor
23                     East Palo Alto, California

24      REPORTED BY:   Mary E. Garland
                       Certified Shorthand Reporter
25                     License Number 4721

                                              Page 1

1  are entitled to a 15-minute paid break."
2      Did you ever have any discussions or hear any
3  discussions relating to any kind of a modification of
4  rest break schedules for California employees?
5      A. No.
6      Q. Prior to the rollout of the 2007 handbook, was
7  it Polo's policy in California to provide a rest break
8  to any employee who worked more than two hours?
9      A. I don't recall that being a policy.
10     Q. Would you take a look at page POLO 1537,
11 please.
12     A. You know, I can't read what that is. So can
13 you tell me what page number?
14     MR. GOINES: Yes, the Bates are somewhat cut
15 off on that document.
16     Q. BY MR. KITCHIN: Page 36.
17     A. Oh, I'm sorry. Here it is.
18     Q. Great. "Internal Security Policies and Rules"?
19     A. Yes.
20     Q. In this section, on the next page, which is
21 page 37 of the manual, or 1538, there's a column that is
22 entitled "General Security."
23     A. Yes.
24     Q. The third bullet point reads:
25     "Bag checks must be performed anytime an

Page 122

1  clocks out, then goes and gets whatever personal items
2  they are going to take home, then finds a manager, and
3  then leaves the store?
4      A. It could be either way you described. It could
5  also be that they grab their items, they clock out, they
6  go to the door, the manager clocks them out. So it
7  could be a variation of that.
8      Q. Have you ever heard any complaints, at any
9  point in time that you've served as regional or district
10 manager or director, that employees are having to wait
11 for what they believe is an unreasonable period of time
12 between the time they clock out and the time a manager
13 is available to do a bag inspection?
14     A. I never heard such a complaint.
15     Q. Did you ever have any managers of any of the
16 stores under your jurisdiction complain that because of
17 staffing issues, people were having to wait for some
18 period of time between clock-out and bag inspection?
19     A. No.
20     Q. Did you ever have a discussion with Tin Hua in
21 which he passed on complaints that sales associates were
22 having to wait after they'd clocked out for their bag
23 checks?
24     A. I never heard that.
25     Q. Did you ever have any discussions with any of

Page 124

1      employee leaves the store. Each employee must
2      inform a manager that he or she is about to
3      leave the store with a bag, box, or any other
4      item used to carry merchandise. When the
5      manager arrives, the employee should then punch
6      out for lunch or end of shift and proceed to
7      have all bags inspected by the manager before
8      exiting the store."
9      To your knowledge, is this procedure being
10 followed in all of the stores over which you have some
11 responsibilities at this time?
12     A. No.
13     Q. It is not?
14     A. No. I can't say it's consistent. I would say
15 typically the employee grabs their -- whatever, their
16 bag, and sometimes even calls a manager ahead and says
17 they'd like to go to lunch; and the manager goes down,
18 and they punch out, and they go. That's typically how.
19     Q. At the end of a shift, when the store is closed
20 to the public and an employee is ready to leave the
21 store for the day, are employees today required to find
22 a manager to do a bag inspection or a loss prevention
23 inspection before they clock out?
24     A. No.
25     Q. Is it typically the procedure that the employee

Page 123

1  the department managers in the San Francisco store about
2  wait times for loss prevention inspections?
3      A. Discussions about -- can you be a little more
4  specific?
5      Q. Yes. Did you ever talk with any manager in the
6  San Francisco store about the wait times that were
7  involved in performing loss prevention inspections?
8      A. I never talked about wait times, but did
9  discuss the urgency in having bag inspections at the end
10 of the day at that back door. I don't know if that's
11 answering. I'm not sure of your question exactly.
12     Q. Based on your observations in all of these
13 stores in your jurisdiction, what do you think the
14 longest -- or what observation have you made as to the
15 longest time a sales associate has had to wait between
16 clocking out at the end of their shift and being
17 released from the store after a bag inspection?
18     A. After a bag inspection?
19     Q. From the time of clocking out to walking out
20 the door after having their bags inspected.
21     A. Oh, after a bag inspection? Seconds.
22     Q. Let me rephrase it. Have you ever had personal
23 observations of someone who clocked out at the end of
24 the shift and then went through a bag inspection to go
25 home? Let me try this once again.

Page 125

32 (Pages 122 to 125)

1          CERTIFICATION OF DEPOSITION OFFICER

2

3          I, MARY E. GARLAND, duly authorized to administer

4     oaths pursuant to Section 2093(b) of the California Code

5     of Civil Procedure, do hereby certify that the witness

6     in the foregoing deposition was duly sworn by me to

7     testify to the truth, the whole truth and nothing but

8     the truth in the within-entitled cause; that said

9     deposition was taken at the time and place therein

10    stated; that the testimony of said witness was

11    thereafter transcribed by means of computer-aided

12    transcription under my direction; that the foregoing is

13    a full, complete and true record of said testimony; and

14    that the witness was given an opportunity to read and

15    correct said deposition and to subscribe to the same.

16          I further certify that I am not of counsel or

17    attorney for either or any of the parties in the

18    foregoing deposition and caption named, nor in any way

19    interested in the outcome of the cause named in said

20    caption.

21          Executed March 19, 2008, at San Francisco,

22    California.

23    _____

24              MARY E. GARLAND, CSR 4721

25

EXHIBIT 60.

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4

5   ANN OTSUKA, an individual; JANIS        No. C-07-02780-SI
    KEEFE, an individual; CORINNE
6   PHIPPS, an individual; and
    JUSTIN KISER, an individual;
7   individually and on behalf of
    all others similarly situated,

8                Plaintiffs,

9      vs.

10  POLO RALPH LAUREN CORPORATION;
    a Delaware Corporation; POLO
11  RETAIL, LLC, a Delaware Corporation;
    POLO RALPH LAUREN CORPORATION, a
12  Delaware Corporation, doing business
    in California as POLO RETAIL CORP;
13  FASHIONS OUTLET OF AMERICA, INC., a
    Delaware Corporation and DOES 1-500,
14  inclusive,

15               Defendants.
                                        /
16

17
               DEPOSITION OF KIM LEE BABKA
18

19
          DATE:          March 7, 2008
20
          TIME:          10:03 a.m.
21
          LOCATION:      Greenberg Traurig
22                        1900 University Avenue
                          Fifth Floor
23                        East Palo Alto, California

24        REPORTED BY:    Mary E. Garland
                          Certified Shorthand Reporter
25                        License Number 4721

                                              Page 1

**Golden Gate Reporting**

1    are entitled to a 15-minute paid break."
2        Did you ever have any discussions or hear any
3    discussions relating to any kind of a modification of
4    rest break schedules for California employees?
5    A. No.
6    Q. Prior to the rollout of the 2007 handbook, was
7    it Polo's policy in California to provide a rest break
8    to any employee who worked more than two hours?
9    A. I don't recall that being a policy.
10   Q. Would you take a look at page POLO 1537,
11  please.
12   A. You know, I can't read what that is. So can
13  you tell me what page number?
14    MR. GOINES: Yes, the Bates are somewhat cut
15  off on that document.
16   Q. BY MR. KITCHIN: Page 36.
17   A. Oh, I'm sorry. Here it is.
18   Q. Great. "Internal Security Policies and Rules"?
19   A. Yes.
20   Q. In this section, on the next page, which is
21  page 37 of the manual, or 1538, there's a column that is
22  entitled "General Security."
23   A. Yes.
24   Q. The third bullet point reads:
25    "Bag checks must be performed anytime an

Page 122

1    clocks out, then goes and gets whatever personal items
2    they are going to take home, then finds a manager, and
3    then leaves the store?
4    A. It could be either way you described. It could
5    also be that they grab their items, they clock out, they
6    go to the door, the manager clocks them out. So it
7    could be a variation of that.
8    Q. Have you ever heard any complaints, at any
9    point in time that you've served as regional or district
10  manager or director, that employees are having to wait
11  for what they believe is an unreasonable period of time
12  between the time they clock out and the time a manager
13  is available to do a bag inspection?
14   A. I never heard such a complaint.
15   Q. Did you ever hear any managers of any of the
16  stores under your jurisdiction complain that because of
17  staffing issues, people were having to wait for some
18  period of time between clock-out and bag inspection?
19   A. No.
20   Q. Did you ever have a discussion with Tin Hua in
21  which he passed on complaints that sales associates were
22  having to wait after they'd clocked out for their bag
23  checks?
24   A. I never heard that.
25   Q. Did you ever have any discussions with any of

Page 124

1    employee leaves the store. Each employee must
2    inform a manager that he or she is about to
3    leave the store with a bag, box, or any other
4    item used to carry merchandise. When the
5    manager arrives, the employee should then punch
6    out for lunch or end of shift and proceed to
7    have all bags inspected by the manager before
8    exiting the store."
9    To your knowledge, is this procedure being
10  followed in all of the stores over which you have some
11  responsibilities at this time?
12   A. No.
13   Q. It is not?
14   A. No. I can't say it's consistent. I would say
15  typically the employee grabs their -- whatever, their
16  bag, and sometimes even calls a manager ahead and says
17  they'd like to go to lunch; and the manager goes down,
18  and they punch out, and they go. That's typically how.
19   Q. At the end of a shift, when the store is closed
20  to the public and an employee is ready to leave the
21  store for the day, are employees today required to find
22  a manager to do a bag inspection or a loss prevention
23  inspection before they clock out?
24   A. No.
25   Q. Is it typically the procedure that the employee

Page 123

1    the department managers in the San Francisco store about
2    wait times for loss prevention inspections?
3   A. Discussions about -- can you be a little more
4  specific?
5   Q. Yes. Did you ever talk with any manager in the
6  San Francisco store about the wait times that were
7  involved in performing loss prevention inspections?
8   A. I never talked about wait times, but did
9  discuss the urgency in having bag inspections at the end
10  of the day at that back door. I don't know if that's
11  answering. I'm not sure of your question exactly.
12   Q. Based on your observations in all of these
13  stores in your jurisdiction, what do you think the
14  longest -- or what observation have you made as to the
15  longest time a sales associate has had to wait between
16  clocking out at the end of their shift and being
17  released from the store after a bag inspection?
18   A. After a bag inspection?
19   Q. From the time of clocking out to walking out
20  the door after having their bags inspected.
21   A. Oh, after a bag inspection? Seconds.
22   Q. Let me rephrase it. Have you ever had personal
23  observations of someone who clocked out at the end of
24  the shift and then went through a bag inspection to go
25  home? Let me try this once again.

Page 125

1            CERTIFICATION OF DEPOSITION OFFICER

2

3        I, MARY E. GARLAND, duly authorized to administer

4    oaths pursuant to Section 2093(b) of the California Code

5    of Civil Procedure, do hereby certify that the witness

6    in the foregoing deposition was duly sworn by me to

7    testify to the truth, the whole truth and nothing but

8    the truth in the within-entitled cause; that said

9    deposition was taken at the time and place therein

10   stated; that the testimony of said witness was

11   thereafter transcribed by means of computer-aided

12   transcription under my direction; that the foregoing is

13   a full, complete and true record of said testimony; and

14   that the witness was given an opportunity to read and

15   correct said deposition and to subscribe to the same.

16        I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21        Executed March 19, 2008, at San Francisco,

22   California.

23

24                   _____
                     MARY E. GARLAND, CSR 4721

25

EXHIBIT 61.

**Golden Gate Reporting**

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                       SAN FRANCISCO DIVISION

4

5    ANN OTSUKA, an individual;
     JANIS KEEFE, an individual;
6    CORINNE PHIPPS, an individual;
     and JUSTIN KISER, an individual;
7    individually and on behalf of
     all others similarly situated,

8
                     Plaintiffs,
9                                        Case No. c-07-02780-SI
     and
10
     POLO RALPH LAUREN CORPORATION,
11   a Delaware corporation; POLO
     RETAIL, LLC, a Delaware corporation;
12   POLO RALPH LAUREN CORPORATION, a
     Delaware corporation, doing
13   business in California as POLO
     RETAIL CORP; FASHIONS OUTLET OF
14   AMERICA, INC., a Delaware
     corporation; and DOES 1-500,
15   inclusive,

16                   Defendants.
                                          /
17

18                 DEPOSITION OF THERESA CRUZ

19   DATE:          August 20, 2007

20   TIME:          10:00 a.m.

21   LOCATION:      LAW OFFICE OF PATRICK R. KITCHIN
                    565 Commercial Street
22                  Fourth Floor
                    San Francisco, California 94111

23

24   REPORTED BY:  Katy Leonard
                   Certified Shorthand Reporter
25                 License Number 11599

                                                    Page 1

# Golden Gate Reporting

1  was more of a floor coverage -- that making sure that no
2  two people in that department will go at the same time
3  for their 15-minute break or the lunch break.
4      Q. And has that -- were those conversations
5  taking place since this policy manual was put out, or
6  are those conversations that you've had over the course
7  of a longer period of time?
8      A. It's a longer period of time.
9      Q. With respect to meal breaks -- I'm sorry.
10     With respect to the 15-minute rest breaks,
11  have you ever heard any complaint by any employees that
12  they have not been permitted to take their 15-minute
13  rest breaks?
14     A. No.
15     Q. Have you ever heard any managers complain
16  that their associates are just not taking their
17  15-minute rest breaks, even though they're being offered
18  that time?
19     A. No.
20     Q. If you turn to the next page, 1525, there's
21  a reference under "Sample Break Chart." It refers to
22  the very bottom of the page:
23     "Employees in CA -- in California who
24     work more than two hours are entitled to
25     a 15-minute paid break."

