EXHIBIT 80.

**Golden Gate Reporting**

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4

5    ANN OTSUKA, an individual;
     JANIS KEEFE, an individual;
6    CORINNE PHIPPS, an individual;
     and JUSTIN KISER, an individual;
7    individually and on behalf of
     all others similarly situated,

8
                 Plaintiffs,
9                                    Case No. c-07-02780-SI
     and
10
     POLO RALPH LAUREN CORPORATION,
11   a Delaware corporation; POLO
     RETAIL, LLC, a Delaware corporation;
12   POLO RALPH LAUREN CORPORATION, a
     Delaware corporation, doing
13   business in California as POLO
     RETAIL CORP; FASHIONS OUTLET OF
14   AMERICA, INC., a Delaware
     corporation; and DOES 1-500,
15   inclusive,

16               Defendants.
     _____/

17

18              DEPOSITION OF THERESA CRUZ

19   DATE:       August 20, 2007

20   TIME:       10:00 a.m.

21   LOCATION:   LAW OFFICE OF PATRICK R. KITCHIN
                 565 Commercial Street
22               Fourth Floor
                 San Francisco, California 94111

23

24   REPORTED BY: Katy Leonard
                  Certified Shorthand Reporter
25                License Number 11599

                                              Page 1

Golden Gate Reporting

1 five seconds. How fast a person can walk.
2    Q. And earlier, you talked about paging.
3    A. Yes.
4    Q. Now, what did you mean exactly by that --
5 paging?
6    A. They're paging the manager.
7    Q. How many --
8    A. We have an intercom. And then they call the
9 manager to the back door, or "Manager, please call 200."
10 The 200 is the telephone extension at the back door.
11    Q. Do they ask for a specific manager?
12    A. No. They just say, in general, "manager,"
13 so whoever responds right away.
14    Q. How would you know whether you would go or
15 whether someone else would go?
16    A. I will call that extension and someone will
17 pick up from that extension and say, Oh, someone is
18 coming to check us out already, or, So-and-so department
19 manager already called us.
20    Q. And has the checkout procedure you just
21 described -- has it been the same since you've been
22 working there?
23    A. Yes.
24    Q. And you began working there in 1994; is that
25 correct?

Page 254

1    A. Yes, there is. With the Polo Sport
2 department. The Polo Sport department.
3    Q. I don't understand.
4    A. In the Polo Sport department, they do
5 communicate with their coworkers who goes first.
6 Like, between twelve o'clock, one o'clock, two o'clock,
7 and three o'clock.
8    Q. So, there was a schedule that reflected --
9 there was a schedule for all the employees; is that
10 correct?
11    A. It's not a formal document, but they just
12 write it on a piece of paper, who goes first and who
13 goes second. Who's next.
14    Q. So, there was a set time for each employee
15 to take a certain meal period; is that correct?
16    A. Yes.
17    Q. And was it your responsibility to make sure
18 that they took their meal periods?
19    A. No.
20    Q. Whose responsibility was it?
21    A. Um, it's the responsibility of the sales
22 associate.
23    Q. And to the — well, let me move on to rest
24 periods for a second.
25       Was there a time set for rest periods?

Page 256

1    A. Yes.
2       THE WITNESS: Is there construction in the
3 building, or outside?
4       MR. KITCHIN: There's a building next door.
5 BY MR. KIM:
6    Q. And how long did the inspections take,
7 typically?
8       MR. GOINES: Are you talking about how long the
9 physical inspection of the bag took?
10       MR. KIM: Physical inspection of the bag.
11       THE WITNESS: The bag check?
12       MR. KIM: Yes.
13       THE WITNESS: It will take two seconds, unless
14 you have other shopping bags with you that you went
15 shopping, of course it will take about another two
16 seconds to check that.
17 BY MR. KIM:
18    Q. Okay. Let me ask you some questions about
19 meal and rest periods.
20       Was there a time set for the meal period?
21    A. No.
22       For meal period? You mean --
23    Q. Yeah.
24    A. Oh, the lunch break?
25    Q. For lunch break. Yeah.

Page 255

1    A. For the 15-minute break?
2    Q. Yes.
3    A. No.
4    Q. Now, whose responsibility was it to make
5 sure that the employees took their rest periods?
6    A. It's the responsibility of the sales
7 associate.
8    Q. Okay. Do you know if they took their rest
9 periods?
10    A. I would know if I see them, which is -- the
11 break room is right across from my office.
12    Q. So, let's be specific about the time period.
13    A. Yes.
14    Q. 2002 until now, do you know if your
15 employees took rest periods?
16    A. Not all of them.
17    Q. Not all of them took rest periods?
18    A. No.
19    Q. Do you know why?
20    A. It all depends with the sales associate.
21 I'm only there to remind them once or twice. I will
22 remind them, but I will not obligate -- I will not
23 obligate them to take their meals, especially if they're
24 working with their clients.
25    Q. Okay. How do you know that they didn't take

Page 257

65 (Pages 254 to 257)

## Golden Gate Reporting

their rest periods?

You said not all of them took their rest periods.

A. How would I know?

Q. Yeah.

A. Because the top sellers in our store doesn't normally take a 15-minute break. All they do is go to the kitchen and go get -- refill their bottled water.

Q. And did a majority of the employees not take their rest periods?

A. Not the majority, I would say. Most of the people who doesn't take breaks are the top sellers.

Q. And so, I guess that would mean that it wasn't -- my understanding of your testimony is that it was not your responsibility to make sure that they took rest periods; it was up to the sales associate if they wanted to take it or not?

A. Yes.

Q. Did your employees take meal periods?

A. Yes.

Q. Where did they take their meal periods?

A. Um, for people who would bring their lunch, they stay in the break room, and some people they go out for lunch. They leave the store.

Q. And since you've been employed at Polo, has

Page 258

MR. GOINES: Thank you.

(Whereupon, at 5:52 p.m., the deposition of THERESA CRUZ was concluded.)

---oOo---

Page 260

the store practice regarding meal and rest periods been the same or has it changed?

A. It's been the same.

Q. Now, who is your immediate supervisor?

A. Catherine Post.

Q. Is she the general manager?

A. Yes.

Q. Do you have any other supervisors?

A. Right now? No. She's my only supervisor.

Q. Do you have an E-mail account at Polo?

A. Yes.

Q. Do you have and E-mail account at the store?

A. E-mail account, yes. I just had one recently.

MR. KIM: Okay. I have no further questions.

MR. KITCHIN: We're off the record.

THE REPORTER: Mr. Goines, do you want a copy of the transcript?

MR. GOINES: Yeah. I want a copy -- actually, what I'd like is a copy and also a mini. And a disc, please.

THE REPORTER: And Mr. Kim, would you like a copy of the transcript?

MR. KIM: My office will get back to you on what we want.

Page 259

CERTIFICATION OF DEPOSITION OFFICER

I, KATY LEONARD, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, hereby certify that the witness in the foregoing deposition was by me sworn to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was thereafter transcribed by means of computer-aided transcription; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, or in any way interested in the outcome of this cause named in said caption.

_____

KATY LEONARD, CSR 11599

Page 261

66 (Pages 258 to 261)

**Golden Gate Reporting**

1                  CERTIFICATION OF DEPOSITION OFFICER

2

3            I, KATY LEONARD, duly authorized to

4    administer oaths pursuant to Section 2093(b) of the

5    California Code of Civil Procedure, hereby certify that

6    the witness in the foregoing deposition was by me sworn

7    to testify to the truth, the whole truth and nothing but

8    the truth in the within-entitled cause; that said

9    deposition was taken at the time and place therein

10   stated; that the testimony of the said witness was

11   thereafter transcribed by means of computer-aided

12   transcription; that the foregoing is a full, complete

13   and true record of said testimony; and that the witness

14   was given an opportunity to read and correct said

15   deposition and to subscribe the same.

16            I further certify that I am not of counsel

17   or attorney for either or any of the parties in the

18   foregoing deposition and caption named, or in any way

19   interested in the outcome of this cause named in said

20   caption.

21

22

23

24                       KATY LEONARD, CSR 11599

25

                                              Page 261

EXHIBIT 81.

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4

5    ANN OTSUKA, an individual; JANIS        No. C-07-02780-SI
     KEEFE, an individual; CORINNE
6    PHIPPS, an individual; and
     JUSTIN KISER, an individual;
7    individually and on behalf of
     all others similarly situated,

8
                    Plaintiffs,
9       vs.

10   POLO RALPH LAUREN CORPORATION;
     a Delaware Corporation; POLO
11   RETAIL, LLC, a Delaware Corporation;
     POLO RALPH LAUREN CORPORATION, a
12   Delaware Corporation, doing business
     in California as POLO RETAIL CORP;
13   FASHIONS OUTLET OF AMERICA, INC., a
     Delaware Corporation and DOES 1-500,
14   inclusive,

15                  Defendants.
                                          /
16

17

             DEPOSITION OF VALERIE ANN HARRISON
18

19
     DATE:          August 10, 2007
20
     TIME:          10:08 a.m.
21
     LOCATION:      120 Kearny Street
22                  Suite 3200
                    San Francisco, California
23
     REPORTED BY:   Mary E. Garland
24                  Certified Shorthand Reporter
                    License Number 4721
25
                                                    Page 1

**Page 166**

1     On the Bates number 1524 --
2     A. Okay.
3     Q. -- in the right-hand corner, refers to "Meal
4 Periods and Breaks."  And the first sentence reads,
5 "Polo provides its employee with breaks and meal periods
6 in accordance with local laws.  It is the manager's
7 responsibility to ensure that the appropriate breaks are
8 taken."  Was that discussed at the meeting?
9     A. I believe that was mentioned by Kristi Mogel.
10     Q. What did -- it's Kristi; right?
11     A. Kristi.
12     Q. Kristi Mogel, what did she say with respect to
13 meal and rest breaks?
14     A. Just that, as a manager, that you should be
15 making sure that everybody is getting their breaks.
16     Q. Did you hear at that meeting that managers were
17 having any kind of concerns about their sales associates
18 getting their meal or rest breaks?
19     A. Concerns?
20     Q. Did any managers make any comments about
21 whether or not their sales associates were taking meal
22 and rest breaks?
23     A. I believe it was -- it was brought up that
24 there have been some sales associates who just forewent
25 their 15-minute break because they had an appointment,

**Page 168**

1     A. Just that we were to, you know, tell them that
2 they needed to take their breaks and encourage it.  And
3 that, obviously, like, you know, a senior seller that
4 has an appointment and wants to forego the 15-minute
5 break, you just have to make sure that, you know, you're
6 encouraging it and telling them they need to take their
7 full breaks.
8     Q. Did Kristi Mogel say that this had been a
9 problem at the San Francisco store, that sales
10 associates were not, for whatever reason, taking either
11 their meal or rest breaks?
12     A. No.
13     Q. On page 1532, at the bottom right-hand column,
14 it says "Employee Conduct and Responsibilities," and it
15 repeats some of the language that we've seen in the
16 other manuals.
17     A. Mm-hm.
18     Q. On the following page, 1533, this long list of
19 prohibited behavior -- "unacceptable behavior," it
20 says -- there's no language in here now regarding the
21 prohibition against disclosing wages.
22     Did anyone at this meeting when this was rolled
23 out make reference to whether employees could now, under
24 the Polo's policy, discuss their wages with others?
25     A. I don't recall that being mentioned.

**Page 167**

1 or the sales floor was busy, so on and so forth.
2     Q. Did Kristi Mogel talk about, during this-·
3 meeting when this was rolled out, any compensation for
4 missed meal or rest breaks?
5     A. I don't recall that that was discussed.
6     Q. Who at the meeting talked about sales
7 associates missing their meal or rest breaks?
8     A. Actually, I did bring that one subject up --
9 not so much meals, but rest breaks only -- because it's
10 not that I didn't always encourage it and tell them they
11 should take their breaks, but that was opposition that I
12 got from some of my senior sales associates.
13     Q. I'm sorry.  That was the opposition?
14     A. They would come to me and say, you know, "I'd
15 rather be on the sales floor."
16     Q. So none of your sales associates complained
17 that they weren't able to take their breaks?
18     A. No.
19     Q. Did anyone else at the meeting when this new
20 manual was rolled out say anything about their sales
21 associates in their departments taking or not taking
22 rest and meal breaks?
23     A. Not that I recall.
24     Q. What more did Kristi Mogel say about the meal
25 and rest breaks?

**Page 169**

1     Q. If you could take a look at page 1538, the
2 right-hand column begins "General Security."  The third
3 bullet point reads:
4         "Bag checks must be performed anytime an
5         employee leaves the store.  Each employee must
6         inform a manager that he or she is about to
7         leave the store with a bag, box or any other
8         item used to carry merchandise.  When the
9         manager arrives, the employee should then punch
10         out (for lunch or end of shift) and proceed to
11         have all bags inspected by the manager before
12         exiting the store."
13     Was this new policy discussed at the meeting
14 when this new manual was rolled out?
15     A. Not that I recall.
16     Q. After this -- let me lay some foundation here.
17     Were your sales associates provided a copy of
18 this new manual?
19     A. Everyone received it, yes.
20     Q. And was that provided by Theresa Cruz, or you,
21 or do you know?
22     A. If I recall correctly, it was passed out to
23 everyone in the morning meeting.
24     Q. And after that morning meeting when it was
25 passed out to sales associates, did you have any

43 (Pages 166 to 169)

CERTIFICATION OF DEPOSITION OFFICER

1

2

3        I, MARY E. GARLAND, duly authorized to administer

4   oaths pursuant to Section 2093(b) of the California Code

5   of Civil Procedure, do hereby certify that the witness

6   in the foregoing deposition was duly sworn by me to

7   testify to the truth, the whole truth and nothing but

8   the truth in the within-entitled cause; that said

9   deposition was taken at the time and place therein

10   stated; that the testimony of said witness was

11   thereafter transcribed by means of computer-aided

12   transcription under my direction; that the foregoing is

13   a full, complete and true record of said testimony; and

14   that the witness was given an opportunity to read and

15   correct said deposition and to subscribe to the same.

16        I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21        Executed August 15, 2007, at San Francisco,

22   California.

23

24                    MARY E. GARLAND, CSR 4721

25

EXHIBIT 82.

APR-30-1900  15:12                                                                      P.01

1  Patrick R. Kitchin, Esq. (SBN. 162965)
2  **THE LAW OFFICE OF PATRICK R. KITCHIN**
   565 Commercial Street, 4th Floor
3  San Francisco, CA 94111
   415-677-9058
4  415-627-9076 (fax)

5  Attorneys for Plaintiffs
6  Janis Keefe, Corinne Phipps, and
   Renee Davis

7

8                          UNITED STATES DISTRICT COURT
9                        NORTHERN DISTRICT OF CALIFORNIA
                             SAN FRANCISCO DIVISION
10

11  ANN OTSUKA, an individual; JANIS KEEFE, ) Case No.: C-07-02780-SI
    an individual; CORINNE PHIPPS, an        )
12  individual; and RENEE DAVIS, an individual; )
    individually and on behalf of all others similarly ) DECLARATION OF MANDY SHADE IN
13  situated,                                 ) SUPPORT OF PLAINTIFFS' MOTION FOR
14                                            ) CLASS CERTIFICATION
                                              )
15              Plaintiffs,                   ) Date: July 11, 2006
16         vs.                                ) Time: 9:00 a.m.
                                              )
17  POLO RALPH LAUREN CORPORATION; a ) LOCATION: Courtroom 10, 19th Floor
    Delaware Corporation; POLO RETAIL, LLC., a ) 450 Golden Gate Avenue
18  Delaware Corporation; POLO RALPH          ) San Francisco, California 94102
    LAUREN CORPORATION, a Delaware            )
19  Corporation, doing business in California as ) JUDGE: Hon. Susan Illston
20  POLO RETAIL CORP; and FASHIONS            )
    OUTLET OF AMERICA, INC.,                  )
21                                            )
22              Defendants.                   )
                                              )
23                                            )
                                              )
24  _____ )

25  I, Mandy Shade, declare:

26       1)    I am a resident of Barstow, California, and make this declaration based on my
27  personal knowledge.

28

_____                                    1
*Otsuka, et al. v. Polo, et al.*                              Case No. C-07-02780-SI

2)     From around September 19, 1999 to December 24, 2004, I worked at the Polo Ralph Lauren Factory Store in Barstow, California. I worked there full-time.

3)     When I was hired, I was told that I was not allowed to tell any other employee how much I was earning.

