WILLIAM J. GOINES (SBN 061290)
KAREN ROSENTHAL (SBN 209419)
CINDY HAMILTON (SBN 217951)
ALISHA M. LOUIE (SBN 240863)
GREENBERG TRAURIG, LLP
1900 University Avenue, Fifth Floor
East Palo Alto, CA 94303
Telephone: (650) 328-8500
Facsimile: (650) 328-8508
Email:      goinesw@gtlaw.com
            rosenthalk@gtlaw.com
            hamiltonc@gtlaw.com
            louiea@gtlaw.com

JEREMY A. MEIER (SBN 139849)
GREENBERG TRAURIG, LLP
1201 K Street, Suite 1100
Sacramento, CA  95814-3938
Telephone:  (916) 442-1111
Facsimile:  (916) 448-1709
Email:      meierj@gtlaw.com

Attorneys for Defendants Polo Ralph Lauren Corporation;
Polo Retail, LLC; Polo Ralph Lauren Corporation, doing
business in California as Polo Retail Corporation; and
Fashions Outlet of America, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANN OTSUKA, an individual; JANIS KEEFE, an individual; CORINNE PHIPPS, an individual; and on behalf of all others similarly situated,<br><br>          Plaintiff,<br>v.<br><br>POLO RALPH LAUREN CORPORATION, a Delaware Corporation; et al.,<br><br>          Defendants. | Case No.  C07-02780 SI<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION  FOR CLASS CERTIFICATION**<br><br>DATE:       July 11, 2008<br>TIME:       9:00 a.m.<br>CTRM:      10, 19th Fl.<br>JUDGE:     The Hon. Susan Illston |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION.................................................................................................. 1

II.   STATEMENT OF FACTS ................................................................................... 2

      A.    Defendants' California Business Operations ................................................ 2

            1.    Defendants Operate Eight Separate California Polo Full-Price Stores .............. 3

            2.    The Full Price Stores Utilize Exempt Commission Sales Associates ................ 5

            3.    Defendants Also Operate Fifteen Distinct Outlet Stores ...................... 6

            4.    The Named Full Price Plaintiffs Worked In San Francisco And Palo Alto For A Few Months Time, While The Outlet Store Named Plaintiff Was Not A Representative Employee ......................................................................... 8

      B.    Summary of Polo's Argument ................................................................... 9

III.  LEGAL ARGUMENT ....................................................................................... 10

      A.    The Legal Standard Under Fed. R. Civ. P. 23 .......................................... 10

            1.    Plaintiffs' Burden To Meet The Requirements For Class Certification ........... 11

      B.    Plaintiffs Fail To Establish That Common Issues Predominate Or That A Class Action Is A Superior Means Of Adjudication For The Off The Clock And Rest Break Claims .................................................................................... 12

            1.    Plaintiffs Fail To Recognize That Polo Is Only Obligated To Provide, Not Ensure, Breaks .............................................................................. 13

            2.    Plaintiffs' Time Spent On Loss Prevention Inspections Constitute *De Minimis* Wait Times ............................................................................... 14

            3.    Common Questions Do Not Predominate Over Individual Questions For Plaintiffs' Off The Clock Claims Under Rule 23(b)(3) ...................... 15

            4.    Plaintiffs Cannot Establish Typicality For Their Rest Break Claims .............. 18

            5.    Plaintiffs Have Not Met The Requirement For Superiority On Their Off The Clock And Rest Break Claims As Adequate Alternatives Exist .............. 18

      C.    Plaintiffs Do Not Present A Theory of Liability that Presents a Common Question For The Arrears Subclass Under Rule 23(b)(3).......................... 19

            1.    The Arrears Commission Program Is Lawful Such That The Only Possible Common Theory Of Liability Involves Individualized Claims ...................... 20

            2.    Under Rule 23(b)(3), An Arrears Subclass Is Not Superior To Alternative Forms Of Adjudication .......................................................................... 21

3. Plaintiffs Cannot Establish Rule 23(a) Typicality, Commonality or Numerosity for the Arrears Subclass ................................................................. 21

D. The Misclassification Subclass ................................................................. 22

1. Plaintiffs Cannot Establish Typicality For Their Misclassification Claim ....... 22

2. Plaintiffs Cannot Establish Commonality For Their Misclassification Claim ................................................................................................. 22

3. There Is An Insufficient Number of Misclassification Claimants ................... 24

4. Plaintiffs Cannot Establish Their Misclassification Claim Meets the Superiority Requirement of Rule 23(b) (3) ............................................ 24

E. Plaintiffs Are Inadequate Class Representatives ......................................... 25

1. A Class Action Does Not Provide Substantial Benefits .............................. 25

IV. CONCLUSION ............................................................................................ 25

1

## TABLE OF AUTHORITIES

2

Page

3

### Federal Cases

4

*Amchem Products v. Windsor*
  521 U.S. 591 (1997)..................................................................................10

5

6

*Atkins v. General Motors Corp.*
  701 F.2d 1124 (5th Cir. 1983).................................................................15

7

*Ballaris v. Wacker Siltronic Corp.*
  370 F.3d 901 (9th Cir. 2004....................................................................14

8

*Bates v. United Parcel Service*
  204 F.R.D. 440 (N.D. Cal. 2001)............................................................11

9

*Blackie v. Barrack*
  524 F.2d 891 (9th Cir. 1975)....................................................................13

10

*Brown v. Federal Express Corp.*
  ___F.R.D.___, 2008 WL 906517, *4-6 (C.D. Cal. 2008)..............14, 16, 18

11

*Burkhalter Travel Agency v. MacFarms International Inc.*
  141 F.R.D. 144 (N.D. Cal. 1991).............................................................11

12

*Carter v. Panama Canal Co.*
  314 F. Supp. 386 (D.D.C. 1970)...............................................................15

13

*Coopers & Lybrand v. Livesay*
  437 U.S. 463 (1978)...................................................................................12

14

15

*Devlin v. Scardelletti*
  536 U.S. 1 (2005)..........................................................................................1

16

*Doninger v. Pacific Northwest Bell, Inc.*
  564 F.2d 1304 (9th Cir. 1977)..................................................................11

17

*E.I. du Pont de Nemours & Co. v. Harrup*
  227 F.2d 133 (4th Cir. 1955)....................................................................15

18

*Frank v. Wilson & Co.*
  172 F.2d 712 (7th Cir. 1949)....................................................................15

19

*Gaspar v. Linvatec Corp.*
  167 F.R.D. 51 (N.D. Ill. 1996)..................................................................24

20

21

*General Tel. Co. of Northwest, Inc. v. EEOC*
  446 U.S. at 330.................................................................................22, 24

22

*Green v. Planters Nut & Chocolate Co.*
  177 F.2d 187 (4th Cir. 1949)....................................................................15

23

*Guthrie v. Evans*
  815 F.2d 626 (11th Cir. 1987)......................................................................1

24

*Hanlon v. Chrysler Corp.*
  150 F.3d 1011 (9th Cir. 1998)..................................................................23

25

26

*Hanon v. Dataproducts Corp.*
  976 F.2d 497 (9th Cir. 1992)........................................................10, 11, 22

27

*Hodgson v. Katz & Besthoff, #38, Inc.*
  365 F. Supp. 1193 (W.D. LA. 1973)........................................................15

28

i

*IBP, Inc. v. Alvarez*
546 U.S. 21 (U.S. 2005)...................................................................................................14

*In re American Medical Sys.*
75 F.3d 1069 (6th Cir. 1996)...........................................................................................11

*In re Check/Mastermoney Antitrust Litig. v. Visa*
280 F.3d 124 (2d Cir. 2001)............................................................................................12

*In re Dalkon Shield Products Liability Litigation*
693 F.2d 847 (9th Cir. 1982), cert. denied, 459 US 1171 (1983) ...................................10

*In re Ford Motor Co. Ignition Switch*
174 F.R.D. 332 (D.N.J. 1997)..........................................................................................11

*In re Unioil Sec. Litig.*
107 F.R.D. 615 (C.D. Cal. 1985) .....................................................................................11

*Jiminez v. Domino's Pizza, Inc.*
238 F.R.D. 241(C.D. Cal. 2006) ......................................................................................12

*Kenny v. Supercuts, Inc.*
Case No. 3:06-cv-07521-CRB (N.D. Cal. 2008) .......................................................14, 16

*Lindow v. United States*
738 F.2d 1057 (9th Cir. 1984)....................................................................................14, 15

*Marshall v. Fabric World, Inc.*
23 Wage & Hour Cases (BNA) 414 (M.D. Ala. 1977).....................................................15

*Martin v. Dahlberg, Inc.*
156 F.R.D. 207 (N.D. Cal.. 1994) ....................................................................................13

*Morisky v Public Service Electric and Gas Co.*
111 F. Supp. 2d 493 (D.N.J. 2000) ..................................................................................11

