# EXHIBIT 3

**to Declaration of William J. Goines in Opposition to
Plaintiffs' Motion for Class Certification**

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN FRANCISCO DIVISION

 4

 5   ANN OTSUKA, an individual; JANIS      No. C-07-02780-SI
     KEEFE, an individual; CORINNE
 6   PHIPPS, an individual; and
     JUSTIN KISER, an individual;
 7   individually and on behalf of
     all others similarly situated,

 8                       Plaintiffs,

 9      vs.

10   POLO RALPH LAUREN CORPORATION;
     a Delaware Corporation; POLO
11   RETAIL, LLC, a Delaware Corporation;
     POLO RALPH LAUREN CORPORATION, a
12   Delaware Corporation, doing business
     in California as POLO RETAIL CORP;
13   FASHIONS OUTLET OF AMERICA, INC., a
     Delaware Corporation and DOES 1-500,
14   inclusive,

15                       Defendants.
                                           /
16

17
                  DEPOSITION OF KIM LEE BABKA
18

19
          DATE:         March 7, 2008
20
          TIME:         10:03 a.m.
21
          LOCATION:     Greenberg Traurig
22                      1900 University Avenue
                        Fifth Floor
23                      East Palo Alto, California

24        REPORTED BY:  Mary E. Garland
                        Certified Shorthand Reporter
25                      License Number 4721
```

Golden Gate Reporting

1          A.   Yes.   I began in sales in 1996, in June;

2     roughly three months later, I became a department

3     accessories manager; and just under a year, in 1997, I

4     became the general manager of the La Jolla store.

5               In 1999, I moved to Dallas, Texas, and became

6     the general manager there.   Roughly a year later, I

7     became the area manager in Dallas.   In 2001, I became

8     the district manager in California and Hawaii.   And then

9     in 1995, became a regional director, overseeing --

10              MR. GOINES:   2005?

11              THE WITNESS:   Excuse me.   I'm sorry.   2005.

12    Thank you.

13              -- regional director, overseeing California

14    stores, Arizona; and at that time, Las Vegas and Hawaii.

15         Q.   BY MR. KITCHIN:   And is your current title

16    regional director?

17         A.   Yes.

18         Q.   And was your first position, for the

19    approximately three months -- I'm sorry.   Your first

20    position in sales, was that in Dallas?

21         A.   La Jolla.

22         Q.   La Jolla.   And then when you were department

23    accessories manager --

24         A.   Correct.

25         Q.   -- La Jolla, as well?

415.499.DEPO ~ 866.936.DEPO
www.GoldenGateReporting.com                    ©2008

1    definitely have the numbers piece in it.

2           We would have the schedule on it, who's

3    working, what managers are on duty, who's working in

4    each department; but it's not -- it really doesn't even

5    closely resemble this.  It's just some of the similar

6    information.

7       Q.   Is there any document from the full-price

8    stores, that you're aware of, that document when an

9    associate has actually taken a rest break?

10      A.   Again, the documents that are in certain stores

11   would be within different department managers' binders

12   or a format like the sign-up sheet, as I had mentioned

13   earlier, but not one that is kept on a daily basis like

14   this.

15      Q.   So if I understand you, you're not aware of a

16   document that would detail or memorialize that a sales

17   associate has actually taken a rest break at some

18   specific time?

19      A.   Not a standardized format.  There are formats

20   in certain stores, and I do know that some of the

21   managers do keep them; but I can't say that it's kept in

22   every single store the same way.

23      Q.   And do those that you're aware of set out a

24   plan for the day, when associates are scheduled to take

25   meal or rest breaks?

1      A.  Again, an associate would sign up for when they

2   would like to go.  It doesn't always stick, depending on

3   appointments that come in, or how long it may take, or

4   whatever; but there is -- the objective is to plan out a

5   schedule and have -- make sure that breaks are taken.

6          We want our employees to take all their breaks,

7   so.  It's very important.

8      Q.  I'm going to show you a document that we

9   previously marked as Exhibit 11, "Polo Ralph Lauren

10  Assimilation Handbook," has a date of 2005.  Are you

11  familiar with this assimilation handbook?

12     A.  Yes, I am.

13     Q.  I'm not sure this is all the pages from the

14  assimilation handbook, but it's what we've been using.

15         Was this assimilation handbook used at the

16  full-price retail stores in California?

17     A.  Yes.

18     Q.  And what was its purpose?

19     A.  To assimilate someone or to on-board an

20  associate, and to ensure that they understand, really, a

21  lot of the processes within the four walls.

22     Q.  Is this something that was meant for managers,

23  as a guide to assimilating sales associates?

24     A.  For both, yes.  For a manager, as a guide; and

25  then also for the team, so that the associate was up to

1      Q.   And to your knowledge, was it the expectation

2   that all sales associates employed in all of the retail,

3   full-price stores in California were to receive a copy

4   of the 2007 handbook?

5      A.   Yes.

6      Q.   And was it the expectation that each of those

7   sales associates would sign an acknowledgment of

8   receiving and understanding the policies?

9      A.   Yes.

10      Q.   And was the same procedure expected, that

11   copies of the acknowledgment would be put into the

12   employees' files?

13      A.   Yes.

14      Q.   On page 1524, do you see the section on the

15   right-hand column, "Meal Periods and Breaks"?

16      A.   Yes.

17      Q.   The first paragraph of that section, second

18   sentence reads, "It is the manager's responsibility to

19   ensure that the appropriate breaks are taken."

20           How do managers at Polo, at this time, make

21   sure that their sales associates are taking all of the

22   rest breaks that they're required to give those

23   associates?

24      A.   Discussing it with them, encouraging them, and

25   trying their best to schedule them.  You know, I don't

Page 119

1    think they actually make anyone take them, but they

2    certainly -- I mean, we're certainly a company that

3    supports taking all breaks.  So it's widely discussed

4    and expected.

5        Q.  Prior to the rollout of the 2007 handbook, had

6    you heard from any source that any sales associates

7    were, for any reason, not taking all of their rest

8    breaks?

9        A.  I don't recall hearing that people weren't

10   taking their rest breaks.

11       Q.  Did you ever talk with any of the managers at

12   any of the stores about whether they were having any

13   problems making sure that all sales associates were

14   taking the appropriate rest breaks?

15       A.  Well, again, I would say -- I can't say that I

16   heard of problems; but it's widely discussed, whether

17   it's on general managers' call on, you know, every

18   Tuesday or every other Tuesday.  It's certainly an

19   expectation, but forcing them to take them is not

20   something I know is done.  Encouraging them to take

21   them, absolutely.

22       Q.  Have you ever heard anyone say that a sales

23   associate was not taking their breaks because they felt

24   pressured to sell enough merchandise to cover their

25   sales targets or rules?

Page 120

1      A.  No, I've never heard of that.  The only time

2  I've ever heard of someone having a difficulty getting a

3  break in or going later is that they had a customer that

4  they chose not to leave.

5      Q.  To your knowledge, has Polo Ralph Lauren ever

6  paid a sales associate an extra hour of pay for missing

7  a rest break?

8      A.  I'm not clear on --

9      Q.  Yes.  Just whether you've ever heard that Polo

10 has paid a sales associate an extra hour because that

11 sales associate didn't take a rest break?

12     A.  I don't know.

13     Q.  You've never heard that stated, that someone

14 has been paid an extra hour for missing a rest break?

15     A.  I don't recall hearing that.

16     Q.  Did you ever hear that a sales associate

17 complained about missing rest breaks because there

18 wasn't sufficient floor coverage within their department

19 to permit them to take a rest break?

20     A.  No.  I've heard of situations where a manager

21 has gone to cover so that they can take a rest break.

22     Q.  Would you take a look at page 1525.  The

23 left-hand column has "Sample Break Chart."  At the very

24 bottom of that column, there's an asterisk, and then it

25 states, "Employees in CA who work more than two hours

Page 121

1    the department managers in the San Francisco store about

2    wait times for loss prevention inspections?

3        A.   Discussions about -- can you be a little more

4    specific?

5        Q.   Yes.  Did you ever talk with any manager in the

6    San Francisco store about the wait times that were

7    involved in performing loss prevention inspections?

8        A.   I never talked about wait times, but did

9    discuss the urgency in having bag inspections at the end

10   of the day at that back door.  I don't know if that's

11   answering.  I'm not sure of your question exactly.

12       Q.  Based on your observations in all of these

13   stores in your jurisdiction, what do you think the

14   longest -- or what observation have you made as to the

15   longest time a sales associate has had to wait between

16   clocking out at the end of their shift and being

17   released from the store after a bag inspection?

18       A.   After a bag inspection?

19       Q.   From the time of clocking out to walking out

20   the door after having their bags inspected,

21       A.   Oh, after a bag inspection?  Seconds.

22       Q.   Let me rephrase it.  Have you ever had personal

23   observations of someone who clocked out at the end of

24   the shift and then went through a bag inspection to go

25   home?  Let me try this once again.

Golden Gate Reporting

