# EXHIBIT 7

**to Declaration of William J. Goines in Opposition to
Plaintiffs' Motion for Class Certification**

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4

      ANN OTSUKA, an individual;  )
5     et al.,                     )
                                  )
6              Plaintiffs,        )
                                  )
7         vs.                     ) No.  C-07-02780-SI.
                                  )
8     POLO RALPH LAUREN           )
      CORPORATION, a Delaware     )
9     Corporation; et al.,        )
                                  )
10             Defendants.        )
      _____ )

11

12          DEPOSITION OF:  TIN HUA

13       TAKEN ON:  Friday; March 21, 2008

14

15

16

17

18

19

20    REPORTED BY:

21

22

23

24    PATRICIA L. HUBBARD

25    CSR #3400, CRP #10, RPR #7847

```
 1        A.    Polo Ralph Lauren.

 2        Q.    Did you have any other college

 3   experience?

 4        A.    Yes.  I did attend San Jose State

 5   university, as well.

 6        Q.    And when was that?

 7        A.    That was after 1995.                    10:30

 8        Q.    And during what years?

 9        A.    It was the year between 1995 and 1996.

10        Q.    And what was the purpose of that?

11        A.    Post-baccalaureate.

12        Q.    Did you get a certificate or degree?

13        A.    Yes.

14        Q.    What was that?

15        A.    It was a biology post-baccalaureate.

16        Q.    What was your start date with Polo Ralph

17   Lauren?                                            10:31

18        A.    If I can recall correctly, it was in

19   June of 1995.  I actually worked during the time that

20   I was with -- attending University of Illinois at the

21   outlet store.

22        Q.    Which outlet store?

23        A.    Tuscola.

24        Q.    Is that in Illinois?

25        A.    Yes.
```

Page 17

```
 1          Q.    Were you a sales associate?

 2          A.    I don't -- I'm not certain if that's the

 3     title that was given.

 4          Q.    Was there some sort of a loss prevention

 5     program in place at that store at that time that

 6     you're aware of?

 7          A.    I don't recall.                        10:33

 8          Q.    What did you do after -- in terms of

 9     work after the six months at the outlet store in

10     Tuscola, Illinois?

11          A.    From my -- from my graduating with

12     University of Illinois, I went out to San Jose,

13     California, and that's when I started with the -- the

14     store in Santa Clara with Ralph Lauren.

15          Q.    Is that an outlet store?

16          A.    It was a retail store.

17          Q.    What was your job title at that time?    10:33

18          A.    Sales associate.

19          Q.    And during what time period did you work

20     as a sales associate at the Santa Clara retail store?

21          A.    I don't recall the exact time frame.

22          Q.    What's your best estimate as to the date

23     you began working there and the date that you stopped

24     working there as a sales associate?

25          A.    I was promoted within the store.  So my
```

Page 19

```
 1    best guesstimate is that I was a sales associate for
 2    about six months.
 3         Q.   When did you start working as a sales
 4    associate at the Santa Clara store?
 5         A.   1995.
 6         Q.   And during that same year you were
 7    promoted; is that correct?                          10:34
 8         A.   That's correct.
 9         Q.   And to what job position were you
10    promoted?
11         A.   Men's department manager.
12         Q.   I'm sorry.  Men's department?
13         A.   Manager.
14         Q.   And how long did you work as a men's
15    department manager at the Santa Clara store?
16         A.   Again I don't recall the exact time
17    frame.                                              10:35
18         Q.   What's the best estimate that you have
19    regarding the duration of your role as a men's
20    department manager at the Santa Clara store?
21         A.   Can you rephrase that question?
22         Q.   Sure.  How long did you work as a men's
23    department manager at the Santa Clara retail store?
24              What's your best estimate as to the
25    duration?
```

Page 20

1          A.     My best estimate, it's probably four or

2     five months.

3          Q.     And then what happened?

4          A.     Then I was promoted to the general

5     manager of the store.

6          Q.     And how long did you work as GM -- do

7     you call it GM?                                    10:35

8          A.     GM.

9          Q.     How long did you work as a GM at the

10    Santa Clara store?

11         A.     Again the time frame is -- it's not

12    clear.

13         Q.     What's your best estimate as to when you

14    were promoted to GM?

15         A.     Within the year being the general

16    manager there.

17         Q.     So, in about 1996?                     10:36

18         A.     Yes.

19         Q.     And how long did you work as GM at the

20    Santa Clara store?

21         A.     For about a year.

22         Q.     And then what happened?

23         A.     Then I was promoted to the store in

24    Waikiki in Hawaii as the general manager.

25         Q.     Why was that a promotion?

Page 21

```
1          A.    A promotion in volume.

2          Q.    And how long did you work as the Waikiki

3    GM?

4          A.    For about a year, as well.

5          Q.    And then what happened in terms of your

6    job?

7          A.    The company decided to close down the        10:36

8    store, at which time I was transitioned to help the

9    store in Ala Moana, which is also in Hawaii.

10         Q.    Were you a GM at that time?

11         A.    I was -- I was just in transition as a

12   support.

13         Q.    How long did you do that?

14         A.    I don't recall the exact time.

15         Q.    What's your best estimate?

16         A.    Several months.

17         Q.    And then what happened next in terms of      10:37

18   your job with Polo Ralph Lauren?

19         A.    I was transitioned into an assistant GM

20   role to the Ala Moana store.

21         Q.    And how long did you do that?

22         A.    Again the time frame is not exact in my

23   mind right now.

24         Q.    What's your best estimate as to the

25   duration of that position?
```

Page 22

1          A.    Within six months.

2          Q.    And then what happened?

3          A.    Then after that I was repromoted to the

4     GM of the Ala Moana store.

5          Q.    And how long did you do that?

6          A.    Again this is a guesstimate, but I do

7     believe it was around two years' time.                    10:38

8          Q.    And then your next position?

9          A.    My next position was -- I came back to

10    California, but I forgot exactly which store I came

11    back to California to.

12         Q.    Was it in Northern California or

13    Southern California?

14         A.    It is Northern California.

15         Q.    And you were a GM at that time?

16         A.    Yes.

17         Q.    And how long did you do that?               10:39

18         A.    For -- again this is a guesstimate.

19    Probably a year and a half.

20         Q.    And what year is this now that you were

21    a GM at this Northern California store after

22    returning from Hawaii?

23         A.    My guess is that I was back in

24    California in 2003.

25         Q.    Where were you living at that time?

Page 23

1          A.      In Northern California, north of

2    San Jose, San Mateo area.

3          Q.      Do you know if it was the Palo Alto

4    store?

5          A.      I don't recall honestly if it was Palo

6    Alto or San Francisco that I was involved with first.

7          Q.      Okay.  So returning to Northern                    10:40

8    California and working as a GM for a one and a

9    half-year period beginning in about 2003, you're at

10   either the Palo Alto store or the San Francisco

11   store; is that correct?

12         A.      That's correct.

13              Now that we went through that sequence,

14   it is the Palo Alto, store, yes, that I was there

15   first.

16         Q.      So you were at the Palo Alto store at

17   this time for about a year and a half; is that           10:40

18   correct?

