# EXHIBIT 11

**to Declaration of William J. Goines in Opposition to
Plaintiffs' Motion for Class Certification**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**CERTIFIED COPY**

ANN OTSUKA, et al.,

       Plaintiff,

-vs-                                                    No. C07-02780 BZ

POLO RALPH LAUREN
CORPORATION, a Deleware
corporation, et al.

       Defendants.
_____/

Videotaped Deposition of

CORINNE PHIPPS

Tuesday, June 12, 2007

Reported by:
KACY PARKER BARAJAS, RPR, CRR
CSR No. 10915
Job No. 15854LR



**PHILLIPS LEGAL SERVICES**
SAN FRANCISCO DEPOSITION REPORTERS
ONE SUTTER STREET, SUITE 700
SAN FRANCISCO, CA 94104
1-888-333-8270
WWW.PHILLIPSDEPO.COM

|   |   |
|---|---|
| 1 | A.        Oh, goodness, I can't actually remember at this |
| 2 | point.  Let me think about that for a minute.  It might |
| 3 | have -- it might have been Benefit Cosmetics. |
| 4 | Q.        Were you employed at Benefit Cosmetics before or |
| 09:49:56  5 | after your employment at Polo Ralph Lauren? |
| 6 | A.        I believe it was before. |
| 7 | Q.        Do you recall -- let me state it.  Our records |
| 8 | reflect that you joined Polo Ralph Lauren in or about June |
| 9 | of 2004 and left at the latter part of October '04.  Is that |
| 10 | consistent with your recollection? |
| 11 | A.        Yes. |
| 12 | Q.        At the time you left Polo Ralph Lauren, did you |
| 13 | seek employment? |
| 14 | A.        Yes. |
| 15 | Q.        And do you recall with which company or companies |
| 09:50:25 16 | or organization you worked after you left Polo Ralph Lauren? |
| 17 | A.        It may have been Interstate Batteries.  I would |
| 18 | have to look at my resume actually. |
| 19 | Q.        Prior to -- when you worked at Benefit Cosmetics, |
| 20 | what was the nature of your position? |
| 21 | A.        You know, I'm sorry.  I don't remember. |
| 22 |           MR. GOINES:  Why don't we mark as Exhibit A a |
| 09:50:58 23 | document entitled Corinne K. Mullen.  It is identified as |
| 24 | POLO 00023. |
| 25 |                     (Exhibit A was marked.) |

        1    A.        Oh, no.
11:41:15  2    Q.        I want to ask you a question kind of in the general
        3    area.  We've been talking about as to whether during the
        4    course of your employment from the latter part of June 2004
11:41:27  5    through the latter part of October 2004 you took rest breaks
        6    during the course of your work shifts?
        7    A.        Is there a question?  I'm sorry.
        8    Q.        Did you take rest breaks?
        9    A.        I did, yes.
       10    Q.        Okay.  You were in a department that had four
       11    salespeople plus a manager, correct?
       12    A.        Yes.
       13    Q.        Okay.  And during the typical shift in which you
       14    worked, how many other salespeople were working alongside
       15    you in that department?
       16    A.        Typically there would be two salespeople, that
11:41:59 17    would be including me, and a manager.
       18    Q.        So two salespersons plus a manager would work the
       19    same shift?
       20    A.        Simultaneously, yeah.
       21    Q.        Okay.  And were you -- did you take rest breaks
       22    during those shifts?
       23    A.        Yes, I did.
       24    Q.        And on what frequency did you take rest breaks?
       25    A.        I took my rest breaks, one in the morning and one

1  in the afternoon, regularly.

11:42:28 2  Q.      And were the -- how were the rest -- was your rest

3  break scheduled, or how was it communicated to you, hey,

4  Corinne, your turn to go on a break?  I'm just trying to

5  figure out how it happened.  I'm not suggesting that's how

6  it happened.  I just want to know how it happened.

7  A.      Well, I had mentioned earlier there was no written

8  schedule of when -- to the best of my recollection, there

9  was no written schedule as to when you would take a lunch

10  break, so there would be no written schedule as to when you

11:42:56 11  would take your rest period.  So basically we -- the two

12  people who would be working the floor, we would just work it

13  out amongst one another when do you want to take your rest

14  break, when do you want to take your rest break, and we

15  would kind of tier it from there.  And then just check with

16  our manager that we had actually -- we're going to take

17  our -- we're going to go take our 15 minutes to sit down or

18  whatever it was.

19  Q.      And it's your recollection that you would take such

20  a break twice during each workday?

