Patrick R. Kitchin, Esq. (SBN. 162965)
**THE LAW OFFICE OF PATRICK R. KITCHIN**
565 Commercial Street, 4th Floor
San Francisco, CA 94111
Telephone: 415-677-9058
Facsimile: 415-627-9076

Nancy E. Hudgins, Esq. (SBN. 85222)
Matthew M. Grigg, Esq. (SBN 195951)
**LAW OFFICES OF NANCY E. HUDGINS**
565 Commercial Street, 4th Floor
San Francisco, CA 94111
Telephone: 415-979-0100
Facsimile: 415-979-0747

Attorneys for Plaintiffs
Janis Keefe, Corinne Phipps, Renee Davis
And the Certified Plaintiffs' Class

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| ANN OTSUKA, an individual; JANIS KEEFE, an individual; CORINNE PHIPPS, an individual; and RENEE DAVIS, an individual; individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>vs.<br><br>POLO RALPH LAUREN CORPORATION; a Delaware Corporation; POLO RETAIL, LLC., a Delaware Corporation; POLO RALPH LAUREN CORPORATION, a Delaware Corporation, doing business in California as POLO RETAIL CORP; and FASHIONS OUTLET OF AMERICA, INC.,<br><br>Defendants. | Case No.: C-07-02780-SI<br><br>DECLARATION OF DWIGHT D. STEWARD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO POLO'S MOTION IN LIMINE 1<br><br>Pretrial: February 23, 2010<br>Time: 3:30 p.m.<br><br>Trial Date: March 8, 2010<br>Time: 8:30 a.m.<br><br>Place: Courtroom 10 (19th Floor)<br>Judge: Hon. Susan Illston |

---

*Otsuka, et al. v. Polo, et al.*                                                                     Case No. C-07-02780-SI
DECLARATION OF DWIGHT D. STEWARD, PH.D.
1

I, Dwight D. Steward, Ph.D., declare:

1. I have been retained by Plaintiffs' counsel in this case to provide expert witness services, including the design, dissemination, and analysis of a random survey of the plaintiffs' class. I make this declaration based on personal knowledge and render opinions based on my education, training, and experience in survey and statistical methods.

2. I have been asked by the plaintiffs' counsel to provide a declaration in response to the defendants' motion in limine to exclude portions of my testimony related to the plaintiffs' wage and hour class action questionnaire. In the motion in limine, the defendants argue that the plaintiffs' survey is not in line with generally accepted scientific statistical survey principles. It is my opinion that the defendants' motion in limine misrepresents the plaintiffs' survey and misstates the underlying scientific principles that the plaintiffs' survey is based upon.

3. As discussed below, the plaintiffs' survey is reliable and is based on sound scientific principles that are consistent with the peer reviewed literature in the scientific community. Throughout the motion, the defendants argue that the plaintiffs' survey was not conducted in accordance with principles that are generally discussed in several legal cases, The Federal Judicial Center's Reference on Scientific Evidence ('Reference on Scientific Evidence'), and a couple of academic research papers. Specifically, the defendants state that generally accepted principles regarding surveys dictate that "a proper universe must be examined and representative sample must be chosen, the persons conducting the survey must be experts, the data must be properly gathered and accurately reported."

4. The plaintiffs' survey meets all of these guidelines. As stated in the Reference on Scientific Evidence referred to by the defendants, "the use of probability sampling techniques maximizes both the representativeness of the survey results and the ability to assess the accuracy of the estimates obtained from the survey." As discussed in my report and at my deposition, generally accepted random probability sampling techniques, as described in the Reference on Scientific Evidence, were utilized to select a sample of individuals to survey.

5. Further, as described in the defendants' reference sources, I used standard and generally accepted statistical procedures to determine if the individuals included in the survey sample were

representative of the overall population of class of the former employees. These statistical tests included comparing individual characteristics such as hourly wage rates, hours worked, store locations, and job tenures of the individuals that were included in the random sample to the individuals in the overall population of the class of former employees. The tests show that the randomly selected individuals in the survey sample are representative and statistically equivalent to the individuals in the overall population of former employees.

6. Additionally, the data relied upon in the survey was "properly gathered and accurately reported." In the analysis, multiple audits were used to insure that survey data was properly collected and entered. In addition, statistical standard errors and confidence intervals were constructed and reported in the analysis. As is well established in the scientific community, standard errors and confidence intervals are used to assess the reliability, validity, and statistical significance of the plaintiffs' survey results. (See The Federal Judicial Center's Reference on Scientific Evidence, p. 239-244)

7. The statistical tests showed that the standard errors associated with the survey responses were small and the results were statistically significant. In the current setting, small standard errors and statistically significant results mean that the survey can reliably be used to project the survey's findings to the overall population of class members. (See for example Modern Business Statistics, Anderson, Sweeney, Williams, 2003) The sampling methodology and survey construction is consistent with the survey literature. (See for example: Mail and Internet Surveys, The Tailored Design Method, Don Dillman, 2007, Sampling of Populations, Levy and Lemeshow, 2008)

8. As an economist, I have experience in the construction and use of survey data. I have been involved in the administration and analysis of numerous surveys in both wage and hour litigation and in non-litigation settings. As a full-time faculty member of the economics department at the University of Texas at Austin for approximately six years, I taught dozens of statistics courses that dealt with the use, administration, and analysis of statistical surveys.