Page 218

1      Was that a policy change that occurred in
2  conjunction with the rollout of this April, 2007
3  handbook?
4      A. Say that again.
5      Q. Yeah. Page 1525 says that California
6  employees who work more than two hours are entitled to a
7  15-minute break. It says it right at the very bottom in
8  tiny print.
9      A. Yes.
10     This one. (Indicating)
11     MR. GOINES: (Indicating)
12  BY MR. KITCHIN:
13     Q. Do you see that?
14     A. Yes.
15     Q. Okay. Was that, if you know, a new policy
16  that was rolled out in 2007 that hadn't been used as a
17  policy before then?
18     A. I don't recall.
19     Q. Okay. Um, I'm going to have you turn to
20  page 1532 of the manual.
21     Since this manual was rolled out, have you
22  hired any new sales associates?
23     A. Um, yes.
24     Q. Have you gone over the Employee Conduct and
25  Responsibility Section of this manual that's found at

Page 219

1  Polo 1532?
2      A. Yes.
3      Q. And do you -- do you actually read each of
4  these items to the employee?
5      A. No.
6      Q. Do you -- how do you go over these different
7  prohibitive behavior items?
8      A. I ask them if they have any questions, and
9  if they have any questions, that's the time we discuss
10  this problem.
11     Q. I'm going to have you look at page 1538.
12     A. Okay.
13     Q. Top of the right-hand column says, "General
14  Security." The second bullet point reads, quote:
15     Bag checks must be performed any time
16     the employee leaves the store.
17     That's been a policy since you've started
18  there; correct?
19     A. Yes.
20     Q. Next sentence reads, quote:
21     Each employee must inform a manager that
22     he or she is about to leave the store
23     with a bag, box, or any other item used
24     to carry merchandise, closed quote.
25     Now, that's been a policy in the store since

Page 220

1  you started working there; right?
2      A. Yes.
3      Q. And not only must an employee notify a
4  manager if they're leaving with a box or bag, even if
5  they're leaving with nothing but their clothes, they
6  still need to inform a manager; correct?
7      A. Yes.
8      Q. The next sentence reads, quote:
9      When the manager arrives, the employee
10     should then punch out for lunch or end
11     of shift and proceed to have all bags
12     inspected by the manager before exiting
13     the store.
14     Is this the first time, in your knowledge,
15  that Polo has had a specific policy that states that the
16  employee is not to punch out for lunch or the end of a
17  shift until they have secured the assistance of a
18  manager to do a bag inspection?
19     A. I -- I cannot recall on this one.
20     Q. Okay. Do you recall at any time when you
21  worked at Polo where a written document was provided to
22  sales associates that said, You must find a manager to
23  help you do the bag inspection before you punch out?
24     A. I don't recall.
25     Q. Okay. Do you recall ever hearing any

Page 221

56 (Pages 218 to 221)

**Golden Gate Reporting**

1  manager tell any associate that before you punch out for
2  lunch or at the end of a shift, you must first find a
3  manager to make sure that that manager can let you out
4  of the door?
5      A.  Yes.
6      Q.  You've heard that someone said that you must
7  find a manager before you punch out?
8      A.  I'm sorry.  No, no.
9      Q.  Okay.  So, you've never heard any manager
10  tell an employee prior -- well, before this policy was
11  rolled out, you never heard a manager tell an employee
12  that they must find a manager to help them get out of
13  the store before they punch out?
14      A.  No.
15      Q.  I'm going to have you turn to page 1556
16  under the section in the left column, "How You Are
17  Paid."
18          When you had the meeting to discuss with
19  other managers the rollout of this new policy manual,
20  was one of the items on the outline you told me you
21  saw -- did it refer to overtime compensation for
22  employees?
23      A.  There are no overtime for compensation
24  employees.
25      Q.  My question is, When you had the meeting to

1      A.  I can't remember.
2      Q.  Do you remember if there was any reference
3  on the outline to a policy change that referred to
4  overtime compensation?
5      A.  I don't remember.
6      Q.  Do you remember any discussion during any
7  meeting or meetings that this new policy manual was
8  discussed, where anyone discussed whether employees, and
9  specifically sales associates, have the right to receive
10  overtime compensation -- premium overtime compensation?
11      A.  No.
12      Q.  Are any employees currently receiving any
13  premium overtime compensation?
14      A.  No.
15      Q.  Do you know if anyone at Polo, whether in
16  your store, the corporate office, is performing any kind
17  of an analysis of the sales records of specific sales
18  associates to determine whether they are entitled to
19  receive premium overtime compensation?
20      A.  No.
21      Q.  Have you heard --
22      MR. GOINES:  Excuse me one second.
23          (Off-the-record discussion.)
24      MR. KIM:  And let the record reflect that
25  defense counsel has just communicated with and advised

1  discuss the rollout of this new manual -- there was
2  meeting held; correct?
3      A.  I didn't roll out this new manual.
4      Q.  No, no.  This new manual was put into effect
5  sometime this year, 2007; correct?
6      A.  Yes.
7      Q.  And there was a meeting held with managers
8  to discuss the new policies; correct?
9      A.  Yes.
10      Q.  And one of the things you received during
11  that meeting was an outline showing you these are the
12  policies that have been modified in some way; correct?
13      A.  I do not recall.  I cannot remember
14  everything that's outlined there.
15      Q.  Right.  But there was an outline that you
16  were provided.
17      MR. GOINES:  No.  She said -- go on.
18      MR. KITCHIN:  Let me make sure we're on the same
19  page.
20  BY MR. GOINES:
21      Q.  You received some kind of an outline showing
22  these are some policy changes?
23      A.  Yes.
24      Q.  You don't remember exactly which policy
25  changes were discussed in the outline; correct?

1  the deponent.
2      MR. GOINES:  You can say whatever you want to
3  say and I can say whatever I want to say, but I didn't
4  advise her.  I asked her a question, and it's
5  privileged.  So, I don't appreciate your gratuitous
6  statements that have no meaning and no effect.  I can
7  talk to our client whenever I want to.
8      MR. KIM:  Okay.  I'm going to actually
9  apologize.  I said "advise."  That was inappropriate,
10  because I don't know exactly what happened.
11          I just want to put on the record that after
12  that question was posed, defense counsel had a
13  communication with the deponent.  It's my right to make
14  the record reflect that.  And when I said something
15  further, I was overreaching and I apologize for that.
16      MR. GOINES:  The witness needs to correct a
17  statement that she made in response to a prior question.
18  She said that no employees in Polo San Francisco get
19  overtime compensation.  That's not correct, and I'll
20  allow her to correct the record.
21      THE WITNESS:  My shipping people, my alterations
22  department, receives overtime time-and-a-half in excess
23  of eight hours.
24      MR. KITCHIN:  I see.
25      THE WITNESS:  Yes.

**415.499.DEPO ~ 1.866.936.DEPO**
**www.GoldenGateReporting.com**                    ©2007

**Golden Gate Reporting**

CERTIFICATION OF DEPOSITION OFFICER

1

2

3          I, KATY LEONARD, duly authorized to

4    administer oaths pursuant to Section 2093(b) of the

5    California Code of Civil Procedure, hereby certify that

6    the witness in the foregoing deposition was by me sworn

7    to testify to the truth, the whole truth and nothing but

8    the truth in the within-entitled cause; that said

9    deposition was taken at the time and place therein

10   stated; that the testimony of the said witness was

11   thereafter transcribed by means of computer-aided

12   transcription; that the foregoing is a full, complete

13   and true record of said testimony; and that the witness

14   was given an opportunity to read and correct said

15   deposition and to subscribe the same.

16          I further certify that I am not of counsel

17   or attorney for either or any of the parties in the

18   foregoing deposition and caption named, or in any way

19   interested in the outcome of this cause named in said

20   caption.

21

22

23

24

25          KATY LEONARD, CSR 11599

Page 261

EXHIBIT 62.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANN OTSUKA, et al.,

        Plaintiff,

-vs-

No. C07-02780 BZ

POLO RALPH LAUREN
CORPORATION, a Deleware
corporation, et al.

        Defendants.
_____/

**CERTIFIED COPY**

Videotaped Deposition of

CORINNE PHIPPS

Tuesday, June 12, 2007

Reported by:
KACY PARKER BARAJAS, RPR, CRR
CSR No. 10915
Job No. 15854LR



**PHILLIPS LEGAL SERVICES**
SAN FRANCISCO DEPOSITION REPORTERS
ONE SUTTER STREET, SUITE 700
SAN FRANCISCO, CA 94104
1-888-333-8270
WWW.PHILLIPSDEPO.COM

1    whatever he did was -- you know, was gold.

10:43:28  2             MR. FEDER:  Could we take a short break just to use

3    the restroom.

4             MR. GOINES:  Yeah.  Sure.  No problem.

5             THE VIDEOGRAPHER:  This marks the end of tape

6    number one in the deposition of Corinne Phipps.  Going off

10:43:38  7    the record, the time is 10:43 a.m.

10:55:44  8             (Brief recess taken.)

9             THE VIDEOGRAPHER:  Back on the record.  Here marks

10    the beginning of tape number two in the deposition of

11    Corinne Phipps.  The time is 10:55 a.m.

10:55:56 12    Q.        BY MR. GOINES:  All righty.  Ms. Phipps, in

13    response to an earlier question, you indicated that one of

14    the other issues that impacted your decision to resign

15    was -- my shorthand notes say, waiting to check out?

16    A.        Uh-huh.

17    Q.        Can you tell me what you meant by that and how it

18    impacted -- I know I shouldn't ask you two or three

19    questions at a time, but I'm going to try -- how it impacted

20    your decision to resign?

21    A.        Well, I stated earlier I was engaged at this time,

10:56:30 22    and I would have wedding appointments or, I don't know,

23    engagement appointments to go talk to bridal people.  There

24    was an appointment we had at the Omni Hotel for -- to check

25    out the site to see if we wanted to have our wedding there.

1    And also my fiance lived in Mountain View, so I would have

2    to -- I had appointments to get to the train.  It wasn't my

3    appointment.  It was Caltrans appointment.  So the train was

10:56:57 4    actually leaving the station.  And on numerous occasions I

5    missed appointments.  I missed the train.  I -- just beyond

6    frustrated that when you're -- when I clocked out, I would

7    have to wait at the back door for a manager to come look

8    through my things and then unkey the door and let me out.

9    Q.       Okay.  Let me see if I can just kind of delve into

10:57:29 10    that a little bit.

11    A.       Sure.

12    Q.       At the time you became a Polo employee, did you

13    learn that one of the Polo practices was to check employees'

14    bags and personal effects, if you will, as they were

15    departing the store either for a lunch break or at the end

16    of their work shift?

17    A.       Yes.  I did know that.

18    Q.       And was this something that was explained to you in

19    the hiring process?

20    A.       Yeah.

10:57:59 21    Q.       And was -- were those discussions with Tin?

22    A.       I don't recall who they were with, but I know I was

23    briefed on them.

24    Q.       And if I can take you to when you were briefed on

25    them, what were you told?

1  register that you would be clocking out on, so you could
2  only clock out on one register computer -- computer and
3  register. It's the same. They're synonymous.
4  Q.    I'm using those as synonyms as well.
5  A.    Okay. Great. So then I would go back to her
6  computer and clock out. That would generally be -- well,
7  we're talking about clocking out. Yeah. So that would
8  generally be when the store had already been closed and the
9  doors were locked, and there were no more customers in the
10  store.
11  Q.    And then you would go to the back. Was there only
12  one exit where employees such as yourself could depart at
13  the end of your shift?
14  A.    Yeah, yes.
15  Q.    And that was at the rear of the store?
16  A.    I don't know if it was at the rear. It's not at
17  the rear of the store. It's more like in the basement of
18  the store.
19  Q.    And if someone was there, they would go take a look
20  at your bag and good evening, see you tomorrow?
21  A.    Relatively, yeah. They would look in your bag,
22  make sure you didn't have anything that was not -- you know,
23  they would make sure that there were no Polo property in
24  your purse that didn't have a receipt for it. They would
25  put a key in the door or in the wall. I think it was in the

Page 61

1  wall. Maybe it was in the door. I don't remember. And
2  then they would let you out so the alarm wouldn't go off.
3  Q.    And then you indicated there were -- I don't want
4  to put words in your mouth, nor do I want to mischaracterize
5  what you said, but there were occasions where you had to
6  call for a manager to allow you to be -- to allow the loss
7  prevention search to take place and then depart?
8  A.    Correct.
9  Q.    Okay. And I think you indicated kind of putting
10  two and two together on occasion, I don't want -- I
11  want you to quantify it if you can.
12  A.    Okay.
13  Q.    I had to -- it took a long time to get a manager to
14  come, and I missed appointments, missed trains, and the
15  like, correct?
16  A.    That is correct.
17  Q.    Okay. So you worked at the company from the latter
18  part of June to the latter part of October. Are you able to
19  tell me did you keep any record of the days where it was
20  longer than a moment or two for you to check out of the
21  store, a moment or two meaning a manager was there within
22  close proximity as opposed to when you specifically had to
23  call for a manager to come to the door to allow you to be
24  exited?
25  A.    So you're asking if I have any written record of

Page 62

1  this?
2  Q.    Right.
3  A.    No. It's all mental.
4  Q.    Okay. So bearing on your recollection of how --
5  what I'm trying to find is a quantification of the number of
6  days where you had to wait longer than a moment or two and
7  then -- well, let me stop there.
8  A.    Sure.
9  Q.    Okay. How many -- can you quantify the number of
10  occasions where you had to wait for a manager to be
11  contacted to arrive at the exit door and be checked out?
12  A.    Now we're only talking about checking out at night;
13  is that correct?
14  A.    Yes, ma'am, yes.
15  A.    That's it?
16  Q.    Yeah.
17  A.    I would probably say to my best recollection
18  probably three times a week out of five.
19  Q.    Okay.
20  A.    That I would have to wait any -- in an upwards of a
21  half an hour.
22  Q.    And when you say three times a week wait upwards to
23  a half an hour, was it always a half hour? Was it sometimes
24  five minutes? I'm trying to get some recollection of how
25  long this would take.

Page 63

1  A.    It would take anywhere -- my best guess -- and this
2  is just wait time, not when a manager is standing right
3  there; is that correct?
4  Q.    Right.
5  A.    Anywhere probably from ten minutes to a half an
6  hour.
7  Q.    And this would happen -- ten minutes to a half hour
8  would happen three times a week checking out?
9  A.    Very regularly, yes. That's my definition of
10  happening regularly, at least three times a week checking
11  out.
12  Q.    You seem to want to make sure we're talking about
13  checking out. Were there other occasions where you had to
14  wait to either check in or check out?
15  A.    Oh, yeah.
16  Q.    Okay. Explain those to me, please, so I can
17  inquire about those.
18  A.    Okay. So when you had to check in at a certain --
19  let's just say when you're starting your shift in the
20  morning, this is -- actually, whenever you're starting your
21  shift, now that I -- whenever you would start your shift,
22  you would have to ring the doorbell to be let in. And if
23  there was not a manager down in the area waiting or
24  listening to a bell or on their lunch break or what have
25  you, you would be waiting outside to come in to check in to

Page 64

16 (Pages 61 to 64)

REPORTER'S CERTIFICATE

I certify that the witness in the foregoing deposition,

CORINNE PHIPPS

was by me duly sworn to testify in the within-entitled cause; that said deposition was taken at the time and place therein named; that the testimony of said witness was reported by me, a duly Certified Shorthand Reporter of the State of California authorized to administer oaths and affirmations, and said testimony was thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said deposition.

IN WITNESS WHEREOF, I have hereunto set my hand this 25th day of June, 2007.

_____
KACY PARKER BARAJAS, RPR
Certified Realtime Reporter
State of California
Certificate No. 10915

Page 189

---

PHILLIPS LEGAL SERVICES
One Sutter Street, Suite 700
San Francisco, California 94104
(415) 601-4601

GREENBERG TRAURG
WILLIAM J. GOINES, ESQ.
1900 University Avenue, Fifth Floor
San Francisco, CA 94303

Case Name: Ann Otsuka, et al. v. Polo Ralph Lauren
Deposition of: Corinne Phipps
Date Taken: June 12, 2007

Dear Mr. Goines:

We wish to inform you of the disposition of this original transcript. The following procedure is being taken by our office:

_____ The witness has read and signed the deposition. (See attached.)

_____ The witness has waived signature.

_____ The time for reading and signing has expired.

_____ The sealed original deposition is being forwarded to your office.

_____ Other:

Sincerely,

Phillips Legal Services
Ref No. 15854LR

cc: Patrick R. Kitchin, Esq.

Page 191

---

PHILLIPS LEGAL SERVICES
One Sutter Street, Suite 700
San Francisco, California 94104
(415) 601-4601

June 27, 2007

Corinne Phipps
c/o LAW OFFICE OF PATRICK R. KITCHIN
565 Commercial Street, Fourth Floor
San Francisco, CA 94111
Re: Deposition of Corinne Phipps
Case Name: Ann Otsuka, et al. v. Polo Ralph Lauren
Deposition Date: June 12, 2007
Dear Ms. Phipps:

Your deposition has been prepared and is ready for you to read, correct, and sign. The original will be held in our office for 35 days from the date of this letter.

If you are represented by an attorney, you may wish to discuss with your attorney the reading and signing of your deposition. If your attorney has purchased a copy of your deposition, you may review that copy. If you choose to read your attorney's copy, please fill out, sign, and submit to our office the DEPONENT'S CHANGE SHEET from the back of your deposition.

If you choose to read your deposition at our office, it will be available between 9:00 a.m. and 4:00 p.m. Please bring this letter as a reference.

If you do not wish to read your deposition, please sign below and return within 30 days of the date of this letter.

_____
CORINNE PHIPPS          DATE

Sincerely,

KACY PARKER BARAJAS, CSR No. 10915
Phillips Legal Services
Ref No. 15854LR
cc: William J. Goines, Esq.