4)     I seldom got rest breaks during my shifts. This was either because I was too busy helping customers or because the managers never released me for a break.

5)     I was also told by managers that I could be fired if I did not allow them to check my bags before leaving the store after the end of my shifts. The managers told us that they would not allow us to leave unless we went through the checks. I would wait with my co-workers for the managers to search us and let us leave. This happened just about every time I was at work at the Polo store. I generally waited from 10 to 15 minutes after clocking out to be checked and allowed to leave the store. Sometimes, I did wait up to 20 minutes for them to allow me to leave. I was not paid for any of this waiting time.

Signed under penalty of perjury under the laws of the State of California. Executed at Barstow, California, on June 3, 2008.

 

_Mandy Shade_
Mandy Shade

_Otsuka, et al. v. Polo, et al._            Case No. C-07-02780-SI

DECLARATION OF MANDY SHADE IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

EXHIBIT 83.

1   Patrick R. Kitchin, Esq. (SBN. 162965)
2   **THE LAW OFFICE OF PATRICK R. KITCHIN**
    565 Commercial Street, 4th Floor
3   San Francisco, CA 94111
    415-677-9058
4   415-627-9076 (fax)

5   Attorneys for Plaintiffs
6   Janis Keefe, Corinne Phipps, and
    Renee Davis

7

8                    UNITED STATES DISTRICT COURT
9                   NORTHERN DISTRICT OF CALIFORNIA
                        SAN FRANCISCO DIVISION
10

11  ANN OTSUKA, an individual; JANIS KEEFE, ) Case No.: C-07-02780-SI
    an individual; CORINNE PHIPPS, an        )
12  individual; and RENEE DAVIS, an individual; )
    individually and on behalf of all others similarly ) DECLARATION OF DAVE LAND IN
13  situated,                                 ) SUPPORT OF PLAINTIFFS' MOTION FOR
                                              ) CLASS CERTIFICATION
14                                            )
15              Plaintiffs,                   ) Date:  July 11, 2006
                                              ) Time:  9:00 a.m.
16          vs.                               )
                                              )
17  POLO RALPH LAUREN CORPORATION; a ) LOCATION:  Courtroom 10, 19th Floor
    Delaware Corporation; POLO RETAIL, LLC., a ) 450 Golden Gate Avenue
18  Delaware Corporation; POLO RALPH          ) San Francisco, California 94102
    LAUREN CORPORATION, a Delaware            )
19  Corporation, doing business in California as ) JUDGE:  Hon. Susan Illston
    POLO RETAIL CORP; and FASHIONS            )
20  OUTLET OF AMERICA, INC.,                  )
                                              )
21                                            )
            Defendants.                       )
22                                            )
                                              )
23                                            )
                                              )
24  ─────────────────────────────────────────

25  I, Dave Land, declare:

26      1)      I am a resident of Orange County, California, and make this declaration based on

27  my personal knowledge.

28                                                                                              1

─────────────────────────────────────────────────────────────────
*Otsuka, et al. v. Polo, et al.*                              Case No. C-07-02780-SI

        DECLARATION OF DAVE LAND IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

2)    In 2000, I worked at the Polo Ralph Lauren store in Mammoth Lakes, California.

3)    I usually worked 5 days each week. I was able to take breaks every once and a while, if I made sure to ask, and if we were not busy. I estimate that about 80-90% of the time, I was not able to take my rest breaks. If we were busy on the floor helping customers, management did not want us to leave for breaks at those times. We also were under pressure to sell the merchandise in the store, so management did not encourage breaks for that reason, too.

4)    I understood that I was not allowed to leave the store after clocking out until a manager checked me and my co-workers and then unlocked the door to let us leave the building.

5)    For these "loss prevention searches," I was required to wait near the store exit, after having clocked out, until my co-workers and the managers on duty finished their work. I was usually waited with a group of people for the manager to come check bags and let us go. This occurred just about every day I was at work. On average, I estimate that I had to wait from 10 to 20 minutes after I had clocked out before I was permitted to leave the building. I was not paid for any of this waiting time.

Signed under penalty of perjury under the laws of the State of California. Executed at Simi Valley, California, on June _3_, 2008.

_____
Dave Land

2

EXHIBIT 84.



COPY

1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION
------------------------------------------x
ANN OTSUKA, an individual; JANIS KEEFE, an
individual; CORINNE PHIPPS, an individual;
JUSTIN KISER, an individual; individually and
on behalf of all others similarly situated, and
RENEE DAVIS, an individual; individually and on
behalf of all others similarly situated,

                    Plaintiffs,

    -against-

POLO RALPH LAUREN CORPORATION; a Delaware
Corporation; POLO RETAIL, LLC., a Delaware
Corporation; POLO RALPH LAUREN CORPORATION, a
Delaware Corporation, doing business in
California as POLO RETAIL CORP; FASHIONS OUTLET
OF AMERICA, INC., a Delaware Corporation,

                    Defendants,

Case No.:   C-07-02780-SI
------------------------------------------x

                    200 Park Avenue
                    New York, New York

                    December 4, 2007
                    10:18 a.m.


        Videotaped Deposition of JUSTIN KISER,

pursuant to notice, before Sophie Nolan, a

Notary Public of the State of New York.



        ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
             New York, New York  10022
                  212-750-6434
                  Ref: 86114

281

1                        KISER

2        Q.    Now, what, if anything, was said to

3   you about the rest breaks after you were hired

4   by Polo?

5        A.    What do you mean by said to me?

6        Q.    Well, I mean, you said something

7   about being pressured not to take your break.

8        A.    Yes.

9        Q.    And I'm asking what was said to you

10  about that.

11       A.    I was pressured, told, that senior

12  sellers don't take breaks and don't take

13  lunches and I felt very pressured that they

14  wanted me to be a top seller and that --

15       Q.    Who told you that senior sellers

16  don't take breaks or lunches?

17       A.    Rosalinda and Theresa.

18       Q.    And did you respond when they

19  made -- when either of them made that comment?

20       A.    I didn't.

21       Q.    Did it change your behavior in

22  taking breaks?

23       A.    Yes.

24       Q.    And how did it do that?

25       A.    I didn't take 15-minute breaks and

282

1                         KISER

2    I would take short lunches or sometimes skip a

3    lunch.

4          Q.    So, are you saying at some point

5    you decided you were no longer going to take

6    your 15-minute breaks at all?

7          A.    Yeah, because I felt pressured.  I

8    felt like if I took them I was being

9    questioned.  I remember one time being down in

10   the break room, Theresa questioning Janice and

11   getting all upset at her and they got into,

12   like, this argument over why are you still down

13   here, and I didn't want to deal with that and I

14   was just, like, I'll just stay on the floor.

15         Q.    Well, why are you still down here

16   sounds like a question about -- to an associate

17   who has overstayed their break.

18         A.    Or she would also say -- she would

19   also say, "You're down here again?"  Or just

20   like little comments she would make all the

21   time.

22         Q.    And whose comments were these?

23         A.    Theresa's.

24         Q.    Theresa's?

25         A.    Uh-huh.  And she had made a comment

285

1                          KISER

2     taken two.  You can count it on my hands.  I

3     may have gone down there when it was -- they

4     were having cake for someone and had a slice of

5     cake, but I didn't count down 15 minutes.  I

6     ate it up and went back up to the floor because

7     I knew I was going to be questioned, who's up

8     there.

9              Q.     So you're saying from September of

10    2004 through August of 2005, you took maybe one

11    or two breaks and otherwise you totally did not

12    take any breaks at all?

13             A.     Yes.

14             Q.     That's an accurate statement?

15             A.     Yes.

16             Q.     Now, did you complain to anybody

17    about not being able to take your rest breaks?

18             A.     I didn't because I felt like they

19    were pressuring me not to.  Why would I

20    complain to these people?

21             Q.     Did you complain to any coworkers?

22             A.     Yeah.

23             Q.     To whom?

24             A.     We all kind of complained to each

25    other, all of us in the sportswear, and then

286

KISER

1 maybe I complained a few times to my roommates,

2 you know, my mother, just things like that.  I

3 would say, you know, is this -- is this right

4 what they're doing?

5          Q.    Okay.  You said the workers all

6 complained to each other.  Does that mean that

7 no one in the men's sportswear department took

8 breaks?

9          A.    They did more than I did, but they

10 felt like they were being pressured and they

11 were always being questioned, who's watching

12 the front room.  Who's -- you know, when there

13 was a lot of theft going on, but we still

14 needed our breaks.

15          Q.    Well, how many sales associates

16 would be -- would be assigned to work the

17 floor?

18          A.    In my department?

19          Q.    Yeah.

20          A.    I think there was, like, seven

21 total and so then certain days people had to

22 have off, so certain days maybe there was only

23 three or maybe there was only four, or, you

24 know, because someone called in sick maybe two,

324

                    C E R T I F I C A T E

STATE OF NEW YORK      )
                       )ss.:
COUNTY OF NEW YORK     )

            I, SOPHIE NOLAN, a Notary Public

    within and for the State of New York, do

    hereby certify:

            That JUSTIN KISER, the witness

    ~~whose deposition is herein before set forth,~~

    was duly sworn by me and that such deposition

    is a true record of the testimony given by

    such witness.

            I further certify that I am

    not related to any of the parties to this

    action by blood or marriage; and that I am in

    no way interested in the outcome of this

    matter.

            IN WITNESS WHEREOF, I have

    hereunto set my hand this 17th day of December,

    2007.


                            *Sophie Nolan*

                        SOPHIE NOLAN

EXHIBIT 85.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


ANN OTSUKA, an individual,

et al.,

**CERTIFIED COPY**

                    Plaintiffs,

        vs.                    No. C-07-02780-SI

POLO RALPH LAUREN CORPORATION,

et al.,

                    Defendants.

_____/


Videotaped Deposition of

**JANIS KEEFE**

Monday, March 17, 2008


Reported by:
IRIS MEINKE-SMITH, RMR/CRR
CSR No. 3798
Job No. 18235LR



**PHILLIPS LEGAL SERVICES**
SAN FRANCISCO DEPOSITION REPORTERS
795 FOLSOM STREET, FIRST FLOOR
SAN FRANCISCO, CA 94107
1-888-333-8270
WWW.PHILLIPSDEPO.COM

1    A.       -- on average.

2    Q.       And on the occasions -- and I take it what

3    you're saying is on a daily basis in that regular

4    workweek you would only take one of your two breaks.

12:12:04 5    Is that what I'm hearing?

6    A.       Yeah, on an average.

7    Q.       Okay.

8    A.       It could vary maybe like four, four times,

9    five times.  But it's just I do recall that the store

12:12:13 10    was that busy, and I was often told not to take two

11    breaks.

12    Q.       And on the occasions when you were told not

13    to take two breaks, who told you that?

14    A.       Theresa, Tin.  Maybe Harvey a couple of

12:12:32 15    times was directed by Tin to tell people to not take.

16            We were kind of led to feel, too, that if we

17    were taking a break, like we were made to feel

18    uncomfortable if we -- if they saw us in the break

19    room taking our break.  So it was almost like we

12:12:54 20    didn't feel comfortable to take our breaks.

21    Q.       And in what way or manner were you led to

22    feel uncomfortable?

23    A.       There was managers in there like clocking

24    you, timing you.  Like, "Haven't you been here ten

12:13:06 25    minutes already?"  "Haven't you been here five

84

1    minutes already?"

2           I mean, it's like it was really

3    intimidating, almost, to take a break.  Like you

4    didn't want to be in the break room.

12:13:16 5   Q.      And which managers were those who you

6    observed putting on -- you know, saying haven't you

7    been here so long, or --

8    A.      Tin, Theresa.

9    Q.      Anybody else?

12:13:31 10  A.      That's -- those are the only two people that

11   really come to mind.

12   Q.      Did you ever confront Tin or Theresa and

13   say, "I'm entitled to two breaks and you can't

14   deprive me of taking them"?

12:13:52 15  A.      A couple of times I did.

16   Q.      And Tin or Theresa or both?

17   A.      I think Theresa.

18   Q.      Do you recall what her response was?

19   A.      She was -- you know, she was more

12:14:10 20  understanding about that stuff.  So she would say,

21   "Okay, well, take your break."  You know, "If you

22   feel that way, take your break."

23          But she was instructed by Tin on a few

24   occasions to tell people not to take their break.

12:14:29 25  Q.      And on what do you base that statement?

                                                      85

REPORTER'S CERTIFICATE

1

2        I certify that the foregoing proceedings in

3   the within-entitled cause were reported at the time

4   and place therein named; that said proceedings were

5   reported by me, a duly Certified Shorthand Reporter

6   of the State of California authorized to administer

7   oaths and affirmations, and were thereafter

8   transcribed into typewriting.

9        I further certify that I am not of counsel

10  or attorney for either or any of the parties to said

11  cause of action, nor in any way interested in the

12  outcome of the cause named in said cause of action.

13        IN WITNESS WHEREOF, I have hereunto set my

14  hand this 1st day of April, 2008.

15

16  _____ _Iris Meinke-Smith_ _____

17  IRIS MEINKE-SMITH, CA CSR No.3798
    Registered Merit Reporter
18  Certified Realtime Reporter

19

20

21

22

23

24

25
                                              150

EXHIBIT 86.

**Golden Gate Reporting**

```
 1              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
 2                 SAN FRANCISCO DIVISION
    -------------------------------X
 3  ANN OTSUKA, an Individual; JANIS
    KEEFE, an individual, CORINNE PHIPPS,
 4  an individual, and JUSTIN KISER,
    an individual, individually and
 5  on behalf of all others similarly
    situated,
 6
                    Plaintiffs.
 7
    v.                                    No. C-07-02780-SI
 8
    POLO RALPH LAUREN CORPORATION,
 9  a Delaware Corporation, POLO
    RETAIL, LLC, a Delaware Corporation,
10  POLO RALPH LAUREN CORPORATION, a
    Delaware Corporation doing business
11  in California as POLO RETAIL CORP.,
    FASHIONS OUTLET OF AMERICA, INC., a
12  Delaware Corporation, and DOES -500,
    inclusive,
13
                    Defendants.
14  -------------------------------X
15
                     January 17, 2008
16                   New York, New York
                     Time:  10:00 a.m.
17                   Volume 1, Pages 63
18
19        Deposition of JOANNE CONOVAS, taken on behalf

20  of the Plaintiffs, at Greenberg Traurig, Met Life

21  Building, 200 Park Avenue, New York, New York, commencing

22  at 10:00 a.m., January 17, 2008, before Anthony

23  Armstrong, a Notary Public and Certified Shorthand

24  Reporter of the State of New York.

25
```

Page 1

**Golden Gate Reporting**

1  with the commission and that commission payment
2  to be paid. That's the detail that comes to be
3  posted on the employee's check if they have
4  commission.
5      Q.    On this specific paycheck, which is
6  Phipps confidential Page 2, can you tell whether
7  Corinne Phipps was paid her base rate or
8  commission?
9          MR. CAPOBIANCO:    Objection to form.
10     A.    This first page?
11     Q.    Could you tell whether this paycheck
12  was based on an hourly rate payment or based on
13  commission?
14     A.    This payment was based on an hourly
15  rate. Looking at this, the employee's gross
16  commission was less than the regular pay.
17  Therefore, there was no net commission.
18     Q.    I'm going to show you a document that
19  we will mark as Exhibit 56.
20          (Whereupon, Exhibit 56 was marked
21          for identification.)
22          *************
23  BY MR. KITCHIN:
24     Q.    This document -- are you familiar
25  with the form of what we have marked as

Page 50

1      Q.    This form, looking at Page 280, Janis
2  Howay. There is an indication, ST space OT?
3      A.    Straight time, overtime.
4      Q.    So, again, from this report, we can't
5  tell whether Janis worked 1.24 hours on a single
6  day or on multiple days that were designated to
7  be overtime; is that correct?
8      A.    That's correct.
9      Q.    We would need to compare the time
10  card information for this pay period to determine
11  how that overtime was distributed; is that
12  correct?
13     A.    Yes.
14     Q.    Let me show you what was previously
15  marked as Exhibit K to the Corinne Phipps
16  deposition.
17          (Whereupon, Exhibit K was
18          previously marked for identification.)
19          *************
20  BY MR. KITCHIN:
21     Q.    I ask you if you are familiar with
22  this form?
23     A.    (Perusing.)
24          No. I don't recall seeing this, no.
25     Q.    Have you ever had an opportunity

Page 52

1  Exhibit 56?
2      A.    Yes.
3      Q.    What is this set of documents?
4      A.    This is what we call the payroll 260
5  report. It's a payment detailed listing of the
6  paychecks for a period of time.
7      Q.    What system is this generated from?
8      A.    This is the Lawson system.
9      Q.    In order to prepare this 260 report,
10  what did your department need to do?
11     A.    We just need something in writing,
12  exactly what it is that we are looking for, time
13  period, employees.
14     Q.    How long has the Lawson system been
15  in effect?
16     A.    Since January, 2004.
17     Q.    And to produce reports such as this
18  showing earnings, hours and so forth, how big of
19  a project would that be to run reports like this
20  on specific employees?
21     A.    It shouldn't be a problem.
22     Q.    You would just enter into the system
23  the parameters for your search and it would
24  generate a similar 260 report on any individual?
25     A.    Yes.