*Nardone v. General Motors, Inc.*
207 F. Supp. 336 (D.N.J. 1962) .......................................................................................15

*Northern v. Nelson*
448 F.2d 1266 (9th Cir. 1971)..........................................................................................24

*Rutstein v. Avis Rent-A-Car Sys., Inc.*
211 F.3d 1228 (11th Cir. 2000).........................................................................................12

*Smith v. Cleveland Pneumatic Tool, Co.*
173 F.2d 775 (6th Cir. 1949)............................................................................................15

*States Wholesale, Inc. v. Synthetic Industries, Inc.*
206 F.R.D. 271 (C.D. Cal. 2002) .....................................................................................13

*Utah v. American Pipe & Construction Co.*
49 F.R.D. 17 (C.D. Cal. 1969) .........................................................................................24

*Valentino v. Carter Wallace Inc.*
97 F.3d. 1227 (9th Cir. 1996)...........................................................................................11

*Walls v. Wells Fargo Bank*
262 B.R. 519 (Bankr. E.D. Cal. 2001) ........................................................................20, 23

*White v. Starbucks Corp.*
497 F.Supp.2d 1080 (N.D. Cal. 2007) .......................................................................14, 16

*Wofford v. Safeway Stores*
78 F.R.D. 460 (N.D. Cal. 1978)........................................................................................22

ii

*Wyler Summit Partnership v. Turner Broadcasting Systems, Inc.*
  135 F.3d 658 (9th Cir 1998)......................................................................13

*Zinser v. Accufix Research Institute, Inc.*
  252 F.3d 1180 (9th Cir. 2001).............................................................11, 12

**State Cases**

*Brewer v. Patel*
  20 Cal.App.4th 1017 (1993)......................................................................15

*City of San Jose v. Superior Court*
  12 Cal.3d 447 (1974)................................................................................25

*Fitch v. Select Products, Inc.*
  36 Cal. 4th 812 (2005) ............................................................................13

*Frieman v. San Rafael Rock Quarry, Inc.*
  116 Cal. App.4th  29 (2004)......................................................................19

*Hicks v. Kaufman and Broad Home Corp.*
  89 Cal.App.4th 908 (2001).......................................................................13

*Isner v. Falkenberg/Gilliam & Associates, Inc.*
  160 Cal.App.4th 1393 (2008)....................................................................15

*Koehl v. Verio, Inc.*
  142 Cal. App. 4th 1313 (Cal. App. 1st Dist. 2006)....................................20

*Murphy v. Kenneth Cole Prods., Inc.*
  40 Cal. 4th 1094 (2007) ..........................................................................14

*Prachasaisoradej v. Ralphs Grocery Company*
  42 Cal.4th 217, 223 (2007) ......................................................................20

*Sav-On Drug Stores, Inc. v. Superior Court*
  34 Cal. 4th 319 (2004) .............................................................................12

*Sinatra v. Chico Unified School Dist.*
  119 Cal. App. 4th 701 (Cal. App. 3d Dist. 2004) .....................................19

**Federal Statutes**

Portal-to-Portal Act of 1947......................................................................14

**State Statutes**

Cal. Labor Code § 226.7 ...........................................................................14

Cal. Labor Code § 232 ..............................................................................19

Cal. Labor Code § 512(a)...........................................................................14

**Federal Rules and Regulations**

29 C.F.R. § 779.417(a)...............................................................................23

29 CFR § 779.417......................................................................................23

29 CFR § 790.3 .........................................................................................14

Fed. R. Civ. P. 23 .............................................................10, 11, 12, 13

Fed. R. Civ. P. 23(a)..........................................................10, 12, 22, 24

iii

Fed. R. Civ. P. 23(b) .......................................................................................................10, 12
Fed. R. Civ. P. 23(b)(3).............................................................................10, 12, 13, 15, 19, 21

**State Regulations**
CA Regulation 11070..........................................................................................................20
Cal. Wage Order 4-2001(3)(D) ..........................................................................................23

**Other Authorities**
Newberg on Class Actions, §3.3, p.225 ...............................................................................24

1    **I.    INTRODUCTION**

2    Courts have routinely rejected invitations by plaintiffs to extend the use of class actions to

3    cases requiring individualized proof. As long acknowledged, "'[a] fundamental purpose of the class

4    action'... [is] to render manageable litigation that involves numerous members of a homogeneous

5    class, who would all otherwise have access to the court through individual lawsuits." *Devlin v.*

6    *Scardelletti*, 536 U.S. 1, 10 (2005) (quoting *Guthrie v. Evans*, 815 F.2d 626, 629 (11th Cir. 1987).

7    Now before this Court is the determination of whether, under Rule 23 of the Federal Rules of Civil

8    Procedure, Plaintiffs' claims meet the fundamental purpose for which class actions are intended. As

9    discussed herein, this case does not merit class action certification because to do so would render the

10    litigation unmanageable, involving thousands of members with highly individualized facts and

11    issues.

12    Defendants in this wage and hour class action case own and operate twenty-eight distinct

13    retail and outlet stores in California. The defendants include Polo Ralph Lauren Corporation; Polo

14    Retail, LLC; Polo Ralph Lauren Corporation, doing business in California as Polo Retail

15    Corporation; and Fashions Outlet of America, Inc ("Polo" or "Defendants").

16    The named plaintiffs, Ann Otsuka ("Otsuka"), Janice Keefe ("Keefe"), Corrine Phipps

17    ("Phipps"), and Renee Davis ("Davis") ("Plaintiffs"), are former employees who worked in Ralph

18    Lauren stores, located in San Francisco (Keefe and Phipps), in Palo Alto (Otsuka), and at the Polo

19    Ralph Lauren Factory Outlet store, located in Cabazon, near Palm Springs (Davis). Three of the

20    named plaintiffs worked for Polo for a matter of just a few short months, and Davis worked at the

21    Cabazon store for less than two years.

22    In this instance, one size does not fit all. To certify the proposed classes would require a trial

23    of each different store shift, by department and by store. Plaintiffs present insufficient common

24    theories of liability, making for a predominance of individualized claims. A class action is not a

25    superior means of fair and efficient adjudication. Further, Plaintiffs have failed to meet the

26    requirements for numerosity, typicality and commonality. Based upon the requirements of Rule 23

27    and fundamental considerations of due process, these classes should not be certified.

28

1

## II.   STATEMENT OF FACTS

This lawsuit began in the Superior Court for the County of San Francisco on May 30, 2006, alleging thirteen different class claims for violation of wage and hour laws, including breach of contract, fraud, false imprisonment, unfair competition, unjust enrichment, and related California statutory labor law violations.  Following removal to this Court and motion practice, Plaintiffs' operative Third Amended Complaint alleges eight different claims and, after extensive discovery, Plaintiffs now seek to certify four claims pursuant to this Motion.

Plaintiffs' Motion for Class Certification ("Motion" or "MPA") proposes an overly broad class comprised of all former California salespersons and cashiers from Ralph Lauren (Full-Price Stores) and Polo Ralph Lauren Factory Outlet stores ("Outlet Stores"), all of whom have alleged to not have been paid for off the clock loss inspection searches and missed rest breaks.  Plaintiffs also propose two subclasses for former California employees who worked in the Full-Price Stores, allegedly subject to misclassification (exempt from overtime) and for those Full-Price Store employees whose wages were impacted by Polo's conditional "arrears" commission program.

Defendants have attached over 70 declarations from Polo employees from every Full-Price Store and Outlet Store in California, some of whom have been employed by Polo since the mid-1990's. These employees have testified that they have always taken rest breaks, or in the case of the Full-Price Stores, chose not to take rest breaks voluntarily because they preferred to remain selling and earning commissions. These employees also testify that the length of time for loss prevention inspections has always ranged from thirty seconds to five minutes. Given the dramatic disparity in the experiences of Plaintiffs' declarants from Defendants' declarants, there is a serious factual issue as to whether anyone other than Plaintiffs' declarants has experienced those problems while at Polo.[1]

### A.   Defendants' California Business Operations

Defendants collectively own and operate retail establishments in the consumer fashion and apparel industry that can be found around the globe. In California, Polo owns and operates, among other things, Ralph Lauren, the high-end luxury line of the Polo brand of retail stores and Polo Ralph Lauren Factory Outlet, a moderately priced retail establishment of Polo carrying a broad range of

---

[1] Indeed, the testimony offered by some of the Plaintiffs' declarants is directly contradicted by the testimony of current long-term Polo employees who know Plaintiff's declarants. *See* Goines Decl., Exs. 19 at ¶¶24-27, 56 at ¶¶7-9, 75 at ¶¶9-12.

Polo brand merchandise in outlet shopping malls throughout California. Though both businesses are part of the Polo retail family, each is distinct from the other. Further, each store is unique and operates under different business conditions.