```
 1            Has anyone in any of the Polo stores over which
 2   you have jurisdiction given you any estimate of the time
 3   it takes for a sales associate to go from clocking out
 4   to leaving the building?
 5       A.  Probably the longest, two to three minutes.
 6   But to answer your prior question, once someone --
 7   there's a manager checking the bag, then they just walk
 8   right out the door.  So I think that's where the
 9   confusion --
10       Q.  Yes.  It was a bad question.
11       A.  That's okay.
12       Q.  Once the bag check is done, then the door is
13   there and people leave, so it's matter of seconds;
14   correct?
15       A.  Right.
16       Q.  And so the longest that you've ever heard
17   anyone took between clocking out and having their bags
18   inspected is two or three minutes?
19       A.  That I've ever witnessed --
20       Q.  That you've ever witnessed?
21       A.  Yes.
22       Q.  And have you ever heard anyone tell you that
23   sales associates in any of the stores were not able to
24   go throunh the bag inspection in two or three minutes on
25   a regular basis?
```

Page 126

# EXHIBIT 4

**to Declaration of William J. Goines in Opposition to
Plaintiffs' Motion for Class Certification**

```
 1
 2                UNITED STATES DISTRICT COURT
 3              NORTHERN DISTRICT OF CALIFORNIA
 4                  SAN FRANCISCO DIVISION
 5
    ANN OTSUKA, an              )
 6  individual; et al.,        )
                                )
 7          Plaintiffs,         )
                                )
 8     vs.                      )   No.  C-07-02780-SI
                                )
 9  POLO RALPH LAUREN           )
    CORPORATION, a Delaware     )
10  Corporation; et al.,        )
                                )
11          Defendants.         )
                                )
    _____
12
13          DEPOSITION OF:  DIANA COPELAND
14          TAKEN ON:  Wednesday, May 28, 2008
15
16
17
18
19
20
21
22
23  REPORTED BY:
24
25  PATRICIA L. HUBBARD
    CSR #3400, CRP #10, RPR #7847
```

Page 1