19         A.      That's correct.

20         Q.      And then what happened?

21         A.      And then I was asked to -- to go to the

22   San Francisco store.

23         Q.      So you became the GM of the

24   San Francisco store?

25         A.      I was asked to help out at first, and

1    then later on within the next several months, then I

2    was placed as the GM in San Francisco.

3         Q.    When did you first start helping out at

4    the San Francisco store?

5         A.    I don't recall the exact dates.

6         Q.    What's your best estimate?

7         A.    Possibly in 2004 sometime.                10:41

8         Q.    And how long were you helping out before

9    you were asked to become a GM at the San Francisco

10   store?

11        A.    A short period of time, a few months.

12        Q.    How long did you serve as the

13   San Francisco store GM?

14        A.    For about, again, a little bit over a

15   year.

16        Q.    And what's your best estimate as to the

17   start and stop dates during which you served as       10:41

18   San Francisco store GM?

19        A.    I don't recall.

20        Q.    And what was your next job position

21   after that?

22        A.    I was promoted to oversee San Francisco,

23   Burlingame and Palo Alto at that time.

24        Q.    And what was your job title at that

25   time?

```
 1          A.      Area manager.

 2          Q.      And how long did you do that?

 3          A.      Approximately a year and a half, as

 4    well.

 5          Q.      What was your next job position?

 6          A.      At which time in -- I do believe it was

 7    the end of March, 2007 -- beginning of March of 2007    10:42

 8    I left the company.  I was unemployed for about three

 9    weeks, a month.

10          Q.      And then?

11          A.      And then after that I started to work

12    for Georgio Armani as a general manager.

13          Q.      Where was that store?

14          A.      It was in San Francisco.

15          Q.      Why did you leave Polo Ralph Lauren?

16          A.      I just felt that it was time for me

17    to -- to step away for a little bit and take a short    10:43

18    break and -- and to look at different opportunities.

19          Q.      Why did you feel it was time for you to

20    step away?

21          A.      I had been with the company for 13

22    years, and I just wanted to see what other

23    opportunities were out there.

24          Q.      Did the Armani store in San Francisco

25    have some sort of program for conducting loss
```

Page 26

```
 1   communicated by GM's to all employees?
 2        A.    As far as I know, the day that I was
 3   hired.
 4        Q.    Is it your understanding that these
 5   policies were applied in all stores, not just the
 6   ones you worked in?
 7        MR. GOINES:  Objection.  Overbroad.          10:56
 8        THE WITNESS:  Can you rephrase that question.
 9   BY MR. GRIGG:
10        Q.    Sure.  Is it your understanding that the
11   policy that all GM's had to educate all employees to
12   employee handbook policies and procedures was in
13   effect at all Polo stores, Polo Ralph Lauren stores?
14        A.    I don't have the answer for all the
15   stores, but I know that it's the policy that I
16   upheld.
17        Q.    Have you heard anything to the effect    10:56
18   that it was required at other stores?
19        A.    I have not.
20        Q.    Have you had any training by Polo Ralph
21   Lauren or by anyone else that suggested to you
22   that -- strike that.  I'll withdraw that.
23             Did you ever hear any complaints about
24   the loss prevention practices in effect at any Polo
25   Ralph Lauren stores?
```

```
1           A.    I don't recall.

2           Q.    Did Rosalinda Wallwork ever have a

3    conversation with you about concerns raised about

4    loss prevention practices?

5           A.    I don't recall.

6           Q.    Did any employee ever say to you, "Hey,

7    I've been waiting at the back door" or any door "in      10:57

8    order to get out for a loss prevention practice" --

9    "loss prevention search"?

10          A.    Not that I can recall.

11          Q.    Well, let's talk about your time as

12   first the GM at the Palo Alto store.  Let's just go

13   through an average day.

14                What time would people -- would the

15   first people get to the store in the morning in

16   Palo Alto during the time that you were GM?

17          A.    It all depends.  When you say "people,"    10:58

18   who is that?

19          Q.    Anyone.

20          MR. GOINES:  Are you talking about employees?

21   Are you talking about customers?  Are you talking

22   about --

23   BY MR. GRIGG:

24          Q.    Anyone.

25          A.    So the first employee --
```

Page 33

```
 1    decided, that the standard is represented to the
 2    Ralph Lauren standards, then we would say, you know,
 3    everyone to clock out.
 4              And then they would go to the doors
 5    where the managers are waiting.  And then that's when
 6    everyone gets checked out at the same time and leave
 7    the building.                                        11:03
 8         Q.   So generally all associates would leave
 9    at the same time?
10         A.   Generally, yes.  Unless there will be
11    times where they have appointments already where they
12    need to leave prior, you know, with approval.
13         Q.   How long would it be for an average --
14    how long would an average employee have to wait on an
15    average night to -- between the time that they
16    clocked out and the time that they actually get out
17    the door?                                            11:03
18         A.   There shouldn't be any waiting period
19    except for the period that they grab their bags and
20    go to the front door.  There are -- actually probably
21    more often than not, they actually grab their bags
22    and everything and then clock out and then go to the\
23    door.
24              So I would say a minute or two.
25         Q.   So one to two minutes on average between
```

Page 37

1  the time someone clocks out and gets out the door at

2  the end of the day; is that correct?

3       A.    That's correct.

4       Q.    Did you ever hear of anyone waiting

5  longer than that?

6       A.    Not that I can recall, no.

7       Q.    Did any employee ever complain to you     11:04

8  about spending too much time with the loss prevention

9  inspection?

10      A.    Not that I can recall.

11      Q.    Did you ever get back to the door and

12 see people sitting on the ground saying, "Hey, we've

13 been waiting"?

14      A.    Not that I know of.

15      Q.    Did you ever talk to anyone higher up in

16 the company about loss prevention inspections?

17      A.    No.  Not that I know.                       11:05

18      Q.    Did employees at the -- when you were

19 the GM at the Palo Alto store take rest breaks?

20      A.    Absolutely.

21      Q.    And what was the policy for employees

22 taking rest breaks in effect while you were the

23 Palo Alto store GM?

24      A.    I know that -- first of all, I know the

25 company cares a lot about making sure that the

Page 38

1    employees get their rest break, and we encourage it

2    and make sure that they have full understanding that

3    we encourage it and want to make sure that everyone

4    does it.

5              But we also allow the individual to

6    decide, you know, for both mornings, lunch and

7    evening as to when they -- they want to take that.    11:06

8         Q.    And you said, "We make sure they have

9    full understanding about that"; is that correct?

10        A.    That is correct.

11        Q.    And how does Polo make sure that the

12   employees have a full understanding that they're

13   entitled to a rest break or can work through it if

14   they want?

15        MR. GOINES:   Objection.  Mischaracterizes

16   testimony.

17        THE WITNESS:   Can you rephrase that question?    11:06

18   BY MR. GRIGG:

19        Q.    Sure.  How did your company, Polo, make

20   sure that employees understood that they were

21   entitled to take a rest break if they wanted, but

22   could work through it if they wanted?