21  A.      In an eight-hour period, yes.

22  Q.      Once in the morning, once in the afternoon?

23  A.      That's correct.

24  Q.      Now procedurally though you wouldn't actually go

25  log out of the system to take a rest break?

```
  1  employees.  Were you aware of that policy while you were an
  2  employee of the company?
  3  A.      Yes, I was.
15:43:26  4  Q.      And how was it -- that policy communicated to you?
  5  A.      I actually don't remember, but I know that it was a
  6  taboo subject.
  7  Q.      And was the rationale or the basis of the policy
  8  ever explained to you?
  9  A.      No.
 10  Q.      Did you ever discuss your wages or compensation
 11  with coworkers?
 12  A.      I think I did.
 13  Q.      So regardless of the policy, you shared your
 14  compensation with your coworkers to the extent you felt you
 15  needed to or wanted to?
 16  A.      Yeah.  I guess that's -- that would be correct.
15:44:00 17  Q.      Did you ever get disciplined for sharing your wages
 18  and compensation information with your coworkers?
 19  A.      No, I didn't.
 20  Q.      Do I understand that on a daily basis you could
 21  determine how much commission any of your coworkers earned,
 22  correct?
 23  A.      Yes.
 24  Q.      That was public data available to you as a person
 25  in the San Francisco store?
```

# EXHIBIT 12

**to Declaration of William J. Goines in Opposition to
Plaintiffs' Motion for Class Certification**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ANN OTSUKA, an individual,
et al.,

CERTIFIED COPY

             Plaintiffs,

      vs.                No. C-07-02780-SI

POLO RALPH LAUREN CORPORATION,
et al.,

             Defendants.

_____/

Videotaped Deposition of

**RENEE DAVIS**

Wednesday, March 19, 2008

Reported by:
IRIS MEINKE-SMITH, RMR/CRR
CSR No. 3798
Job No. 18236LR



**PHILLIPS LEGAL SERVICES**
SAN FRANCISCO DEPOSITION REPORTERS
795 FOLSOM STREET, FIRST FLOOR
SAN FRANCISCO, CA. 94107
(888) 333.5270
(800) 455-8030 fax
WWW.PHILLIPSDEPO.COM

1              Other than discussing the issue of rest

2    breaks and lunch breaks with Rudy and then Lucille

3    coming into the tail end of the conversation, did you

4    discuss any other issues that are presented in the

10:29:47 5    complaint, as you understand it, with any of your

6    other former co-workers at the factory outlet?

7    A.       The only other thing that Rudy and I

8    discussed -- Lucille wasn't a part of the

9    conversation -- was waiting at the door at 10 o'clock

10:29:59 10   to leave and not being able to do so because we had

11   to wait to be searched and have a manager let us out.

12   Q.       10 o'clock meaning 10 o'clock p.m., correct?

13   A.       Yes.

14   Q.       And what did you and Rudy discuss in that

10:30:15 15   regard?

16   A.       Just how we were tired of having to do it.

17   Q.       Tired of having to do what?

18   A.       Wait every time we're supposed to leave at

19   10 o'clock, and the majority of the time we couldn't

10:30:26 20   because there wasn't anybody available to let us

21   leave.

22   Q.       Anything else you recall discussing with

23   Rudy or Lucille?

24   A.       No.

10:30:40 25   Q.       Other than co-workers in your -- in the

                                                                    27

1    Cabazon outlet store, have you had conversations with

2    any other employees of Polo's factory outlet stores

3    regarding issues in this case?

4    A.    No.

10:30:52 5    Q.    Have you been to any other Polo factory

6    outlet stores?

7    A.    No.

8    Q.    Do you know how many other factory outlet

9    stores Polo maintains in the State of California?

10:31:05 10    A.    I believe there are at least two or three

11    others.  I know there's Camarillo and then there are,

12    I think, a couple up this way.

13    Q.    As part of your role in this case, have you

14    made any steps to understand the practices with

10:31:23 15    regard to rest breaks and lunch breaks in stores

16    other than the Cabazon outlet store?

17    A.    No.

18    Q.    Have you made any steps to learn how the

19    loss prevention searches are conducted at the end of

10:31:37 20    the business day at any store other than the Cabazon

21    factory outlet store?

22    A.    No.

23    Q.    Do you know the physical layout of any of

24    the other factory outlet stores owned by Polo in the

10:31:52 25    State of California?

28

```
 1    A.        No.

 2    Q.        With regard to Rudy, do you know what

 3    department he worked in when you two overlapped?

 4    A.        Men's.

 5    Q.        He worked in men's.  And how about Lucille?

 6    A.        She was a cashier.  Excuse me.

 7    Q.        And if I understand correctly -- can I call

 8    you Renee?

 9    A.        Sure.

10    Q.        Thank you.

11              Renee, you started as a cashier in Cabazon;

12    is that correct?

13    A.        Yes.

14    Q.        And did you -- was your position that of a

15    cashier during the entire time you worked at Polo or

16    did that position change?

17    A.        I was -- it remained the same.  But I did do

18    other duties or worked in different departments, but

19    my primary position was cashier.

20    Q.        And so primarily you functioned as a

21    cashier, which -- can you tell me -- just describe

22    for me generally what you did as a cashier.

23    A.        Rang up merchandise, you know, bagged it and

24    gave it to the customers, took e-mail orders and

25    phone orders.
```

10:32:07 5
10:32:1710
10:32:2715
10:32:4420
10:33:0325

29

1    each day what time that your break -- what time your

2    rest break was expected to be and what time your

3    lunch break was expected to be?

4    A.        Yes.

11:00:35 5    Q.        And then how would you go about -- you're

6    working, let's just say, a 12:00 to 9:00 shift.  And

7    how -- let's say your -- you saw a schedule, oh, I'm

8    supposed to get a break at 2 o'clock.  How would you

9    go about taking that break?