9. My professional research routinely utilizes statistical survey data. I have designed, administered and analyzed surveys of approximately 1,600 law enforcement agencies in Texas concerning racial profiling, and police officers' critical knowledge, beliefs, attitudes and practices

on behalf of the NAACP, the Texas Criminal Justice Coalition and other national organizations. Law enforcement agencies across Texas have relied on this survey research to gain an understanding of racial profiling in their communities and to improve community relations in critical neighborhoods across Texas.

10.    The defendants further suggest that the survey is flawed because the Reference on Scientific Evidence states that " ...the survey must be conducted independently of the attorneys involved in the litigation."   The defendants' assertion is inappropriate and misstates the referenced document.  In fact, the Reference on Scientific Evidence manual states  "An early handbook for judges recommended that survey interviews be conducted independently of the attorneys in the case....However, some attorney involvement in the survey design is necessary to ensure that relevant questions are directed to a relevant population"  Id. p. 237 In the administration of the survey of the plaintiffs in this case, the plaintiffs' attorneys were involved to the extent required to identify the relevant population and to assist me in focusing on the relevant areas of inquiry as the Reference on Scientific Evidence describes.

11.    The defendants further state that the Survey failed to conform to generally accepted principles because the plaintiffs' survey did not include "don't know", "can't remember" or "no opinion" options. The defendants further assert that a study performed in 1991 by Scot Burton and Edward Blair suggest that potential memory recall problems by survey takers invalidates the survey results.   The defendants' assertions are based on mischaracterizations of the general discussion in the Reference on Scientific Evidence and the cited reference.

12.    The Reference on Scientific Evidence does not state, nor is it generally accepted requirement, that a 'don't know' option be included in a survey.  The discussion in the Reference, which is in regard to questions that were asked in a 1980's marketing survey of consumer's knowledge of a company's product, states that the use of a quasi-filter question like "don't know' can be used, not that it must be used.  Moreover, the nearly 20-year-old article by Scot Burton and Edward Blair that is cited by the defendants provides no meaningful insights on the wage and hour survey at issue in this case.   The article referenced by the defendants is a theoretical article that is based on a self-administered questionnaire that asked junior and senior level business majors about

the number of B grades they received and the number of courses taken outside of the College of Business at a large university.

13. There was no statistical evidence to suggest that memory recall was an actual issue in this case. In the analysis of the plaintiffs' survey, I compared the responses of the individuals by the year in which they were employed. There is no statistically significant difference between the survey responses of the individuals terminated in earlier years and those who were terminated in later years. Additionally, there were very few written comments on the questionnaires and there were no questions asked by survey takers regarding their ability to recall past rest break activity or loss prevention time delays.

14. Finally, the defendants state that the survey is invalid because the plaintiffs' response rate of 22.36% is staggeringly low. The defendants' assertion is inappropriate and unsupported by the literature. In contrast to the defendants' assertions, there is no generally accepted survey response rate threshold dictated by the statistical and economic science literature. Response rates vary across studies.

15. In some survey studies, a survey response threshold of 10% may be defined as low by researchers (See for example Working With Low Survey Response Rates, Eric Dey, 1997). In the legal case referenced in the defendants' motion, the Court appeared to define a low response rate threshold as 2.16%. Clearly, the plaintiff survey response rate of 22.36% in this case would not be viewed as low by either of these two standards.

16. In this case, there were a relatively substantial number of non-deliverable addresses uncovered in the data provided by the defendants, indicating that some surveys were actually not delivered to the class members. As result, the plaintiffs' response rate in this survey is in all likelihood understated.

17. Over the last three years, I have been involved in the analysis of surveys in 15 to 20 wage and hour cases. The response rate in this survey falls squarely within the rates I have observed in other wage and hour surveys.

18. In any event, even if the response rate was low, which it is not, it is a well-known and established principle in the scientific community, that the response rate does not by itself

invalidate a survey. The Reference on Scientific Evidence mentioned in the defendants' motion clearly states this fact. The document states: "If this lack of response were distributed randomly, valid inferences about the population could be drawn from the characteristics of the available elements in the sample." Id. p. 245.

19. The Reference on Scientific Evidence recommends guidelines by which to address the potential impact of nonresponse bias in as survey. The Reference states "Determining whether the level of nonresponse in a survey is critical generally requires an analysis of the determinants of nonresponse...The survey expert should be prepared to provide evidence on the potential impact of nonresponse on the survey results...To assess the impact of nonresponse to a particular question, the survey expert should analyze the differences between those who answered and those who did not answer". Id. p.245.

20. The statistical procedure that was utilized in the analysis of plaintiffs' survey in this case is completely consistent with the procedures suggested by the Reference on Scientific Evidence. There is no statistical evidence in the data that nonresponse bias was an issue in this case. To address the potential nonresponse bias, I compared individual characteristics such as hourly wage rates, hours worked, store locations, and job tenures of the individuals who responded to the survey sample to the individuals who did not respond to the survey.

21. The individuals who responded to the survey are statistically equivalent to those who did not respond to the survey. In other words the "lack of response" is distributed randomly so valid statistical inferences can be drawn from the sample.

I declare under penalty of perjury under the laws of the United States of America that the foregoing declaration is true and correct and that this declaration was made on February 16, 2010, in Austin, Texas.

_____

Dwight D. Steward, Ph.D.