Page 190

1                    REPORTER'S CERTIFICATE

2

3         I certify that the witness in the foregoing

4   deposition,

5                    CORINNE PHIPPS

6   was by me duly sworn to testify in the within-entitled

7   cause; that said deposition was taken at the time and place

8   therein named; that the testimony of said witness was

9   reported by me, a duly Certified Shorthand Reporter of the

10  State of California authorized to administer oaths and

11  affirmations, and said testimony was thereafter transcribed

12  into typewriting.

13        I further certify that I am not of counsel or

14  attorney for either or any of the parties to said

15  deposition, nor in any way interested in the outcome of the

16  cause named in said deposition.

17        IN WITNESS WHEREOF, I have hereunto set my hand

18  this 25th day of June, 2007.

19

20

21                    _____
                      KACY PARKER BARAJAS, RPR
22                    Certified Realtime Reporter
                      State of California
23                    Certificate No. 10915

24

25

EXHIBIT 63.

ANN OTSUKA VS. POLO RALPH LAUREN CORP

JUSTIN KISER - 12/4/07

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



Ellen Grauer
COURT REPORTING Co. LLC

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

ANN OTSUKA                                                    VS. POLO RALPH LAUREN CORP
JUSTIN KISER - 12/4/07

---

Page 261

(2) out of the week and the other two I'd open.
(3)    Q.   What was opening shift hours?
(4)    A.   9:15 to 6.
(5)    Q.   But I thought you said that even
(6) when you only were scheduled to work to 6 you
(7) still had --
(8)    A.   Well, I'm just telling you the --
(9) what the scheduled hours were.  That wasn't
(10) what my hours were.
(11)    Q.   Okay.  My question was did you
(12) always work closing shift?
(13)    A.   I always worked until closing
(14) shift, like, after 7 p.m.
(15)    Q.   So you always worked until after
(16) the store closed and were responsible for the
(17) end-of-day cleanup?
(18)    A.   Yes.
(19)    Q.   Always?
(20)    A.   Always.
(21)    Q.   How long did it take to walk from
(22) the clock-out register to the exit door?
(23)    A.   Three to four minutes.
(24)    Q.   Did you ever miss an appointment
(25) after work because you had to wait for the bag

---

Page 262

(2) check to occur?
(3)    A.   Yes.
(4)    Q.   What appointment did you miss?
(5)    A.   I missed an appointment with my
(6) mother, an appointment with friends and I
(7) believe it was either a dental or a doctor
(8) appointment.  I'm not sure exactly.
(9)    Q.   How many times did you miss an
(10) appointment with your mother?
(11)    A.   Well, it happened once and she
(12) goes, "I'm not waiting for you anymore.  This
(13) is ridiculous."  She was going to pick me up
(14) after work and she was just waiting.  She
(15) figured I'd get out at 7.  I said, "Well, I get
(16) off at 7, but I don't know what time I'm going
(17) to get out."  So, she got there at 7 and was,
(18) like, "This is ridiculous."  You know, kept
(19) calling the store and then --
(20)       And then finally she refused to
(21) pick me up anymore because she's, like, "I
(22) don't know what time you're getting out of
(23) there.  How can they keep you this late?"
(24)    Q.   So, the appointment was that your
(25) mother was picking you up?

---

Page 263

(2)    A.   She was picking me up and then one
(3) time she was taking me to either a doctor or a
(4) dentist.  That's where we were supposed to go
(5) to that night.
(6)    Q.   So the mother and the doctor and
(7) dentist was the same appointment?
(8)    A.   Yes.
(9)    Q.   And friends, how many appointments
(10) with your friends did you miss because you had
(11) to -- because of the bag check?
(12)    A.   Numerous.
(13)    Q.   Numerous appointments.  Well,
(14) didn't you by this point just tell them to meet
(15) you somewhere where they wanted to be?
(16)    A.   Well, why would I tell someone that
(17) when I had scheduled hours?
(18)    Q.   Well, because presumably after a
(19) certain time you realized that you couldn't
(20) predict what time you would be leaving.
(21)    A.   After a while I would say, you
(22) know, "I'll just meet you there," but towards
(23) the beginning of my employment I figured I'd
(24) get out at 7.  But then as I saw it progress
(25) and they're like, "No, you can't leave."

---

Page 264

(2)       You know, then I was like, "Let me
(3) meet you there" or "I'll meet you at my house"
(4) or -- but I missed quite a few appointments
(5) before I knew how late on average I was going
(6) to be getting out.
(7)    Q.   And how many appointments did you
(8) miss until you determined that?
(9)    A.   I don't know an exact number.
(10)    Q.   I mean, are we talking five or ten
(11) or twenty or thirty?
(12)    A.   Probably ten, eight to ten.
(13)    Q.   Did you ever find the bag check
(14) process to be humiliating?
(15)    A.   A little bit, yes.
(16)    Q.   Why?
(17)    A.   Well, I just felt like they
(18) weren't -- we had to keep our bags in a certain
(19) area down by the door and then I felt like
(20) they, you know, really weren't trusting us, you
(21) know, and then we had -- we could keep certain
(22) things in our lockers, but, you know --
(23)       I don't know, I just felt like why
(24) do they need to go through all of my stuff.
(25) They would even make me open my sunglass case,

---

324

1                    C E R T I F I C A T E

2

3    STATE OF NEW YORK      )

4                          )ss.:

5    COUNTY OF NEW YORK     )

6

7              I, SOPHIE NOLAN, a Notary Public

8        within and for the State of New York, do

9        hereby certify:

10             That JUSTIN KISER, the witness

11       whose deposition is herein before set forth,

12       was duly sworn by me and that such deposition

13       is a true record of the testimony given by

14       such witness.

15             I further certify that I am

16       not related to any of the parties to this

17       action by blood or marriage; and that I am in

18       no way interested in the outcome of this

19       matter.

20             IN WITNESS WHEREOF, I have

21       hereunto set my hand this 17th day of December,

22       2007.

23

24                          _Sophie Nolan_

25                          SOPHIE NOLAN

EXHIBIT 64.

**Golden Gate Reporting**

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4

 5   ANN OTSUKA, an individual;      )
     JANIS KEEFE, an individual,     )
 6   CORINNE PHIPPS, an              )
     individual; and RENEE DAVIS,    )
 7   an individual; individually     )
     and on behalf of all others     )
 8   similarly situated,             )
                Plaintiffs,          )
 9                                   )

10      -vs-                         )   No. C-07-02780-SI

11                                   )

12   POLO RALPH LAUREN CORPORATION;  )
     a Delaware Corporation; POLO    )
13   RETAIL, LLC., a Delaware        )
     Corporation, POLO RALPH LAUREN  )
14   CORPORATION, a Delaware         )
     Corporation, doing business in  )
15   California as POLO RETAIL       )
     CORP; FASHIONS OUTLET OF        )
16   AMERICA, INC., a Delaware       )
     Corporation,                    )
17             Defendants.           )

18   _____)

19

20           The deposition of HARVEY RESNICK, called
     by the Plaintiffs for examination, pursuant to
21   subpoena and pursuant to the Federal Rules of
     Civil Procedure for the United States District
22   Courts pertaining to the taking of depositions,
     taken before Cynthia J. Conforti, Certified
23   Shorthand Reporter, at Suite 2500, 77 West Wacker
     Drive, Chicago, Illinois, commencing at the hour
24   of 10:09 a.m. on the 23rd day of April, A.D.,
25   2008.
```

Page 1

**Golden Gate Reporting**

1    Q.  How often would that happen?
2    A.  It's hard to day.  It depended on I think
3   really the time of the year.  I think at holiday
4   time it was more frequent than others probably
5   just because the volume of traffic through the
6   store during the day required much more in the way
7   of cleanup and preparation for the next day, and
8   so some people would be finished, others were not,
9   and those who were ready to leave wanted to leave,
10  and they would page or call looking for a manager.
11       Managers such as myself, I was upstairs in
12  my area, and the other manager if it women's or
13  home furnishings, they were located downstairs
14  closer to that exit, so it was always my hope that
15  somebody from downstairs would let them out so I
16  didn't have to go downstairs and back upstairs.
17       Q.  So on occasion you would hear a page or
18  get a call saying "We're ready to go."
19       A.  Yeah.
20       Q.  And let's deal with when you heard a page.
21       On occasion did you hear a page that sales
22  associates were waiting at the employee exit in
23  which you didn't respond to it hoping that a
24  manager from downstairs would walk over and do the
25  inspection?

Page 42

1    A.  Yes.
2    Q.  Did you ever hear that any of the managers
3   were particularly nonresponsive to pages or
4   requests to have loss prevention inspections
5   performed?
6    A.  Not specifically.  Just in general
7   sometimes it seemed that to the sales associates
8   that they were waiting a long time, and they would
9   become impatient.
10       Q.  Did any sales associates ever tell you
11  that they believed they had waited a long time for
12  the loss prevention inspection to occur?
13       A.  Yes.
14       Q.  Was that on a single occasion or a number
15  of occasions?
16       A.  More than once.
17       Q.  Do you remember any specific individuals
18  who told you that they had been waiting for what
19  they thought was an unreasonable amount of time at
20  the back door?
21       A.  Not specifically, no.
22       Q.  Do you recall in general or specifically
23  how long a sales associate told you that they had
24  been waiting to have a loss prevention inspection
25  performed?

Page 43

1    A.  Oh, I think sometimes they would say
2   they'd been waiting 10, 15 minutes.
3    Q.  Did you ever go down to do a loss
4   prevention inspection to find anyone sitting on
5   the floor in the hallway?
6    A.  Yes.
7    Q.  How often did that occur?
8    A.  It was not unusual that there were groups
9   of people waiting to leave.  They'd be sitting on
10  the floor there.
11       Q.  At the close of business was it the case
12  that individuals from different departments, maybe
13  even your department, left at different times and
14  so required inspections to be performed?
15       A.  Yes, that's right.
16       So as they would -- as each one would be
17  ready to leave, they would want somebody to come
18  to the door to do the inspection so that they
19  could leave, which, since there was nobody
20  assigned to that position, there was nobody -- not
21  one manager was assigned to watch, you know, stay
22  at the door and release everybody as they come
23  through, then that's why it would occur that, you
24  know, three or four, five people might be sitting
25  there waiting to leave, waiting for a manager to

Page 44

1   come, and for a manager it was a bit of a strain
2   to go back and forth to your department to let one
3   person out, go back, let another one out, go.  It
4   wasn't unusual for managers not to respond to the
5   first call for someone to let them out.
6    Q.  Were there occasions where at the close of
7   business you went down to the employee exit more
8   than one time to let people out?
9    A.  Yes.
10       Q.  Do you have any recollection of kind of
11  the length of time that you're aware of between
12  the first person or group of people leaving at the
13  close of business and the last people to finish up
14  to be released and waiting for their loss
15  prevention inspection?
16       A.  Well, sometimes the very first people to
17  be finished would be from one of the departments
18  in the lower level of the store.  They might be
19  done within 10 minutes of the store closing and be
20  out and able to leave.  A lot of times, very
21  often, people in the men's area were still working
22  another 30 minutes.  Wouldn't be that unusual,
23  especially again to have this little repetition
24  for the holiday time.
25       You know, a big portion of my six months

Page 45

12 (Pages 42 to 45)

## Golden Gate Reporting

1  search, either Tin or Theresa?
2      A.  Yes, they both did it from time to time.
3      Q.  What I'm trying to hone in on,
4  Mr. Resnick, is you indicated that there were
5  times that you would actually be summoned to the
6  door through a page and found sales associates
7  several sitting on the floor --
8      A.  That's correct.
9      Q.  -- in the hallway.
10     A.  That is correct.
11     Q.  And then one or some of them would say,
12 "I've been waiting for 10 minutes" or "I've been
13 waiting for 15 minutes.  Thanks for coming down.
14 I want to go home."
15         What I'm trying to do is if you can
16 quantify the number of times that you understood
17 sales associates had been waiting more than a few
18 minutes for someone to actually perform the loss
19 prevention search and allow them to exit the
20 store.
21     A.  I don't think I could put an exact number
22 on it.  Just to say that it was numerous times.
23 It wasn't a rare occasion.  It was a more common
24 occurrence.
25     Q.  Would you put -- did it occur more than

Page 98

1      Q.  Okay.  Other than people in Mr. Kitchin's
2  office with whom have you discussed this lawsuit?
3      A.  No one.
4      Q.  Do you know a gentleman by the name of Dan
5  Fetter?
6      A.  No.
7      Q.  Mr. Resnick, if I understand your
8  testimony this morning, the department that you
9  mentioned, which was the men's clothing and the
10 men's sport department, all things being equal
11 required more work at the end of the day to clean
12 up what had been taken out during the course of
13 the day, restocked, reshelved than the women's
14 department or the home collection department,
15 correct?
16     A.  That's fair to say, yes.
17     Q.  And so if I understand correctly, the
18 normal course of events would be that the home
19 collection sales associates would probably be the
20 first to go clean up, and they would go through
21 loss prevention and go home.
22     A.  Correct.
23     Q.  Probably women's would be second, they had
24 a little bit more to do than the home collection
25 but less to do than your department.

Page 100

1  half the times that you were on site?
2      MR. KITCHIN:  Objection, calls for
3  speculation.
4      THE WITNESS:  Let's say it occurred at
5  least once every week.
6  BY MR. GOINES:
7      Q.  I understood I asked you about your
8  familiarity with the other stores.  Do you have
9  any familiarity of the physical layout of any of
10 the other Polo Ralph Lauren stores, full price
11 retail stores?  Would that resonate would you?
12     A.  I really don't.
13     Q.  Okay.  All right.
14         Have you talked to Justin Kaiser about
15 this lawsuit?
16     A.  Other than to acknowledge that there is a
17 lawsuit, no.
18     Q.  Have you talked to Corinne Phipps about
19 this lawsuit?
20     A.  No.
21     Q.  Janis Keefe, have you discussed this
22 lawsuit with her?
23     A.  No.
24     Q.  And you did not know Ann Otsuka, correct?
25     A.  Don't know her.

Page 99

1      A.  Correct.
2      Q.  Okay.  Now, as a general rule in your
3  department, either men's clothing and men's sport,
4  let me see if I can break those down into two
5  piece.
6         The men's clothing was actually on the
7  same floor as the employee break room, locker room
8  and exit, correct?
9      A.  That is correct.
10     Q.  As a general rule, when you were managing
11 that department, would you have the one or two
12 people who were staffing men's clothing come up
13 and help do the cleanup in the men's sport before
14 everybody would be excused for the day or would
15 the people staffing men's clothing clean up that
16 area, get things ready for the next day and then
17 leave?
18     A.  Most of the time that was what you just
19 described as of the situation.
20     Q.  Okay.
21     A.  The only time it varied was holiday time
22 when I asked the clothing staff to come upstairs
23 and help out.
24     Q.  You've mentioned holiday times a couple
25 times this morning.  I'd just like to bracket what

Page 101

26 (Pages 98 to 101)

certcert

1    I further certify that the signature to the

2    foregoing deposition was not waived by counsel for

3    the respective parties.

4    I further certify that the taking of this

5    deposition was pursuant to subpoena, and that

6    there were present at the deposition the attorneys

7    hereinbefore mentioned.

8    I further certify that I am not counsel for

9    nor in any way related to the parties to this

10   suit, nor am I in any way interested in the

11   outcome thereof.

12   IN TESTIMONY WHEREOF:  I have hereunto set my

13   hand and affixed my notarial seal this 7th day of

14   May, 2008.

15

16

17

18

19   Cynthia J. Conforti, CSR, CRR

20   Notary Public, Cook County, Illinois

21

22   CSR License No. 084-003064

23

24

25

EXHIBIT 65.

1  Patrick R. Kitchin, Esq. (SBN. 162965)
2  **THE LAW OFFICE OF PATRICK R. KITCHIN**
   565 Commercial Street, 4th Floor
3  San Francisco, CA 94111
   415-677-9058
4  415-627-9076 (fax)

5  Attorneys for Plaintiffs
   Janis Keefe, Corinne Phipps, and
6  Renee Davis

7

8              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
9                 SAN FRANCISCO DIVISION

10
   ANN OTSUKA, an individual; JANIS KEEFE,  ) Case No.: C-07-02780-SI
11 an individual; CORINNE PHIPPS, an         )
   individual; and RENEE DAVIS, an individual; )
12 individually and on behalf of all others similarly ) DECLARATION OF ALLISON
   situated,                                  ) DANKBERG IN SUPPORT OF
13                                            ) PLAINTIFFS' MOTION FOR CLASS
                                              ) CERTIFICATION
14                                            )
15            Plaintiffs,                     )
              vs.                             ) Date: July 11, 2006
16                                            ) Time: 9:00 a.m.
17 POLO RALPH LAUREN CORPORATION; a )
   Delaware Corporation; POLO RETAIL, LLC., a) LOCATION: Courtroom 10, 19th Floor
18 Delaware Corporation; POLO RALPH          ) 450 Golden Gate Avenue
   LAUREN CORPORATION, a Delaware            ) San Francisco, California 94102
19 Corporation, doing business in California as )
   POLO RETAIL CORP; and FASHIONS           ) JUDGE: Hon. Susan Illston
20 OUTLET OF AMERICA, INC.,                  )
21            Defendants.                     )
22                                            )
                                              )
23                                            )
24 _____  )

25 I, Allison Dankberg, declare:

26     1)     I am a resident of San Diego County, California, and make this declaration based on
27 my personal knowledge.
28                                                                                        1

   _____          Case No. C-07-02780-SI
   *Otsuka, et al. v. Polo, et al.*

        DECLARATION OF ALLISON DANKBERG IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

1      2)     Between 2000 and 2004, I worked at the Polo Ralph Lauren Factory Store in

2  Carlsbad, California.

3      3)     When I was hired, I was told by people in management that I was not permitted to

4  tell any other employee how much I was earning.

5      4)     I understood that I was required to participate in "bag checks" or "loss prevention

6  searches" before I could leave the store after the end of my shift.

7      5)     When leaving for lunch, for breaks, or at the end of the day, I clocked out and then

8  had to find a manager who could do the bag check at the employee exit.  When leaving for a break,

9  I actually ended up waiting for 5 to 10 minutes of that break to be searched and allowed to leave.

10  This happened regularly. At closing time, I clocked out and would then wait about 15 to 20

11  minutes before I was searched and allowed to leave the store.  This happened after almost every

12  shift.  I was not paid for any of this waiting time.

13

14  Signed under penalty of perjury under the laws of the State of California.  Executed at San Diego,

15  California, on May 29, 2008.

16

17  *Allison Dankberg*

        Allison Dankberg

18

19

20

21

22

23

24

25

26

27

28

                                                                         2

*Otsuka, et al. v. Polo, et al.*                         Case No. C-07-02780-SI

DECLARATION OF ALLISON DANKBERG IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

EXHIBIT 66.

## Golden Gate Reporting

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4

 5   ANN OTSUKA, an individual; JANIS      No. C-07-02780-SI
     KEEFE, an individual; CORINNE
 6   PHIPPS, an individual; and
     JUSTIN KISER, an individual;
 7   individually and on behalf of
     all others similarly situated,
 8
                   Plaintiffs,
 9      vs.

10   POLO RALPH LAUREN CORPORATION;
     a Delaware Corporation; POLO
11   RETAIL, LLC, a Delaware Corporation;
     POLO RALPH LAUREN CORPORATION, a
12   Delaware Corporation, doing business
     in California as POLO RETAIL CORP;
13   FASHIONS OUTLET OF AMERICA, INC., a
     Delaware Corporation and DOES 1-500,
14   inclusive,

15                 Defendants.
                                        /
16

17

               DEPOSITION OF ROSALINDA WALLWORK
18

19

          DATE:          November 13, 2007
20

          TIME:          10:02 a.m.
21

          LOCATION:      1900 University Avenue
22                       Fifth Floor
                         East Palo Alto, California
23

          REPORTED BY:   Mary E. Garland
24                       Certified Shorthand Reporter
                         License Number 4721
25
```