Page 51

1  to -- strike that.
2          Have you ever reviewed the April,
3  2007, Polo Ralph Lauren Retail Employee Handbook?
4      A.    I have a copy of it. I haven't
5  really read through the entire document.
6      Q.    I'm going to show you what we have
7  previously marked as Exhibit 24. It's pages that
8  I selected out of the larger manual. I have a
9  few questions about sections within the handbook.
10          (Whereupon, Exhibit 24 was
11          previously marked for identification.)
12          *************
13     A.    (Perusing.)
14  BY MR. KITCHIN:
15     Q.    To your knowledge, has Polo Ralph
16  Lauren ever paid any sales associates in any of
17  the stores in California an hour of wages for
18  missing a meal or rest break?
19     A.    I really have no way of knowing that.
20     Q.    Have you ever received a request from
21  any store in California to add an additional hour
22  of pay to an employee because they have missed a
23  meal or rest break?
24     A.    Not that I can recall for that
25  reason, specifically.

Page 53

14 (Pages 50 to 53)

## Golden Gate Reporting

1              C E R T I F I C A T E

2        I, Anthony Armstrong, a Certified

3   Shorthand Reporter and Notary Public within

4   and for the State of New York, do hereby

5   certify:

6        That JOANNE CONOVAS, the witness whose

7   testimony is hereinbefore set forth, was

8   duly sworn by me and that such testimony is

9   a true record of the testimony given by such

10  witness.

11       I further certify that I am not

12  related to any of the parties by blood or

13  marriage, and that I am in no way interested

14  in the outcome of this matter.

15

16

17                          Anthony Armstrong

18

19

20

21

22

23

24

25

Page 62

EXHIBIT 87.

**Golden Gate Reporting**

```
 1              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
 2                SAN FRANCISCO DIVISION
     ------------------------------X
 3   ANN OTSUKA, an Individual; JANIS
     KEEFE, an individual, CORINNE PHIPPS,
 4   an individual, and JUSTIN KISER,
     an individual, individually and
 5   on behalf of all others similarly
     situated,
 6
                   Plaintiffs.
 7
     v.                              No. C-07-02780-SI
 8
     POLO RALPH LAUREN CORPORATION,
 9   a Delaware Corporation, POLO
     RETAIL, LLC, a Delaware Corporation,
10   POLO RALPH LAUREN CORPORATION, a
     Delaware Corporation doing business
11   in California as POLO RETAIL CORP.,
     FASHIONS OUTLET OF AMERICA, INC., a
12   Delaware Corporation, and DOES -500,
     inclusive,
13
                   Defendants.
14   ------------------------------X

15

                     January 18, 2008
16                   New York, New York
                     Time:  9:51 a.m.
17                   Volume 1, Pages 84

18

19         Deposition of BETH FLYNN, taken on behalf

20   of the Plaintiffs, at Greenberg Traurig, Met Life

21   Building, 200 Park Avenue, New York, New York, commencing

22   at 9:51 a.m., January 18, 2008, before Anthony

23   Armstrong, a Notary Public and Certified Shorthand

24   Reporter of the State of New York.

25
```

                                                    Page 1

## Golden Gate Reporting

1  California?
2  A.  No.
3  Q.  Have -- under California law, when an
4  employee misses a meal or rest break, under
5  certain circumstances the employer is required to
6  pay the employee an extra hour at their normal
7  hourly rate for missing that break.
8  In your experience, did Polo -- have
9  you ever seen any request for the payment of any
10  sales associate who has missed a meal or rest
11  break?
12  A.  Not that I'm aware of.
13  Q.  So you have never -- your department
14  as far as you know has never been requested to
15  adjust an employee's hours of work based on that
16  employee missing a meal or rest break?
17  A.  Correct.
18  Q.  I'm going to show you what we have
19  previously marked as Exhibit 53, a large document
20  showing an analysis that Mr. Cohen performed that
21  he referred to as a 50 percent test.
22  (Whereupon, Exhibit 53 was
23  previously marked for identification.)
24  **************
25

Page 74

1  Did your department have any role in
2  drafting or reviewing or revising this section of
3  the manual?
4  A.  No.
5  Q.  If an employee believes that an
6  improper deduction has been made to their
7  paycheck, are you involved in analyzing or
8  responding to that complaint by the employee?
9  A.  No.
10  Q.  If an employee has demonstrated to a
11  manager that they worked an extra hour that
12  wasn't memorialized, would they -- if you know,
13  would they go to payroll to ask for the payment
14  of an additional hour of wages?
15  A.  I would believe so.
16  Q.  They wouldn't come through your
17  department in any fashion?
18  A.  No.
19  Q.  If an employee during the course of
20  the arrears program believed that the arrears
21  status was incorrect in any way, would you be
22  involved in any way in the analysis or response
23  to that query?
24  A.  Not directly.
25  Q.  How indirectly would you be responsi-

Page 76

1  BY MR. KITCHIN:
2  Q.  Have you seen this analysis prior to
3  today?
4  A.  No, I don't believe so.
5  Q.  In about the summer, perhaps
6  August of last year, was your department involved
7  in any way in performing any duties relating to
8  the payment of overtime compensation to employees
9  of Polo in California?
10  A.  Not that I'm aware of.
11  Q.  Are you aware that Polo put out a new
12  employee handbook in about 2007?
13  A.  Yes.
14  Q.  Have you seen that handbook?
15  A.  I believe so.
16  Q.  I'm going to show you what we
17  previously marked as Exhibit 24. It's certain
18  selected pages from the April 2007 handbook.
19  (Whereupon, Exhibit 24 was
20  previously marked for identification.)
21  **************
22  BY MR. KITCHIN:
23  Q.  If you turn to -- I'll refer to Polo,
24  at the bottom numbers, Polo 1556, Section 10 of
25  the manual.

Page 75

1  -- or involved in that process?
2  A.  The query would go to the full price
3  store ops team, to be currently Evan Cohen. And
4  if They had questions, they would reach out to my
5  team for any additional data.
6  Q.  Would you turn to page 1557.
7  A.  Yes.
8  Q.  Is this a section entitled Reporting
9  Work Hours?
10  A.  Yes.
11  Q.  The third paragraph begins, quote,
12  "To insure that accurate time records are kept,
13  you must accurately complete a time sheet and
14  forward it to your supervisor." Closed quote.
15  Do you know whether in either the full
16  price or factory outlet stores in California
17  employees are now completing a time sheet to
18  forward to their supervisors?
19  A.  Not that I'm aware.
20  Q.  Have you ever seen any handwritten
21  time sheet from any California store?
22  A.  No.
23  Q.  Have you ever heard of a process
24  called sales commission reconciliation that Polo
25  has recently performed on California employees?

Page 77

20 (Pages 74 to 77)

**Golden Gate Reporting**

```
1                 C E R T I F I C A T E

2          I, Anthony Armstrong, a Certified

3      Shorthand Reporter and Notary Public within

4      and for the State of New York, do hereby

5      certify:

6          That BETH FLYNN, the witness whose

7      testimony is hereinbefore set forth, was

8      duly sworn by me and that such testimony is

9      a true record of the testimony given by such

10     witness.

11         I further certify that I am not

12     related to any of the parties by blood or

13     marriage, and that I am in no way interested

14     in the outcome of this matter.

15

16

17                    Anthony  Armstrong

18

19

20

21

22

23

24

25
```

Page 83

EXHIBIT 88.

## Golden Gate Reporting

1        UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
2              SAN FRANCISCO DIVISION
     -----------------------------X
3    ANN OTSUKA, an Individual; JANIS
     KEEFE, an individual, CORINNE PHIPPS,
4    an individual, and JUSTIN KISER,
     an individual, individually and
5    on behalf of all others similarly
     situated,
6
7             Plaintiffs.

     v.                                    No. C-07-02780-SI
8
     POLO RALPH LAUREN CORPORATION,
9    a Delaware Corporation, POLO
     RETAIL, LLC, a Delaware Corporation,
10   POLO RALPH LAUREN CORPORATION, a
     Delaware Corporation doing business
11   in California as POLO RETAIL CORP.,
     FASHIONS OUTLET OF AMERICA, INC., a
12   Delaware Corporation, and DOES -500,
13   inclusive,

14            Defendants.
     -----------------------------X

15
16               December 6, 2007
                 New York, New York
17               Time:   10:26 a.m.
                 Volume 1, Pages 130

18
19        Deposition of SHARONDA WEATHERSPOON, taken on behalf

20   of the Plaintiffs, at Greenberg Traurig, Met Life Building,

21   200 Park Avenue, New York, New York, commencing at 10:26

22   a.m., December 6, 2007, before Anthony Armstrong, a Notary

23   Public and Certified Shorthand Reporter of the State of New

24   York.

25

                                                      Page 1

1  when this 2002 handbook was used in the factory outlet
2  stores required to follow the time set out in this
3  sample break chart?
4      A.   Yes.
5      Q.   Were there any, if you know -- back in the
6  time when this specific handbook was used in
7  California, were there any modifications of the
8  break -- sample break chart provided to California
9  managers that in any way modified this schedule?
10     A.   That, I'm not certain of.
11     Q.   Have you heard, prior to, say, 2006, whether
12 the sample break chart was modified in any way for the
13 California stores?
14     A.   I wouldn't know because I was not in the
15 position that I am in now and I only had responsibility
16 for New Jersey.
17     Q.   But you haven't heard that it was modified?
18 You haven't heard whether it was or was not modified;
19 is that correct?
20     A.   Yes.  I haven't heard whether it was or
21 wasn't.
22     Q.   Would you please turn to page 774, referring
23 to the Polo numbers at the bottom of the page.
24         The prior page, 773, if you look at that first,
25 the right-hand column is described as employee conduct

Page 46

1      A.   Can you repeat that?
2      Q.   This is a manual we are looking at from 2002.
3  And I understand it was before you had responsibilities
4  over California factory outlet stores.
5         My question is whether you know this policy was
6  applied in California back in that timeframe.
7      A.   I know that the policy was applied in New
8  Jersey for the area that I was responsible for, but I
9  can't really speak to California during that time.
10     Q.   Okay.  I'll take that back.
11         I take it this was not the employee handbook
12 that you reviewed in preparation for the deposition?
13     A.   I'm not certain.  We did review the break
14 schedule, but it looks very similar to the one I did
15 review.
16     Q.   At this time, are all sales associates at the
17 factory outlet stores in California hired by Fashion
18 Outlets of America, Incorporated?
19     A.   I do believe so.
20     Q.   You're not aware of employees -- sales
21 associate employees in California's factory outlet
22 stores who are working directly for Polo Ralph Lauren
23 Corporation, would that be true?
24     A.   I'm not certain.
25     Q.   At this time, does Polo have a standard policy

Page 48

1  and responsibilities.  Are you familiar with the rules
2  set out under this column?
3      A.   Yes.
4      Q.   On the next page, which is 774, Item No. 23
5  reads, quote, divulging personal salary arrangements to
6  other Polo retail corporation associates.
7         Prior to 2006, do you know whether this
8  specific policy applied to the factory outlet stores in
9  California?
10     A.   I can't really tell you if it did or if it
11 didn't because I was not responsible for California
12 during that time.
13     Q.   Would you take a look at page Polo 777,
14 please.
15         In the right-hand column there is a heading,
16 general security.  Do you see that?
17     A.   Yes.
18     Q.   The third item reads, quote, bag checks must
19 be performed anytime an employee leaves a store.  It is
20 each individual's responsibility to notify a manager
21 when leaving the store with bags, box or any other
22 items used to carry merchandise.
23         Do you know whether that policy was applied to
24 all employees of the factory outlet stores in California
25 back in the 2002 timeframe?

Page 47

1  regarding the number and duration of rest breaks
2  provided to Polo's factory outlet sales associates?
3      A.   Yes.
4      Q.   And is that policy meant to apply to all
5  factory outlet stores in California?
6      A.   Yes.
7      Q.   Does Polo, to your knowledge, have a
8  standardized policy regarding what to do if an employee
9  misses for any reason any one of his or her rest
10 breaks?
11     A.   Not to my knowledge.
12     Q.   If a sales associate misses a rest break for
13 any reason, is that sales associate provided any
14 additional compensation?
15     A.   I'm not certain.
16     Q.   Have you ever heard of any instance where a
17 sales associate has missed a rest break for any reason
18 in California and was paid an additional hour of
19 compensation for missing that break?
20     A.   I have not personally been made aware of any
21 situation like the one you have described.
22     Q.   Same question with respect to meal breaks.
23         Have you ever had heard of a sales associate in
24 California who missed his or her meal break being
25 provided an extra hour of compensation for missing the

Page 49

13 (Pages 46 to 49)

**Golden Gate Reporting**

```
1                    C E R T I F I C A T E

2          I, Anthony Armstrong, a Certified

3    Shorthand Reporter and Notary Public within

4    and for the State of New York, do hereby

5    certify:

6          That SHARONDA WEATHERSPOON, the witness

7    whose testimony is hereinbefore set forth, was

8    duly sworn by me and that such testimony is a

9    true record of the testimony given by such

10   witness.

11         I further certify that I am not related

12   to any of the parties by blood or marriage,

13   and that I am in no way interested in the

14   outcome of this matter.

15

16                              _____

17                              Anthony Armstrong

18

19

20

21

22

23

24

25
```

Page 130

EXHIBIT 89.



## POLO RETAIL CORPORATION

## SALES ASSOCIATE COMPENSATION

### SALES ASSOCIATE HANDBOOK

### APRIL 2002

CONFIDENTIAL

POLO 000716

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................1

II.   ELIGIBILITY ......................................................................................1

III.  COMPONENTS OF THE PLAN
      BASE RATE AGAINST COMMISSION .......................................2
      STORE GROUPS ..........................................................2
      TIERED SALES PLAN STRUCTURE ..........................................2
      NEW HIRES ..........................................................2
      PAY SCHEDULE ..........................................................3

IV.   PLAN ADMINISTRATION
      PAYROLL CALENDAR ..........................................................4
      TIME CLOCK PROCEDURES ..........................................4
      OVERTIME ..........................................................4
      VACATION, SICK/PERSONAL, AND HOLIDAY PAY ..........4
      SALES REPORTS ..........................................................5

V.    COMPENSATORY REVIEWS
      ANNUAL REVIEW ..........................................................6
      "IF YOU HIT IT, YOU GET IT" RULE ..........................................6
      SALES THRESHOLD VARIANCE ..........................................6

VI.   COMMISSION POLICY
      SALES ..........................................................7-8
      RETURNS/EXCHANGES ..........................................................8-9

VII.  CONTACTS ..........................................................10

**CONFIDENTIAL**

POLO 000717

# INTRODUCTION

The sales associate compensation plan is designed to reward our employees as they continue to meet and exceed their individual sales goals. As employees continue to succeed, the plan provides rewards in the form of greater commission opportunities. The goal of this plan is to ensure that individual goals are aligned with those of the overall division and that as a team we can work toward reaching new heights of success.

# ELIGIBILITY

All Sales Associates, Senior Sales Associates and Executive Sales Associates (full-time, part-time, and/or temporary) in store groups one (1) through three (3) will participate in this plan.

CONFIDENTIAL

POLO 000718

# COMPONENTS OF THE PLAN

## BASE RATE AGAINST COMMISSION

Base rate against commission is a pay structure where the commission pay is the difference between the base rate of pay and the total net commission earnings over a two week pay period. If net commission earnings fall below the base rate of pay, the sales associate will still receive their base rate of pay without payback.

Base rates (either hourly or salaried) and commission percentages vary based upon an associate's store group, title, and individual sales history.

All Sales Associates earn a base hourly rate against commission. All Senior Sales Associates and Executive Sales Associates earn a base salary rate against commission.

## STORE GROUPS

Stores are divided into groups based upon store volume, square footage, seasonality and number of employees. These groups are evaluated annually by senior management and may be adjusted as business conditions dictate.