### 1.    Defendants Operate Eight Separate California Polo Full-Price Stores

Defendants own and operate eight Polo Full-Price Stores in California located in San Francisco, Burlingame, Palo Alto, Beverly Hills, Malibu (the Malibu location is comprised of three separate store structures), Costa Mesa, La Jolla and Palm Desert. (Mogel Declaration[2] ("Decl.") at ¶ 2.) Full-Price Stores are specialty retailers catering to a high-end luxury clientele. (Goines Decl., Exs. 16-39.) The stores themselves are located in high-end retail areas that include shopping malls and other boutique areas.

No two stores are alike. Each store has different practices and procedures. Each store differs in size and number of employees. Full-Price Stores utilize commission sales employees, who are paid on a draw versus commission basis.[3] Each store schedules rest breaks differently; each store has different configurations and procedures to clock out for loss prevention inspections. (Goines Decl., Ex. 8 (Mireles Transcript ("Tr.")) at 58, and Exs. 16-39.)

The Full-Price Stores vary in size and operate according to the particular needs of the store. For instance, the Burlingame store which has 5,200 square feet of operations and retail space, has a management team that consists of two Co-General Managers and has 7 sales associates, some of whom work full-time and some of whom work part-time. The retail space of the store is contained to a single area, without separate rooms designating different departments. (Goines Decl., Ex. 17.) Consequently, every person on the sales floor is easily within sight and easily accessible. By way of further comparison, the store environment in the Beverly Hills store is much different. The management team is comprised of a General Manager and a team of 11 other managers who have management of operations and department responsibilities. Unlike the Burlingame store, the 21,600

---

[2] For purposes of this opposition, Polo cites to the evidence submitted herewith by referencing the Declarant's last name and/or exhibit number.

[3] The Polo Full-Price Store located Burlingame, California compensates its sales associates on a base plus commission compensation structure. Certain other sales associates in the Full-Price Stores also work on a base plus commission compensation structure, including sales associates in the Children's Department in Beverly Hills store and a sales associate in the Palo Alto store. (Mogel Decl. at ¶ 5.)

square foot Beverly Hills store is comprised of segregated space, designating different departments that extend over two floors of retail space. There are approximately 35 sales associates that work in the Beverly Hills store, most whom work full-time and some of whom are regarded as the largest grossing sales associates. Based on the size of the staff, management team and store structure, managers are equipped with portable phones that are tied to the store's internal phone system so that they can remain accessible throughout the day, given the large size of the store. (Goines Decl., Ex. 16 at ¶¶ 4, 23.)

The stores operate according to the individual business needs of the store. In Malibu, there are three separate store structures. Although sales associates are assigned to work in a particular store, Men's, Women's or RRL, based on scheduling and coverage needs, sales associates often times will work in any of the three stores. (Goines Decl., Ex. 20.)  The Costa Mesa store similarly has a unique store environment. Its location in the South Coast Plaza Mall requires that the store operate on extended hours. Consequently, the store has an opening, mid and closing shift, with sales associates coming and going at various points in the day. (Goines Decl., Ex. 18 at ¶¶ 10-11.)

All Full-Price Stores require employees, including sales associates, to undertake a bag inspection check prior to exiting. While this policy remains consistent throughout all of the Full-Price stores, the procedure is different in each store. In the Beverly Hills store, a separate employee, bearing the job title Asset Protection Associate, has responsibilities that include bag inspection checks. Ordinarily, the Asset Protection Associate stations himself near the employee exit (store's valet door) at the end of the day to facilitate back inspection checks for sales associates, as sales associates complete their duties and responsibilities at varying times, depending on the individual needs of their departments. (Goines Decl., Ex. 16 at ¶ 21.) The practice is different in the Costa Mesa store. There, management and sales associates generally complete their duties for the day at the same time. Once the closing manager has done a walk-through of the store, sales associates then clock-out and walk out of the store with the manager. The manager then performs a bag inspection search for each sales associate outside of the store in the interior of the mall. (Goines Decl., Ex. 18 at ¶ 14.)

4

1
2
3
4
5
6
7
8
9
10
11

Rest breaks, similarly, are coordinated differently in each store, based on the individual store needs and individual needs of the sales associates. In the Malibu stores, at times there is only one employee assigned to each of the three stores. Consequently, if that employee takes a rest break, he/she will leave a note on the door and close the store until he/she returns from his/her break. (Goines Decl., Ex. 49 at ¶ 7.) Based on the nature of the business, sales associates themselves make independent decisions regarding the taking of rest breaks. For example, Susan George, a sales associate in the La Jolla store, chooses not to take rest breaks because she has "no desire to spend [her] time elsewhere, other than on the sales floor…" (Goines Decl., Ex 48 at ¶ 9.) On the other hand, Josephine Sahyoun, a sales associate in the Burlingame store, typically takes a 15 minute rest break in the morning, a meal break in the afternoon and a 15 minute rest break in the evening. (Goines Decl., Ex. 44 at ¶ 7.)

12
13
14

From Polo's smallest Full-Price California store, RRL in Malibu at 849 square feet to the Beverly Hills store at 21,600 square feet, each business in Polo's Full-Price retail chain operates under different conditions. Thus, each store utilizes different practices and procedures.

15

### 2.   The Full Price Stores Utilize Exempt Commission Sales Associates

16
17
18
19

The sales associates who work in the Full-Price Stores are typically career sales associates with a prior history in sales in the fashion apparel and retail industry. Polo Full-Price Stores work on a "draw versus commission" structure with most sales associates earning commission compensation as opposed to a draw. The majority of sales associates are full-time. (Goines Decl., Exs. 16, 18-23.)

20
21
22
23
24

The draw versus commission structure is a performance-based and incentive compensation plan. While sales associates are always guaranteed their base pay or draw, those sales associates that sell Polo merchandise at their commission rate, which results in commissions above their base pay, receive net commission earnings. The more net sales a sales associate generates, the more he/she receives in net commission earnings. (Mogel Decl. at ¶¶ 5-10.)

25
26
27

Sales associates are therefore motivated to cultivate relationships with clients and build their business. They provide customers individualized attention with their product purchases. Sales associates in the Full-Price Stores are motivated to "drive their own business" and consequently

28

5

operate with more autonomy than sales associates in the Outlet Stores, as will be discussed below. (Goines Decl., Exs. 16, 18-23.) A sales associate in the Full-Price Store often schedules appointment times with their clients and will adjust his/her schedule in order to accommodate their individual business needs. *Id.*

### 3.    Defendants Also Operate Fifteen Distinct Outlet Stores

Defendants own and operate fifteen Outlet Stores in California, including a Children's Outlet Store and luxury Outlet Store. The Outlet Stores are located in thirteen cities, including Alpine, Anderson, Barstow, Cabazon, Camarillo, Carlsbad, Gilroy, Mammoth Lakes, Ontario, Pismo Beach, San Diego, Tulare and Vacaville. The Outlet Stores carry a broad-range of Polo's moderately priced brands and, on occasion, a very limited amount of discounted select merchandise from the Full-Price stores. The Outlet Stores are a volume-based business, as opposed to a specialty retailer as in the Full-Price Stores. These stores are located in large outlet malls along with other retailers who market themselves as "discounted" or "outlet" retailers.

The Outlet Stores differ in sales volume and physical size and in how they are managed. By way of example, the Anderson store has a management team consisting of a General Manager and 3 Assistant Managers and has 4 sales associates. Due to the small size of the store, generally no more than two employees, including managers, work at any given time and shift times vary and fluctuate according to season and need. (Goines Decl., Ex. 25 at ¶ 13.) Conversely, the Cabazon store has a management team comprised of a General Manager, 4 Assistant Managers and 4 Supervisors. There are approximately 85 sales associates that work in the Cabazon store. Shifts start at 5:00 am and begin on the hour throughout the day. (Goines Decl., Ex. 28 at ¶ 14.)

Bag inspection checks are performed differently in each Outlet Store. In the San Diego store, for instance, the Customer Service Manager ("CSM") usually informs sales associates when to clock-out based on their shift schedule, whereupon, the CSM will station himself by the employee door to perform bag inspection checks for departing employees. (Goines Decl., Ex 80 at ¶4.) In the Cabazon store, there is "usually a manager waiting at the front door to perform the bag inspection." (Goines Decl., Ex. 66 at ¶ 4.) However, since the Cabazon store utilizes walkie-talkies to facilitate communication on the floor, exiting sales associates can request an employee, usually the greeter

who is located near the employee door, to message a manager to the employee door to perform a bag inspection search. (Goines Decl., Ex. 65 ¶ 4). In the Barstow store, there is an additional policy in the store which requires that sales associates carry their personal items in a clear plastic bag. (Goines Decl., Ex. 26 at ¶ 26.) This requirement facilitates the bag inspection process.