```
 1    poloclassaction.com?
 2         A.   No.
 3         Q.   Did you see any media coverage when
 4    this lawsuit was first filed?
 5         A.   No.
 6         Q.   Okay.  Could you just give me a brief
 7    thumbnail sketch of your educational background
 8    after high school?
 9         A.   Sure.  Two years associate's degree
10    in college and two years of college after that.
11    Did not receive final bachelor's degree.
12         Q.   What was your associate's degree in?
13         A.   Liberal studies.
14         Q.   Okay.  When were you first employed
15    by any of the Polo entities?
16         A.   April, 2004.
17         Q.   And prior to working for Polo where
18    did you work?
19         A.   Gap, Inc.
20         Q.   And prior to Gap, Inc.?
21         A.   Limited Brands.
22         Q.   And before that?
23         A.   I was in school.
24         Q.   Okay.  What was your position with
25    Limited Brands?
```

Page 15

1    April of 2004, what was your position?

2        A.    Same as it is today, regional

3    manager.

4        Q.    Okay.  And is there a fuller title to

5    that?  Is it regional manager of something?

6        A.    Senior director of stores.

7        Q.    And does your region include the

8    entire State of California?

9        A.    Yes.

10.      Q.    Do you cover other states, as well?

11       A.    Yes.

12       Q.    Which other states?

13       A.    Hawaii, Washington, Oregon, Arizona,

14    Nevada.

15       Q.    Okay.

16       A.    Utah, Colorado, New Mexico, Texas,

17    Minnesota, Missouri, Iowa, Indiana, Illinois.

18       Q.    That's it?

19       A.    I hope I'm not forgetting one.

20       Q.    Okay.  That was very well done.

21            And would you describe your current

22    duties and responsibilities as --

23            Is it all right if I refer to your

24    position as regional manager?

25       A.    Regional manager is fine.

Page 18

1       A.    A very long time.

2           Q.    And employees were required to abide

3    by the policies in this manual?

4       A.    Yes.

5           Q.    Until approximately 2007 did Polo

6    have a policy in the factory outlet stores that

7    prohibited employees from discussing their wages

8    with their co-employees?

9       A.    The first part of that question, was

10   that until 2007?

11          Q.    Yes.

12      A.    Was that correct?

13              Could you restate that for me?

14          Q.    Is it currently Polo's policy to

15   prohibit employees at the factory outlet stores

16   from discussing their wages with other employees?

17      A.    Can't prohibit employees from having

18   discussions.

19          Q.    Currently that's -- you brought up

20   currently.

21              That's not a policy that Polo has

22   right now to prohibit employees from discussing

23   their wages with others; is that correct?

24      A.    Not that I'm aware of.

25          Q.    Was that a policy that was in place

Page 94

```
 1    at the factory outlet stores in California prior

 2    to 2007?

 3           A.   I don't know it to be a policy, nor

 4    could you prohibit people.

 5           Q.   I'm going to show you what we

 6    previously marked as Exhibit 4.  It's some

 7    selected pages from the Polo Ralph Lauren 2002

 8    Retail Employee Handbook Bates stamped 752 and

 9    others.

10           On page -- take a look at page 21 and

11    22.  21 lists a category "Employee Conduct and

12    Responsibilities."

13           You see that?

14           A.   Thank you.  Okay.

15           Q.   The last sentence in the first

16    paragraph reads,

17                    "Certain types of unacceptable

18                    behavior warrant specific

19                    mention."

20           See that?

21           A.   I am there.

22           Q.   On the next page, item number 23

23    reads,

24                    "Divulging personal salary

25                    arrangements to other retail
```

Page 95

1                     Polo corporation associates."

2                Had you ever seen this policy

3    statement prior to just now?

4          A.    I had no recollection of that.

5          Q.    Okay.  I'll take that back.

6          A.    Okay.

7                MR. KITCHIN:  Why don't we go off the

8    record, please.

9

10                (Whereupon at 1:53 P.M. a lunch

11                 recess was taken.)

12                      * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 96

```
 1          A.    Sure.

 2          Q.    Let me show you what we previously

 3   marked as Exhibit 69 to these depositions.  It's

 4   a Monday, December 3, 2007 Daily Planning Agenda

 5   for the Alpine, California store.

 6                Are you familiar with this form?

 7          A.    I am.

 8          Q.    Is this a form that is used in all of

 9   the factory outlet stores in California at this

10   time?

11          A.    A DPA is used in each of our stores,

12   Daily Planning Agenda.

13          Q.    And has a Daily Planning Agenda been

14   in use in all of the factory outlet stores in

15   California since you began your employment there

16   in 2004?

17          A.    In a form, yes.

18          Q.    So the form itself may have undergone

19   revisions since then?

20          A.    Yes.

21          Q.    But that some type of a daily

22   planning agenda has been used in the course of

23   your employment at Polo, correct?

24          A.    Could you repeat that for me?

25          Q.    Although the form may have been
```

Page 99

1    revised or amended over the course of your

2    employment at Polo, some type of Daily Planning

3    Agenda has been used this all of the factory

4    outlet stores since you began working there in

5    2004; is that correct?

6         A.   Some form.

7         Q.   These Daily Planning Agenda set forth

8    the names of individuals who are going to be

9    working in the store on a specific date; is that

10   correct?

11        A.   Yes.

12        Q.   And how does the manager use this

13   specific form in the operation of his or her

14   store?

15        A.   In what aspect of the operation of

16   the store.

17        Q.   How is this form used by your

18   managers at the factory outlets?

19        A.   The form is utilized to know who

20   works in the store that day.

21        Q.   And does it help the manager to

22   schedule meal breaks for the employees?

23        A.   Yes.

24        Q.   And what else does it do?

25        A.   Gives you job assignments, breaks.

```
1              Q.   And are you aware of any Daily

2    Planning Agenda forms that have been used by Polo

3    since you were employed by Polo Ralph Lauren that

4    contain information verifying that a scheduled

5    break had indeed been taken by the employee?

6              A.   Ask me that again, please.

7              Q.   Let me ask it in a different way.

8                   Are Daily Planning Agendas used to

9    schedule meal and rest breaks?

10             A.   Yes.

11             Q.   And the managers fill these out on a

12   daily basis to schedule specific individuals

13   working so that they can schedule meal and rest

14   breaks for those employees, correct?