23        MR. GOINES:   That's not what he said.

24   BY MR. GRIGG:

25        Q.    Is that --

Page 39

```
 1          MR. GOINES:  Argumentative.
 2   BY MR. GRIGG:
 3          Q.   Am I misstating what you said?
 4          A.   That's correct, sir.
 5          Q.   How am I misstating what you said?
 6          A.   I have spoken that we encourage and
 7   would like all employees to take advantage of their    11:07
 8   breaks, including lunch breaks, throughout the day.
 9          Q.   And you somehow communicated this to
10   employees; is that correct?
11          A.   We do communicate all benefits to
12   employees via the employee handbook, as I stated
13   earlier, that we would sit down at the beginning of
14   when they're hired, and we verbally would walk
15   through and read through all the handbooks.
16          Q.   So when you were the Palo Alto GM, you
17   walked through all the employee handbooks with all    11:07
18   the employees; is that correct?
19          A.   That's correct.
20          Q.   Did you also have them sign the employee
21   handbooks?
22          A.   There is a section at the end of the
23   handbook that requires a signature, yes.
24          Q.   So what was your -- did you have a
25   custom and practice in terms of complaining to them
```

Page 40

```
 1   with what frequency did employees take their rest

 2   breaks?

 3        A.    Can you rephrase that?

 4        Q.    Sure.  Did most employees take all the

 5   rest breaks to which they were entitled?

 6        A.    To my knowledge, yes.

 7        Q.    Did it ever come to your attention that,   11:17

 8   an employee had missed a rest break?

 9        A.    Not that I know.

10        Q.    Were there certain times when the store

11   was so busy that it would have been difficult for an

12   employee to take a rest break at either the Palo Alto

13   or the San Francisco store?

14        A.    Not that I can recall.

15        Q.    Did you ever say anything to the effect

16   of an employee should wait before taking their rest

17   break?                                               11:18

18        A.    No.  Not that I can recall.

19        Q.    Did any other manager, to your

20   knowledge, say that to a sales associate at any time;

21   in other words, "You should wait before taking your

22   rest break"?

23        A.    No.  Not to my knowledge.

24        Q.    Did you ever hear or engage in any

25   communications to the effect that a sales associate
```

Page 46

1        Q.    Under what circumstances -- I'm sorry.

2    I spoke over you.

3            What were you saying?

4        A.    No.  I said I don't recall exactly when

5    the time frame of the arrears program was in place.

6    So I can't answer that to that specific.

7        Q.    Okay.  Then I somewhat amended my          11:59

8    question by saying under what circumstances.

9        A.    What does that mean?

10       Q.    Under what circumstances did you become

11   aware of the arrears program?

12       A.    How did I receive the information?

13       Q.    Yes.

14       A.    Okay.  As I stated at the beginning of

15   this conversation, that the company is very effective

16   in the way that we communicate -- the corporate

17   office communicates out information.  So once we get    12:00

18   communication -- or I get communication from the

19   corporate office, then we would host an overall store

20   meeting, and then the individual that's effected will

21   be communicated individually.

22       Q.    Okay.  You just said the company's very

23   effective about communicating out information.

24            What do you mean by that?

25       A.    That if there were to be any newness in

1    policies, anything that needs to be announced to the

2    store staff and team, then we would usually host a

3    meeting, an overall meeting in the store to

4    communicate that, the information, to the staff.

5         Q.    And how was information transmitted from

6    the company to general managers?

7         A.    We usually would either have a              12:01

8    conference call or an e-mail or communication from

9    the general manager's direct supervisor.

10        Q.    And who would that be?

11        A.    In my case, it would be Kim Babka.

12        Q.    And by what means did you learn about

13   the arrears program initially?

14        A.    I don't recall the exact meeting.

15        Q.    What do you recall being told about the

16   arrears program when you first learned about it?

17        A.    That it's part of our compensation          12:01

18   program.

19        Q.    And did you convey information

20   concerning the arrears program to sales associates?

21        A.    Yes.

22        Q.    And how did you do that?

23        A.    Again through store meetings and through

24   individual one-on-one's.

25        Q.    Did you have a store meeting during

Page 83

```
 1    which the arrears program was discussed?
 2         A.    Yes.  I don't recall when or how
 3    exactly, but I always would have a store meeting
 4    around all communications.
 5         Q.    When you say you would always have a
 6    store meeting around all communications, what do you
 7    mean by that?                                        12:02
 8         A.    If there were to be a new -- again, a
 9    new launch of certain policies or procedures or new
10    company's announcements that is in a grander scale
11    that needs to be heard by all employees, then we
12    would have a store meeting.
13         Q.    And what -- who decides whether it needs
14    to be heard by all employees?
15         A.    It's uniformly usually decided by,
16    again, corporate office or my direct supervisor or at
17    times my own initiation.                             12:02
18         Q.    But you specifically recall having a
19    meeting during -- an all-hands meeting; is that
20    correct?  In other words, all sales associates?
21         A.    Correct.
22         Q.    Concerning the arrears program; is that
23    correct?
24         A.    That's correct.
25         Q.    Did you have one-on-one counseling --
```

Page 84

1    one-on-one conversations, rather, about the arrears

2    program with sales associates?

3        A.    Yes.

4        Q.    And what were the names of any sales

5    associates with whom you had a conversation about the

6    arrears program, if you can recall any of their

7    names?                                               12:03

8        A.    I don't recall any of the names, but I

9    know that one-on-one's was -- were carried out for

10   all employees -- sales associates.

11       MR. GOINES:  Is this a convenient time to take

12   a short break?

13       MR. GRIGG:  Sure.

14       MR. GOINES:  Okay.

15           (Brief recess.)

16   BY MR. GRIGG:

17       Q.    During your tenure at the San Francisco   12:18

18   and Palo Alto stores did you ever have problems with

19   sales associates taking too many rest breaks?

20       A.    No.  Not that I can recall.

21       Q.    Did you ever have problems with sales

22   associates taking rest breaks that were too long?

23       A.    No, not that I can recall.

24       Q.    Did you ever have to ask, encourage or

25   instruct a sales associate to get back on the floor

```
 1    says,
 2                        "Any remaining arrears balance
 3                        owed will be captured on the
 4                        March 31st paycheck."
 5              Did that occur?
 6         A.    I would assume that it did.
 7         Q.    And why would you assume that it did?      12:48
 8         A.    Because it's stated.
 9         Q.    And what is this document?
10              How would you have gotten this?
11         A.    It's -- again it's probably through a
12    format of communication through the web, e-mails,
13    personally delivered by my direct supervisor, but
14    usually in the same format as described above with
15    all communications.
16         Q.    With whom did you discuss this document?
17         A.    Can you rephrase that?                     12:49
18              With whom did I discuss about the
19    documents or about --
20         Q.    Yeah, this document, did you discuss
21    this document with anyone?
22         A.    We -- I went over the documentations
23    again in a group meeting with the staff and any
24    individual that's been affected by this, yes.
25         Q.    So you specifically told sales
```

Page 108

1    associates that the arrears program was terminated;

2    is that correct?

3         A.    That's correct.

4         Q.    And you told all sales associates that,

5    correct?

6         A.    Yes.  To my knowledge, yes.

7         Q.    And then on the next page it talks about    12:50

8    a base-plus commission option.  And then in the notes

9    portion it says,

10                        "Associates on this program must

11                        not work more than 40 hours in a

12                        given week."

13             Do you see that (indicating), under the

14    notes portion?

15         A.    Okay.

16         Q.    Before we talked about that.

17             Have you seen this document, too, or is    12:50

18    this -- was this connected to the same document, do

19    you know?