11:01:00 10    A.        I would ask whoever was in charge that day

11    if it was okay for me to take my break at that time.

12    Q.        And -- and what did you understand the

13    variables were as to whether you were going to be

14    able to take your break at that time or not?

11:01:18 15    A.        It depended on how busy the store was, if

16    there was enough available coverage.

17    Q.        And during the totality of your employment

18    at Polo, is it your contention that you did not get

19    all the rest breaks that you were entitled to take?

11:01:44 20    A.        Yes.

21    Q.        And how would I -- how would you -- or have

22    you calculated how many rest breaks you missed?

23    A.        That -- that would depend on whether we're

24    talking about the seasonal time when it's extremely

11:02:00 25    busy as compared to the other, say, seven months out

52

1    of the year when it's just basic, everyday traffic.

2    Q.        Okay.  You've used the phrase "seasonal."

3    Were there periods that you considered seasonal and

4    busier than the regular times?

11:02:15 5    A.        Oh, absolutely.

6    Q.        And can you tell me when those were?

7    A.        Say, from the end of October through maybe

8    the first week or two of January.

9    Q.        Okay.  Was that -- any other times that you

11:02:35 10    would have -- you would identify as seasonal?

11    A.        No.

12    Q.        Okay.  And so what I'm trying to understand

13    is, is you -- one of the issues in this lawsuit that

14    you've contended is that you missed your scheduled

11:02:59 15    rest breaks.  And I'm trying to understand how many

16    of those rest breaks you believe you missed during

17    the term of your employment and how you would go

18    about calculating that.

19    A.        Well, during the seasonal position when it's

11:03:13 20    really busy, I'd say if I worked five days out of the

21    week, at least four of those days I would miss at

22    least one of my breaks.  And there have been a couple

23    of occasions where I didn't even get one.  However, I

24    did get the lunch.  But the scheduled breaks I wasn't

11:03:32 25    allowed to take because it was just too busy and

53

1    there was not enough coverage in the store.

2    Q.        So if I understand correctly, you would

3    estimate that during the -- call it a seasonal

4    time --

11:03:42 5   A.        Okay.

6    Q.        -- the last part of October to the first

7    part of January, if you worked a full five-day --

8    strike that -- if you worked a five-day period, you

9    missed at least one of your breaks four of those five

11:03:56 10  days?

11   A.        Yes.

12   Q.        And the reason for that was because there

13   was just too much business?

14   A.        Yes, and not enough coverage for it.

11:04:12 15  Q.        Not enough coverage at the cashier's stand

16   or not enough coverage in the store in general?

17   A.        In the store in general.

18   Q.        Do you have any personal knowledge as to

19   whether other people who worked at the Cabazon store

11:04:25 20  during this seasonal period, other than perhaps Rudy

21   and Lucille, missed the same number of rest breaks

22   during the seasonal period that you did, assuming the

23   same parameters of a five-day workweek?

24   A.        Yes.

11:04:45 25  Q.        And how would you go about estimating that?

54

1    A.        I would say it was pretty much the same as

2    me.

3    Q.        And what do you base that on?

4    A.        Conversations with other employees, because,

11:04:59 5   you know, some of us would smoke and it's time to go

6    on our break, and so the gist of the conversation

7    was, "Man, I'm dying for a cigarette because I didn't

8    get a chance to take my break."  Just little comments

9    like that.

11:05:11 10  Q.        Do you know how many people worked on any

11   particular shift during the seasonal period?

12   A.        Okay.  We've got six station -- I want to

13   say 20 to 30.

14   Q.        And of -- how many of those 20 to 30 during

11:05:32 15  this normal shift would have, from your experience,

16   missed at least one rest break?

17   A.        At least half, if not more.

18   Q.        I think you indicated, but I want to make

19   sure I understood it correctly, that regardless of

11:05:54 20  the season, meaning the busier time versus the

21   regular time, when you worked a shift that entitled

22   you to a lunch break, you got your lunch break?

23   A.        Most of the time, yes.

24   Q.        And departing from the heavier time, the

11:06:13 25  latter part of October to the first part of

55

1    January --

2    A.        Uh-huh.

3    Q.        -- the other seven months, when you worked a

4    shift that entitled you to a rest break, can you tell

11:06:23  5    me in general whether you were able to take those

6    rest breaks?

7    A.        I'd say maybe three-quarters of the time,

8    yes.

9    Q.        What do you base that estimate on?

11:06:39 10    A.        Can you rephrase that, please?

11    Q.        Sure.  We're talking now -- I think you

12    described it as roughly the seven other months of the

13    year when it was not this high season.  When you --

14    in your workday, you -- if I'm understanding

11:06:57 15    correctly, you said about three-quarters of the time

16    I got my rest breaks and about a quarter of the time

17    I didn't.  Is that right?

18    A.        Right.

19    Q.        And I think you said earlier when we were

11:07:06 20    talking about the season, you were -- you said I

21    would miss one of my rest breaks, not both of them;

22    is that right?

23    A.        There were times I would miss one.  I know

24    for a fact the two days after Thanksgiving and

11:07:23 25    Christmas you really just didn't even get them.  You

                                                              56

1    would get your lunch, but you wouldn't get your

2    breaks at all.