Page 1

1  procedure?
2      A. It was brief. I mean, it -- we didn't surround
3  the whole meeting around it. It was just something that
4  was mentioned, we put a system in place, and we moved on
5  to the next topic.
6      Q. Could you describe the new system that you
7  referred to?
8      A. We gave the stock manager keys. And,
9  basically, he was in the back most of the time, so he
10  was allowed keys to open and close the door.
11      And even prior to that, we received shipments
12  between one or 12 and four, so that door was constantly
13  open, anyway, so. But now he had keys and it would --
14  he could open the door, close the door.
15      Q. And was he, prior to that change in policy --
16      MR. GOINES: Objection -- oh.
17      Q. BY MR. KITCHIN: -- was he permitted to --
18      This is the? I'm sorry. Loading? What --
19      A. The shipping department.
20      Q. Shipping department manager? Prior to -- let
21  me start a new question, clean it up.
22      A. Okay.
23      Q. Prior to the meeting in which loss prevention
24  inspection procedures were discussed, did the shipping
25  department manager have the authority to conduct loss

Page 26

1  prevention inspections of employees leaving the store?
2      A. No.
3      Q. Did the shipping manager have keys to the back
4  door to turn the alarm off?
5      A. Yes.
6      Q. Earlier, I believe you testified that, after
7  the meeting, he was given keys.
8      A. Okay. He had keys, he was just not allowed to
9  check people in and out.
10      Q. I see. Was the shipping manager present at
11  this meeting where loss prevention inspections were
12  discussed?
13      A. No.
14      Q. What was the shipping manager's name?
15      A. Oh. Chris. I don't remember his last name.
16      Q. Do you know if he's still employed by Polo?
17      A. Hmm. No, he is not.
18      Q. And where does he work now?
19      A. I have no idea.
20      Q. During the meeting that you referred to where
21  loss prevention inspections were discussed, did anyone
22  make any comments at the meeting that, prior to that
23  meeting, people were having to wait to exit the
24  building?
25      A. Yes.

Page 27

1      Q. And who made comments about the waiting time to
2  leave the building?
3      A. Well, there were no comments made about it, but
4  there were some people that have said, "I've had to
5  wait," you know, "for more than five minutes." So, I
6  mean, it wasn't really discussed in great detail, that I
7  remember.
8      Q. Were there other topics discussed during the
9  meeting where the loss prevention inspection issue was
10  discussed relating to the claims in the lawsuit?
11      A. No. We discussed putting a system in place so
12  that people can come in and out, you know, perhaps
13  quicker than, you know, we were getting the door.
14      Like I said, it wasn't a meeting surrounding
15  that. It was something we talked about, put the system
16  in place, and moved on to the next topic. We didn't
17  have a managers' meeting surrounding the lawsuit.
18      Q. Prior to the meeting that we're discussing
19  where loss prevention inspections was discussed, had you
20  had any other meetings relating to any concerns about
21  wait time to exit the building?
22      A. No.
23      Q. So that topic, based on your best recollection,
24  was never discussed at any manager meeting prior to the
25  meeting that we've been discussing?

Page 28

1      A. No.
2      Q. I'm going to get back to the loss prevention
3  inspection --
4      A. Sure.
5      Q. -- but I want to move back now to the other
6  discussions that you described or identified between
7  you, and Mr. Hua, and Valerie Harrison.
8      A. Mm-hm.
9      Q. I can't remember the number you said, but it
10  was more than one meeting where the lawsuit was
11  discussed; correct?
12      A. It was not a meeting. It was comments being
13  made as we're closing down shop or making our final
14  notes. And for me personally, mainly, was the
15  discussion surrounding the time clock situation that I
16  never brought to light. So that is really the most that
17  I remember discussing this lawsuit. In fact, all of
18  this is just shocking to me, so.
19      That was the only serious conversation I had
20  with the management team about the whole thing that I'd
21  read in the paper, was that I probably should have
22  mentioned that Justin was doing something weird with the
23  time clock, but I didn't really know what it was. And
24  after I was rest assured -- I was told that if he was
25  doing something strange, that we would probably know,

Page 29

8 (Pages 26 to 29)

Q. Did you come to believe that the response time of managers, other than yourself, was too slow to requests to have bag checks performed?

MR. GOINES: Objection. Vague.

THE WITNESS: To get bag checks? I believe that people got checked pretty -- I mean, in a pretty reasonable time.

Q. BY MR. KITCHIN: The meetings in which the bag check procedure was discussed, I think you said in detail, did anyone suggest any different procedure to follow to expedite the exit by sales associates?

A. I think we changed -- we changed the policy a bit, where our stock supervisor would have access -- or could check them out. Again, it was a complaint that kept coming up. So that was one of the actions we took, we gave Chris the authority to check people in and out.

Q. How late did Chris work on most days?

A. Till five.

Q. What time did sales associates generally leave the building?

A. Six, 6:15, 6:30.

Q. So he wasn't there to check them out at the end of their shift, but was there to check them out during lunch breaks?

A. Yeah.

Page 122

Q. Was there any suggestion of any change in procedure that dealt specifically with expediting the exit of the building at the end of a sales associate's work shift?

A. We tried so many different things. I mean, we opened up the Home department for people to come back in, if they were coming back from their lunches, so they wouldn't have to wait. On Sundays, we let people go through Polo Sport, which is -- because the rest of the mall is closed. So, I mean, there were many ways to enter and leave the building.

Q. But were there any proposed changes to the practices or policies that related specifically to exiting at the end of a work shift at six, 6:15, or 6:30?

A. No. Because we would have the managers back there. I mean, all three managers, at any different day, would be back there at the end of the night.

Q. At the end of a shift, did you ever go back to the back door and find more than one person waiting to get out of the store?

A. At the end of a shift? Sometimes.

Q. And sometimes did you go back there and there were people in the back of the hallway, sitting on the floor, waiting for a manager to come in?

Page 123

A. Not sitting on the floor, but waiting by the door.

Q. And any of those times you came and there was more than one person waiting by the door, did any of the sales associates tell you how long they had been waiting?

A. Sometimes they would say they've been waiting there forever, or they've been back there, I mean, not specific times, but. When I was downstairs, it would literally take 15, 20 minutes to close out the department. So if anybody was working in any other department and, say, they left at six, and I'm closing out drawers or I'm doing management functions or money functions, it would take about 15 minutes for me to go from the back -- or from the department to the back.

So if they ever waited, it would have had to have been maybe 15 minutes -- 15 to 20 minutes, if, in fact, they were waiting that long. Because they would have to get their coat, clock out, get their bag.

So many a time, it just seemed exaggerated, the times that they said that they were waiting back there. I mean, it became so that it just -- it was just not -- it didn't seem right that they had been waiting there the time that they said. And it was always the same people over, and over, and over again.

Page 124

So, I mean, after awhile, it was just -- I didn't believe that they had been waiting back there for so long, or as long as they thought they were.

Q. Did anyone ever compliment you by comparing your quick response time to get to the back door to other managers' response time?

A. Yes.

Q. And who did they compare you to?

A. It depends on who it was.

Q. Did any sales associates tell you that certain managers took a long time to let them out at the end of their shift?

A. Yes.

Q. And which managers were referenced?

A. Valerie, sometimes.

Q. Any other managers that complaints were made about relating to letting associates out at the end of their shifts?

A. Sometimes Theresa. But I'm sure there were complaints about me when I didn't get their quick enough, so.

Q. Do you remember anyone specifically who said something to the effect of, "You always come quick. Everyone else is slow"?

A. Yeah. Or, yes.

Page 125

32 (Pages 122 to 125)

CERTIFICATION OF DEPOSITION OFFICER

I, MARY E. GARLAND, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was thereafter transcribed by means of computer-aided transcription under my direction; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed November 26, 2007, at San Francisco, California.

_____
MARY E. GARLAND, CSR 4721

EXHIBIT 67.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANN OTSUKA, et al.,

       Plaintiff,

-vs-

POLO RALPH LAUREN
CORPORATION, a Deleware
corporation, et al.

       Defendants.
                 /

**CERTIFIED COPY**

No. C07-02780 BZ

Videotaped Deposition of

CORINNE PHIPPS

Tuesday, June 12, 2007

Reported by:
KACY PARKER BARAJAS, RPR, CRR
CSR No. 10915
Job No. 15854LR



**PHILLIPS LEGAL SERVICES**
SAN FRANCISCO DEPOSITION REPORTERS
ONE SUTTER STREET, SUITE 700
SAN FRANCISCO, CA 94104
1-888-333-8270
WWW.PHILLIPSDEPO.COM

1   this?

2   Q.      Right.

3   A.      No.  It's all mental.

4   Q.      Okay.  So bearing on your recollection of how --

5   what I'm trying to find is a quantification of the number of

6   days where you had to wait longer than a moment or two and

7   then -- well, let me stop there.

8   A.      Sure.

9   Q.      Okay.  How many -- can you quantify the number of

11:10:00 10   occasions where you had to wait for a manager to be

11   contacted to arrive at the exit door and be checked out?

12   A.      Now we're only talking about checking out at night;

13   is that correct?

14   Q.      Yes, ma'am, yes.

15   A.      That's it?

16   Q.      Yeah.

17   A.      I would probably say to my best recollection

18   probably three times a week out of five.

19   Q.      Okay.

20   A.      That I would have to wait any -- in an upwards of a

21   half an hour.

11:10:29 22   Q.      And when you say three times a week wait upwards to

23   a half an hour, was it always a half hour?  Was it sometimes

24   five minutes?  I'm trying to get some recollection of how

25   long this would take.

```
 1   A.        It would take anywhere -- my best guess -- and this
 2   is just wait time, not when a manager is standing right
 3   there; is that correct?
 4   Q.        Right.
 5   A.        Anywhere probably from ten minutes to a half an
 6   hour.
 7   Q.        And this would happen -- ten minutes to a half hour
 8   would happen three times a week checking out?
 9   A.        Very regularly, yes.  That's my definition of
10   happening regularly, at least three times a week checking
11   out.
12   Q.        You seem to want to make sure we're talking about
13   checking out.  Were there other occasions where you had to
14   wait to either check in or check out?
15   A.        Oh, yeah.
16   Q.        Okay.  Explain those to me, please, so I can
17   inquire about those.
18   A.        Okay.  So when you had to check in at a certain --
19   let's just say when you're starting your shift in the
20   morning, this is -- actually, whenever you're starting your
21   shift, now that I -- whenever you would start your shift,
22   you would have to ring the doorbell to be let in.  And if
23   there was not a manager down in the area waiting or
24   listening to a bell or on their lunch break or what have
25   you, you would be waiting outside to come in to check in to
```

11:10:56 (line 7)
11:11:27 (line 20)

REPORTER'S CERTIFICATE

1  

2  

3       I certify that the witness in the foregoing

4  deposition,

5                CORINNE PHIPPS

6  was sworn by me duly sworn to testify in the within-entitled

7  cause; that said deposition was taken at the time and place

8  therein named; that the testimony of said witness was

9  reported by me, a duly Certified Shorthand Reporter of the

10  State of California authorized to administer oaths and

11  affirmations, and said testimony was thereafter transcribed

12  into typewriting.

13       I further certify that I am not of counsel or

14  attorney for either or any of the parties to said

15  deposition, nor in any way interested in the outcome of the

16  cause named in said deposition.

17       IN WITNESS WHEREOF, I have hereunto set my hand

18  this 25th day of June, 2007.