Children's sales associates in Ala Moana, Beverly Hills, Chicago, Manhasset and Short Hills may be compensated according to the Group 1 schedule.

## TIERED SALES PLAN STRUCTURE

The tiered sales plan structure is designed to reward associates in the form of greater commission opportunities as they exceed their individual sales level goals. When an associate achieves an annual sales volume that exceeds their sales compensation tier, they are eligible to be compensated at a higher commission percentage and/or base rate.

## NEW HIRES

General Managers will determine a new sales associate's sales compensation tier working with their District Manager and/or Human Resources.

Any new sales associate whose base rate is set at less than $12.00 an hour is entitled to a new hire training base rate of $12.00 an hour against commission for the first 30 days of employment.

CONFIDENTIAL

POLO 000719

## POLO RETAIL CORPORATION
### PAY SCHEDULE FOR ALL SALES ASSOCIATES

| Tier | | Group 1 | Group 2 | Group 3 |
|---|---|---|---|---|
| | | Aspen, Bal Harbour, Boca Raton, East Hampton, La Jolla, Minneapolis, Naples, Palm Beach, Phoenix, South Hampton | Ala Moana, Atlanta, Beverly Hills, Chicago, Dallas, Denver, Georgetown, Houston, Las Vegas, 888 Madison Avenue, Manhasset, Newbury Street, Palo Alto, Philadelphia, San Francisco, Short Hills, Soho | 867 Madison Avenue |
| 1 | Base Rate Against 8.5% Commission | | $0 - $399,999 | $0 - $749,999 |
| 2 | Base Rate Against 9% Commission | $0 - $199,999 | $400,000 - $599,999 | |
| 3 | Base Rate Against 9.5% Commission (Senior Sales Associate in Groups 2 & 3) | $200,000 - $499,999 | $600,000 - $999,999 | $750,000 - $999,999 |
| 4 | Base Rate Against 10% Commission (Senior Sales Associate) | $500,000 - $999,999 | $1,000,000 - $1,499,999 | $1,000,000 - $1,499,999 |
| 5 | Base Rate Against 10.5% Commission (Executive Sales Associate) | $1,000,000 - $1,999,999 | $1,500,000 - $1,999,999 | $1,500,000 - $1,999,999 |
| 6 | Base Rate Against 11% Commission (Executive Sales Associate) | $2,000,000+ | $2,000,000+ | $2,000,000+ |

CONFIDENTIAL

POLO 000720

# PLAN ADMINISTRATION

## PAYROLL CALENDAR

All sales associates are paid every other Friday, consistent with the company's official payroll calendar. This paycheck will include their base rate (hourly or salaried) and any net commissions earnings based upon net sales during the prior two week pay period.

Special Purchase deductions will be made from each paycheck during agreed upon time frames.

## TIME CLOCK PROCEDURES

All in-store employees are required to use a time clock. There are no exceptions. Failure to consistently use the time clock will be considered a violation of Company policy and may result in disciplinary action.

## OVERTIME

Hours worked for full-time associates may be adjusted below or above a 40-hour workweek at the General Manager's discretion based on the needs of the business. For any additional hours worked, sales productivity per hour must be maintained.

Sales Associates, Senior Sales Associates, and Executive Sales Associates are not eligible to receive a premium overtime compensation rate. However, a sales commission reconciliation will be performed at the close of each fiscal year to ensure that each associate is compliant with Federal Labor guidelines stipulating that the majority of their pay must be in the form of commission. If an associate is found to be overtime eligible at that time, then the appropriate amount of overtime compensation will be paid to that associate.

## VACATION, SICK/PERSONAL, AND HOLIDAY PAY

All sales associates will receive vacation, sick/personal and holiday pay based upon their base pay rate. This pay will be included in their total base pay calculation, which is held against commission.

CONFIDENTIAL

POLO 000721

## SALES REPORTS

In order to ensure that your net sales amount is accurate, all commission eligible employees will be provided with a weekly summary report. This report will be available at the store each Tuesday and will include total sales and total returns for the prior week. Should an associate fail to receive a copy of this report, it is their responsibility to request it from their manager.

It is the associate's responsibility to review this report for accuracy and report any discrepancy to their manager. Please do not call the payroll department if you have questions concerning the accuracy of your sales report. If the issue cannot be resolved at the store, the General Manager will contact the appropriate corporate office.

Each employee has sixty days from the original date of the report to address any problems or issues. If you fail to report a problem within this time frame, the report will be deemed accurate and no adjustments will be made.

**CONFIDENTIAL**

POLO 000722

# COMPENSATORY REVIEWS

## ANNUAL REVIEW

At the close of each fiscal year, every sales associate will receive an annual review which may have compensatory ramifications based upon their fiscal year sales. Although all associates will receive an annual review, an associate must have worked the entire fiscal year to qualify for a compensatory adjustment.

If an associate's fiscal year sales are below their compensation tier's sales threshold, their compensation rate will be adjusted downward to the applicable compensation rate at the beginning of the fiscal year.

The Company reserves the right to adjust an associate's compensation level based upon individual sales performance.

## "IF YOU HIT IT, YOU GET IT" RULE

If a sales associate exceeds their compensation tier's sales threshold at any time during the fiscal year, their pay will be adjusted upward to the applicable compensation rate at the beginning of the next pay cycle.

## SALES THRESHOLD VARIANCE

A sales threshold variance will be determined by senior management and can be changed or eliminated year to year. Sales associates can exercise a threshold variance and remain at their tier level if their annual sales fall below their prior year's sales tier. This exception does not apply to associates who missed advancing to a higher compensation tier. This exception cannot be applied in two consecutive years.

CONFIDENTIAL

POLO 000723

# COMMISSION POLICY

Commissions are only earned on the sale of merchandise net of any markdowns, promotions, discounts or returns.

Commissions are not earned on supplemental shipping, alterations and/or sales tax charges.

Sales to any employee or to an employee's family are not commission eligible except during corporate directed shopping events. All employee sales should be processed under the applicable House Employee Sales number.

Commissions are not earned on the sale of footwear. However, applicable shoe points may be awarded consistent with current shoe point policy from Ralph Lauren Footwear.

Selling outside of your primary department with your known client is encouraged; however, management reserves the right to station you in a specific area to meet business needs.

Additionally, the following rules apply:

## SALES

I.    If Sales Associate A assists a walk-in customer or an existing client with new purchases, Sales Associate A receives commissions on product sold.

II.   If Sales Associate A assists Sales Associate B's client while Sales Associate B is either not working or unavailable, Sales Associate A receives commission on product sold.

III.  For charge send transactions, if the customer is in Store A and the product is in Store B, then the sales associate in Store A receives the commission.

IV.   Sales Associate A assists a customer and places product on hold. If the customer later returns and Sales Associate A is either unavailable or not working and Sales Associate B rings up the product, Sales Associate A receives commission on the merchandise placed on hold. If Sales Associate B assists the customer with additional purchases, Sales Associate B receives commission on the additional purchases. If the merchandise was not placed on hold, Sales Associate B receives commission on the product.

V.    If two customers arrive together and shop in the store with two different sales associates (either in the same or in different departments), each sales associate receives commission for the product they sold.

VI.   If a customer shops in one department with Sales Associate A and shops in another department with Sales Associate B, each respective sales associate receives commission for the product they sold.

VII.  Any sales processed through the Polo.Com website are not eligible for commission payment.

- 7 -

**CONFIDENTIAL**

POLO 000724

VIII.   Merchandise cannot be purchased from an outside store and then returned to PRC for the purpose of generating sales/commissions for a sales associate. Only merchandise purchased from PRC stock is eligible for commission payment.

IX.     Sales of decorative and/or creative props must follow established Creative Services procedures. All transactions must be rung through the POS system. An employee's standard commission rate will be used to determine commission.

## RETURNS/EXCHANGES

Every attempt should be made to determine the original sales associate for all returns through the use of the actual receipt or the POS system database. A good faith principle should also be used if you are aware of the original sales associate; however, the original sales associate must consent and acknowledge the original transaction in cases of good faith. If the original sales associate cannot be determined, the appropriate House Account number should be credited.

Every attempt should be made to allow the original sales associate the opportunity to facilitate the return/exchange.

All returns must be approved and signed by a member of store management.

I.      If a customer purchases product from Sales Associate A and returns the product, the return is credited to Sales Associate A's number, regardless of the location of either the purchase or the return.

II.     All returns of damaged, defective, or mis-altered merchandise should be returned to the original sales associate's number regardless of responsibility.

III.    If a customer purchases product from both Sales Associate A and Sales Associate B, all returns of the product are credited to the applicable sales associate number.

IV.     If a customer purchases product from Sales Associate A and returns the product to Sales Associate B, the return is credited to Sales Associate A's employee number.

V.      If a customer purchases product from Sales Associate A and Sales Associate A is unavailable or not working when the customer comes back, then Sales Associate B should assist the customer.

- If the product is exchanged for a like item, then the product should be returned and re-sold under Sales Associate A's number. For example, a medium blue knit shirt is exchanged for a large red knit shirt.
- If the product is returned, then the product should be returned under Sales Associate A's number.

In either case, if the customer selects additional merchandise or a different style of product, then those items are considered new purchases and Sales Associate B should receive commission for all new purchases.

CONFIDENTIAL

POLO 000725

VI.    If the original sales associate is unknown, then the following principles apply:
- If the product is exchanged for a like item, then the product should be returned and re-sold under the appropriate house number.
- If the product is returned, then the product should be returned under the appropriate house number.

In either case, if the customer selects additional merchandise or a different style or product, then those items are considered new purchases and the sales associate should receive commission for all new purchases.

CONFIDENTIAL

POLO 000726

# CONTACTS

If you have any questions regarding this compensation program, please feel free to contact your General Manager, District Manager, Michael Buntaine, or Jeanne Sterck or John Mezzo in Human Resources.

# DISCLAIMER

Although Polo Retail Corporation intends to continue this plan in the form outlined in this handbook, the Company reserves to right to amend, revoke, suspend or terminate this plan at any time. In addition, neither this description, nor any other written or oral communication, nor your participation in the Polo Retail Corporation Sales Compensation Plan is intended to create a contractual relationship or guarantee of employment, either express or implied. Notwithstanding anything contained in this document, your employment relationship with the Company continues to be "at will," which means that your employment with the Company may be terminated by either you or the Company at any time, with or without cause, and with or without notice.

CONFIDENTIAL

POLO 000727



## POLO RETAIL CORPORATION

## SALES ASSOCIATE COMPENSATION

### SALES ASSOCIATE HANDBOOK

#### APRIL 2004

**CONFIDENTIAL**

POLO 000728

# TABLE OF CONTENTS

I.   INTRODUCTION..............................................................................................3

II.  ELIGIBILITY AND SERVICE STRATEGY...............................................................3

III. COMPONENTS OF THE PLAN
     BASE RATE AGAINST COMMISSION   ...........................................4
     STORE GROUPS                    ...........................................4
     TIERED SALES PLAN STRUCTURE     ...........................................4
     NEW HIRES                       ...........................................4

IV.  PERFORMANCE IMPROVEMENT COACHING
     THE PROGRAM.......................................................5
     ONE ON ONE PROGRAM................................................5
     NEW HIRES.........................................................6
     BASE PLUS STORES..................................................6

V.   PLAN ADMINISTRATION
     PAYROLL CALENDAR  ...............................................7
     TIME CLOCK PROCEDURES  ..........................................7
     OVERTIME          ...............................................7
     VACATION, SICK/PERSONAL, AND HOLIDAY PAY   ....................7
     SALES REPORTS     ...............................................8

VI.  COMPENSATORY REVIEWS
     ANNUAL REVIEW     ...............................................9
     "IF YOU HIT IT, YOU GET IT" RULE   ............................9
     SALES THRESHOLD VARIANCE     ....................................9

VII. COMMISSION POLICY
     SALES  ..........................................................10
     RETURNS/EXCHANGES ...............................................11

VIII. CONTACTS       ..................................................12

CONFIDENTIAL

POLO 000729

# INTRODUCTION

The sales associate compensation plan is designed to reward our employees as they continue to meet and exceed their individual sales goals. As employees continue to succeed, the plan provides rewards in the form of greater commission opportunities. The goal of this plan is to ensure that individual goals are aligned with those of the overall division and that as a team we can work toward reaching new heights of success.

# ELIGIBILITY

All Sales Associates and Senior Sales Associates in store groups one (1) through three (3) will participate in this plan.

# SERVICE STRATEGY

Our Sales Associates are Ralph Lauren's leading edge to our customers around the world, delivering the highest level of customer service and ensuring that all of our customers are welcome in our stores.

CONFIDENTIAL

POLO 000730

# COMPONENTS OF THE PLAN

## BASE RATE AGAINST COMMISSION

Base rate against commission is a pay structure where the commission pay is the difference between the base rate of pay and the total net commission earnings over a two week pay period. Base rates (either hourly or salaried) and commission percentages vary based upon an associate's store group, title, and individual sales history.

All Sales Associates earn a base hourly rate against commission. All Senior Sales Associates earn a base salary rate against commission.

## STORE GROUPS

Stores are divided into groups based upon store volume and seasonality. These groups are evaluated annually by senior management and may be adjusted as business conditions dictate.

Children's sales associates in Ala Moana, Beverly Hills, Chicago, Manhasset and Short Hills will be compensated according to the Group 1 schedule.

## TIERED SALES PLAN STRUCTURE

The tiered sales plan structure is designed to reward associates in the form of greater commission opportunities as they exceed their individual sales level goals. When an associate achieves an annual sales volume that exceeds their sales compensation tier, they are eligible to be compensated at a higher commission percentage and/or base rate.

## NEW HIRES

General Managers will determine a new sales associate's sales compensation tier working with their District Manager and/or Human Resources.

Generally, New Hires will begin at the entry rate of the plan, which varies if hired as a Part Time or Full Time associate.

For the first two pay periods of employment, newly hired sales associates will receive a training base rate of $12.00 an hour against commission. After the first two pay periods, sales associates will receive the hourly base rate relative to their group and tier assignment. Two separate PAFS will need to be submitted. The first reflecting the training base rate the sales associate is to receive. The second reflecting the hourly base rate the associate receives relative to their group and tier. The commission rate needs to be included on both PAFS. We encourage managers to submit the second PAF form after the first pay period to ensure timely processing and accurate payment.

CONFIDENTIAL

# PERFORMANCE IMPROVEMENT COACHING

Sales associate performance is imperative to the success of our company. We expect only the best from our associates, not only in the selling of our product and delivering great customer service, but also in contributing to the overall success of the store. This may include assisting in such areas as: product merchandising, stock, inventory, markdowns, and the opening and closing of the store. All associates will be held to the same standards and will be evaluated as such.

## PROGRAM

Sales associates are expected to sell enough to cover their base salary on a consistent basis each pay period. Sales Associates will be evaluated at the end of each quarter. Quarterly reviews will be based on the start and end dates of each quarter and the payroll periods that coincide with the quarterly end dates. *Please note, for the purposes of evaluation, if a pay period is split between two quarters, that pay period will count towards the prior quarter.* In each quarter you can miss no more then two pay periods prior to receiving a warning *(Missing a pay period means that your sales volume does not cover your base salary).* If in the following quarter you again miss more than 2 pay periods you will drop a tier or face termination *(termination occurs if you are at the entry level commission rate).* To be subject to disciplinary action, sales associates must under perform for two successive quarters. This applies in perpetuity, thus should you receive a warning in the fourth quarter, you will enter the first quarter of the new fiscal year on warning, and be subject to the rules of the plan.

All associates will have a monthly *one on one meeting* with their manager to discuss performance and goals. The manager is there to help ensure that the associate is given the tools to be successful.

Sales Associates on a legitimate approved leave will be excluded from the performance management evaluation during their weeks out. Sales Associates who take vacation, sick/personal, or holiday time are expected to meet the requirements of the program. We allow for sales associates to miss two pay periods (or 4 weeks) each quarter to accommodate such situations as, time off.

## ONE ON ONE PROGRAM

Each month managers will be required to have a meeting with each sales associate to discuss and review performance, as well as, assign goals and objectives for the next month. The one on one form will contain each sales associate's specific measurable goals for the prior month, in addition to other sales and pro-activity goals assigned as needed by the manager. In the case where performance is not up to par, the manager is responsible for coaching the associate, to assist in ensuring future success. Both the manager and associate are required to sign off on the form, and its content, at the conclusion of each monthly meeting. These documents will be kept on file.