Rest breaks are detailed on each Outlet Store's Daily Planning Agenda ("DPA"). (Goines Decl., Exs. 85 at ¶ 4, 86 at ¶ 4, 30 at ¶ 4, 4 (Copeland Tr.) at 99-103, and Exs. 24-39.) Based on the structured shift schedule maintained in the stores, the CSM usually advises sales associates of when they may take their rest breaks.[4] Not only are such breaks provided but they are consistently taken.[5]

(a) <u>Polo's Outlet Store Employees Are Paid Hourly with Overtime</u>

In the Outlet Stores, there are several job classifications apart from management. In addition to sales associates, there are stock associates (work mostly with shipping and receiving and bringing new shipments to the store); cashiers (work at Point of Sale system and designated at cash registers to ring up sales); and lead cashiers (also work at Point of Sale system and designated to ring up sales, execute merchandise returns and open and close the register) ("Hourly Employees"). Hourly Employees typically are seasonal, part-time, not career oriented salespersons, and have significantly higher turnover rates than do the Full-Price Stores.

The Polo Outlet Stores experience a high-volume of foot traffic. Consequently, the focus is upon making immediate sales, not developing a book of business. Rather than individualized customer attention, customers freely walk about the store, seeking assistance from sales associates as necessary.

Polo Outlet Store Hourly Employees are paid hourly wages and, where applicable, overtime compensation. Outlet Store Hourly Employees do not receive commission for sales. Based on the volume of employees, including sales associates and the hourly compensation environment, a manager is designated to be on the floor at all times, and is referred to as the CSM. (Goines Decl.,

---

[4] Goines Decl., Exs. 55 at ¶ 6, 54 at ¶ 6, 56 at ¶ 4, 57 at ¶ 10, 58 at ¶ 8, 59 at ¶ 9, 61 at ¶ 8, 62 at ¶ 2, 63 at ¶ 9, 65 at ¶ 6, 69 at ¶ 9, 70 at ¶ 7, 74 at ¶ 6, 76 at ¶ 6, 77 at ¶ 7, 79 at ¶ 7, 80 at ¶ 7, 81 at ¶ 7.

[5] Goines Decl., Exs. 54 at ¶ 7, 57 at ¶ 11, 58 at ¶ 8, 59 at ¶ 8, 60 at ¶9, 61 at ¶ 8, 62 at ¶ 9, 63 at ¶ 10, 65 at ¶ 7, 66 at ¶ 7, 67 at ¶ 5, 68 at ¶ 9, 69 at ¶ 10, 70 at ¶ 8, 71 at ¶ 11, 72 at ¶ 14, 73 at ¶ 10, 74 at ¶ 8, 76 at ¶ 97, 77 at ¶ 8, 78 at ¶ 8, 79 at ¶ 8, 80 at ¶ 8, 81 at ¶ 8, 82 at ¶ 7, 83 at ¶ 8, 83 at ¶ 8, 84 at ¶ 7.

7

Exs 24-39.) The CSM regulates and enforces the schedules of the sales associates on the floor, monitoring their shifts and time on the floor, including rest and/or meal breaks. (*Id.*) Each Outlet Store sales associate is scheduled to take his/her rest and/or meal break at a designated time that is scheduled at the start of each business day. *Id.* Polo Outlet Store sales associates do not have flexibility with their schedules.

### 4. The Named Full Price Plaintiffs Worked In San Francisco And Palo Alto For A Few Months Time, While The Outlet Store Named Plaintiff Was Not A Representative Employee

**Ann Otsuka** was a Sales Associate in the Palo Alto Polo Full-Price Store. (Third Amended Complaint ("TAC") at ¶¶ 13-20.) Otsuka has filed no motion for certification.[6]  She was a sales associate in the Home Collections Department of the Palo Alto store from approximately five months beginning in May 2004. *Id.* She alleges injuries based on the actions of the store management solely in the Palo Alto store. *Id.*

**Corrine Phipps** was a Sales Associate in the Home Department of the San Francisco Full-Price Store and alleges injuries based on the actions of the store management solely in the San Francisco store. (TAC at ¶¶ 21-27.) Phipps was a sales associate in the Home Collections Department in the San Francisco store from approximately May 2004 to December 2004. *Id.*

**Janice Keefe**, a Sales Associate in the Men's Sport Department of the San Francisco Polo Full-Price Store from approximately May 2004 to January 2005, has alleged injuries based solely on the actions of the store management in the San Francisco Store. (TAC at ¶¶ 28-35.)

On October 24, 2007 Plaintiffs amended their Complaint a second time to add a new Plaintiff, **Renee Davis**, to represent a new class of individuals: those who were employed in Polo Ralph Lauren Factory Outlet Stores. Davis was predominately a cashier at the Polo Ralph Lauren Factory Outlet store in Cabazon, California ("Cabazon Outlet Store") from approximately October 2002 through February 2004. (TAC at ¶¶ 36-42.)

Renee Davis ultimately resigned after several performance warnings and personal absences. (Goines Decl., Exs 12-13.)  While she may have had legitimate personal reasons to miss work, for

---

[6] Otsuka is represented by separate counsel, The Law Offices of Daniel Feder ("Feder"). Feder has filed no papers in support of Plaintiffs Phipps, Keefe and Kiser's Motion. Feder was relieved as counsel for Phipps, Keefe and Kiser and Motion counsel Patrick R. Kitchin was relieved as counsel for Otsuka on September 21, 2007, pursuant to this Court's order.

8

purposes of certification and reliability of witness testimony, Davis cannot be considered representative of most outlet employees. Davis has alleged that her claims arise out of conduct, transactions or occurrences that took place in the Cabazon outlet discount store. The facts and circumstances of Renee Davis's claims materially differ from the other named plaintiffs (and from the putative class). She raises separate and unique factual issues: She was a cashier; she worked in an Outlet Store; her clock out procedures at the end of the day differed from the Full-Price plaintiffs; and she was not compensated under the same pay plan (she was non-exempt) and was not subject to arrears.[7] (TAC at ¶¶ 36-42; Goines Decl., Ex. 2.)

**B.    Summary of Polo's Argument**

The purported class is made up of thousands of individuals who worked in different stores under different practices and procedures, and whose claims raise varied issues. Plaintiffs have not, and cannot, establish the requisite commonality or typicality necessary to certify this action under Federal law. The four named plaintiffs do not have claims that sufficiently typify those of the putative class members. Each named plaintiff fails to adequately represent the putative class members' interests.

Polo policies are implemented in distinctly different ways in each store, resulting in relevant procedures that vary from store to store. All employees' rest breaks were either taken, allowed or waived. Polo's arrears commission pay plan is legal and can neither constitute a "take back" of wages, nor be shown to impact a sufficient number of employees for certification purposes. Polo neither misclassified its employees under California and/or Federal law, nor failed to properly document pay records (and such a subclass would be insufficiently small in number to justify certification). Lastly, any off the clock and/or loss prevention inspection time was *de minimis* in nature and varies so significantly in fact from store to store and plaintiff to plaintiff.

---

[7] The named Plaintiffs also originally included <u>Justin Kiser</u>, who subsequently voluntarily dismissed himself as a named Plaintiff March 24, 2008 and re-filed an individual action in San Francisco Superior Court March 25, 2008 -- while at the same time maintaining his status as a putative member of this action. Kiser was a sales associate in the Men's Department of the San Francisco store from approximately July 2004 to August 2005. (Second Amended Complaint at ¶¶ 35-45.) The specific conduct, transaction, or occurrence which formed the basis for Kiser's claims regarding failure to pay premium overtime, his work off-the-clock, false imprisonment, and rest and meal break violations are all based on actions that took place solely in the San Francisco Full-Price Store and are the subject of his now separate individual action in state court. *Id.*

9

Plaintiffs' broad brush argument in support of fulfillment of the requirements for class certification does not withstand scrutiny. *The reality is, as shown herein, the various claims, facts and issues involved in this action are diverse and distinct and would effectively require thousands of separate individualized trials.* Significantly, Plaintiffs misstate and mischaracterize Polo's obligations under California law for each of the key class claims, and thereby fail to identify both the relevant issues of (individualized) proof and the identity of any common theories of liability. As such, their Motion is fatally flawed.

A class action does not offer a superior form of adjudication. Plaintiffs have not, and cannot, meet their burden on this Motion.

## III.    LEGAL ARGUMENT

### A.    The Legal Standard Under Fed. R. Civ. P. 23

This Court may certify a class if Plaintiffs establish that each of the four requirements of Federal Rule of Civil Procedure 23 are met, along with at least one of the requirements of Rule 23(b). *See* Fed. R. Civ. P. 23; *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992); *In re Dalkon Shield Products Liability Litigation*, 693 F.2d 847, 854 (9th Cir. 1982), cert. denied, 459 U.S. 1171 (1983). The requirements of Rule 23(a) are as follows: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."