15             A.   No.  They're not scheduled each day.

16             Q.   How are the meal and rest periods for

17   individuals who are working in a specific store

18   scheduled?

19             A.   A week at a time.

20             Q.   So when the manager has put together

21   his or her weekly schedule for sales associates

22   and supervisors and managers and so forth, the

23   manager will go in and come up with a plan of

24   when those employees will be working, taking

25   breaks and taking meals, would that be accurate?
```

1    A.    Yes.

2        Q.    Does this form provide evidence that

3    any of the breaks that were scheduled were

4    actually taken?

5            MR. GOINES:    Objection to the extent

6    it calls for a legal conclusion.

7            THE WITNESS:    Could you say that

8    again?

9    BY MR. KITCHIN:

10        Q.    Is there anything on this form that

11    provides confirmation that any of the breaks

12    scheduled were actually taken at the time

13    scheduled?

14        A.    The form is utilized to know when to

15    break the employee.

16        Q.    Would it be accurate to say that the

17    form is not utilized to memorialize when an

18    employee took a meal or rest break?

19        A.    It can be. ·

20        Q.    How can it be?

21        A.    By noting on the DPA if the employee

22    has taken his or her break.

23        Q.    Is there anything on Exhibit 69 that

24    tells us that the employees listed here took the

25    breaks as scheduled by their manager?

Page 102

Golden Gate Reporting

1          A.    I don't see a notation.

2          Q.    Have you seen some Daily Planning

3    Agendas that have notations by a manager that the

4    employee had actually taken the break that was

5    scheduled?

6          A.    Yes.

7          Q.    Has Polo developed a policy for

8    having managers verify that breaks have been

9    taken in the last two years?

10         A.    Not a policy per se, but there is a

11   practice.

12         Q.    There is a practice by all managers

13   or some managers to note when employees took

14   their meal or rest breaks?

15         A.    And you asked me all or some?

16         Q.    Yes.

17         A.    In California?

18         Q.    In California.

19         A.    All.

20         Q.    So all managers, except for the

21   manager that filled out this form, make a

22   notation as to when an employee has actually

23   taken their meal or rest break?

24         A.    It's dependent upon the quality of

25   the execution in each store.

Page 103

```
 1    come to perform a bag check inspection?

 2         A.   Yes.

 3         Q.   On how many occasions have you seen

 4    employees at the exit waiting for a manager to

 5    come and perform the inspection?

 6         A.   I don't have a number.

 7         Q.   Has it happened numerous times when

 8    you've seen that or --

 9         A.   I've seen that a few times.

10         Q.   And do you have any knowledge as to

11    how long in any occasions the sales associates

12    had been standing at the exit waiting for a

13    manager to arrive to perform a bag inspection?

14         A.   I haven't seen them wait very long.

15         Q.   How long have you seen them wait?

16         A.   Under a minute.

17         Q.   You've never seen any employees at a

18    door waiting longer than a minute for a bag check

19    inspection?

20         A.   Not in my estimation.

21         Q.   And you have no estimate as to the

22    number of times you've seen those inspections

23    taking place?