20         A.    I don't recall the exact content on the

21    documents that I viewed.

22         Q.    Is it your understanding that the

23    employees on the base-plus commission option must not

24    work more than 40 hours in a given week?

25         MR. GOINES:  Objection.  Lack of foundation.

Page 109

```
 1   entail?

 2         A.    Just printing reports, showing what the

 3   sales were for the day, and, you know, how much --

 4   what kind of tenders and how much we have taken in

 5   for the day.

 6         Q.    And where would they print out these

 7   reports?                                          13:50

 8         A.    In the operations office.

 9         Q.    And what are the titles of these reports

10   they're printing out?

11         A.    Sales reports.

12         Q.    Any other reports?

13         A.    I don't know the exact name of the other

14   reports.

15         Q.    What other duties would the other

16   manager, in other words, not the on-the-floor

17   manager, have around closing time?                13:51

18         A.    I think to the most part that's all.

19         Q.    Did you discuss the arrears program with

20   Janice Keefe, also known as Janice Howay?

21         A.    I don't remember that particular

22   program, but, yes, I've discussed the content of the

23   employees handbook, which the arrears was in.

24         Q.    I'm sorry.  Did you just say that you

25   discussed the content of the arrears program in the
```

1    employee handbook?

2         A.    That's correct.

3         Q.    What employee handbook was the arrears

4    program in?

5         A.    All of the -- can you rephrase that

6    question?

7         Q.    Sure.  It's my understanding that you      13:52

8    discussed the content of the arrears program as that

9    was set forth in some handbook.

10        A.    Uh-huh.  It was either the handbook or

11   the communication, at which time, yes.

12        Q.    So the arrears program you're saying may

13   not have been set forth in an employee handbook, but

14   instead may have been set forth in a different

15   document, correct?

16        A.    That's correct, yeah.

17        Q.    And you would have discussed that with     13:52

18   Janice Keefe, also known as Janice Howay, correct?

19        A.    That's correct.

20        Q.    And did you also discuss it with Corrine

21   Mullen?

22        A.    Yes.

23        Q.    Did they say anything about the arrears

24   program when you first told them about it?

25        A.    Not that I can recall, no.

```
 1         A.    I would say yes.

 2         Q.    Did you tell N. Otsuka about the arrears

 3   process or arrears program?

 4         A.    Yes.

 5         Q.    And what did you tell her about it?

 6         A.    I think the same format of communication

 7   with everyone, how the pay structure works and how      14:08

 8   she is being compensated for her time for commission

 9   pay.

10         Q.    Did she ask you any questions about it?

11         A.    I usually with the same format would

12   show the example and ask if there is any questions

13   surrounding how you are being paid, yes.

14         Q.    Do you recall if she asked you any

15   questions about it?

16         A.    I don't recall that, no.

17         Q.    I'm going to show you what we've           14:09

18   previously marked as Exhibit 32 and ask you if you

19   recognize that.

20         A.    Vaguely I think I have seen this, yes.

21         Q.    And in what context do you think you saw

22   this?

23         A.    If I can recall correctly, it is after I

24   have reacquired the Palo Alto store going through

25   individual documentations that I came across this
```

Page 135

 1    particular letter.

 2         Q.    When you say after you reacquired the

 3    Palo Alto store, are you talking about when you got a

 4    promotion such that you were overseeing the

 5    Palo Alto, San Francisco and Burlingame stores?

 6         A.    That's correct.

 7         Q.    And at that time you discovered this       14:10

 8    when or you came across this in what context?

 9         A.    As I was going through all the older --

10    all the files just to make sure that we cleaned out

11    all the employee files.

12         Q.    And did you have any conversation with

13    anyone about this letter?

14         A.    I didn't, no.

15         Q.    Did you read this letter at that time?

16         A.    I don't think I read it in its full

17    content, no.                                          14:10

18         Q.    In this letter she says in the first

19    paragraph in the middle,

20                    "It was not until I inquired

21                    about a major discrepancy in my

22                    last paycheck that I was informed

23                    of a program known as arrears."

24              Do you know if that's true, that she

25    wasn't informed of a program known as arrears until;

```
 1    based on the date of this letter, sometime in October

 2    of 2004?

 3         A.    I can't speak to what she says.  I can

 4    speak to that when she was hired she was communicated

 5    to.

 6         Q.    When she was hired she was

 7    communicated --                                        14:11

 8         A.    To the arrears program and the

 9    compensation program.

10         Q.    And that was because you told her about

11    it; is that correct?

12         A.    That's correct.

13         Q.    Are employees generally told if they're

14    not making their sales targets?

15         A.    They would be -- they would be

16    communicated to on a monthly basis, and generally in

17    formal conversations and coaching happened, you know,   14:11

18    throughout the weeks and during the week, as well,

19    but the formal one would be a sit down one-on-one at

20    the end of the month or usually the week after the

21    month has ended, the first week after the month has

22    ended.

23         Q.    And when did that monthly counseling

24    first go into effect, that one-on-one counseling?

25    When did that first start?
```

Page 137

.

# EXHIBIT 8

**to Declaration of William J. Goines in Opposition to
Plaintiffs' Motion for Class Certification**

## Golden Gate Reporting

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4

5    ANN OTSUKA, an individual; JANIS        No. C-07-02780-SI
     KEEFE, an individual; CORINNE
6    PHIPPS, an individual; and
     JUSTIN KISER, an individual;
7    individually and on behalf of
     all others similarly situated,
8
                    Plaintiffs,
9      vs.

10   POLO RALPH LAUREN CORPORATION;
     a Delaware Corporation; POLO
11   RETAIL, LLC, a Delaware Corporation;
     POLO RALPH LAUREN CORPORATION, a
12   Delaware Corporation, doing business
     in California as POLO RETAIL CORP;
13   FASHIONS OUTLET OF AMERICA, INC., a
     Delaware Corporation and DOES 1-500,
14   inclusive,

15                  Defendants.
                                        /
16

17
                DEPOSITION OF PHOEBE MIRELES
18

19
         DATE:            November 15, 2007
20
         TIME:            10:15 a.m.
21
         LOCATION:        One Montgomery Street
22                        Suite 3220
                          San Francisco, California
23
         REPORTED BY:     Mary E. Garland
24                        Certified Shorthand Reporter
                          License Number 4721
25

                                                   Page 1

## Golden Gate Reporting

1    case?

2        A.   No.

3        Q.   Have you seen the Web site poloclassaction.com,

4    that we established for this case?

5        A.   No.

6        Q.   Have you discussed the case, other than with

7    Ms. Louie, with any other persons?

8        A.   No.

9        Q.   Do you know where Mr., I believe it's, Zablan

10   currently resides?

11       A.   I believe it's in Hawaii.

12       Q.   Does he go by another name, other than that?

13       A.   Yes.  That is actually his middle name.  His

14   first name is Zane.

15       Q.   Z-a-n-e?

16       A.   Yes.

17       Q.   And his last name is spelled?

18       A.   Z-a-b-l-a-n.   Zablan.

19       Q.   Do you know which island of Hawaii he lives on?

20       A.   Oahu.

21       Q.   Have you ever discussed any of the claims in

22   this case with him?