3    Q.        Other than the few days following

4    Thanksgiving and Christmas where you said you

11:07:38 5    generally wouldn't get your breaks at all, is that

6    your testimony?

7    A.        I'm sorry?

8    Q.        Other than your lunch break.

9    A.        Could you repeat that again?

11:07:45 10    Q.        I sure can.   I sure can.

11              I'm trying to understand just the frequency

12    that you contend you missed your rest breaks.   And

13    focusing on the -- what we are calling the seasonal

14    area -- the seasonal time, I thought your testimony

11:08:03 15    was that if I worked a five-day -- if I worked in any

16    five-day period, for four of those days I would miss

17    at least one.   That's what I wrote down.   Is that --

18    A.        That's correct.

19    Q.        Okay.   And I take it the other day you would

11:08:20 20    get both of them, other than the Thanksgiving,

21    Christmas crunch where you said I just didn't get my

22    breaks at all?

23    A.        Right.

24    Q.        Those would be rest breaks, but did you get

11:08:29 25    meal breaks?

                                                        57

1    A.      Yes.

2    Q.      Okay.  Now, focusing on the other period of

3    time, the regular time.

4    A.      Okay.

11:08:36 5    Q.      I understood your testimony to be that about

6    three-quarters of the time I got both my rest breaks

7    and my meal break, but for about a quarter of the

8    time I missed at least one break.  Is that what

9    you're saying?

11:08:50 10    A.      Yes.

11    Q.      Okay.  These -- where the schedule for the

12    day was posted, was that only posted in one place or

13    were they posted in multiple places in the store?

14    A.      The main schedule was posted in the back by

11:09:36 15    the office door.  And then they took that, and that's

16    where they made the daily schedule, which was on a

17    clipboard up at the cash registers.

18    Q.      And how many cash registers were there?

19    A.      Six, I believe.

11:09:54 20    Q.      Were you normally stationed at -- on the

21    days you worked, did you normally work the same cash

22    register or did you rotate?

23    A.      They rotated.

24    Q.      At the time that you became a permanent

11:10:56 25    part-time employee, did you understand one way or

58

```
 1    A.        Yes.

 2    Q.        Since you left the employ at the Cabazon

 3    store, have you sought to become re-employed with

 4    Polo in any company -- in any position or any store?

01:42:40 5    A.        No.

 6              MR. GOINES:   I'm going to have marked as our

 7    next exhibit, which will be 549, a two-page document

 8    that appears to be in handwritten form.   And it is

 9    Bates Polo 1758.

01:43:02 10              (Exhibit 549 was marked for

 11              identification.)

 12    Q.        BY MR. GOINES:   Ms. Davis, is this document

 13    in your handwriting?

 14    A.        No.

01:43:26 15    Q.        Do you recognize the handwriting?

 16 ·   A.        Yes.

 17    Q.        And whose handwriting is it?

 18    A.        It looks like April Hicks'.

 19    Q.        Was the document that we have marked as

01:43:39 20    Exhibit 549 ever given to you to comment on by April

 21    Hicks or anyone else at the Polo Cabazon store?

 22    A.        No.

 23              MR. GOINES:   I would like to have marked as

 24    Exhibit 550 a letter addressed to Renee Davis at

01:44:03 25    1068 East Nicolet Street, Banning, from April Hicks.
```

92

```
 1    It does not bear a date, but bears production numbers

 2    Polo 1760 and 61.

 3                   (Exhibit 550 was marked for

 4                   identification.)

 5    Q.       BY MR. GOINES:  Ms. Davis, would you be kind

 6    enough to take a look at Exhibit 550?

 7    A.       Okay.

 8    Q.       Okay.  Do you recall receiving this letter?

 9    A.       Yes.

10    Q.       And the second sentence refers to an

11    August 14th -- it has a reference to August 14th.

12    Would this have been, obviously, August 14th, 2003?

13    A.       I'm sorry, could you repeat that?

14    Q.       I sure can.

15             The second sentence of this letter states

16    that, "On the 14th of August, Herb Rafetto and I

17    administered a first written warning to you on time

18    and attendance."

19             Does this refresh your recollection that in

20    the middle part of August 2003 you received a written

21    warning regarding your attendance?

22    A.       Yes.

23             MR. GOINES:  I'm going to have marked as

24    Exhibit 550 a document entitled, "Polo Ralph Lauren

25    Factory Stores Performance Discussion Recap."
```

01:44:30 (line 5)
01:44:43 (line 10)
01:45:00 (line 15)
01:45:14 (line 20)
01:45:29 (line 25)

93

1              MR. KITCHIN:  That would be 551.

2              MR. GOINES:  Did I misspeak again?

3              MR. KITCHIN:  Yeah.  It's after lunch.

4                   (Exhibit 551 was marked for

01:45:50  5               identification.)

6    Q.      BY MR. GOINES:  Ms. Davis, Exhibit 551

7    appears to be a form.  And there's a signature next

8    to "Employee Signature," and I wanted to ask if that

9    is your signature?

01:46:06 10   A.      Yes.

11   Q.      And you signed this on or about August 10,

12   2003?