19  

20  

21  

                    _____

                    KACY PARKER BARAJAS, RPR

22                  Certified Realtime Reporter

                    State of California

23                  Certificate No. 10915

24  

25  

Page 189

---

PHILLIPS LEGAL SERVICES
One Sutter Street, Suite 700
San Francisco, California 94104
(415) 601-4601

GREENBERG TRAURG
WILLIAM J. GOINES, ESQ.
1900 University Avenue, Fifth Floor
San Francisco, CA 94303

Case Name: Ann Otsuka, et al. v. Polo Ralph Lauren
Deposition of: Corinne Phipps
Date Taken: June 12, 2007

Dear Mr. Goines:

We wish to inform you of the disposition of this original transcript. The following procedure is being taken by our office:

____The witness has read and signed the deposition. (See attached.)

____The witness has waived signature.

____The time for reading and signing has expired.

____The sealed original deposition is being forwarded to your office.

____Other:

Sincerely,

Phillips Legal Services
Ref No. 15854LR

cc: Patrick R. Kitchin, Esq.

Page 191

---

PHILLIPS LEGAL SERVICES
One Sutter Street, Suite 700
San Francisco, California 94104
(415) 601-4601

June 27, 2007

Corinne Phipps
c/o LAW OFFICE OF PATRICK R. KITCHIN
565 Commercial Street, Fourth Floor
San Francisco, CA 94111
Re: Deposition of Corinne Phipps
Case Name: Ann Otsuka, et al. v. Polo Ralph Lauren
Deposition Date: June 12, 2007
Dear Ms. Phipps:
Your deposition has been prepared and is ready for you to read, correct, and sign. The original will be held in our office for 35 days from the date of this letter.
If you are represented by an attorney, you may wish to discuss with your attorney the reading and signing of your deposition. If your attorney has purchased a copy of your deposition, you may review that copy. If you choose to read your attorney's copy, please fill out, sign, and submit to our office the DEPONENT'S CHANGE SHEET from the back of your deposition.
If you choose to read your deposition at our office, it will be available between 9:00 a.m. and 4:00 p.m. Please bring this letter as a reference.
If you do not wish to read your deposition, please sign below and return within 30 days of the date of this letter.

_____    _____
CORINNE PHIPPS          DATE

Sincerely,

KACY PARKER BARAJAS, CSR No. 10915
Phillips Legal Services
Ref No. 15854LR
cc: William J. Goines, Esq.

Page 190

48 (Pages 189 to 191)

REPORTER'S CERTIFICATE

1

2

3        I certify that the witness in the foregoing

4    deposition,

5                    CORINNE PHIPPS

6    was by me duly sworn to testify in the within-entitled

7    cause; that said deposition was taken at the time and place

8    therein named; that the testimony of said witness was

9    reported by me, a duly Certified Shorthand Reporter of the

10    State of California authorized to administer oaths and

11    affirmations, and said testimony was thereafter transcribed

12    into typewriting.

13        I further certify that I am not of counsel or

14    attorney for either or any of the parties to said

15    deposition, nor in any way interested in the outcome of the

16    cause named in said deposition.

17        IN WITNESS WHEREOF, I have hereunto set my hand

18    this 25th day of June, 2007.

19

20

21                    KACY PARKER BARAJAS, RPR

22                    Certified Realtime Reporter
                    State of California

23                    Certificate No. 10915

24

25

EXHIBIT 68.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


ANN OTSUKA, an individual,                    **CERTIFIED COPY**

et al.,

              Plaintiffs,

       vs.                         No. C-07-02780-SI

POLO RALPH LAUREN CORPORATION,

et al.,

              Defendants.

_____/


Videotaped Deposition of

**JANIS KEEFE**

Monday, March 17, 2008


Reported by:
IRIS MEINKE-SMITH, RMR/CRR
CSR No. 3798
Job No. 18235LR




**PHILLIPS LEGAL SERVICES**
SAN FRANCISCO DEPOSITION REPORTERS
795 FOLSOM STREET, FIRST FLOOR
SAN FRANCISCO, CA 94107
1-888-333-8270
WWW.PHILLIPSDEPO.COM

1    A.        I would say about 15 percent of the time

2    there was a manager readily available.

3    Q.        And --

4    A.        Throughout my course of employment.

01:48:01 5    Q.        Okay.  And that would mean you would clock

6    out, someone was readily available, do loss

7    prevention search, go on to your business?

8    A.        Right.

9    Q.        Now, that means about 85 percent of the time

01:48:14 10    there was a lag between your clocking out and your --

11    someone being available to conduct a loss prevention

12    search, right?

13    A.        Yes.

14    Q.        Okay.  And on those occasions when you had

01:48:34 15    to conduct -- so on those other occasions when a

16    manager wasn't readily available, I take it you had

17    to page someone to come down or come over to perform

18    the search and allow you to exit the store?

19    A.        Yes.

01:48:49 20    Q.        Okay.  And was there -- again, I'm trying to

21    generalize a little bit.  I try to be weary of that.

22              But was there a person who you normally

23    looked to to page to conduct the loss prevention

24    search when you were departing at the end of the day?

01:49:08 25    A.        Not a particular manager.  It was just

109

1    "Manager to the back door."

2    Q.       Okay.

3    A.       Basically.

4    Q.       So you would get on the phone system and

01:49:17 5    say, "Manager to the back door.  We want to leave."

6    A.       Yes.

7    Q.       Okay.

8    A.       Or just "Manager to the back door."  Not "We

9    want to leave."

01:49:24 10    Q.       They would understand.

11    A.       Yeah, you weren't allowed to say that much.

12    Q.       And in -- was there an average time on those

13    85 percent of the time occasions that you had to wait

14    for a manager or someone authorized to perform the

01:49:48 15    loss prevention search to come down to the back door,

16    conduct a search and allow you to depart for the day?

17    A.       I would say an average of about 15 to

18    20 minutes.

19    Q.       So as to those 85 percent of the time best

01:50:10 20    estimate, you would wait an average of 15 to

21    20 minutes for a manager to respond and conduct the

22    bag and loss prevention search?

23    A.       Yes.

24    Q.       And did you keep any records or materials or

01:50:34 25    information that would support the statement that on

                                                      110

REPORTER'S CERTIFICATE

1

2        I certify that the foregoing proceedings in

3  the within-entitled cause were reported at the time

4  and place therein named; that said proceedings were

5  reported by me, a duly Certified Shorthand Reporter

6  of the State of California authorized to administer

7  oaths and affirmations, and were thereafter

8  transcribed into typewriting.

9        I further certify that I am not of counsel

10  or attorney for either or any of the parties to said

11  cause of action, nor in any way interested in the

12  outcome of the cause named in said cause of action.

13        IN WITNESS WHEREOF, I have hereunto set my

14  hand this 1st day of April, 2008.

15

16        _____

17        IRIS MEINKE-SMITH, CA CSR No.3798
          Registered Merit Reporter
18        Certified Realtime Reporter

19

20

21

22

23

24

25
                                                    150

EXHIBIT 69.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


ANN OTSUKA, an individual,

et al.,

**CERTIFIED COPY**

Plaintiffs,

vs.                              No. C-07-02780-SI

POLO RALPH LAUREN CORPORATION,

et al.,

Defendants.

_____/


Videotaped Deposition of

**RENEE DAVIS**

Wednesday, March 19, 2008


Reported by:
IRIS MEINKE-SMITH, RMR/CRR
CSR No. 3798
Job No. 18236LR




**PHILLIPS LEGAL SERVICES**
SAN FRANCISCO DEPOSITION REPORTERS
795 FOLSOM STREET, FIRST FLOOR
SAN FRANCISCO, CA 94107
(888) 333-8270
(800) 455-8030 fax
WWW.PHILLIPSDEPO.COM

1    to understand is -- let me read something to you.

2    A.        Okay.

3    Q.        This is from the third amended complaint.

4    And it says, "When Ms. Davis worked the closing shift

12:00:57 5    defendants, managers locked the store's exit door and

6    then required Ms. Davis to clock out and wait at the

7    store exit for a manager to check her person and

8    personal effects to ensure she and the other

9    employees were not attempting to steal merchandise.

12:01:13 10    She was regularly required to wait ten to 15 minutes

11    for the inspections after she had clocked out and was

12    never compensated for that time."

13            That's what has been filed with the court.

14    And what I want to understand is, was it every day

12:01:34 15    you waited ten to 15 minutes or -- I'm trying to

16    understand with what level, what the normal checkout

17    procedure was.  Was there -- I'm just trying to

18    understand the bases for what I've just read to you.

19    A.        It didn't happen every day, but usually at

12:01:55 20    closing time you're down to usually one manager, and

21    that manager is in the back counting the tills.  And

22    he's the one who has to search you and -- before you

23    can leave.

24            So at 10 o'clock when we're closing, you

12:02:10 25    know, they've pulled the tills and they're in the

75

1    back counting the tills. And after maybe 15 minutes,

2    you know, if not myself, somebody else would call and

3    say, "Hey, you know, can somebody just let us out?"

4            "Well, I'm busy. I can't leave the till,"

12:02:24 5    that type of thing. Or "I'm on the phone." And...

6    Q.       So I'm -- I'm really -- I'm not trying to

7    put words in your mouth, but what I'm trying to

8    understand is, was the issue of waiting more than a

9    couple of minutes --

12:02:36 10    A.       Yes.

11    Q.       -- I'll get to that in a minute, normally,

12    usually at the closing shift?

13    A.       Yes.

14    Q.       At the nonclosing shift, so when you didn't

12:02:45 15    work a closing shift, because we had these staggered

16    shifts, was there a normal amount of time that you

17    would wait between clock-out, go get your coat, your

18    bags, your goods and have someone check you out?

19    A.       Maybe five or ten minutes.

12:02:59 20    Q.       So every -- in my understanding, at the end

21    of every shift, on a daily basis, regardless of the

22    end of the shift, you waited five to ten minutes to

23    be --

24    A.       Yes.

12:03:11 25    Q.       -- to have a loss prevention search?

76

1    And if I understand correctly, on the times

2  when you worked the closing shift, it could be longer

3  than five to ten minutes?

4  A.    Yes.

12:03:26 5  Q.    Was there an outside time?

6  A.    What do you mean?

7  Q.    What was the longest time you ever waited?

8  A.    Over 30 minutes.

9  Q.    How many times did that happen?

12:03:40 10  A.    Several.

11  Q.    Several can be three to five to me.

12  A.    Okay.  I'd maybe say anywhere from six to

13  eight.

14  Q.    Okay.  So --

12:03:54 15  A.    Okay.  Excuse me.  Are we referring to the

16  whole time I was there?

17  Q.    Yes, ma'am.

18  A.    Okay.  Well, the over 30 minutes, maybe six

19  to eight.

12:04:06 20  Q.    And the closing shift was normally around

21  15 minutes, if I understand correctly?

22  A.    15 to 30, depending.

23  Q.    And the other shifts were five to ten?

24  A.    Yes.

12:04:19 25  Q.    And that's pretty consistent every day?

77

1    A.        Yes.

2    Q.        Did you ever register a complaint to any

3    person in a managerial role at the Cabazon store

4    about these wait times to have the loss prevention

12:04:51 5    search conducted?

6    A.        Verbally or in writing?

7    Q.        Let's talk verbally first.

8    A.        Every time it happened.

9    Q.        So that would be every day?

12:05:00 10    A.        Yes.

11    Q.        To whom would you complain?

12    A.        Any of the previous managers I mentioned

13    before:  April, Stuart, Fred, Katilda.  There were a

14    couple of others, but I can't recall their names.

12:05:17 15    Q.        I remember you couldn't recall their names.

16    A.        Right.

17    Q.        Okay.  And what was their response?

18    A.        Well, depending on who you were talking to,

19    it would be, "Well, could you try to be more

12:05:33 20    patient?"  Some of them would say, "Well, you know,

21    this is what's going on right now.  You're going to

22    have to wait."

23            And some of them could be kind of

24    condescending because they knew I was riding a bus

12:05:46 25    and I had to be out of there at a certain time.  And

                                                          78

REPORTER'S CERTIFICATE

1

2      I certify that the foregoing proceedings in

3   the within-entitled cause were reported at the time

4   and place therein named; that said proceedings were

5   reported by me, a duly Certified Shorthand Reporter

6   of the State of California authorized to administer

7   oaths and affirmations, and were  thereafter

8   transcribed into typewriting.

9      I further certify that I am not of counsel

10  or attorney for either or any of the parties to said

11  cause of action, nor in any way interested in the

12  outcome of the cause named in said cause of action.

13     IN WITNESS WHEREOF, I have hereunto set my

14  hand this 4th day of April, 2008.

15

16  _____ _Iris Meinke-Smith_ _____

17  IRIS MEINKE-SMITH, CA CSR No.3798
    Registered Merit Reporter
18  Certified Realtime Reporter

19

20

21

22

23

24

25                                              122

EXHIBIT 70.

# COPY

1

1  UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF CALIFORNIA
2  SAN FRANCISCO DIVISION
   ----------------------------------------x
3  ANN OTSUKA, an individual; JANIS KEEFE, an
   individual; CORINNE PHIPPS, an individual;
4  JUSTIN KISER, an individual; individually and
   on behalf of all others similarly situated, and
5  RENEE DAVIS, an individual; individually and on
   behalf of all others similarly situated,

6
                    Plaintiffs,
7    -against-

8  POLO RALPH LAUREN CORPORATION; a Delaware
   Corporation; POLO RETAIL, LLC., a Delaware
9  Corporation; POLO RALPH LAUREN CORPORATION, a
   Delaware Corporation, doing business in
10 California as POLO RETAIL CORP; FASHIONS OUTLET
   OF AMERICA, INC., a Delaware Corporation,

11                  Defendants,
12 Case No.:  C-07-02780-SI
   ----------------------------------------x
13

14                  200 Park Avenue
                    New York, New York
15
                    December 4, 2007
16                  10:18 a.m.

17

18        Videotaped Deposition of JUSTIN KISER,

19 pursuant to notice, before Sophie Nolan, a

20 Notary Public of the State of New York.

21

22

23     ELLEN GRAUER COURT REPORTING CO. LLC
        126 East 56th Street, Fifth Floor
24          New York, New York  10022
                 212-750-6434
25               Ref: 86114

253

1                    KISER
2         Q.    So you're walking down to the
3   employee exit and now you get there, right?  Is
4   there a manager there?
5         A.    No.
6         Q.    No.  Can't you call a manager and
7   say, "We're walking down to the exit, can you
8   meet us at the exit"?
9         A.    We had.
10        Q.    Excuse me?
11        A.    We had done that.
12        Q.    You had done that.
13        A.    And they would say, "Don't call us
14   unless you're at the back door."
15        Q.    Okay.  So now you're at the back
16   door and now you have to call the manager?
17        A.    Yes.
18        Q.    Okay.  And how long does it take
19   the manager to get there, on average?
20        A.    15, 20 minutes.
21        Q.    That's on average?
22        A.    Sometimes more.  Yes.
23        Q.    Now, is this an issue that's only
24   affecting your department?
25        A.    Yes.

1                              KISER

2    got kind of got demoted to just women's -- I

3    don't know, something she told me because her

4    and Tin were having it out.

5              Then she -- Harvey left and then he

6    told -- Tin told her to watch over as men's

7    assistant, men's assistant sportswear, where I

8    worked, and then as David came Rosalinda became

9    David's assistant.  David was men's department

10   manager.  Rosalinda was his assistant and then

11   they hired a women's manager.

12        Q.    So David ultimately stepped into

13   the role that Harvey previously filled?

14        A.    Yes.

15        Q.    And when was that?

16        A.    I really don't recall.  Towards the

17   end of my time at Polo.

18        Q.    Were there any times when the bag

19   check process took only a minute or two?

20        A.    There were a handful of times.

21        Q.    You mean a handful of times

22   throughout your employment?

23        A.    Yes, where it took maybe five

24   minutes.