**CONFIDENTIAL**          POLO 000732

## NEW HIRES

During the first two payroll periods of your employment, associates *will not* be held against the performance improvement coaching plan. Additionally, associates are entitled to receive a $12 per hour training wage mentioned above.

## HOURLY STORES

For sales associates that are on a base plus commission plan, (Copley, Dallas West Village, Burlingame, Costa Mesa, South Beach) a sales goal will be set for each sales associate. This goal will be a percentage increase to last year's sales volume result. (If the sales associate did not work for the full prior fiscal year, the goal will be based on a trended sales result). If these goals are not being met, sales associates can be dropped a tier or be terminated following two successive quarters of substandard performance *(termination occurs if sales associate is at the entry level commission rate).*

CONFIDENTIAL

POLO 000733

# PLAN ADMINISTRATION

## PAYROLL CALENDAR

All sales associates are paid every other Friday, consistent with the company's official payroll calendar. This paycheck will include their base rate (hourly or salaried) and any net commissions earnings based upon net sales during the prior two week pay period.

Fall and Spring Special Purchase Deductions will be made to an employees check at designated times during the year with the employees consent

## TIME CLOCK PROCEDURES

All in-store employees are required to clock in and clock out each the time they enter and leave the store via the POS system. This includes any and all breaks taken during regular working hours. There are no exceptions. If you forget to do this, please see your manager in order to avoid any payroll discrepancies.

## OVERTIME

Hours worked for full-time associates may be adjusted below or above a 40-hour workweek at the General Manager's discretion based on the needs of the business. For any additional hours worked, sales productivity per hour must be maintained.

Sales Associates and Senior Sales Associates are not eligible to receive a premium overtime compensation rate. However, a sales commission reconciliation will be performed at the close of each fiscal year to ensure that each associate is compliant with Federal Labor guidelines stipulating that the majority of their pay must be in the form of commission. If an associate is found to be overtime eligible at that time, then the appropriate amount of overtime compensation will be paid to that associate.

## VACATION, SICK/PERSONAL, AND HOLIDAY PAY

All sales associates will receive vacation, sick/personal and holiday pay based upon their base pay rate. This pay will be included in their total base pay calculation, which is held against commission.

CONFIDENTIAL

POLO 000734

## SALES REPORTS

In order to ensure that your net sales amount is accurate, all commission eligible employees will be provided with a weekly summary report. This report will be available at the store each Tuesday and will include total sales and total returns for the prior week. Should an associate fail to receive a copy of this report, it is their responsibility to request it from their manager.

It is the associate's responsibility to review this report for accuracy and report any discrepancy to their manager. Please do not call the payroll department if you have questions concerning the accuracy of your sales report. If the issue cannot be resolved at the store, the General Manager will contact the appropriate corporate office.

Each employee has sixty days from the original date of the report to address any problems or issues. If you fail to report a problem within this time frame, the report will be deemed accurate and no adjustments will be made.

CONFIDENTIAL

POLO 000735

# COMPENSATORY REVIEWS

## ANNUAL REVIEW

At the close of each fiscal year, every sales associate will receive an annual review which may have compensatory ramifications based upon their fiscal year sales. Any sales associate hired after the 1st Quarter of the fiscal year will receive a compensatory review after he/she has completed 9 full months of selling. An annual sales trend will be established by dividing their cumulative 9-month's sales by 9 and multiplying the result by 12. If an associate's annual sales trend is above or below their compensation tier's sales threshold, their compensation rate will be adjusted accordingly effective the next pay cycle.

If an associate's fiscal year sales are below their compensation tier's sales threshold, their compensation rate will be adjusted downward to the applicable compensation rate at the beginning of the fiscal year.

The Company reserves the right to adjust an associate's compensation level based upon individual sales performance.

## "IF YOU HIT IT, YOU GET IT" RULE

If a sales associate exceeds their compensation tier's sales threshold at any time during the fiscal year, their pay will be adjusted upward to the applicable compensation rate at the beginning of the next pay cycle.

## SALES THRESHOLD VARIANCE

A sales threshold variance will be determined by senior management and can be changed or eliminated year to year. Sales associates can exercise a threshold variance and remain at their tier level if their annual sales fall below their prior year's sales tier. This exception does not apply to associates who missed advancing to a higher compensation tier. This exception cannot be applied in two consecutive years.

**CONFIDENTIAL**

## COMMISSION POLICY

Commissions are only earned on the sale of merchandise net of any markdowns, promotions, discounts or returns.

Commissions are not earned on supplemental shipping, alterations and/or sales tax charges.

Sales to any employee or to an employee's family are not commission eligible except during corporate directed shopping events. All employee sales should be processed under the applicable House Employee Sales number.

Sales to any customer via Polo.Com (please see your manager for specific rules), are commission eligible via the "Never Walk A Sale Program".

Selling outside of your primary department with your known client is expected; however, management reserves the right to station you in a specific area to meet business needs.

Additionally, the following rules apply:

<u>SALES</u>

I.     If Sales Associate A assists a walk-in customer or an existing client with new purchases, Sales Associate A receives commissions on product sold.

II.    If Sales Associate A assists Sales Associate B's client while Sales Associate B is either not working or unavailable, Sales Associate A receives commission on product sold.

III.   For charge send transactions, if the customer is in Store A and the product is in Store B, then the sales associate in Store A receives the commission.

IV.    Sales Associate A assists a customer and places product on hold. If the customer later returns and Sales Associate A is either unavailable or not working and Sales Associate B rings up the product, Sales Associate A receives commission on the merchandise placed on hold. If Sales Associate B assists the customer with additional purchases, Sales Associate B receives commission on the additional purchases. If the merchandise was not placed on hold, Sales Associate B receives commission on the product.

V.     If two customers arrive together and shop in the store with two different sales associates (either in the same or in different departments), each sales associate receives commission for the product they sold.

VI.    If a customer shops in one department with Sales Associate A and shops in another department with Sales Associate B, each respective sales associate receives commission for the product they sold.

VII.   Merchandise cannot be purchased from an outside store and then returned to PRC for the purpose of generating sales/commissions for a sales associate. Only merchandise purchased from PRC stock is eligible for commission payment.

VIII.  Sales of decorative and/or creative props must follow established Creative Services procedures. All transactions must be rung through the POS system. An employee's standard commission rate will be used to determine commission.

**CONFIDENTIAL**

All Ralph Lauren merchandise can be returned at any PRC store, regardless of where it was purchased. If it has a Polo Ralph Lauren or Ralph Lauren tag, the product is returnable.

Every attempt should be made to determine the original sales associate for all returns through the use of the actual receipt or the POS system database. A good faith principle should also be used if you are aware of the original sales associate; however, the original sales associate must consent and acknowledge the original transaction in cases of good faith. If the original sales associate cannot be determined, the appropriate House Account number should be credited.

Every attempt should be made to allow the original sales associate the opportunity to facilitate the return/exchange.

All returns must be approved and signed by a member of store management.

I. If a customer purchases product from Sales Associate A and returns the product, the return is credited to Sales Associate A's number, regardless of the location of either the purchase or the return.

II. All returns of damaged, defective, or mis-altered merchandise should be returned to the original sales associate's number regardless of responsibility.

III. If a customer purchases product from both Sales Associate A and Sales Associate B, all returns of the product are credited to the applicable sales associate number.

IV. If a customer purchases product from Sales Associate A and returns the product to Sales Associate B, the return is credited to Sales Associate A's employee number.

V. If a customer purchases product from Sales Associate A and Sales Associate A is unavailable or not working when the customer comes back, then Sales Associate B should assist the customer.
   - If the product is exchanged for a like item, then the product should be returned and re-sold under Sales Associate A's number. For example, a medium blue knit shirt is exchanged for a large red knit shirt.
   - If the product is returned, then the product should be returned under Sales Associate A's number.

   In either case, if the customer selects additional merchandise or a different style of product, then those items are considered new purchases and Sales Associate B should receive commission for all new purchases.

VI. If the original sales associate is unknown, then the following principles apply:
   - If the product is exchanged for a like item, then the product should be returned and re-sold under the appropriate house number.
   - If the product is returned, then the product should be returned under the appropriate house number.

   In either case, if the customer selects additional merchandise or a different style of product, then those items are considered new purchases and the sales associate should receive commission for all new purchases.

VII. If the product is returned from a department store, Polo.Com or any of our factory stores every attempt should be made to identify the product and return it under the appropriate House Return designation.

**CONFIDENTIAL**

## CONTACTS

If you have any questions regarding this compensation program, please feel free to contact your General Manager, District Manager, Evan Cohen in Store Operations, or Lara Moldawsky or John Mezzo in Human Resources.

## DISCLAIMER

Although Polo Retail Corporation intends to continue this plan in the form outlined in this handbook, the Company reserves to right to amend, revoke, suspend or terminate this plan at any time. In addition, neither this description, nor any other written or oral communication, nor your participation in the Polo Retail Corporation Sales Compensation Plan is intended to create a contractual relationship or guarantee of employment, either express or implied. Notwithstanding anything contained in this document, your employment relationship with the Company continues to be "at will," which means that your employment with the Company may be terminated by either you or the Company at any time, with or without cause, and with or without notice.

CONFIDENTIAL

POLO 000738



# POLO RETAIL CORPORATION

# SALES ASSOCIATE COMPENSATION

### SALES ASSOCIATE HANDBOOK

#### JULY 2005

**CONFIDENTIAL**

POLO 000739

# TABLE OF CONTENTS

I. INTRODUCTION......................................................................................3

II. ELIGIBILITY AND SERVICE STRATEGY............................................3

III. COMPONENTS OF THE PLAN
   BASE RATE AGAINST COMMISSION    .................................................4
   STORE GROUPS    ......................................................................4
   TIERED SALES PLAN STRUCTURE    .................................................4
   NEW HIRES    ......................................................................4
   TRAINING RATES .................................................................4-5

IV. PERFORMANCE IMPROVEMENT COACHING
   THE PROGRAM..........................................................................6
   ONE ON ONE PROGRAM..............................................................7
   NEW HIRES................................................................................7
   BASE PLUS STORES....................................................................7

V. PLAN ADMINISTRATION
   PAYROLL CALENDAR    .............................................................8
   TIME CLOCK PROCEDURES    .....................................................8
   OVERTIME    ......................................................................8
   VACATION, SICK/PERSONAL, AND HOLIDAY PAY    .......................8
   SALES REPORTS    ...................................................................9

VI. COMPENSATORY REVIEWS
   ANNUAL REVIEW    .................................................................10
   "IF YOU HIT IT, YOU GET IT" RULE    .........................................10
   SALES THRESHOLD VARIANCE    .............................................10

VII. COMMISSION POLICY
   SALES ....................................................................................11
   RETURNS/EXCHANGES ............................................................12

VIII. CONTACTS    .......................................................................13

CONFIDENTIAL

POLO 000740

# INTRODUCTION

The sales associate compensation plan is designed to reward our employees as they continue to meet and exceed their individual sales goals. As employees continue to succeed, the plan provides rewards in the form of greater commission opportunities. The goal of this plan is to ensure that individual goals are aligned with those of the overall division and that as a team we can work toward reaching new heights of success.

# ELIGIBILITY

All Sales Associates and Senior Sales Associates in store groups one (1) through three (3) will participate in this plan.

# SERVICE STRATEGY

Our Sales Associates are Ralph Lauren's leading edge to our customers around the world, delivering the highest level of customer service and ensuring that all of our customers are welcome in our stores.

CONFIDENTIAL

POLO 000741

# COMPONENTS OF THE PLAN

## BASE RATE AGAINST COMMISSION

Base rate against commission is a pay structure where the commission pay is the difference between the base rate of pay and the total net commission earnings over a two week pay period. Base rates (either hourly or salaried) and commission percentages vary based upon an associate's store group, title, and individual sales history.

All Sales Associates earn a base hourly rate against commission. All Senior Sales Associates earn a base salary rate against commission.

## STORE GROUPS

Stores are divided into groups based upon store volume and seasonality. These groups are evaluated annually by senior management and may be adjusted as business conditions dictate.

Children's sales associates in Ala Moana, Beverly Hills, Chicago, Manhasset and Short Hills will be compensated according to the Group 1 schedule.

## TIERED SALES PLAN STRUCTURE

The tiered sales plan structure is designed to reward associates in the form of greater commission opportunities as they exceed their individual sales level goals. When an associate achieves an annual sales volume that exceeds their sales compensation tier, they are eligible to be compensated at a higher commission percentage and/or base rate.

## NEW HIRES

General Managers will determine a new sales associate's sales compensation tier working with their District Manager and/or Human Resources.

Generally, New Hires will begin at the entry rate of the plan, which varies if hired as a Part Time or Full Time associate.

## TRAINING RATE FOR NEW HIRES
*(Addendum made July 2005)*

## Apparel Associates
For the first six pay periods (or 90 days) of employment, associates that sell apparel will receive a training base rate of $12.00 an hour against commission. After the training period, sales associates will receive the hourly base rate relative to their group and tier assignment.

CONFIDENTIAL    POLO 000742

## Home Associates

For the first twelve pay periods (or 180 days) of employment, associates that are part of the Home Department will receive a training base rate of $12.00 an hour against commission. After the training period, sales associates will receive the hourly base rate relative to their group and tier assignment.

In both scenarios, two separate PAFs will need to be submitted upon hire. The first reflecting the training base rate the sales associate is to receive. The second reflecting the hourly base rate the associate receives (at the appropriate effective date) relative to their group and tier. *The commission rate needs to be included on both PAFs*. Managers should submit the second PAF, along with all new hire paperwork, ensuring the correct effective date of the pay rate change (*the first day of the pay period when the rate change takes place*).

**CONFIDENTIAL**

POLO 000743

# PERFORMANCE IMPROVEMENT COACHING

Sales associate performance is imperative to the success of our company. We expect only the best from our associates, not only in the selling of our product and delivering great customer service, but also in contributing to the overall success of the store. This may include assisting in such areas as: product merchandising, stock, inventory, markdowns, and the opening and closing of the store. All associates will be held to the same standards and will be evaluated as such.

## PROGRAM

Sales associates are expected to sell enough to cover their base salary on a consistent basis each pay period. Sales Associates will be evaluated at the end of each quarter. Quarterly reviews will be based on the start and end dates of each quarter and the payroll periods that coincide with the quarterly end dates. *Please note, for the purposes of evaluation, if a pay period is split between two quarters, that pay period will count towards the prior quarter.* In each quarter you can miss no more then two-pay periods prior to receiving a warning *(Missing a pay period means that your sales volume does not cover your base salary)*. If in the following quarter you again miss more than 2 pay periods you will drop a tier or face termination *(termination occurs if you are at the entry level commission rate)*. To be subject to disciplinary action, sales associates must under perform for two successive quarters. This applies in perpetuity, thus should you receive a warning in the fourth quarter, you will enter the first quarter of the new fiscal year on warning, and be subject to the rules of the plan.

All associates will have a monthly *one on one meeting* with their manager to discuss performance and goals. The manager is there to help ensure that the associate is given the tools to be successful.

Sales Associates on a legitimate approved leave will be excluded from the performance management evaluation during their weeks out. **Sales Associates who take vacation, sick/personal, or holiday time are expected to meet the requirements of the program. We allow for sales associates to miss two pay periods (or 4 weeks) each quarter to accommodate such situations as, time off.**

## ONE ON ONE PROGRAM

Each month managers will be required to have a meeting with each sales associate to discuss and review performance, as well as, assign goals and objectives for the next month. The one on one form will contain each sales associate's specific measurable goals for the prior month, in addition to other sales and pro-activity goals assigned as needed by the manager. In the case where performance is not up to par, the manager is responsible for coaching the associate, to assist in ensuring future success. Both the manager and associate are required to sign off on the form, and its content, at the conclusion of each monthly meeting. These documents will be kept on file.

CONFIDENTIAL

POLO 000744

During the assigned training period of your employment, associates *will not* be held against the rules of the performance improvement coaching plan. However, your overall performance during this period will still be evaluated by your manager. Additionally, associates are entitled to receive a $12 per hour training wage mentioned above.

## HOURLY STORES

For sales associates that are on a base plus commission plan, (Copley, Dallas West Village, Burlingame, South Beach) a sales goal will be set for each sales associate. This goal will be a percentage increase to last year's sales volume result. (If the sales associate did not work for the full prior fiscal year, the goal will be based on a trended sales result). If these goals are not being met, sales associates can be dropped a tier or be terminated following two successive quarters of substandard performance (*termination occurs if sales associate is at the entry level commission rate*).