Plaintiffs base their Motion on Rule 23(b)(3). (MPA at 2:16, 20:20-24:24). Under Rule 23(b)(3), Plaintiffs must also establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See Amchem Products v. Windsor*, 521 U.S. 591, 615 (1997) .

Rule 23(b)(3) includes the following factors for determining whether common questions predominate and whether superiority exists: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation

10

concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

### 1.    Plaintiffs' Burden To Meet The Requirements For Class Certification

Plaintiffs bear the burden of proof as to each of the Rule 23(a) and Rule 23(b) requirements. *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). Indeed, "the failure of plaintiffs to carry their burden as to any one of the requirements of Rule 23 precludes the maintenance of the lawsuit as a class action." *Burkhalter Travel Agency v. MacFarms International Inc.*, 141 F.R.D. 144, 152 (N.D. Cal. 1991).

Further, certification of a class depends upon a "rigorous analysis" by the Court as to whether the requirements of Rule 23 are met. *Valentino v. Carter Wallace Inc.*, 97 F.3d 1227, 1233 (9th Cir. 1996) (quoting *In re American Medical Sys.*, 75 F.3d 1069, 1078-79 (6th Cir. 1996); *see also, General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982). Plaintiffs "must provide facts to satisfy these requirements; simply repeating the language of the rules … is insufficient." *Bates v. United Parcel Service*, 204 F.R.D. 440, 443 (N.D. Cal. 2001) (citing *Doninger v. Pacific Northwest Bell, Inc.*, 564 F.2d 1304, 1309 (9th Cir. 1977). Though the Court should not evaluate the "merits" of Plaintiffs' claims at this juncture, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *General Telephone*, 457 U.S. at 160.

Specifically, "it may be necessary for the court 'to analyze the elements of the parties' substantive claims and review facts revealed in discovery in order to evaluate whether the requirements of Rule 23 have been satisfied.'" *Morisky v Public Service Electric and Gas Co.*, 111 F. Supp. 2d 493, 500 (D.N.J. 2000) (quoting *In re Ford Motor Co. Ignition Switch*, 174 F.R.D. 332, 353 (D.N.J. 1997). Courts routinely consider evidence "'which goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case.'" *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992) (quoting *In re Unioil Sec. Litig.*, 107 F.R.D. 615, 618 (C.D. Cal. 1985).

1
2
3
4
5
6

In particular, under Rule 23(b) Plaintiffs must establish that common issues of fact or law predominate over individual issues and that a class action is a superior method of fair and efficient adjudication. *Zinser*, at 1186, as amended, 273 F.3d 1266 (9th Cir. 2001). In order to *"determine whether common issues predominate, this Court must first examine the substantive issues raised by Plaintiffs and second inquire into the proof relevant to each issue."* *Jiminez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 251 (C.D. Cal. 2006) (emphasis added).

7
8
9
10
11
12
13
14

While the merits themselves may thus not be decided, the Court should consider the requirements of Rule 23 in light of the appropriate issues framed by Plaintiffs' complaint. In their Motion, Plaintiffs not only mischaracterize the nature of Polo's wage and hour policies, but also fail to accurately set forth Defendants' obligations under California law for rest breaks, commissions and overtime. In a complex case such as this, with numerous claims, allegations and subclasses, it is unavoidable that the Court's analysis of Rule 23 would "entail even greater entanglement with the merits." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n.12 (1978)(quoting 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 3911, p. 485 n. 45 (1976)).

15
16
17
18
19

Further, Plaintiffs cannot show that their claims are not contingent upon an overwhelming number of individualized fact disputes. Ultimately, Plaintiffs have failed to, and cannot, meet their preponderance of the evidence burden to fulfill Rule 23(a)'s requirements for typicality and commonality and Rule 23(b)'s requirements for predominance and superiority. *See, e.g., Sav-On Drug Stores, Inc. v. Superior Court*, 34 Cal. 4th 319, 326 (2004).

20
21

**B.   Plaintiffs Fail To Establish That Common Issues Predominate Or That A Class Action Is A Superior Means Of Adjudication For The Off The Clock And Rest Break Claims**

22
23
24
25
26
27
28

In order for Rule 23(b)(3) to be met, Plaintiffs "must establish that 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole ... predominate over those issues that are subject only to individualized proof.'" *In re Visa Check/Mastermoney Antitrust Litig. v. Visa*, 280 F.3d 124 (2d Cir. 2001) (quoting *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000). The requirement of predominance is stricter than the requirement for commonality under Rule 23(a). *States Wholesale, Inc. v. Synthetic*

*Industries, Inc.*, 206 F.R.D. 271, 277 (C.D. Cal. 2002).

In such a complex case as this, an evaluation of Rule 23(b)(3) necessarily involves a review of the proof needed for the claim(s) Plaintiffs allege. Plaintiffs bear the burden of establishing that common questions of law or fact predominate over questions affecting only individual class members. *See Martin v. Dahlberg, Inc.*, 156 F.R.D. 207 (N.D. Cal. 1994). In order to determine if common issues of law or fact predominate, "the trial court must examine the issues framed by the pleadings and the law applicable to the causes of action alleged." *See Hicks v. Kaufman and Broad Home Corp.*, 89 Cal.App.4th 908, 916 (2001).

To assess whether Rule 23's requirements have been met, Plaintiffs must provide an accurate interpretation of what is necessary for each claim under California law. Polo's rest break and inspection obligations under California law, as well as their overtime and commission obligations, must each be correctly set forth so that the Court can evaluate Rule 23(b)(3). *Id.* The nature and range of proof necessary to establish claims must be considered. *See Blackie v. Barrack*, 524 F.2d 891, 900-01 (9th Cir. 1975). Because Plaintiffs misinterpret Polo's obligations under California law (especially as to rest breaks and inspection wait times), they misunderstand the proof relevant to the elements of these claims. This in turn leads to Plaintiffs' erroneous 23(b)(3) conclusion that common issues predominate and that a class action is a superior method for adjudicating the off the clock and rest break claims.

### 1. Plaintiffs Fail To Recognize That Polo Is Only Obligated To Provide, Not Ensure, Breaks

A rigorous analysis of the Rule 23(b)(3) requirements under the proper California legal standard for rest breaks confirms that individual issues predominate. Given that the California Supreme Court has yet to speak on this issue, the Court must apply the legal standard that it believes the Supreme Court would adopt. *See Wyler Summit Partnership v. Turner Broadcasting Systems, Inc.*, 135 F.3d 658, 663 (9th Cir. 1998).

Every indication is that California law does not support Plaintiffs' theory that Polo is required to *ensure* that all its nonexempt employees take rest breaks, but merely that it *provide* rest breaks. *Fitch v. Select Products, Inc.*, 36 Cal. 4th 812, 818 (2005); *Murphy v. Kenneth Cole Prods.*,

13

*Inc.*, 40 Cal. 4th 1094 (2007); Cal. Labor Code § 226.7 ("No employer shall require any employee to work during any meal or rest period… If an employer fails to provide an employee a meal period or rest period…"); Cal. Labor Code § 512(a)) ("An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period … except that … the meal period may be waived by the mutual consent…").

Further, the District Courts of California have interpreted California law to require that employers are obligated to provide, not guarantee, rest breaks.  *White v. Starbucks Corp.*, 497 F.Supp.2d 1080, 1085-9 (N.D. Cal. 2007); *Brown v. Federal Express Corp.*, __F.R.D.__, 2008 WL 906517, *4-6 (C.D. Cal. 2008); *Kenny v. Supercuts, Inc.*, No. 3:06-cv-07521-CRB (N.D. Cal. June 2, 2008) (Order Denying Class Certification).

### 2.  Plaintiffs' Time Spent On Loss Prevention Inspections Constitute *De Minimis* Wait Times

Activities which are preliminary to or postliminary to the workday of an employee are generally not compensable unless made so by agreement, custom or practice.  If such preliminary or postliminary activities are an <u>integral and indispensable part</u> of the employee's <u>principal activities</u>, the time spent is compensable.  The Portal-to-Portal Act of 1947 provides that certain preliminary activities are not compensable under the FLSA.  *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 35 (U.S. 2005).  These non-compensable activities include activities which are preliminary to or postliminary to said principal activity or activities. *See* 29 C.F.R. § 790.3.

Whether Polo required any employees to wait for inspections and whether any wait time was significant are issues of fact and law.  *See Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 912 (9th Cir. 2004). Even if any waiting was integral and indispensable to the job, a question still remains, however, as to whether the time spent on this activity was *de minimis*.  "Employees cannot recover for otherwise compensable time if it is *de minimis*." *Lindow v. United States*, 738 F.2d 1057, 1061-62 (9th Cir. 1984).

In determining whether otherwise compensable time is *de minimis*, the Ninth Circuit considers "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." *Id.* at 1063.