24         A.   A few.

25         Q.   A few.
```

Page 118

**Monday, December 3, 2007**      Daily Planning Agenda      **Store 130 – Alpine, CA**

| | Today | Yesterday | LY |
|---|---|---|---|
| ...les: | | | 3,559 |
| ...udget: | 4,213 | 12,676 | 0 |
| % to Bud: | 0.0% | 0.0% | 0.0% |
| Stretch: | | | |
| SPH: | 111 | | 150 |
| UPT: | | | 2.29 |
| ADT: | | | 76.43 |
| AUR: | | | 33.35 |

**Open:**

| Time | Goal | Actual | UPT | ADT |
|---|---|---|---|---|
| 10:00a | | | | |
| 11:00a | | | | |
| 12:00p | | | | |

**Mid:**

| Time | Goal | Actual | UPT | ADT |
|---|---|---|---|---|
| 1:00p | | | | |
| 2:00p | | | | |
| 3:00p | | | | |
| 4:00p | | | | |

**Evening:**

| Time | Goal | Actual | UPT | ADT |
|---|---|---|---|---|
| 5:00p | | | | |
| 6:00p | | | | |
| 7:00p | | | | |
| 8:00p | | | | |

**Shift Meeting**

**Recognition/Contests**

**Product/Promotions**

### Daily Schedule

**Managers**

| | Shift | On-Call | Breaks |
|---|---|---|---|
| Renteria, Laura M | 7:00a-4:00p | | 12 |
| Woolen, Ashley A | 10:00a-7:00p | | 3 |
| Umbrasas, Carole Ann B | 12:00p-9:00p | | 4 |
| Eorette, Everett K | 1:00p-10:00p | | 5 |

Management Hours: 36

Total Scheduled Managers: 4

**Leads**

| | Shift | On-Call | Breaks |
|---|---|---|---|
| Smith, Cameron A | 5:00p-10:00p | 7 | 4 |

Leads Hours: 5

**Sales**

| | Shift | On-Call | Breaks |
|---|---|---|---|
| Dillon, Desirea L | 7:00a-12:00p | (12-4) | 93 |
| Schutz, Kyle M | 7:00a-11:00a | (11-3) | 945 |
| Orgega, Erik M | | (3:30) | |
| Sandstrom, Alexa C | | (2-5) | |

Sales Hours: 9

Total Scheduled Associates: 3

| | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 3 | 4 | 3 | 3 | 4 | 4 | 4 | 3 | 4 | 4 | 3 | 2 | 0 | 0 | |
| Management | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 2 | 2 | 3 | 4 | 4 | 4 | 3 | 3 | 3 | 2 | 2 | 1 | 0 | 0 |
| Leads | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 |
| Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |



EXHIBIT
69
Babka 3-7-08

3 (cp)
11/28/07 9:29 AM

Page 1 of 1

# EXHIBIT 5

**to Declaration of William J. Goines in Opposition to
Plaintiffs' Motion for Class Certification**

## Golden Gate Reporting

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3          SAN FRANCISCO DIVISION

4

5    ANN OTSUKA, an individual;
     JANIS KEEFE, an individual;
6    CORINNE PHIPPS, an individual;
     and JUSTIN KISER, an individual;
7    individually and on behalf of
     all others similarly situated,
8
              Plaintiffs,
9                                    Case No. c-07-02780-SI
     and
10
     POLO RALPH LAUREN CORPORATION,
11   a Delaware corporation; POLO
     RETAIL, LLC,a Delaware corporation;
12   POLO RALPH LAUREN CORPORATION, a
     Delaware corporation, doing
13   business in California as POLO
     RETAIL CORP; FASHIONS OUTLET OF
14   AMERICA, INC., a Delaware
     corporation; and DOES 1-500,
15   inclusive,

16            Defendants.
     _____/
17

18            DEPOSITION OF THERESA CRUZ

19   DATE:       August 20, 2007

20   TIME:       10:00 a.m.

21   LOCATION:   LAW OFFICE OF PATRICK R. KITCHIN
                 565 Commercial Street
22               Fourth Floor
                 San Francisco, California 94111
23

24   REPORTED BY:  Katy Leonard
                    Certified Shorthand Reporter
25                  License Number 11599

                                              Page 1

## Golden Gate Reporting

1    the Philippines, and in college, I finished it in the

2    Philippines also.  I took up a Bachelor of Science major

3    in interior design.

4              Q.  And when was that degree awarded?

5              A.  1984.

6              Q.  And what was the university?

7              A.  University of Santo Tomas.

8              Q.  And any other formal education after

9    receiving the degree from the University of Santo Tomas?

10             A.  No.

11             Q.  When did you start working for Polo Ralph

12   Lauren?

13             A.  1994.

14             Q.  And prior to taking that position, what were

15   you doing?

16             A.  I was a part-time stock person for GAP and

17   Crate & Barrel.

18             Q.  And was that here in San Francisco?

19             A.  Yes.

20             Q.  And those were both part-time stock

21   positions?

22             A.  Yes.  For two months.

23             Q.  And prior to working for GAP and Crate &

24   Barrel, did you have any other employment within the

25   retail industry?

                                              Page 18

## Golden Gate Reporting

1       A.  I did.

2       Q.  You did?

3       A.  Yes.

4       Q.  And what was that?

5       A.  I worked for our family business.

6       Q.  And what kind of business was that?

7       A.  Furniture business.

8       Q.  And that was in the Philippines?

9       A.  Yes.

10      Q.  Prior to that, any retail experience?

11      A.  No.

12      Q.  What position did you begin -- what was your

13  position when you began working for Polo in 1994?

14      A.  Cashier.

15      Q.  And was that in the San Francisco Polo

16  store?

17      A.  Yes.

18      Q.  And was that a full-time or part-time

19  position?

20      A.  Full-time position.

21      Q.  And did you have any management-level duties

22  as a cashier?

23      A.  No.

24      Q.  How long did you remain a cashier at Polo?

25      A.  Till 1997.

Page 19

## Golden Gate Reporting

1          Q.   And was he general manager of the store?

2          A.   He was the general manager.

3          Q.   And after working in a position as

4     administrative assistant, did you take another position

5     at the company?

6          A.   I did.  I was promoted to be the operations

7     manager.

8          Q.   And what year was that?

9          A.   Between 1997 and 1998.

10         Q.   And who did you report to in that position?

11         A.   Michael Moser, M-o-s-e-r.

12         Q.   And what were your duties as operations

13    manager?

14         A.   Um, I took care of the shipping department

15    and I took care of the store, the preparation for the

16    business day and at the end of the day, and I took care

17    of -- we have a few CSR, which is a cashier also -- I

18    took care of them.  I took care of the cleaning crew.

19         Q.   Anything else?

20         A.   Um, basically I'm on the floor taking care

21    of customer also.

22         Q.   When you began as operations manager, were

23    you also doing any kind of scheduling for sales

24    associates in the store?

25         A.   No.

Page 21

## Golden Gate Reporting

```
 1          A.   Um, no.
 2          Q.   Are you still serving in the same position
 3    as operations manager?
 4          A.   Yes.
 5          Q.   Over the years, have your duties changed in
 6    ways that differ from what you described your duties to
 7    be when you first began as operations manager?
 8          A.   No.
 9          Q.   Okay.  When you became operations manager in
10    1997 or 1998, did you undergo any type of training
11    through Polo Ralph Lauren to prepare you for your new
12    position?
13          A.   No.
14          Q.   Did you have any meetings with any
15    higher-level managers to help you transition from your
16    position as an administrative assistant to operations
17    manager?
18          A.   Yes.
19          Q.   And who did you meet with to help you in
20    that transition?
21          A.   Michael Moser.
22          Q.   Anyone else?
23          A.   Others are done through telephone to
24    corporate office.
25          Q.   At the current time, do you have a specific
```

Page 23

## Golden Gate Reporting

```
 1                    Certain types of unacceptable behavior
 2                    warrant specific mention.
 3                And then on this page, 773, there are 13
 4    items, and on the next page it goes to 27 items.
 5                Do you remember seeing this specific list of
 6    unacceptable behavior?
 7         A.   Um, no.
 8         Q.   No.
 9                Take a look at page 774, if you would.  Item
10    No. 23 reads, quote:
11                    Divulging personal salary arrangements
12                    to other Polo Retail Corporation
13                    associates, closed quote.
14                Was it Polo's policy in San Francisco to
15    prohibit sales associates from telling one another how
16    much money they were earning?
17         A.   No.
18         Q.   And --
19         A.   I don't think it's -- because every single
20    sales associate gets 8 percent commission.
21         Q.   Did you ever hear -- do you recall seeing
22    this specific reference that says, "Divulging personal
23    salary arrangements to other Polo Retail Corporation
24    associates"?
25         A.   No.
```

Page 138

## Golden Gate Reporting