23       A.   No.

24       Q.   I'd like to have you, just briefly, give me a

25   thumbnail sketch of your education after high school.

Page 16

## Golden Gate Reporting

1       A.   Okay.  I studied briefly at the Honolulu
2   Community Collage in Oahu, and took a couple classes at
3   the University of Hawaii.
4       Q.   And what were the courses?
5       A.   It was fashion merchandising.
6       Q.   Any other formal education after high school?
7       A.   No.
8       Q.   Would you give me a thumbnail sketch of your
9   employment background, beginning with your first
10  position in the retail business.
11      A.   First position ever was with Louis Vuitton,
12  part-time in high school.  Then I started with Ralph
13  Lauren.  And that was in 1996, summer of '96, I want to
14  say it was June.  And I was there part-time, as a
15  cashier, in high school.
16      Q.   Which store did you work in for Polo?
17      A.   Ralph Lauren in Honolulu.
18      Q.   And how long did you work as a cashier in
19  Honolulu?
20      A.   '96, '97, '98.  Probably a year and a half.
21      Q.   Through sometime in 1998?
22      A.   Yes.  And then --
23      Q.   Did you remain a cashier, through that time,
24  part-time?
25      A.   Yes.  Part-time cashier.

Page 17

## Golden Gate Reporting

1    Q.  After that position at Polo, what was your next

2    position in the retail business?

3    A.  I went on to be a sales associate, from about

4    '98 to 2000.

5    Q.  And was that in Honolulu?

6    A.  Yes.

7    Q.  And throughout that time, your position was

8    sales associate?

9    A.  Yes.

10   Q.  Were you ever designated a senior seller?

11   A.  No.

12   Q.  And your next position in retail?

13   A.  It was as an assistant Men's manager, still

14   there in the Honolulu location.

15   Q.  And that began sometime approximately in 2000?

16   A.  In 2000.

17   Q.  Until when?

18   A.  Until 2002.

19   Q.  And throughout that time, did you remain as an

20   assistant manager?

21   A.  Yes.

22   Q.  In the Men's department?

23   A.  Yes.

24   Q.  What was your next position in retail?

25   A.  Then I was the Women's manager, and was

Page 18

## Golden Gate Reporting

1    transferred to the Stanford location.

2         Q.   Did you become the Women's manager in Hawaii?

3         A.   No.

4         Q.   So you became the Women's manager --

5         A.   At Stanford.

6         Q.   -- at Stanford?

7         A.   Mm-hm.

8         Q.   In approximately 2002?

9         A.   Mm-hm.

10        Q.   Yes?

11        A.   Yes.  It was in April or May of '02.

12        Q.   And when you first began, who was the store's

13   general manager?

14             MR. GOINES:  You're talking about Stanford?

15             MR. KITCHIN:  Correct.

16             THE WITNESS:  Her name was Christy Hannaford.

17        Q.   BY MR. KITCHIN:  And how long did you remain

18   the Women's manager at Stanford?

19        A.   I was the Women's manager until about the

20   summer of '04.

21        Q.   And in the summer of '04, what was your

22   position?

23        A.   Then I became the general manager.

24        Q.   Again, at the Stanford?

25        A.   Yes.

Page 19

## Golden Gate Reporting

1       Q.  And how long did you remain the general manager

2    at Stanford?

3       A.  I left the company, in that position, in April

4    of '05.  I believe it was April.  Yes.

5       Q.  And after leaving the Stanford Polo store, as

6    general manager, what was your next position?

7       A.  Women's manager at Giorgio Armani, in May of

8    '05.

9       Q.  I want to focus on the time period beginning in

10   April of '02, when you came to California to become the

11   Women's manager at the Stanford Polo store.

12          When you came to that store, did you undergo

13   any kind of orientation or training?

14      A.  Hmm.  It was very brief.  It was an

15   introduction to my new role with the current general

16   manager, which was Christy Hannaford.

17      Q.  How long did the actual orientation or training

18   take?

19      A.  Possibly a few days, maybe my first week there.

20   I can't recall exactly.

21      Q.  During that initial training by Ms. Hannaford,

22   did you speak with anyone about the employment laws in

23   California and how they are applied to retail workers?

24      A.  No.

25      Q.  Did anyone at that time discuss with you

Page 20

## Golden Gate Reporting

1     A.   Yes.

2     Q.   And did they have a break room in the store?

3     A.   Yes.

4     Q.   And did they have lockers in the store?

5     A.   Yes.

6     Q.   So would employees typically clock out and then

7  go to their lockers and get purses and personal

8  belongings?

9     A.   No.   They would actually get their things and

10  then clock out.

11     Q.   How do you know that?

12     A.   I remember them doing so.

13     Q.   So employees would --

14     A.   I don't know for sure if they did it all the

15  time, but I remember that.

16     Q.   So you saw sales associates who were going to

17  the lockers to get their bags and personal items, taking

18  those items back to the cash register, and then clocking

19  out?

20     A.   Yes.   Say, they were leaving for the day, they

21  put their scarfs on, their jackets, grab their bags, go

22  downstairs, do their thing, and then meet someone at the

23  door.

24     Q.   Were there ever times when you were paged to do

25  the loss prevention or bag checks for sales associates

Page 58

## Golden Gate Reporting

1    when you couldn't respond to them within a few minutes?

2        A.   Sometimes.  But typically, we would partner

3    with the other person.  So if I was the one doing all

4    the deposits and the numbers, the other person, whether

5    it was a manager or senior seller, would have the keys

6    and be ready for them to leave.

7        Q.   So more often than not, there were at least two

8    people in the store with keys who were permitted to let

9    people out of the store at the end of the shift?

10       A.   If there are two managers, we had two sets of

11   keys.  If there was one manager and, say, a senior

12   seller, we had one set of keys.  Say, I was doing things

13   upstairs -- or vice versa, that person could do that

14   upstairs -- I would be downstairs with the keys or they

15   would be downstairs with the keys.

16       Q.   Throughout the course of your employment at the

17   Stanford Shopping Center, did you ever hear of any sales

18   associates complaining that they had been required to

19   wait for what they thought was an unreasonable period of

20   time to be let out of the store to go home?

21       A.   No, not to my knowledge.

22       Q.   So you had never even heard from another

23   manager of such a complaint?

24       A.   There's a possibility, yes.

25       Q.   On what do you base the statement that there's

Page 59

## Golden Gate Reporting

1  a possibility?

2      A.  I think it was brought to my attention that a

3  manager said that the associates complained about

4  waiting and they claimed it was like a few minutes, when

5  I don't know how long it was for the sales associates.

6      Q.  Who claimed that it was a few minutes?

7      A.  Any manager at the time.  It could have been

8  Haaheo, it could have been -- who else was the manager

9  at the time? -- Sabrina.  There was an assistant key

10  holder, Jennifer.  I don't know for sure.  It could have

11  been any one of them.

12      Q.  Now, let me make sure we have this clear.

13          So a manager told you that sales associates had

14  complained about the wait time to get --

15      A.  Yes.

16      Q.  -- out of the store, and the manager told you

17  that the sales associates had only waited a few minutes?

18      A.  Right.

19      Q.  Based on your memory of this --

20      A.  Right.

21      Q.  -- did the sales associates tell the manager,

22  who told you, that they had only waited a few minutes,

23  or do you know?