13   A.      Yes.

14   Q.      And this appears -- appears to be -- there's

01:46:18 15   a check mark in the upper portion of this document

16   entitled -- where it's a check next to the phrase

17   "First Written Warning."  And then it says, "Incident

18   or Performance Issue," and there's a description

19   where it states, "Renee has 16 instances since the

01:46:37 20   31st of March where she has either been sick, has not

21   had a ride, or had a personal issue."

22          Do you recall having a discussion with Herb

23   Rafetto and April Hicks regarding this performance

24   issue mentioned in Exhibit 551?

01:47:01 25   A.      Yes.

                                                      94

1    Q.        And what do you recall them saying to you

2    with regard to the reason that you were being

3    provided with a written warning?

4    A.        The reason why?

01:47:12 5    Q.        Yes.

6    A.        I believe because they were excessive

7    absences.

8    Q.        Did you -- did you disagree with the -- with

9    the -- the statement made on Exhibit 551 that you had

01:47:33 10    16 absences since March 31st where you had been sick,

11    did not have transportation or had a personal issue?

12    A.        Do I disagree with it?

13    Q.        Did you disagree with it at the time?

14    A.        No.

01:48:03 15    Q.        Do you recall the discussion with April and

16    Herb at the time this Performance Discussion Recap

17    was provided to you?

18    A.        No.

19    Q.        Do you recall asking either Herb or April

01:48:27 20    what information they based the conclusion on that

21    you had had these absences referenced in Exhibit 551?

22    A.        No.

23    Q.        What -- what did either Renee -- excuse me,

24    what did either April or Herb tell you you needed to

01:48:51 25    do to avoid further discipline?

95

1    A.        To try to make it to work when scheduled,

2    and if I can't come in, call the two hours ahead of

3    time that they would like for you to call in in order

4    to get coverage for you.

01:49:08 5    Q.        Did you consider this performance issue a

6    serious one?

7    A.        No.

8    Q.        And why not?

9    A.        Because I had explained to them prior to

01:49:27 10   them hiring me that my husband has cancer, I have an

11   asthmatic child, and this is after me coming back

12   from a car accident. And I had provided them with

13   doctor's notes, but they would schedule me the day

14   after -- if a note took me off to like a certain day,

01:49:44 15   and then they would still put me on the schedule the

16   next week. And I'd already explained to them, well,

17   after this date I have to go back to be checked to

18   see if I am able to go to work.

19   Q.        So is it your -- is it your recollection

01:49:59 20   that you were -- well, let me back up.

21            If I understood your testimony a moment ago,

22   you didn't disagree that you had the absences as

23   noted on this -- on Exhibit 551, correct?

24   A.        Correct.

01:50:16 25   Q.        But is it your testimony that you felt

                                                    96

1    can do.  I'm not physically able to return back to

2    work."

3              Then I had a couple of deaths in the family

4    also, so I had to provide newspaper articles, death

01:51:25 5    certificates, things like that.

6    Q.        So you felt that their -- their -- you felt

7    this performance or written warning was not deserved?

8    A.        Well, I'm sure it was deserved because it is

9    excessive.  But my point to them was they were aware

01:51:49 10    that this was going to happen.  I mean, it's more

11    excessive than I thought, too, because I had the car

12    accident.  But, you know, I told them that my husband

13    is going through chemotherapy, these types of things.

14    And if I need to call off when it's scheduled, I'll

01:52:02 15    let you know as soon as I know.  And that was about

16    all I could do.

17    Q.        Okay.  Taking a look at Exhibit 550, please,

18    I think it's the letter.

19    A.        Okay.

01:52:19 20    Q.        Did this letter -- was this -- this letter

21    appears to be after the Performance Discussion Recap

22    just because it appears to refer to dates that are

23    dated after the August 10, 2003.

24              And do you recall receiving this letter at

01:52:39 25    your home?

                                                          98

| | |
|---|---|
| 1 | A.        Yes. |
| 2 | Q.        Okay.  Do you recall responding to this |
| 3 | letter? |
| 4 | A.        No. |
| 01:53:04 5 | MR. GOINES:  Let me -- I'm going to come |
| 6 | back to this letter in a minute. |
| 7 | But let me have marked as Exhibit 552 a |
| 8 | document entitled, "Performance Discussion Recap," |
| 9 | bearing the date -- bearing the production number |
| 01:53:23 10 | 1767. |
| 11 | (Exhibit 552 was marked for |
| 12 | identification.) |
| 13 | Q.        BY MR. GOINES:  Ms. Davis, I note that |
| 14 | Exhibit 552 has not been signed by anyone. |
| 01:53:55 15 | Do you recall being provided with a copy of |
| 16 | Exhibit 552 at any time prior to taking a look at the |
| 17 | personnel file that Polo provided to Mr. Kitchin? |
| 18 | A.        I never received this. |
| 19 | Q.        Okay. |
| 01:54:26 20 | A.        It actually is dated a week apart. |
| 21 | Q.        If I could ask you again to focus your |
| 22 | attention on 552. |
| 23 | A.        Okay. |
| 24 | Q.        There's a reference to -- under the heading |
| 01:54:41 25 | "Summary of Previous Discussions," it says, "On |

99

1    A.       Yes.

2    Q.       And can you tell me what you recall

3    discussing with her about that?