25        Q.    Did it ever take a minute or two?

259

1                           KISER

2          A.    No.

3          Q.    Never?

4          A.    Never.

5          Q.    Did it ever take three to four

6    minutes?

7          A.    Never.

8          Q.    What about five to six minutes?

9          A.    Yes.

10          Q.    And how frequently was that?

11          A.    A couple of times, maybe ten times

12    total, as I worked there a year.

13          Q.    What about seven or eight minutes,

14    how frequent was that?

15          A.    Maybe 15 times.

16          Q.    Okay.  What was the longest that

17    the bag check ever took?

18          A.    Maybe 30 to 40 minutes.

19          Q.    And what happened on that

20    particular occasion?

21          A.    Well, they heard a lot of huffing

22    and puffing.

23          Q.    By?

24          A.    The associate, you know, what's

25    going on, why does it take this long.  I was in

324

1                   C E R T I F I C A T E

2

3    STATE OF NEW YORK      )

4                          )ss.:

5    COUNTY OF NEW YORK     )

6

7              I, SOPHIE NOLAN, a Notary Public

8    within and for the State of New York, do

9    hereby certify:

10             That JUSTIN KISER, the witness

11   whose deposition is herein before set forth,

12   was duly sworn by me and that such deposition

13   is a true record of the testimony given by

14   such witness.

15             I further certify that I am

16   not related to any of the parties to this

17   action by blood or marriage; and that I am in

18   no way interested in the outcome of this

19   matter.

20             IN WITNESS WHEREOF, I have

21   hereunto set my hand this 17th day of December,

22   2007.

23

24                          _Sophie Nolan_

25                          SOPHIE NOLAN

EXHIBIT 71.

1   Patrick R. Kitchin, Esq. (SBN. 162965)
2   **THE LAW OFFICE OF PATRICK R. KITCHIN**
    565 Commercial Street, 4th Floor
3   San Francisco, CA 94111
    415-677-9058
4   415-627-9076 (fax)
5   Attorneys for Plaintiffs
6   Janis Keefe, Corinne Phipps and
    Renee Davis
7
                        UNITED STATES DISTRICT COURT
8                     NORTHERN DISTRICT OF CALIFORNIA
9                         SAN FRANCISCO DIVISION
10  ANN OTSUKA, an individual; JANIS KEEFE,      ) Case No.: C-07-02780-SI
    an individual; CORINNE PHIPPS, an individual; )
11  and RENEE DAVIS, an individual; individually  )
12  and on behalf of all others similarly situated, ) DECLARATION OF KATY FAWVER IN
                                                  ) SUPPORT OF PLAINTIFFS' MOTION FOR
13                                                ) CLASS CERTIFICATION
                        Plaintiffs,               )
14                                                )
            vs.                                   ) Date: July 11, 2008
15                                                ) Time: 9:00 a.m.
    POLO RALPH LAUREN CORPORATION; a              )
16  Delaware Corporation; POLO RETAIL, LLC., a    ) LOCATION: Courtroom 10, 19th Floor
    Delaware Corporation; POLO RALPH LAUREN       ) 450 Golden Gate Avenue
17  CORPORATION, a Delaware Corporation, doing    ) San Francisco, California 94102
18  business in California as POLO RETAIL CORP;    )
    and FASHIONS OUTLET OF AMERICA, INC.,         ) JUDGE: Hon. Susan Illston
19                                                )
20                      Defendants.               )
                                                  )
21                                                )
                                                  )
22                                                )
                                                  )
23
24  I, Katy Fawver, declare:
25          1)      I am a resident of Shasta County, California, and make this declaration based on my
26  personal knowledge.
27          2)      During 2003 to 2005, I worked as a sales associate in the Anderson Polo Factory
28  Outlet Store located at 1699 Highway 273, Anderson, California, in the Men's Department. I was

---

1    initially hired as a part-time employee; at some point relatively soon after my hire, I worked as a

2    full-time employee.

3          3)     I missed nearly all of my rest breaks on a daily basis. Either my department was

4    too busy for me to take breaks or I was discouraged by managers from taking rest breaks.

5          4)     I regularly worked more than 8 hours in one day or more than 40 hours in one

6    week. This unpaid overtime included time for the rest breaks I was not allowed to take and the

7    times I was required to remain inside the store for the "bag checks" after I had clocked out for the

8    day. I estimate that on a couple of days each week I had to wait for about 15 to 20 minutes after

9    the end of my shift to have my bags checked by a manager before I could leave the store. I was

10   instructed to clock out, and then find a manager who could perform the bag check at the employee

11   exit. I was not paid at all for the time spent in the "bag checks." I certainly was not paid overtime

12   for these hours or the hours when I did not get a rest break.

13         5)     I was instructed by my managers and in the Polo employee handbook that I could

14   not leave the Polo store at any time unless a manager performed a bag check on me at the

15   employee exit. I understood I could be fired if I did not undergo a bag check before I left the store.

16

17   Signed under penalty of perjury under the laws of the State of California. Executed at Redding,

18   California, on May 15, 2008.

19

20

21                                    Katy Fawver

22

23

24

25

26

27

28

_Otsuka, et al. v. Polo, et al._                                    Case No. C-07-02780-SI

DECLARATION OF KATY FAWVER IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

2

EXHIBIT 72.

1  Patrick R. Kitchin, Esq. (SBN. 162965)
2  **THE LAW OFFICE OF PATRICK R. KITCHIN**
   565 Commercial Street, 4th Floor
3  San Francisco, CA 94111
   415-677-9058
4  415-627-9076 (fax)

5  Attorneys for Plaintiffs
6  Janis Keefe, Corinne Phipps, and
   Renee Davis

7

8              UNITED STATES DISTRICT COURT
9             NORTHERN DISTRICT OF CALIFORNIA
                SAN FRANCISCO DIVISION
10

11  ANN OTSUKA, an individual; JANIS KEEFE, ) Case No.: C-07-02780-SI
    an individual; CORINNE PHIPPS, an        )
12  individual; and RENEE DAVIS, an individual; )
    individually and on behalf of all others similarly ) DECLARATION OF MEGAN
13  situated,                                 ) GLASSMEYER IN SUPPORT OF
                                              ) PLAINTIFFS' MOTION FOR CLASS
14                                            ) CERTIFICATION
                                              )
15              Plaintiffs,                   )
        vs.                                   ) Date: July 11, 2006
16                                            ) Time: 9:00 a.m.
    POLO RALPH LAUREN CORPORATION; a )
17  Delaware Corporation; POLO RETAIL, LLC., a) LOCATION: Courtroom 10, 19th Floor
    Delaware Corporation; POLO RALPH          ) 450 Golden Gate Avenue
18  LAUREN CORPORATION, a Delaware            ) San Francisco, California 94102
19  Corporation, doing business in California as )
    POLO RETAIL CORP; and FASHIONS           ) JUDGE: Hon. Susan Illston
20  OUTLET OF AMERICA, INC.,                  )
                                              )
21                                            )
                Defendants.                   )
22                                            )
                                              )
23                                            )
                                              )
24  _____ )

25  I, Megan Glassmeyer, declare:

26      1)    I am a resident of the State of Colorado, and make this declaration based on my

27  personal knowledge.

28                                                                              1

    _____
    *Otsuka, et al. v. Polo, et al.*                          Case No. C-07-02780-SI

    DECLARATION OF MEGAN GLASSMEYER IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

2)    For about six months in 2002, I worked in the Polo Ralph Lauren Factory Outlet Store in Alpine, California.

3)    When I was hired to work at this store, management employees informed me that I was not allowed to discuss my salary with any of my co-workers.

4)    I was instructed by my managers and by the Polo employee handbook that I could not leave the Polo store at any time unless a manager performed a bag check on me at the employee exit. I understood I could be fired if I did not undergo a bag check before I left the store.

5)    I was told to clock out at the end of my shift, and then I just had to stand around and wait with other employees until a manager checked our personal things before letting us leave the store. The managers would check everything, purses, bags, and even cups of liquid, such as coffee or soda. The bag checks sometimes felt like a police line-up. In general, I had to wait from 10 to 15 minutes after I had clocked out before I was checked and allowed to leave. I was not paid for this waiting time.

Signed under penalty of perjury under the laws of the State of California. Executed in the State of Colorado, on June 3rd , 2008.

Megan Glassmeyer

Otsuka, et al. v. Polo, et al.    Case No. C-07-02780-SI

2

DECLARATION OF MEGAN GLASSMEYER IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

EXHIBIT 73.

1   Patrick R. Kitchin, Esq. (SBN. 162965)
2   **THE LAW OFFICE OF PATRICK R. KITCHIN**
    565 Commercial Street, 4th Floor
3   San Francisco, CA 94111
    415-677-9058
4   415-627-9076 (fax)

5   Attorneys for Plaintiffs
6   Janis Keefe, Corinne Phipps, and
    Renee Davis
7

8                     UNITED STATES DISTRICT COURT
9                   NORTHERN DISTRICT OF CALIFORNIA
                        SAN FRANCISCO DIVISION
10

11   ANN OTSUKA, an individual; JANIS KEEFE,  ) Case No.: C-07-02780-SI
     an individual; CORINNE PHIPPS, an         )
12   individual; and RENEE DAVIS, an individual; )
     individually and on behalf of all others similarly) DECLARATION OF SAUNDRA
13   situated,                                  ) NICHOLSON IN SUPPORT OF
                                                ) PLAINTIFFS' MOTION FOR CLASS
14                                              ) CERTIFICATION
                                                )
15                Plaintiffs,                   )
                                                ) Date: July 11, 2006
16          vs.                                 ) Time: 9:00 a.m.
                                                )
17   POLO RALPH LAUREN CORPORATION; a           )
     Delaware Corporation; POLO RETAIL, LLC.,   ) LOCATION: Courtroom 10, 19th Floor
18   a Delaware Corporation; POLO RALPH         ) 450 Golden Gate Avenue
     LAUREN CORPORATION, a Delaware             ) San Francisco, California 94102
19   Corporation, doing business in California as )
     POLO RETAIL CORP; and FASHIONS            ) JUDGE: Hon. Susan Illston
20   OUTLET OF AMERICA, INC.,                   )
                                                )
21                Defendants.                   )
                                                )
22                                              )
                                                )
23                                              )
                                                )
24   _____ )

25   I, Saundra Nicholson, declare:

26          1)     I am a resident of Burbank, California, and make this declaration based on my
27   personal knowledge.
28                                                                                          1
     _____
     *Otsuka, et al. v. Polo, et al.*                              Case No. C-07-02780-SI

     DECLARATION OF SAUNDRA NICHOLSON IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

2)    Between approximately March 2004 to March 2006, I worked at the Polo Ralph Lauren store in Beverly Hills, California as a Customer Service Representative. I was hired as a full-time employee, and regularly worked five days each week.

3)    I understood that I was not allowed to leave the store after clocking out (or for lunch) until a manager checked my belongings and those of my co-workers and then unlocked the door to let us leave the building after the end of our shifts. I was told and understood that this was one of the mandatory things that everyone had to do, including myself.

4)    For these "loss prevention searches," I was required to wait near the store exit, after having clocked out, until my co-workers and the managers on duty finished their work. Gradually, we would gather there as a group and sit around, waiting for one of the managers to come back to the area, search our things, and let us leave the building. Sometimes, we gathered in the Men's Department, similarly waiting for the managers to finish their end-of-shift duties, find us, complete the search of each of us, unlock the back door, and let us go home. These checks, and the waiting, happened off the clock, and occurred just about every day that I was at work. On average, I estimate that I had to wait from 10 to 20 minutes after I had clocked out before I was permitted to leave. I hated waiting. I was not paid for any of this waiting time.

Signed under penalty of perjury under the laws of the State of California. Executed at Burbank, California, on June 2, 2008.

Saundra Nicholson

2

Otsuka, et al. v. Polo, et al.                              Case No. C-07-02780-SI

DECLARATION OF SAUNDRA NICHOLSON IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

EXHIBIT 74.

1  Patrick R. Kitchin, Esq. (SBN. 162965)
2  **THE LAW OFFICE OF PATRICK R. KITCHIN**
   565 Commercial Street, 4th Floor
3  San Francisco, CA 94111
   415-677-9058
4  415-627-9076 (fax)

5  Attorneys for Plaintiffs
6  Janis Keefe, Corinne Phipps and Renee Davis

7
                    UNITED STATES DISTRICT COURT
8                 NORTHERN DISTRICT OF CALIFORNIA
                     SAN FRANCISCO DIVISION
9

10  ANN OTSUKA, an individual; JANIS KEEFE,  ) Case No.: C-07-02780-SI
    an individual; CORINNE PHIPPS, an        )
11  individual; and RENEE DAVIS, an individual; )
    individually and on behalf of all others similarly ) DECLARATION OF MARA APODACA IN
12  situated,                                 ) SUPPORT OF PLAINTIFFS' MOTION FOR
                                              ) CLASS CERTIFICATION
13                                            )
                                              )
14              Plaintiffs,                   ) Date: July 11, 2006
                                              ) Time: 9:00 a.m.
15         vs.                                )
                                              )
16  POLO RALPH LAUREN CORPORATION; a ) LOCATION: Courtroom 10, 19th Floor
    Delaware Corporation; POLO RETAIL, LLC., a) 450 Golden Gate Avenue
17  Delaware Corporation; POLO RALPH          ) San Francisco, California 94102
    LAUREN CORPORATION, a Delaware            )
18  Corporation, doing business in California as ) JUDGE: Hon. Susan Illston
    POLO RETAIL CORP; and FASHIONS            )
19  OUTLET OF AMERICA, INC.,                  )
                                              )
20                                            )
            Defendants.                       )
21                                            )
                                              )
22                                            )
                                              )
23  _____ )

24  I, Mara Apodaca, declare:

25      1)    I am a resident of Mammoth Lake, California, and make this declaration based on

26  my personal knowledge.

27

28  _____
                                                        Case No. C-07-02780-SI
    *Otsuka, et al. v. Polo, et al.*

        DECLARATION OF MARA APODACA IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

2)    Between approximately July 8, 2002 and April 20, 2006, I worked in the Mammoth Lakes Polo Factory Outlet Store. I was hired as a full-time employee.

3)    I was frequently not able to take my rest breaks during my work shifts because I was too busy tending to customers and my other duties. I estimate that I missed both of my daily rest breaks at least 45% of the time when I worked in the Mammoth Lakes Store.

4)    On many occasions I worked more than 8 hours in one day or more than 40 hours in one week, including my missed rest breaks and the times I was required to remain inside the store after I had clocked out for the day. When I had to stay late for a bag check, I was not paid at all for this time. I was definitely not paid overtime for these hours.

5)    I was instructed by my managers and in the Polo employee handbook that I could not leave the Polo store at any time unless a manager performed a bag check on me. I understood I could be fired if I did not undergo a bag check before I left the store.

6)    I was instructed to clock out, when leaving for lunch or at the end of the day, and then required to find a manager who could do the bag check at the employee exit. We were told by our managers to wait at the cash registers until one of them could check our bags. We had to wait no matter what. We could not leave the store until that check was done. I usually had to wait at least ten minutes after my shift, and sometimes waited 15 minutes or so after my shift had ended. This happened to me about 3 times each week I worked. I was not paid for any of this waiting time.

Signed under penalty of perjury under the laws of the State of California. Executed at Mammoth Lake, California, on May 15, 2008.

_____
Mara Apodaca

*Otsuka, et al. v. Polo, et al.*                    Case No. C-07-02780-SI

DECLARATION OF MARA APODACA IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

EXHIBIT 75.