CONFIDENTIAL

POLO 000745

# PLAN ADMINISTRATION

## PAYROLL CALENDAR

All sales associates are paid every other Friday, consistent with the company's official payroll calendar. This paycheck will include their base rate (hourly or salaried) and any net commissions earnings based upon net sales during the prior two week pay period.

Fall and Spring Special Purchase Deductions will be made to an employees check at designated times during the year with the employees consent

## TIME CLOCK PROCEDURES

All in-store employees are required to clock in and clock out each the time they enter and leave the store via the POS system. This includes any and all breaks taken during regular working hours. There are no exceptions. If you forget to do this, please see your manager in order to avoid any payroll discrepancies.

## OVERTIME

Hours worked for full-time associates may be adjusted below or above a 40-hour workweek at the General Manager's discretion based on the needs of the business. For any additional hours worked, sales productivity per hour must be maintained.

Sales Associates and Senior Sales Associates are not eligible to receive a premium overtime compensation rate. However, a sales commission reconciliation will be performed at the close of each fiscal year to ensure that each associate is compliant with Federal Labor guidelines stipulating that the majority of their pay must be in the form of commission. If an associate is found to be overtime eligible at that time, then the appropriate amount of overtime compensation will be paid to that associate.

## VACATION, SICK/PERSONAL, AND HOLIDAY PAY

All sales associates will receive vacation, sick/personal and holiday pay based upon their base pay rate. This pay will be included in their total base pay calculation, which is held against commission.

**CONFIDENTIAL**

POLO 000746

## SALES REPORTS

In order to ensure that your net sales amount is accurate, all commission eligible employees will be provided with a weekly summary report. This report will be available at the store each Tuesday and will include total sales and total returns for the prior week. Should an associate fail to receive a copy of this report, it is their responsibility to request it from their manager.

It is the associate's responsibility to review this report for accuracy and report any discrepancy to their manager. Please do not call the payroll department if you have questions concerning the accuracy of your sales report. If the issue cannot be resolved at the store, the General Manager will contact the appropriate corporate office.

Each employee has sixty days from the original date of the report to address any problems or issues. If you fail to report a problem within this time frame, the report will be deemed accurate and no adjustments will be made.

CONFIDENTIAL

POLO 000747

### ANNUAL REVIEW

At the close of each fiscal year, every sales associate will receive an annual review which may have compensatory ramifications based upon their fiscal year sales. Any sales associate hired after the 1st Quarter of the fiscal year will receive a compensatory review after he/she has completed 9 full months of selling. An annual sales trend will be established by dividing their cumulative 9-month's sales by 9 and multiplying the result by 12. If an associate's annual sales trend is above or below their compensation tier's sales threshold, their compensation rate will be adjusted accordingly effective the next pay cycle.

If an associate's fiscal year sales are below their compensation tier's sales threshold, their compensation rate will be adjusted downward to the applicable compensation rate at the beginning of the fiscal year.

The Company reserves the right to adjust an associate's compensation level based upon individual sales performance.

### "IF YOU HIT IT, YOU GET IT" RULE

If a sales associate exceeds their compensation tier's sales threshold at any time during the fiscal year, their pay will be adjusted upward to the applicable compensation rate at the beginning of the next pay cycle.

### SALES THRESHOLD VARIANCE

A sales threshold variance will be determined by senior management and can be changed or eliminated year to year. Sales associates can exercise a threshold variance and remain at their tier level if their annual sales fall below their prior year's sales tier. This exception does not apply to associates who missed advancing to a higher compensation tier. This exception cannot be applied in two consecutive years.

CONFIDENTIAL

POLO 000748

# COMMISSION POLICY

Commissions are only earned on the sale of merchandise net of any markdowns, promotions, discounts or returns.

Commissions are not earned on supplemental shipping, alterations and/or sales tax charges.

Sales to any employee or to an employee's family are not commission eligible except during corporate directed shopping events. All employee sales should be processed under the applicable House Employee Sales number.

Sales to any customer via Polo.Com (please see your manager for specific rules), are commission eligible via the "Never Walk A Sale Program".

Selling outside of your primary department with your known client is expected; however, management reserves the right to station you in a specific area to meet business needs.

Additionally, the following rules apply:

## SALES

I.    If Sales Associate A assists a walk-in customer or an existing client with new purchases, Sales Associate A receives commissions on product sold.

II.   If Sales Associate A assists Sales Associate B's client while Sales Associate B is either not working or unavailable, Sales Associate A receives commission on product sold.

III.  For charge send transactions, if the customer is in Store A and the product is in Store B, then the sales associate in Store A receives the commission.

IV.   Sales Associate A assists a customer and places product on hold. If the customer later returns and Sales Associate A is either unavailable or not working and Sales Associate B rings up the product, Sales Associate A receives commission on the merchandise placed on hold. If Sales Associate B assists the customer with additional purchases, Sales Associate B receives commission on the additional purchases. If the merchandise was not placed on hold, Sales Associate B receives commission on the product.

V.    If two customers arrive together and shop in the store with two different sales associates (either in the same or in different departments), each sales associate receives commission for the product they sold.

VI.   If a customer shops in one department with Sales Associate A and shops in another department with Sales Associate B, each respective sales associate receives commission for the product they sold.

VII.  Merchandise cannot be purchased from an outside store and then returned to PRC for the purpose of generating sales/commissions for a sales associate. Only merchandise purchased from PRC stock is eligible for commission payment.

VIII. Sales of decorative and/or creative props must follow established Creative Services procedures. All transactions must be rung through the POS system. An employee's standard commission rate will be used to determine commission.

**CONFIDENTIAL**          POLO 000749

All Ralph Lauren merchandise can be returned at any PRC store, regardless of where it was purchased. If it has a Polo Ralph Lauren or Ralph Lauren tag, the product is returnable.

Every attempt should be made to determine the original sales associate for all returns through the use of the actual receipt or the POS system database. A good faith principle should also be used if you are aware of the original sales associate; however, the original sales associate must consent and acknowledge the original transaction in cases of good faith. If the original sales associate cannot be determined, the appropriate House Account number should be credited.

Every attempt should be made to allow the original sales associate the opportunity to facilitate the return/exchange.

All returns must be approved and signed by a member of **store management**.

I.     If a customer purchases product from Sales Associate A and returns the product, the return is credited to Sales Associate A's number, regardless of the location of either the purchase or the return.

II.    All returns of damaged, defective, or mis-altered merchandise should be returned to the original sales associate's number regardless of responsibility.

III.   If a customer purchases product from both Sales Associate A and Sales Associate B, all returns of the product are credited to the applicable sales associate number.

IV.    If a customer purchases product from Sales Associate A and returns the product to Sales Associate B, the return is credited to Sales Associate A's employee number.

V.     If a customer purchases product from Sales Associate A and Sales Associate A is unavailable or not working when the customer comes back, then Sales Associate B should assist the customer.

- If the product is exchanged for a like item, then the product should be returned and re-sold under Sales Associate A's number. For example, a medium blue knit shirt is exchanged for a large red knit shirt.
- If the product is returned, then the product should be returned under Sales Associate A's number.

In either case, if the customer selects additional merchandise or a different style of product, then those items are considered new purchases and Sales Associate B should receive commission for all new purchases.

VI.    If the original sales associate is unknown, then the following principles apply:

- If the product is exchanged for a like item, then the product should be returned and re-sold under the appropriate house number.
- If the product is returned, then the product should be returned under the appropriate house number.

In either case, if the customer selects additional merchandise or a different style or product, then those items are considered new purchases and the sales associate should receive commission for all new purchases.

VII.   If the product is returned from a department store, Polo.Com or any of our factory stores every attempt should be made to identify the product and return it under the appropriate House Return designation.

**CONFIDENTIAL**

POLO 000750

# CONTACTS

If you have any questions regarding this compensation program, please feel free to contact your General Manager, District Manager, Store Operations, or appropriate Human Resources Representative.

# DISCLAIMER

Although Polo Retail Corporation intends to continue this plan in the form outlined in this handbook, the Company reserves to right to amend, revoke, suspend or terminate this plan at any time. In addition, neither this description, nor any other written or oral communication, nor your participation in the Polo Retail Corporation Sales Compensation Plan is intended to create a contractual relationship or guarantee of employment, either express or implied. Notwithstanding anything contained in this document, your employment relationship with the Company continues to be "at will," which means that your employment with the Company may be terminated by either you or the Company at any time, with or without cause, and with or without notice.

CONFIDENTIAL

POLO 000751

EXHIBIT 90.

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                SAN FRANCISCO DIVISION

 4

 5   ANN OTSUKA, an individual; JANIS        No. C-07-02780-SI
     KEEFE, an individual; CORINNE
 6   PHIPPS, an individual; and
     JUSTIN KISER, an individual;
 7   individually and on behalf of
     all others similarly situated,
 8
                  Plaintiffs,
 9
          vs.
10   POLO RALPH LAUREN CORPORATION;
     a Delaware Corporation; POLO
11   RETAIL, LLC, a Delaware Corporation;
     POLO RALPH LAUREN CORPORATION, a
12   Delaware Corporation, doing business
     in California as POLO RETAIL CORP;
13   FASHIONS OUTLET OF AMERICA, INC., a
     Delaware Corporation and DOES 1-500,
14   inclusive,

15                Defendants.                       /

16

17           DEPOSITION OF KIM LEE BABKA

18

19
         DATE:           March 7, 2008
20
         TIME:           10:03 a.m.
21
         LOCATION:       Greenberg Traurig
22                       1900 University Avenue
                         Fifth Floor
23                       East Palo Alto, California