14

There is no precise amount of time that may be denied compensation as *de minimis*. No rigid rule can be applied with mathematical certainty. *Id.* (citing *Frank v. Wilson & Co.*, 172 F.2d 712, 716 (7th Cir. 1949)); *Nardone v. General Motors, Inc.*, 207 F. Supp. 336, 341 (D.N.J. 1962). Rather, common sense must be applied to the facts of each case.

Most courts have found daily periods of approximately 10 minutes *de minimis* even though otherwise compensable. *See, e.g.*, *E.I. du Pont de Nemours & Co. v. Harrup*, 227 F.2d 133, 135-36 (4th Cir. 1955) (10 minutes); *Green v. Planters Nut & Chocolate Co.*, 177 F.2d 187, 188 (4th Cir. 1949) ("obvious" that 10 minutes is *de minimis*); *Carter v. Panama Canal Co.*, 314 F. Supp. 386, 392 (D.D.C. 1970) (2 to 15 minutes), aff'd, 150 U.S. App. D.C. 198, 463 F.2d 1289 (D.C. Cir.), cert. den., 409 U.S. 1012, 34 L. Ed. 2d 306, 93 S. Ct. 441 (1972); *see also Hodgson v. Katz & Besthoff, #38, Inc.*, 365 F. Supp. 1193, 1197 n. 3 (W.D. La. 1973) (summary of *de minimis holdings*).[8]

In light of the elements of proof thereby required to establish liability for waiting time for any Polo inspections, as is explained below, individual circumstances must be considered and common issues do not predominate under Rule 23(b)(3).

### 3. Common Questions Do Not Predominate Over Individual Questions For Plaintiffs' Off The Clock Claims Under Rule 23(b)(3)

    (a) The Rest Break Allegations Do Not Portend A Theory Of Liability That Presents A Common Question.

    (b) Polo's Policy And Practice Was To Provide Rest Breaks And Employees Took Them Or Waived Them.

---

[8] Courts will consider whether the claimants performed the work on a regular basis. *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. Or. 1984), citing *Smith v. Cleveland Pneumatic Tool, Co.*, 173 F.2d 775, 776 (6th Cir. 1949) (unpaid working time *de minimis* where "not a daily occurrence"); *Hodgson v. Katz & Besthoff, #38, Inc.*, 365 F. Supp. 1193, 1197 (W.D. La. 1973) (court considered whether work "happened with a fair amount of regularity"); *see also Atkins v. General Motors Corp.*, 701 F.2d 1124, 1129 (5th Cir. 1983) (2 isolated instances over 6 to 8 weeks *de minimis*); *Marshall v. Fabric World, Inc.*, 23 Wage & Hour Cases (BNA) 414, 421 (M.D. Ala. 1977) (sporadic work *de minimis*). Similarly, the uncertainty of how often employees performed the tasks and of how long a period was required for their performance are also relevant. *See Nardone v. General Motors, Inc.*, 207 F. Supp. at 341; *See also Isner v. Falkenberg/Gilliam & Associates, Inc.* 160 Cal.App.4th 1393, 1401 (2008) and *Brewer v. Patel*, 20 Cal.App.4th 1017 (1993) (California employees are not entitled to compensation for time spent on a job site when they are not performing work responsibilities and are free to do personal tasks such as talking on their phone or other activities).

15

Plaintiffs do not seek to certify a class for lunch break violations, only rest breaks.[9] Under California law, employees are entitled to receive rest breaks, but there is no obligation on Polo to guarantee or ensure that each employee actually takes each rest break. *See Starbucks*, 497 F.Supp. at 1085-9; *Brown*, 2008 WL 906517 at*4-6; *Supercuts*, Order Denying Class Certification.

In this instance, there is no evidence susceptible to common proof that Polo had a policy that affirmatively prevented employees from taking rest breaks. *Brown*, 2008 WL 906517 at*4-6. Polo's policy, applied consistently in California, is that rest breaks are to be taken. (Goines Decl., Ex 3 (Babka Tr.) at 111:6-7, 119:20- 120:4, and Exs. 85 at ¶ 3, 86 at ¶ 4, 30 at ¶ 30; Kitchin Decl., Exs. 12, 13.) The evidence is that the Plaintiff Phipps took *all* her rest breaks. (Goines Decl., Ex 11 (Phipps Tr.) at 83:21 - 84:1.) Polo allowed and encouraged all employees to take rest breaks, and employees either did so or voluntarily waived them.[10] Polo thus complied with its obligations under the law.

Moreover, the evidence on rest breaks varies to such a wide degree as to make individual issues predominate over common issues. *Brown*, 2008 WL 906517 at *6 ("Because FedEx was required only to make meal breaks and rest breaks available to Plaintiffs, Plaintiffs may prevail only if they demonstrate that FedEx's policies deprived them of those breaks. Any such showing will require substantial individualized fact finding.") Similarly, in this case the implementation of rest breaks differs from store to store, shift to shift, and department to department. (*Compare* Goines Decl., 49 at ¶ 7, 47 at ¶ 7, 48 at ¶ 9, 44 at ¶ 4, 66 at ¶ 7.). In the Outlet Stores, employees are scheduled to take rest breaks on the store's DPA. (Goines Decl., Exs. 30 at ¶ 4, 85 at ¶ 4, 86 at ¶ 4, and Exs. 24-39.). In the Polo Full-Price Stores, daily rest breaks are scheduled on a department by department basis, allowed, and encouraged. (*See e.g.*, Exs. 3 (Babka Tr.) at 111:6-7, 119:20 - 120:4, and Exs. 16 at ¶ 27, 22 at ¶ 23, 7 at ¶ 38: 21 - 39:7.). Employees were encouraged to take breaks, knew they were allowed and, ultimately, any fact analysis of employee rest breaks in this case would require an individualized showing on a store by store and employee by employee basis.

Such a fact finding expedition would therefore require many separate trials into the reasons

---

[9] Plaintiffs' Motion effectively concedes there is no evidence to support any lunch break claims.
[10] *See supra* note 4 ; *see also* Goines Decl., Exs. 40 at ¶ 6, 41 at ¶ 6, 43 at ¶ 6, 44 at ¶ 6, 48 at ¶ 9, 44 at ¶ 7, 45 at ¶ 6, 46 at ¶ 6, 47 at ¶ 7, 48 at ¶ 9, 49 at ¶ 6, 50 at ¶ 7, 51 at ¶ 7, 52 at ¶ 5, 53 at ¶¶ 5-7.

16

why each particular employee may or may not have elected to take his or her rest breaks. Such trials would raise conflicting evidence into why each aggrieved employee did not take rest breaks, what their motivation was, what the circumstances were, and when the circumstances arose and under what particular conditions.

(c)    The Loss Prevention Inspection Allegations Do Not Portend A Theory Of Liability That Presents A Common Question

(1)    Employees Did Not Have To Wait Any Significant Amount Of Time For Inspections

The evidence suggests that the time absorbed for any loss prevention searches was *de minimis.* Wait times varied, but ranged from seconds to a few minutes. (Goines Decl., Ex. 1.) Further, each store is different in terms of its process and time spent for such inspections. (*See e.g.,* Goines Decl., Exs. 26 at ¶ 26, 18 at ¶ 18, and Ex 1 at "Time for Loss Prevention Search" Column.) Shifts ended periodically throughout the day and any wait times varied from shift to shift and store by store. (Goines Decl., Ex. 1 at "Number of Shifts Per Day" Column; Exs, 24-39.) The overwhelming evidence suggests that each individual's wait times varied distinctly. To certify such a class would unfairly deprive Polo of an ability to fully cross examine and test the validity of such claimants.

(d)    Polo Was Not Obligated to Keep Records for *De Minimis* Wait Times

Plaintiffs suggest that Polo failed to maintain proper wage records for time spent off the clock. (MPA 13:16-17-15:3-5). Because the basis for certification is alleged only in relation to the inspection and arrears claims, which themselves present individualized fact issues and which do not raise sufficiently common legal theories of liability, there is no basis for maintaining any record keeping subclass. Polo was under no obligation to keep records for *de minimis* inspection wait times and even if it were, such record keeping requires an individualized trial for each aggrieved party to determine how long they may have had to wait, what were the circumstances, why they waited, what store, what time of day and whether it was in fact *de minimis.*

(e)    Due Process Requires That Highly Individualized Rest Break And Inspection Issues Be Tried Separately

These off the clock claims are individualized. No two employees will have the same story to

17

tell. Such distinctly varied individualized rest break and wait time claims cannot be tried as a class without unnecessarily impinging on the due process rights of Defendants. *Brown*, 2008 WL 906517 at *6. To do so requires a multiplicity of separate trials, and would otherwise mean that Polo could not inquire into the reasons or motivations why each alleged aggrieved employee failed to take a rest break on a particular day in a particular department of a particular Full Price or Outlet Store, or whether the employee had to wait at all for the loss prevention inspection. Polo would be deprived of its right to cross-examine each rest break and inspection claimant and raise its defenses. There is no way of fairly adjudicating particularized rest break and inspection claims on a class wide basis.