```
 1          Q.  Did you ever tell any sales associate that
 2   it was improper for them to talk with other sales
 3   associates about how much money they had earned?
 4          A.  Well, as my own opinion --
 5          Q.  Well, let me just focus you here.
 6              Did you ever tell a sales associate that
 7   they were not permitted to tell other sales associates
 8   how much money they had earned?
 9          A.  No.
10          Q.  Did you ever hear any other manager at Polo
11   Ralph Lauren in San Francisco tell any sales associates
12   that they were not permitted to share their salary
13   information with any other associate?
14          A.  No.
15          Q.  You have a personal opinion about this you
16   had -- about this specific item?
17          A.  Well, I don't discuss my salary to anybody.
18          Q.  Okay.  And have you ever been instructed
19   that you're not entitled to do that?
20          A.  Well, when I read my employee handbook, when
21   I started with the company, I do recall not to tell
22   anybody about -- not to indulge [sic] your salary with
23   other staff.
24          Q.  And you haven't done that?
25          A.  No.
```

Page 139

## Golden Gate Reporting

1    was more of a floor coverage -- that making sure that no

2    two people in that department will go at the same time

3    for their 15-minute break or the lunch break.

4         Q.   And has that -- were those conversations

5    taking place since this policy manual was put out, or

6    are those conversations that you've had over the course

7    of a longer period of time?

8         A.   It's a longer period of time.

9         Q.   With respect to meal breaks -- I'm sorry.

10        With respect to the 15-minute rest breaks,

11   have you ever heard any complaint by any employees that

12   they have not been permitted to take their 15-minute

13   rest breaks?

14        A.   No.

15        Q.   Have you ever heard any managers complain

16   that their associates are just not taking their

17   15-minute rest breaks, even though they're being offered

18   that time?

19        A.   No.

20        Q.   If you turn to the next page, 1525, there's

21   a reference under "Sample Break Chart." It refers to

22   the very bottom of the page:

23             "Employees in CA -- in California who

24             work more than two hours are entitled to

25             a 15-minute paid break."

Page 218

## Golden Gate Reporting

```
 1          Q.  And did they ask you to adjust their time
 2   based on that?
 3          A.  Yes.
 4          Q.  Did you ever go back into the back hallway
 5   at the store to see people sitting on the floor waiting
 6   to get out of the door so that you could let them out at
 7   the end of their shift?
 8          A.  No.
 9          Q.  Did you ever see more than three people
10   congregating at the exit -- the employee exit to get out
11   at the end of their shift before you came to let them
12   out?
13          A.  Yes.
14          Q.  What is the maximum number of people that
15   you've seen standing back at the back waiting to get out
16   of the store?
17          A.  I'd say about three or four people.
18          Q.  Okay.  And did you ever show up at the back
19   door to let people out at the end of their shift and any
20   of them complain to you that they had been waiting there
21   for some period of time?
22          A.  Um, they waited for about more than two
23   minutes or three minutes.
24          Q.  We have testimony in the case that people
25   had to wait 20 to 30 minutes to get out of the back door
```

Page 230

## Golden Gate Reporting

1    at the end of the shift on a fairly regular occasion.

2         Do you have any recollection of anyone in

3    the store waiting for more than ten minutes to get out

4    of the back door before a manager was present to do a

5    bag inspection?

6         A.   No.

7         Q.   Did you ever hear anyone claim, other than

8    in this lawsuit, that they were required to wait for

9    more than ten minutes at the back door to get out at the

10   end of their shift?

11        A.   No.

12        Q.   Did you ever hear anyone complain that they

13   had to wait for more than ten minutes to get in the back

14   door at the beginning of their shift?

15        A.   To get in the at the back door at the

16   beginning of their shift?

17        Q.   Correct.

18        A.   No.  Because I'm always there at the

19   morning.

20        Q.   And how many days a week do you typically

21   work?

22        A.   Five days a week.

23        Q.   So, at least one or two of the days, you're

24   not there?

25        A.   Yes.  And Tin is there in the morning when

Page 231

# EXHIBIT 6

**to Declaration of William J. Goines in Opposition to
Plaintiffs' Motion for Class Certification**

## Golden Gate Reporting

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                   SAN FRANCISCO DIVISION

4

5   ANN OTSUKA, an individual; JANIS      No. C-07-02780-SI
    KEEFE, an individual; CORINNE
6   PHIPPS, an individual; and
    JUSTIN KISER, an individual;
7   individually and on behalf of
    all others similarly situated,

8                    Plaintiffs,

9      vs.

10  POLO RALPH LAUREN CORPORATION;
    a Delaware Corporation; POLO
11  RETAIL, LLC, a Delaware Corporation;
    POLO RALPH LAUREN CORPORATION, a
12  Delaware Corporation, doing business
    in California as POLO RETAIL CORP;
13  FASHIONS OUTLET OF AMERICA, INC., a
    Delaware Corporation and DOES 1-500,
14  inclusive,

15                   Defendants.
                                          /
16

17

           DEPOSITION OF VALERIE ANN HARRISON
18

19

        DATE:          August 10, 2007
20
        TIME:          10:08 a.m.
21
        LOCATION:      120 Kearny Street
22                     Suite 3200
                       San Francisco, California
23
        REPORTED BY:   Mary E. Garland
24                     Certified Shorthand Reporter
                       License Number 4721
25

                                          Page 1

## Golden Gate Reporting

1   that you've worked for.

2        A.  Let's see.  Bath & Body Works was before Ralph

3   Lauren.  I also worked -- this may not be in order --

4   for a company called The Best of Times, which is clocks

5   and watches, that was also retail.  I worked for the

6   Southland Corporation, which was actually considered

7   wholesale, but it's similar as far as structure, as far

8   as selling.  And I worked for a small company while I

9   was in college and while I was still in high school

10  called The Loop, back in Michigan.

11       Q.  Did you work as a manager for any of those

12  companies?

13       A.  Yes.

14       Q.  In which companies were you management level?

15       A.  Let's see.  The Loop, the Best of Times,

16  Bath & Body Works, and obviously Polo.

17       Q.  And so in June of 2000, you joined Polo?

18       A.  Yes.

19       Q.  And what was your initial position at Polo?

20       A.  I was the assistant Home Collection manager.

21       Q.  And who was the Home Collection manager at that

22  time?

23       A.  Cynthia McCullough.

24       Q.  And do you recall how you ended up taking a job

25  as the assistant Home Collections manager?

Page 23

## Golden Gate Reporting