24      A.  I don't know.

25      Q.  Was it your impression that the sales

Page 60

## Golden Gate Reporting

1  associates were complaining that they had to wait for

2  more than a few minutes?

3      A.  No.  Because I never got a complaint, a

4  personal complaint.  This is all word of mouth, through

5  managers, or a manager -- I don't remember -- and it

6  wasn't something that happened very often.  And if it

7  did, they would say it and it was in passing, and they

8  had apologized for maybe they were busy, in the

9  restroom.  I don't know.

10      But I would always ask, "Well, why were they

11  waiting for that amount of time?" or however long it

12  was.  But it was never more than a few minutes.

13      Q.  On how many separate occasions do you recall

14  hearing from any source that sales associates were

15  complaining about having to wait too long to leave the

16  store?

17      A.  Very few.  And if it was, it was during a very

18  short period of time where we were maybe short on

19  managers.  Just trying to think here.  There's myself --

20  I would say just a few times.  There wasn't a whole lot

21  of complaints that I can remember.  And, again, it

22  wasn't to me; possibly to other managers.

23      Q.  Were there any occasions where you learned from

24  any source that sales associates were complaining that

25  it took what they believed to be an unreasonable period

Page 61

## Golden Gate Reporting

1    of time to have a manager do a bag check so that they

2    could leave for their lunch break?

3        A.   No.

4        Q.   So you never heard that complaint --

5        A.   No.

6        Q.   -- while you were working there?

7        A.   Not an unreasonable amount of time, no.  But

8    what's unreasonable?

9        Q.   Well, my question is:  Did you ever hear from

10   any source that an employee, an associate, had

11   complained that they felt that they had had to wait for

12   some unreasonable period of time to get out of the store

13   to have their lunch?

14       A.   No.

15       Q.   I'd like to shift topics here a bit and talk

16   about the rest breaks that employees, sales associates,

17   received while they worked at Polo at Stanford.

18       A.   Yes.

19       Q.   What breaks did a full-time employee get during

20   a full-day shift?

21       A.   They got two 15-minute breaks and one hour

22   lunch break.  The two 15-minute breaks were on the

23   clock, the hour lunch break was off the clock.

24       Q.   Did you ever hear from any source, during the

25   time you worked at the Polo Stanford Shopping Center,

Page 62

1    that sales associates were not taking either of their

2    15-minute breaks?

3        A.   Some chose not to.  They would rather stay on

4    the sales floor and sell.

5        Q.   Do you have any recollection of which sales

6    associates chose not to take their 15-minute breaks?

7        A.   No, I don't.

8        Q.   Do you have an estimate for me of the

9    percentage of sales associates, over the course of your

10   employment, that you believe chose not to take their

11   15-minute breaks?

12       A.   Oh, very few, small percentage.  I would say

13   less than ten.  Most of the people chose to take their

14   15s.  And I encouraged it when I was the manager.

15       Q.   Did you ever hear anyone complain that they

16   had been unable to take their 15-minute break for any

17   reason?

18       A.   I wouldn't say a -- nothing directly to me.

19   Possibly to their -- well, while I was a GM.  Possibly

20   to their department managers.  And this was scheduled

21   within the departments, as long as there was coverage,

22   as long as it was at a reasonable time.

23            They couldn't go from 8:45 to nine o'clock,

24   when we're going to close at nine, let's just say.  It

25   just -- it would depend, yeah.  But not a personal or

Page 63

# EXHIBIT 9

**to Declaration of William J. Goines in Opposition to
Plaintiffs' Motion for Class Certification**

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN FRANCISCO DIVISION

 4

 5   ANN OTSUKA, an individual; JANIS      No. C-07-02780-SI
     KEEFE, an individual; CORINNE
 6   PHIPPS, an individual; and
     JUSTIN KISER, an individual;
 7   individually and on behalf of
     all others similarly situated,
 8
                       Plaintiffs,
 9      vs.

10   POLO RALPH LAUREN CORPORATION;
     a Delaware Corporation; POLO
11   RETAIL, LLC, a Delaware Corporation;
     POLO RALPH LAUREN CORPORATION, a
12   Delaware Corporation, doing business
     in California as POLO RETAIL CORP;
13   FASHIONS OUTLET OF AMERICA, INC., a
     Delaware Corporation and DOES 1-500,
14   inclusive,

15                      Defendants.
                                          /
16

17
                  DEPOSITION OF KRISTI MOGEL
18

19
            DATE:          February 4, 2008
20
            TIME:          10:06 a.m.
21
            LOCATION:      Greenberg Traurig
22                         1900 University Avenue
                           Fifth Floor
23                         East Palo Alto, California

24          REPORTED BY:   Mary E. Garland
                           Certified Shorthand Reporter
25                         License Number 4721

                                              Page 1
```

1      Q.  What was your first position at Macy's West?

2      A.  Assistant manager.

3      Q.  For the San Francisco Union Square store?

4      A.  Stanford, Palo Alto store.

5      Q.  And the position after that?

6      A.  Assistant human resource manager.

7      Q.  And after serving as assistant human resources

8  manager, did you have another position?

9      A.  Yes.  Human resource manager at the Monterey

10  and Salinas stores.

11      Q.  And following that position?

12      A.  Human resource manager at Valley Fair, in Santa

13  Clara.

14      Q.  And after that position?

15      A.  Human resource manager in Union Square.

16      Q.  And on December 9th, 2003, you began working

17  for Polo Ralph Lauren Corporation?

18      A.  Correct.

19      Q.  And what was your position?

20      A.  Human resource manager.

21      Q.  And has your title changed since you began

22  working as human resource manager for Polo?

23      A.  Yes.

24      Q.  How long did you serve as human resource

25  manager when you first began?

Page 18

```
1         A.   All the way up until my title changed.

2         Q.   When did your title change?

3         A.   Approximately four months ago.

4         Q.   And what is your current title?

5         A.   Director.

6         Q.   Director of?

7         A.   Human resources.

8         Q.   In your position as human resources manager you

9    held from 2003 until about four months ago, did you have

10   within the scope of your duties and responsibilities

11   more than one store?

12        A.   Yes.

13        Q.   Which stores did you have responsibility over?

14        A.   San Francisco, Burlingame, Palo Alto, La Jolla,

15   South Coast Plaza, Beverly Hills, Ala Moana in Hawaii,

16   Las Vegas, Phoenix.  And then more recently, we've had

17   some new store openings.

18        Q.   Any of those in California, that you have

19   responsibilities and duties over?