4    A.       That, once again, I explained to her that

01:58:33 5   just because I was taken off until that period of

6    time, I would need to go back for a follow-up checkup

7    to make sure I could go back to work and to also get

8    the medical release which they requested me to get.

9    Q.       And did you obtain that?

01:58:50 10  A.       Yes.

11   Q.       And April seems to suggest in this letter

12   that if you don't show up on the 26th, you're going

13   to be fired.  Did that happen?

14   A.       No.

01:59:02 15  Q.       Did you understand it didn't happen because

16   April understood your explanation of needing to get a

17   further release from your physician?

18   A.       I was never given an explanation one way or

19   another.  I just know it never happened.

01:59:21 20           MR. GOINES:  I would like to have marked as

21   our next exhibit, which will be 553, a document

22   entitled, "Performance Discussion Recap," bearing the

23   date February 7, 2004.

24                     (Exhibit 553 was marked for

01:59:32 25                     identification.)

102

1    Q.      BY MR. GOINES:  Ms. Davis, is this a

2    document that was presented to you on or about

3    February 7th, 2004?

4    A.      Yes.

02:00:06 5    Q.      And do you recall who presented this to you

6    for signature?

7    A.      Probably April.

8    Q.      The upper portion of this document says

9    discussion initiated by A. Hicks and H. Rafetto.

02:00:21 10    Does that in any way assist in refreshing

11    your recollection as to whether both April and Herb

12    presented this to you or --

13    A.      Yes.

14    Q.      Okay.  So you think it was both?

02:00:30 15    A.      Yes.

16    Q.      Okay.  Under the summary -- under the

17    heading "Summary of Previous Discussions," it states,

18    "Renee received a first written warning for time and

19    attendance in August 2003.  Since then she has had

02:00:57 20    numerous attendance problems and has been counciled

21    on her actions."

22    My question to you is, do you recall,

23    following the first written warning in August, having

24    discussions with either April or Herb regarding your

02:01:09 25    attendance issues?

103

```
 1    A.       Yes.

 2    Q.       And on how many occasions do you recall

 3    having discussions with April and Herb regarding your

 4    attendance between August '03 and February of '04?

02:01:22 5    A.       Actually, they really didn't start until

 6    Black Friday, the day after Thanksgiving.

 7    Q.       And you refer to Black Friday because

 8    that's --

 9    A.       That's just what they call it.  In retail,

02:01:35 10   that's what they refer it to.  It's supposed to be

11    the worst shopping day of the year, whatever.

12    Q.       Gotcha.

13    A.       Because I had my accident on Thanksgiving.

14    So the next day I reported to work, and they could

02:01:48 15   clearly see that I was not able to work.  I explained

16    to them what had happened.  They sent me home.

17          And I had asked to be removed off of the

18    schedule.  She had some issues with it.  And we kind

19    of exchanged words because she wasn't understanding I

02:02:06 20   was just in a car accident.  I know it's Black

21    Friday, but I can't be there.

22          And then she reminded me of our previous

23    conversation.  And at that point, you know, I didn't

24    care.  I said, "My health is more important to me.

02:02:19 25   If you can't understand that, I don't know what to
```

104

1    tell you."

2    Q.        Other than the occasion of the discussion

3    with April on this -- on the -- on the Black Friday,

4    had you had any other discussions with her between

02:02:37 5    August and February regarding your attendance-related

6    issues?

7    A.        The only ones I recall are, if I were

8    absent, being told sarcastically, "Well, you know you

9    need a doctor's note."

02:03:04 10   Q.        Under the heading of this particular

11   exhibit -- we're looking at 553 -- "What is the

12   Action Plan," was that action plan on this document

13   prior to your signing it?

14            In other words, it says, "Renee understands

02:03:22 15   that as of Today, 2-7-04, she is on final written

16   warning for time and attendance," and it goes on to

17   describe certain conditions.

18            My question to you is, was that typing on

19   Exhibit 553 at the time you signed it?

02:03:38 20   A.        Yes.

21            MR. GOINES:  I'm going to have marked as our

22   next exhibit, Exhibit 554, a one-page letter bearing

23   the date February 28, 2004.

24            (Exhibit 554 was marked for

02:03:57 25            identification.)

                                                            105

# EXHIBIT 13

**to Declaration of William J. Goines in Opposition to
Plaintiffs' Motion for Class Certification**

3·31·03 (10-7) sick
4·5·03 (12-9) went home @ 4:06 sick
4·8·03 (10-4) personal Bssues
4·10·03 (10-4) husband sick
4·11·03 (10-4) husband to Dr
4·13·03 (2-6) car trouble
5·4·03 (2-6) call out / family
5·5·03 (11-3) call out to Will / can't come in
5·15·03 (11-4) sick — crying because of Dad
5·20·03 (3-7) personal
6·3·03 (11-8) sick
5·19·03 (3-8) no show
6·14·03 (4-11) sick kid
6·15·03 (12-5) personal — father's day
6·22·03 (12-5) no ride
6·25·03 (12-5) came in later (tooth problem)
7·2·03 (12-5) sick
7·7·03 (12-8) went home @ 7 — tooth pain
7·10·03 (12-9) sick
7·11·03 (1-10) husband Dr
Called out and said she might be out for
husbands Dr problem — never called back
7·12·03 (12-9) No Show No Call
7·13·03 (11-5) No show
Called on Monday to say she did not check schedule
for shifts and will be out sick Mon + Tues for
sick — DR NOTE — exhaustion / dehydration
7·20·03 — (11-5) grandparent died  (5.5)
7·25·03 — (1-10)                      8
7·26·03 — (12-5)                      5
7·30·03 — (12-5) call out
7·27·03 — (11-8) NO SHOW
8·1·03 — (3-11) sick