Patrick R. Kitchin, Esq. (SBN. 162965)
**THE LAW OFFICE OF PATRICK R. KITCHIN**
565 Commercial Street, 4th Floor
San Francisco, CA 94111
415-677-9058
415-627-9076 (fax)

Attorneys for Plaintiffs
Janis Keefe, Corinne Phipps, and
Renee Davis

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ANN OTSUKA, an individual; JANIS KEEFE, an individual; CORINNE PHIPPS, an individual; and RENEE DAVIS, an individual; individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> POLO RALPH LAUREN CORPORATION; a Delaware Corporation; POLO RETAIL, LLC., a Delaware Corporation; POLO RALPH LAUREN CORPORATION, a Delaware Corporation, doing business in California as POLO RETAIL CORP; and FASHIONS OUTLET OF AMERICA, INC., <br><br> Defendants. | Case No.: C-07-02780-SI <br><br> DECLARATION OF AMIR FILSOOF IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION <br><br> Date: July 11, 2008 <br> Time: 9:00 <br><br> LOCATION: Courtroom 10, 19th Floor <br> 450 Golden Gate Avenue <br> San Francisco, California 94102 <br><br> JUDGE: Hon. Susan Illston |

I, Amir Filsoof, declare:

1. I am a resident of Orange County, California, and make this declaration based on my personal knowledge.

2. During 2005 and 2006, I worked as a Sales Associate in the Men's Department of the La Jolla, California, Polo Ralph Lauren store. During the summer of 2004, I worked as a

Sales Associate at the Palo Alto, California, Polo Ralph Lauren store in the Polo Sport Department.

3. During my employment at both Polo locations, I almost never took rest breaks. It was part of the culture that it was discouraged, given the demands of the work and the sales targets. In addition, staffing levels were sometimes insufficient to allow for breaks, due to the need to assist customers. I cannot remember ever taking a rest break.

4. There was also a policy that employees could not leave a Polo store unless a manager performed a bag check or "Loss Prevention Search" at the employee exit. I, too, was searched after almost every shift, and I understood that I could be fired if I did not undergo a search before I left the store. At both stores, almost every time I worked, I clocked out and was then required to wait at the back of the store for a manager to complete a Loss Prevention Search. The way it worked was that each section of the store had to finish cleaning up for the day before anyone could leave. If I finished up cleaning my section first, then I would go to help other sections, because everyone wanted to be able to go home as soon as possible. Often, then, myself and other associates who had finished cleaning their sections were at the back, waiting for others to finish cleaning or for managers to finish their duties before they came search us and allow us to leave. The smallest amount of time I had to wait was from 5 to 10 minutes. At least 50% of the days I worked, I waited 15 to 20 minutes after I had clocked out before I was permitted to leave the building. People did get frustrated while waiting, saying things like, "It's Friday night. I want to go home."

5. I was not paid for missed rest breaks, nor was I paid for the time I spent waiting to be searched after clocking out, at either the La Jolla or the Palo Alto Polo stores.

Signed under penalty of perjury under the laws of the State of California.

DATED: May 29, 2008

Amir Filsoof

Otsuka, et al. v. Polo, et al.                                    Case No. C-07-02780-SI

DECLARATION OF AMIR FILSOOF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

2

EXHIBIT 76.

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                SAN FRANCISCO DIVISION

 4

 5    ANN OTSUKA, an individual; JANIS      No. C-07-02780-SI
      KEEFE, an individual; CORINNE
 6    PHIPPS, an individual; and
      JUSTIN KISER, an individual;
 7    individually and on behalf of
      all others similarly situated,

 8
                      Plaintiffs,
 9       vs.

10    POLO RALPH LAUREN CORPORATION;
      a Delaware Corporation; POLO
11    RETAIL, LLC, a Delaware Corporation;
      POLO RALPH LAUREN CORPORATION, a
12    Delaware Corporation, doing business
      in California as POLO RETAIL CORP;
13    FASHIONS OUTLET OF AMERICA, INC., a
      Delaware Corporation and DOES 1-500,
14    inclusive,

15                    Defendants.
                                           /
16

17
                 DEPOSITION OF KRISTI MOGEL
18

19
         DATE:            February 4, 2008
20
         TIME:            10:06 a.m.
21
         LOCATION:        Greenberg Traurig
22                        1900 University Avenue
                          Fifth Floor
23                        East Palo Alto, California

24       REPORTED BY:     Mary E. Garland
                          Certified Shorthand Reporter
25                        License Number 4721
```

Page 1

**Golden Gate Reporting**

| | |
|---|---|
| 1   A. Seven. | 1    Q. Are there any other stores that, since you |
| 2   Q. And is there a loss prevention person there on | 2  began working for Polo, had on-site asset protection |
| 3  each of those days? | 3  personnel? |
| 4   A. We just added a second position there; but for | 4    A. No. We have a regional asset protection |
| 5  some time, it was only with one person. So, no. There | 5  manager who will rotate between stores at times, but |
| 6  were several days there was no one present. | 6  that would not be his primary role. |
| 7   Q. And during the days when that person wasn't | 7    Q. Would you take a look at Exhibit 24, on page |
| 8  present, then managers would perform the loss prevention | 8  37, or Bates stamped 1538. The right-hand column is |
| 9  inspections? | 9  "General Security." |
| 10   A. Yes. And during the days when they were | 10    A. Yes. |
| 11  present, managers would perform the loss -- the security | 11    Q. The third bullet point reads: |
| 12  inspection. | 12    "Bag checks must be performed anytime an |
| 13   Q. At the conclusion of the latest shift that | 13    employee leaves the store. Each employee must |
| 14  works in the Beverly Hills store, to your knowledge, is | 14    inform a manager that he or she is about to |
| 15  a loss prevention or asset protection person generally | 15    leave the store with a bag, box, or any other |
| 16  on duty at that time? | 16    item used to carry merchandise. When the |
| 17   A. If they're scheduled. Again, it depends on | 17    manager arrives, the employee should then punch |
| 18  their schedule and their shifts. | 18    out (for lunch or end of shift) and proceed to |
| 19   Q. Does that mean that sometimes the asset | 19    have all bags inspected by the manager before |
| 20  protection person is there at the end of the final shift | 20    exiting the store." |
| 21  at the store and sometimes they're not? | 21    To your knowledge, is this procedure -- that |
| 22   A. Correct. | 22  is, an employee finding a manager before they clock out |
| 23   Q. Have you ever observed asset protection | 23  -- being followed in all of the stores over which you |
| 24  personnel performing loss prevention inspections in the | 24  have some duties and responsibilities at this time? |
| 25  Beverly Hills store? | 25    A. To my knowledge, I wasn't aware of this |
| Page 154 | Page 156 |

| | |
|---|---|
| 1   A. Yes. | 1  terminology. |
| 2   Q. And where are those inspections performed? | 2    Q. Prior to April 2007, to your knowledge, was it |
| 3   A. There are two public entrances and exits. It's | 3  the policy or practice of any store over which you had |
| 4  in the back side of the building, facing the alley. We | 4  some duties and responsibilities to have employees find |
| 5  call that the valet entrance. That's where those are | 5  a manager to perform a loss prevention inspection before |
| 6  performed. | 6  they clocked out? |
| 7   Q. And in the Beverly Hills store, is that the | 7    A. Logistically, it would be difficult to do, |
| 8  only door, under normal circumstances, that an employee | 8  because many times the computers where you can clock out |
| 9  may enter or exit? | 9  are not near the exit. So, again, this is something |
| 10   A. Yes. Unless the alarm is set and the store's | 10  that is new discussion for me right here today. |
| 11  literally at closing mode; then everyone needs to leave | 11    Q. Has it been generally the practice in all of |
| 12  out of the alarmed door. | 12  the California retail stores over which you have some |
| 13   Q. And is that one of the other -- that's not the | 13  duties and responsibilities for the sales associates to |
| 14  door that leads out to valet? | 14  clock out prior to the time that they find a manager who |
| 15   A. Correct. It's a nonpublic door, and it's | 15  is available to perform a loss prevention search? |
| 16  through the employee locker room. | 16    A. Yes. They would clock out, typically, collect |
| 17   Q. So at the end of a business day, for those | 17  their belongings, and leave the store. |
| 18  sales associates who are working that later shift and | 18    Q. Have you ever learned from any source, other |
| 19  are closing the store, do they then exit out of this | 19  than perhaps counsel in this action, that employees of |
| 20  other door, not the valet door? | 20  Polo Ralph Lauren in California had complained that they |
| 21   A. No. The associates would primarily leave out | 21  were being required to wait what they believed was an |
| 22  of the valet door. It's the managers who stay well | 22  unreasonable amount of time to have loss prevention or |
| 23  after the store closes to do any more remaining store- | 23  bag check inspections performed at the end of their |
| 24  closing functions. So it's predominantly the management | 24  shifts? |
| 25  team that would leave out of the alarmed door. | 25    A. No, I don't recall any formal complaints around |
| Page 155 | Page 157 |

CERTIFICATION OF DEPOSITION OFFICER

I, MARY E. GARLAND, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was thereafter transcribed by means of computer-aided transcription under my direction; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed February 12, 2008, at San Francisco, California.

_____
MARY E. GARLAND, CSR 4721

184

EXHIBIT 77.

**Golden Gate Reporting**

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN FRANCISCO DIVISION

 4

 5   ANN OTSUKA, an individual; JANIS      No. C-07-02780-SI
     KEEFE, an individual; CORINNE
 6   PHIPPS, an individual; and
     JUSTIN KISER, an individual;
 7   individually and on behalf of
     all others similarly situated,

 8
                    Plaintiffs,
 9      vs.

10   POLO RALPH LAUREN CORPORATION;
     a Delaware Corporation; POLO
11   RETAIL, LLC, a Delaware Corporation;
     POLO RALPH LAUREN CORPORATION, a
12   Delaware Corporation, doing business
     in California as POLO RETAIL CORP;
13   FASHIONS OUTLET OF AMERICA, INC., a
     Delaware Corporation and DOES 1-500,
14   inclusive,

15                  Defendants.
                                         /
16

17
                DEPOSITION OF VALERIE ANN HARRISON
18

19
         DATE:          August 10, 2007
20
         TIME:          10:08 a.m.
21
         LOCATION:      120 Kearny Street
22                      Suite 3200
                        San Francisco, California
23
         REPORTED BY:   Mary E. Garland
24                      Certified Shorthand Reporter
                        License Number 4721
25
                                              Page 1
```

# Golden Gate Reporting

1  discussion with your sales associates regarding loss
2  prevention inspection procedures that are laid out on
3  this page of the exhibit?
4      A. No.
5      Q. Did you notice a change in the behavior of your
6  sales associates with respect to leaving the store?
7      A. No.
8      Q. Between the time that this policy was rolled
9  out and the time that you left Polo, was it the practice
10  of your associates to come and find you and say, "I'm
11  ready to go to lunch. Can you check me out," and then
12  punch out at the register?
13      A. They would not necessarily come and find me,
14  no.
15      Q. As I understand it, you might be approached by
16  an associate from Men's Sports or something?
17      A. Sure.
18      Q. Because you're a manager and you can check them
19  out?
20      A. That's correct.
21      Q. Did you find the behavior of the sales
22  associates, just in general, who were seeking you out to
23  do the bag inspections had now moved to be in compliance
24  with this new directive that you find a manager before
25  you punch out?

Page 170

1      A. So that would have meant they would have come
2  and found me, and then they would have gone and clocked
3  out?
4      Q. Yes.
5      A. Not that I noticed.
6      Q. You never saw anyone do that during the period
7  of time you were there when this policy was in effect?
8      A. No.
9      Q. If you would turn to 1556, the section entitled
10  "Your Pay." One of the issues addressed in this new
11  manual is set out in about the fourth paragraph under
12  "How You Are Paid," and it begins:
13          "Exempt employees are not eligible for
14          overtime. Non-exempt employees are eligible
15          for overtime and are paid for those hours
16          worked through the previous two weeks.
17          Commissioned employees are subject to
18          special rules and procedures in accordance with
19          applicable law and should contact their human
20          resources representative for further details."
21          Was the issue of premium overtime compensation
22  discussed in the meeting in which this policy manual was
23  rolled out?
24      A. Not that I recall.
25      Q. In the management meeting in which the 2007

Page 171

1  employee manual was rolled out, did anyone discuss a new
2  procedure for recording sales associates' hours worked?
3          That's a terrible way to ask this. I'm going
4  to strike that question.
5          After this new manual was rolled out, were
6  sales associates required to write down on some form all
7  the hours that they worked when they clocked in, clocked
8  out, and so forth?
9      A. Write down? No.
10      Q. No. On page 1557, in the left-hand column,
11  paragraph begins, "To ensure that accurate time records
12  are kept, you must accurately complete a time sheet and
13  forward it to your supervisor."
14          Did that start happening in the store after
15  this policy was rolled out?
16      A. No.
17      Q. So from the time that this policy was rolled
18  out to the time you left Polo, did any of your sales
19  associates bring you time sheets for you to do something
20  with?
21      A. No, not — I mean, unless they had a change.
22  That's the only form that they would have to bring us.
23      Q. Was it discussed at the meeting when this
24  manual was rolled out anything about having employees
25  write down their own hours?

Page 172

1      A. Not that I recall.
2          (Brief recess taken.)
3          (Exhibit 25 marked for identification.)
4      Q. BY MR. KITCHIN: I've handed you what I've
5  marked as Exhibit 25, which is the personnel file that
6  we were provided for Corinne Mullen, or Corinne Phipps,
7  from Polo Ralph Lauren.
8          You were serving as the manager of Home
9  Collections when Corinne Phipps was hired; is that
10  correct?
11      A. Yes.
12      Q. And did you interview with her or interview her
13  before she was hired?
14      A. Yes.
15      Q. And did you interview her on one occasion or
16  was it a multiple-meeting interview?
17      A. I don't recall if I was in any of the other
18  interviews that she was in. You usually have to go on
19  more than, obviously, one with different people. It was
20  at least once.
21      Q. And do you know whether Corinne Phipps was
22  seeking to obtain a position at Polo in Home Collections
23  or just a position at Polo?
24      A. I don't recall. She did have home background.
25      Q. And eventually a decision was made to hire her;

Page 173

44 (Pages 170 to 173)

CERTIFICATION OF DEPOSITION OFFICER

I, MARY E. GARLAND, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was thereafter transcribed by means of computer-aided transcription under my direction; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed August 15, 2007, at San Francisco, California.

_____
MARY E. GARLAND, CSR 4721

**EXHIBIT 77(a)**

# Golden Gate Reporting

1        UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3          SAN FRANCISCO DIVISION

4

5   ANN OTSUKA, an individual; JANIS          No. C-07-02780-SI
    KEEFE, an individual; CORINNE
6   PHIPPS, an individual; and
    JUSTIN KISER, an individual;
7   individually and on behalf of
    all others similarly situated,

8              Plaintiffs,

9      vs.