24       REPORTED BY:    Mary E. Garland
                         Certified Shorthand Reporter
25                       License Number 4721
```

Page 1

1    A. I have seen an e-mail or a grid that might
2 show, by store, what materials they're getting.
3    Q. Was it a part of your duties, as either
4 regional director or district manager of California, to
5 ensure that Polo's policies and procedures were applied
6 consistently across the stores in California?
7    MR. GOINES: Objection. Overbroad.
8    THE WITNESS: Can you be specific in --
9    Q. BY MR. KITCHIN: Okay. Let me break it down.
10    Was it included within your duties and
11 responsibilities, at any time since 2001, to make sure
12 that those stores within California that are on the draw
13 versus commission system have that program or policy
14 applied consistently from store to store?
15    A. It would be part of my responsibility, along
16 with human resources, as well, yes.
17    Q. And why is it important for you at Polo to have
18 the draw versus commission system applied consistently
19 across the stores in California to which it applied?
20    A. Well, because it's fair and consistent, and we
21 care about doing the right thing.
22    MR. KITCHIN: Let me show you a document that
23 begins Bates 864, that I don't believe we've previously
24 marked, that is the Polo Ralph Lauren sales associate
25 compensation handbook from September of 2006.

Page 74

1    in, certainly, keeping all associates on the 90 days
2 otherwise. I don't know the other reasons.
3    Q. So the language that's at POLO 742, on page 4
4 of the manual, "Training Rate For New Hires," we know
5 that wasn't included in the prior manual that we looked
6 at, the 2004 manual. Was this one of the changes that
7 was instituted across all of the stores in California,
8 except for the Burlingame store?
9    A. As I recall, yes.
10    Q. On page 6 of the manual, which is Bates 744,
11 "Performance Improvement Coaching"?
12    A. Mm-hm.
13    Q. Under "Program," it reads, "Sales associates
14 are expected to sell enough to cover their base salary
15 on a consistent basis each pay period."
16    Did that policy apply to all sales associates,
17 except for the Burlingame store, in California in the
18 2005 time period?
19    A. I believe so.
20    Q. It's been Polo's expectation, at least since
21 the performance improvement coaching component of the
22 system was put into place, that sales associates were
23 expected to cover their base salary or hourly rate
24 whether they were subject to Arrears or not; is that
25 correct?

Page 76

1    (Exhibit 67 marked for identification.)
2    Q. BY MR. KITCHIN: So before we get to Exhibit 67
3 -- I have them out of order here -- I'm going to show
4 you a document that was previously marked as Exhibit 30,
5 which is the Polo Retail Corporation sales associate
6 compensation handbook from July 2005. It begins Bates
7 739. Are you familiar with the July 2005 sales
8 associate compensation handbook?
9    A. I know of it. I would need to read it, just to
10 gain familiarity again.
11    Q. Take your time and just review it. I just have
12 a couple questions.
13    A. Okay.
14    Q. Are you familiar with this July 2005 handbook?
15    A. Yes.
16    Q. Do you know why this handbook was rolled out --
17 let me ask a different question. Sorry.
18    Did this handbook replace the April 2004 sales
19 associate compensation handbook?
20    A. Yes, I believe it did.
21    Q. And do you know why this revision or amendment
22 was made in July of 2005?
23    A. I don't know the exact reason. I know that one
24 of the -- the expanded training program, in terms of
25 extending the Home associates to 180 days, was a change

Page 75

1    A. Yes.
2    Q. And do you know whether this specific July 2005
3 compensation handbook was meant to be provided to all
4 sales associates at the full-price stores in California?
5    A. I believe so.
6    Q. And was it yours and/or Polo's objective that
7 the policies and procedures set out in this 2005
8 handbook were to be applied consistently to the stores
9 in California to which the policies applied?
10    A. Yes.
11    Q. Let's take a look at Exhibit 67, which is the
12 September 2006 compensation handbook, begins POLO 864.
13    Are you familiar with this 2006 handbook?
14    A. Yes. Again, I would need to, you know, read
15 through it.
16    Q. Sure.
17    A. But, yes.
18    Q. I'm going to have you look again, before we
19 move on to this, at Exhibit 8.
20    Bates 734, which is page 6 of the manual, under
21 "Overtime," there's this reference to the commission
22 reconciliation. Did you ever ask anyone, let's say,
23 prior to the year 2007, whether Polo was performing a
24 commission reconciliation?
25    A. I recall surfacing it at one point, when was it

Page 77

20 (Pages 74 to 77)

# Golden Gate Reporting

**Page 78**

1  done or how was it done. I don't recall when that was
2  or even who I spoke to. I believe it was HR.
3      Q. Did you ever speak about the reconciliation
4  prior to 2007 with Evan Cohen?
5      A. I don't recall if it was Evan.
6      Q. And when you, I think you said, surfaced this
7  question, was it in an in-person meeting or a telephone
8  conversation?
9      A. I think it -- I don't recall. I just remember
10  asking, "Is this something we're doing?" Not me,
11  because I wouldn't, but compensation would do it.
12      Q. And what were you told?
13      A. I don't recall. I don't even recall an answer.
14      Q. Do you have any kind of an estimate as to when
15  this conversation took place?
16      A. Maybe two years ago. I don't recall.
17      Q. And you don't recall, even in general terms,
18  the response you were given?
19      A. That it was up to compensation. That's all I
20  know. I don't recall any more than that.
21      Q. So then did you talk with anyone at
22  compensation to ask --
23      A. No.
24      Q. Let me finish the question.
25      -- to ask whether the reconciliation was being

**Page 79**

1  performed?
2      A. No.
3      Q. Now, to Exhibit 67. And you're familiar with
4  the sales associate compensation handbook from
5  September 2006; is that correct?
6      A. Yes.
7      Q. Do you know specifically any of the reasons
8  that the September 2006 compensation handbook was rolled
9  out?
10      A. No, I don't recall the exact Arrears
11  conversation around it. I do recall looking at how the
12  quarters would be applied to any missed pay periods
13  within a quarter.
14      Q. Do you know if this manual was meant to be
15  provided to all sales associates working the full-price
16  retail stores in California?
17      A. I believe it was.
18      Q. And was it yours and/or Polo's intention that
19  the policies and procedures set out in this manual would
20  be applied consistently to those stores to which the
21  policies applied?
22      A. Yes, that would have been the expectation.
23      Q. Do you know or do you have any knowledge of
24  any systematic difference at any of the stores in the
25  application of any of the policies set out in the

**Page 80**

1  compensation manual?
2      MR. GOINES: Objection. Overbroad.
3      THE WITNESS: I was just going to say, what do
4  you mean by "systematic changes"?
5      Q. BY MR. KITCHIN: I'll rephrase it.
6      The policies and procedures set out in the
7  compensation handbook were meant to be applied
8  consistently to those stores to which they applied;
9  correct?
10      A. Right.
11      Q. Are you aware of any stores that applied
12  policies that weren't proscribed or prescribed in this
13  manual?
14      A. In 2006?
15      Q. Yes.
16      A. I don't know about -- I don't know of any
17  noncompliance. I do know that a more recent development
18  has been that within some of our Children's departments
19  -- and, again, I'd have to look at a roster to confirm
20  -- there may be associates who are on an hourly plus
21  where there are lower price points for a specific
22  department; but, again, I'd have to look at a roster.
23  That would be one thing. But -- I'm not sure. Maybe
24  I'm not answering your question right.
25      Q. No. You are. Thank you.

**Page 81**

1      I'll have you take a look at page 8, which is
2  Bates 871. Again, under "Overtime," there's a reference
3  to a sales commission reconciliation. In the 2006 time
4  period, were you aware of whether anyone at Polo was
5  performing this reconciliation referred to on page 8?
6      A. I'm not aware if they were or they weren't.
7      MR. KITCHIN: Let's go off the record for a
8  minute.
9      (Luncheon recess taken from 12:25 to 1:14 p.m.)
10      Q. BY MR. KITCHIN: Ms. Babka, is the Rugby store
11  in Palo Alto within your duties and responsibilities?
12      A. No.
13      Q. I'm going to show you what we previously marked
14  as Exhibit 3. It's "PRC Sales Associate Compensation
15  Restructure April 2002," begins POLO Bates 448.
16      Have you ever seen this restructure report
17  before today?
18      A. Not sure.
19      Q. Let me ask you a specific question about some
20  of the content. Under "Analysis," the second paragraph,
21  that begins:
22      "Also senior sales associates who earned
23      approximately 70 percent commission pay were
24      more productive in this program than sales
25      associates who earned approximately 60-70

21 (Pages 78 to 81)

CERTIFICATION OF DEPOSITION OFFICER

I, MARY E. GARLAND, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was thereafter transcribed by means of computer-aided transcription under my direction; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed March 19, 2008, at San Francisco, California.

MARY E. GARLAND, CSR 4721

.

EXHIBIT 91.

1                    UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                    SAN FRANCISCO DIVISION

4

5    ANN OTSUKA, an individual;
     JANIS KEEFE, an individual;
6    CORINNE PHIPPS, an individual;
     and JUSTIN KISER, an individual;
7    individually and on behalf of
     all others similarly situated,

8

                   Plaintiffs,
9                                        Case No. c-07-02780-SI
     and
10

     POLO RALPH LAUREN CORPORATION,
11   a Delaware corporation; POLO
     RETAIL, LLC, a Delaware corporation;
12   POLO RALPH LAUREN CORPORATION, a
     Delaware corporation, doing
13   business in California as POLO
     RETAIL CORP; FASHIONS OUTLET OF
14   AMERICA, INC., a Delaware
     corporation; and DOES 1-500,
15   inclusive,

16                 Defendants.
     _____/
17

18             DEPOSITION OF THERESA CRUZ

19   DATE:          August 20, 2007

20   TIME:          10:00 a.m.

21   LOCATION:      LAW OFFICE OF PATRICK R. KITCHIN
                    565 Commercial Street
22                  Fourth Floor
                    San Francisco, California 94111

23

24   REPORTED BY:   Katy Leonard
                    Certified Shorthand Reporter
25                  License Number 11599

                                                    Page 1

## Golden Gate Reporting

1    Q. With Justin Kiser, did you tell him that
2  when he came back from lunch, if he rang the doorbell
3  twice at the employee exit and no one came -- that he
4  was to go to the home collections entrance and come in
5  that way?
6    A. Yes.
7    Q. Do you know who did Janis Keefe's
8  walk-through?
9    A. I believe it's Tin Hua.
10    Q. When a new employee comes aboard to the San
11  Francisco Polo store, do you have any involvement in
12  helping them get set up to watch videotapes relating to
13  the business of Ralph Lauren?
14    A. Yes.
15    Q. And what videotapes are shown to new sales
16  associates?
17    A. The introduction to Ralph Lauren company.
18  The videos for women's department.
19    Q. Does everyone see those regardless of their
20  department?
21    A. Oh, yes. And then home collection
22  department.
23    Q. These are separate videos that you're
24  talking about?
25    A. Separate video.

Page 58

1    Q. Okay.
2    A. And then at the time, we have the sportswear
3  also.
4    Q. You had at that time?
5    A. Polo Sport.
6    Q. What time are you referring to?
7    A. I'm sorry. 2004, 2005.
8    Q. Okay. You don't use that sports --
9    A. We do.
10    Q. You still use that?
11    A. We still use that, but there's different --
12  like, there's for RLX and there's for regular
13  sportswear.
14    Q. Okay. So, intro to Ralph Lauren, women's
15  department, home collections department, sports
16  department.
17        Anything else?
18    A. Yes. Ralph Lauren Made to Measure.
19    Q. Any other videotapes?
20    A. Safety with regards to --
21    Q. Does that safety videotape include
22  information about loss prevention?
23    A. Um, yes.
24    Q. Okay.
25    A. No. Let me recall that. No. I'm sorry.

Page 59

1    Q. Okay. All right. Are there any other
2  videotapes?
3    A. There is another videotape for loss
4  prevention, but I forgot the title of the tape.
5    Q. Has there been a loss-prevention video since
6  at least 2004 that is shown to new sales associates?
7    A. I'm still using the old ones.
8    Q. Okay. Any idea how long you've been using
9  the old loss-prevention videotape?
10    A. Approximately about four years.
11    Q. Does the loss-prevention videotape address
12  loss-prevention inspections of sales associates?
13    A. No.
14    Q. Is it -- what is it focused on?
15    A. It's more of the people -- like, other
16  people stealing in the store. The other one is about
17  sharing or giving a discount to other friends.
18    Q. And that's included in the loss-prevention
19  video?
20    A. Yes.
21    Q. Any other videos you can recall showing to
22  new employees?
23    A. I have a Visa card and Mastercard. How to
24  process credit card sales.
25    Q. And you show that to them as well?

Page 60

1    A. Yes.
2    Q. Are new sales associates provided a Ralph
3  Lauren handbook -- employee handbook?
4    A. Yes.
5    Q. Are they provided the manual dealing with
6  sales associate compensation?
7    A. Um, yes.
8    Q. Are they provided any other documents that
9  contain Polo Ralph Lauren's statements of policies for
10  employees?
11    A. No.
12    Q. In the new-hire process, focusing now on the
13  2004, 2005 time frame, were employees provided any kind
14  of additional handouts on employee compensation?
15    A. I wouldn't know that, because I don't work
16  with the compensation.
17    Q. All right. Do you personally provide the
18  sales associates with -- newly hired sales associates
19  with the employee handbook?
20    A. Yes.
21    Q. And for each sales associate, do you have
22  them, at some point, sign an acknowledgement that they
23  have received and understood the policies?
24    A. Yes. After they read it.
25    Q. And that's your job to do that?

Page 61

16 (Pages 58 to 61)

# Golden Gate Reporting

1  acknowledgement; correct?
2      A. Yes.
3      Q. And they also sign the employee -- or, sales
4  associate compensation handbook that's in effect?
5      A. They don't. I ask them to hold on to it,
6  because Kristi Mogel is the one who's in charge of the
7  reviewing.
8      Q. Okay. So, you may provide them with a copy
9  of the sales compensation handbook?
10     A. Yes.
11     Q. You tell them it's important it review it?
12     A. Yes.
13     Q. And then you tell them to talk with Kristi
14  Mogel about it?
15     A. Yes.
16     Q. And is there an acknowledgement of policies
17  and procedures page for this specific "Code of Conduct"
18  handout that people sign?
19     A. This? (Indicating)
20     Q. Yes.
21     A. Yes, there is.
22     Q. And with the sales associate compensation
23  handout, that has an acknowledgement as well; correct?
24     A. I cannot recall if there is one on the last
25  page.

Page 158

1      Q. Okay. But you don't go through that with
2  employees to have them sign it, indicating that they've
3  acknowledged and received it.
4      A. Um, after they have finished their review
5  with Kristi Mogel, that's when I ask them if they are
6  ready to hand me the acknowledgement.
7      Q. Okay. And so, then -- and that's on the
8  sales associate compensation handbook?
9      A. Yes.
10     Q. And so, they turn in their acknowledgement
11  to you?
12     A. Yes.
13     Q. And do you place those in their employment
14  file?
15     A. Yes.
16     Q. And do you do that consistently with all new
17  hires?
18     A. Yes, I do.
19     Q. Okay.
20     A. Because I have to send it to the corporate
21  office.
22     Q. Okay. So, the acknowledgement, do you keep
23  a copy in the local store?
24     A. Um, not on a consistent basis.
25     Q. Okay. Do you send all signed

Page 159

1  acknowledgments to the corporate office?
2      A. Yes.
3      Q. And that's on a consistent basis?
4      A. Um, if I do the processing of the paperwork,
5  I do that -- I send it to the corporate office, but
6  there are times when I'm not around and Tin will be doing
7  the hiring. He will be the one taking charge of the
8  paperwork.
9      Q. Okay. And today, Ms. Post, does she take on
10  those responsibilities that Tin used to do --
11     A. Yes.
12     Q. -- with the employment policy manuals?
13     A. Mm-hm, yes.
14     Q. Okay. I'm going to show you a document that
15  I marked as Exhibit 10. It's entitled, "Special FY05
16  Addendum."
17     And as always, my first question is, Do you
18  recognize this document?
19     A. Um, no, I didn't.
20     Q. Okay. There are some documents that you
21  will see today that include a title like this, where it
22  says "FY," and then some year, "Addendum."
23     Do you recognize that format of documents
24  provided by someone within the Polo organization?
25     A. I did not see this copy at all.

Page 160

1      Q. Okay.
2      A. I don't recall if I was off -- if I was off
3  for -- or, I was on vacation at that time.
4      Q. So, you've never seen this document before
5  today?
6      A. No.
7      Q. So, you don't know whether this document was
8  handed out to sales associates?
9      A. I wouldn't know.
10     Q. Okay. Have you ever had a discussion with
11  any sales associate regarding the arrears program?
12     A. No.
13     Q. Have you ever become aware of any individual
14  who Polo deemed to be in arrears?
15     A. No.
16     Q. Did you ever hear that the arrears program
17  was explained in written form to sales associates at
18  Polo?
19     A. I'm not aware of that, no.
20     Q. Did you ever hear that the arrears program
21  was explained verbally to sales associates at the
22  San Francisco Polo store?
23     A. I don't know.
24     Q. I'll take that back.
25     A. (Indicating)

Page 161

41 (Pages 158 to 161)

Golden Gate Reporting

CERTIFICATION OF DEPOSITION OFFICER

1

2

3       I, KATY LEONARD, duly authorized to

4   administer oaths pursuant to Section 2093(b) of the

5   California Code of Civil Procedure, hereby certify that

6   the witness in the foregoing deposition was by me sworn

7   to testify to the truth, the whole truth and nothing but

8   the truth in the within-entitled cause; that said

9   deposition was taken at the time and place therein

10  stated; that the testimony of the said witness was

11  thereafter transcribed by means of computer-aided

12  transcription; that the foregoing is a full, complete

13  and true record of said testimony; and that the witness

14  was given an opportunity to read and correct said

15  deposition and to subscribe the same.

16       I further certify that I am not of counsel

17  or attorney for either or any of the parties in the

18  foregoing deposition and caption named, or in any way

19  interested in the outcome of this cause named in said

20  caption.

21

22

23

24

25

KATY LEONARD, CSR 11599

Page 261

EXHIBIT 92.

**Golden Gate Reporting**

1     UNITED STATES DISTRICT COURT

2     NORTHERN DISTRICT OF CALIFORNIA

3     SAN FRANCISCO DIVISION

4

5   ANN OTSUKA, an individual; JANIS        No. C-07-02780-SI
    KEEFE, an individual; CORINNE
6   PHIPPS, an individual; and
    JUSTIN KISER, an individual;
7   individually and on behalf of
    all others similarly situated,

8                 Plaintiffs,

9      vs.

10  POLO RALPH LAUREN CORPORATION;
    a Delaware Corporation; POLO
11  RETAIL, LLC, a Delaware Corporation;
    POLO RALPH LAUREN CORPORATION, a
12  Delaware Corporation, doing business
    in California as POLO RETAIL CORP;
13  FASHIONS OUTLET OF AMERICA, INC., a
    Delaware Corporation and DOES 1-500,
14  inclusive,

15                Defendants.                    /

16

17            DEPOSITION OF KRISTI MOGEL

18

19

        DATE:          February 4, 2008
20
        TIME:          10:06 a.m.
21
        LOCATION:      Greenberg Traurig
22                     1900 University Avenue
                       Fifth Floor
23                     East Palo Alto, California

24      REPORTED BY:   Mary E. Garland
                       Certified Shorthand Reporter
25                     License Number 4721

                                        Page 1

**Golden Gate Reporting**

1  together with documents that were to be specifically
2  given to new hires who were hired after April or May of
3  2007?
4     A. Yes. There's multiple documents that are
5  required to be part of a new-hire packet, and that was
6  one of them.
7     Q. Was there any document that either you prepared
8  or you became aware of that laid out the specific
9  documents that were to compromise the new-hire handouts?
10    A. Not a specific separate document, but when --
11 to my memory, when you went on to the web site at that
12 time, it was all listed under "Human Resources New-Hire
13 Paperwork."
14    Q. And that was within the Polo internet system;
15 is that correct?
16    A. That's my memory of it, yes.
17    Q. And was this system with the new-hire paperwork
18 available to be accessed only by managers?
19    A. No. Any employee has access to the retail web.
20    Q. So was there a specific folder within that
21 system that was entitled "Human Resources New-Hire
22 Paperwork"?
23    A. My recollection -- again, it's what I do every
24 day right now, so I'm a little bit blurry around that
25 time. But I can't imagine that there would be any

Page 74

1  important document that wasn't available for everyone,
2  so.
3     Q. And you have a specific recollection -- strike
4  that. At this time, if a store in California is hiring
5  a new sales associate, is it the procedure that they go
6  to the Polo web site and go to a specific folder or
7  button on that is that entitled "Human Resources
8  New-Hire Paperwork"?
9     A. Yes.
10    Q. What does that look like on the web site? Is
11 it a radial button, is it a list of folders and files?
12    A. Yes. There's several different categories on
13 the retail web; operations, marketing, public relations,
14 human resources, asset protection, all these different
15 categories. So when you go into "Human Resources," you
16 would see a list of the HR representatives in the
17 company information, and then you'd also see a tab for
18 "New-Hire Paperwork Processes And Policies."
19    Q. And when you click on that tab, what does it
20 show you today?
21    A. Everything that is mandatory for any new-hire
22 packet.
23    Q. And so that would include --
24    A. W-4, I-9, employee data sheet, the sales
25 associate handbook, direct deposit form, application --

Page 75

1  let's see if there's some other things. There's several
2  other -- special purchase form. There's many forms.
3     Q. And do you have a specific recollection that,
4  during the operation of the Arrears program, this "Human
5  Resources New-Hire Paperwork" tab included on it an
6  addendum that described the Arrears program?
7     A. I remember it was accessible. Again, it was
8  several years ago.
9     Q. Do you remember if it was included within the
10 file or tab than you identified as a "New-Hire
11 Paperwork"?
12    A. What I recall is reiterating the importance
13 that there's two components to the compensation
14 material; there's the handbook itself, and there's the
15 addendum. And I continually reminded the managers how
16 important it is to take the time to print both, because
17 they were not all part of one document.
18       So forgive me if I can't specifically recall
19 where that was, but I do know that I reiterated the
20 importance of having a total package.
21    Q. There are two different kinds of employee
22 handbooks that are used in the retail stores. My
23 understanding is there's the Polo Ralph Lauren employee
24 handbook, and then there's a sales associate
25 compensation handbook; is that correct?

Page 76

1     A. Yes.
2     Q. Are those two documents today included as a
3  file within the "New-Hire Paperwork" tab?
4     A. Yes, they are.
5     Q. So when a new hire is made, does the management
6  within a specific store print out a copy of those
7  handbooks?
8     A. Yes.
9     Q. So those handbooks aren't printed in New York,
10 or somewhere else, and shipped in boxes to stores to
11 hand out?
12    A. Because of the size of it, the employee
13 handbook, which is 70-plus pages, is an order that you
14 can actually order and have shipped to your store.
15       The compensation handbook -- because not all
16 associates in our company require that book, it's very
17 specific to commission -- that is available on-line, and
18 the expectation is you do print it out.
19    Q. So today a sales associate at the full-price
20 retail stores in California can go onto the retail web
21 and click around and could find the "New-Hire
22 Paperwork," and if they wanted and had the need for
23 that, could print it out?
24    A. Yes. Anyone has access to it.
25    Q. How is the decision made to hire a sales

Page 77

20 (Pages 74 to 77)

**Golden Gate Reporting**

1  and guidelines.
2      Q. And you're referring to Exhibit 63?
3      A. Yes, Exhibit 63.
4      Q. Were you ever present in any group or
5  individual meeting, other than with Ann Otsuka, in which
6  the Arrears program was described to a sales associate?
7      A. Not to my recollection, no.
8          MR. KITCHIN: I'm going to show you a document
9  that we'll mark as Exhibit 64.
10     (Exhibit 64 marked for identification.)
11     Q. BY MR. KITCHIN: This is a document that's
12 Bates stamped number 917. It's called "Polo Ralph
13 Lauren PRC Commission Policy." I'm going to ask you if
14 you're familiar with that document.
15     A. No, I'm not familiar with this.
16     Q. I'm going to show you a document we previously
17 marked as Exhibit 4 to these depositions. It's the
18 "Polo Ralph Lauren Retail Employee Handbook 2002."
19     Do you recall ever having an opportunity to
20 review the 2002 Polo Ralph Lauren employee retail
21 handbook?
22     A. No. The handbook I've always been familiar
23 with is the 2004.
24     Q. So you don't recall seeing any version of the
25 retail employee handbook dated 2002; is that correct?

Page 134

1  in a commissioned environment.
2      Q. So if an individual had started working for the
3  company in 2003 or 2004, were those employees provided a
4  copy of the sales associate compensation handbook issued
5  in April of 2004?
6      A. That was the expectation, yes.
7      Q. Do you know as a matter of fact whether this
8  specific April 2004 handbook was provided to current
9  employees when this handbook was rolled out in 2004?
10     A. I wasn't involved in all of the offers. I did
11 see several of these copied, and printed, and ready for
12 distribution.
13     Q. Page 4 of the document, Polo Bates stamped 732,
14 begins, "Performance Improvement Coaching" --
15     A. Yes.
16     Q. -- you see that?
17     Was the program that Polo called Performance
18 Improvement Coaching applied consistently to all sales
19 associates in the full-price retail stores in
20 California, except with respect to the Arrears program
21 that was applied only to certain individuals who had
22 been hired after a certain date?
23     A. Performance Improvement Coaching applied to
24 everyone who was given a goal of selling, a minimum
25 expectation to sell. Arrears was certainly more of a

Page 136

1      A. Not to my knowledge. It wasn't something I
2  would have carried around.
3      Q. I'm going to show you what we've previously
4  marked as Exhibit 2. This is an April 2002 Polo Retail
5  Corporation sales associate compensation handbook.
6      Do you recall ever receiving or reviewing the
7  April 2002 sales associate compensation handbook?
8      A. No. This is -- many of the titles and subjects
9  in here are familiar with the more current version; but
10 that's why it becomes difficult, is some of the
11 information keeps getting transposed to a newer version.
12     Q. By the time you started at Polo in 2003, had
13 the 2004 handbook been issued by the company?
14     A. I don't recall.
15     Q. I'm going to show you what we previously marked
16 as Exhibit 8. This is "Polo Retail Corporation Sales
17 Associate Compensation Handbook April 2004. And this
18 is, my understanding, a full document.
19     Have you ever seen this specific handbook
20 before?
21     A. Yes. This is one I'm more familiar with.
22     Q. And was this a handbook that was provided to
23 all sales associates working at the full-price retail
24 stores in California sometime in about 2004?
25     A. Yes. This would have been provided for anyone

Page 135

1  compensation piece that was as a result of not selling.
2  So it's a difficult component. Because performance
3  improvement certainly applied, no matter what your date
4  of hire. Everyone had the same expectation of making
5  your goals happen.
6      Q. If someone who was not subject to the Arrears
7  component consistently failed to meet their sales goals
8  or targets, were there consequences for that individual?
9      A. Yes.
10     Q. And what were those consequences?
11     A. If after one quarter that was challenging for
12 an individual -- and that means that you were not able
13 to cover your base for more than two pay periods in that
14 quarter -- there would have been formal documentation
15 with that individual. Because they're certainly
16 concerned if you can't generate commission in a
17 commission job.
18     And then the second consecutive quarter, if
19 the same thing happened, they may move into a career
20 discussion, in general, on whether or not that job was
21 the right one for them.
22     Q. So an individual who failed to meet their sales
23 targets for two consecutive quarters could be terminated
24 for not meeting the expectations of the company?
25     A. Correct.

Page 137

35 (Pages 134 to 137)

1          CERTIFICATION OF DEPOSITION OFFICER

2

3          I, MARY E. GARLAND, duly authorized to administer

4     oaths pursuant to Section 2093(b) of the California Code

5     of Civil Procedure, do hereby certify that the witness

6     in the foregoing deposition was duly sworn by me to

7     testify to the truth, the whole truth and nothing but

8     the truth in the within-entitled cause; that said

9     deposition was taken at the time and place therein

10    stated; that the testimony of said witness was

11    thereafter transcribed by means of computer-aided

12    transcription under my direction; that the foregoing is

13    a full, complete and true record of said testimony; and

14    that the witness was given an opportunity to read and

15    correct said deposition and to subscribe to the same.

16         I further certify that I am not of counsel or

17    attorney for either or any of the parties in the

18    foregoing deposition and caption named, nor in any way

19    interested in the outcome of the cause named in said

20    caption.

21         Executed February 12, 2008, at San Francisco,

22    California.

23

24                _____
                  MARY E. GARLAND, CSR 4721

25

184

EXHIBIT 93.

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4

5   ANN OTSUKA, an individual; JANIS          No. C-07-02780-SI
    KEEFE, an individual; CORINNE
6   PHIPPS, an individual; and
    JUSTIN KISER, an individual;
7   individually and on behalf of
    all others similarly situated,

8              Plaintiffs,

9     vs.

10  POLO RALPH LAUREN CORPORATION;
    a Delaware Corporation; POLO
11  RETAIL, LLC, a Delaware Corporation;
    POLO RALPH LAUREN CORPORATION, a
12  Delaware Corporation, doing business
    in California as POLO RETAIL CORP;
13  FASHIONS OUTLET OF AMERICA, INC., a
    Delaware Corporation and DOES 1-500,
14  inclusive,

15             Defendants.
                                           /
16

17

           DEPOSITION OF VALERIE ANN HARRISON

18

19

        DATE:         August 10, 2007

20
        TIME:         10:08 a.m.

21
        LOCATION:     120 Kearny Street
22                    Suite 3200
                      San Francisco, California

23
        REPORTED BY:  Mary E. Garland
24                    Certified Shorthand Reporter
                      License Number 4721

25

                                              Page 1

1   shorter period of time?
2     A. I believe it was longer.
3     Q. Did you receive a packet of documents in about
4   May of 2004 that included the attachments referenced on
5   the first page of this exhibit?
6     A. I honestly don't recall.
7     Q. Did you ever sit for a PowerPoint presentation
8   in about 2004 where any new policies were discussed
9   relating to sales associate compensation?
10    A. I don't recall a PowerPoint presentation, per
11  se.
12    Q. There's a reference at the bottom of this where
13  it says "Associate Guide to Performance Improvement" on
14  page 438, the Bates stamp, and it refers to, "it was not
15  in your binders." Do you see that, "Some of you
16  mentioned it was not in your binders"?
17    A. I'm sorry. I'm having a hard time finding it.
18    Q. It's the last bullet point right above "Home
19  Associates."
20    A. Oh, sorry.
21    Q. "Some of you mentioned it was not in your
22  binders." I'm wondering if you received, as apparently
23  these individuals did, some type of a binder with this
24  new material relating to employment compensation?
25    A. I personally did not, but that probably would

Page 98

1   have gone to the general manager.
2     Q. And I see at that time, Tin Hua; T-i-n H-u-a,
3  was your store's general manager, 2004?
4     A. I believe so.
5     Q. Did you undergo specific training in about 2004
6  relating to performance improvement plans?
7     A. I don't recall that, but if you can give me
8  any more details you have on that, I might be able to
9  remember more.
10    (Exhibit 8 marked for identification.)
11    Q. BY MR. KITCHIN: I'm going to show you what
12  we've marked as Exhibit 8. It is "Polo Ralph Lauren,"
13  "Polo Retail Corporation Sales Associate Compensation
14  Sales Associate Handbook April 2004." That will be
15  Exhibit 8. Do you recall, in about April of 2004, a new
16  or a revised sales associate compensation handbook being
17  provided to you?
18    A. I know I got more than one while in my tenure
19  at Polo. Specifically that, no.
20    Q. When the sales associate compensation or the
21  employee handbook was revised -- that, as we go through
22  today, we'll see examples of that -- were copies of the
23  revised manuals provided to all sales associates?
24    A. That's what I saw that were passed out.
25    Q. Did you provide them to your sales associates?

Page 99

1     A. No, not specifically. It was generally the GM,
2  the general manager of the store, or Theresa, the
3  operations manager, would go through and pass those out.
4    Q. Do you know if -- we'll just keep it to the
5  associates who worked for Home Collections. Do you know
6  if, when they received a copy of a revised handbook,
7  they were required to sign an acknowledgement of the new
8  handbook provided to them?
9    A. That was asked of everyone.
10    Q. And did everyone, as far as you know, sign that
11  when they received the new handbooks?
12    A. As far as I know.
13    Q. We're looking at Exhibit 8, the April 2004
14  handbook. I'd like you to turn to POLO 731 -- it's four
15  pages in -- and direct your attention to the first
16  section, "Base Rate Against Commission."
17     This paragraph is stated in some of the earlier
18  manuals, but this one drops the language regarding "no
19  payback if commission falls below the base rate."
20  There's no reference to that in this paragraph. And I'm
21  wondering if you have any knowledge regarding why that
22  language was dropped from the handbook in about 2004?
23    A. I'm not sure.
24    Q. In about 2004, did Polo institute a policy that
25  required employees, sales associates, to pay back part

Page 100

1   of their commission if they failed to hit their target
2  rates -- or sales goals, I should say?
3    A. So you're speaking of arrears?
4    Q. I'm speaking of -- I don't know if it was
5  called arrears in 2004, but with the concept of arrears
6  that we'll talk a lot about, was arrears in practice in
7  April of 2004, if you know?
8    A. I know that at one point, we did practice
9  arrears for pay structure, but I can't tell you when, to
10  be honest.
11    Q. Do you ever recall seeing any documents
12  provided to sales associates that made reference to
13  arrears?
14    A. Not that I can recall.
15    Q. Do you recall ever seeing any discussion of
16  arrears in any of the sales associate compensation
17  handbooks that you saw when you were employed at Polo?
18    A. Again, not that I can recall.
19    Q. On page 732 of Exhibit 8, entitled on this page
20  "Performance Improvement Coaching," you indicated
21  earlier that you were familiar with the concept of
22  performance improvement coaching?
23    A. Yes.
24    Q. And could you just describe in your own terms
25  what performance improvement coaching was made up of at

Page 101

26 (Pages 98 to 101)

CERTIFICATION OF DEPOSITION OFFICER

1

2

3    I, MARY E. GARLAND, duly authorized to administer

4    oaths pursuant to Section 2093(b) of the California Code

5    of Civil Procedure, do hereby certify that the witness

6    in the foregoing deposition was duly sworn by me to

7    testify to the truth, the whole truth and nothing but

8    the truth in the within-entitled cause; that said

9    deposition was taken at the time and place therein

10   stated; that the testimony of said witness was

11   thereafter transcribed by means of computer-aided

12   transcription under my direction; that the foregoing is

13   a full, complete and true record of said testimony; and

14   that the witness was given an opportunity to read and

15   correct said deposition and to subscribe to the same.

16       I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21       Executed August 15, 2007, at San Francisco,

22   California.

23

24   _____
     MARY E. GARLAND, CSR 4721

25

EXHIBIT 94.