### 4. Plaintiffs Cannot Establish Typicality For Their Rest Break Claims

The overwhelming reliable evidence is that Polo both provided rest breaks and that employees took them or waived them.[11] There is no common claim for rest break violations.

Further, Phipps testified she took her rest breaks. Goines Decl., Ex. 11 (Phipps Tr.) at 83:21 - 84:1. Otsuka failed to appear for her deposition and any testimony or evidence from her at this point should be excluded. Davis testified she missed 25% of her Outlet Store rest breaks (Goines Decl, Ex. 12 (Davis Tr.) at 52-58) though the evidence also reflects Polo schedules rest breaks on the Outlet Store DPAs. (Goines Decl., Exs. 30 at ¶ 4, 85 at ¶ 4, 86 at ¶ 4, and Ex. 4 (Copeland Tr.) at 99:2 - 20. 100: 1 - 6.)

Davis's claim is not sufficiently related to the rest break claims of the putative class. She cannot speak for Full-Price Store employees. (Goines Decl, Ex 12 (Davis Tr.) at 27:25 - 29:1.) She cannot speak for other Outlet Stores' break procedures and practices. *Id.* To the contrary, the overwhelming evidence is that employees throughout Polo stores know they are entitled to breaks under Polo's policy and that they in fact do take breaks or decide on their own not to take them. (Goines Decl., Exs. 40-53, 54-84.)

### 5. Plaintiffs Have Not Met The Requirement For Superiority On Their Off The Clock And Rest Break Claims As Adequate Alternatives Exist

Class action is not the superior means of adjudicating such individualized claims. The California "Supreme Court has consistently admonished trial courts ... to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts." *Frieman v. San*

---

[11] *See supra* note 9.

*Rafael Rock Quarry, Inc.*, 116 Cal. App. 4th 29, 35 (2004).

Plaintiffs' off the clock class and rest break class does not advance the goals of fair and efficient adjudication. Plaintiffs can bring small claims or Department of Labor and Standards Enforcement ("DLSE" or "Labor Commissioner") actions for their rest break and inspection time claims, if in fact they have any meritorious claims. The numbers of claimants would likely not be overwhelmingly high for these alternative forums of adjudication.

**C.    Plaintiffs Do Not Present A Theory of Liability that Presents a Common Question For The Arrears Subclass Under Rule 23(b)(3)**

The fourth class or subclass sought by Plaintiffs' Motion concerns Polo's commission pay plan in the Full-Price Stores.[12] For only those retail sales associates hired between April 18, 2004 and March 25, 2006, Polo utilized an arrears program ("Arrears Program") as part of its compensation system for sales associates. In its Full-Price Stores, Polo uses a "draw versus commission" system of compensation. Under this system, for each pay period, sales associates are guaranteed a minimum base salary, or "draw," regardless of the commissions earned. Sales associates always receive, at a minimum, their base salary. Sales associates may receive net commission earnings, but receiving net commission earnings is subject to a condition precedent of hitting a specific sales target. (Mogel Decl. at ¶¶ 11-20.)

The Arrears Program provided that employees must cover their base salary before a commission is "earned." Sales associates were not entitled to net commission earnings until and

---

[12] Certain employee declarations attached to Plaintiffs' counsel's declaration in support of the Motion refer to issues related to employees who may have been precluded from discussing compensation. Plaintiffs' Motion does not seek to certify such a class and does not raise this issue as a basis for certifying any class or subclass. Even still, there is no common or typical theory of liability for any such claim, as there is no evidence that any prohibition against speech caused any adverse action (as is required). The cases in California under Labor Code § 232, unlike here, are termination cases - i.e., an employee was terminated for discussing his/her wages and the court was making a determination of whether the termination was lawful. Opinions assume that any lawsuit will be predicated on some type of adverse action based on an employee's disclosure of wages. *See, e.g., Sinatra v. Chico Unified School Dist.*, 119 Cal. App. 4th 701, 708 (Cal. App. 3d Dist. 2004) ("An employer, by the express terms of Labor Code section 232, is prohibited from discharging a worker for exercising his or her right to discuss wages.") Polo managers testified that Polo did not prohibit employees from discussing compensation and Plaintiff Phipps testified that she discussed her wages and compensation with co-workers. (Goines Decl., Ex. 5 (Cruz Tr.) at 138, Ex. 4 (Copeland Tr.) at 94 - 96 Ex. 9 (Mogel Tr.) at 101-102, Ex. 11 (Phipps Tr.) at 172.)

1  unless they cover their base salary plus any accumulated difference between their net commission

2  earnings and base salary (if the base salary exceeded commissions). *Id.*

3

4  **1.   The Arrears Commission Program Is Lawful Such That The Only**
    **Possible Common Theory Of Liability Involves Individualized Claims**

5  Further, there is no viable common theory of liability for the arrears subclass. Plaintiffs

6  misconstrue Polo's commission program.  Polo's Arrears Program was a bona fide commission

7  program under California law.  It provided that employees must cover their base salary before a

8  commission is "earned."

9  Under the Arrears Program, sales associates always receive their base pay and do not receive

10  net commission earnings until and unless they cover their base pay plus any accumulated difference

11  between their commissions and base pay (if the base pay exceeds commissions). *Id.* California has

12  "long recognized, and enforced, commission plans agreed to between employer and employee,

13  applying fundamental contract principles to determine whether a salesperson has, or has not, earned

14  a commission." *Koehl v. Verio, Inc.*, 142 Cal. App. 4th 1313, 1331 (Cal. App. 1st Dist. 2006).

15  Polo did not have an Arrears Program which raises common questions of liability. *See In re*

16  *Walls v. Wells Fargo Bank*, 262 B.R. 519, 525 (Bankr. E.D. Cal. 2001) (citing *Hanlon v. Chrysler*

17  *Corp.*, 150 F.3d 1011, 1019-20 (9th Cir. 1998) (commonality met by showing common questions of

18  liability); *Prachasaisoradej v. Ralphs Grocery Company*, 42 Cal. 4th 217, 223 (2007) (store's

19  incentive compensation plan ("ICP") did not constitute a "deduction" and plan participants received,

20  regardless of the store's performance, their guaranteed normal rate of pay - the dollar wage they

21  were promised and expected as compensation for carrying out their individual jobs.).

22  Polo's Arrears Program similarly guarantees payment of a base wage, regardless of the

23  amount of commissions earned. The *Ralphs* Court acknowledged that the ICP, based on the financial

24  performance of the business "is by nature fluctuating and uncertain" - however, the Court stated that:

25  "But this uncertainty alone cannot cause the plan to violate the wage-protection policies of the Labor

26  Code and Regulation 11070. To hold otherwise would make every kind of achievement-based

27  supplementary incentive compensation system, whether based on individual or overall business

28  performance, illegal." *Ralphs* at 239. The Court further stated: "The wage-protection statutes and

20

rules do not demand that employee compensation be absolutely certain or stable from pay period to pay period, regardless of the employees' contrary understanding." *Id.*

Plaintiffs cannot maintain an action based on the theory that the Arrears Program is illegal (MPA 14:27-28) or that, by extension, it reflects a failure to pay or to maintain accurate records (MPA 15:3-5). Plaintiffs are thus left with a claimed "breach of contract" theory (MPA 15:1-2), which is, firstly, factually inaccurate.[13] Secondly, because Plaintiffs only assert the Arrears Program was never explained to them in writing (MPA 10:18) and because the evidence reflects it was at least explained individually by managers orally (Goines Decl., Exs. 41 at ¶9, 45 at ¶ 8, 46 at ¶ 8, 47 at ¶ 9; Mogel Decl. at ¶¶ 17-19), and understood by sales associates (Goines Decl., Exs. 41 at ¶ 9, 45 at ¶ 8, 46 at ¶ 9), it is clear that the arrears subclass would necessitate highly individualized fact inquiries into what manager said what to which employee, and into what each employee understood and accepted.

There is no way the trier of fact can determine the elements of liability for the Arrears Program absent an inquiry into the specific "who, what, where, and when" of each supposed oral representation or non disclosure made by Polo to each claimant, for each relevant term and condition of their commission sales employment agreement.

### 2.    Under Rule 23(b)(3), An Arrears Subclass Is Not Superior To Alternative Forms Of Adjudication

As with the overtime amounts that are in dispute, the amounts in controversy are all relatively small. (Hurlow Decl., Ex. A.) For those 49 employees affected by the Arrears Program, the adjustments ranged from $2.83 to $2,447.54. *Id.*; *See also* Cohen Decl. at ¶¶ 5-10; Mogel Decl ¶¶ 17-19.) There is no reason why any affected claimants could not pursue Labor Commissioner actions or small claims cases.