```
1          Q.   Do you recall whether you were given any
2     handouts relating to management capabilities to modify
3     or change time record entries?
4          A.   I don't recall.
5          Q.   Do you recall during the 2000, 2001 time frame
6     whether there was a specific time card modification form
7     that needed to be filled out whenever any change to a
8     time record was made?
9          A.   I don't recall that far back.
10         Q.   During that first year of employment at Polo,
11    did you undergo any training in any other location,
12    other than the Polo Ralph Lauren store here in San
13    Francisco?
14         A.   It was all in San Francisco.
15         Q.   You didn't undergo any training in the
16    corporate office in New York or New Jersey?
17         A.   No.
18         Q.   At some point, you were promoted to department
19    manager; is that correct?
20         A.   That's correct.
21         Q.   And when did that change take place?
22         A.   That was the end of July, beginning of August
23    of 2001.
24         Q.   And did Cynthia McCullough leave at that time?
25         A.   Yes.
```

Page 32

## Golden Gate Reporting

1      Q.   Was someone else promoted or hired to serve as

2   assistant Home Collections manager?

3      A.   No.

4      Q.   Throughout the course of your employment after

5   July, August 2001, was there ever anyone who was put

6   into the position as assistant Home Collections manager?

7      A.   No.

8      Q.   When did you actually leave Polo Ralph Lauren?

9      A.   It was beginning of July.

10     Q.   Of this year?

11     A.   Yes.

12     Q.   And why did you leave Polo in July of this

13   year?

14     A.   To pursue a career more in the design world.

15     Q.   You left on good terms with Polo?

16     A.   Yes.

17     Q.   I'd like to go through kind of a thumbnail

18   sketch of your duties as assistant manager during that

19   what ends up being a little over a year from 2000 to

20   2001.  Could you just briefly describe what your duties

21   were in that position.

22     A.   To be on the sales floor, and also not only be

23   a support to the sales associates, but also to sell, was

24   basically my main objective; meaning support.  If they

25   needed help with a client, if they needed me to grab

Page 33

## Golden Gate Reporting

1    to put their bags in, personal items?

2        A.   There were lockers.  Generally, they were too

3    small for most people's bags.  There were also

4    cubbyholes at the back door, as well.

5        Q.   And so was the process during that first year

6    that an individual sales associate would clock out on a

7    cash register and then go collect their personal items,

8    if they had any there, and then go to the back door to

9    be inspected, and then leave?

10       A.   Yes.

11       Q.   During that first year, were there occasions,

12   that you observed or heard about where sales associates,

13   had to wait for a manager to come and let them out of

14   the building after performing a bag inspection?

15       A.   Not that I recall.

16       Q.   So based on your best recollection here today,

17   is it your testimony that employees who were leaving

18   always encountered a manager at the back door when they

19   were ready to leave?

20       A.   I -- to be honest with you, I don't -- I can't

21   speak to that far back, as far as what I remember

22   exactly.  And, obviously, it varied from day to day.

23       Q.   During that first year, did any sales associate

24   tell you that they had had to wait for some period of

25   time to have their bags inspected?

Page 47

## Golden Gate Reporting

```
 1        A.  Not that I recall.

 2        Q.  During that first year of time, did any of the

 3   other managers discuss with you or in your presence any

 4   concerns about the loss prevention inspection process?

 5        A.  Not that I recall.

 6        Q.  Did you, as an assistant manager during that

 7   first year, participate in management meetings?

 8        A.  Yes.

 9        Q.  And were management meetings held on a regular,

10   scheduled basis?

11        A.  I don't remember that far back.

12        Q.  Was the loss prevention inspection process ever

13   discussed in any of the management meetings back during

14   that first year?

15        A.  Not that I recall.

16        Q.  During that first year, at any of the

17   management meetings, was it ever discussed that sales

18   associates were having a difficult time getting back

19   into the building, that is, to have someone open the

20   door for them?

21        A.  Not that I recall.

22        Q.  During your first year of employment as

23   assistant manager, at the end of the day, at 6:15, were

24   all of the cash registers typically operational?