20        A.   Yes.

21        Q.   Which ones are those?

22        A.   Three stores in Malibu.

23        Q.   And what stores are those?

24        A.   A Men's store; a Women's store; and an RRL

25   store, R-R-L.
```

Page 19

1      Q.   It reads, "This contains the detail around

2   arrears which we pulled out of the handbook and is now a

3   separate attachment."

4           Was there any discussion at this meeting, or

5   meetings, in 2004 in New York regarding whether to

6   include information about Arrears in the handbook or in

7   a separate attachment?

8      A.   Not to my knowledge.

9      Q.   Was there any expression of concern at that

10  meeting that it would be important not to share the

11  Arrears information with employees in California who

12  would not be subject to the Arrears based on their date

13  of hire?

14     A.   It might have been a comment that I was -- I

15  had made at the time.

16     Q.   What was that comment about?

17     A.   My personal belief is, whenever it comes to

18  payroll and compensation, it's a private issue; and I

19  feel that's best handled in a one-on-one situation

20  between the individual who's affected and the manager.

21     Q.   Has it ever been, to your knowledge, a policy

22  of Polo Ralph Lauren to prohibit sales associates in

23  California from discussing how much they were earning

24  with other sales associates?

25     A.   No.   It's always a public celebration, because

Page 101

1    we're a commission-based environment.  So the results of

2    someone's sales or productivity are posted in public

3    places all over the store.

4         Q.  Have you ever seen a policy that expressly

5    prohibited sales associates from discussing their wages

6    with other sales associates in California?

7         A.  I did see a reference to that in the handbook,

8    that I was, I believe, told -- I can't recall by who --

9    but that that was no longer current.  Our handbook was

10   outdated at the time I saw it.

11        Q.  And approximately when do you recall learning

12   from someone that that policy was outdated?

13        A.  I think soon after I started.  They were in the

14   process of revising the handbook with several updates,

15   and that was one of them.

16        Q.  During this meeting, or meetings, in New York

17   in 2004 regarding the roll-out described in Exhibit 7,

18   was there any discussion that you recall relating to the

19   payment or nonpayment of premium overtime compensation

20   to sales associates in California?

21        A.  No.  And I'm still -- I'm still thinking.

22   That's why I'm looking at the dates of this and trying

23   to put it together for myself.

24             As difficult as it is for me to say this, I

25   honestly do not know if I was at this meeting, if Lara

Page 102

```
 1    duties and responsibilities.

 2             At this point in time, how many breaks during

 3    the day are sales associates permitted?

 4        A.  It depends on the length of their shift.

 5        Q.  For those sales associates on a specific date

 6    who are working eight hours, how many breaks are they

 7    entitled to receive from Polo during the course of that

 8    eight-hour day?

 9        A.  That would be two breaks, two breaks a day.

10        Q.  So which breaks would those be?

11        A.  Be paid --

12             MR. GOINES:  Your question is about rest

13    breaks; right?

14             MR. KITCHIN:  Yes.

15        Q.  I'm asking generally, including lunch breaks.

16        A.  Oh, I apologize.  I didn't understand that.  An

17    eight-hour day would be one meal and two breaks.

18        Q.  And when are the breaks, the rest breaks,

19    scheduled for an eight-hour-day employee?

20        A.  There's a few guidelines in the book; that you

21    should do your best to take your break no earlier than

22    two hours into your shift.  There's some general

23    guidelines.  But those breaks are permitted and part of

24    the culture, just based on when people's appointments

25    are, and when their customers come in, and when the
```

Page 144

1    second late shift arrives.

2        Q.  Prior to the roll-out of the 2007 employee

3    handbook, were there any differences, that you're aware

4    of, in the scheduling of rest breaks for sales

5    associates in any of the full-price retail stores?

6        A.  To my knowledge, the rest breaks were never

7    scheduled.

8        Q.  Prior to the roll-out of the 2007 --

9            MR. GOINES:  I think you misunderstood his

10   question.

11           MR. KITCHIN:  Yes.  I'm going to reask it.

12           MR. GOINES:  Thank you.

13       Q.  BY MR. KITCHIN:  Let's take a look at page 23,

14   which is the Bates stamp number 1524.  On the right-hand

15   bottom, it says "Meal Periods and Breaks."

16           You see that?

17       A.  Yes.

18       Q.  The first two sentences read:

19           "Polo provides its employees with breaks and

20           meal periods in accordance with local laws.  It

21           is the manager's responsibility to ensure that

22           the appropriate breaks are taken."

23           Prior to the roll-out of this handbook in April

24   of 2007, did Polo consider it the manager's

25   responsibility to ensure that sales associates were

1    taking appropriate breaks?

2        A.  Certainly.  Ultimately, they're accountable for

3    that.

4        Q.  And what policies or procedures were you aware

5    of that were in effect prior to April of 2004 for

6    managers to ensure that their sales associates within

7    their departments were taking the breaks in accordance

8    with California law?

9        A.  A reinforcement of the policy was ongoing.

10       Q.  Were there, to your knowledge, any written

11   documents used by any managers in the full-price retail

12   stores to track when a sales associate took a rest break

13   during their working day?

14       A.  I don't believe there were any documents to

15   track that.

16       Q.  Prior to April of 2007, when this manual was

17   rolled out, had you ever heard from any source, managers

18   or sales associates, that they had any concerns about

19   sales associates not taking their rest breaks during

20   their work shifts?

21       A.  Never.

22       Q.  Did you ever hear from any source that senior

23   sellers typically did not take their rest breaks?

24       A.  No.

25       Q.  Did you ever hear from any source prior to the

Page 146

1    terminology.

2         Q.  Prior to April 2007, to your knowledge, was it

3    the policy or practice of any store over which you had

4    some duties and responsibilities to have employees find

5    a manager to perform a loss prevention inspection before

6    they clocked out?

7         A.  Logistically, it would be difficult to do,

8    because many times the computers where you can clock out

9    are not near the exit.  So, again, this is something

10   that is new discussion for me right here today.

11        Q.  Has it been generally the practice in all of

12   the California retail stores over which you have some

13   duties and responsibilities for the sales associates to

14   clock out prior to the time that they find a manager who

15   is available to perform a loss prevention search?

16        A.  Yes.  They would clock out, typically, collect

17   their belongings, and leave the store.

18        Q.  Have you ever learned from any source, other

19   than perhaps counsel in this action, that employees of

20   Polo Ralph Lauren in California had complained that they

21   were being required to wait what they believed was an

22   unreasonable amount of time to have loss prevention or

23   bag check inspections performed at the end of their

24   shifts?

25        A.  No, I don't recall any formal complaints around

Page 157

1   that at all.

2       Q.  Do you recall any informal complaints that

3   people were having to wait what they considered to be an

4   unreasonable amount of time to secure the assistance of

5   a manager to perform a bag check at the end of their

6   shifts?

7       A.  No.

8       Q.  Have you ever performed a bag check or loss

9   prevention inspection in any of the stores over which

10  you have some responsibilities and duties when a group

11  of individuals were waiting at the appropriate exit door

12  when you arrived to perform a bag check or loss

13  prevention inspection?

14      A.  Once, that I recall that.

15      Q.  In which store did that occur?

16      A.  San Francisco.

17      Q.  And was that at the designated employee exit?

18      A.  It was.

19      Q.  And approximately when did that happen?

20      A.  I would say well over three years ago.

21      Q.  Do you recall specifically who was waiting at

22  the back door when you arrived?

23      A.  I don't recall.

24      Q.  Do you remember the approximate number of

25  individuals who were waiting at the back door?

# EXHIBIT 10

**to Declaration of William J. Goines in Opposition to
Plaintiffs' Motion for Class Certification**

Golden Gate Reporting

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN FRANCISCO DIVISION

 4

 5   ANN OTSUKA, an individual;   )
     JANIS KEEFE, an individual,  )
 6   CORINNE PHIPPS, an           )
     individual; and RENEE DAVIS, )
 7   an individual; individually  )
     and on behalf of all others  )
 8   similarly situated,          )
                  Plaintiffs,     )
 9                                )

10       -vs-                     )   No. C-07-02780-SI

11                                )

12   POLO RALPH LAUREN CORPORATION;)
     a Delaware Corporation; POLO  )
13   RETAIL, LLC., a Delaware      )
     Corporation, POLO RALPH LAUREN)
14   CORPORATION, a Delaware       )
     Corporation, doing business in)
15   California as POLO RETAIL     )
     CORP; FASHIONS OUTLET OF      )
16   AMERICA, INC., a Delaware     )
     Corporation,                  )
17            Defendants.          )

18   _____ )

19

20            The deposition of HARVEY RESNICK, called
     by the Plaintiffs for examination, pursuant to
21   subpoena and pursuant to the Federal Rules of
     Civil Procedure for the United States District
22   Courts pertaining to the taking of depositions,
     taken before Cynthia J. Conforti, Certified
23   Shorthand Reporter, at Suite 2500, 77 West Wacker
     Drive, Chicago, Illinois, commencing at the hour
24   of 10:09 a.m. on the 23rd day of April, A.D.,

25   2008.
```