Exhibit No. 599
Date: 3/19/08
Witness: DAVIS
Iris M. Smith, CSR 3796

POLO 01758

| | |
|---|---|
| 8·16 | (12-9) called at 11:10 — sick headache |
| 8·15 | (2-11) clocked out at 3:45 — would not finish shift |
| 10·23 | (11-8) called said 2-10 called @ 3³⁰ family emergenc |
| 10·20 | (10-5) came @ 10:30 |
| 11· 6:03 | (% 12-9) No Call |
| 11·17.03 | (% 12-9) No Call |
| 11·30 | 8-5 |
| 12·1 | 4-9³    Back pain — Dr Note |
| 12·3 | 4-9³ |
| 12·6 | 12-5³    No Show |
| 12·7 | 2-7 —  No Note to return |
|  | Received Note  worked on ¹²/₁₂  1 hr |
| 12·13 | 2-7 No Show |
| 12/18 | 5-9 sick |

POLO 01759



# POLO RALPH LAUREN
### F A C T O R Y   S T O R E

Renee Davis
1068 E. Nicolet St
Banning, Ca 92220

Dear Renee,

In reference to our conversation on Friday, I wanted to further discuss with you our position on your attendance. On the 14th of August, Herb Rafetto and I administered a first written warning to you on time and attendance. During that conversation, we all agreed that if you were to have another absence, you would need to bring in a doctor's note excusing you, otherwise you would be served with a final written warning. On the 15th of August 2003, you were scheduled to work 2p-11p. At approximately 3:45pm, you decided to clock out and go home due to what you called a migraine. You refused to finish your shift. On the 16th of August 2003, you were scheduled to work 12p-9p. You called up at 11:10 to say that you would not be in due to migraine. At this time, I informed you that as per our agreement, you would need to bring in a doctor's note to excuse your absence, or I would be serving you with a final written warning. You did not provide me with a note until the 5th of September 2003. The note stated that you get migraines, but was unclear as to what, if any, limitations you have for working, and if you were suffering from migraines for the time that you missed work. You and I conversed about this note and its vagueness, at which time you asked me if you could just take the final written warning and return to work. I responded that I would run it by Human Resources, but my initial response was that it would probably be OK. After speaking with Human Resources, I wrote up a final written warning for you on time and attendance, planning to serve it to you upon your next shift. However, you then proceeded to ask for 2 weeks off to work the local supermarket strike. I agreed to this, as the business was in a slow period. I have not seen you since this time, and your final written warning is still pending.

At this time, since our conversation on Friday the 16th, you have stated that you are ready to return to work on the 26th. Your Doctor's note is through this date. Please return to work on Monday the 26th of January at 12pm for a 12p-5p shift. At that time, I will be administering your final written warning that is still pending for time and attendance. If



Exhibit No. 250
Date: 3/19/08
Witness: Davis
Iris M. Smith, CSR 3756

DESERT HILLS PREMIUM OUTLETS
48650 SEMINOLE ROAD, SUITE 178, CABAZON, CA 92230
TEL: 909-849-8446 • FAX: 909-849-3426

POLO 01760



# POLO RALPH LAUREN
### F A C T O R Y   S T O R E

you are unable to return to work on the 26th of January, you will be terminated. If you have any questions on this matter, please feel free to contact me at 909-849-8446. If I am unavailable, please contact Bridget O'Brien in Human Resources at 1-800-578-7656.

Sincerely,

April Hicks
HR Manager
Polo Ralph Lauren
909-849-8446

POLO RALPH LAUREN FACTORY STORES
## PERFORMANCE DISCUSSION RECAP

| Employee: | Renee Davis | | 65 |
|---|---|---|---|
| Discussion Participants: | | A. Hicks, E. Radke | |
| Discussion initiated by: | A. Hicks, E. Radke | | Date: 8-10-03 |

**Check one:**

☐ **Progress Discussion\*** — Development guidance, training, directional, or coaching
☐ **Disciplinary Discussion\*** — Specific performance not consistent with company expectations
☑ **First Written Warning\***
☐ **Final Written Warning\*** — Violation of company regulations/policies or severe/continuing performance not consistent with company expectations
☐ **Termination** — Violation of company regulations/policies or severe/continuing performance not consistent with company expectations
  Severe violation of company regulations/policies or failure to show significant improvement in areas of concern.
  \* *Management should present training recommendations and clarify goals, policies, and expectations.*

### Incident or Performance Issue:

Renee has 16 instances since the 31st of March where she has either been sick, has not had a ride, or had a personal issue. The dates are as follows:   4-5, 4-8, 4-13, 5-4, 5-15, 6-3, 6-14, 6-15, 6-22, 8-25, 7-2, 7-7, 7-10.  On 7-12 and 7-12, Renee was scheduled to work. She called on Monday the 14th, to say that she did not check her schedule and that she was exhausted from being at the hospital with her husband. On 7-27, Renee did not show up for work again. On 7-30 and 8-1, Renee called out sick.