10  POLO RALPH LAUREN CORPORATION;
    a Delaware Corporation; POLO
11  RETAIL, LLC, a Delaware Corporation;
    POLO RALPH LAUREN CORPORATION, a
12  Delaware Corporation, doing business
    in California as POLO RETAIL CORP;
13  FASHIONS OUTLET OF AMERICA, INC., a
    Delaware Corporation and DOES 1-500,
14  inclusive,

15             Defendants.
                                            /
16

17

            DEPOSITION OF PHOEBE MIRELES
18

19
        DATE:         November 15, 2007
20
        TIME:         10:15 a.m.
21
        LOCATION:     One Montgomery Street
22                    Suite 3220
                      San Francisco, California
23
        REPORTED BY:  Mary E. Garland
24                    Certified Shorthand Reporter
                      License Number 4721
25

                                            Page 1

Page 62

1  of time to have a manager do a bag check so that they
2  could leave for their lunch break?
3      A. No.
4      Q. So you never heard that complaint --
5      A. No.
6      Q. -- while you were working there?
7      A. Not an unreasonable amount of time, no. But
8  what's unreasonable?
9      Q. Well, my question is: Did you ever hear from
10 any source that an employee, an associate, had
11 complained that they felt that they had had to wait for
12 some unreasonable period of time to get out of the store
13 to have their lunch?
14     A. No.
15     Q. I'd like to shift topics here a bit and talk
16 about the rest breaks that employees, sales associates,
17 received while they worked at Polo at Stanford.
18     A. Yes.
19     Q. What breaks did a full-time employee get during
20 a full-day shift?
21     A. They got two 15-minute breaks and one hour
22 lunch break. The two 15-minute breaks were on the
23 clock, the hour lunch break was off the clock.
24     Q. Did you ever hear from any source, during the
25 time you worked at the Polo Stanford Shopping Center,

Page 64

1  direct complaint or concern to me.
2      Q. Let me ask this question: You learned through
3  other managers that some sales associates had complained
4  to them that they were not getting their 15-minute
5  breaks for some reason?
6      A. Right.
7      Q. On how many occasions did you learn that such
8  complaints had been made?
9      A. Very few.
10     Q. Do you have an estimate?
11     A. I don't have an estimate. And I can't recall
12 when it would have happened, but I'm sure it did. And
13 we would try to accommodate them.
14     Q. Throughout the time that you worked at the
15 Stanford Shopping Center, did you ever become aware that
16 Polo had paid any sales associate any additional wages
17 for missing one of their rest breaks?
18     A. No.
19     Q. Throughout the course of your employment for
20 Polo, did you discuss with anyone the California
21 requirements relating to the payment of wages to
22 employees who missed rest breaks?
23     A. No, not that I can recall.
24     Q. Other than what you may have learned through
25 Polo's attorneys, are you aware that employees who miss

Page 63

1  that sales associates were not taking either of their
2  15-minute breaks?
3      A. Some chose not to. They would rather stay on
4  the sales floor and sell.
5      Q. Do you have any recollection of which sales
6  associates chose not to take their 15-minute breaks?
7      A. No, I don't.
8      Q. Do you have an estimate for me of the
9  percentage of sales associates, over the course of your
10 employment, that you believe chose not to take their
11 15-minute breaks?
12     A. Oh, very few, small percentage. I would say
13 less than ten. Most of the people chose to take their
14 15s. And I encouraged it when I was the manager.
15     Q. Did you ever hear anyone complain that they
16 had been unable to take their 15-minute break for any
17 reason?
18     A. I wouldn't say a -- nothing directly to me.
19 Possibly to their -- well, while I was a GM. Possibly
20 to their department managers. And this was scheduled
21 within the departments, as long as there was coverage,
22 as long as it was at a reasonable time.
23         They couldn't go from 8:45 to nine o'clock,
24 when we're going to close at nine, let's just say. It
25 just -- it would depend, yeah. But not a personal or

Page 65

1  rest breaks are entitled to receive an additional one
2  hour of compensation for that rest break that's missed?
3      MR. GOINES: Objection. Mischaracterizes the
4  law in the State of California. She can answer to the
5  best of her knowledge.
6      THE WITNESS: I'm not aware of that, no.
7      Q. BY MR. KITCHIN: While you were working at the
8  Stanford Shopping Center for Polo, did you become aware
9  of any sales associates who were paid premium overtime,
10 that is, time and a half, for any hours worked in excess
11 of eight hours per day or 40 hours per week?
12     A. Not that I can recall.
13     Q. Was there a policy at Polo Ralph Lauren, at any
14 period of time that you worked at the Stanford Shopping
15 Center, that the company did not pay premium overtime
16 compensation to any sales associates?
17     A. Not that I can recall.
18     Q. On occasion, did managers at the Stanford
19 Shopping Center Polo store have management meetings to
20 discuss business?
21     A. Yes.
22     Q. Were those regularly scheduled?
23     A. Yes.
24     Q. How often did those meetings occur while you
25 were employed at the Stanford Shopping Center?

17 (Pages 62 to 65)

CERTIFICATION OF DEPOSITION OFFICER

I, MARY E. GARLAND, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was thereafter transcribed by means of computer-aided transcription under my direction; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed November 26, 2007, at San Francisco, California.

MARY E. GARLAND, CSR 4721

EXHIBIT 78.

1      UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA

3      SAN FRANCISCO DIVISION

4

5   ANN OTSUKA, an individual; JANIS        No. C-07-02780-SI
    KEEFE, an individual; CORINNE
6   PHIPPS, an individual; and
    JUSTIN KISER, an individual;
7   individually and on behalf of
    all others similarly situated,

8              Plaintiffs,

9      vs.

10  POLO RALPH LAUREN CORPORATION;
    a Delaware Corporation; POLO
11  RETAIL, LLC, a Delaware Corporation;
    POLO RALPH LAUREN CORPORATION, a
12  Delaware Corporation, doing business
    in California as POLO RETAIL CORP;
13  FASHIONS OUTLET OF AMERICA, INC., a
    Delaware Corporation and DOES 1-500,
14  inclusive,

15             Defendants.
                                    /
16

17          DEPOSITION OF ROSALINDA WALLWORK

18

19
        DATE:         November 13, 2007
20
        TIME:         10:02 a.m.
21
        LOCATION:     1900 University Avenue
22                    Fifth Floor
                      East Palo Alto, California
23
        REPORTED BY:  Mary E. Garland
24                    Certified Shorthand Reporter
                      License Number 4721
25

                                            Page 1

1    A. Yes.
2    Q. And was that on more than one occasion?
3    A. I mean, I don't remember. We -- that was a
4 huge topic. We talked about it quite bit, actually,
5 because there were so many complaints that would come
6 about, so.
7    Q. Same question with respect to Valerie Harrison.
8 Were there times where you actually observed a
9 discussion or a comment being made about exiting and
10 entering the building when Valerie Harrison was present?
11    A. Yes.
12    Q. On more than one occasion?
13    A. Possibly.
14    Q. While you were working at Polo, were sales
15 associates entitled, under Polo's policy, to receive two
16 15-minute breaks each day that they worked a full-time
17 shift?
18    A. Yes.
19    Q. So they were entitled to a morning 15-minute --
20    A. Mm-hm. A lunch break.
21    Q. -- an hour lunch, and then an afternoon
22 15-minute break?
23    A. Yes.
24    Q. Did all of the sales associates that you worked
25 with in your departments, to your knowledge, take all of

Page 142

1    A. We had a daily break sheet, where we broke down
2 when people took their meal breaks.
3    Q. Was it just the meal breaks on the daily sheet?
4    A. The meal breaks. And when I worked in Men's,
5 which is a larger department, people would sign up for
6 15s, as well. Because they'd like to go like at a
7 certain time, like at 11, or they'd like to go at four
8 in the afternoon, so they would sign up for breaks.
9    Q. Was that a form that was kept on a computer
10 or --
11    A. Yes.
12    Q. Do you remember if it was an Excel file or --
13    A. It was a Word document, very simple.
14    Q. Did it have a table with columns and rows?
15    A. The first one did, and the second one didn't.
16 Because we liked to update the sheet, because it also
17 had other information on there. It had like daily goals
18 or customers that were coming in.
19    Q. So when you were in the Men's department, you
20 used --
21    A. I think that was Excel, because -- and when we
22 were in Ladies', it was a Word document, because it was
23 more -- just more information on it.
24    Q. And both in the Ladies' department and in the
25 Men's department, break times were pencilled in?

Page 144

1 their rest breaks?
2    A. Yes.
3    Q. Were there any sales associates that you worked
4 specifically with that you were aware were not taking
5 either their morning or afternoon break, so that they
6 could sell more?
7    A. The only time that someone might not take their
8 break is if they had an appointment.
9    Q. An appointment with a customer?
10    A. Yes.
11    Q. Were you aware of times where a person wasn't
12 able to take one of their 15-minute breaks because of an
13 appointment with a customer?
14    A. Yes.
15    Q. Do you remember specific instances of that or
16 do you just have a general recollection of that?
17    A. I can think of maybe one instance where someone
18 maybe didn't take their breaks. I mean, in the
19 departments I worked in, breaks were taken. I mean, I
20 can't think of one person that did not take their
21 breaks.
22    Q. Did you, as assistant manager key holder, or
23 manager, keep any kind of written notes as to when a
24 person within your department would be taking their rest
25 breaks?

Page 143

1    A. Not so much the breaks, but the lunch breaks.
2    Q. But in the Men's department, people would sign
3 up for specific allotments of 15-minute breaks?
4    A. At times. It wasn't practiced all the time;
5 but at times when people had something to do, they would
6 say, "I need to run out and," you know, "do something on
7 my break," so we would write it down. But it wasn't --
8 sometimes you had appointments, so it was very hard to
9 gauge when you could go on your 15.
10    Q. Was it Polo's policy, during the whole time
11 that you worked there, that employees were not permitted
12 to leave the building during their 15-minute breaks?
13    A. No. You can leave the building whenever.
14    Q. Did you ever hear any complaints that were
15 being made by any sales associates, in any department at
16 Polo San Francisco, that they weren't taking their
17 15-minute rest breaks?
18    A. No.
19    Q. In any management meetings that you
20 participated in, was rest breaks, as a problem area,
21 ever discussed?
22    A. No. Just the time clock situation, where
23 people would forget to come in and out. We would just
24 assume that there could be an issue, but --
25    Q. With respect to rest breaks, employees didn't

Page 145

37 (Pages 142 to 145)

CERTIFICATION OF DEPOSITION OFFICER

I, MARY E. GARLAND, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was thereafter transcribed by means of computer-aided transcription under my direction; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed November 26, 2007, at San Francisco, California.

_____
MARY E. GARLAND, CSR 4721

EXHIBIT 79.

**Golden Gate Reporting**

1                UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4

5   ANN OTSUKA, an individual; JANIS        No. C-07-02780-SI
    KEEFE, an individual; CORINNE
6   PHIPPS, an individual; and
    JUSTIN KISER, an individual;
7   individually and on behalf of
    all others similarly situated,

8                    Plaintiffs,

9     vs.

10  POLO RALPH LAUREN CORPORATION;
    a Delaware Corporation; POLO
11  RETAIL, LLC, a Delaware Corporation;
    POLO RALPH LAUREN CORPORATION, a
12  Delaware Corporation, doing business
    in California as POLO RETAIL CORP;

13  FASHIONS OUTLET OF AMERICA, INC., a
    Delaware Corporation and DOES 1-500,
14  inclusive,

15                   Defendants.
                                        /

16

17

                  DEPOSITION OF PHOEBE MIRELES
18

19

            DATE:          November 15, 2007
20

            TIME:          10:15 a.m.
21

            LOCATION:      One Montgomery Street
22                         Suite 3220
                           San Francisco, California
23

            REPORTED BY:   Mary E. Garland
24                         Certified Shorthand Reporter
                           License Number 4721
25

                                              Page 1

**Page 62**

1 of time to have a manager do a bag check so that they
2 could leave for their lunch break?
3    A. No.
4    Q. So you never heard that complaint --
5    A. No.
6    Q. -- while you were working there?
7    A. Not an unreasonable amount of time, no. But
8 what's unreasonable?
9    Q. Well, my question is: Did you ever hear from
10 any source that an employee, an associate, had
11 complained that they felt that they had had to wait for
12 some unreasonable period of time to get out of the store
13 to have their lunch?
14    A. No.
15    Q. I'd like to shift topics here a bit and talk
16 about the rest breaks that employees, sales associates,
17 received while they worked at Polo at Stanford.
18    A. Yes.
19    Q. What breaks did a full-time employee get during
20 a full-day shift?
21    A. They got two 15-minute breaks and one hour
22 lunch break. The two 15-minute breaks were on the
23 clock, the hour lunch break was off the clock.
24    Q. Did you ever hear from any source, during the
25 time you worked at the Polo Stanford Shopping Center,

**Page 64**

1 direct complaint or concern to me.
2    Q. Let me ask this question: You learned through
3 other managers that some sales associates had complained
4 to them that they were not getting their 15-minute
5 breaks for some reason?
6    A. Right.
7    Q. On how many occasions did you learn that such
8 complaints had been made?
9    A. Very few.
10    Q. Do you have an estimate?
11    A. I don't have an estimate. And I can't recall
12 when it would have happened, but I'm sure it did. And
13 we would try to accommodate them.
14    Q. Throughout the time that you worked at the
15 Stanford Shopping Center, did you ever become aware that
16 Polo had paid any sales associate any additional wages
17 for missing one of their rest breaks?
18    A. No.
19    Q. Throughout the course of your employment for
20 Polo, did you discuss with anyone the California
21 requirements relating to the payment of wages to
22 employees who missed rest breaks?
23    A. No, not that I can recall.
24    Q. Other than what you may have learned through
25 Polo's attorneys, are you aware that employees who miss

**Page 63**

1 that sales associates were not taking either of their
2 15-minute breaks?
3    A. Some chose not to. They would rather stay on
4 the sales floor and sell.
5    Q. Do you have any recollection of which sales
6 associates chose not to take their 15-minute breaks?
7    A. No, I don't.
8    Q. Do you have an estimate for me of the
9 percentage of sales associates, over the course of your
10 employment, that you believe chose not to take their
11 15-minute breaks?
12    A. Oh, very few, small percentage. I would say
13 less than ten. Most of the people chose to take their
14 15s. And I encouraged it when I was the manager.
15    Q. Did you ever hear anyone complain that they
16 had been unable to take their 15-minute break for any
17 reason?
18    A. I wouldn't say a -- nothing directly to me.
19 Possibly to their -- well, while I was a GM. Possibly
20 to their department managers. And this was scheduled
21 within the departments, as long as there was coverage,
22 as long as it was at a reasonable time.
23    They couldn't go from 8:45 to nine o'clock,
24 when we're going to close at nine, let's just say. It
25 just -- it would depend, yeah. But not a personal or

**Page 65**

1 rest breaks are entitled to receive an additional one
2 hour of compensation for that rest break that's missed?
3    MR. GOINES: Objection. Mischaracterizes the
4 law in the State of California. She can answer to the
5 best of her knowledge.
6    THE WITNESS: I'm not aware of that, no.
7    Q. BY MR. KITCHIN: While you were working at the
8 Stanford Shopping Center for Polo, did you become aware
9 of any sales associates who were paid premium overtime,
10 that is, time and a half, for any hours worked in excess
11 of eight hours per day or 40 hours per week?
12    A. Not that I can recall.
13    Q. Was there a policy at Polo Ralph Lauren, at any
14 period of time that you worked at the Stanford Shopping
15 Center, that the company did not pay premium overtime
16 compensation to any sales associates?
17    A. Not that I can recall.
18    Q. On occasion, did managers at the Stanford
19 Shopping Center Polo store have management meetings to
20 discuss business?
21    A. Yes.
22    Q. Were those regularly scheduled?
23    A. Yes.
24    Q. How often did those meetings occur while you
25 were employed at the Stanford Shopping Center?

17 (Pages 62 to 65)

1        CERTIFICATION OF DEPOSITION OFFICER

2

3        I, MARY E. GARLAND, duly authorized to administer

4    oaths pursuant to Section 2093(b) of the California Code

5    of Civil Procedure, do hereby certify that the witness

6    in the foregoing deposition was duly sworn by me to

7    testify to the truth, the whole truth and nothing but

8    the truth in the within-entitled cause; that said

9    deposition was taken at the time and place therein

10   stated; that the testimony of said witness was

11   thereafter transcribed by means of computer-aided

12   transcription under my direction; that the foregoing is

13   a full, complete and true record of said testimony; and

14   that the witness was given an opportunity to read and

15   correct said deposition and to subscribe to the same.

16       I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21       Executed November 26, 2007, at San Francisco,

22   California.

23

24   MARY E. GARLAND, CSR 4721

25