```
         1    a document titled Polo Ralph Lauren Polo Retail Corporation
13:33:12 2    Sales Associate Compensation.
         3                    (Exhibit I was marked.)
         4    Q.        BY MR. GOINES:  Ms. Phipps, I've had placed in
         5    front of you what has been marked as Exhibit I, and it's a
         6    document titled Polo Retail Corporation Retail Sales
         7    Associate compensation.  My question is have you ever seen
         8    this document before?
         9    A.        May I take a moment?
13:33:50 10   Q.        Yeah, please.
13:35:28 11   A.        Okay.  Was there a pending question yet?
         12   Q.        Yeah.  My question was whether you ever recall
         13   receiving a copy of Exhibit I.
         14   A.        I do.
         15   Q.        And do you recall how it was presented to you?
         16   A.        I'm sorry.  I don't recall how it was presented to
         17   me, no.
         18   Q.        Do you recall whether it was given to you before --
         19   as part of the hiring process or was it given to you after
         20   you had been hired and part of the orientation process?
13:36:00 21   A.        I don't recall when.
         22   Q.        Do you recall who?
         23   A.        No, I don't either, sorry.
         24   Q.        When you interviewed with the company, I think you
         25   said you interviewed with three people?
```

REPORTER'S CERTIFICATE

1
2
3       I certify that the witness in the foregoing
4   deposition,
5              CORINNE PHIPPS
6   was by me duly sworn to testify in the within-entitled
7   cause; that said deposition was taken at the time and place
8   therein named; that the testimony of said witness was
9   reported by me, a duly Certified Shorthand Reporter of the
10  State of California authorized to administer oaths and
11  affirmations, and said testimony was thereafter transcribed
12  into typewriting.
13      I further certify that I am not of counsel or
14  attorney for either or any of the parties to said
15  deposition, nor in any way interested in the outcome of the
16  cause named in said deposition.
17      IN WITNESS WHEREOF, I have hereunto set my hand
18  this 25th day of June, 2007.
19
20
21              _____
                 KACY PARKER BARAJAS, RPR
22               Certified Realtime Reporter
                 State of California
23               Certificate No. 10915
24
25

Page 189

---

1              PHILLIPS LEGAL SERVICES
                 One Sutter Street, Suite 700
2             San Francisco, California 94104
                    (415) 601-4601
3
4
5   GREENBERG TRAURIG
    WILLIAM J. GOINES, ESQ.
6   1900 University Avenue, Fifth Floor
    San Francisco, CA 94303
7
    Case Name: Ann Otsuka, et al. v. Polo Ralph Lauren
8   Deposition of: Corinne Phipps
    Date Taken: June 12, 2007
9
    Dear Mr. Goines:
10
    We wish to inform you of the disposition of this original
11  transcript. The following procedure is being taken by our
    office:
12
13      _____The witness has read and signed the
             deposition. (See attached.)
14
        _____The witness has waived signature.
15
        _____The time for reading and signing has
16           expired.
17      _____The sealed original deposition is being
             forwarded to your office.
18
        _____Other:
19
20  Sincerely,
21
22  Phillips Legal Services
    Ref No. 15854LR
23
    cc: Patrick R. Kitchin, Esq.
24
25

Page 191

---

1              PHILLIPS LEGAL SERVICES
                 One Sutter Street, Suite 700
2             San Francisco, California 94104
                    (415) 601-4601
3
    June 27, 2007
4
    Corinne Phipps
5   c/o LAW OFFICE OF PATRICK R. KITCHIN
    565 Commercial Street, Fourth Floor
6   San Francisco, CA 94111
7   Re: Deposition of Corinne Phipps
    Case Name: Ann Otsuka, et al. v. Polo Ralph Lauren
8   Deposition Date: June 12, 2007
9   Dear Ms. Phipps:
10  Your deposition has been prepared and is ready for you to
    read, correct, and sign. The original will be held in our
11  office for 35 days from the date of this letter.
12  If you are represented by an attorney, you may wish to
    discuss with your attorney the reading and signing of your
13  deposition. If your attorney has purchased a copy of your
    deposition, you may review that copy. If you choose to read
14  your attorney's copy, please fill out, sign, and submit to
    our office the DEPONENT'S CHANGE SHEET from the back of your
15  deposition.
16  If you choose to read your deposition at our office, it will
    be available between 9:00 a.m. and 4:00 p.m. Please bring
17  this letter as a reference.
18  If you do not wish to read your deposition, please sign
    below and return within 30 days of the date of this letter.
19
20  _____
    CORINNE PHIPPS              DATE
21
    Sincerely,
22
23
    KACY PARKER BARAJAS, CSR No. 10915
24  Phillips Legal Services
    Ref No. 15854LR
25  cc: William J. Goines, Esq.

Page 190

---