### 3.    Plaintiffs Cannot Establish Rule 23(a) Typicality, Commonality or Numerosity for the Arrears Subclass

Even under Plaintiffs' own theories, the Arrears Program affected only forty-nine employees over a two year period. (Hurlow Decl., Ex. A.) The Outlet Store employees are not subject to

---

[13] Plaintiffs suggest employees were misled or did not understand the Arrears Program. (MPA 10:16-19). However, the Sales Associate Compensation - Sales Associate Handbook for April 2004 is entirely consistent with the terms of the April 2004 Arrears Program (and the Arrears Program only applies to hires after April 18, 2004). (Mogel Decl., Ex. B at POLO 000731.)

21

arrears as they only receive hourly pay. (Goines Decl., Ex. 24 - 39, Exs. 54-84.) Even if the Arrears Program was not adequately explained to employees, as Plaintiffs suggest, certification of this subclass would still result in 49 different trials to show who was told what, when and how -- and to show whether each individual affected employee understood and accepted the Arrears Program.

### D.    The Misclassification Subclass

#### 1.    Plaintiffs Cannot Establish Typicality For Their Misclassification Claim

Typicality under Rule 23(a) limits the class claims to those fairly enunciated by the named plaintiffs' claims. *General Tel. Co. of Northwest, Inc. v. EEOC*, 446 U.S. 318, 330 (1980). The typicality requirement is met when the class members have the same or similar injuries and when the action is based on conduct not unique or particular to the named plaintiffs. *Wofford v. Safeway Stores*, 78 F.R.D. 460, 488-489 (N.D. Cal. 1978).

The Ninth Circuit defines the test for typicality as "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (1992). In addition, the fact that class representatives may be subject to certain defenses to their claims, while other class members are not, can also vitiate against class certification. *Id.*

In this instance, the named plaintiffs fail to represent the putative class claims for the misclassification subclass. (*See* Cohen Decl., Ex. A.) None of the named plaintiffs has a claim for unpaid overtime wages based on misclassification. Davis, an Outlet Store employee, was always paid hourly with applicable overtime.

#### 2.    Plaintiffs Cannot Establish Commonality For Their Misclassification Claim

The Rule 23(a) "commonality" prong requires that Plaintiffs establish that issues of law or fact exist which are common to all members of the purported class. Merely because there might be a consistent employment policy does not establish factual or legal commonality because what matters is the implementation of the policy. Moreover, Plaintiffs' Motion with respect to misclassification again fails to recite a proper reading of the law and thus fails to recognize the lack of commonality

22

for fundamental questions of liability.  Absent a common question of *liability*, Plaintiffs cannot maintain a subclass on the overtime or arrears claims. *In re Walls*, 262 B.R. at 525; *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019-20 (9th Cir. 1998).

In California, an employee is exempt from overtime pay regulations if the employee's earnings "exceed one and one-half (1-1/2) times the minimum wage if more than half of that employee's compensation represents commissions" Cal. Wage Order 4-2001(3)(D). Polo performs "reconciliations" on an annual basis for each sales associate in order to determine if more than half of the compensation of each sales associate represents commissions.  Polo performs the reconciliations yearly, in accordance with 29 C.F.R. § 779.417, because Polo has determined that a period of one year in the retail industry is the period which best typifies the total characteristics of each employee's earning pattern. *See* Section 779.417(a).  Using one-year period for its reconciliations prevents anomalous results that would occur as a result of seasonal fluctuations in retail business. ( Cohen Decl. at ¶¶ 11-20.)

Polo inadvertently failed to perform reconciliations prior to 2007. (Cohen Decl. at ¶ 13.) In 2007, Polo became aware that reconciliations had not been performed.  At that time, Polo's manager of retail store operations, Evan Cohen, performed reconciliations for fiscal years 2003, 2004, 2005, 2006 and 2007.  *Id.* at ¶¶ 11-20. For each year, Mr. Cohen looked at all sales associate's compensation data and determined if more than 50 percent of each sales associate's compensation was comprised of commissions. *Id.* If the sales associate did not meet the 50 percent requirement, then Mr. Cohen examined each pay period during the year.  Polo then paid overtime for any periods where the sales associate was owed overtime wages.  Polo also paid the sales associates interest on all owed overtime wages.  *Id.* The total number of Polo sales associates whose commissions represented 50 percent or less of their annual compensation for fiscal years 2003-2007, was thirty-eight (38) and the payments totaled $1,171.00, exclusive of interest. *Id.*

Plaintiffs utilize a two week pay period as the basis for this subclass. There is no legal basis for establishing liability under this theory.  Even still, Polo performed the promised reconciliations and paid any overtime wages owed plus interest.  There is no common question of liability present,

23

regardless of damages. *Id.*

### 3. There Is An Insufficient Number of Misclassification Claimants

Because the Rule 23(a) requirement of numerosity requires that joinder of all class members be "impracticable," this prong must be examined against the particular facts of each case. "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *General Tel. Co. of the Northwest, Inc. v. EEOC*, 446 US 318, 329 (1980). The relevant issue for numerosity is whether joinder is impracticable, not whether any particular number is reached. As such, courts have denied certification of classes with large numbers of potential members. *Utah v. American Pipe & Construction Co.*, 49 F.R.D. 17 (C.D. Cal. 1969).

There are not even forty class members on the misclassification claim. *Id.* Of the 38 potential subclass members, some were owed amounts as little as .13 or .30 cents. *Northern v. Nelson*, 448 F.2d 1266, 1267 (9th Cir. 1971) ($1.05 claim *de minimis*).

When the class is so small other factors must be considered to make the "impracticability" evaluation. Newberg on Class Actions, §3.3, p.225. In order for such small classes to be certified, other factors such as judicial economy, whether the class member can bring an individual claim, and the physical location of members may also be weighed. *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51 (N.D. Ill. 1996). In this instance, these claimants (as discussed below) can easily bring small claims or individual administrative actions in short order.

### 4. Plaintiffs Cannot Establish Their Misclassification Claim Meets the Superiority Requirement of Rule 23(b) (3)

First, all alleged misclassification employees have been paid overtime plus interest. Second, their claims are relatively small. These 38 or fewer individuals can easily bring individual DLSE claims (with or without counsel), and have in fact already done so. For example, Kiser has his same individual claims pending in San Francisco Superior Court (Case No. CGC08473648); Scott Strohschein has filed a pending appeal of a denial of commissions by the DLSE with the Los Angeles Superior Court (Case No. 08-C-00893), and still other former employees have brought similar DLSE claims (Sayad Kamal, Labor Commissioner Case No. 12-70583 ER).

Such civil claimants could claim penalties, and Plaintiffs' counsel could be entitled to

24

recover attorneys' fees, thereby rendering separate individual misclassification claims reasonably practical and expeditious in a state administrative forum, small claims, and/or in a state court.

### E.    Plaintiffs Are Inadequate Class Representatives

#### 1.    A Class Action Does Not Provide Substantial Benefits

As discussed above, in order for the class(es) to be certified, under Rule 23(a) both the class representatives and their counsel need to be adequate representatives for the putative class members. Here, however, there is a history of conflict between class counsel and one of the class representatives. The circumstances leading to the prior Motion to be Relieved as Counsel portend a potential inability of class counsel to manage, represent and effectively communicate with the class.[14]

Further, class status does not provide substantial benefits, especially in light of Defendants' due process considerations. *City of San Jose v. Superior Court*, 12 Cal.3d 447, 459 (1974) (California Supreme Court "has consistently admonished trial courts to carefully weigh respective benefits and burdens and to allow maintenance of class action only where substantial benefits accrue to both litigants and the courts").

## IV.    CONCLUSION

For all the foregoing reasons, this action does not merit class certification. The issues are individualized and not well suited to class adjudication. The requirements of Rule 23 have not been met. Defendants respectfully request the Court deny Plaintiffs' Motion in all respects.

DATED: June 20, 2008                           GREENBERG TRAURIG, LLP


                                               By: /s/ William J. Goines
                                                   WILLIAM J. GOINES

                                               Attorneys for Defendants, Polo Ralph
                                               Lauren Corporation; Polo Retail, LLC;
                                               Polo Ralph Lauren Corporation, doing
                                               business in California as Polo Retail
                                               Corporation; and Fashions Outlet of
                                               America, Inc.

---

[14] On May 30, 2008 Polo filed its Motion to Dismiss Otsuka with this Court, and on June 8, 2008 Feder and Otsuka responded. No order has yet been forthcoming. In their opposition, Feder and Otsuka assert that they are both eager to remain in the case, yet Feder admits he has not spoken with Otsuka since August, 2007 and, further, states no intention of having her appear for deposition.