25        A.  The first year, CSRs would begin closing
```

Page 48

## Golden Gate Reporting

1    Q.  And I should have written this down, but you

2   said that there were somewhere around 20 individuals who

3   were working --

4    A.  I would estimate.

5    Q.  What is the largest number of sales associates

6   that you can recall doing bag inspections for at the end

7   of their shifts during that first year?

8    A.  Oh, boy.  I don't recall.

9    Q.  Do you have a recollection of doing ten bag

10  inspections, one after the other, that first year?

11   A.  Possibly.  Because we had -- we did have LP

12  also helping out.  We didn't -- I mean, it wasn't an

13  everyday thing.  It's possible.

14   Q.  Do you have an estimate as to the longest time

15  it took for a sales associate, during that first year,

16  to undergo a bag inspection at the end of their shift

17  when you were performing the bag inspections?

18   A.  I don't recall.  I can't imagine it would be

19  more than a few minutes.

20   Q.  Were the loss prevention policies that were in

21  place during your first year of employment applied

22  consistently to all sales associates in the store?

23   A.  Yes.

24   Q.  And why were they applied consistently to all

25  sales associates?

Page 63

## Golden Gate Reporting

1   that they had to wait for a manager to come to the back

2   door to let them out at the end of the shift was too

3   long?

4       A.  At the end of the shift, no.

5       Q.  Did you ever hear any employee complain, any

6   sales associate complain that they had been stuck

7   outside, ringing the doorbell, in the morning, trying to

8   get to work and no one showed up to open the door for

9   some unreasonable period of time?

10      A.  If they had to wait, they probably only had to

11  wait a few moments, because --

12      Q.  That's not my question.  My question is:  Did

13  you ever hear anyone complain that they came in the

14  morning and had to stand out there an unreasonable

15  amount of time, from their perspective, to get in

16  because no one answered the door?

17      A.  I have had people say that they had to wait.

18      Q.  And who told you that they had to wait?

19      A.  I don't recall.  It was a couple of people.

20  And they didn't say how long they had to wait.  They

21  just said that they were outside waiting to be in, let

22  in.

23      Q.  Did Corinne Phipps tell you that she had been

24  delayed for some period of time outside, trying to get

25  in for her morning clock-in?

Page 143

1      A.   I don't recall her ever saying that.

2      Q.   Did any sales associates, throughout the time

3   you were working for Polo in San Francisco, ever

4   complain to you that they had been required to wait for

5   what they thought was an unreasonable amount of time

6   outside of the store when they returned from their lunch

7   break?

8      A.   I have had people say that they had to wait a

9   couple of times.  It was on occasion, though.

10      Q.   And who were those people that told you that

11   they had to wait?

12      A.   I don't recall.  I just recall that that was --

13   there was a couple occasions that that did happen.

14      Q.   Did anyone ever ask you to adjust their time

15   because they had been what they felt had been delayed in

16   getting in the back door to start their shift?

17      A.   Not that I can recall.

18      Q.   Did anyone make such a complaint regarding

19   waiting at the end of their lunch break to get back in

20   and ask you to adjust their time because they had been

21   stuck outside?

22      A.   Again, I don't recall making those kind of

23   adjustments.

24      Q.   Do you recall hearing from anyone in the store,

25   from managers, from sales associates, that anyone

Page 144

## Golden Gate Reporting

1  considered the waiting time to get out of the store at

2  the end of their shift was unreasonable?

3      A.  Not that I recall.  I mean, there were people

4  sometimes that had to wait a few minutes to get out the

5  back door for a manager to come from the floor, but it

6  was not more than maybe a few minutes.

7      Q.  So you've never heard that anyone ever had to

8  wait a half hour to get out of the store because

9  managers were too busy doing something else?

10     A.  Not when I was there.

11     Q.  Did you ever hear that anyone had to wait for

12 up to 15 minutes to get out of the store because a

13 manager or the managers were too busy to let them out?

14     A.  Fifteen minutes?  No.

15     Q.  Did you ever hear from anyone at the store that

16 they had waited for 10 or 15 minutes, or more to get

17 into the store at any period of time when they were

18 trying to get to work?

19     A.  No.

20     Q.  Did you ever hear from anyone at the store that

21 they were required to wait 10 or 15 minutes to get back

22 in after their lunch break?

23     A.  Again, I had people say that they'd had to wait

24 a few minutes, but not 10 or 15.

25          (Exhibit 15 marked for identification.)

Page 145

## Golden Gate Reporting

1    or the sales floor was busy, so on and so forth.

2        Q.  Did Kristi Mogel talk about, during this

3    meeting when this was rolled out, any compensation for

4    missed meal or rest breaks?

5        A.  I don't recall that that was discussed.

6        Q.  Who at the meeting talked about sales

7    associates missing their meal or rest breaks?

8        A.  Actually, I did bring that one subject up --

9    not so much meals, but rest breaks only -- because it's

10   not that I didn't always encourage it and tell them they

11   should take their breaks, but that was opposition that I

12   got from some of my senior sales associates.

13       Q.  I'm sorry.  That was the opposition?

14       A.  They would come to me and say, you know, "I'd

15   rather be on the sales floor."

16       Q.  So none of your sales associates complained

17   that they weren't able to take their breaks?

18       A.  No.

19       Q.  Did anyone else at the meeting when this new

20   manual was rolled out say anything about their sales

21   associates in their departments taking or not taking

22   rest and meal breaks?

23       A.  Not that I recall.

24       Q.  What more did Kristi Mogel say about the meal

25   and rest breaks?

Page 167

## Golden Gate Reporting

1       A.   Just that we were to, you know, tell them that

2   they needed to take their breaks and encourage it.  And,

3   that, obviously, like, you know, a senior seller that

4   has an appointment and wants to forego the 15-minute

5   break, you just have to make sure that, you know, you're

6   encouraging it and telling them they need to take their

7   full breaks.

8       Q.   Did Kristi Mogel say that this had been a

9   problem at the San Francisco store, that sales

10  associates were not, for whatever reason, taking either

11  their meal or rest breaks?

12      A.   No.

13      Q.   On page 1532, at the bottom right-hand column,

14  it says "Employee Conduct and Responsibilities," and it

15  repeats some of the language that we've seen in the

16  other manuals.

17      A.   Mm-hm.

18      Q.   On the following page, 1533, this long list of

19  prohibited behavior -- "unacceptable behavior," it

20  says -- there's no language in here now regarding the

21  prohibition against disclosing wages.

22           Did anyone at this meeting when this was rolled

23  out make reference to whether employees could now, under

24  the Polo's policy, discuss their wages with others?

25      A.   I don't recall that being mentioned.

Page 168