Page 1

1    A.    I believe it was an hour.

2    Q.    And did sales associates clock out when

3    they began their meal break and clock back in when

4    they returned?

5    A.    Yes, that's correct.

6    Q.    And for sales associates who worked a full

7    eight hour or eight-hour-plus day, were they

8    specifically scheduled for rest breaks in the

9    morning and afternoon?

10    A.    I don't recall ever scheduling that, but

11    they were entitled to a break.  I always tried to

12    emphasize the importance of not going in groups

13    because we needed to cover the sales floor, so

14    other than that, I just pretty much left it open

15    to whenever somebody felt they needed a break.

16    Q.    Did you ever hear any managers

17    discouraging sales associates from taking rest

18    breaks?

19    A.    The only thing that might have been said

20    with regard to that was that some people who

21    needed to bring their sales up were the ones who

22    were most often taking -- most obviously taking

23    their breaks, and they'd be seen on break and

24    somebody might say to them, you know, "You need to

25    be selling, not taking time off the floor."

```
 1      A.    It was probably mentioned, but just in
 2   passing really, not so much of lodging a
 3   complaint.
 4      Q.    So you have a general recollection of at
 5   least one employee indicating to you that for some
 6   reason they weren't able to take their rest
 7   breaks.
 8      A.    Yes.
 9      Q.    Do you have a general recollection of the
10   number of times that you heard a sales associate
11   say something to that effect?
12      A.    I don't know.
13      Q.    When we were off the record, I was trying
14   to pinpoint when you worked for Polo, and do you
15   believe that you worked for Polo from July or
16   August of 2004 through approximately February of
17   2005?
18      A.    Yes.
19      Q.    Did you ever have a discussion with any
20   management level person at Polo about premium
21   overtime compensation for sales associates?
22      A.    Yes.
23      Q.    What do you recall about any conversations
24   you had about premium overtime compensation?
25      A.    Well, sometime probably within the first
```

Page 53

```
 1    that you were working and supervising your team
 2    you'd sit down in the meeting and say "Harvey's
 3    going to go to lunch at 11, Pats's going to go to
 4    lunch at 12, Bill's going to go to lunch at one,"
 5    something like that?
 6        A.   That's correct.
 7        Q.   Okay.  And to the best of your
 8    recollection the sales associates took their lunch
 9    breaks on a daily basis during the tenure you were
10    at Polo in your group.
11        A.   Yes, yes.
12        Q.   Okay.
13        A.   I would say that I'm sure that somewhere
14    in the tenure that I was there somebody missed a
15    lunch.  I'm sure it happened.
16        Q.   Okay.  Fair.
17             Now, on the rest break issue, you I
18    believe used the phrase this morning that you
19    understood that your sales associates were
20    entitled to two rest breaks during the course of a
21    full workday, correct?
22        A.   That is correct.
23        Q.   But that at the start of the shift you
24    didn't sit down in that huddle and say when you're
25    going to take your break, when I'm going to take
```

Page 116

1    my break, when Patrick's going to take his break,

2    correct?

3        A.    That is correct.

4        Q.    You left it to the sales associates to

5    kind of figure out how the hub and flow of the day

6    went so that he or she could take a rest break?

7        A.    Yes.  I wanted them to take their rest

8    breaks when they really felt they needed a break,

9    not simply to take time off the floor.

10       Q.    And also when it worked out in terms of

11   the actual selling of goods and services.

12       A.    Absolutely, yes.

13       Q.    During your tenure did any sales

14   associate, Justin or others, come to you and say,

15   "Harvey, you know, I'm not able to get my break or

16   so and so's abusing his or her break, and it's

17   just not fair, and I need you to come in and

18   referee this problem."

19       A.    Probably.

20       Q.    As a general rule would it be fair to say

21   you encouraged your sales associates to take their

22   rest breaks when they needed them?

23       A.    Yes.

24       Q.    And you know of no situation, no specific

25   situation where sales associates were not taking

1    their rest breaks during -- as entitled during the

2    workday?

3        A.    I'm not sure it's fair to characterize it

4    quite like that.

5        Q.    Please.  How would you characterize it?

6        A.    As a manager --

7        Q.    Yes, sir.

8        A.    -- my feeling about the rest breaks was

9    that the sales associate was entitled to the rest

10   break.  It was up to him to decide if he was going

11   to take it or not.

12            Unlike the lunch break which was mandatory

13   and I scheduled, you had to take your one hour off

14   the clock for lunch.

15            If you were feeling great, selling a lot

16   and didn't feel like you needed a break, I didn't

17   think I needed to impose a break on anybody.

18            I don't know what the law in California

19   says about that sort of thing, but that was my

20   approach, so rest breaks were as needed when

21   appropriate based on the needs of the selling

22   floor as well as the sales associates personally.

23       Q.    And during your tenure did any sales

24   associate come to you and say, "Hey, Harvey, I'm

25   just not able to get my rest break.  It's too

Golden Gate Reporting

1    busy.  You know, I have no floor coverage."  Did

2    you ever get any complaints like that?

3        A.   Yes, I believe I did hear some people say

4    things like that.  You know, in a retail

5    environment you hear a lot of stuff like that.

6        Q.   Sometimes true, sometimes not true, right?

7        A.   Exactly, that's right.

8        Q.   So you would normally try and encourage

9    the people to work collaboratively so that they

10   got rest breaks when needed because they were

11   entitled to them.

12       A.   Exactly, right.

13       Q.   I don't have much more.

14       A.   Okay.  It's all right.

15       Q.   Did any of the sales associates in your

16   team, men's clothing and men's sportswear, ever

17   complain to you about a discrepancy between the

18   hours on his or her paycheck and the hours that

19   they believed they were entitled to be paid for

20   any particular pay period?

21       A.   I don't recall anybody making that

22   complaint.

23       Q.   On the days that you worked and Tin also

24   worked, so you're working the same day as Tin, as

25   a general rule did Tin -- was Tin remaining on the

415.499.DEPO ~ 866.936.DEPO
www.GoldenGateReporting.com                    ©2008