### Impact on Business:

When a cashier does not show up for a scheduled shift, this causes the wait for customers to check out to increase.  It causes the floor employees to have to cover the cash wrap, which in turn causes less customer service on the sales floor.  This causes the store to lose business and affects the profitability.

### Summary of Previous Discussions:

n/a

### What is the Action Plan?

Renee must show up for all scheduled shifts.  The employee hand book only allows for 6 absences in one calendar year.  If Renee can not make a shift, she must call in and speak to a manager no later than 2 hours before her shift or as soon as possible thereafter.  Renee understands that if she has any further absences, she must get a doctor's note.  If further violations in attendance occur, further corrective action will follow.

If this is a goal-setting discussion, please note the follow-up time frame and attach specific goals.
☐ 1 month          ☐ 2 months          ☐ 3 months          ☐ Other

What is the next step if performance/behavior is not corrected?
☐ Disciplinary Discussion    ☐ First Written Warning    ☑ Final Written Warning    ☐ Termination
Follow-up meetings will occur:    ☐ Weekly          ☐ Monthly          ☐ Other

### Employee's Comments
*(attach additional sheet if necessary)*

*I sorry for the inconvience   Rene Davis*

I have read this document and have been given an opportunity to comment. I understand that failure to improve my performance or the occurrence of additional incidence(s) of unsatisfactory performance or violations of company policies will result in further corrective action, up to and including termination.

| Employee Signature: | *Renee Davis* | Date: | 8-10-03 |
|---|---|---|---|
| Supervisor's Signature: | *E. Radke* | Date: | 8-10-03 |

Copy: Employee          Copy: Employee File

Exhibit No. 551
Date: 3/19/08
Witness: DAVIS
Iris M. Smith, CSR 3798

Copy: Corporate Human Resources

POLO 01766

POLO RALPH LAUREN FACTORY STORES
## PERFORMANCE DISCUSSION RECAP

| Employee: | Renee Davis | 65 |
|---|---|---|
| Discussion Participants: | A. Hicks, H. Rafetto | |
| Discussion Initiated by: | A. Hicks, H. Rafetto | Date: 2-7-04 |

**Check one:**

☐ Progress Discussion*  — Development guidance, training, directional, or coaching
☐ Disciplinary Discussion*  — Specific performance not consistent with company expectations
☐ First Written Warning*  — Violation of company regulations/policies or severe/continuing performance not consistent with company expectations

☑ Final Written Warning*  — Violation of company regulations/policies or severe/continuing performance not consistent with company expectations
☐ Termination  — Severe violation of company regulations/policies or failure to show significant improvement in areas of concern.

*  Management should present training recommendations and clarify goals, policies, and expectations.

### Incident or Performance Issue:

Renee has excessive absences on her attendance record. See Attached

### Impact on Business:

When an associate can not show up for a scheduled shift, this causes a lack of sales floor coverage. This can negatively impact the store's sales.

### Summary of Previous Discussions:

Renee received a first written warning for time and attendance in August 2003. Since then she has had numerous attendances problems and has been councled on her actions.

### What is the Action Plan?

Renee UNDERSTANDS that as of Today, 2-7-04, she is on final written warning for time and attendance. Renee must not be late for any shifts. Renee understands that she must call in and speak to a manager at least 2 hours prior to her shift if she can not come in. She understands that if she is can not make a shift due to illness, she must obtain a Dr.'s note. She will not be allowed to return to work without one. If she is unable to provide a Dr.'s note, Renee will be terminated. If any further violations of time and attendance occur, Renee will be terminated. This will serve as final notice.

If this is a goal-setting discussion, please note the follow-up time frame and attach specific goals.
☐ 1 month          ☐ 2 months          ☐ 3 months          ☐ Other _____
What is the next step if performance/behavior is not corrected?
☐ Disciplinary Discussion    ☐ First Written Warning    ☐ Final Written Warning    ☑ Termination
Follow-up meetings will occur:    ☐ Weekly    ☐ Monthly    ☐ Other

### Employee's Comments
(attach additional sheet if necessary)

I have read this document and have been given an opportunity to comment. I understand that failure to improve my performance or the occurrence of additional incidence(s) of unsatisfactory performance or violations of company policies will result in further corrective action, up to and including termination.

| Employee Signature: | _(signature)_ | Date: | 2-7-04 |
|---|---|---|---|
| Supervisor's Signature: | _(signature)_ | Date: | 2-7-04 |

Exhibit No. 5-3
Date: 3/19/08
Witness: Davis
Iris M. Smith, CSR 7786

Copy: Employee          Copy: Employee File          Copy: Corporate Human Resources

POLO 01757